# EXHIBIT D

EFiled: Sep 22 2017 11:05AM EDT
Transaction ID 61147673
Case No. 12111-VCS

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| THE NATIONAL COLLEGIATE STUDENT LOAN MASTER TRUST, *et al.*, | : <br> : <br> : <br> : |
| Plaintiffs, | :    C.A. No.  12111-VCS |
| v. | : <br> : |
| PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY D/B/A AMERICAN EDUCATIONAL SERVICES, | : <br> : <br> : <br> : |
| Defendant. | : <br> : |

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION <u>FOR EMERGENCY RELIEF</u>

**Dated:**  September 22, 2017

For the reasons discussed below, Plaintiff Trusts,[1] by their undersigned counsel, respectfully request that the Court grant their Motion for Emergency Relief allowing counsel for the Owners of the beneficial interests of the Trusts to execute the Notice of Default to the Special Servicer and the Notice of Default to the Administrator (collectively the "Default Documents"), as the Owners initially instructed in their Authorization and Direction Letter[2] sent to Wilmington Trust Company ("Wilmington"), pursuant to the Proposed Consent Judgment filed by the Consumer Financial Protection Bureau ("CFPB") and the Trust Agreement. Plaintiffs require this immediate relief because Wilmington refuses to carry out its duties under the Trust Related Agreements, placing the Trusts at immediate risk of potentially violating the Indenture. Copies of the default notices and the related instruction letter are attached as Composite Exhibit 1 hereto.[3]

---

[1] "Plaintiffs" or "Trusts" refers to The National Collegiate Master Student Loan Trust I, The National Collegiate Student Loan Trusts 2003-1, 2004-1, 2004-2, 2005-1, 2005-2, 2005-3, 2006-1, 2006-2, 2006-3, 2006-4, 2007-1, 2007-2, 2007-3, and 2007-4, collectively.

[2] Plaintiffs sent an initial Authorization and Direction letter on September 18, 2017, notifying Wilmington of the CFPB Proposed Consent Judgment, and findings that breaches had occurred. Plaintiffs sent a renewed Authorization and Direction letter on September 20, 2017, pursuant to communications between Plaintiffs and Wilmington, in another attempt to have Wilmington comply with Owner instructions. *See* Exhibit 2.

[3] Exhibits referenced herein are exhibits to the Affidavit of Amy E. Keller in Support of Plaintiffs' Motion for Emergency Relief, which is attached to the Transmittal Affidavit of Michael T. Manuel, filed contemporaneously herewith.

## **STATEMENT OF FACTS**

On September 18, 2017, the CFPB filed a Proposed Consent Judgment in the United States District Court for the District of Delaware, pursuant to a stipulated consent to the issuance of a consent order executed by the Trusts. *See* Composite Exhibit 3 (Stipulation and Consent to the Issuance of a Consent Order and Proposed Consent Judgment). The Proposed Consent Judgment made findings regarding the wrongdoing of several of the Trusts' Servicers.[4] Specifically, the CFPB found, that in connection with the collection of student loans, the Servicers (1) provided false and misleading affidavits and testimony; (2) provided improperly notarized affidavits; (3) filed lawsuits without the ability to prove the claims if contested; and (4) engaged in the collection of time-barred debt. Exhibit 3 ¶4.

As part of the Proposed Consent Judgment, the Trusts are required to "take all actions necessary to comply with the terms of the Order, including but not limited to ensuring that all of the [the Trusts'] Servicers acting as [the Trusts'] agents comply with the terms of the Order." Exhibit 3 ¶9. Additionally, the Trusts

---

[4] The term "Servicer" is defined by the Proposed Consent Judgment as "any Servicer, Primary Servicer, Subservicer, Administrator and any other individual or entity acting on behalf of [the Trusts] with respect to the servicing of the student loans owned by Respondents, whether retained directly by [the Trusts] or retained by an individual or entity acting on behalf of [the Trusts]." Exhibit 3 ¶7q.

2

must "require that any of the [Trusts'] Servicers or other agents retained by [the Trusts] in connection with servicing or collection of student loans (1) agree to abide by the terms and conditions of the Order and (2) require any agents that [the Trusts'] Servicers hire in connection with servicing or collection of student loans to abide by the terms and conditions of the Order."  Exhibit 3 ¶9b.

The manner by which the Trusts are able to hold their Servicers accountable for breaches of the Trust Related Agreements, including those breaches identified by the CFPB, is governed by the Indenture. Exhibit 4 (Indenture, §§ 3.07(d) and 3.18). Section 3.07(d) of the Indenture provides that:

> If the Issuer shall have knowledge of the occurrence of a Servicer Default, an Administrator Default or a Back-up Administrator Default, the Issuer shall promptly notify the Indenture Trustee and the Rating Agencies thereof, and shall specify in such notice the action, if any, the Issuer is taking with respect to such default.

Section 3.18 of the Indenture further provides that the Trusts must give the Indenture Trustee prompt written notice of each Event of Default:

> The issuer shall give the Indenture Trustee and the Rating Agencies prompt written notice of each Event of Default hereunder and each default on the part of a Servicer of its obligations under a Servicing Agreement or the Administrator of its obligations under the Administration Agreement. In addition, the Issuer shall deliver to the Indenture Trustee, within five days after the occurrence thereof, written notice in the form of an Officers' Certificate of the Issuer of any event which with the giving of notice and the lapse of time would become an Event of Default under Section 5.01(iii), its status and what

>action the Issuer is taking or proposes to take with respect thereto.

Under the Trust Agreements, the Trusts are not permitted to act on their own behalf. Exhibit 5 (Trust Agreement, §2.03(b)(i)). Although the Trusts act in their own name, "the Owner Trustee or other agents . . . act on behalf of the Trust[s] subject to the direction by the Owners. . . ." *Id.* Therefore, the Owner Trustee, Wilmington, is required to act on behalf of the Trusts, as directed by the Owners, so long as the direction is not improper under the Trust Related Agreements. Exhibit 5 (Trust Agreement, § 4.02(a)).

On September 18, 2017, in accordance with the provisions identified above, the Trusts sent Wilmington an Authorization and Direction Letter (subsequently amended on September 20, 2017). Composite Exhibit 1. The letter instructed the Owner Trustee to execute and deliver Notices of Default to the Administrator and the Special Servicer of the Trusts. *Id.* Wilmington, however, consistent with its routine refusals to follow Owner instructions, refused to follow these instructions as well.[5] By refusing to act and execute the Default Documents, Wilmington is forcing the Trusts to potentially breach the Trust Related Agreements. If

---

[5] *See* email correspondence between L. Gotthoffer, A. Levitt, and N. Caggiano, attached hereto as Exhibit 2.

Wilmington is not ordered to execute the Default Documents as required by the Trust Related Agreements, the Trusts will suffer irreparable harm including:

- Placing the Trusts at risk of immediate proceedings for the collection of all amounts payable on the Notes and/or complete or partial foreclosure of the Indenture;[6]

- The immediate sale of the Notes comprising the Indenture Trust Estate;[7] and

- Allowing for the continued engagement of the Trusts in unlawful servicing and collection activities.[8]

The CFPB has identified systemic abuses, oversight failures, and improper debt collection activities relating to the student loans comprising the Trusts' assets. These are events of default, requiring notice under the Trust Related Agreements. By refusing to execute the Default Documents even when it would be indemnified for taking actions in furtherance of the Owners' instructions, Wilmington is putting

---

[6] Indenture § 5.04(a) (noting that these events will occur at the written direction of the Interested Noteholders).

[7] *Id.*

[8] As identified in Exhibit 3, Section 3.07(b) of the Indenture provides that even though the Issuer contracts with others to assist in its duties under the Indenture, the performance of the Servicers and Administrator is deemed to be action taken by the Issuer. Thus, by preventing the Trusts from initiating default procedures against those entities, Wilmington is forcing the Trusts to continue its connection to potentially unlawful activity.

the Trusts at risk due to its own purported concerns based on an allegation by a party defending another lawsuit.

Specifically, Wilmington refuses to act because of the "ownership issue" that has been the centerpiece of this litigation. Exhibit 2 (Sept. 19 email from N. Caggiano to A. Levitt). But Wilmington's latest refusal represents the latest in a series of inconsistent positions between litigation and its ordinary business practices. Wilmington intervened in this action to "obtain instructions from the Court regarding the proper identity of the owners of the Trusts authorized to give instructions to the Owner Trustee," despite that Wilmington has sent—and continues to send—notices to the Owners characterizing them as the "Owners" of the Trusts,[9] and representing the same under oath. *See id.* (Sept. 20 email from A. Levitt to N. Caggiano). Inevitably, because Wilmington has indicated that it may very well continue refusing to follow Owner instructions even after the issue is decided,[10] the Trusts need the immediate relief sought herein.

---

[9] Most recently, as described in the September 20 email from Adam Levitt, on September 19, 2017, where Dorri Costello, a Wilmington Vice President, emailed the "Owners" of the Trusts: "NC Residuals Owners Trust, NC Owners LLC and Pathmark Associates, LLC, as Owners (the 'Owners')."

[10] Exhibit 2 (Sept. 20 email from A. Levitt to N. Caggiano, noting that, "the fact is that you have already represented to us in your July 7, 2017 email that, regardless of the Court's determination, WTC may *still* elect to ignore owner instructions ('While the Trust Agreements provide for Owners to direct the Owner Trustee in

Wilmington should be required to execute the Default Documents as required by the Trust Agreements; however, Wilmington refuses to act. Accordingly, because Wilmington will not perform its obligations to the Trusts, the Owners respectfully request that the Court grant this emergency motion so that counsel for the Owners may send the required Default Documents, and prevent the Trusts from potentially, and immediately, violating the terms of the Indenture, as well as the terms of the Proposed Consent Judgment.

## ARGUMENT

To justify the relief Plaintiffs seek, Plaintiffs must demonstrate that: (1) they have asserted colorable claims; (2) the harm to the Trusts will be irreparable; and (3) the balance of the equities lies in favor of granting the motion. *Trilogy Portfolio Co., LLC v. Brookfield Real Estate Fin. Partners, LLC*, 2012 WL 120201, at *1 (Del. Ch. Jan. 13, 2012).[11]

As set forth below, Plaintiffs here satisfy each of these standards, and are thus entitled to their requested relief. Wilmington should execute the Default Documents; however, its refusal to act is placing the Trusts at risk of immediate harm. Accordingly, the Court should grant Plaintiffs' requested equitable relief.

---

certain circumstances, as you know, the Owner Trustee is not always obligated to follow Owner directions. . . .').").

[11] The elements described herein concern motions for temporary restraining orders. Plaintiffs seek similar, urgent relief.

### 1. The Trusts have demonstrated sufficient evidence to make equitable relief appropriate, here.

Emergency relief may be granted where "it clearly appears from specific facts shown by affidavit . . . that immediate and irreparable injury, loss or damage will result to the applicant. . . ." Ch. Ct. R. 65(b)(1).  To determine whether a party has asserted sufficient facts to justify the order like the one Plaintiffs seek, here, the moving party must only show "a reasonable probability of success on the merits. . . ." *Durkee Indus. Foods Corp. v. Reckitt & Colman, Inc.*, 1989 WL 42472 at *4 (Del. Ch. Apr. 10, 1989).  Since "the evidentiary record in a [similar] situation is seldom as developed as it is in a preliminary injunction setting . . . the inquiry becomes whether the movant has made a showing sufficient to warrant stopping action or threatened action for some abbreviated period of time until the evidentiary record can be developed for the presentation of a preliminary injunction motion." *Id.*; *Cottle v. Carr*, 1988 WL 10415 at *3 (Del. Ch. Feb. 9, 1988) ("[T]he approach often taken (but rarely articulated) [on a similar motion] . . . is whether the moving party has made a showing . . . sufficient to justify holding up the challenged act or transaction for the brief period required to develop an

evidentiary record and to make an orderly presentation of a preliminary injunction motion." (quotation omitted)).[12]

The Trusts have set forth sufficient evidence that Wilmington has violated the Trust Related Agreements by refusing to follow valid directions from the Owners of the Trusts to execute and deliver Notices of Default to the Administrator and Special Servicer of the Trusts. *See* Affidavit of Amy E. Keller, attached hereto. Wilmington is required by the Trust Agreements to "take such action or actions as may be specified in [the Trust Agreement] or in any instruction delivered in accordance with [the Trust Agreement]." [13]  Exhibit 5 (Trust Agreement, § 4.02(a)). Wilmington may only refuse a valid instruction from the Owners if:

---

[12] The facts here are simple, and governed by the Trust Related Agreements and the parties' communications. However, to the extent the Court deems the record undeveloped with regard to this motion, courts have "recognized that motions for TROs may be subject to less exacting merits-based scrutiny," and thus "greater flexibility accompanies judicial consideration of a motion for a TRO, which permits the Court to assess the imminent and irreparable injury sought to be avoided by the movant." *CNL-AB LLC v. Eastern Property Fund I SPE (MS REF) LLC*, 2011 WL 353529, at *7 (Del. Ch. Jan. 28, 2011). The relief sought by Plaintiffs here is similar to that of a temporary restraining order.

[13] In its Motion to Intervene, Wilmington admits that "[t]o discharge its duties as Owner Trustee, subject to its rights, privileges and protections in the Trust Agreements, Wilmington Trust may be required to follow directions from, and cause the Trusts to act at the behest of, the Owners from time to time. Exhibit 6 (Wilmington Trust Company's Unopposed Motion to Intervene ¶ 3).

> [I]t shall *have reasonably determined, or shall have been advised by counsel*, that such action:
>
>> (i) is contrary to the terms [of the Trust Agreement] or of any document contemplated hereby to which the Trust or the Owner Trustee is a party or is otherwise contrary to law, (ii) is likely to result in personal liability on the part of the Owner Trustee, unless the Owners shall have provided to the Owner Trustee indemnification or security reasonably satisfactory to the Owner Trustee against all costs, expenses and liabilities arising from the Owner Trustee's taking of such action, or (iii) would adversely affect the status of the Trust as partnership for Federal income tax purposes.

(emphasis added).

By refusing to follow the Authorization and Direction letter sent to it by the Owners, Wilmington has failed to comply with its obligations under Section 4.02(a) of the Trust Agreements. Wilmington has failed to identify its "reasonable determination" or advice from counsel excusing its refusal to act.[14] Simply, Wilmington has no good excuse: the events of default identified in the Default Documents are supported by the CFPB's findings. As a result of those findings, the Trusts are required to send such notices to the Indenture Trustee under the Indenture and Wilmington is required to facilitate such notices under the Trust

---

[14] Nor has Wilmington, in its Motion to Intervene, identified any reasonable determination or opinion from counsel that the ownership dispute alleged by PHEAA has any merit. Instead, Wilmington states that "Wilmington Trust does not take a position with respect to the identity of the beneficial owner(s) of the Trust. . . ." Ex. 7 (Wilmington Trust Company's Unopposed Motion to Intervene, ¶ 10).

10

Agreements. Exhibit 4 (Indenture, §§ 3.07(d) and 3.18); Exhibit 5 (Trust Agreements, § 4.02(a)).

Wilmington does not (and cannot) reasonably believe that it will be subject to personal liability for complying with its contractual obligations. The Authorization and Direction Letter clearly and unambiguously agrees to indemnify Wilmington "from and against any and all losses, damages, liabilities, claims, actions, suits, costs, expenses, disbursements (including all reasonable fees and expenses of its counsel, agents, and other experts), taxes, and penalties of any kind and nature whatsoever. . . ." Composite Exhibit 1 (Authorization and Direction Letter, ¶3). There is thus no valid basis for Wilmington's refusal to follow the instructions contained in the Authorization and Direction Letter.

However, the Owner Trustee, Wilmington, refuses to act, and the Trusts are owner-directed Delaware Statutory Trusts formed under the Delaware Statutory Trust Act, 12 Del. Code §§ 3801, *et seq*. As provided in § 2.03(b)(i) of the Trust Agreement, in conducting the operations of the Trusts, the Trusts act solely in their own name, and "the Owner Trustee or other agents selected in accordance with this Agreement will act on behalf of the Trust subject to direction by the Owners. . . ."

Accordingly, because Wilmington refuses to execute the Default Documents, the Trusts believe that they may be in violation of the Indenture on

Monday, September 25, 2017.[15] But any interpretation of the Trust Agreement or Indenture that would require the Trusts to violate the Indenture because the Owner Trustee refuses to act is an obvious contravention of the original intent of the parties. "It is a basic principle of equity that the Court of Chancery has jurisdiction to reform a document to make it conform to the original intent of the parties." *Waggoner v. Laster,* 581 A.2d 1127, 1135 (Del. 1990). Obviously, the original intent of the Owners and Wilmington was not to allow the Trusts to violate the Indenture in the event of a disagreement. Accordingly, the Court should exercise its power to afford aggrieved parties an equitable remedy, and allow the Owners to take action, themselves, allowing their counsel to execute and serve the Default Documents.

### 2. The Trusts will be irreparably harmed.

The Trusts face imminent and irreparable harm in the absence of immediate action by the Court. Plaintiffs need not show the exact damage to the Trusts, but only present their colorable claims. *See Cnty. of York*, 2008 WL 4824053, at **7-8 (Del. Ch. Oct. 28, 2008) (finding a "sufficiently pled possibility of irreparable harm" even though the plaintiff had alleged threatened irreparable harm "in the

---

[15] Pursuant to Section 3.18 of the Indenture, the Trusts are obligated to give the Indenture Trustee written notice of each Event of Default, "within five days after the occurrence thereof. . . ."

most cursory fashion."). The Trusts have set forth far more than cursory allegations of irreparable harm.

If the Trusts' motion is denied, and Wilmington persists in its refusal to execute and deliver the above-referenced default notices, the Trusts may be in breach of the Trust Related Agreements no later than Monday, September 25, 2017. Once this happens, the Trusts may be unable to recover: the Indenture Trustee may institute proceedings for collection of all amounts payable on the Notes; institute proceedings for the complete or partial foreclosure of the Indenture; or sell the Indenture Trust Estate. Exhibit 4 (Indenture § 5.04(a)(i)-(iv)). Most importantly, the Trusts have no other adequate remedy at law to prevent the harm that is certain to occur, other than a Court order allowing them to act in the absence of Wilmington's action. *See Cook v. Oberly*, 459 A.2d 535, 540 (Del. Ch. 1983) (finding that party seeking order "must also demonstrate that no adequate remedy exists at law and that equitable intervention is, therefore, necessary"). The Trusts have, therefore, demonstrated a substantial threat of irreparable harm if the requested order is not granted.

### 3. The balance of hardships favors the Trusts.

The balance of hardships clearly favors the Trusts. "[I]f the balance of hardships tips decidedly towards the plaintiff, it is ordinarily sufficient that the plaintiff has raised questions going to the merits which are so serious, substantial,

13

difficult and doubtful, as to make them fair ground for litigation and thus, for more deliberate investigation." *Cottle*, 1988 WL 10415 at *3 n.4 (quoting *G.B.C., Inc. v. United States*, 302 F. Supp. 1283 (E.D. Tenn. 1969)).

The Trusts here face imminent, irreparable harm for which there is no other adequate remedy at law while Wilmington, on the other hand, will suffer no prejudice if Owners' counsel executes and serves Notices of Default.[16] Accordingly, the Trusts' Motion should be granted.

---

[16] When the "ownership issue" is resolved by the Court, at that point, Wilmington (or any successor Owner Trustee) can ratify the Default Documents to conform with the Trust Related Agreements that the Owner Trustee should act for the Trusts. As it concerns Wilmington's immediate concerns, if it were required to execute the Default Documents, the Authorization and Direction Letter clearly states that the Trusts agree to indemnify and hold Wilmington harmless for any and all personal liability and/or expenses that will result as a consequence of following the Owners' directions. Composite Exhibit 1 (Authorization and Direction Letter, ¶ 3).

Furthermore, the Default Notices clearly state that "[a]ny statements and certifications herein and in the attached are statements and certification of the Trusts only and not of Wilmington Trust Company." *Id.* (Notices of Default to Administrator and Special Servicer, Owner Trustee Disclaimer).  Finally, the Trust Agreement indemnifies Wilmington for actions it takes on behalf of the Owners. Exhibit 5 (Trust Agreement, § 10.02).  Thus, Wilmington's claim that it would be prejudiced as a result of being required to follow these instructions is disingenuous at best.

## CONCLUSION

For all of the foregoing reasons, the Trusts respectfully request that this Court grant this motion allowing the Owners' counsel to execute and serve the Default Documents pursuant to the Indenture and the CFPB Proposed Consent Judgment. This equitable relief is appropriate, the Court is able to grant it, and it would prevent the Trusts from potentially violating the Indenture.

Dated: September 22, 2017

Respectfully submitted,

**OF COUNSEL:**

Adam J. Levitt, *pro hac vice*
Amy E. Keller, *pro hac vice*
**DıCELLO LEVITT & CASEY LLC**
Ten North Dearborn Street
Eleventh Floor
Chicago, Illinois  60602
(312) 214-7900

**GRANT & EISENHOFER P.A.**

/s/ James J. Sabella
Stuart M. Grant (#2526)
James J. Sabella (#5124)
Michael T. Manuel (#6055)
123 Justison Street
Wilmington, Delaware  19801
(302) 622-7000

*Counsel for Plaintiffs*

Words: 3,535