**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU<br><br>        Plaintiff,<br><br>v.<br><br>THE NATIONAL COLLEGIATE MASTER STUDENT LOAN TRUST, et al.<br><br>        Defendants. | C.A. No. 17-cv-01323 (GMS) |

## PLAINTIFF CONSUMER FINANCIAL PROTECTION BUREAU'S CONSOLIDATED RESPONSE TO MOTIONS TO INTERVENE

Plaintiff Consumer Financial Protection Bureau ("Bureau") hereby responds to the motions to intervene filed by Ambac Assurance Corporation ("Ambac") (D.I. 4); Transworld Systems Inc. ("TSI") (D.I. 9); Objecting Noteholders (D.I. 11); GSS Data Services, Inc. ("GSS") (D.I. 12); the Pennsylvania Higher Education Assistance Agency d/b/a American Education Services ("PHEAA") (D.I. 20); Wilmington Trust Company ("WTC") (D.I. 31); U.S. Bank National Association ("U.S. Bank") in its capacity as Successor Special Servicer (D.I. 33 & 34); and U.S. Bank in its capacity as Indenture Trustee (D.I. 35 & 36).

## INTRODUCTION

The Consumer Financial Protection Bureau is a federal agency charged with protecting consumers by enforcing Federal consumer financial laws. Over the course of multiple years, the Bureau conducted an investigation into fifteen (15) Delaware statutory trusts known as the

1

National Collegiate Student Loan Trusts ("NCSLTs" or "the Trusts"),[1] which own private student loans and hire third parties to service those loans. The Bureau's investigation developed extensive evidence that the Trusts, acting through certain of their servicers, engaged in a variety of illegal debt collection and litigation practices—practices which caused substantial harm to thousands of consumers and unjustly enriched the Trusts. After arms-length negotiations, the Bureau and the Trusts agreed to the Proposed Consent Judgment that was filed with this Court on September 18, 2017. *See* D.I. 3-1 ("Proposed Consent Judgment" or "PCJ"). The Proposed Consent Judgment would, if approved, provide restitution to consumers harmed by the Trusts' illegal practices in debt collection lawsuits, and comprehensive injunctive relief to prevent future harm. Of significance to the hundreds of thousands of consumers with student loans acquired by the Trusts, the Proposed Consent Judgment would require the Trusts to conduct an independent audit to address serious questions raised by the Bureau's investigation about whether the Trusts possess documentation showing that consumers actually owe debts to the Trusts.

Seven entities now seek to intervene in this action for the purpose of opposing the Proposed Consent Judgment. None of the would-be intervenors dispute the violations alleged in the Complaint. Nor do they dispute that those violations caused harm to thousands of consumers. Nor do they claim to be owners of the Trusts, or to have the power to settle litigation on the Trusts' behalf. Instead, the intervenors rely on various trust-related agreements, and ongoing litigation between them and the Trusts to present a litany of purported obstacles to the Trusts' ability to enter into a settlement with the Bureau to reform the Trusts' servicing practices and prevent future harm to consumers. There is no need for the Court to wade into the labyrinth of

---

[1] The NCSLTs include the National Collegiate Master Student Loan Trust, NCSLT 2003-1, NCSLT 2004-1, NCSLT 2004-2, NCSLT 2005-1, NCSLT 2005-2, NCSLT 2005-3, NCSLT 2006-1, NCSLT 2006-2, NCSLT 2006-3, NCSLT 2006-4, NCSLT 2007-1, NCSLT 2007-2, NCSLT 2007-3, and NCSLT 2007-4.

trust-related agreements to determine whether to enter the Proposed Consent Judgment.

Moreover, to the extent the intervenors have disputes with the Trusts, including with the

determination of the Trusts' owners to enter into a negotiated settlement with the Bureau, those

disputes should be resolved through private litigation and not intertwined with the Bureau's

efforts to protect consumers.

No movant has articulated a valid reason for why the Bureau should not be able to obtain

the relief contained in the Proposed Consent Judgment on behalf of consumers. Nonetheless, the

Bureau does not oppose the motions to intervene filed by Ambac, the insurer for some of

noteholders as well as an investor, and U.S. Bank in its capacity as Indenture Trustee and as

Successor Special Servicer. The Bureau respectfully requests that the Court deny the motions to

intervene filed by TSI, PHEAA, GSS, the Objecting Noteholders, and WTC**,** because they have

failed to meet their burden for intervention under Rule 24(a)(2), or 24(b) of the Federal Rules of

Civil Procedure. To the extent the Court permits any entities to intervene it should be for the

limited purpose of objecting to the Bureau's Motion to Approve the Proposed Consent

Judgment.[2]

## **BACKGROUND**

### A.    **The Trusts**

Student loan debt is the second largest category of consumer debt in the United States,

just behind mortgages.[3] More than 44 million consumers across the country collectively owe

---

[2] Consistent with the stipulated order extending the Bureau's time to respond to the various
intervention motions, *see* D.I. 46 at 2-3, this response only addresses the pending motions to
intervene, and does not address movants' objections to the Proposed Consent Judgment. The
Bureau requests that the Court set a schedule for briefing the Bureau's motion for approval of the
Proposed Consent Judgment once the Court has resolved the intervention motions.
[3] Federal Reserve Bank of New York, *Household Debt and Credit Report: Q2 2017* (2017),
https://www.newyorkfed.org/microeconomics/hhdc.

over $1.4 trillion in student loan debt.[4] The student loans at issue in this matter are private student loans purchased by the Trusts. This section provides a brief history of the Trusts and their relationship with various third parties to provide background as to how the Trusts operate and how the collections lawsuits at issue came to be filed.

The Trusts are Delaware statutory trusts that were formed between 2001 and 2007. Compl. ¶¶ 9, 11; *see also* 12 Del. Code § 3801, et seq.[5] They were formed for the purpose of acquiring private student loans, collecting payments from the student borrowers who entered into those loans, and then distributing those payments to the holders of notes sold to investors pursuant to certain agreements. Compl. ¶ 10. Under the Trust agreements, the **Owners** are those entities that acquire a beneficial interest in the Trusts. Significantly, the beneficial interest includes not only an equity interest in the Trusts, but also the "right to direct or consent to the actions of the Owner Trustee and otherwise participate in the management of and control the affairs of the Trust." D.I. 13-1, Butcher Decl. Ex. A § 1.01 (Trust Agreement for National Collegiate Student Loan Trust 2006-4 ("Trust Agreement")). The Trusts have no employees, and instead conduct their operations through various third parties. Compl. ¶¶ 12, 15.

Those third parties have various roles, which are set out in a series of agreements. The **Owner Trustee**, a position currently held by movant WTC,[6] has certain ministerial obligations, such as executing documents. For non-ministerial matters, the Owner Trustee generally must

---

[4] Consumer Financial Protection Bureau, Prepared Remarks of Seth Frotman at 1 (March 22, 2017) http://files.consumerfinance.gov/f/documents/201703_cfpb_Frotman-Testimony-CA-Senate-Banking-Committee.pdf.

[5] A June 2015 Report issued by the Bureau on complaints regarding the servicing of private student loans included a simple graphical depiction of the structure of one of the National Collegiate Student Loan Trusts at the time. *See* Consumer Financial Protection Bureau, Mid-Year Update on Student Loan Complaints 13-14 (2015), http://files.consumerfinance.gov/f/201506_cfpb_mid-year-update-on-student-loan-complaints.pdf.

[6] Wilmington Trust Company is seeking to resign its role as the Owner Trustee in an action pending in the Delaware Court of Chancery.

follow the directions of the Trusts' Owners. *See infra* Section V. The **Administrator**, a position held by movant GSS, performs various ministerial functions for the Trusts delineated in the Administration Agreement. *See infra* Section IV. The **Indenture Trustee**, one of the roles played by movant U.S. Bank, is responsible under indenture agreements for preserving the assets of the Trusts, including the payments obtained from student borrowers, for the benefit of the investors. Those investors include movants Ambac and the Objecting Noteholders; Ambac also serves as an insurer for certain of the Trusts.

The Trusts disperse responsibility for servicing and collecting on student loans across another group of third parties, who act as the Trusts' agents. The role of the **Primary Servicer**, a position held by movant PHEAA, principally involves servicing and collection activities for student loans that are either current or no more than thirty days delinquent. *See infra* Section III. The **Special Servicer**, a position originally held by an affiliate of First Marblehead Corporation ("First Marblehead"), is responsible for collection activities for past-due and defaulted student loans, including collections litigation, pursuant to Special Servicing Agreements. In 2012, movant U.S. Bank assumed the role of **Successor Special Servicer** upon First Marblehead's resignation. U.S. Bank, in turn, entered into Special Sub-Servicing Agreements with **Subservicers,** which were responsible for conducting collections, and if those efforts were unsuccessful, overseeing various law firms that file collection lawsuits against borrowers in the name of the Trusts**.** Movant TSI has been a Subservicer of the Trusts since November 1, 2014. Compl. ¶ 16; *see also infra* Section II.

This dispersion of servicing responsibility across a shifting group of agents and sub-agents of the Trusts created predictable risks for consumers, including the risk that collections

lawsuits would be filed without proper ownership records.[7]

### B.    The Bureau's Investigation and Complaint

The Bureau's investigation of the Trusts focused on collections lawsuits filed on behalf

of the Trusts since 2012 against borrowers who allegedly had defaulted on their student loans. As

alleged in the Complaint, the Bureau found that the Trusts, acting through certain of their

servicers, engaged in several deceptive and unfair acts or practices in violation of the Consumer

Financial Protection Act. Those practices included: the filing of false and misleading affidavits,

*see* Compl. ¶¶ 24-42; the filing of improperly notarized affidavits, *see id.* ¶¶ 43-51; the filing of

collections lawsuits against consumers even where the Trusts lacked documents necessary to

prove that a debt was owed to the Trusts, *see id.* ¶¶ 52-57; and the filing of collections lawsuits

outside the applicable statutes of limitations, *see id.* ¶ 58. These illegal practices caused

substantial injury to thousands of consumers, and resulted in the unjust enrichment of the Trusts.

*See id.* ¶ 94.

Since the Trusts have no employees, in May 2016, the Bureau contacted WTC inquiring

whether the Trusts had counsel so the Bureau could schedule a call to inform the Trusts of the

potential legal violations it had uncovered through its investigation. The Bureau was informed by

WTC that the law firm Chaitman LLP was counsel to the Trusts. WTC had hired Chaitman LLP

as counsel to coordinate representation for the Trusts in various lawsuits, and Chaitman then

brought on the law firm McCarter & English to represent the Trusts in the Bureau's

investigation. WTC then notified the Bureau that an attorney from McCarter & English would be

representing the Trusts and would participate in the call to discuss potential violations by the

Trusts. After the call, McCarter & English submitted a written response on behalf of the Trusts.

---

[7] *See* Stacey Cowen and Jessica Silver-Greenberg, <u>As Paperwork Goes Missing, Private Student Loan Debts May be Wiped Away</u>, N.Y. Times (July 17, 2017), https://www.nytimes.com/2017/07/17/business/dealbook/student-loan-debt-collection.html.

The Bureau then engaged in settlement negotiations with the Trusts through counsel, McCarter & English. The Bureau was cognizant of ongoing litigation regarding ownership of the Trusts. However, the Trust Agreements explicitly give the Owners the authority to "compromise any claim or lawsuit brought by or against the Trust," with an exception for collection lawsuits, *see* D.I. 13-1, Trust Agreement § 4.01(b)(i), and the Trusts provided the Bureau with a legal opinion regarding the authority of the Owners to enter into a settlement on behalf of the Trusts.

### C.  The Proposed Consent Judgment

The Proposed Consent Judgment, filed at the same time as the Complaint, would provide redress to harmed consumers and injunctive relief to ensure that the Trusts' violations do not continue. During the course of its investigation, the Bureau identified more than 2000 lawsuits filed by the Trusts without paperwork demonstrating that that Trusts owned the subject loans, and more than 400 lawsuits filed by the Trust past the applicable statutes of limitations periods. PCJ ¶¶ 36, 37; Compl. ¶¶ 3, 58. Consumers subjected to these lawsuits will receive redress under the Proposed Consent Judgment. PCJ ¶¶ 34-37.

Moreover, in recognition that only a fraction of the consumers harmed by the Trusts' servicing practices may have been uncovered during the Bureau's investigation, the Proposed Consent Judgment requires the Trusts to conduct an independent audit to determine, among other things, whether the Trusts possess sufficient loan documentation, including signed promissory notes and complete chain of assignment documentation "to support the claim that a Debt is currently owed to a Trust." PCJ ¶ 19. The audit will also determine whether additional lawsuits were filed without documentation or past the applicable statute of limitation. *Id.*  One purpose of requiring the audit is to identify additional consumers who should receive redress. Another is to

prevent lawsuits from being filed in the future without adequate documentation by requiring the Trusts to determine what documentation they have for each loan before filing.

The Proposed Consent Judgment also provides additional protections for consumers.  It would require the Trusts to develop a comprehensive compliance plan, *see* PCJ ¶¶ 28-30, and would require that a Board ensure that the Trusts and their servicers comply with Federal consumer financial law and the terms of the Proposed Consent Judgment, *id.* ¶¶ 31-33. The Proposed Consent Judgment would also require the Trusts to suspend all collection on defaulted debt "pending approval and implementation" of the compliance plan. PCJ ¶ 16. The injunctive provisions of the Proposed Consent judgment will protect consumers from ongoing and future harm resulting from the illegal litigation practices alleged in the compliant. This brief description of the relief contained in the Proposed Consent Judgment illustrates some of the significant consequences to consumers if prolonged litigation delays entry of the Proposed Consent Judgment.

## ARGUMENT

## I.     LEGAL STANDARD

While in many cases "the disposition of the action will have some impact on the interests of third parties," *Harris v. Pernsley*, 820 F.2d 592, 596 (3d Cir. 1987), it is well-established that not all parties who may be affected by a litigation are entitled to intervene. Under Federal Rule of Civil Procedure 24(a)(2), a non-party seeking to intervene as of right has the burden to show that "'(1) the application for intervention is timely; (2) the applicant has a sufficient interest in the litigation; (3) the interest may be affected or impaired, as a practical matter by the disposition of the action; and (4) the interest is not adequately represented by an existing party in the litigation.'" *United States v. Territory of Virgin Islands*, 748 F.3d 514, 519 (3d Cir. 2014)

(quoting *Harris*, 820 F.2d at 596). A potential intervenor must satisfy each of these four requirements. *See id.*

Many of the pending motions to intervene hinge on the second and third requirements, both of which are demanding. To satisfy the second requirement, a would-be intervenor "must demonstrate that there is a tangible threat to a legally cognizable interest." *Harris*, 820 F.2d at 601. An interest that is "general and indefinite" will not suffice. *Liberty Mut. Ins. Co. v. Treesdale, Inc.*, 419 F.3d 216, 220 (3d Cir. 2005) (internal citation omitted). Nor will an interest that is "remote or attenuated." *Kleissler v. U.S. Forest Service*, 157 F.3d 964, 972 (3d Cir. 1998). Further, "a mere economic interest in the outcome of the litigation is insufficient to support a motion to intervene." *Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc.*, 72 F.3d 361, 366 (3d Cir. 1995).

Even where a non-party has a legally sufficient interest in the litigation, it must separately satisfy the third Rule 24(a)(2) requirement by showing that that interest "will be directly affected in a substantially concrete fashion by the relief sought." *Kleissler*, 157 F.3d at 972. Thus, a motion to intervene should be denied where the litigation "will not have an immediate, adverse effect" on the potential intervenor, and instead will have only a "collateral and … speculative" impact. *Treesdale,* 419 F.3d at 225; *see also Harris*, 820 F.2d at 601 (would-be intervenor "must do more than show that his or her interests may be affected in some incidental manner").

Where a non-party fails to satisfy the requirements for intervening as of right, Federal Rule of Civil Procedure 24(b) allows for permissive intervention—but only under limited circumstances. As relevant here, a would-be intervenor must demonstrate that it "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). The decision whether to allow permissive intervention is discretionary, and in

"exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3).[8]

## II.     THE MOTION TO INTERVENE FILED BY TSI SHOULD BE DENIED

The Court should deny TSI's motion to intervene. *See* D.I. 9. TSI was responsible for overseeing a network of law firms that filed collection lawsuits on behalf of the Trusts. On the same day the Bureau filed the Complaint and Proposed Consent Judgment with this Court, the Bureau entered into an administrative Consent Order with TSI (Consent Order) after a lengthy investigation into its conduct and extensive settlement negotiations. *See* Pl. Ex. A (Consent Order).[9] TSI argues that it is entitled to intervene on the grounds (1) that the Proposed Consent Judgment will "conflict" with the Consent Order, and (2) that it has a "substantial economic interest in the matter." D.I. 9 at 4-6, 10. Neither argument has merit.[10]

### A.     TSI Cannot Intervene Based on the Purported Conflict Between the Proposed Consent Judgment and the Administrative Consent Order

TSI argues that it has a right to intervene in this matter because the Proposed Consent Judgment and the Consent Order "contemplate different supervisory and reporting structures and … the implementation of different policies, procedures, and relief." D.I. 9 at 6. That is incorrect.

---

[8]  TSI, PHEAA, and WTC have not moved to intervene under Rule 24(b) in their motions, *see generally* D.I. 9, 20, 31, and may not do so for the first time in their reply briefs, *see* D. Del. L.R. 7.1.3(c)(2).

[9]  Exhibits cited herein as "Pl. Ex." are attached to the Declaration of Carolyn Hahn, filed herewith.

[10]  TSI also claims that the Court lacks subject matter jurisdiction because the Trusts are not "covered persons" under the Consumer Financial Protection Act (CFPA). *See* D.I. 9 at 6-7. TSI's assertion is simply erroneous and contrary to the plain language of the CFPA. The Trusts engaged in both "servicing loans, including acquiring, purchasing, selling [or] brokering" and in collecting debt; they are therefore "covered persons." 12 U.S.C. § 5481(15)(A)(i), (x). TSI suggests that the Trusts are exempt from these provisions because they have no employees and hire third parties, but there is no basis for such an exemption in the language of the CFPA. Nor does TSI dispute that the Trusts engage in "acquiring" student loans. *See* Compl. ¶ 10 (alleging that the "basic purpose of each Trust is to acquire a pool of private student loans").

The alleged "conflicts" between the two agreements that TSI asserts are illusory and cannot provide a basis for intervention in this matter.

First, TSI wrongly claims that there is a conflict between the reporting structure established by its Consent Order and by the Proposed Consent Judgment. It is true, as TSI notes, that its Consent Order requires it to interact with and provide information to U.S. Bank as Successor Special Servicer. D.I. 9 at 3-4. However, it is *not* the case that the Proposed Consent Judgment "[c]ontemplates that the Trusts – and not the successor special servicer – will interact with the Trusts' servicers, including TSI, to implement the injunctive relief." *Id.* at 5. As TSI acknowledges, the Trusts have no employees. *Id.* Indeed, the Proposed Consent Judgment's injunctive provisions take the existing loan servicing structure into account,[11] including U.S. Bank's role as the successor Special Servicer, in requiring injunctive relief. The Proposed Consent Judgment specifically states that "Defendants shall take all actions necessary to comply with the terms of the Order, *including but not limited to ensuring that all of Defendants' Servicers acting as Defendants' agents comply with the terms of the Order*." PCJ ¶ 9(a) (emphasis added). TSI's obligations to interact with, cooperate with, and provide information to U.S. Bank pursuant to the Bureau's Consent Order is not disturbed by the Proposed Consent Judgment, and no conflicting requirement to interact with the Trusts has been added.

Further, there is no conflict in the reporting structure between the Proposed Consent Judgment and the Consent Order with respect to pending and concluded lawsuits where misleading affidavits were filed. The Proposed Consent Judgment requires that: "Defendants must instruct their attorneys, Defendants' Servicers, and their agents to either withdraw the

---

[11] "Servicer" in the Proposed Consent Judgment is defined as "any Servicer, Primary Servicer, Subservicer, Special Servicer, Administrator, and any other individual or entity acting on behalf of Defendants with respect to the Servicing of the student loans owned by Defendants, whether retained directly by Defendants or retained by an individual or entity acting on behalf of Defendants." PCJ ¶ 7(q).

pending Collections Lawsuit or notify the Court [that it is withdrawing the affidavit pursuant to an agreement between the Bureau and the Trusts]" and for concluded lawsuits "instruct their attorneys, Defendants' Servicers, and their agents to cease post-judgment enforcement activities . . . " PCJ ¶¶ 14, 15. In accordance with the existing structure, the Trusts would instruct U.S. Bank as the Special Servicer responsible for default serving to take the necessary steps, including authorizing TSI to withdraw misleading affidavits and to cease post judgment enforcement activities, as required to implement the injunctive relief in the Proposed Consent Judgment. Thus, nothing in the Proposed Consent Judgment contemplates, let alone requires, that TSI interact with the Trusts. Rather, consistent with the Consent Order, TSI is obligated to work with U.S. Bank as the Successor Special Servicer to implement the injunctive relief required by the Proposed Consent Judgment.

Second, comparison of the affidavit provisions in the Consent Order and Proposed Consent Judgment demonstrates that TSI's bald assertion that the Proposed Consent Judgment "[c]ontemplates different affidavit-related policies and procedures than those in the TSI Consent Order" is erroneous. D.I. 9 at 5. Indeed, the conduct provisions related to affidavits contained in the Consent Order and Consent Judgment are virtually identical. *Compare* Consent Order ¶ 45(l) *with* PCJ ¶ 9(f). Similarly, the Compliance Plan provisions of the Consent Order and the Proposed Consent Judgment related to affidavits closely track one another. *Compare* Consent Order ¶ 52(c)-(e) *with* PCJ ¶ 28(c)(iii-v).

Third, TSI's claim that its interests may be impaired "if it submits its own Compliance Plan . . . but the Trusts submit a conflicting or more onerous Compliance plan  that affects the exact same activities" rests entirely on speculation. D.I. 9 at 10. TSI hasn't identified any actual conflict between the plans. Nor has it identified any potential conflict. Rather TSI makes

conclusory allegations that a conflict could hypothetically exist. Moreover, TSI's hypothetical concern about potentially conflicting compliance plans fails to take into account that the Bureau must approve both TSI's and the Trusts' Compliance Plans. *See* Consent Order ¶¶ 52-54; PCJ ¶¶ 28-30. To ensure the expeditious implementation of the relief contained in both agreements for the benefit of consumers, the Bureau has every incentive to ensure that TSI is not subject to conflicting obligations.[12] TSI cannot establish a right to intervene based on such a speculative concern about a purely hypothetical conflict between the two compliance plans. *See Treesdale*, 419 F.3d at 225 (litigation must have "an immediate, adverse effect" on an intervenor, rather than a "speculative" impact, to support intervention under Rule 24(a)(2)).

Therefore, TSI has not satisfied its burden under Rule 24(a)(2) to demonstrate that it has a sufficient interest that would be impaired by entry of the Proposed Consent Judgment based on alleged conflicts between the Consent Order and the Proposed Judgment.

### B.      TSI Does Not Have a Sufficient Economic Interest That Will be Impaired

TSI also asserts that it will suffer "substantial financial loss" because the Proposed Consent Judgment requires the Trusts to stop transferring debt to the Special Servicer (and presumably TSI) and to suspend all collections efforts until a compliance plan is approved and implemented. D.I. 9 at 10. TSI does not explain or quantify the financial loss it would suffer as a result of this Court entering the Proposed Consent Judgment. It is unclear whether TSI is even referring to some potential loss of fees, or payments it receives resulting from its work overseeing law firms that file collection lawsuits on behalf of the Trusts. Thus, TSI's assertion

---

[12] TSI's reliance on *EEOC v. AT&T*, 506 F.2d. 735 (3d Cir. 1974), is misplaced. In that case a union sought to intervene because provisions of its collective bargaining agreement with the defendants in that case "may well be modified or invalidated by the memorandum of agreement and consent decree." *Id.* at 742. Here TSI is not claiming that the Proposed Consent Judgment conflicts with any agreement it has with the Trusts because it has no contractual agreement with the Trusts. Rather it relies on the theoretical possibility that there might be conflicts between the Consent Order and the Proposed Consent Judgment.

that it would suffer a "substantial financial loss" is at best speculative. *Kleissler*, 157 F.3d at 976

(Becker, C.J., concurring) (stating that a court must examine whether "the litigation pose[s] a

"'tangible threat'" to the applicant or simply a speculative one").

Moreover, even assuming *arguendo* that TSI may incur a loss of revenue should the

Court enter the Proposed Judgment, that "mere economic interest" does not support intervention

as of right under Federal Rule of Civil Procedure 24(a)(2). *Mountain Top*, 72 F.3d at 366; *see

also United States v. Allegheny Cty. Sanitary Auth.,* Civ. A. No. 07-0737, 2008 WL 203378 at \*3

(W.D. Pa. Jan. 24, 2008) (denying intervention as of right where "petitioners' interest in this

action is purely an economic one"). The loss of revenue or assumption of additional expenses by

a nonparty are mere economic interests insufficient to support intervention as of right. *See, e.g.*,

*Curry v. Regents of Minnesota*, 167 F.3d 420, 423 (8th Cir. 1999) (potential intervenor's

economic interest in "maintaining the quantum of their funding" and "upholding the current fee

system" did not "rise to the level of a legally protectable interest necessary for mandatory

intervention"); *Se. Pa. Transp. Auth. v. Pa. Pub. Util. Comm'n,* 210 F. Supp. 2d 689, 704 (E.D.

Pa. 2002) (denying intervention where potential intervenor claimed that enforcement of a

judgment would require it to pay higher assessments). Thus, TSI has not shown it has a sufficient

interest based on a potential loss of revenue resulting from entry of the Proposed Consent

Judgment, and its motion under Rule 24(a)(2) should be denied.[13]

---

[13] Although this Court has not granted (and should not grant) TSI's intervention motion, TSI
nevertheless proceeds in its motion to argue the merits regarding entry of the Proposed Consent
Judgment. D.I. 9 at 11-14. The Bureau is fully prepared to refute TSI's arguments and all other
arguments concerning entry of the Proposed Consent Judgment once the Court resolves the
pending intervention motions.

III.     **THE MOTION TO INTERVENE FILED BY PHEAA SHOULD BE DENIED**

The Court should also deny PHEAA's motion to intervene. *See* D.I. 20. PHEAA's role with respect to the Trusts is limited: it serves as the "Primary Servicer," which principally involves servicing and collection activities for student loans that are either current or no more than thirty days delinquent. *See* D.I. 20 at 3. When loans are delinquent for more than thirty days, they are transferred to other agents of the Trusts for additional collection efforts. Thus, as PHEAA acknowledges, it does not file the debt collection lawsuits that are the subject of the Bureau's Complaint and much of the injunctive relief contained in the Proposed Consent Judgment. *Id.* Notwithstanding its tangential relationship to the subject of this lawsuit, PHEAA seeks to intervene to protect two interests that are purportedly threatened by the Proposed Consent Decree – its reputation and its contractual rights. Neither of PHEAA's asserted grounds for intervention under Rule 24(a)(2) is sufficient.

A.     **PHEAA Cannot Intervene Based on Its Alleged Reputational Interest**

PHEAA claims that it is entitled to intervene because the Bureau's Complaint and the Proposed Consent Judgment might "harm[] PHEAA's reputation by improperly implicating PHEAA in wrongful conduct." D.I. 20 at 5; *see also id.* at 6-7. As an initial matter, PHEAA "has cited no legal authority to support the argument that its interest in protecting its reputation is sufficient for intervention," and many courts have held such an interest is not sufficient. *EEOC v. Farmer's Pride, Inc.*, No. 12-MC-148, 2014 WL 1053482, at *3 (E.D. Pa. Mar. 18, 2014) (collecting cases); *see also Veasey v. Perry*, 577 F. App'x 261, 263 (5th Cir. 2014) ("True the Vote claims it needs to intervene to defend its reputation. Nothing in the caselaw, however, recognizes such an abstractly defined interest."). PHEAA's attempt to intervene based upon a purported reputational interest thus fails as a matter of law.

Further, even if a non-party's interest in its reputation could in theory serve as a legally sufficient basis to intervene (which it cannot), PHEAA has not demonstrated that this litigation poses any actual harm to its reputation. Neither the Complaint nor the Proposed Consent Judgment ever identify PHEAA by name – not once. *See generally* D.I. 1; D.I. 3-1. And the Complaint contains only a single reference to the Primary Servicer (*i.e.*, PHEAA). That reference appears in a paragraph that broadly defines "Servicers" to include "any Servicer, Primary Servicer, Subservicer, Special Servicer, Administrator, and any other individual or entity acting on behalf of the Trusts with respect to the servicing and collection of the student loans owned by the Trusts." Compl. ¶ 13. Although the Complaint contains only that single indirect reference to it as the Primary Servicer, PHEAA asserts that it faces significant reputational harm from being "erroneously group[ed] … with other entities that allegedly participated in improper conduct." D.I. 20 at 6.

This argument rests on an inaccurate reading of the Complaint, and on a speculative and unsupported theory of reputational harm. Contrary to PHEAA's suggestion, *see* D.I. 20 at 7 & n.3, the Complaint makes clear that the Special Servicer and the Subservicer (not the Primary Servicer) are the parties responsible for litigation filed on behalf of the Trusts. *See* Compl. ¶¶ 21-23 (describing 2009 and 2012 agreements with the Special Servicer, which was required to hire Subservicers); *id.* at ¶ 24 ("Subservicers, acting through Defendants' Special Servicer … initiated 94,046 collections lawsuits"). In any event, it is unduly speculative to suppose that a single reference to the "Primary Servicer" in the Complaint could (1) lead to the incorrect identification of PHEAA as an entity responsible for filing collection lawsuits and (2) thereby cause any meaningful harm to PHEAA's reputation. PHEAA has presented no actual evidence of such harm, and its motion should therefore be denied. *See Floyd v. City of New York*, 770 F.3d

1051, 1061 (2d Cir. 2014) (affirming denial of police unions' motion to intervene in civil rights lawsuit where "unions had submitted no evidence to substantiate their claims of reputational harm").

### B.     PHEAA Cannot Intervene Based on the Alleged Impairment of its Contractual Rights

PHEAA also claims that it is entitled to intervene "to protect its contractual rights" under the September 28, 2006 Amended and Restated Private Student Loan Servicing Agreement (the "Servicing Agreement") that sets forth its duties and obligations as the Primary Servicer. D.I. 20 at 8. As noted above, PHEAA has at best only a tangential relationship to the main subject of this lawsuit. As the Primary Servicer, PHEAA had no responsibility for filing (or overseeing law firms that file) the collections lawsuits that are the focus of the Bureau's Complaint. *Id.* at 3. Most of the injunctive provisions of the Proposed Consent Judgment impose obligations on the Trusts relating to those collections lawsuits. *See, e.g.*, PCJ ¶¶ 9(c)-(f), 11, 14, 15. Only a few provisions in the Proposed Consent Judgment relate to PHEAA as the Primary Servicer. Those provisions neither "reform the terms of the Servicing Agreement" nor impose "new, onerous, and extremely expensive obligations" on PHEAA. D.I. 20 at 8. PHEAA's arguments to the contrary rest on mischaracterizations of both the Proposed Consent Judgment and its own Servicing Agreement.

For example, PHEAA complains that it will have to submit to an independent audit of students' loans and suggests that that obligation is not included in the Servicing Agreement. D.I. 20 at 5-6 (citing PCJ ¶ 19). However, the Proposed Consent Judgment requires the Trusts—not the Primary Servicer—to hire and pay the auditors who will conduct the compliance audit. *See* PCJ ¶ 19. And the Servicing Agreement (which PHEAA does not attach to its motion) expressly contemplates such an audit. Specifically, Section 7.01 of the Servicing Agreement grants First

Marblehead (the predecessor to the current Owners), its agents, and any federal governmental

officials with regulatory authority over FMC:

> the absolute right, at FMC's expense … at any time during the term hereof:

> (i) to audit or examine all books, records, documents, other writings, information, whether in hard copies, electronic form or otherwise, relating to Services to be provided by Servicer [*i.e.*, PHEAA] under this Agreement at the location(s) where Servicer maintains such books, records, documents writings and information….

Pl. Ex. B § 7.01 (Servicing Agreement); *see also id.* § 7.04 (requiring PHEAA to provide access

to its personnel, facilities, and records for operational audits to evaluate its performance); *id.* §

7.09 (requiring PHEAA to "fully cooperate" with audits conducted by FMC). PHEAA cannot

credibly argue that the Bureau's settlement with the Trusts involves a compliance audit that it

"did not bargain for" (D.I. 20 at 8) when its own contract gives the Trusts the absolute right to

conduct such an audit.

Other provisions in the Proposed Consent Judgment are consistent with the Servicing

Agreement or at most incidentally affect PHEAA as part of remedying the Trusts' practices

relating to collections lawsuits. For example:

- Paragraph 16(1) requires the Trusts to direct the Primary Servicer to temporarily cease transferring student loans to the Special Servicer and any Subservicer. PHEAA does not identify any provision of the Servicing Agreement that conflicts with this requirement or identify any actual burden that ceasing such transfers poses. *See* D.I. 20 at 5-6.

- Paragraph 16(4) requires the Trusts to direct the "Primary Servicer to instruct the Special Servicer and all Subservicers" to return certain loans to the Primary Servicer's possession "that are completed and the subject of each monthly Compliance Audit Report" required under the Compliance Audit section of the Proposed Consent Judgment. PHEAA does not identify any provision of the Servicing Agreement that conflicts with this requirement or any actual burden this provision would pose. *See* D.I. 20 at 5-6. Indeed, this requirement is consistent with the Servicing Agreement's requirement that PHEAA maintain custody of credit agreements and related documents. *See* Pl. Ex. B at § 4.04.

- Paragraph 17(1) requires that payments from consumers be placed in an escrow account. PHEAA already transfers money that it receives from consumers to other agents of the Trusts. Under the Proposed Consent Judgment, PHEAA would merely be required to

temporarily redirect those funds into a new account designated by the Trusts in order to provide the relief contemplated.

- Paragraph 28 requires the Trusts to develop a compliance plan designed to ensure that the Trusts and its servicers comply with applicable Federal consumer financial laws and the terms of the Proposed Consent Judgment. While PHEAA implies that the compliance plan was not contemplated by the Servicing Agreement, D.I. 20 at 6, that agreement requires PHEAA to conduct servicing "in full compliance with … all federal and state laws and regulations" applicable to PHEAA or to any Owner of the Trusts, Pl. Ex. B at § 4.01. Further, while PHEAA speculates that the compliance plan will be "onerous," D.I. 20 at 6, the Trusts (not PHEAA) are responsible for developing the compliance plan and most of the contemplated contents of the plan relate to collections lawsuits (which are filed by other agents of the Trusts, not PHEAA). *See* PCJ ¶ 28(c)(iii)-(vi).

As these examples illustrate, none of PHEAA's conclusory allegations about the allegedly "massive" obligations imposed upon it hold up upon inspection of the Proposed Consent Judgment and the Servicing Agreement. D.I. 20 at 5. Similarly, there is no basis for PHEAA's suggestion that the Proposed Consent Judgment attempts to "reform" the Servicing Agreement or interferes with PHEAA's contractual rights. *Id.* at 2.[14] PHEAA's allegations therefore should be disregarded. *See Floyd v. City of New York*, 302 F.R.D. 69, 110 (S.D.N.Y. 2014), *aff'd in relevant part,* 770 F.3d 1051 ("[C]onclusory allegations ... do not entitle [a movant] to intervention as of right under Rule 24." (citation omitted)).

Indeed, it is telling that while PHEAA claims that it needs to "protect its contractual rights," D.I. 20 at 8, its motion does not cite any provision of the Servicing Agreement or even attach that agreement. In similar circumstances, courts have not hesitated to deny motions to intervene. *See Sheppard v. Phoenix*, No. 91 Civ. 4148(RPP), 1998 WL 397846, at *5 (S.D.N.Y. July 16, 1998) (denying intervention where movants, who alleged that their collective bargaining rights were harmed, "neither refer to any specific provision of their labor contract with the City

---

[14] Nor is there any legal basis for PHEAA's suggestion that approval of the Proposed Consent Judgment—which seeks to remedy violations of Federal consumer financial law—should hinge on whether the Bureau and the Trusts satisfy the Delaware state law standards for reformation of a written agreement. *See* D.I. 20 at 8-9.

nor attach a copy of the contract, or any portions of it, to their papers"). This Court can and should do the same.

Ultimately, PHEAA's various arguments about its reputation and the Servicing Agreement at most suggest that its "interests may be affected in some incidental manner" by implementation of the Proposed Consent Judgment, *Harris*, 820 F.2d at 601, including its "mere economic interest" as the Trusts' Primary Servicer, *Mountain Top*, 72 F.3d at 366. That is simply not enough to intervene as of right under Rule 24(a)(2), and PHEAA's motion should be denied.

## IV.    THE MOTION TO INTERVENE FILED BY GSS SHOULD BE DENIED

GSS Data Services' motion to intervene fails to identify specific interests that the company possesses that would be affected in direct, concrete ways by the Proposed Consent Judgment. Because the interests that GSS asserts are, at best, "general and indefinite," and because the asserted impacts on these purported interests are "collateral and … speculative," its motion to intervene under Rule 24(a)(2) should be denied. *See Treesdale*, 419 F.3d at 220, 225.

GSS performs a limited role in the operation of the Trusts. Namely, it is the Trusts' "Administrator," and, as the company acknowledges in its motion, its duties and responsibilities are exclusively defined in its contract with the Trusts. *See* D.I. 12 at 1, 9; D.I. 13-2, Butcher Decl. Ex. B at § 1 ("Administration Agreement"). These duties are primarily ministerial, and consist mostly of preparing and filing "all such documents, reports, filings, instruments, certificates and opinions" that the Trusts must prepare and file under its various agreements and applicable law. *See* D.I. 13-2, Administration Agreement § 1(a)(i). Indeed, in the case of non-ministerial matters—which includes the compromising of lawsuits brought against the Trusts—GSS is explicitly forbidden from taking any action at all unless directed by the Indenture Trustee, Owner Trustee, or Owners. *See id.* at §§ 1(d)(i), 1(d)(i)(B). Significantly, GSS has no role in the

servicing of the delinquent loans at issue, let alone the filing of collection lawsuits. In contrast, the Complaint and the Proposed Consent Judgment in this action primarily address the loan servicing, debt collection, and litigation practices of the Trusts' servicers responsible for these activities. *See, e.g.*, Compl. ¶¶ 2-3; PCJ ¶ 4. Any overlap between the conduct addressed by the Proposed Consent Judgment and the duties assigned to GSS by the Administration Agreement is minimal at best, and GSS's motion has not shown otherwise.

A.     **GSS Has Failed to Demonstrate That Any Legally Sufficient Interest Will be Impaired**

GSS argues in conclusory fashion that it has a right to intervene because the Proposed Consent Judgment "conflicts with the Trust Related Agreements concerning the ongoing operation of the Trusts" and because the Trust Related Agreements "appear to be superseded" by the Proposed Consent Judgment. *See* D.I. 12 at 9-10. However, the company's motion does not identify any contractual interest that *it* possesses that would be directly and concretely affected by the Proposed Consent Judgment. *See Kleissler*, 157 F.3d at 972. Rather, GSS makes categorical and unsupported assertions regarding the effect of the Proposed Consent Judgment on control of the Trusts. *See* D.I. 12 at 9.

In the only case GSS has cited to support its motion, a union sought to intervene in the entry of a consent judgment between several federal agencies and AT&T. *See* D.I. 12 at 7 (citing *EEOC v. AT&T*, 506 F.2d 735 (3d Cir. 1974)). There, the court found that the union could intervene because its collective bargaining agreement with the company was directly "impaired or impeded" by the consent judgment. *See AT&T*, 506 F.2d at 741-42; *see also EEOC v. AT&T*, 365 F. Supp. 1105, 1111 (E.D. Pa. 1973) (finding that the consent judgment made "unilateral revisions [to the union's] current contracts.")

Here, by contrast, GSS does not point to a single provision of the Proposed Consent Judgment that would directly revise or impair the Administration Agreement or any other agreement to which GSS is a party. This is unsurprising because the injunctive provisions in the Proposed Consent Judgment primarily relate to the default servicing of the loans – for which GSS has no responsibility. Similarly, the Compliance Audit required by the Proposed Consent Judgment does not anticipate the participation of GSS. Thus, GSS resorts to vague claims that the Proposed Consent Judgment "appears" to supersede Trust Related Agreements, and that it "appears to vest" authority over the Trusts with the Board. *See* D.I. 12 at 9-10. These vague assertions are unsupported by any concrete explanation as to how the Proposed Consent Judgment impacts the Administration Agreement, and therefore cannot carry GSS's burden under Rule 24(a)(2) to demonstrate that it has a sufficient, protectable legal interest that would be concretely impaired by the Proposed Consent Judgment. *See Virgin Islands*, 748 F.3d at 519; *Treesdale*, 419 F.3d at 220.

> ### B. GSS's Remaining Arguments Are Unpersuasive and Inaccurate

GSS also makes two additional arguments for intervention under Rule 24(a)(2), neither of which establish that it has a right to intervene here.

First, GSS argues that it should be permitted to intervene because the Trusts moved in the action in the Delaware Court of Chancery to have a notice of default entered as to GSS as administrator of the Trusts. *See* D.I. 12 at 7-8. But, as GSS admits, the Court of Chancery denied this motion, rendering it irrelevant to this motion to intervene. *See id.* at 8. Any anticipated future actions by the Trusts regarding GSS are entirely speculative. Further, the Proposed Consent Judgment contains no provisions concerning the Administrator's position in the Trusts' structure (or any provisions suggesting that the Administrator should be replaced). GSS's concern that the

Proposed Consent Judgment will result in its removal from its position does not constitute a sufficient basis for intervention under Rule 24(a).

Second, GSS argues that the Proposed Consent Judgment identifies the company as a "Servicer" and speculates that the definition may create a conflict with the Administration Agreement or make the company's obligations "unclear." *See D.I 12.* at 8-9. This hypothetical concern lacks an actual basis in the Proposed Consent Judgment. The conduct provisions in the Proposed Consent Judgment do obligate the Trusts to require that their servicers, including GSS as the Administrator, agree to abide by its provisions and refrain from taking certain actions. *See* PCJ ¶ 9. However, these conduct provisions predominantly address the filing of collection lawsuits. *Id*. As discussed above, GSS has no role in the default servicing of the Trusts' student loans, let alone in the filing of collection lawsuits. *See* D.I. 13-2, Administration Agreement § 1. Therefore, GSS has not demonstrated that the Proposed Consent Judgment's conduct provisions relating to servicers conflict with or make unclear any of GSS's existing contractual obligations or duties.

Finally, GSS also moves in the alternative for permissive intervention under Rule 24(b)(1)(B). *See* D.I. 12 at 6-7. That request should be denied. GSS's presence in this lawsuit— given its largely ministerial role and its lack of involvement in the Trusts' collections suits—will add little, and risks unduly delaying these proceedings. *See* Fed. R. Civ. P. 24(b)(3). Further, its motion makes no claims or arguments in support of permissive intervention. *Anspach ex rel. Anspach v. City of Philadelphia, Dep't of Pub. Health*, 503 F.3d 256, 258 n.1 (3d Cir. 2007) ("[F]ailure to raise an argument in one's opening brief waives it." (citation omitted)).

## V.      THE MOTION TO INTERVENE FILED BY WILMINGTON TRUST COMPANY SHOULD BE DENIED

The Court should deny WTC's motion for intervention. As the company acknowledges in its motion, WTC plays a limited, non-discretionary role in the Trusts' operations. *See* D.I. 31 at 2.[15] Its responsibilities are delineated in the Trust Agreements, and consist principally of ministerial duties such as executing and signing trust documents and tax returns. *See* D.I. 13-1, Trust Agreement §§ 8.02, 8.05, 8.07. As WTC also acknowledges, it can be directed by the Owners or, in some cases, the Administrator. D.I. 31 at 2. In the event that WTC takes or refrains from taking any action at the direction or instruction of the Owners, it is protected from personal liability for that action or restraint and is fully indemnified by the Owners. *See* D.I. 13-1, Trust Agreement §§ 8.06, 10.02. Additionally, WTC has no role in the servicing or default servicing of the student loans at issue. WTC thus has a tangential relationship to the Proposed Consent Judgment, which aims to end illegal debt collection and loan servicing activities conducted on behalf of the Trusts. WTC nonetheless argues that it is entitled to intervene as of right under Rule 24(a), but its motion fails to satisfy its burden of demonstrating that it has a sufficient interest in this litigation and that that interest will be impaired.

### A.      WTC Has Not Shown That It Has a Specific Protectable Interest in This Litigation

WTC cannot meet its burden of showing that it has a right to intervene in this litigation because it has no specific and definite interest in this litigation's subject matter. *See Treesdale,* 419 F.3d at 220. Indeed, WTC admits that it "does not have discretionary management or regulatory responsibilities" in the Trusts, that it serves merely as an "accommodation party," and that it receives "*de-minimus* annual compensation" for performing this role. *See* D.I. 31 at 2. In

---

[15] The Bureau initially dealt with WTC, as it is the designated agent for service of process for the Trusts, with respect to procedural issues regarding service of administrative subpoenas on the Trusts.

fact, the sole argument that WTC makes to support its claim to a legally protectable right is the statement that it is "indisputably the Owner Trustee of the Trusts." *See id.* at 5. However, the company provides no explanation of how its limited role in the Trusts' structure, and nothing more, gives it a right to intervene here. Nor does it cite to a single authority in support of its position. Moreover, as discussed above, this litigation addresses the loan servicing, debt collection, and litigation practices of the Trusts' servicers. *See, e.g.*, Compl. ¶¶ 2-3; PCJ ¶ 4. Nothing in WTC's motion or the Trust Agreement shows that WTC has any meaningful connection with these activities or servicers.

### B.       WTC Has Not Shown That Any Interest That It Has Will be Concretely Affected by This Litigation

Even if WTC's role as the current Owner Trustee provides it with a sufficient protectable interest in this litigation (which it does not), WTC fails to satisfy its burden to demonstrate that this interest will be affected in an immediate and adverse way. *See Treesdale*, 419 F.3d at 225. Although WTC claims that the Proposed Consent Judgment will require it to take actions "in violation of the Trust Agreements and the Trust Related Agreements" it neither cites to any offending provision of the Proposed Consent Judgment, or even explains these claimed violations. D.I. 31 at 6. On the contrary, the Trust-Related Agreements grant the Owners the right to compromise lawsuits brought against the Trusts, and here, a Proposed Consent Judgment was negotiated and agreed to by the Owners (with counsel appointed with the participation of WTC) pursuant to that authority.

Elsewhere in its motion, WTC asserts that it received an opinion from counsel advising it that the Proposed Consent Judgment would "contravene the Trusts' Indentures." D.I. 31 at 3. But it does not attach or quote this purported advice, or even explain the content of counsel's

advice.[16] WTC cannot intervene based on such conclusory assertions that the Proposed Consent

Judgment is contrary to the Trust Agreements. *See Floyd*, 302 F.R.D. at 110 (noting that

conclusory allegations cannot support intervention as of right under Rule 24); *Sheppard*, 1998

WL 397846, at *5 (denying motion to intervene where union claimed that a settlement was

contrary to its labor agreement but failed to cite specific provisions of the labor agreement that

would be impaired).

Moreover, as noted above, WTC is fully indemnified by the Owners for taking or

refraining to take any action at the direction of the Owners. Thus, even assuming *arguendo* that

the Proposed Consent Judgment does violate the Trusts Agreements and Related Trust

Agreements (which it does not), WTC would not appear to incur any liability. *See* D.I. 13-1,

Trust Agreement §§ 8.06, 10.02.  In light of this fact, and WTC's failure to put forth more than

conclusory assertions about the consequences of the Proposed Consent Judgment, it has not even

identified how its interests might be affected, let alone demonstrated that they will be.

## VI.   THE MOTION TO INTERVENE FILED BY THE OBJECTING NOTEHOLDERS SHOULD BE DENIED

### A.   The Objecting Noteholders and U.S. Bank as Indenture Trustee Seek to Intervene to Protect the Same Interest

In the event the Court grants U.S. Bank's motion to intervene in its capacity as Indenture

Trustee (which the Bureau does not oppose), the Court should deny the motion to intervene filed

by the Objecting Noteholders, whose interests will be adequately represented by U.S. Bank. *See*

---

[16] WTC and some of the other intervenors appear prepared to argue that the Trusts cannot be ordered to pay penalties, or even to return amounts collected unlawfully from consumers whose loans the Trusts cannot demonstrate they own. In essence, they are arguing that—although the Trusts profit directly from the unlawful collections—they cannot be held liable because of the securitization contracts.

*Virgin Islands*, 748 F.3d at 519 (denying motion to intervene where movant's interests were adequately represented).

Various entities that own approximately $1.4 billion in notes issued by the Trusts (Objecting Noteholders) filed a motion to intervene for the limited purpose of opposing the Proposed Consent Judgment. D.I. 11 at 1. The Objecting Noteholders seek to intervene based on their possession of notes issued by the Trusts. *See id.* The Objecting Noteholders claim that entry of the Proposed Consent Judgment "would impose a substantial – and potentially irreparable injury" because of the dilution of the Trusts' assets that would occur if the Trusts had to pay $19.1 million to the Bureau and implement the required injunctive provisions. *Id.* at 2. It is the Trusts' assets that back and guarantee the payments owed to the Objecting Noteholders. *Id.* In addition, the Objecting Noteholders argue that certain provisions in the Proposed Consent Judgment (ceasing collections, establishing an escrow account for monies collected by the Trusts, and altering the Indenture to permit a Board to determine what if any amounts are paid to the noteholders) would "threaten to vitiate" their rights to obtain payment of interest and principal due to them under agreements governing the Trusts. *Id.* at 3. Thus, the Noteholders' purpose in intervening is clearly to oppose entry of the Proposed Consent Judgment in order to protect their right to receive payments under the various Trust agreements.

U.S. Bank's interests are the same or substantially overlap with the interests of the Objecting Noteholders. U.S. Bank states in its Opening Brief supporting its motion to intervene that it "holds as trustee for the benefit of the holders' of the debt issued by the Trusts (the 'Noteholders') a perfected security interest in the student loans . . . including payments collected by servicers and paid out as principal and interest to the debt holders." D.I. 36 at 1. U.S. Bank goes on to claim that the "Proposed Consent [Judgment] imposes a lengthy moratorium on

collection activity, which will inevitably reduce the funds available to pay the Noteholders." *Id.* at 2. In arguing that as Indenture Trustee it has a sufficient interest in the litigation, U.S. Bank claims that the Proposed Consent Judgment "will directly and adversely affect the security and other contractual interests of the Noteholders, and therefore affect the Indenture Trustee." *Id.* at 8. Indeed, U.S. Bank acknowledges that it "has consulted with Noteholders and *has the authority under the Indentures to act for Noteholders in legal proceedings*, such as this matter." *Id.* (emphasis added). Therefore, U.S. Bank as Indenture Trustee is seeking to intervene in this matter for the same purpose as the Noteholders—to oppose entry of the Proposed Consent Judgment in order to protect the interest of Noteholders as investors in the Trusts to receive payments under the various Trust agreements.

    **B.**    **U.S. Bank as Indenture Trustee Would Adequately Represent the Interests of the Noteholders**

"Representation will be considered inadequate on any of the following three grounds: (1) that although the applicant's interests are similar to those of a party, they diverge sufficiently that the existing party cannot devote proper attention to the applicant's interests; (2) that there is collusion between the representative party and the opposing party; or (3) that the representative party is not diligently prosecuting the suit." *Brody By and Through Sugzdinis v. Sprang*, 657 F.2d 1108, 1123 (3d Cir. 1992) (citation omitted); *Nat'l Collegiate Athletic Ass'n v. Corbett*, 296 F.R.D. 342, 349 (M.D. Pa. 2013). The Noteholders do not and cannot credibly argue that there is any collusion between U.S. Bank and either the Bureau or the Trusts, or that U.S. Bank would not diligently oppose entry of the Proposed Consent Judgment should the Court grant its intervention motion as Indenture Trustee.

Thus the only possible grounds for determining that the Noteholders' interests are not adequately represented would be that its interests in this litigation diverge from those of U.S.

Bank as Indenture Trustee. However, as articulated *supra*, a plain reading of the Noteholders'

Motion and U.S. Bank's Opening Brief as Indenture Trustee reveals that both entities are seeking

to intervene in this matter for the purpose of protecting the Noteholders' right to receive

payments under the various Trust agreements. Where an entity seeking to intervene shares the

same or substantially overlapping interests with another party, then that entity is adequately

represented and cannot intervene under Rule 24. *See Pennsylvania Gen. Energy Co., LLC v.*

*Grant Twp.*, 658 F. App'x 37, 41 (3d Cir. 2016) ("Fatal to the Appellant's request to intervention

is the substantial overlap between their interests and those of the Township."); *U.S. ex rel. Frank*

*M. Sheesley Co. v. St. Paul Fire and Marine Ins. Co.*, 239 F.R.D. 404, 414 (W.D. Pa. 2006)

(denying intervention as of right where intervenor "made no contention that the [Defendants']

interests are different from its own"); *In re Camden Police Cases*, No. 11–1315 RBK/JS, 2012

WL 4442415 at *3 (D.N.J. Sep. 24, 2012) (denying intervention where proposed intervenor and

existing party both shared interest in maximizing insurance coverage).

      Given U.S. Bank's representation that it has contractual obligation to act on behalf of the

noteholders, and its shared objective of maximizing payments to the noteholders, it adequately

represents the interests of the Objecting Noteholders. Therefore, if the Court grants U.S. Bank's

motion to intervene in its capacity as Indenture Trustee, the Objecting Noteholders' motion to

intervene should be denied.[17]

## VII.   THE COURT SHOULD LIMIT INTERVENORS' PARTICIPATION IN THIS LAWSUIT

      To the extent the Court grants any of the pending motions to intervene, it should limit

intervenors' participation in this lawsuit to objecting to entry of the Proposed Consent Judgment.

---

[17] If the Court find that U.S. Bank as Indenture Trustee lacks a sufficient interest to intervene in this action, the Objecting Noteholders also clearly do not have a sufficient interest.

It is well established that intervention under Rule 24(a)(2) "may be subject to appropriate conditions or restrictions responsive, among other things, to the requirements of efficient conduct of the proceedings." Fed. R. Civ. P. 24 Adv. Comm. Notes (1966); *see also Beauregard, Inc. v. Sword Servs. L.L.C.*, 107 F.3d 351, 353 (5th Cir. 1997) ("[R]easonable conditions may be imposed even upon one who intervenes as of right"). The Third Circuit has thus recognized that it can be appropriate to limit an intervenor's participation to a "discrete phase[] of an action"— such as the "remedial stage"—because an intervenor "may have a sufficient interest to intervene as to certain issues in an action without having an interest in the litigation as a whole." *Harris,* 820 F.2d at 599.

Here, the movants generally acknowledge that their reason for seeking to intervene is for the purpose of opposing the Proposed Consent Judgment. *See, e.g.*, D.I. 11 at 1 (Objecting Noteholders "move to intervene for the limited purpose of objecting to the Proposed Consent Judgment"). None of the movants claim to intervene for the purpose of disputing the Trusts' liability for the debt collection misconduct alleged in the Complaint. Accordingly, if the Court grants any of the intervention motions, it should be for the limited purpose of presenting briefing on their positions regarding the remedies ordered by the Proposed Consent Judgment. Such a limitation will ensure that the presence of additional parties does not unduly delay this action— which seeks urgently needed relief on behalf of consumers for Defendants' ongoing violations of Federal consumer financial law. *See F.T.C. v. Mercury Mktg. of Delaware, Inc.*, No. CIV.A.00-3281, 2004 WL 2110686, at *2 (E.D. Pa. Aug. 25, 2004) (allowing entities to intervene "for the limited purpose of advancing their interest as to the appropriate remedy as it relates to all parties, on condition that they do not attempt to delay or continue the proceedings presently scheduled"). To further avoid such delay, the Bureau respectfully requests that the Court set a schedule for

briefing the Bureau's motion for entry of the Proposed Consent Judgment once the Court has ruled on the pending intervention motions.

## CONCLUSION

For the reasons set forth above, the Court should deny the motions to intervene filed by TSI, PHEAA, GSS, the Objecting Noteholders, and WTC because they have failed to satisfy the requirements of Federal Rule of Civil Procedure 24. In addition, should the Court grant any of the pending motions to intervene, it should limit intervenors' participation in this action to objecting to the entry of the Proposed Consent Judgment.


Dated: November 1, 2017

Respectfully submitted,

ANTHONY ALEXIS
Enforcement Director

DEBORAH MORRIS
Deputy Enforcement Director

CRAIG COWIE
Assistant Litigation Deputy

/s/ Carolyn Hahn

(E-mail: Carolyn.Hahn@cfpb.gov)
(Phone: 202-435-7250
Colin Reardon
(E-mail Colin.Reardon@cfpb.gov)
(Phone: 202-435-9668)
Gabriel Hopkins
(E-mail Gabriel.Hopkins@cfpb.gov)
(Phone: 202-435-7842)
*Enforcement Attorneys*
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552
Facsimile: (202) 435-7722

For the Consumer Financial Protection Bureau

<u>Certificate of Service</u>

I hereby certify that on November 1, 2017, a copy of foregoing Plaintiff Consumer Financial Protection Bureau's Consolidated Response to Motions to Intervene was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.

/s/ Carolyn Hahn
Carolyn Hahn
1700 G Street NW
Washington, DC 20552
E-mail: Carolyn.Hahn@cfpb.gov
Phone: 202-435-7250