**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, | : | C.A. No. 17-1323 (MN) |
| | : | |
| Plaintiff, | : | |
| | : | **PUBLIC VERSION Filed March 19, 2020** |
| v. | : | |
| | : | |
| THE NATIONAL COLLEGIATE MASTER STUDENT LOAN TRUST et al., | : | |
| | : | |
| Defendants. | : | |

**INTERVENORS' CONSOLIDATED ANSWERING BRIEF IN OPPOSITION TO
PLAINTIFF'S MOTION TO APPROVE THE PROPOSED CONSENT JUDGMENT**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................... 1

FACTS ................................................................................................................... 4

    **A.** The Trusts ..............................................................................................4

    **B.** The Grant of the Trusts' *Res* to the Indenture Trustee .........................7

    **C.** VCG's Plan to Obtain Control Over the Trusts ...................................10

    **D.** VCG Hires Chaitman Without Authorization—And Only for the Odyssey Agreement, Not for the CFPB Action ...........................................................12

    **E.** Chaitman Hires McCarter Without Authorization—And for the PHEAA Action, Not for the CFPB Action ..........................................................13

    **F.** VCG Directs McCarter to Effect ██████████████ ..............................14

    **G.** VCG Directs ████████████████████ ...........................................20

    **H.** VCG Tries But Fails to Secure Authority for the PCJ ...............................21

    **I.** Lacking the Owner Trustee's Authorization, VCG Proposes ███████ ..........23

ARGUMENT .......................................................................................................... 25

  **I.** **MCCARTER LACKED THE AUTHORITY TO EXECUTE THE PCJ** ................. 25

    **A.** McCarter Lacked Authority Because the Owners Lacked Authority .........................25

    **B.** McCarter Lacked Authority Because Chaitman Lacked Authority ...........................28

    **C.** Without the Indenture Trustee's Approval, the Settlement is Void ...........................30

    **D.** McCarter Lacked the Requisite Consents from Other Transaction Parties ................31

  **II.** **IT WAS IMPROPER FOR MCCARTER TO ENTER INTO THE PCJ** ................. 36

CONCLUSION ....................................................................................................... 40

## TABLE OF AUTHORITIES

**Cases**                                                                                      **Page**

*Bass v. Federal Sav. & Loan Ins. Corp.*,
   698 F.2d 328 (7th Cir. 1983) ..................................................................................31

*In re Bank of New York Mellon*,
   42 Misc.3d 1237(A) (N.Y. Sup. Ct. 2014)..............................................................30

*In re Corn Derivatives Antitrust Litig.*,
   748 F.2d 157 (3d Cir. 1984)...................................................................................36

*In re: National Collegiate Student Loan Trusts
   2003-1*, No. 18-3327 (3rd Cir.)...............................................................................4

*In re National Collegiate Student Loan Trusts
   2003-1*, 16-cv-00341 (D. Del. 2016) ...................................................................11

*McCarter & English LLP v. The National Collegiate Master Student Loan Trust I,
   et al.*, Index No. 654144/2018 (N.Y. Sup. Ct.)................................................29, 37

*Phoenix Light SF Ltd. v. U.S. Bank, N.A.*,
   No. 14-cv-10116 (KB), 2015 WL 2359358 (S.D.N.Y. May 18, 2015)............30, 31

*Schock v. Nash*,
   732 A.2d 217 (Del. 1999) ......................................................................................36

*Triton Const. Co. v. E. Shore Elec. Servs., Inc.*,
   2009 WL 1387115 (Del. Ch. May 18, 2009).........................................................26

*In re U.S. Bank Nat'l Ass'n*,
   51 Misc.3d 273 (N.Y. Sup. Ct. 2015) ....................................................................31

*U.S. Bank Nat'l Assoc. v. Federal Home Loan Bank of Boston*,
   2016 WL 9110399 (N.Y. Sup. Ct. 2016)................................................................31

*U.S. v. Sharlands Terrace, LLC*,
   2007 WL 1577847 (D. Nev.) ..................................................................................31

*United States v. City of Hialeah*,
   140 F.3d 968 (11th Cir. 1998) ...............................................................................32

**Statutes**

12 Del. C. § 3338 .........................................................................................................32

12 Del. C. § 3806 ...................................................................................................26, 27

12 U.S.C. § 5564(c) ........................................................................................................25

**Other**

Del. Ct. Ch. R. 101(a)(7)................................................................................................32

Restatement of Agency § 8.09........................................................................................26

DRPC 1.2 ........................................................................................................................37

Pursuant to the Court's order dated November 29, 2018 (D.I. 99), as amended, the Intervenors hereby submit their answering brief addressing the two threshold issues ("Threshold Issues") identified by the Court in opposition to the motion by the Consumer Financial Protection Bureau ("CFPB") for approval of the Proposed Consent Judgment ("PCJ").

## PRELIMINARY STATEMENT

The McCarter & English, LLP law firm ("McCarter") was not authorized to agree to *any* federal court enforcement order on behalf of any of the fifteen National Collegiate Student Loan Trusts,[1] much less an order that—like the PCJ—contravenes the Trusts' governing agreements, conflicts with binding contractual relationships among multiple parties, imposes burdensome compliance provisions at extraordinary costs to the Trusts, and assesses multi-million dollar penalties on top of disgorgement and restitution awards.

Nor did McCarter obtain the requisite approval from those parties with the authority to endorse the PCJ, or the requisite consent from those parties that actually would bear the financial burden (the Noteholders and Note Insurer) and that would be tasked with performing the directives of the PCJ (the other Intervenors).  Nonetheless, knowing full well that it lacked the contractually-mandated authorization, McCarter improperly followed the directive of certain residual equity holders of the Trusts (the "Owners") to agree to an enforcement order that would illicitly re-write the governing agreements to the Owners' advantage, diverting to their own pockets funds contractually earmarked to repay the Noteholders and providing the Owners with control of the Trusts.  As both unauthorized and improper, the PCJ should not be approved.

---

[1] Capitalized terms not otherwise defined have the meaning ascribed thereto in the Trust Agreements ("TA"), Indentures and the Administration Agreements.  Unqualified references to these agreements are to those versions from the National Collegiate Student Loan Trust ("NCSLT" or "Trust") 2006-4 transaction.  References to the agreements as "Insured" are to those from NCSLT 2007-4.  If terms are the same, only the NCSLT 2006-4 agreements are cited.

McCarter lacked the authority to execute the PCJ on the Trusts' behalf for at least four independent reasons.  As to each, McCarter **admitted** at deposition the salient predicate facts establishing its lack of authority:

*First***,** McCarter did not obtain the authorization of the Owner Trustee to execute the PCJ. Under the governing Trust Agreements, the Owners can act only through the Owner Trustee, as the Trusts' authorized agent.  ███████████████████████████████████████████ █████████████████████████████. ████████████████████ only after the Owner Trustee rejected Uderitz's demand that it execute the PCJ having determined that, *inter alia*, the PCJ violated the governing Trust Related Agreements.  That the Owner Trustee did not execute the PCJ or authorize McCarter to execute the PCJ is fatal to McCarter's authority.

*Second,* McCarter had no authority to execute the PCJ on behalf of the Trusts because Chaitman LLP, which purported to retain McCarter on behalf of the Trusts, lacked authority.

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████.  In fact, the record shows the retention of Chaitman was defective because ████ ███████████████████████████████████████.  Moreover, even if it had been obtained, Chaitman's retention did not encompass compromising the CFPB's claims or acting on behalf of all the Trusts.  Since all of McCarter's authority flowed from Chaitman, these defects in Chaitman's authority necessarily mean that McCarter also lacked authority.

*Third,* ████████████████████████████████████████████████████████.
Until the Notes are repaid and the Indentures are discharged, only the Indenture Trustee has authority to compromise claims that, like the CFPB's allegations against the Trusts, affect the priority of liens on and payments from the student loans granted by the Owner Trustee to the Indenture Trustee.  Yet, McCarter did not even ███████████████████████████████████████

██████████████████████████████████████.

      ***Fourth,*** <u>McCarter did not obtain the requisite consent from the other necessary transaction parties</u>. ██████████████████████████████████████████

████████████████████████████████████████████████

███████. Yet consent from those parties was never obtained even though the PCJ would re-write the Trusts' governance, priority of liens and payments, and call for material unauthorized payments to be made from the Trusts' assets. And even if the PCJ did not breach the Trust Related Agreements (it does), McCarter conceded that ████████████████████████████████████ ████████████████████████████████.

      In addition, McCarter's signing of the PCJ on behalf of the Trusts was improper as it violated the duties it owed to the Trusts—and to the Trusts' priority economic beneficiaries:

      ***First,*** McCarter negotiated terms of the PCJ that were intended to (and would) alter the Trust Related Agreements by placing the Owners in control of the Trusts' governance and assets, while accepting ████████████████████ the extraordinary financial penalties the CFPB proposed. Those terms served to benefit the Owners to the detriment of the Trusts and the true priority economic beneficiaries that would bear the resultant losses—Noteholders and Ambac.

      ***Second,*** to further Uderitz's interests, ████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████. In fact, McCarter signed the PCJ following Uderitz's determination that ████████████████████████████████ ████████████████████████████████.

      For each of the forgoing reasons, the Intervenors respectfully submit that the Court should find that the CFPB has not overcome either Threshold Issue, and deny the motion for approval.

## FACTS

The following sections recite the irrefutable record—with the salient facts drawn from McCarter's admissions—that demonstrates that the Threshold Issues are dispositive of this matter.

### A.     The Trusts

#### 1.     The Trusts, Trustees, and Administrator

The Trusts are fifteen Delaware statutory trusts created between 2001 and 2007 to effectuate the securitization of pools of student loans.  D.I. 1 ¶ 10.  The operation of each Trust is governed by a Trust Agreement, Indenture, and Administration Agreement, which are "contemporaneous, interrelated documents that each refer to the other" and must be read together to be properly understood.[2]  The Trust Agreements are governed by Delaware law.  Ex. 1, TA     § 14.10.  The Indentures and Administration Agreements are governed by New York law.  Ex. 2, Administration Agreement § 13; Ex. 3, Indenture § 11.12.[3]

In McCarter's words, ███████████████████████████ █████████████ Ex. 4 at -0001464. The Trusts have no officers or employees.  D.I. 1 ¶ 12. Rather, three entities are respectively tasked with particular, contractually-specified aspects of the Trusts' administration while the Indentures are outstanding:  The Owner Trustee (Wilmington Trust Company or "WTC"), the Administrator (GSS Data Services), and the Indenture Trustee (U.S. Bank).  *See* Ex. 1, TA §§ 2.01, 2.03(b)(i), (iv); Ex. 2, Administration Agreement § 1(c)(i); Ex. 3, Indenture § 3.19.

---

[2] Brief for Defendants-Appellees at 44, *In re: National Collegiate Student Loan Trusts 2003-1*, BL-44, No. 18-3327 (3rd Cir.).

[3] All references to "Ex_" are to exhibits annexed to the accompanying declaration of Erik Haas dated March 12, 2020.

### 2.    The Priority Economic Beneficiaries

Noteholders and Ambac as Note Insurer are the two priority economic beneficiaries of the Trusts that have the only remaining viable economic claims to the Trusts' assets.[4]  By executing the Indenture, the Owner Trustee pledged the Trusts' rights in the "student loans and payments received therefrom" to an Indenture Trustee, whereby those interests became part of the Indenture Trust Estate that serves as Collateral for the Noteholders and Ambac.  Ex. 1, TA    § 2.03(a)(i), (b)(i); Ex. 3, Indenture, Granting Clause.  Under the Indenture, the Indenture Trustee holds a first priority lien on those assets for "the benefit of the holders of the Notes and Ambac."  Ex. 5, Insured Indenture, Granting Clause.  Accordingly, the Noteholders and Ambac are entitled to payment of **all** amounts due to them before **any** amounts may be paid to the Owners.  Ex. 5, Insured Indenture § 8.02; Ex. 6, Insured TA § 5.02.  Reflecting their priority economic interests, the Noteholders and Ambac are express third-party beneficiaries of the Trust Agreements, the Servicing Agreements, and Indentures.  *See* Ex. 6, Insured TA § 14.04; Ex. 3, Indenture §§ 11.10, 11.18.[5]

### 3.    The Residual "Owners"

The Trusts issued certificates that represent residual beneficial ownership interests.  Ex. 1, TA § 3.01.  The holders of the residual interests are referred to as "Owners."  *Id*. § 1.01.  As residual interest holders, the Owners are not entitled to receive **any** payments until the Notes are

---

[4] Ambac issued policies guaranteeing payments on certain Notes in three Trusts:  the Master Trust, NCSLT 2007-3, and NCSLT 2007-4 (collectively, the "Insured Trusts").

[5] *Accord* Ex. 3, Indenture § 11.18 ("This Indenture will inure to the benefit of and be binding upon the parties hereto, the Owner Trustee, the Noteholder, the Note Owners, TERI and their respective successors and permitted assigns."); Ex. 5, Insured Indenture § 11.10 ("Ambac is hereby explicitly recognized as being a third-party beneficiary hereunder and may enforce any such right, remedy or claim conferred, given or granted hereunder as if it were a party hereto."); Ex. 7, Insured Administration Agreement § 18 ("[T]he parties hereto acknowledge that Ambac, the Noteholders, Certificateholders and TERI . . . are express third party beneficiaries hereof and are entitled to enforce their respective rights hereunder as if actually parties hereto."); Ex. 8, Insurance & Indemnity Agreement §§ 2.03(i), 2.04(h); D.I. 181 at 5.

repaid, Ambac is fully reimbursed under its policy, and each Indenture is discharged.  Ex. 5, Insured Indenture § 8.02(d); Ex. 6, Insured TA § 5.02.  In light of the loan defaults that have occurred, the Owners ███████████████████████████████████████████████ .[6]  Ex. 10, Rodriguez-Lugo 249:20-251:11.  As explained in detail below, the Owners' ability to make decisions for any Trust is severely circumscribed under the governing agreements unless and until the related Indentures are discharged—an event that is extremely remote.  Regardless, under the Trust Agreements, the Owners have no right to act in the name of any Trust; only the Owner Trustee may act in their name, in connection with any instructions that are consistent with the governing agreements.

In all but the Master Trust, the residual ownership certificates in the Trusts currently are held by two Owners:  NC Owners LLC, which owns 99.9999%, and Pathmark Associates LLC ("Pathmark"), which owns 0.00001%.  Uderitz controls VCG Securities LLC ("VCG"), which in turn controls NCO Owners LLC.[7]  VCG first acquired its interest in these residual certificates in 2009.  Ex. 11 at 1-3.  At that time a Citibank affiliate—SL Resid Holdings LLC ("Citi")—owned approximately 13-35% of the residuals.  *Id.* at 2-3.  In March 2016, VCG acquired Citi's residual interests— ████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████ .  Ex. 12 at 27:25-28:13; Ex. 25 at 17.

Although VCG "████████████████████████████████████████," *see* Ex. 13, the "Owners" are not the "Trusts", and their interests are not necessarily aligned, *see*

---

[6] As noted in another action, VCG assigned <u>zero</u> value to positions senior to its residual interest, thereby acknowledging the residual will never receive any distribution.  *See* Ex. 9 at 11.

[7] ████████████████████████████████████████████████████

██████████████████████████████████████ .  *See* Ex. 33, Kosch 34:4-12, 87:3-12

Ex. 1, TA §§ 1.01 (definition of "Authorized Officer"), 2.01-2.03, 4.02(a), (b); Ex. 14, Gotthoffer 48:9-11.

### 4.    The Servicers

Loan "servicing" is the process of collecting amounts due on the loans.  The Trusts contracted primarily with Pennsylvania Higher Education Assistance Agency ("PHEAA") to act as the servicer of loans that are current or not seriously past due.  D.I. 54 at 5; D.I. 95 at 8.

Pursuant to special servicing agreements executed in 2009 with the consent of the Indenture Trustee, an affiliate of First Marblehead (the sponsor of the securitizations) acted as the special servicer overseeing collection of past due or defaulted loans and managing collection litigation. The First Marblehead affiliate resigned in 2012, and U.S. Bank, as "Back-up Special Servicer", assumed the role of Successor Special Servicer, but its function was to engage sub-servicers.  D.I. 1 ¶¶ 21-23; D.I. 54 at 5.  In 2014, TSI assumed control over certain business units that previously had been run by NCO Financial Systems, Inc. and became the sub-servicer managing collections and collection litigation activity.  D.I. 1 ¶ 16; D.I. 54 at 5; D.I. 95 at 8.

### B.    The Grant of the Trusts' *Res* to the Indenture Trustee

The Trust Agreements provide that the purpose of each Trust is to "acquire a pool of Student Loans, to execute the Indenture and to issue the Notes" and to execute the agreements for the "administration" and "servicing" of those loans.  Ex. 1, TA §§ 2.03(a)(i)-(iii), 2.04.  Absent the consent of Noteholders (and Ambac for the Insured Trusts), each Trust Agreement strictly limits and proscribes the Trust from engaging in additional business or activities "[u]ntil the Indenture is discharged."  Ex. 1, TA § 2.03(a)(iv); *accord* Ex. 6, Insured TA § 14.01(a).

By executing the Indenture and pursuant to its "Granting Clause", each Trust assigned and pledged to the Indenture Trustee all right, title and interest in the student loans and related securitization contracts, for the benefit of the Noteholders and Ambac.  Ex. 5, Insured Indenture,

Granting Clause.[8]  This Grant was an "absolute" conveyance of "all rights, powers and options" of the Trusts including "generally to do and receiv[e] anything that the [Trust] is or may be entitled to do or receive."  Ex. 3, Indenture, App. A (Definition of "Grant"); *id.* § 3.07(f).  Pertinent here, the Grant encompassed "all present and future claims, demands, causes and chooses in action" pertaining to the student loans and their servicing, including the authority "to bring Proceedings" in the name of the Trusts.[9]  *Id.*, Granting Clause.

Included within the Grant is a first priority and perfected lien on the Indenture Trust Estate in favor of the Indenture Trustee for the benefit of the Noteholders and Note Insurer.  Ex. 5, Insured Indenture § 3.22(a), (b), (f).  The Indenture Trustee "shall deposit" payments received from servicers into the Collection Accounts, from which distributions are made according to the Indenture payment waterfall.  Ex. 3, Indenture §§ 8.01, 8.02(d).  Further, "the Trust Accounts [including the Collection Account] shall be under the ***sole dominion and control*** of the Indenture Trustee."  *Id.* § 8.02(c) (emphasis added).  Payments from the Trust Accounts are made in strict accordance with heavily negotiated payment provisions set forth in the Indentures that establish the relative priority of all distributions ("Payment Waterfall").  *See* Ex. 3, Indenture §§ 3.23(m), 3.17, 8.02(d).  The Payment Waterfall assigns highest priority to certain fees and expenses of the Owner Trustee, Indenture Trustee, Servicers, and Administrator (subject to applicable caps), and sets forth how remaining funds must be distributed to the Noteholders, Note Insurer, and other specified parties.  To preserve and protect those priority interests, the Indentures prohibit the Trusts

---

[8] The Trust Agreements explicitly provide that the "pledge of any Trust Property to any Person by the Owner Trustee made under any Trust Related Agreement and pursuant to the terms of this Agreement shall bind the Owners and shall be effective to transfer or convey the rights of the Owner Trustee and the Owners in and to such Trust Property to the extent set forth in such Trust Related Agreement."  Ex. 1, TA § 14.03.

[9] "Proceedings" is defined broadly to include "any suit in equity, action at law or other judicial or administrative proceeding."  Ex. 3, Indenture at A-20.

from impairing or conveying, and mandate that the Trusts take all actions necessary to maintain and preserve, the Indenture Trust Estate and the lien created by the Indenture—until the Notes are repaid and the Indentures are discharged. *See id.* §§ 2.09, 3.05(i), 3.23(m), (o), 9.02.

Moreover, the Indentures require the Trusts to obtain consent from the Indenture Trustee, the Noteholders, and Ambac in order "to amend, modify, waive, supplement, terminate or surrender" the terms of the Trust Related Agreements, or ***"to agree to"*** any such act. Ex. 3, Indenture § 3.07(f) (emphasis added); *accord* Ex. 5, Insured Indenture § 3.07(f). The Trusts may not "sell, transfer, exchange or otherwise dispose" of any part of the Indenture Trust Estate unless expressly permitted by the Trust Related Agreements or directed to do so by the Indenture Trustee or Ambac. Ex. 5, Insured Indenture § 3.08.

Finally, to reinforce the priority rights of the Noteholders and Ambac over the interests of the Owners, the Trust Agreements constrain the Owners' ability to cause the Trusts to act while the Notes are outstanding:

- The Trusts can act only through the Owner Trustee and its agents. Ex. 1, TA §§ 2.01, 2.02, 2.03(b)(i), (ii), (iv), (vi), 4.01, 4.02, 9.03(b), 10.01;

- The Owners' right to direct the Owner Trustee to take actions on behalf of the Trusts is limited, and the Owners are expressly prohibited from directing the Owner Trustee to take actions that would violate the Trust Related Agreements. *Id.* § 4.02(b);

- The Owner Trustee is not obligated to follow any direction that violates any Trust Related Agreement or the law. *Id.* § 4.02(a)(i);

- Directions to the Owner Trustee to take non-ministerial actions must be made by ***all*** the Owners. *Id.* § 4.01(a). The Master Trust Agreement also provides that ██ ██████████████████████████ Ex. 15, Master TA § 4.01(a);

- The Trusts must "avoid the appearance . . . of conducting business on behalf of any Owner or any Affiliate of an Owner." Ex. 1, TA § 2.03(b)(iv).

These terms align the authority over the Trusts and their assets with the entities that have the

priority economic interests—the Noteholders and Ambac.

### C.    VCG's Plan to Obtain Control Over the Trusts

The PCJ's origins — and McCarter's unauthorized and improper decision to execute the PCJ — lie in VCG's attempt to monetize its otherwise worthless investment in the Trusts by installing its own affiliate as servicer for the Trusts.  To that end, ████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████. Ex. 16, Uderitz 353:25-354:2, 50:24-51:8.  In an email sent in November 2015 concerning ██████████████, Uderitz outlined his ██ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ Ex. 17 at -042904.  ██████████████████████████████████████████ ████████████████████████████████████████████████. *Id.*  Uderitz instructed Chaitman and his other counsel that ██████████████████████ ██████████████████████████████ *Id.*

VCG's efforts to have the Trusts retain Odyssey began as early as November 2014, ███ ████████████████████████████████████████████████████████████████ ████████████████████████████████. *See* Ex. 18 (the "████████████ ████████████████"). ██████████████████████████████████████████ ████████████████████████████████████████████. *Id.* at -00010625.  The Owner Trustee, though, never signed that servicing agreement.

On December 29, 2014, VCG issued ████████████████████████████ ████████████████████████████████████████████. Ex. 19 (the "████████████ ████████████████████"). ██████████████████████████████████. *Id.* at -00003935.  ████████████████████████████████████████████████. Ex. 1, TA §



4.01(a).  Moreover, although the Owner Trustee executed the Odyssey Agreement ███████, it was not—and has never been—countersigned by the Administrator or the Indenture Trustee.[10]

The servicing rights Uderitz sought to control ████████████[11] *See* Ex. 10, Rodriguez-Lugo 45:23-46:15.[12]  In addition, under the terms of the agreement crafted by Uderitz, Odyssey was entitled to purchase defaulted loans out of the trust at a 10% discount and set the sales price for those loans in its "sole discretion."  Ex. 21 § 2(C)(iii).  The Odyssey Servicing Agreement also permitted Odyssey to receive open-ended servicing fees.  *Id.* § 5(B).  Odyssey's business strategy includes ████████████████████████████████.  Ex. 10, Rodriguez-Lugo 59:21-61:23, 64:3-16, 255:3-256:25.[13]

████████████████ Uderitz engaged VCG's joint venture partner, BPA, to conduct an "audit" of PHEAA, the servicer for loans that were current or not severely past due.  Ex. 16, Uderitz 54:13-23.  As BPA's director testified, that audit was never

---

[10] The Administrator and the Indenture Trustee questioned whether Odyssey had been validly appointed as a servicer, ultimately leading to the Indenture Trustee filing a Trustee Instruction Proceeding in Minnesota State Court, a proceeding which was eventually transferred to federal court in this District.  That case is now on appeal in the Court of Appeals for the Third Circuit.

[11] ████████████████████████████.  Ex. 20 at -0017499.

[12] To date, Odyssey has sought reimbursement from the Trusts for $1.46 million in alleged servicing expenses, ***although Odyssey has yet to service a single loan***.  Ex. 22, *In re National Collegiate Student Loan Trusts 2003-1*, Doc. 1-4, 16-cv-00341 (D. Del. 2016).  VCG's counsel recognized that Odyssey's invoices are not ████████  *See* Ex. 23 at -038293.

[13] Rodriguez-Lugo testified that VCG's focus was on ████████████████████████████████  Ex. 10, Rodriguez-Lugo 65:3-14.

finished and the findings were "inconclusive". *See* Ex. 24 at 650-59. ███████████

███████████████████████████. *See, e.g.*, Ex. 25 at 8-11,

17-18.

### D. VCG Hires Chaitman Without Authorization—And Only for the Odyssey Agreement, Not for the CFPB Action

███████████████████████████████

███████████████. ███████████████████

███████████████████████████

███████████████████████ Ex. 26 ("Chaitman

Direction Letter"); Ex. 27 ("Chaitman Engagement Letter"). ███████████

███████. Ex. 16, Uderitz 34:9-12, 71.  Under the Trust Agreements, ████████

████████████████████████████[14] *See* Ex. 16,

Uderitz 80:1-10; Ex. 28, Costello 104:15-105:14.

In an effort to end-run this consent requirement by shoe-horning Chaitman's engagement

███████████████████████████████

███████████████████████████████

███████ Ex. 29 at -0011036.  And in discussions with the Owner Trustee, VCG confirmed

that  Chaitman's  engagement ███████████████████

███████ Ex. 30 at -0010659.

███████████████████████████

███████████████. Ex. 28, Costello 106:7-108:5; Ex. 31.  Indeed, as Uderitz

---

[14] The direction of "all" Owners is required to direct the Owner Trustee to take "nonministerial" action. Ex. 1, TA § 4.01(a); *see also* Ex. 10, Rodriguez-Lugo 92:9-93:15 (████████████
████████████).  For "ministerial" matters, at least 85% of the residual interests of a Trust is required. Ex. 1, TA § 4.03.

testified, ████████████████████. Ex. 16, Uderitz 76:24-77:23.  Instead,

████████████████████████████████████████

██████ Ex. 32 at -0007623.

████████████████████████████, the  Owner  Trustee ████████████

████████████████████████████████████████████

████ signed the Chaitman Engagement Letter on behalf of all fifteen Trusts.  *See* ████████

████████████.  The Chaitman Engagement Letter, though, did not specifically reference the

purpose of Chaitman's retention—████████████████████████████.  Since

then, Chaitman has failed to disclose the narrow scope of its retention, and attempted to use the

Chaitman  Engagement  Letter  as  a  blank  check  engagement  by  the  Trusts,  including  in

representations made to this Court.  *See* D.I. 82.

Ambac did not consent to the retention of Chaitman on behalf of the Master Trust. ████

████████.

### E.   Chaitman Hires McCarter Without Authorization—And for the PHEAA Action, Not for the CFPB Action

With  no  further  authorization,  Uderitz  had  Chaitman  retain  McCarter  to  further  VCG's

████████ by suing PHEAA.  Specifically, by letter dated March 6, 2016, Chaitman purported

to retain McCarter to file a lawsuit on behalf of the Trusts against PHEAA. ████████████

████████.  The Owner Trustee's corporate representative testified that ████████████

████████████████████████.[15]  Ex. 28, Costello 20:4-15

("████████████████████████.").

The engagement letter between Chaitman and McCarter concerning the PHEAA matter is

---

[15] Tellingly, Chaitman would not ████████████████████████████████
████████████████.  Ex. 14, Gotthoffer 62:9-65:18.

████████████████████████████████████████████████████

███. Ex. 33, Kosch 60:21-61:3, 62:6-15. █████████████████████████

█████████████████████. *Id.*, 62:6-63:6.  But as McCarter concedes, ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████. *Id.*, 60:21-62:5.

**F.      VCG Directs McCarter to Effect a** ███████████████████

███████████████████████████████████████████

████████████████████████████████████████████████████.

*See* Ex. 35.

███████████████████████████████████████████

████████████████████████████████████████████. Ex. 14, Gotthoffer

60:20-61:17; Ex. 28, Costello 20:4-15. ████████████████████████

████████████████████████████████████████████████████

█████████████████. Ex. 33, Kosch 73:6-76:5. ███████████████████

████████████████████████████████. *Id.*, 87:3-20.

**1.      *McCarter Initially*** ████████████████████

███████████████████████████████████████████. Ex. 36.  As

McCarter recounted, ████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████. Ex. 33, Kosch 114:8-116:9.

McCarter's view at the outset was ████████████████████████

████████████████████████████████████████████████████

Ex. 37 at -000823-24.  At the time, VCG and McCarter understood █████████████

14

█████████████████████████████████████████. Ex. 33, Kosch 109:23-111:6, 122:25-124:16, 133:6-139:21.  Indeed, Uderitz stated █████████████████████████████████████

█████████████ Ex. 38 at -0011989; *see also* Ex. 39 at -0012593 (███████████████████████

████████████████████████████).

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████[16]  Ex. 25 at 1, 17 (emphasis added).  McCarter explained ███████████

████████████████████████████████████████████████████████████

███████████████████████████████████. *Id.* at 5-6.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████. *Id.* at 2, 14-15; Ex. 33, Kosch 133:6-139:21. ██████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████. Ex. 25 at 14-17; Ex. 33, Kosch 138:20-140:16. ███████████████████████████

████████████████████████████████████████, when in fact the audit was incomplete and its results were inconclusive.  Ex. 25 at 9; *see* Facts Section C. ███████████████████████████

████████████████████████████████████████. Ex. 33, Kosch 395:25-396:8.

    Finally, ██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

---

[16] ████████████████████████████████████████████, Ex. 33, Kosch 132:24-133:5.

███████████████████. Ex. 25 at 12-13, 15-18.

### 2.    *McCarter Works to Fashion a PCJ Favorable to VCG*

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████  Ex. 33, Kosch 168:5-10; *see also id.*, 105:20-109:22, 169:25-173:16.   McCarter

recommended to VCG ████████████████████████████████████████

████████████████████████████████████████████████████████

Ex. 40 (emphasis added).[17]  When Chaitman suggested ████████████████████████

███████████████████████████████████████, McCarter offered the

following workaround:



████████████████████████████████████████████████████.

Ex. 42 at -030264 (emphasis added).[18]

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

────────────────────

[17] *See also* Ex. 41 at -000162-163 (████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████) (emphasis added).

[18] Ex. 45 at -0009019 (████████████████████████████████████████████████

████████) (emphasis added), -0009042 ("███████████████████████████████████████").

██████████████████████████████████████████████████████

████. Ex. 43 at -000723-24.

██████████████████████████████████████████

██████████████████████████████████████. Ex. 33, Kosch 167:21-173:16,

217:22-221:13, 227:6-228:13; Ex. 44 (████████████████████████████

████████████).  As it summarized at the time, ████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████"[19] Ex. 47 at

-000978.  VCG instructed McCarter ████████████████████████████████

██████████████████████████. Ex. 48.

███████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████. Ex. 49. ████████████████████████████████████

███████████████████████████████████████████. Ex. 50 at -

0002884; PCJ ¶ 7(f) (emphasis added).

        Ultimately, ████████████████ an order that would alter the Trusts' governance and upend

the priority of liens and priority of payment terms mandated in the Trust Related Agreements to

favor the Owners at the expense of the Trusts' true priority economic beneficiaries—the

Noteholders and Ambac.  For instance, the PCJ would redirect all cash flows from Collection

---

[19] *See also* Ex. 46 at -0003051 (████████████████████████████████████████████

██████████████████████████████████████████████████████).

Accounts that are under the "sole dominion and control" of the Indenture Trustee, *see* Ex. 3, Indenture § 8.02(c), to an escrow account under the Board's (i.e., VCG's) control. *See* PCJ ¶¶ 17-18. As Chaitman aptly stated, the escrow account would mean ███████████████ ████████████████████████ Ex. 51 at -004345.

████████████████████████████████████████████████████████████

███████████████████████████████████████████████. Ex. 33, Kosch 261:24-263:9, 295:13-300:7, 366:6-368:7.[20] ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████. *Id.*, 295:13-300:7, 366:6-368:7; Ex. 16, Uderitz 348:12-350:12. Throughout the negotiations, VCG never disclosed to the CFPB ████████████████████████████ ████████████████████████████████.[21] Ex. 16, Uderitz 203:8-17.[22]

### 3.   McCarter Accepts CFPB Monetary Demands Detrimental to the Trusts

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████. Ex. 33, Kosch 207:4-209:19, 364:4-366:5.  McCarter admitted ████████ ████████████████████████████████████████████████████████████

---

[20] *See also* Ex. 52 at -007610 (███████████████████████████████████████████████ ███████████████████████████).

[21] ████████████████████████████ the consent order to require the Trusts to audit all 600,000 loans that they owned since their inception, a requirement that ████████████████████████ ████████████████████. Ex. 33, Kosch 258:9-259:9, 178:5-179:5; Ex. 16, Uderitz 195:20-199:15. ██████ ████████████████████████████████████████████████████████████.
Ex. 33, Kosch 258:9-259:9; 260:5-14.

[22] McCarter and VCG understood ████████████████████████████████████████████ ████████████████████████████. *See* Ex. 54 ("██████████████████ ████████████████████" in reference to the Indenture requirements and the PCJ).

███████████████████████. *Id.*, 240:7-19; Ex. 53 at -0012955; *see also* Ex. 54 at -0016106

(███████████████████████████████████"). ████████████████

████████████████████████████████████████████████████

███████████. Ex. 33, Kosch 208:18-209:19, 236:18-237:11, 240:7-242:4. ████████████

████████████████████████████████████████████████████

█████████████████████████████████████.[23] *Id.*, 364:10-365:25.

     **4.**    *McCarter Never* ████████████████████████████

    McCarter accepted the CFPB's proposed financial penalties and sanctions without ████

████████████████████████████. For example, the CFPB ████ provided McCarter with

copies of three cherry-picked affidavits that had been filed in assorted collections lawsuits. *See*

████████████████████. These affidavits did not prove the fact or extent of the CFPB's

claims. Ex. 55. As Uderitz put it, ██████████████████████. Ex. 16, Uderitz 149:12-

23.



███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████ Ex. 56 at -001693. ██████████████████████

██████████████████████████████████████ *Id.*

---

[23] ████████████████████████████████████████ despite the fact that the CFPB's consent
order with TSI provided for the payment of a $2.5 million civil money penalty. *See* Consent Order
¶ 58, In the Matter of Transworld Systems, 2017-CFPB-0018.

**G.    VCG Directs** ████████████████████████████

While VCG and McCarter were negotiating the terms of a consent order that later became the PCJ, they kept the Trusts' constituents in the dark.[24]  *See, e.g.,* ███████████████████.  The terms were not disclosed to any of these parties until July 2017, when VCG instructed McCarter to disclose the PCJ ████ to the Owner Trustee.  Ex. 58 at -0001702.  When the Owner Trustee thereafter raised questions about the propriety of the order and indicated that it planned to use its express contractual right to consult with the Administrator regarding the terms, Chaitman ████████████████████████████████████████████████ ██████████████████████████.  Ex. 59 at -0001252.

One of the constituents kept in the dark was Ambac.  ███████████████████████ ████████████████████████████████████████████████.  *See* Ex. 41 at -000163.  ████████████████████████████████████████████ ████████████████████████████████████████████████ Ex. 16, Uderitz 320:7-10, 323:3-10.  As VCG recounted, ████████████████████ ████████████████████████████████████████.  Ex. 60.  ████ ████████████████████████████████████████████████ ██████████████.  *Id.*; *see also* Ex. 16, Uderitz 320:16-323:19.  ███████████ ████████████████████████████████████████████, McCarter responded ██████████████████████████████—even though Ambac would be paying claims to Noteholders that would not receive distributions because of the financial penalties imposed by the order, and even though it knew ███████████████████████.  *Id.*;

---

[24] They did so even though McCarter had ████████████████████████████████ ████████████████████████.  Ex. 41 at -000163.

Ex. 33, Kosch 363:12-364:3; Ex. 62 (McCarter acknowledging "Ambac has a consent right").

VCG directed McCarter ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.[25] Ex. 33, Kosch 101:13-21, 309:11-21; Ex. 16, Uderitz 322:7-323:10. Rather, VCG directed McCarter ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. Ex. 61 at -0012915-17; *see also* Ex. 60. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. *See* Ex. 63. Ultimately, the Owner Trustee was the only Trust constituent other than the Owners to see a copy of an order—which it refused to sign—before the PCJ was filed in court.

### H. VCG Tries But Fails to Secure Authority for the PCJ

#### 1. *The Owner Trustee Denies VCG the Authority to Act for the Trusts*

In 2016, VCG sought ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. Ex. 28, Costello 50:17-51:22. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. *Id.*, 50:17-51:3. The Owner Trustee ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. *See* Ex. 28, Costello 51:4-52:17; Ex. 68 at -0001633. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. Ex. 10, Rodriguez-Lugo 247:2-22.

---

[25] *See* Ex. 64; Ex. 65 ("you may share the latest version of the consent order with Ambac with the caveat that they should keep it confidential"); Ex. 66 ("▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇"); Ex. 67 at -0012114 (▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇").

### 2. *VCG Fails to Obtain Ambac's Consent*



██████. Ex. 69; Ex. 33, Kosch 181:24-182:8; Ex. 62 ("█████████████████████████████

██████████████████████").

Nonetheless, ████████████████████████████████████. Ex. 16,

Uderitz 322:16-323:19. ██████████████████████████████

█████████████████████. Ex. 70 at -0012914 ("███████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████"). ██████████████████████████████

██████████████████████████████████████████████████████

███████████████ Ex. 57 at -0011638.  Consequently, Ambac never gave consent to the PCJ

for any of the Insured Trusts. ████████████████.

### 3. *The Owner Trustee Rejects VCG's Demand To Sign the Consent Order*

When VCG attempted to direct the Owner Trustee to execute the draft administrative order

that McCarter and the CFPB staff had negotiated in early July 2017, the Owner Trustee informed

VCG that it was unwilling to sign because the order appeared to impose obligations on the Trusts

that are contrary to the Trust Related Agreements.  Ex. 58 at -0001699-700.  The Owner Trustee,

with the advice of counsel, cited numerous reasons why the Owners' direction to sign appeared to

be invalid: (a) litigation concerning whether VCG and affiliates improperly owned 100% of the

Certificates was not yet resolved; (b) Ambac had not authorized the direction for the Master Trust;

and (c) the order "could impose obligations on the Trusts that are contrary to the express terms of

the Indenture."  On the latter point, the Owner Trustee noted those apparently improper obligations

included (i) the payment of large sums of money "for which there is no applicable provision in the [Payment] waterfall" and the payment of "restitution, disgorgement and civil monetary penalties . . . would appear to completely reshape the structure of this secured financing"; and (ii) "numerous restrictive covenants in the Indentures that prohibit the Trusts from disposing of their assets or incurring additional indebtedness other than as expressly provided therein or otherwise subordinating the rights of the Noteholders."[26] *Id.*; *see also* ▮▮▮▮▮▮▮▮. The Owner Trustee gave VCG the opportunity to submit a legal analysis as to why the proposed consent order was proper under the Trust-related Agreements, ▮▮▮▮▮▮. *See* Ex. 58 at -000170; Ex. 14, Gotthoffer 118:15-119:9.

▮▮▮▮▮▮, WTC gave notice of its resignation as Owner Trustee. ▮▮▮. However, that resignation only becomes effective upon the proffer of, and acceptance of the role by, a qualified replacement, or by order of a court of competent jurisdiction. TA § 12.01(a). The Delaware Court of Chancery granted WTC's motion to resign as Owner Trustee, but directed WTC to continue to serve as Owner Trustee.

## I. Lacking the Owner Trustee's Authorization, VCG Proposes ▮▮▮▮▮▮

Having failed to convince the Owner Trustee to execute the proposed consent order,

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮. Ex. 73. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex. 33, Kosch 181:2-9, 251:11-252:8.

---

[26] The CFPB was copied on the Owner Trustee's email to the Owners rejecting the Owners' direction to execute the consent order. *See* Ex. 58. The Owner Trustee's rejection of the Owner direction ▮▮▮▮▮▮▮▮▮▮. Ex. 71 at -00013252.

█████████████████████████████████████████████████████████████████

████████████████████████████████████.  Ex. 45 at -0009080-88 (invoices from this time

period include "████████████████████████████████████████████████████

██████████████████████"; "█████████████████████████████████████████████

█████████████████████████████████"; "██████████████████████████████████

██████████████████████████████████████████████████████████████████

███████████.").  McCarter  conceded,  however,  that  ████████████████████

██████████████████████████████████████████████████████████████████

█████████████████████████████████.  Ex. 33, Kosch 181:2-9.  Moreover, McCarter analyzed

███████████████████████████████████████████████████████████████████.

Ex. 74.

█████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████.  Ex. 75 at -0001468; Ex. 33, Kosch 180:3-181:9, 334:14-335:21.  ███████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

███████████.  Ex. 4 at -0001468.[27]

█████████████████████████████████████████████████████████████████

████████████████████████████████████████.  *See* Ex. 76.  However, in September, the CFPB

and McCarter agreed to change the form of the enforcement action from an administrative action

---

[27] ████████████████████████████████████████████████████████████████

████████████████████████████████████, as set forth *infra* at pp. 27-28.

issued by the CFPB's Director to a federal court injunctive action that requires court approval under 12 U.S.C. § 5564(c). *See* Ex. 77.

On September 18, 2017, upon direction from VCG, the PCJ was signed by McCarter attorneys purportedly on behalf of all fifteen Trusts, including the Insured Trusts, and the CFPB filed the PCJ in this Court with a pro forma motion for the Court to approve the PCJ. *See* PCJ at 1-2; D.I. 3; ████████████████████.

## ARGUMENT

Focusing exclusively on the Threshold Issues, as directed by this Court, the PCJ is invalid and should not be approved.

## I. MCCARTER LACKED THE AUTHORITY TO EXECUTE THE PCJ

### A. McCarter Lacked Authority Because the Owners Lacked Authority

McCarter asserts ████████████████████████████████████ ████████████████████████████████████. But the Trust Agreements are unequivocal that—until the Indentures discharged—the Owners have no authority to act unilaterally on behalf of the Trusts, but rather must act through and by direction to the Owner Trustee, including to "compromise any claim or lawsuit brought by or against the Trust…" Ex. 1, TA § 4.01(b)(i); *see also id* § 2.03(b)(i), (iv). There is good reason for this contractual mandate: It provides a check on the Owners, as residual interest holders in the Trusts, from causing the Trusts to take actions that benefit the Owners to the detriment of the senior and priority interests of the Noteholders and Note Insurer. The Trusts Agreements specifically authorize the Owner Trustee to refuse Owner directions that it reasonably determines (or is advised by counsel) are

contrary to the Trust Related Agreements or the law.[28] *Id.* § 4.02(a).

Consistent with those terms, █████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████. That is why the Owners

issued a direction to the Owner Trustee to execute the draft administrative order in June 2017. *See*

Facts H.3, *supra.* Pursuant to Section 4.02 of the Trust Agreements, the Owner Trustee properly

declined to follow that direction and declined to execute the order. *Id.* The Owner Trustee's

refusal to execute a consent order (with the same terms as the PCJ) is alone dispositive of the

pending motion.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████.

*First,* █████████████████████████████████████████████████

█████████████████████████████████████████: the default rule is that

---

[28] Because the Owner Trustee is an authorized agent of the Trusts and therefore the authorized representative of McCarter's "client," *see* 12 Del. C. § 3806 ("the business and affairs of a statutory trust shall be managed by or under the direction of its trustees"), McCarter was obligated to abide by the Owner Trustee's decision not to execute the PCJ. Restatement of Agency § 8.09 ("agent has a duty to comply with all lawful instructions received from the principal and persons designated by the principal concerning the agent's actions on behalf of the principal"); *see also Triton Const. Co. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *12 (Del. Ch. May 18, 2009), *aff'd*, 988 A.2d 938 (Del. 2010) ("Under Delaware law, an agent has a duty to refrain from placing himself in a position antagonistic to his principal.").

[29] *See also* Ex. 33, Kosch 180:3-181:9 ("████████████████████████████

███████████████████████████████████████████████████████████

████████████████████).

26

only "trustees" have the authority to act on behalf of the Trusts.  *See* █████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████.  Here, the Owner Trustee rejected

the proposed order because of valid concerns that it was inconsistent with the Trust Related

Agreements.

     ***Second***, ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████.  But read in full, those

sections state that the Administrator has authority to compromise suits if it receives "instructions

from the Indenture Trustee, in accordance with the Indenture, from the Owner Trustee or the

Owners in accordance with the Trust Agreement."[30]  Ex. 2, Administration Agreement § 1(d)(i).

Thus, ███████████████████, (i) the Indenture Trustee has the authority to instruct the

Administrator to compromise suits, and (ii) any authority the Owners have may be exercised only

through the Owner Trustee (or Administrator).  ████████████████████████

---

[30] For the Insured Trusts, the authority to instruct the Administrator to compromise litigation also includes "Ambac."  *See* Ex. 7, Insured Administration Agreement § 1(c)(i)(B).

██████████████████████████████████████████████.[31]

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████.

**B.    McCarter Lacked Authority Because Chaitman Lacked Authority**

McCarter was ostensibly retained by Chaitman pursuant to Chaitman's purported authority

███████████████████████████████████████████. *See* Facts D, E.  ███

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████. Ex. 33,

Kosch 78:2-7, 188:2-9.  ████████████████████████████████████

███████████████████████████████████. *See* Facts I.  Indeed, ████

██████████████████████████████████████████████████████████

████████████████████████████████████████.

*First*, ████████████████████████████████████████████████

██████████████████████████████████████, as required by the Trust Agreements.

*See* Ex.1, TA § 4.01(a), (b), 4.03. ████████████████████████████

████████████████████████████. Ex 16, Uderitz 64:6-65:2, ████████

██████████████████████████████. *See supra* Facts A.3., D, E.

---

[31] ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████. █████████████████████

██████████████████████████████████████████████████. The
distinction is material, because as the terms denote, the nonministerial acts—including
compromising litigation—are subject to stricter standards.

██████████████████████████████████████████████████████████████

██████████████████████████████████████. *Id.* ████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████. *See supra* Facts D; Ex. 28, Costello 109:4-110:2. ██████

████████████████████████████ Chaitman was never properly engaged on behalf of those three

Trusts, and neither was McCarter.

  ***Second***, █████████████████████████████████████████████████

██████████████████████████████████████████████████.[32] *See*

*supra* Facts D. Chaitman's authority to act on behalf of the Trusts was limited ████████████

████████, and it lacked the authority to retain McCarter to respond to the CFPB's allegations on

behalf of the Trusts. *Id.*

  ***Third***, ████████████████████████████████████████████████████████████.

*See supra* Facts D; Ex. 28, Costello 109:4-110:2. █████████████████████████████,

Chaitman was never properly engaged on behalf of those three Trusts, and neither was McCarter.

---

[32] In related litigation, McCarter has suggested that the Owner Trustee's approval of fees for work done by Chaitman and McCarter involving the CFPB ratified their authority. *See, e.g.*, *McCarter Fee Action*, No. 654144/2018, ECF No. 234 (N.Y. Sup. Ct.). That is unpersuasive. The Owner Trustee had no authority to ratify work done on behalf of the Trusts absent a legitimate direction pursuant to express provisions of the Trust Related Agreements. Ex. 1, TA § 4.01(b); ████████ ████████. Even if it had the authority (and it did not), the Owner Trustee did not ratify or waive any objection to either firm's authority to negotiate or consent to the PCJ. The Owner Trustee paid initial invoices from Chaitman and McCarter in reliance on the Owners' and Chaitman's representations as to the propriety of the fees. However, ███████████████████████ ████████████████████████████. Ex. 28, Costello 123:9-124:24. There was no knowing endorsement of the scope of the engagement, and thus no ratification or waiver.

*Finally*, 

▮▮▮▮▮▮.  Ex. 28, Costello 110:15-25; Ex. 16, Uderitz 359:12–19.  Under the Master Trust Agreement, Ambac's consent is required for any direction by the Owners to the Owner Trustee for non-ministerial matters.[33] ▮▮▮▮▮▮▮▮.  That consent was never obtained.  ▮▮▮▮▮ ▮▮▮▮▮▮.  For all of the above reasons, the Chaitman Direction Letter offers no support for McCarter's authority to execute the PCJ.

### C.      Without the Indenture Trustee's Approval, the Settlement is Void

Even if McCarter were duly retained by the Owner Trustee (it was not), the PCJ is void as a matter of law because the Indenture Trustee never approved the settlement.

As set forth above, the Grant in each Indenture confers upon the Indenture Trustee the authority "to bring Proceedings in the name of the [Trusts]" and "generally to do and receive anything that the [Trusts are] or may be entitled to do or receive."  Ex. 3, Indenture at A-13 (definition of "Grant").  The Grant expressly includes an assignment to the Indenture Trustee of the "present and future claims, demands, causes and choses in action" with respect to the Collateral.  Ex. 3, Indenture, Granting Clause; s*ee supra* Facts B.

Bedrock New York law confirms that a grant of assets to a securitization trustee includes "a full assignment of the right to commence litigation."  *Phoenix Light SF Ltd. v. U.S. Bank, N.A.*, No. 14-cv-10116 (KB), 2015 WL 2359358, at * (S.D.N.Y. May 18, 2015).  It is well-established that this authority applies to the right to settle claims.  *See, e.g.*, *In re Bank of New York Mellon*, 42 Misc.3d 1237(A) (N.Y. Sup. Ct. 2014) *aff'd as modified*, 127 A.D.3d 120 (N.Y. App. Div. 1st Dep't 2015).  In that case, a securitization trustee obtained judicial confirmation of the trustee's

---

[33] The Owners have previously conceded that Chaitman's retention constitutes a non-ministerial matter.  *See* Ex. 79 at 22.

$8.5 billion settlement of claims associated with more than 500 securitization trusts.  The court observed that the grant to the trustee of "all right, title, and interest" in the assets of these trusts "grants the Trustee the power and authority to commence litigation" and that this "discretionary" power includes the right to settle.  *Id.* at *14-15.[34]

Whatever obligation the Trusts as Issuers retained to defend the Collateral and preserve the lien of the Indenture is subject to the "absolute" assignment of the Grant, which encompasses the right to compromise any claim involving the Collateral.  As a matter of New York law, any attempt to compromise such claims without authorization of the Indenture Trustee is void *ab initio*. ████

████████████████████████████████████████

██████████████████████████████████████.

That the Indenture Trustee did not execute the PCJ or authorize McCarter to execute the PCJ is fatal to McCarter's authority, and dispositive of this action, in and of itself.

### D.    McCarter Lacked the Requisite Consents from Other Transaction Parties

Federal courts have repeatedly rejected consent judgments that affect the legal rights or obligations of non-consenting parties, as is the case here.  *See, e.g.*, *Bass v. Federal Sav. & Loan Ins. Corp.*, 698 F.2d 328, 330 (7th Cir. 1983) (consent Judgment between FSLIC and title company rejected because it improperly froze funds set aside to pay non-consenting officers and directors).  Similarly, in *U.S. v. Sharlands Terrace, LLC*, the court rejected a consent judgment proposed by the government and a variety of housing and design entities because they failed to obtain the consent of the owners of the subject housing properties whose contracts would be affected.  2007 WL 1577847 *1 (D. Nev. May 31, 2007); *see also United States v. City of Hialeah*, 140 F.3d 968,

---

[34] In the wake of this case, numerous New York courts have reached the same conclusion concerning the power of securitization trustees.  *See, e.g., U.S. Bank Nat'l Assoc. v. Federal Home Loan Bank of Boston*, 2016 WL 9110399, at *16 (N.Y. Sup. Ct. 2016); *In re U.S. Bank Nat'l Ass'n*, 51 Misc.3d 273, 284-85 (N.Y. Sup. Ct. 2015).

971 (11th Cir. 1998) (rejecting proposed consent decree in Title VII discrimination case because it would have impaired contractual rights of non-consenting third parties).

If implemented, the terms of the PCJ would fundamentally alter the way the Trusts operate and modify the Trusts' governing agreements and the rights and obligations of the parties thereto, including to force the Trusts to impair the loan collateral in violation of those agreements without the mandatory consent of transaction parties, including the Indenture Trustee, the Noteholders, and Ambac.  McCarter did not have authority to execute the PCJ because it lacked the requisite consents to reform the Trusts' governance and impair the loan collateral.

### 1.    No Consent to Amend the Trust Related Agreements

Under the Indentures, McCarter was required to obtain consent from the Indenture Trustee and the Noteholders (and for the Insured Trusts, Ambac) to amend, modify, waive, supplement, terminate, or surrender the terms of the Trust Related Agreements or enter into any agreement that does the same.  Ex. 3, Indenture §§ 3.07(c), (f); *see also* ██████████████████.[35]  The PCJ contemplates sweeping changes to the operations of the Trust that are contrary to the plain terms of the Trust Related Agreements.

***First***, the PCJ would replace the Trusts' operational structure—in which the Indenture Trustee, Owner Trustee, Administrator and others each play a defined role—with an operating "Board" (i.e., VCG) vested with virtually limitless authority to act for and control the Trusts.  *See* PCJ ¶ 32 ("the Board of Defendants will have the ultimate responsibility for proper and sound management of Defendants.").  Further, while the Trust Agreements require unanimous consent

---

[35] *Accord* 12 Del. C. § 3338 (providing that nonjudicial settlements require the consent of "all whose interest in the trust would be affected by the proposed nonjudicial settlement agreement"); Del. Ct. Ch. R. 101(a)(7) (a consent petition for a modification of a trust must be accompanied by consents from "all whose interest in the trust is affected by the petition," which includes trustees, fiduciaries, beneficiaries, and anyone with other interests).

of *all* the Owners to direct the Owner Trustee as to non-ministerial acts (*see* Ex. 1, TA §§ 4.01, 4.02, 4.03), the Board would have direct control of the Trusts with a simple majority owned by VCG, unchecked by an Owner Trustee or other contractual protections.  *See, e.g.*, PCJ ¶ 7(f) ("'Board' means the registered owner of a majority of the beneficial interest in each of the Trusts").

*Second*, the PCJ would saddle the Trusts with the obligation and the costs of performing a compliance "audit" of each of the 600,000 loans—███████████████████████████████ ███████████████████████████████████████████, and hand over the control of loan servicing to VCG and its affiliate, Odyssey, *see* PCJ ¶¶ 19, 31, 33, 41.  This would turn on its head the current contractual regime whereby the servicing rights under the Basic Documents, including the Special Servicing Agreements, were assigned to the Indenture Trustee pursuant to the Grant of the Indentures.  *See* Ex. 3, Indenture, Granting Clause.

*Third*, the PCJ would redirect all student loan payments that "shall" be placed in the Collection Accounts, which are under the "sole dominion and control" of the Indenture Trustee, *see* Ex. 3, Indenture §§ 8.01(b), 8.02(c), to an "escrow account" controlled by the "Board"—i.e., VCG, *see* PCJ ¶¶ 17-18, 33.  The PCJ would eliminate and replace the mandatory "waterfall" payment provision of the Indentures—the backbone of structured finance transactions that sets forth painstakingly negotiated caps and limitations on administrative expenses, and the priority of payments to various classes of Noteholders (*see, e.g.,* Ex. 3, Indenture § 8.02(d), Ex. 1, TA § 5.02)—and permit the Owners to control distributions from the Escrow "to carry out Trust operations" as they see fit.  *See* PCJ ¶¶ 18, 33.  The escrow account would mean ██████████ ████████████████████████████████████████.[36]

---

[36] If implemented, these changes would also conflate the Trusts' funds and assets with those of the Trusts' Owners in breach of TA § 2.03(b)(ii).  They would authorize the Owners, not the Owner Trustee, to conduct the business and affairs of the Trusts in breach of TA § 2.03(b)(iv).

These injunctive relief provisions ███████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████, *see* Ex. 33,

Kosch 169:15-174:6; Ex. 10, Rodriguez-Lugo 205:22-206:6, ███████████

███████████████, Ex. 10, Rodriguez-Lugo 264:15-265:1. ██████████████

██████████████████████████████████████████. Ex. 16, Uderitz

314:12-315:1.[37] With respect to the Insured Trusts, Uderitz admitted ████████

████████████████████████████████████████████████████████. *Id.*

The same is true for the other Trusts. Of course, █████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████. *See* Facts F.2., F.3.; Ex. 33, Kosch 156:2-158:2.

Because it did not seek or obtain consent from Ambac, the Noteholders, or the Indenture

Trustee, McCarter lacked the authority to execute the PCJ. █████████████████

████████████████████████████████.

### 2. No Consent to Dispose of Trust Assets

McCarter negotiated and executed a PCJ that would require the Trusts to pay millions in

restitution, and additional civil penalties and disgorgement without the necessary consent to make

those payments. In addition to the provisions identified above, the Indentures contain restrictive

covenants that explicitly prohibit the Trusts from disposing of assets, incurring additional

indebtedness, or otherwise subordinating the rights of Noteholders other than as expressly

---

[37] ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████)

provided for in the Indentures.  Ex. 3, Indenture § 3.08(i).  For the Insured Trusts, Ambac's consent is required to dispose of the Trusts' assets in any manner.  Ex. 5, Insured Indenture § 3.08(i); *see also id.* § 3.07; ███████████████████████████████.

The PCJ would violate these covenants.  The fees and penalties will necessarily require the Trusts to "dispose" of assets and otherwise subordinate the Noteholders' and Ambac's priority rights in these assets.  And the escrow will redirect all cash flows from student loans—the Trusts' *only* asset—from the waterfall to an account solely controlled by VCG.  During his deposition, Uderitz admitted ████████████████████████████████████████████.  Ex. 16, Uderitz 317:8-16.  Even during negotiations, McCarter ████████████████ ██████████████████████████████████████████████████████████ ████████████████████ Ex. 80. ████████████████████████████ ███████████████████████████████████ *See* Ex. 33, Kosch 375:16-376:8, 182:9-13; Ex. 16, Uderitz 314:24-315:1; *see supra* Facts G, H.1., H.2.

### 3.    *McCarter* ████████████████████████████████

████████████████████████ Ambac's consent was necessary for McCarter to execute the PCJ on behalf of the Master Trust. ████████████████████████████ ████████. ███████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████. Ex. 15, Master TA § 4.01; *see also* Ex. 81, Master Trust Indenture § 9.02. Yet no such consent was ever obtained.  *See* ████████████████████████████ ██. ████████████████████████████████████████████████ ████████████████. Ex. 33, Kosch 181:24-182:25, 363:22-364:3; Ex. 16, Uderitz 298:24-25. ██ ████████████████████████████████████████████████████

███████████████████████████████████████████████. Ex. 33,

Kosch 363:12-23. ██████████████████████████ no question that the inclusion

of the Master Trust in the PCJ was unauthorized.

## II.    IT WAS IMPROPER FOR MCCARTER TO ENTER INTO THE PCJ

McCarter's unauthorized decision to execute the PCJ on behalf of its supposed client, the

Trusts, was not only a legal nullity, but also improper.  It is axiomatic that McCarter owed an

undivided duty of loyalty to its actual clients, the Trusts.  *See In re Corn Derivatives Antitrust*

*Litig.*, 748 F.2d 157, 161 (3d Cir. 1984) (holding that "an attorney may not abandon his client"

without violating "a duty of continuing loyalty to the client"); *Schock v. Nash*, 732 A.2d 217, 225–

26 (Del. 1999) ("under the duty of loyalty," an attorney "always has the obligation to act in the

best interest of the principal"). ███████████████████████████

███████████████████████████████████████████████

██████████. Ex. 16, Uderitz 62:11-63:10, 276:1-18; Ex. 10, Rodriguez-Lugo 241:12-243:16.

Yet, McCarter negotiated and agreed to a PCJ that it knew the Owner Trustee rejected ███

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████. McCarter's conduct in negotiating and executing the PCJ constitutes independent

grounds for denial of the PCJ, if not a breach of fiduciary duties.

McCarter understood that it was retained to represent the Trusts through the authority granted to the Owner Trustee.[38]  Once McCarter learned that the Owner Trustee – the Trusts' authorized agent and the entity that signed the engagement letter from which McCarter's purported authority to act for the Trusts was derived – declined to execute the PCJ on several legal and contractual grounds, McCarter was obligated to abide by the Owner Trustee's decision not to execute the PCJ.  *See, e.g., DRPC* 1.2 ("a lawyer shall abide by a client's decisions . . . [including] whether to settle a matter.").  At an absolute minimum, ████████████████████████

████████████████████████████████████████████████████████████

████████ McCarter was obligated as the *Trusts'* lawyer not to execute the PCJ.  *See DRPC* 1.7.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

Ex. 33, Kosch 119:14-18, 122:13-123:5; *see supra* Facts F.1. ████████████████████

████████████████████████████████████████████████ *Id.* ████████

████████████████████████████████████████████████████████████

████████ Ex. 33, Kosch 114:15-115:9. ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████ Ex. 56 at -001693.

████████████████████████████████████████████ *Id.* ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████.  The contemporaneous correspondence between McCarter and the CFPB illustrates the upside-down nature of the

---

[38] Indeed, McCarter has filed a lawsuit seeking over $1 million in legal fees incurred in connection with the PCJ as Owner Trustee expenses. *See McCarter & English LLP v. The National Collegiate Master Student Loan Trust I, et al.*, Index No. 654144/2018 (N.Y. Sup. Ct.), Dkt. No. 234 at 10.

negotiations resulting in the PCJ, ███████████████████████████████████

Ex. 82; *see also* Ex. 83. ██████████████████████, McCarter has created unfounded adverse

precedent that has harmed (and will continue to harm) the Trusts.

McCarter's negotiation and consent to the terms of the PCJ also breached its duty to the

Trusts because McCarter ████████████████████████████████████████

████████████████████████████████. At the same time, ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████. ████████

████████████████████████████████████████████████████████

████████████████████████[39]

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████. The PCJ negotiated by McCarter secured this outcome

in several ways:

1. Creation of a supervisory "Board" responsible for the "management" of the Trusts.  PCJ ¶¶ 7(f), 31-33; Facts F.2.

2. Authority to sell the Trusts' defaulted loans, including time-barred loans, out of the Trusts at less than fair market value to a third party that will hire Odyssey to service those loans for a sizeable fee.[40] ████████████████████ ████████; PCJ ¶¶ 10, 48; ████████████████.

3. Audits by BPA (VCG's business partner) of all 600,000 loans owned by the Trusts since their inception at the Trusts' expense, ████████████████████

---

[39] There is no question that McCarter treated VCG—rather than the Trusts—as its true client.  For example, ████████████████████████████████████████████████████ ████████████████████, Ex. 84; Ex. 85.

[40] ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████. *See* Ex. 33, Kosch 261:24-263:9, 366:6-368:7.

██████████████. PCJ ¶ 19; Ex. 33, ████████████████████████
████████████████████████.

4.  VCG is able to use Trust funds held in escrow to make payments at the top of the Trusts' waterfalls to "auditors" (i.e., BPA) and legal counsel (e.g., Chaitman and McCarter) that had been doing VCG's bidding.  PCJ ¶ 17-18; ████████
████████████████████████████████████.

████████████████████████████████████████████████████

████████████████████████████████████████. *See* Ex. 33, Kosch

178:5-179:5, 261:24-262:19, 367:21-368:7.  Furthermore, the harm that the PCJ posed to the

Trusts was specifically raised by the Owner Trustee—the Trusts' authorized agent—when it

refused to execute the proposed order on behalf of the Trusts in July 2017.  *See supra* Facts H.3.

But rather than address those concerns, McCarter ████████████████████████████████

████████████████████████████████████████████████.

McCarter's conduct with respect to Ambac similarly renders the PCJ improper.  ██████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████c.  Once Ambac finally learned that a consent order was under negotiation, ████

████████████████████████████████████████.  Ex. 61 at -

0012914-16; *see supra* Facts G.  ████████████████████████████████████

████████████████████, *see* Facts G at n.24, and ████████████████████████

████████████████████████████████████████████████████[41]

*See supra* Facts G.  ████████████████████████.  *Id.*; *see* Ex. 33, Kosch 309:11-21.

---

[41] ████████████████████████████████████████████████████
████████████████████████████████████████████████████
Ex. 83 at -0015289.  ████████████████████████████████████████
████████████████████████████████.  Ex. 63 at -0001106.

## CONCLUSION

For the foregoing reasons, the Intervenors respectfully submit that the CFPB cannot overcome either of the Threshold Issues, and its motion for approval of the PCJ should be denied.

OF COUNSEL:

Erik Haas
Peter W. Tomlinson
Joshua Kipnees
George A. LoBiondo
Jared Buszin
Devon Hercher
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036

/s/ Melissa N. Donimirski
Kurt M. Heyman (No. 3054)
Melissa N. Donimirski (No. 4701)
HEYMAN ENERIO GATTUSO & HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7300
kheyman@hegh.law
mdonimirski@hegh.law
*Attorneys for Ambac Assurance Corporation*

OF COUNSEL:

Michael A. Hanin
Uri Itkin
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, NY 10019

/s/ Catherine A. Gaul
Catherine A. Gaul (No. 4310)
ASHBY & GEDDES
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
cgaul@ashby-geddes.com
*Attorneys for Objecting Noteholders*

40

OF COUNSEL:

John P. Doherty
William Hao
ALSTON & BIRD LLP
90 Park Avenue
New York, NY 10016

/s/ Rebecca L. Butcher
Rebecca L. Butcher (No. 3816)
LANDIS RATH & COBB LLP
919 Market Street, Suite 1800
Wilmington, DE 19801
(302) 467-4400
butcher@lrclaw.com
*Attorneys for GSS Data Services, Inc.*

/s/ Stacey A. Scrivani
Stacey A. Scrivani (No. 6129)
STEVENS & LEE, P.C.
919 Market Street, Suite 1300
Wilmington, DE 19801
(302) 425-3006
sasc@stevenslee.com

Nicholas H. Pennington
STEVENS & LEE, P.C.
620 Freedom Business Center, Ste 200
King of Prussia, PA 19406
(610) 205-6352
nhp@stevenslee.com

Elizabeth A. Ware
STEVENS & LEE, P.C.
111 N. Sixth Street
Reading, PA 19603
(610) 478-2210
eaw@stevenslee.com
*Attorneys for Pennsylvania Higher Education Assistance Agency d/b/a American Education Services.*

OF COUNSEL

Allyson B. Baker
Meredith L. Boylan
Sameer P. Sheikh
Katherine M. Wright
Tiffany C. Williams
VENABLE LLP
600 Massachusetts Ave., NW
Washington, DC 20001
(202) 344-4000
ABBaker@venable.com
MLBoylan@venable.com
SPSheikh@venable.com
KMWright@venable.com

*/s/ Laura Bouyea*
Daniel A. O'Brien (No. 4897)
Laura Bouyea (No. 6015)
VENABLE LLP
1201 N. Market Street, Suite 1400
Wilmington, DE 19801
(302) 298-3535
daobrien@venable.com

*Attorneys for Transworld Systems, Inc.*

*/s/ Stephen B. Brauerman*
Stephen B. Brauerman (No. 4952)
Sara E. Bussiere ( No. 5725)
BAYARD, P.A.
600 N. King Street, Suite 400
Wilmington, DE 19899
(302) 655-5000
sbrauerman@bayardlaw.com
sbussiere@bayardlaw.com
*Attorneys for Wilmington Trust Company*

OF COUNSEL:

Stephen H. Meyer
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Suite 700
Washington, DC 20006
(202) 956-7605
meyerst@sullcrom.com

Matthew A. Martel
Joseph B. Sconyers
Keith M. Kollmeyer
JONES DAY
100 High Street
Boston, MA 02110-1781
(617) 960-3939
mmartel@jonesday.com
jsconyers@jonesday.com
kkollmeyer@jonesday.com

/s/ David M. Fry
John W. Shaw (No. 3362)
David M. Fry (No. 5486)
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
dfry@shawkeller.com
*Attorneys for U.S. Bank National Association*

DATED: March 12, 2020