**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| Consumer Financial Protection Bureau, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 1:17-cv-01323-MN |
| v. | ) | |
| | ) | |
| The National Collegiate Master Student | ) | |
| Loan Trust, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF CONSUMER FINANCIAL PROTECTION BUREAU'S REPLY IN
SUPPORT OF ITS MOTION TO APPROVE THE PROPOSED CONSENT JUDGMENT**

## Table of Contents

I.    Introduction ........................................................................................................... 1

II.   Facts ....................................................................................................................... 3

III.  Procedural Background ......................................................................................... 5

IV.   Argument ............................................................................................................... 8

    A.   McCarter had authority to execute the Proposed Consent Judgment on behalf of the
        Trusts ............................................................................................................... 8

        1.   McCarter was retained by the Trusts to represent them in the Bureau
            investigation ........................................................................................ 8

            a.   Chaitman was retained by the Trusts .................................... 9

            b.   Chaitman was authorized to represent the Trusts in the Bureau
               investigation ......................................................................... 11

            c.   McCarter was hired by Chaitman to represent the Trusts ..... 14

            d.   McCarter was authorized to represent the Trusts in the Bureau
               investigation ......................................................................... 15

        2.   McCarter was granted authority to execute the Proposed Consent Judgment. 16

            a.   The Owners have authority to settle legal claims brought against the
               Trusts .................................................................................. 17

            b.   No other Trust Party has authority to settle the Bureau's legal claims
               brought against the Trusts ..................................................... 18

    B.   It was not improper or in violation of any Trust Related Agreements for McCarter to
        enter into the Proposed Consent Judgment. ................................................. 22

        1.   The Trust Related Agreements do not prohibit the Trusts from settling claims
            against them ........................................................................................ 22

        2.   McCarter's entry into a settlement on behalf of its clients was proper under
            applicable law ..................................................................................... 23

        3.   There are no conflicts between the terms of the Proposed Consent Judgment
            and the Trust Related Agreements that render McCarter's conduct improper.
            ........................................................................................................ 25

V.    Conclusion............................................................................................................ 27

## **Table of Authorities**

### **Cases**

*Aiken v. Nat'l Fire Safety Counsellors*, 127 A.2d 473 (Del. Ch. 1956) ......................................24

*Arciniaga v. Gen. Motors Corp.*, 460 F.3d 231 (2d Cir. 2006) ............................................12, 19

*Ashall Homes Ltd. v. ROK Entm't Grp. Inc.*, 992 A.2d 1239 (Del. Ch. 2010) .....................12, 19

*Blair v. Anderson*, 325 A.2d 94 (Del. 1974) ...........................................................................21

*Corbesco, Inc. v. Local No. 542, Int'l Union of Operating Eng'rs*, 620 F. Supp. 1239 (D. Del.

   1985).........................................................................................................................24

*In re Bank of N.Y. Mellon*, 986 N.Y.S.2d 864 (N.Y. Sup. Ct. 2014) ....................................19-20

*In re Jamuna Real Estate, LLC*, 385 B.R. 127 (Bankr. E.D. Pa. 2008) ......................................24

*In re U.S. Bank Nat. Ass'n*, 27 N.Y.S.3d 797 (N.Y. Sup. Ct. 2015) ...........................................20

*Instituform of N. Am., Inc. v. Chandler*, 534 A.2d 257 (Del. Ch. 1987) ....................................21

*Matter of Nat'l Collegiate Student Loan Trusts 2003-1, 2004-1, 2004-2, 2005-1, 2005-2 & 2005-

   3*, No. CV 16-341-JFB-SRF, 2018 WL 4181466 (D. Del. Apr. 25, 2018) .............................13

*Moyer v. Moyer*, 602 A.2d 68 (Del. 1992) ...............................................................................24

*Nakahara v. NS 1991 Am. Tr.*, 739 A.2d 770 (Del. Ch. 1998)...................................................17

*Phoenix Light SF Ltd. v. U.S. Bank Nat. Ass'n*, No. 14-CV-10116 KBF, 2015 WL 2359358

   (S.D.N.Y. May 18, 2015) ..............................................................................................19-20

*San Antonio Fire & Police Pension Fund v. Amylin Pharm., Inc.*, 983 A.2d 304 (Del. Ch. 2009)

   .......................................................................................................................................18

*Shields v. Keystone Cogeneration Sys., Inc.*, 620 A.2d 1331 (Del. Super. Ct. 1992) .................24

*Sun-Times Media Grp., Inc. v. Black*, 954 A.2d 380 (Del. Ch. 2008) ........................................10

*U.S. Bank Nat. Ass'n v Federal Home Loan Bank of Boston*, No. 652382/2014, 2016 WL 9110399 (N.Y. Sup. Ct. Aug. 12, 2016) .................................................................20

*U.S. Bank Nat'l Ass'n v. Nat'l Collegiate Student Loan Tr. 2003-1*, No. 1:16CV341, 2018 WL 4462369 (D. Del. Sept. 18, 2018) .................................................................13

### Statutes

12 Del. Code Ann. § 3801(g)(1) ...........................................................................21

12 Del. Code Ann. § 3806(a) ...............................................................................17

12 Del. Code Ann. § 3806(b)(2) ...........................................................................17

12 Del. Code Ann. § 3806(b)(i) ...........................................................................23

### Other Authorities

Del. L. of Corp. and Bus. Org. § 19.7 ...................................................................23

## I.      Introduction

After a multi-year investigation, the Consumer Financial Protection Bureau ("Bureau") brought suit against Defendants National Collegiate Student Loan Trusts ("NCSLTs" or "Trusts") for systematically violating Federal consumer financial law in connection with their debt collection practices. Through their service providers, the Trusts illegally executed and filed affidavits that falsely claimed personal knowledge of consumers' debt and account records and, in many cases, personal knowledge of the chain of assignments establishing ownership of the student loans. *See* D.I. 1, Compl. The Bureau alleged that the Trusts filed at least 2,000 collections lawsuits where they lacked documentation necessary to prove Trust ownership of the loans or where the debt was time-barred. *Id*. The funds collected using these illegal practices were funneled to several of the parties who have intervened in this case and who now oppose entry of the consent judgment, including the noteholders and the note insurer. Relying on the complex web of documents establishing the Trusts, Intervenors[1] seek to protect those ill-gotten gains by opposing entry of the consent judgment executed by the Bureau and the Trusts that would stop the illegal conduct and provide harmed student borrowers with the redress they deserve.

Currently before the Court are two Threshold Issues that ask whether McCarter & English ("McCarter"), the law firm that negotiated and signed the Proposed Consent Judgment ("PCJ") on behalf of the Trusts, had authority to do so; and whether, authority aside, it was "improper" for McCarter to sign the PCJ. D.I. 99 at 1. The answer to the first question is yes;

---

[1] The Intervenors are Ambac Assurance Corporation ("Ambac"), Transworld Systems Inc., the Objecting Noteholders ("Noteholders"), Pennsylvania Higher Education Assistance Agency ("PHEAA"), GSS Data Services, Wilmington Trust Company ("Wilmington Trust" or "WTC"), and U.S. Bank National Association ("U.S. Bank"), separately, in its capacities as Successor Special Servicer and as Indenture Trustee.

McCarter had authority to sign the PCJ. The path to this conclusion is simple: under clear

contractual authority, the Trusts' Owners directed the hiring of Chaitman LLP ("Chaitman"); the

engagement letter with Chaitman explicitly ███████████████████████████████

███████████████████████████████████████████████████; Chaitman in

turn engaged McCarter to represent the Trusts with respect to the Bureau's investigation; and the

only Trust Party authorized to decide whether to settle the Bureau's claims, the Owners, directed

McCarter to execute the PCJ. As the Trusts' duly retained counsel acting at the specific direction

of its client, McCarter had authority to enter into a settlement agreement on the Trusts' behalf.

Intervenors' arguments to the contrary rest on misunderstandings of the Owners' and Owner

Trustee's rights under the Trust Related Agreements and misreadings of the agreements' terms.[2]

---

[2] It appears that McCarter lacked authority to sign on behalf of one of the fifteen trusts: The
National Collegiate Master Student Loan Trust I (the "Master Trust"). The National Collegiate
Master Student Loan Trust I is often referred to by the Trust Parties as the "Master Trust," but
that designation is simple nomenclature and does not signify any relationship or hierarchy with
respect to the other fourteen Trusts. The Master Trust's Trust Agreement has language that does
not appear in the other fourteen Trusts' Trust Agreements. That language requires █████████
█████████████████████████████████████████████████. *See* D.I. 230misc, Intvs.'
Ex. 15 – Master Trust Trust Agreement § 4.01(b)(i) (████████████████████████
██████████████████████████████ (emphasis added, reflecting only
difference in relevant provision between the Master Trust's Trust Agreement and the other
fourteen Trust Agreements). Ambac's approval does not appear to have been given in this case.
Because ██████████████████████ is unique to the one Trust Agreement, and
because that language is not present in any of the other Trusts' Trust Agreements, McCarter's
authority as to the other fourteen Trusts would be unaffected by any finding that ██████████
████████████████████████. Likewise, the settlement as reflected by the PCJ would
not be affected if the Court finds that the Master Trust is not a party to the PCJ. The terms of the
Trust Related Agreements do not suggest that all Trusts must participate in any settlement with
the other Trusts. And no party has argued that removal of one of the Trusts from the PCJ would
affect the settlement more broadly. If the PCJ is ultimately approved and the Master Trust is not
a party to that PCJ, the Bureau will settle with the other fourteen Trusts and continue its suit
against the Master Trust.

The answer to the second question at issue is no; McCarter entering into the PCJ was not improper and did not violate the Trust Related Agreements. The Trust Related Agreements allow the Trusts to settle claims against them, McCarter's entry into the PCJ was proper under Delaware law, and the alleged conflicts that Intervenors have proposed between the PCJ and the Trust Related Agreements are not before the court at this time.

## II.    Facts

The Trusts are 15 owner-directed statutory trusts created under Delaware law to obtain, securitize, service, and collect on private student loans. *See* D.I. 228, Intvs.' Ex. 1 – NCSLT 2006-4 Trust Agreement ("Trust Agmt.") § 2.03(a).[3] The Trusts have no employees and must act through the Owner Trustee and other Trust agents. *See* Trust Agmt. § 2.03(b)(i). The Owner Trustee here, Wilmington Trust Company, and other Trust agents carry out the Trusts' operations at the direction of the Trusts' Owners. *See id.* The Owners of the NCSLTs are NC Owners, LLC, and Pathmark Associates, LLC.

The Trust Agreement provides the Owners with the right to direct the Owner Trustee to take action on behalf of the Trusts with respect to all non-ministerial matters. *See* Trust Agmt.

---

[3] The Bureau will cite to documents that have already been attached as exhibits to Intervenors' brief by their docket item number and exhibit designation: *e.g.*, "D.I. 228, Intvs.' Ex. 1." Citations to exhibits without docket item numbers and using a letter designation, *e.g.*, "Ex. A," are to exhibits annexed to the accompanying declaration of Gabriel Hopkins dated April 30, 2020.

The Bureau will follow Intervenors' convention that unqualified references to the various Trust Related Agreements are to those versions from the National Collegiate Student Loan Trust 2006-4. *See* Opp. Br. at 1 n.1. Unless otherwise noted the cited text in the 2006-4 agreements is substantially identical to the corresponding text in each of the other agreements.

The Bureau will refer to specific Trust Related Agreements in the singular (*e.g.*, "Trust Agreement" and "Indenture"), but when referencing all of the contracts collectively will refer to them in the plural as the "Trust Related Agreements." This is consistent with the terminology used in the contracts themselves, *see, e.g.*, Trust Agmt. at 10 (defining "Trust Related Agreements"), and Intervenors' usage in their opposition brief.

§ 4.01(a). The Trust Agreement provides that only the Owners have authority to direct the Owner Trustee or other authorized Trust agents to settle claims or lawsuits brought against the Trusts. *See* Trust Agmt. §§ 4.01(b)(i) (providing that Owner Trustee may take no action to settle any claim or lawsuit brought against the Trusts without prior written approval from the Owners); 2.03(b)(i) (allowing operations of the Trusts to be conducted by the Owner Trustee or other agents, subject to direction by the Owners); 9.03(b) (allowing the Owner Trustee to act through agents or attorneys in the performance of its duties and obligations).



. *See* D.I. 232, Ex. 26 – Owners' Authorization & Direction Ltr. On ⬛⬛⬛⬛⬛⬛, Wilmington Trust ⬛⬛⬛⬛⬛⬛

⬛⬛⬛⬛⬛⬛ D.I. 232, Ex. 27 – Chaitman Engagement Ltr. at 1. ⬛⬛⬛⬛⬛⬛

⬛⬛⬛⬛⬛⬛ *Id.* ⬛⬛⬛⬛⬛⬛

⬛⬛⬛⬛⬛⬛ *See* D.I. 233, Intvs.' Ex. 34 – McCarter Engagement Ltr.

On May 9, 2016, ⬛⬛⬛⬛⬛⬛

⬛⬛⬛⬛⬛⬛. *See* Ex. A – Email Correspondence between Ed Keefe & Dorie Costello at 0000078. Under the Bureau's "NORA" process, ⬛⬛⬛⬛⬛⬛



. *See* Ex. B, CFPB Bulletin No. 2011-04, Notice and Opportunity to Respond and Advise (NORA) (2011). ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ *See* Ex. A at 0000078. ▮▮▮▮▮▮▮▮▮▮▮ ▮. *See id*. ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ *See id* at 0000077. The Bureau and McCarter proceeded to engage in the NORA process. After the Bureau determined that it would proceed with a public enforcement action, it negotiated and entered into a settlement with the Trusts. McCarter, acting as an authorized agent of the Trusts, executed the Proposed Consent Judgment reflecting that settlement. *See* D.I. 3-1.

## III.   Procedural Background

After the Bureau and Defendants filed their motion to approve the PCJ with this Court, a series of Trust-related parties filed motions seeking intervention. *See* D.I. 4, 9, 11, 12, 20, 31, 33, 35. Despite objections from the Bureau as to some of the proposed intervenors, the Court ultimately granted all of the filed intervention motions. *See* D.I. 95. The Court then called on the parties to propose a briefing and discovery schedule for the motion to approve the PCJ. *See* D.I. 97, Nov. 1, 2018 Oral Order. The Bureau and Intervenors proposed that the Court bifurcate consideration of the PCJ but did not agree on the scope of the two phases. *See* D.I. 98, Joint Proposed Briefing Schedule at 2. The Bureau argued that the only threshold legal question for the Court to consider was whether McCarter had authority to execute the PCJ on the Trusts' behalf, and that no discovery was necessary to brief and decide this issue. *See id*. at 2-3, 4-5. Intervenors agreed that McCarter's authority should be examined in Phase 1, but further argued

that the Court should examine whether McCarter's entry into the PCJ was "improper (or in violation of the Trust Related Agreements)," a question that they viewed as encompassing a litany of factual sub-topics including the Owners' motivations, how the PCJ was negotiated, and which of the Trust Parties might benefit more from approval of the PCJ. *Id*. at 3-4. They also sought to have the Court decide whether the Trusts were "covered persons" under the Consumer Financial Protection Act and whether the Trusts were properly served with the complaint, and requested discovery on all of these topics. *See id*. at 3, 5-6.

The Court accepted the parties' bifurcation proposal, setting two questions for discovery and briefing:

> 1. Whether the law firm of McCarter & English had the authority to execute the Proposed Consent Judgment on behalf of the Defendants under the Trust Related Agreements and applicable law; and

> 2. Whether - authority aside - it was improper or (in violation of Trust Related Agreements) for McCarter & English to enter into the Proposed Consent Judgment.

D.I. 99, Nov. 29, 2018 Scheduling Order at 1.

The Court has repeatedly made clear that these questions are to be read narrowly. In particular, the Court's rendering of the second threshold issue excised the many sub-topics Intervenors sought to include within the definition of "improper." Nevertheless, Intervenors have sought unsuccessfully to proceed as if the Court's order called for an expansive reading of Threshold Issue Two, so much so that discovery demands propounded by Intervenors were challenged by the Bureau and third-party subpoena recipients. On April 4, 2019, the Court held a hearing in which it quashed two subpoenas to third-parties as beyond the scope of the Threshold Issues, and disallowed depositions of former Bureau attorneys for Intervenors' failure to demonstrate the need to depose former trial counsel. *See* D.I. 160, April 4, 2019 Hearing Transcript, at 16:14-19; 25:5-10; 78:21-79:1. The Court also granted a protective order

6

preventing Intervenors from taking a 30(b)(6) deposition of the Bureau because "[t]he topics of the proposed deposition [were] overly broad and exceed[ed] the scope of discovery on the threshold issues." D.I. 155, Oral Order Granting Bureau Mot. for Protective Order.[4] As the Court explained at the hearing after counsel for Intervenor Ambac argued for an expansive reading of Threshold Issue Two: "It's not the propriety of the consent judgment itself, because that's going to be the ultimate issue I need to decide if I'm deciding whether or not to enter it. [Threshold Issue Two] was asking about [whether] it was improper for McCarter & English to enter [the PCJ]." *See* D.I. 160 at 14:3-13.

Intervenors again stray far beyond the reasonable bounds of the Threshold Issues in their brief. More than half of its pages are taken up by a long factual recitation that is chiefly concerned with the motives and intent animating the Trusts' Owners. *See generally* D.I. 226, Intervenors' Consolidated Opposition Brief ("Opp. Br.") at 4-25. The story Intervenors attempt to tell has scant support in the record, and examination of their many exhibits shows that it mostly consists of counsel's arguments posing as facts. But even if the narrative Intervenors attempt to weave was supported by the evidence, the Court has consistently instructed the parties that these concerns are simply not relevant to the Threshold Issues. Hence, while not conceding any facts not directly admitted herein, the Bureau will not address the bulk of these statements,

---

[4] Those topics included: "The process by which the CFPB and the VCG Group negotiated the provisions in the Proposed Consent Judgment," "The nature and extent of requirements for approval from entities other than the NCSLTs (including any member of the Intervenor Group)," "Any conflict between: (i) provisions in the Trust Related Agreements, and (ii) provisions in the Proposed Consent Judgment," and "The process the CFPB engaged in to ascertain the authority of VCG or any law firm or entity purporting to act on behalf of the NCSLTs." D.I. 154-1, Intervenors' 30(b)(6) Notice to Bureau, at 2-3.

focusing instead on the few relevant undisputed facts, the terms of the contracts that govern the Trusts and their agents, and the law applicable to these contracts.[5]

## IV.    Argument

### A.    McCarter had authority to execute the Proposed Consent Judgment on behalf of the Trusts

The Court has asked the parties first to address whether "McCarter & English had the authority to execute the Proposed Consent Judgment on behalf of the Defendants under the Trust Related Agreements and applicable law." D.I. 99, Scheduling Order, at 1. The answer is yes. McCarter was engaged to represent the Trusts in accordance with applicable law and the Trust Related Agreements, and the scope of that engagement granted McCarter the authority to represent the Trusts in this matter and to execute the Proposed Consent Judgment on the Trusts' behalf.

#### 1.    McCarter was retained by the Trusts to represent them in the Bureau investigation

The record evidence shows that McCarter was engaged to represent the Trusts consistent



with ███████████████████████████████████████████. Chaitman, in turn, was ███████████████████████████████████████████████████████████ ███████████████████████████. The Chaitman Engagement Letter was ███████████████████

---

[5] Ambac and the Noteholders recently filed a letter purporting to "bring to the Court's attention" a statement made by the Owners in a filing in the Delaware Chancery Court. *See* D.I. 257, April 28, 2020 Ltr. to Judge Noreika. The Court should disregard the letter as a naked attempt to make additional arguments outside of Intervenors' allotted briefing. Moreover, the specific assertions made in the letter are distortions of the Bureau's and the Owners' respective legal positions and should carry no weight. The Owners' statement in the Chancery Court is not a change of position on their authority to direct the Trusts' agents, as the letter implies. It is irrelevant that McCarter may have advanced different arguments on this point in its August 2017 opinion letter to the Bureau; that opinion letter has no controlling effect here. Moreover, the Bureau has not previously stated that it entered into the PCJ "in reliance on" the opinion letter, as Ambac and the Noteholders claim. *See* D.I. 257 at 1 (citing D.I. 54, Bureau's Resp. to Mots. to Intervene at 7).

████ in accordance with the Trust Related Agreements. No provision of any Trust Related Agreement invalidates or disallows the McCarter retention, nor does the McCarter retention violate any principal of generally applicable law. The retention therefore was valid, and McCarter had the requisite authority to execute the PCJ with the Bureau.

### a.    Chaitman was retained by the Trusts

The Trust Agreement provides that the Owner Trustee may engage counsel to perform the Owner Trustee's duties and obligations. Specifically, it provides:

> In the exercise or administration of the trusts hereunder and in the performance of its duties and obligations under any of the Trust Related Agreements, the Owner Trustee (i) may act directly or, at the expense of the Trust, through agents or attorneys pursuant to agreements entered into with any of them . . . .

Trust Agmt. § 9.03(b).

There is no specific procedure articulated in the Trust Agreement that the Owner Trustee must follow to engage an attorney for the Trusts under this power. Wilmington Trust testified that the actual practice of the Trust Parties was ████████



*See* Ex. C – Excerpted Deposition of Dorie Costello ("Costello Dep.") as 30(b)(6) designee for Wilmington Trust Company at 19:5-20.

*See* D.I. 232, Intvs.' Ex. 26 – Owners' Authorization & Direction Ltr. ("Direction Letter"). ████

████ *See* D.I. 232, Intvs.' Ex. 27 - Chaitman Engagement Ltr. Chaitman was thereby retained to represent the Trusts in

accordance with the terms of the Trust Related Agreements and the established practice of the Trust Parties. *See* Ex. C, Costello Dep. at 19:21-25 ███████████████████████████

████████████████████████████████████████████████████████████████████████████

█████████████████████████████████

Intervenors attempt to invalidate the Chaitman Engagement Letter by arguing that the Direction Letter was not valid because ███████████████████████████. *See* Opp. Br. at 12, 12 n. 14. But as Wilmington Trust testified, ████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

███████████████████████. *See* Costello Dep. at 108:6-11.[6]

Further, the record contains ample evidence that Wilmington Trust and other Trust Parties ██████████████████████████████████████████████. *See Sun-Times Media Grp., Inc. v. Black*, 954 A.2d 380, 398 (Del. Ch. 2008) ("[A]ny course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.") Most obviously, when the Bureau contacted Wilmington Trust

████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████. *See* Ex. A.

Wilmington Trust also acknowledged that ████████████████████████████████████████

████████████████████████████████████████ *See* Costello Dep. at 19:9-12.

---

[6] Intervenors argue ███████████████████████████████████████████ *See* Opp. Br. at 13 (quoting D.I. 232, Intvs.' Ex. 32). But all the email shows is that ███████████████████████████████████████████████████. Intervenors suggest that ███████████████ but provide no evidence that this ever occurred, and do not contradict the record evidence that █████████████████████████████████████████████ of the Chaitman Engagement Letter.

Wilmington Trust further understood that ███████████████████████████

███████████████████████████████████████████████████████████, *see id.*

at 31:2-7, and that ██████████████████████████████████████████

████████████████████████████, *see id.* at 31:8-15.

There is also substantial evidence that ██████████████████████████

████████, a process that required the involvement of multiple Trust Parties. For example,

Wilmington Trust ██████████████████████████████████████████████

██████████████████████████████. *See* Ex. D – August 8, 2016 Issuer Order. ████

██████████████████████████████████████████████████████

███████████████████████████████ *See* Ex. E – Trusts' September 26, 2016 Distribution

Statements (showing ████████████████████████████████████); Ex. F –

Trusts' November 26, 2016 Distribution Statements (same).

        **b.**    **Chaitman was authorized to represent the Trusts in the Bureau investigation**

Under any principled reading of its engagement letter, Chaitman was authorized to

represent the Trusts in the Bureau's investigation. Specifically, under the heading ████████

██████ the Chaitman Engagement letter provides:



D.I. 232, Intvs.' Ex. 27, Chaitman Engagement Ltr. at 1 (emphasis added). ███████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

████████████████████████████████████████ *See* Exs. A-B. Hence, there is no

question that the scope of the Chaitman retention included representation of the Trusts in the

Bureau's investigation.  Nothing in the Trust Related Agreements limits or invalidates the scope

of the plain language of the engagement letter.[7]

      Intervenors argue that Chaitman did not have authority to represent the Trusts before the

Bureau because this broad scope was not the intent of the parties to the Chaitman Engagement

Letter. They claim that the Direction Letter instructing Wilmington Trust to execute the

Chaitman Engagement Letter ████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████.

*See* Opp. Br. at 12-13. This argument fails for multiple reasons. First, ███████████

█████████████████████████████████████████████████████████

██████████████████████████████████████ Intervenors have not

even attempted to interpret the ███████████████, let alone offer any alternative reading.

Thus, the inquiry into the scope of the Chaitman Engagement Letter need not go beyond the

letter itself, which clearly permits Chaitman to represent the Trusts before the Bureau.

      Beyond the plain language of the letter, Intervenors ignore the fact that the Direction

Letter and the Chaitman Engagement Letter ██████████████████████████████

██████. *See Ashall Homes Ltd. v. ROK Entm't Grp. Inc.*, 992 A.2d 1239, 1250 (Del. Ch. 2010);

*Arciniaga v. Gen. Motors Corp.*, 460 F.3d 231, 237 (2d Cir. 2006) (applying New York law). As

Intervenors point out, the Direction Letter states that ███████████████████████

---

[7] In fact, when the Chaitman Engagement Letter was executed it too became a "Trust Related
Agreement." *See* Trust Agmt. at 7 ("'Trust Related Agreements' means any instruments or
agreements signed by the Owner Trustee on behalf of the Trust.").



D.I. 232, Intvs.' Ex. 26 at 1;

Opp. Br. at 12.[8] But this language does not say that

D.I. 232, Intvs.' Ex. 26 at 1. The actions authorized in the

Chaitman Engagement Letter are

. And the opposite conclusion would make no sense: that the Owners directed the hiring of

Chaitman

Finally, the evidence shows that the Trust Parties knew that Chaitman

. As noted above, after Chaitman was retained,

---

[8] The Odyssey Agreement is a contract entered into between six of the Trusts that are defendants in this action and Odyssey Education Resources LLC under which Odyssey would act as a loan servicer for the six trusts. In February 2016, Intervenor U.S. Bank filed a "Petition for Instructions" in Minnesota state court and argued that the Trusts lacked the power to appoint Odyssey as a servicer, that the Odyssey Agreement's terms conflicted with the Trust Related Agreements, and that the Indenture Trustee should not have to pay Odyssey's submitted invoices. *See Matter of Nat'l Collegiate Student Loan Trusts 2003-1, 2004-1, 2004-2, 2005-1, 2005-2 & 2005-3*, No. CV 16-341-JFB-SRF, 2018 WL 4181466, at *2 (D. Del. Apr. 25, 2018). The case was transferred to this District Court where Magistrate Judge Fallon held that the Trusts did have the power to appoint Odyssey under the Trust Related Agreements (and that Noteholder and Indenture Trustee consent was not required), that the agreements' terms were not in conflict, and that Odyssey's invoices should be paid. *See generally id.* at *4-11. Objections filed by U.S. Bank and other parties that have intervened in this action were overruled by Judge Bataillon, who adopted the report and recommendation in its entirety. *See U.S. Bank Nat'l Ass'n v. Nat'l Collegiate Student Loan Tr. 2003-1*, No. 1:16CV341, 2018 WL 4462369, at *5 (D. Del. Sept. 18, 2018).

███████████████████████████████████. *See* Exs. E-F. And these parties were aware that

Chaitman's representation covered ████████████████████████. *See* Ex. G – June 14,

2016 Email from Lance Gotthoffer to Tristan Fleming (████████████████████████████

████████████████████████████████████████████████████).

Such knowledge and conduct is consistent with the plain meaning of the language in the

Chaitman Engagement Letter, and it is entirely inconsistent with the limitation on the scope of

that agreement that Intervenors advance here.

        c.    **McCarter was hired by Chaitman to represent the Trusts**

McCarter was retained in accordance with the provision of the Chaitman Engagement

Letter ████████████████████████████████████████

████████████████████████████████████████████

███████████████████ D.I. 232, Intvs.' Ex. 27 at 1. Under the terms of the ███████████

McCarter Engagement Letter, ████████████████████████████████████

████████████████████████████████████████████

██████████████. *See* D.I. 233, Intvs.' Ex. 34 – McCarter Engagement Ltr.[9]

Intervenors argue that this initial retention was invalid because it ███████████████

████████████████████████████ *See* Opp. Br. at 13-14. But the Trust Agreement empowers

Wilmington Trust to act "through agents or attorneys *pursuant to agreements entered into with*

*any of them.*" Trust Agmt. § 9.03(b). The terms of the agreement that Wilmington Trust entered

---

[9] Intervenors suggest that Chaitman ██████████████████████████████ *See* Opp. Br. at 13 n.15 (citing depo testimony of Lance Gotthoffer related to ████████████████████). Whatever might be true of Chaitman's communications with other firms, the McCarter Engagement Letter explicitly states: ████████████████████████████████████████ D.I. 233, Intvs.' Ex. 34 – McCarter Engagement Ltr. at 1.

into with Chaitman ██████████████████████████████████████████████

████. *See* D.I. 232, Intvs.' Ex. 27, at 1. And Wilmington Trust was fully aware of this term of

Chaitman's engagement, specifically invoking it when ████████████████████████████

██████████████████████████████████. *See* Ex. D – August 8,

2016 Issuer Order at 0001391 ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████; *see also id.* ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

At each step, Wilmington Trust, Chaitman, and McCarter abided by the terms of the

relevant agreements and, aside from arguing that the Chaitman Engagement Letter was invalid to

begin with, Intervenors have not even attempted to show otherwise in their brief. That

Wilmington Trust or other Intervenors regret—with hindsight, while embroiled in litigation—

empowering Chaitman to retain other firms on behalf of the Trusts does not change the fact that

Wilmington Trust *did* so empower Chaitman, and that doing so was valid under the terms of the

Trust Related Agreements.

> **d.    McCarter was authorized to represent the Trusts in the Bureau investigation**

Like Chaitman, McCarter was properly authorized to represent the Trusts before the

Bureau. Intervenors contend that the McCarter retention letter ████████████████████████

████████████████ They are correct that ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████. D.I.

233, Intvs.' Ex. 34 at 2. But the ███████████████████████████████████

████████████████████████████████ *Id*. The evidence shows that ████

███████████████████████████████████████████████████████

████████████████████████████████ *See* Ex. H – Excerpted Deposition of

James Kosch at 64:12-65:25 ████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████ *see also* Ex.

I – Excerpted Deposition of Lance Gotthoffer at 67:14-18. This undisputed testimony makes

clear that the scope of McCarter's engagement ██████████████ include representation of the

Trusts in the Bureau's investigation.

   Bolstering this testimony is the similarly undisputed evidence that McCarter did in fact

represent the Trusts in the Bureau's investigation ██████████████████████████████.

When the Bureau ████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████. *See* Ex. A at 00000077. Moreover, █████████████████

███████████████████████████████████████████████████████

█████████████████ *See* Ex. J, July 19, 2016 McCarter Invoice (████████████████

████████████████████████████). The undisputed evidence therefore

demonstrates that the scope of McCarter's work on behalf of the Trusts ██████████████████

█ include representation of the Trusts before the Bureau.

### 2.    McCarter was granted authority to execute the Proposed Consent Judgment

   McCarter, being properly retained to represent the Trusts before the Bureau, was directed

to enter the PCJ by the only Trust Party with the authority to give it that direction: the Owners.

The Owners exercised this authority pursuant to an express grant in the Trust Agreement, and no principal of law or provision of any Trust Related Agreement abrogated that authority.

### a. The Owners have authority to settle legal claims brought against the Trusts

The Trust Agreement prohibits the Owner Trustee from "compromising"—that is, settling—"any claim or lawsuit brought by or against the Trust" unless it receives prior written approval from the Owners. Trust Agmt. § 4.01(b)(i). And the Trust Agreement authorizes the Owners to direct agents retained by the Owner Trustee. *Id.* § 2.03(b)(i) ("[T]he Owner Trustee or other agents selected in accordance with this Agreement will act on behalf of the Trust subject to direction by the Owners as provided herein."). Read in conjunction with Section 9.03(b), which empowers the Owner Trustee to engage attorneys or other agents to perform its duties and obligations, these provisions make plain that it is the Owners—and only the Owners—that may direct a properly appointed agent of the Trusts to settle claims against the Trusts.

This specific grant of authority to the Owners is entirely consistent with the Delaware Statutory Trust Act ("DSTA"), under which legal authority the Trusts were organized. *See* Trust Agmt. § 2.05. The DSTA explicitly provides that the governing agreements of a trust organized under the act are free to empower beneficial owners to "direct the trustees or other persons in the management of the statutory trust," and to grant to beneficial owners "separate rights, powers or duties with respect to specified property or obligations of the statutory trust." 12 Del. Code Ann. §§ 3806(a), (b)(2). This is in keeping with the DSTA's stated policy to provide statutory trusts with the freedom to organize their structures as the initiating parties see fit. *See Nakahara v. NS 1991 Am. Tr.*, 739 A.2d 770, 782 (Del. Ch. 1998) ("[The DSTA's] highly permissive language reveals a clear intent on the part of the General Assembly to grant business trusts broad freedom in establishing their internal governance mechanisms.")

As Intervenors have acknowledged, the Trusts' operations and functions are carefully distributed among the various Trust Parties and memorialized in the Trust Related Agreements. Each Trust Party may do only what the Trust Related Agreements authorize them to do, and the Trust Related Agreements authorize the Owners—and only the Owners—to direct the Owner Trustee or other Trust agents to settle legal claims brought against the Trusts. Thus, when McCarter negotiated and executed the PCJ with the Bureau, it did so at the direction of the only Trust Party empowered to do so.

> **b.    No other Trust Party has authority to settle the Bureau's legal claims brought against the Trusts**

The Trust Related Agreements do not authorize anyone other than the Owners to decide whether to settle the Bureau's claims against the Trusts. Contrary to Intervenors' assertions, the Indenture's Granting Clause does not give the Indenture Trustee any role in settling the Bureau's claims.

Under New York law "[i]ndentures are to be read strictly and to the extent they do not expressly restrict the rights of the issuer, the issuer is left with the freedom to act." *San Antonio Fire & Police Pension Fund v. Amylin Pharm., Inc.*, 983 A.2d 304, 314 (Del. Ch. 2009) (internal quotation omitted). Here, the Indenture grants to the Indenture Trustee only "present and future claims, demands, causes and choses in action in respect of": "the Financed Student Loans", "all Servicing Agreements", "each Guarantee Agreement", and "all funds on deposit from time to time in the Trust Accounts." *See* D.I. 228, Intvs.' Ex. 3 – Indenture, at Granting Clause. The clause has no broad or catch-all language that would permit the reading of other, unlisted powers or authorities. The Bureau is not suing under the Servicing or Guarantee Agreements, nor is it making any direct claim on the granted assets. Instead, the Bureau is suing the Trusts for violations of Federal consumer financial law. Hence, there simply is no way to fit the Bureau's

claims into the plain language of the Granting Clause. Settling the Bureau's claims against the Trusts is not a power granted to the Indenture Trustee.[10]

Further, the Granting Clause must be read together with the provision of the Trust Agreement that authorizes the Owners to settle claims against the Trusts. *Ashall Homes Ltd. v. ROK Entm't Grp. Inc.*, 992 A.2d 1239, 1250 (Del. Ch. 2010); *Arciniaga v. Gen. Motors Corp.*, 460 F.3d 231, 237 (2d Cir. 2006) (applying New York law). The two provisions should be read together and given their plain meaning: the Trust Agreement authorizes the Owners to settle legal claims brought against the Trust, and the Granting Clause authorizes the Indenture Trustee to bring legal claims relating to the assets and agreements listed in the Granting Clause. Because this is a Bureau action brought against the Trusts to enforce Federal consumer financial law, and not an action brought by the Trusts pursuant to the Granting Clause, it is the Owners that have been empowered by the Trust Related Agreements to settle the Bureau's claims.

The cases Intervenors cite for the proposition that only a "trustee" can bring or settle claims once a grant of collateral has been made are all distinguishable. *See* Opp. Br. at 30-31, 31 n.34. First, all four cases that Intervenors cite present suits by investors for breaches of contractual duties and warranties by the trustees, the servicers, or the originators of the securitized assets, not suits by a regulatory agency for violations of public law. *See Phoenix Light SF Ltd. v. U.S. Bank Nat. Ass'n*, No. 14-CV-10116 KBF, 2015 WL 2359358, at *1 (S.D.N.Y. May 18, 2015); *In re Bank of N.Y. Mellon*, 986 N.Y.S.2d 864, at *11-12 (N.Y. Sup.

---

[10] Intervenors' argument on the Granting Clause liberally mixes in language from the Indenture's definition of the term "grant" in its definitions section. *See* Opp. Br. at 8, 30. While the term may indeed have an expansive meaning in this Indenture, the relevant question is not what "grant" means, but what has been granted. The definition of the term does not (and cannot) expand the limited list of assets and agreements enumerated in the Granting Clause, and therefore does nothing to extend the Indenture Trustee's role into settling the Bureau's claims.

Ct. 2014); *U.S. Bank Nat. Ass'n v Federal Home Loan Bank of Boston*, No. 652382/2014, 2016 WL 9110399, at *1 (N.Y. Sup. Ct. Aug. 12, 2016); *In re U.S. Bank Nat. Ass'n*, 27 N.Y.S.3d 797, at *1-2 (N.Y. Sup. Ct. 2015). Second, none of the opinions interpret a granting clause alongside a provision comparable to § 2.03(b)(i) of the Trust Agreement; they only interpret granting clauses standing alone. *See Phoenix Light*, at *2; *N.Y. Mellon*, at *14; *Bank of Boston*, at *9; *In re U.S. Bank*, at *2. The cases' statements about the scope of an indenture granting clause generally cannot be mechanistically applied to the specific Granting Clause of these Trusts, since this Indenture and its provisions must be read in concert with the Trust Agreement and its provisions. Finally, none of the cited cases deal with trusts organized under the DSTA, meaning that the courts in these cases were not operating within the same statutory and interpretative framework as this Court. These cases therefore provide no meaningful guidance on the interpretation of the contracts at issue here.

Intervenors' arguments that Ambac or the Noteholders have relevant consent rights in this situation are also unavailing.



. *See* D.I. 230misc, Intvs.' Ex. 15 – Master Trust Trust Agreement § 4.01(b)(i)

Intervenors themselves argue that the text of the Master Trust Trust Agreement highlighted above demonstrates

. *See* Opp. Br. at 30, 35. But this argument amounts to a concession that

. If the language quoted above

██████████████████████████████████████

████████████████████████████████████████

because none of their Trust Agreements contain this language.

The Trust Agreement likewise gives the Noteholders no authority to direct or consent to the settlement of claims brought against the Trusts. The only consent rights granted under the Trust Related Agreements to the Noteholders relate to amending the basic activities the Trusts engage in, *see* Trust Agmt. § 2.03(a)(iv), or to amending or changing the basic Trust documents or collateral, *see* Indenture § 3.07(f). Neither of these rights encompasses the authority at issue here: to direct Trust counsel to settle the Bureau's claims.

Ambac and the Noteholders also gain no rights or authorities by virtue of their self-proclaimed status as "true priority economic beneficiaries." *See, e.g.*, Opp. Br. at 3, 17. This term appears nowhere in the Trust Related Agreements, the DSTA, or any Delaware or New York case law that the Bureau has been able to identify.[11] This Court has held that the Noteholders and Ambac are third-party beneficiaries of the Trusts. *See* D.I. 181, Order on Scope of Trusts' Privileges, at 3-5 (holding Noteholders and Ambac are third-party beneficiaries of Trusts for purposes of inclusion in Trusts' attorney-client privilege). But Delaware law is clear that third-party beneficiaries' rights are to enforce contractual promises made for their benefit. *See Blair v. Anderson*, 325 A.2d 94, 96-97 (Del. 1974); *Instituform of N. Am., Inc. v. Chandler*, 534 A.2d

---

[11] Similarly, Intervenors' reference to the Owners as holders of "residual" beneficial interests, *see* Opp. Br. at 5-6, appears to be a rhetorical device to diminish the Owners' role as the "residual" modifier has no identifiable source in any legal authority. To the contrary, the DSTA provides that statutory trusts organized under the act are managed and operated "for the benefit of [the] beneficial owners," 12 Del. Code Ann. § 3801(g)(1), and the Trust Agreement provides that the Owner Trustee will "hold the Trust Property in trust. . . for the use and benefit of the Owners." Trust Agmt. § 2.05.

257, 268-69 (Del. Ch. 1987). As shown above, the contracts at issue give the Noteholders and Ambac no relevant right to be enforced here. Intervenors' rhetorical elevation of their status cannot create extra-contractual rights or powers.[12]

**B.     It was not improper or in violation of any Trust Related Agreement for McCarter to enter into the Proposed Consent Judgment**

The Court has also asked the parties whether McCarter's act of entering into the Proposed Consent Judgment was "improper or (in violation of Trust Related Agreements)." D.I. 99, at 1. Because McCarter's actions did not violate any Trust Related Agreements, and because no principle of law otherwise invalidates McCarter's actions, the answer to that question is no. Intervenors' arguments on Threshold Issue Two amount to little more than an expression of their dissatisfaction with the representation that McCarter provided to the Trusts. Individual Trust Parties' unhappiness with the final terms of a settlement negotiated by duly authorized counsel for the Trusts is not a ground on which to conclude that such counsel's conduct was in any sense "improper."

**1.     The Trust Related Agreements do not prohibit the Trusts from settling claims against them**

Intervenors' brief does not cite to a single provision of any of the Trust Related Agreements in support of their argument on the second Threshold Issue. *See* Opp. Br. at 36-39. That is because there is no provision, in any of the Trust Related Agreements, that would prohibit the Trusts or their duly authorized agents from settling claims against the Trusts. Intervenors' only argument is that the power to settle the Bureau's claims against the Trusts are held by the Indenture Trustee and, in some instances, the Note Insurer. But as explained above,

---

[12] The argument section of Intervenors' brief makes only passing mention of the Noteholders and Ambac's status in the trust structure, and it cites no legal authority to support the assertion that this status is somehow determinative of the Threshold Issues. *See* Opp. Br. at 25.

*see* Section IV.A.2.b, *supra*, that position simply cannot be squared with the actual language of the Trust Agreement and the Indenture.

The Trusts act through the Owner Trustee "or other agents selected in accordance with [the Trust] Agreement." Trust Agmt. § 2.03(b)(i). The Trust Agreement empowers the Owners to direct the Owner Trustee to settle claims brought against the Trusts. *Id.* § 4.01(b)(i). The Owner Trustee is empowered to retain attorneys to carry out its duties and functions on behalf of the Trusts. *Id.* § 9.03(b). And the attorneys and agents retained on the Trusts' behalf act at the direction of the Owners. *Id.* § 2.03(b)(i). Here, Wilmington Trust engaged counsel to represent the Trusts in litigation and regulatory actions. The retention was carried out in accordance with the Trust Agreement, and the Trust Agreement empowers duly retained agents to act on behalf of the Trust at the direction of the Owners. Far from *prohibiting* McCarter from entering into the PCJ, the Trust Agreement plainly *authorizes* the very course of conduct taken here.

### 2. McCarter's entry into a settlement on behalf of its clients was proper under applicable law

As the Trusts' counsel in the Bureau matter, McCarter was authorized under Delaware law to enter into the PCJ on behalf of its client. Wilmington Trust's delegation to a duly retained and authorized law firm of its role as the Trusts' authorized agent to execute settlement agreements on behalf of the Trusts is consistent with Delaware law.

The Delaware Statutory Trust Act explicitly authorizes the delegation of a trustee's powers and obligations to an agent that has been properly engaged under the relevant trust agreements. *See* 12 Del. Code Ann. § 3806(b)(i) ("[A] trustee of a statutory trust has the power and authority to delegate to 1 or more other persons the trustee's rights, powers or duties to manage and control the business and affairs of the statutory trust, including to delegate to agents, officers and employees of the trustee or the statutory trust."); Del. L. of Corp. and Bus. Org.

§ 19.7 ("A trust may contract with agents or independent contractors, and the trustees may delegate their duties, with respect to the management of the business and affairs of a statutory trust."). And courts have recognized that the DSTA permits the delegation of rights and powers similar to those at issue here. *See In re Jamuna Real Estate, LLC*, 385 B.R. 127, 131 (Bankr. E.D. Pa. 2008) ("The law in Delaware, then, is that delegation of basic administrative duties such as the right to sue may be entirely proper.").

Furthermore, under Delaware agency law an attorney of record is presumed to have the actual authority to bind their client to a settlement agreement. *See Moyer v. Moyer*, 602 A.2d 68, 73 (Del. 1992) (citing *Aiken v. Nat'l Fire Safety Counsellors*, 127 A.2d 473, 475-76 (Del. Ch. 1956)). That presumption can be affirmed explicitly or implicitly through the actions of the client affirming or assenting to the attorney's expressions of authority. *See Corbesco, Inc. v. Local No. 542, Int'l Union of Operating Eng'rs*, 620 F. Supp. 1239, 1243 (D. Del. 1985) (applying Delaware law); *Shields v. Keystone Cogeneration Sys., Inc.*, 620 A.2d 1331, 1333-34 (Del. Super. Ct. 1992).

Here, Chaitman and McCarter were properly retained to represent the Trusts before the Bureau. The Court may therefore presume that McCarter had the actual authority to enter into the PCJ. This presumption is upheld by the clear and repeated directions from the Owners to McCarter to enter into the Proposed Consent Judgment. These instructions to McCarter are undisputed by Intervenors; to the contrary, Intervenors insist that the Owners directed McCarter to enter into the PCJ. *See, e.g.*, Opp. Br. at 25. Because the Owners are the Trust Party empowered by the Trust Related Agreements to decide whether to settle the type of claims brought by the Bureau, it is the Owners' direction and assent to McCarter's actions that are controlling on the question of propriety here.

Intervenors argue that Wilmington Trust's refusal to sign a consent order stipulation on behalf of the Trusts is sufficient to show that McCarter's clients—the Trusts themselves—did not consent to McCarter's settlement of the Bureau's claims. *See* Opp. Br. at 37. But as Owner Trustee, Wilmington Trust had no authority to decide whether to enter into a settlement agreement and could only do so at the direction of the Owners. *See* Trust Agmt. § 4.01(b)(i). Wilmington Trust therefore was never empowered to accept or reject the PCJ itself, only the Owners were. And, as noted above, the Trust Agreement plainly permits agents other than the Owner Trustee to act on behalf of the Trust as appropriate. *See id.* § 2.03(b)(i). Wilmington Trust was therefore not essential for either the decision to settle or the execution of the settlement. As such, the fact that McCarter did not follow the lead of Wilmington Trust has no implication for McCarter's duty of loyalty to its clients, the Trusts.

### 3. There are no conflicts between the terms of the Proposed Consent Judgment and the Trust Related Agreements that render McCarter's conduct improper

Contrary to the Intervenors' objections to certain terms of the PCJ, there are no conflicts with the PCJ and the Trust Related Agreements that render McCarter's entry into the PCJ improper. First, as argued above, Intervenors' insistence that terms of the PCJ and the Trust Related Agreements are in conflict should be set aside as outside the scope of the Threshold Issues. The question is, and has always been, whether McCarter's *conduct* was improper. *C.f.* D.I. 160, April 4, 2019 Hearing Transcript at 14:9-12 (Threshold Issue Two is "not the propriety of the consent judgment itself, because that's going to be the ultimate issue [the Court will] need to decide").

Second, there are no conflicts between the PCJ and the Trust Related Agreements. The Trust Related Agreements govern the normal operation of the Trusts and their business. The Proposed Consent Judgment resolves legal liability arising from the Trusts' violations of Federal

law in the course of their operations.[13] There is no mechanism to alter any Trust Related Agreement in the PCJ. To the extent that the settlement affects the Trusts' operations or alters the payment waterfall in a way that deprives certain parties of ill-gotten gains, such outcomes would be the result of the Trusts coming into compliance with Federal law. The Trust Related Agreements cannot bind the Trusts to violate the law.

In fact, contrary to Intervenors' insistence, the terms of the PCJ do not effectuate any changes to the terms of the Trust Related Agreements. Indeed, the PCJ fits alongside them. In particular, the PCJ provides that the Trust Party authorized to direct the Trusts to settle claims— the Owners—be the Trust Party responsible for ensuring the Trusts' compliance with that settlement. *See* D.I. 3-1, PCJ ¶¶ 7(f), 31-33 (provisions about the "Board"). Intervenors insistence that the PCJ empowers the Owners ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬ is not based in the actual provisions of the PCJ, but rather Intervenors' assumptions about the Owners' intentions. *See* Opp. Br. at 38-39 (citing PCJ ¶¶ 10, 19, and 48).

Finally, there is nothing about the fact that the Trusts have agreed to make restitution and penalty payments under the PCJ that violates the Trust Related Agreements. Intervenors argue that the mere fact that the Trusts must make payments under the PCJ is a violation of the Indenture. *See* Opp. Br. at 34-35. But the logical implication of this argument is that the Trusts would never be able to settle any claim or satisfy any judgment, even though the Trust Related Agreements explicitly provide for such actions. In any event, the PCJ provides that the Trusts continue to service student loans and collect appropriate monies from consumers, and to use

---

[13] While the Bureau maintains that the intent of the Owners in directing McCarter to enter into the PCJ is irrelevant to the Threshold Issues, the record supports the very simple intent that the Owners ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ *See* Ex. K, Excerpted Deposition of Donald Uderitz at 148:12-18; 149:6-11; 188:19-22.

those funds to pay for the normal operation and functions of the Trusts pursuant to the Trust Related Agreements, including, specifically, payments to noteholders sufficient to avoid any event of default. *See id.* at ¶ 18.

## V.     Conclusion

For the reasons described above, the Court should find that McCarter had authority to execute the PCJ on behalf of the Trusts and under the Trust Related Agreements and applicable law, and that it was not improper or in violation of the Trust Related Agreements for McCarter to enter into the PCJ. The Court therefore should allow the parties to proceed to the second phase of this Court's consideration of the Bureau's motion to approve the consent judgment.

Dated: April 30, 2020

Respectfully submitted,

*Attorneys for Plaintiff*
*Bureau of Consumer Financial Protection*

THOMAS WARD
*Enforcement Director*

DEBORAH MORRIS
*Deputy Enforcement Director*

ALUSHEYI J. WHEELER
*Assistant Litigation Deputy*

/s/ Gabriel Hopkins
Gabriel Hopkins
gabriel.hopkins@cfpb.gov
Phone: 202-435-7842
Stephen Jacques
stephen.jacques@cfpb.gov
202-435-7368

Jane Peterson
jane.peterson@cfpb.gov
202-435-9740

*Enforcement Attorneys*
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552
Facsimile: (202) 435-7722

CERTIFICATE OF SERVICE

I hereby certify that on May 7, 2020, I electronically filed Plaintiff's Redacted Reply in Support of its Motion to Approve the Proposed Consent Judgment with the Clerk of Court using CM/ECF which will send notification of such filing(s) to all parties to this matter registered for CM/ECF.

I hereby further certify that on May 7, 2020, I sent a copy of Plaintiff's Redacted Reply in Support of its Motion to Approve the Proposed Consent Judgment by email to Intervenor Wilmington Trust Company which is agent authorized to accept service on behalf of the Defendants.

Dated: May 7, 2020

/s/ Gabriel Hopkins
Consumer Financial Protection Bureau
1700 G St. NW
Washington, DC 20552
gabriel.hopkins@cfpb.gov

*Attorney for Plaintiff Consumer*
*Financial Protection Bureau*