IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | C.A. No. 17-1323 (MN) |
| THE NATIONAL COLLEGIATE MASTER STUDENT TRUST, et al., | ) ) ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

Colin T. Reardon, Gabriel S.H. Hopkins, Jane M.E. Peterson, Stephen C. Jacques, CONSUMER FINANCIAL PROTECTION BUREAU, Washington, DC – Attorneys for Plaintiff

Defendants, The National Collegiate Master Student Trusts, currently unrepresented by counsel

Jamie L. Brown, Kurt M. Heyman, Melissa N. Donimirski, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, DE; Devon Hercher, Erik W. Haas, George A. LoBiondo, Jared Buszin, Joshua Kipnees, Peter Shakro, Peter W. Tomlinson, PATTERSON BELKNAP WEBB & TYLER LLP, New York, NY – Attorneys for Ambac Assurance Corporation

Daniel A. O'Brien, VENABLE LLP, Wilmington, DE; Allyson B. Baker, Meredith L. Boylan, Sameer P. Sheikh, Katherine M. Wright, Tiffany C. Williams, VENABLE LLP, Washington, DC – Attorneys for Transworld Systems Inc.

Catherine A. Gaul, ASHBY & GEDDES, PA, Wilmington, DE; Michael Hanin, Henry B. Brownstein, Uri Itkin, KASOWITZ BENSON TORRES LLP, New York, NY – Attorneys for Objecting Noteholders

Rebecca L. Butcher, LANDIS RATH & COBB LLP, Wilmington, DE; John P. Doherty, William Hao, ALSTON & BIRD LLP, New York, NY – Attorneys for GSS Data Services, Inc.

Stacey A. Scrivani, STEVENS & LEE, P.C., Wilmington, DE; Nicholas H. Pennington, STEVENS & LEE, P.C., King of Prussia, PA – Attorneys for The Pennsylvania Higher Education Assistance Agency d/b/a American Education Services

Stephen B. Brauerman, Elizabeth A. Powers, Jayson C. Jowers, BAYARD, P.A., Wilmington, DE – Attorneys for Wilmington Trust Company

John W. Shaw, Jeffrey T. Castellano, David M. Fry, SHAW KELLER LLP, Wilmington, DE; Stephen H. Meyer, SULLIVAN & CROMWELL, LLP, Washington, DC; Matthew A. Martel, Joseph B. Sconyers, Keith M. Kollmeyer, JONES DAY, Boston, MA – Attorneys for U.S. Bank National Association

May 31, 2020
Wilmington, Delaware

**NOREIKA, U.S. DISTRICT JUDGE**:

Before the Court is a motion to approve a Proposed Consent Judgment ("PCJ") in the instant litigation between the Consumer Financial Protection Bureau ("CFPB," "the Bureau," or "Plaintiff") and fifteen Delaware statutory trusts, called the National Collegiate Student Loan Trusts (collectively, "the Trusts" or "Defendants").  (D.I. 3).  The motion is opposed by a number of intervening parties – Ambac Assurance Corporation ("Ambac"), Transworld Systems Inc. ("TSI"), Objecting Noteholders ("Noteholders"), GSS Data Services, Inc. ("GSS"), the Pennsylvania Higher Education Assistance Agency d/b/a American Education Services ("PHEAA"), Wilmington Trust Company ("WTC"), and U.S. Bank National Association ("U.S. Bank") (collectively, "the Intervenors").  (D.I. 226).  Consideration of the motion was bifurcated into two phases and the CFPB and Intervenors have thus far submitted briefing on two Threshold Issues – whether the law firm of McCarter & English ("McCarter") lacked authority to sign the PCJ on behalf of the Trusts and whether, authority aside, it was improper for McCarter to enter into the PCJ.  For the reasons discussed below, the Court finds that McCarter lacked authority to execute the PCJ on behalf of the Trusts under the Trust Related Agreements and applicable law, and therefore denies Plaintiff's motion to approve the Proposed Consent Judgment.

## I.    **BACKGROUND**

The Trusts were created between 2001 and 2007 pursuant to the Delaware Statutory Trust Act, 12 Del. Code § 3801-26 ("DSTA"), to acquire private student loans, collect payments from borrowers, and distribute gains to the holders of notes.  *CFPB v. Nat'l Collegiate Master Student Trust*, No. 17-cv-1323 (MN), 2018 WL 5095666, at *1 (D. Del. Oct. 19, 2018); (*see also* D.I. 228, Ex. 1 (The National Collegiate Student Loan Trust 2006-4 Trust Agreement ("Trust Agreement"))

§ 2.03(a), 2.05).[1] The Trusts have no employees or internal management and rely on certain trust-related agreements to provide their operating structure. *CFPB v. Nat'l Collegiate Master Student Trust*, 2018 WL 5095666, at *1. These agreements include trust agreements, administration agreements, servicing agreements, and indentures (collectively, "Trust Related Agreements") and provide a structure that includes an Owner Trustee, Administrator, Indenture Trustee, Primary Servicer, Special Servicer, and Sub-servicers. (*Id.*).

WTC is the Owner Trustee of the Trusts.[2] (*Id.*). In this role, WTC acts pursuant to the authority granted to it under the Trust Related Agreements and can be directed by the equity owners of the Trusts ("the Owners")[3] or the Administrator. (*Id.*). Should a conflict arise between a directive by the Owners and the terms of the Trust Related Agreements, the Trust Related Agreements control. (*Id.*). Ambac is an insurance company that has provided financial guarantee insurance with respect to securities in certain of the Trusts. (*Id.* at *2).[4]

---

[1]   The Court follows the parties' convention that unqualified references to the various Trust Related Agreements are to those versions from the National Collegiate Student Loan Trust 2006-4, attached as Exhibit 1 to the Intervenors' brief. (*See* D.I. 226 at 1 n.1; D.I. 259 at 3 n.3). Unless otherwise noted, the cited text in the 2006-4 agreements is substantially identical to the corresponding text in each of the other agreements. (*Id.*).

[2]   On July 20, 2017, WTC gave notice of its resignation as Owner Trustee. (D.I. 236, Ex. 72). WTC subsequently filed a motion before the Delaware Court of Chancery to effect its resignation. (*See* D.I. 226 at 23). The Chancery Court granted the motion but directed WTC to continue serving as Owner Trustee until a successor was appointed. (*Id.*; *see also* D.I. 228, Ex. 1 at § 12.01(a) (stating Owner Trustee resignation is only effective upon acceptance of appointment by successor)).

[3]   The current Owners are NC Owners, LLC and Pathmark Associates, LLC. (D.I. 226 at 6; D.I. 259 at 3). Donald Uderitz is a principle of VCG Securities LLC ("VCG") which controls NC Owners LLC. (D.I. 226 at 6; D.I. 259 at 10 n.6). Jorge Rodriguez-Lugo is an employee of VCG, who, along with Uderitz, directed McCarter, purportedly on behalf of the Trusts. (D.I. 226 at 6 n.7).

[4]   The roles and responsibilities of the other Intervenors are not relevant here, but the Court has described them previously. *See, e.g.*, *CFPB v. Nat'l Collegiate Master Student Trust*, 2018 WL 5095666, at *1-2.

McCarter is a law firm that was retained to represent the Trusts.  In November 2015, WTC, as the Owner Trustee and at the direction of the Owners, purportedly retained Chaitman LLP to represent the Trusts in certain matters.  (*See* D.I. 226 at 12-13; D.I. 259 at 4).  The engagement letter states that Chaitman would "act as Special Counsel for the Trusts managing litigation or other adversarial proceedings arising from or relating to one or more Trusts by (i) providing legal services in connection with such matters, and/or (ii) on behalf of the Trusts, selecting, engaging and managing other law firms to provide such Services, at the discretion of Chaitman."  (D.I. 232, Ex. 27 at 1).  The engagement letter also states that "[a]s requested or directed by WTC or the Owners, Chaitman provide [sic] legal services in connection with any litigation, regulatory proceeding, inquiry or investigation arising from or relating to one or more Trusts."  (*Id.*).  Chaitman subsequently engaged McCarter to represent the Trusts for a subset of those matters.[5]  (*See* D.I. 226 at 13; D.I. 259 at 4).

On September 18, 2017, following an investigation, the CFPB brought this action against the Trusts "to obtain permanent injunctive relief, restitution, refunds, disgorgement, damages, civil money penalties, and other appropriate relief for Defendants' violations of Federal consumer financial law in connection with Defendants' servicing and collection of private student loan debt."  (D.I. 1 ¶ 1).  The same day, the CFPB filed a motion for approval of the PCJ.  (D.I. 3-1).  The PCJ was signed by the CFPB and attorneys from McCarter, purportedly on behalf of the Trusts.  (*Id.*).

McCarter signed the PCJ at the direction of the Owners.  (*See* D.I. 226 at 25; D.I. 235, Ex. 56; D.I. 236, Ex. 78).  The Owners, however, had initially directed the Owner Trustee, WTC,

---

[5]      The parties debate whether Chaitman was properly retained as well as the scope of the firm's engagement, including whether the firm was empowered to engage McCarter for the matters that it purportedly did. (*See, e.g.*, D.I. 226 at 28-30; D.I. 259 at 9-15).

to execute the PCJ.  (*See* D.I. 235, Ex. 58).  WTC resisted this instruction on advice of counsel that the direction appeared to be invalid under the Trust Related Agreements.[6]  (*See id.*).

After the CFPB filed its motion to enter the PCJ, the Intervenors moved to intervene. (*See* D.I. 4, 9, 11, 12, 20, 31, 33, 35).[7]  The Court granted those applications (*see* D.I. 95), and bifurcated consideration of the CFPB's motion into two phases.  (*See* D.I. 99).  The Court set two "Threshold Issues" for discovery and briefing in Phase One:

1.    Whether the law firm of McCarter & English had the authority to execute the [PCJ] on behalf of the Defendants under the Trust Related Agreements and applicable law; and

2.    Whether – authority aside – it was improper or (in violation of Trust Related Agreements) for McCarter & English to enter into the [PCJ].

(*Id.*).    Thereafter, the parties engaged in discovery relating to the Threshold Issues.    On March 12, 2020, the Intervenors submitted their answering brief addressing the Threshold Issues. (*See* D.I. 226).  On April 30, 2020, the CFPB filed its reply.  (*See* D.I. 259).[8]

## II.    **LEGAL STANDARD**

As noted, the Trusts are organized under the DSTA (12 Del. Code § 3801-26). (*See* D.I. 228, Ex. 1 at § 2.05).  Additionally, the Trust Agreement states that it "shall in all respects be governed by, and construed in accordance with, the laws of the State of Delaware (excluding

---

[6]    WTC submitted its resignation as Owner Trustee shortly thereafter.  (*See* D.I. 226 at 23).

[7]    Running concurrently with this litigation is a consolidated state-court action considering various similar and overlapping issues.  *See, e.g.*, *In Re Nat'l Collegiate Student Loan Trusts Litig.*, C.A. No. 12111-VCS (Del. Ch.).

[8]    The Defendant Trusts have not submitted briefing on this issue.  On July 10, 2018, the Trusts' counsel of record, McCarter & English moved to withdraw.  (D.I. 79).  That motion was granted by the Court, (*see* D.I. 80), and the Trusts remain unrepresented in this matter.

4

conflict of law rules), including all matters of construction, validity, and performance." (D.I. 228, Ex. 1 at § 14.10).

Although the DSTA "grant[s] business trusts broad freedom in establishing their internal governance mechanisms," *Nakahara v. NS 1991 Am.* Trust, 739 A.2d 770, 782 (Del. Ch. 1998); *accord* 12 Del. Ch. § 3825(b), it provides a series of defaults that apply unless the governing instrument of the statutory trust provide otherwise. *See generally* 12 Del. Ch. § 3806; *cf. Cargill, Inc. v. JWH Special Circumstance, LLC*, 959 A.2d 1096, 1111-13 (Del Ch. 2008) (recognizing DSTA § 3806(c) does not proscribe a blank slate, but merely allows parties "free[dom] in the governing instrument" to modify preexisting requirements). Relevant here, § 3806(a) of the DSTA says:

> Except to the extent otherwise provided in the governing instrument of a statutory trust, the business and affairs of a statutory trust shall be managed by or under the direction of its trustees.

Although anyone – including a beneficial owner – may be named a trustee or be empowered to direct the trustee(s) or other persons in the management of such a trust, unless "otherwise provided in the governing instrument . . . , neither the power to direct a trustee or other persons nor the exercise thereof by any person (including a beneficial owner) shall cause such person to be a trustee." DSTA § 3806(a).

## III.   DISCUSSION

### A.   Whether McCarter Had the Authority to Execute the PCJ on Behalf of the Trusts Under the Trust Related Agreements and Applicable Law.

The CFPB argues that McCarter had authority to sign the PCJ because "under clear contractual authority, the Trusts' Owners directed the hiring of Chaitman LLP" which "in turn engaged McCarter to represent the Trusts with respect to" the CFPB investigation; "and the only

Trust Party authorized to decide whether to settle the Bureau's claims, the Owners, directed McCarter to execute the PCJ." (D.I. 259 at 2).

The CFPB relies on three sections of the Trust Agreement for the "clear contractual authority" asserted – §§ 2.03(b)(i), 4.01(b)(i) and 9.03(b). (*See id.* at 3-4, 9-18). According to the CFPB, "[r]ead in conjunction . . . these provisions make plain that it is the Owners – and only the Owners – that may direct a properly appointed agent of the Trusts to settle claims against the Trusts." (*Id.* at 17). As discussed below, the Court disagrees.

Pursuant to DSTA § 3806(a), unless the Trust Related Agreements provide otherwise, the Trusts are "managed by or under the direction of" their trustee(s) and neither the power to direct such trustee(s) or other persons nor the exercise of such power by any person(s) (including the beneficial owner(s)) causes such person(s) to be a trustee, *i.e.* to assume the powers and responsibilities of a trustee. Under the Trust Related Agreements, the Owners' consent is required to settle claims against the Trusts, but the Owner Trustee is the entity through which the Trusts act and the only entity through which the Trusts may be bound to the PCJ. Here, the relevant trustee is the Owner Trustee, *i.e.*, WTC. (*See* D.I. 228, Ex. 1 at § 2.04). WTC exercised its power under the Trust Related Agreements to resist the Owners' instruction to execute the PCJ. And WTC never delegated – to the extent it could – its power to execute the PCJ to McCarter or the Owners in WTC's stead. As such, McCarter lacked the necessary authority to execute the PCJ on behalf of the Trusts when it did so at the Owners' direction.

> 1. The Contractual Provisions Cited Do Not Allow the Owners to Direct McCarter to Execute the PCJ on Behalf of the Trusts.

The Court will address each of the contractual provisions addressed by the CFPB in turn.

    a.  Section 2.03(b)(i).

Section 2.03(b)(i) provides:

 b)  Until the Indenture is discharged, the operations of the Trust shall be conducted in accordance with the following standards:

    (i)  the Trust will act solely in its own name and the Owner Trustee or other agents selected in accordance with this agreement will act on behalf of the Trust subject to direction by the Owners as provided herein, but such action shall not be in violation of the terms of this Agreement.

(D.I. 228. Ex. 1, § 2.03(b)(i)).

   As the language makes clear, § 2.03(b)(i) is circumscribed by the phrases "as provided herein" and "such action shall not be in violation of the terms of this Agreement." As a result, pursuant to § 2.03(b)(i), the Owner Trustee and other agents selected in accordance with the Trust Agreement are subject to direction by the Owners only to the extent the Trust Agreement provides the Owners the power to direct them. Thus, § 2.03(b)(i) does not on its own confer the Owners the power to direct WTC or an agent of the Trust to take a particular action. And thus, unless other passages in the Trust Related Agreements alter the structure effected by § 3806(a) of the DSTA and provide a mechanism for the Owners to direct the Owner Trustee and other agents of the Trusts, they lack such power. Thus, the Court looks to the other contractual provisions cited by the CFPB.

    b.  Section 4.01 (b)(i).

Section 4.01(b)(i) provides:

 b)  Without limiting the generality of the foregoing, in connection with the following nonministerial matters, the Owner Trustee will take no action, and will not have authority to take any such action, unless it receives prior written approval from all the Owners for so long as any of the Notes are outstanding:

    (i)  Initiate any claim or lawsuit by the Trust and compromise any claim or lawsuit brought by or against the Trust, except

> for claims or lawsuits initiated in the ordinary course of business by the Trust or its agents or nominees for collection on the Student Loans owned by the Trust;

(D.I. 228. Ex. 1, § 4.01(b)(i)).

As such, this provision prohibits the Owner Trustee from "compromis[ing] any claim or lawsuit" unless "it receives prior written approval from all the Owners for so long as any of the Notes are outstanding."[9]  Thus, § 4.01(b)(i) does two things – 1) it restricts the Owner Trustee's ability to settle litigation like that at issue here by requiring written instruction from the Owners and 2) it imposes an unanimity requirement on the Owners to settle such litigation.[10]  Neither of these restrictions, however, empowers the Owners to supplant the Owner Trustee's role in directing and managing the Trusts.  Although the first restriction limits the Owner Trustee's ability to control the Trusts unilaterally and empowers the Owners to direct the Owner Trustee to settle litigation, it does not empower the Owners or other agents of the Trusts to execute such instructions, *i.e.*, to assume the powers and responsibilities of the Owner Trustee to manage and direct the Trusts.

This conclusion is supported by the Owner Trustee's right under the Trust Agreement to refuse instruction from the Owners in a variety of situations.  Section 4.02(a) states that the "Owner Trustee shall take such action or actions as may be specified in this Agreement or in any instructions delivered in accordance with this Article IV or Article VIII; provided, however, that the Owner Trustee shall not be required to take any such action if it shall have reasonably

---

[9]    Based on their arguments, the parties appear to agree that settling or "compromising" this suit via entering the PCJ is a non-ministerial matter to which § 4.01(b)(i) applies.  (*See, e.g.*, D.I. 226 at 25-28; D.I. 259 at 16-18).  The Court concurs.

[10]   Unless expressly provided in the Trust Agreement, "any action which may be taken or consent or instructions which may be given by the Owners under" the Trust Agreement only require an 85% super-majority of the Owners to agree.  (*See* D.I. 228, Ex. 1 at § 4.03).

determined, or shall have been advised by counsel, that such action . . . is contrary to the terms hereof or of any document contemplated hereby to which the Trust or Owner Trustee is a party or is otherwise contrary to law . . . ."  (D.I. 228, Ex. 1 at § 4.02(a) (original emphasis); *see also id.* § 4.02(b) ("No Owner shall direct the Owner Trustee to take or refrain from taking any action contrary to this Agreement or any Trust Related Agreement, nor shall the Owner Trustee be obligated to follow any such direction, if given.")).[11]  No recourse, aside perhaps from removing the existing Owner Trustee and appointing another in the hopes of obtaining a different perspective on the propriety of their instruction, (*see* D.I. 228, Ex. 1 at § 12.01(a)), is afforded to the Owners when the Owner Trustee acts in accordance with those powers.

> c.      Section 9.03(b).

Section 9.03(b) provides:

> b)      In the exercise or administration of the trusts hereunder and in the performance of its duties and obligations under any of the Trust Related Agreements, the Owner Trustee (i) may act directly or, at the expense of the Trust, through agents or attorneys pursuant to agreements entered into with any of them, and the Owner Trustee shall not be liable for the default or misconduct of such agents or attorneys if such agents or attorneys shall have been selected by the Owner Trustee with reasonable care; and (ii) may, at the expense of the Trust, consult with counsel, accountants and other skilled persons to be selected with reasonable care and employed by it, and the Owner Trustee shall not be liable for anything done, suffered or omitted in

---

[11]     Additionally, testimony from a McCarter attorney who signed the PCJ and the Owners' representatives indicate that the Owners have, at least historically, acted through directives to the Owner Trustee.  (D.I. 229, Ex. 10 (Deposition of Jorge Rodriguez-Lugo) at 80:20-24 ("It's the way it works in the trust, right?  The owners direct through the owner trustee."); D.I. 230, Ex. 16 (Deposition of Donald Uderitz) at 58:7-17 ("[W]hen the owners want to give direction, it has done so through Wilmington [Trust] who is currently the owner trustee."); D.I. 233, Ex. 33 (Deposition of James Kosch, a McCarter attorney for the Trusts) at 180:3 – 181:9 (noting that nothing in Trust Agreement expressly allows Owners to sign on behalf of the Trusts); *id.* at 219:22 – 220:6 (noting Trust Agreement at least "generally says" "the owners direct the owner trustee, and if the owner trustee can follow directions, it then executes on them")).  The CFPB has cited no previous instance where the Owners deviated from that practice.

> good faith by it in accordance with the advice or opinion of any such
> counsel, accountants or other skilled persons.

(D.I. 228. Ex. 1, § 9.03(b)).

This section, thus, authorizes the Owner Trustee to act through agents and attorneys on behalf of the Trusts. It does not, however, dictate that the agents or attorneys enlisted by the Owner Trustee assume all powers and responsibilities of the Owner Trustee upon being engaged, nor does that section refer to the Owners, let alone empower them to instruct agents or attorneys enlisted by the Owner Trustee. Rather, § 9.03(b) indicates that the scope of power and responsibility afforded to any agent or attorney enlisted by the Owner Trustee on behalf of the Trusts is dictated by the "agreements entered into with . . . them." (*Id.*).

Here, it is undisputed that WTC has not executed the PCJ and that it invoked Trust Agreement § 4.02 when instructed to do so by the Owners. (*See* D.I. 235, Ex. 58 at 3-4 (WTC responding, via counsel, to Owners' instruction to execute PCJ by invoking Trust Agreement § 4.02(b) and stating, *inter alia*, "[u]pon initial review, . . . it would appear that the proposed CFPB Consent Order could impose obligations on the Trusts that are contrary to the express terms of the Indentures.")). Additionally, the evidence does not indicate that the scope of McCarter's engagement included the gatekeeping aspect of the Owner Trustee's role or the power to receive instructions directly from the Owners.[12] Chaitman's engagement letter, for example, specifically authorizes Chaitman to act on instructions from the Owners. (D.I. 232, Ex. 27 at 1 ("As requested or directed by WTC or the Owners, Chaitman [will] provide legal services in connection with any litigation, regulatory proceeding, inquiry, or investigation arising

---

[12] The Court assumes without deciding that the Owner Trustee could delegate such powers.

from or relating to one or more Trusts.").[13]  Even assuming that language would be sufficient to empower an agent to execute the PCJ at the Owners' instruction notwithstanding the Owner Trustee's refusal, the McCarter engagement letter (D.I. 233, Ex. 34) lacks such a specific directive and the CFPB has pointed to no evidence indicating that the scope of McCarter's work was expanded to permit such direction.[14]

Thus, despite the freedom to do so, the parties did not alter the default standards created by § 3806(a) of the DSTA.  Although unanimous consent of the Owners is required to "compromise" this case, the Owner Trustee remains the party through whom suits of this nature must be compromised.  As neither McCarter nor the Owners were empowered via the Owner Trustee to fill that role and the Owner Trustee has not executed or authorized the execution of the PCJ, McCarter could not do so in its stead.

2.      McCarter Lacked Authority to Execute the PCJ on Behalf of the "Master Trust" Because Ambac Did Not Consent.

With respect to one of the fifteen Trusts, the "Master Trust," McCarter lacked authority to sign the PCJ for an additional reason – Intervenor Ambac, the Note Insurer for that trust, did not provide McCarter with prior written approval.  The CFPB admits as much, stating that "[i]t appears that McCarter lacked authority to sign on behalf of one of the fifteen trusts: The National

---

[13]     The Court assumes without deciding that Chaitman was empowered to engage McCarter for the CFPB matter and to embrace the full scope of responsibilities in its engagement letter (including the power to receive instruction directly from the Owners).

[14]     The scope of McCarter's work was later purportedly expanded – via email – to include "the NORA inquiry from CFPB."  (*See* D.I. 260, Ex. H at 64:12 – 65:25).  Those emails, however, have not been presented to the Court and the testimony submitted to substantiate their existence does not indicate whether McCarter was empowered to receive instruction directly from the Owners.  (*See* D.I. 259 at 16 (citing D.I. 260, Ex. H at 64:12 – 65:25; *id.*, Ex. I at 67:14-18)).

Collegiate Master Student Loan Trust I (the 'Master Trust')."  (D.I. 259 at 2 n.2).  As the CFPB
explains:

> The Master Trust's Trust Agreement has language that does not
> appear in the other fourteen Trusts' Trust Agreements.   That
> language requires that not just the Owners, but also the Note Insurer
> (here, Intervenor Ambac), give written approval to execute a
> settlement agreement in matters like the one brought by the Bureau.
> *See* D.I. 230, [Ex. 15] – Master Trust Agreement § 4.01(b)(i)
> (Owner Trustee has no authority to "compromise any claim or
> lawsuit brought by or against the Trust "unless it receives prior
> written approval from all the Owners *and the Note Insurer*"). . . .
> Ambac's approval does not appear to have been given in this case.

(*Id.*) (original emphasis).

The Court agrees.  Pursuant to the terms of the Master Trust Agreement, Ambac's written
approval is required to authorize any compromise of the CFPB's claims against the Master Trust.
No evidence has been presented indicating that Ambac approved the PCJ in writing.  For this
additional reason, McCarter lacked authority to sign the PCJ on behalf of the Master Trust.  As
this language is unique to the Master Trust, however, and no party has argued that removal of one
of the Trusts from the PCJ would affect the settlement more broadly, this finding does not impact
the Court's analysis of McCarter's authorization, or lack thereof, with respect to the other Trusts.

*             *             *

Based on the foregoing, the Court finds that the law firm of McCarter & English did not
have the the authority to execute the PCJ on behalf of the Defendants under the Trust Related
Agreements and applicable law.  As such, the Court does not address the other arguments raised
by the parties regarding this Threshold Issue.

**B.** **Whether – Authority Aside – It Was Improper or in Violation of Trust Related Agreements for McCarter to Enter the PCJ on Behalf of the Trusts.**

Having determined that McCarter lacked authority to execute the PCJ on behalf of the Trusts, the Court agrees with the CFPB that there is no need to resolve the second Threshold Issue.  (*See* D.I. 98 at 3 (CFPB arguing against consideration of any but first Threshold Issue in Phase One, including second Threshold Issue, because such "additional issues . . . only arise if McCarter & English had the authority to execute the PCJ on behalf of the Trusts")).

## IV.   CONCLUSION

For the foregoing reasons, the Court finds that Plaintiff has failed to satisfy the Threshold Issues.  Plaintiff's motion to approve the PCJ is therefore DENIED.  An appropriate order will follow.