**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, | : | |
| | : | C.A. No. 17-1323 (MN) |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | Public Version Filed: July 17, 2020 |
| THE NATIONAL COLLEGIATE MASTER STUDENT LOAN TRUST et al., | : | |
| | : | |
| Defendants. | : | |

**INTERVENORS' OPENING BRIEF IN SUPPORT OF THEIR
MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(6) AND 12(b)(1)**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS ................................................................................................. 3

    A.   The Trusts, the Special Servicer, and the Subservicers ............................................3

    B.   The CFPB's Investigation and Enforcement Action Against the Trusts ................6

    C.   The CFPB's Enforcement Proceeding and Settlement with the Subservicer
        Responsible for Servicing the Trusts' Defaulted Loans ........................................8

LEGAL STANDARDS .................................................................................................... 10

ARGUMENT .................................................................................................................... 10

I.     THE COURT SHOULD DISMISS THE COMPLAINT UNDER RULE 12(B)(6)
      BECAUSE THE CFPB LACKED THE AUTHORITY TO BRING THIS ACTION ..... 10

    A.   The CFPB's Structure Was Unconstitutional When This Action Commenced ....10

    B.   The CFPB Cannot Evade Dismissal by "Ratifying" Its Own Invalid Acts ..........12

        1.   "Ratification" Cannot Erase the Constitutional Injury .............................13

        2.   Any "Ratification" Here Would Be Too Late ...........................................14

II.   THE COURT SHOULD DISMISS THE COMPLAINT UNDER RULE 12(B)(1)
      FOR LACK OF SUBJECT MATTER JURISDICTION ................................................. 16

III.  THE COURT SHOULD DISMISS THE COMPLAINT UNDER RULE 12(B)(1)
      OR RULE 12(B)(6) BECAUSE IT FAILS TO ALLEGE A VIABLE CLAIM ............. 20

    A.   The Complaint Fails to Allege a Justiciable Case or Controversy Because the
        Alleged Violations Are Not Fairly Traceable to the Conduct of the Trusts ..........20

    B.   The Court Should Dismiss the Complaint Under Rule 12(b)(6) Because the
        CFPB Has Failed to Allege Facts that Support a Plausible Theory of Liability....22

        1.   The Complaint Is Devoid of Any Allegations to Support the
            Existence of an Agency Relationship Between the Trusts and
            Servicers....................................................................................................22

        2.   The Servicing Agreements Confirm that the Trusts Did Not Retain
            Control Over the Servicers Alleged to Have Violated the CFPA.............24

IV.  THE COURT SHOULD DISMISS THE COMPLAINT UNDER RULE 12(B)(6)
      AS TIME-BARRED ....................................................................................................... 25

V.   THE COURT SHOULD DISMISS THE COMPLAINT WITH PREJUDICE ................ 27

CONCLUSION................................................................................................................... 28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Advanced Disposal Servs. E., Inc. v. NLRB*,
  820 F.3d 592 (3d Cir. 2016)...................................................................................14

*Arbaugh v. Y&H Corp.*,
  546 U.S. 500 (2006)...................................................................................10, 16

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...................................................................................10

*Aubrey v. City of Bethlehem, Fire Dep't*,
  466 F. App'x 88 (3d Cir. 2012) ...................................................................15

*Bandimere v. SEC*,
  844 F.3d 1168 (10th Cir. 2016) ...................................................................12

*Baraka v. McGreevey*,
  481 F.3d 187 (3d Cir. 2007)...................................................................23

*U.S. ex rel. Bauschwitz v. Holloman*,
  671 F. Supp. 2d 674 (E.D. Pa. 2009) .......................................................26, 27

*Benjamin v. V.I. Port Authority*,
  684 F. App'x 207 (3d Cir. 2017) ...............................................................12, 16

*Binno v. Am. Bar Ass'n*,
  826 F.3d 338 (6th Cir. 2016) ...................................................................22

*Bowsher v. Synar*,
  478 U.S. 714 (1986)...................................................................................11

*Brass v. Am. Film Techs., Inc.*,
  987 F.2d 142 (2d Cir. 1993)...................................................................15

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997)...................................................................5

*CFPB v. Navient Corp. et al.*,
  No. 17-cv-00101 (M.D. Pa. 2017) ............................................................18

*CFPB v. NDG Fin. Corp.*,
  No. 15-CV-5211, 2016 WL 7188792 (S.D.N.Y. Dec. 2, 2016) .............................15

*CFPB v. RD Legal Funding, LLC*,
   332 F. Supp. 3d 729, 784 (S.D.N.Y. 2018)..................................................12, 13

*Christiana Tr. v. Riddle*,
   911 F.3d 799 (5th Cir. 2018) ..........................................................................25

*Clark v. Cavalry Portfolio Servs., LLC*,
   No. 17 CV 99 (VB), 2017 WL 6757224 (S.D.N.Y. Dec. 29, 2017)......................23

*In re Conduent Education Services, LLC*,
   No. 2019-BCFP-0005 (May 1, 2019) ...............................................................18

*Evans v. Johnson & Johnson Co.*,
   No. CV 14-1316-RGA, 2020 WL 616575 (D. Del. Feb. 10, 2020) .........................8

*FEC v. NRA Political Victory Fund*,
   513 U.S. 88 (1994)....................................................................................13, 14

*FEC v. NRA Political Victory Fund*,
   6 F.3d 821 (D.C. Cir. 1993) ........................................................12, 13, 14, 16

*Finkelman v. Nat'l Football League*,
   877 F.3d 504 (3d Cir. 2017)............................................................................21

*Fisher v. Townsends, Inc.*,
   695 A.2d 53 (Del. 1997) .................................................................................23

*Freund v. Republic of France*,
   592 F. Supp. 2d 540 (S.D.N.Y. 2008).............................................................17

*Garczynski v. Countrywide Home Loans*,
   656 F. Supp. 2d 505 (E.D. Pa. 2009) ..............................................................23

*Gomez v. Campbell–Ewald Co.*,
   768 F.3d 871 (9th Cir. 2014) ..........................................................................23

*In re Google Inc. Cookie Placement Consumer Privacy Litig.*,
   806 F.3d 125 (3d Cir. 2015)..............................................................................8

*Hollingsworth v. Perry*,
   133 S. Ct. 2652 (2013)....................................................................................23

*Jacobson v. Fla. Sec'y of State*,
   957 F.3d 1193 (11th Cir. 2020) ......................................................................21

*Jones v. Delaware Health*,
   709 F. App'x 163 (3d Cir. 2018) ......................................................................27

*Katz v. Feldman*,
    No. 18-213 (MN), 2019 WL 266945 (D. Del. Jan. 18, 2019) ................................................27

*Kavanaugh v. Nussbaum*,
    71 N.Y.2d 535 (1988) ........................................................................................................23

*Keeler v. Mayor of Cumberland*,
    928 F. Supp. 591 (D. Md. 1996) .......................................................................................11

*Klein v. Commerce Energy, Inc.*,
    256 F. Supp. 3d 563 (W.D. Pa. 2017)...............................................................................23

*Lincoln Ben. Life Co. v. AEI Life, LLC*,
    800 F.3d 99 (3d Cir. 2015)................................................................................................10

*Lucia v. SEC*,
    138 S. Ct. 2044 (2018)..............................................................................................13, 14

*McBride v. Warden of Allegheny Cnty. Jail*,
    577 F. App'x 98 (3d Cir. 2014) .......................................................................................15

*Meyer v. Holley*,
    537 U.S. 280 (2003)..........................................................................................................22

*In re NAHC, Inc. Sec. Litig.*,
    306 F.3d 1314 (3d Cir. 2002)...........................................................................................27

*Noel Canning v. NLRB*,
    705 F.3d 490 (D.C. Cir. 2013) ...................................................................................12, 14

*Norton v. Shelby Cty.*,
    118 U.S. 425 (1886)..........................................................................................................11

*Pollice v. Nat'l Tax Funding, L.P.*,
    225 F.3d 379 (3d Cir. 2000)..............................................................................................19

*Rhoades v. United States*,
    950 F. Supp. 623 (D. Del. 1996) ......................................................................................24

*Ringling v. City of Hempstead*,
    193 F. 596 (5th Cir. 1911) ...............................................................................................13

*Robinson v. Johnson*,
    313 F.3d 128 (3d Cir. 2002)..............................................................................................25

*In re Rockefeller Ctr. Props., Inc. Sec. Litig.*,
    311 F.3d 198 (3d Cir. 2002)..............................................................................................10

*Ryder v. United States*,
    515 U.S. 177 (1995)..............................................................................................13

*Seila Law LLC v. CFPB*,
    No. 19-7 (Slip Op.), 2020 WL 3492641 (June 29, 2020) ...........................................6

*Stephens v. Clash*,
    796 F.3d 281 (3d Cir. 2015)..................................................................................15

*Stern v. Marshall*,
    564 U.S. 462 (2011)..............................................................................................14

*SW Gen., Inc. v. NLRB*,
    796 F.3d 67 (D.C. Cir. 2015) ...............................................................................11

*Synar v. United States*,
    626 F. Supp. 1374 (D.D.C. 1986) .........................................................................11

*Toll Bros. v. Twp. of Readington*,
    555 F.3d 131 (3d Cir. 2009)..................................................................................20

*United States v. Graham*,
    305 F.3d 1094 (10th Cir. 2002) ............................................................................17

*In re W.R. Grace & Co*,
    366 B.R. 302 (Bankr. D. Del. 2007) ......................................................................14

*WaveDivision Holdings, LLC v. Highland Capital Mgmt. L.P.*,
    No. 08C-11-132-JOH, 2011 WL 5314507 (Del. Super. Ct. Nov. 2, 2011) .............................24

*In re Wells Fargo Bank*,
    File No. 2016-CFPB-0013 (Aug. 20, 2016) (Consent Order) .................................18

*Wise v. Biowish Techs., Inc*,
    Civ. No. 18-676-RGA, 2019 WL 4344273 (D. Del. Sept. 12, 2019) ........................5

*Zarra v. Sun Sentinel Co.*,
    No. 12-60542-CIV, 2012 WL 5306368 (S.D. Fla. Oct. 29, 2012) .........................18

**Statutes**

12 U.S.C. §§ 5481 .................................................................................................................17

12 U.S.C. § 5491 ...................................................................................................................6

12 U.S.C. § 5531 .................................................................................................................16

12 U.S.C. § 5564 ...........................................................................................................15, 16

28 U.S.C. § 1331 .................................................................................................................10

**Other Authorities**

Fed. R. Civ. P. 12(b)(6).............................................................................................10, 11, 15

Restatement (Second) of Agency .........................................................................................14

Restatement (Third) of Agency ......................................................................................14, 23

U.S. Const. art. III, § 2 ........................................................................................................20

The undersigned Intervenors[1] hereby submit this opening brief in support of their motion to dismiss the complaint of the Consumer Financial Protection Bureau ("CFPB") pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

The complaint should be dismissed because it advances claims that (i) were investigated and brought while the CFPB's structure violated the Constitution's separation of powers, rendering the CFPB's actions void; (ii) are outside the scope of the CFPB's statutory enforcement authority, rendering the Court without subject matter jurisdiction; (iii) are not supported by factual allegations suggesting wrongdoing by the Defendant Trusts; and (iv) are time-barred.

First, for the entire course of this action and the investigation that preceded it, the CFPB's structure was unconstitutional. Just last week, the Supreme Court confirmed that the CFPB, as led by a single Director vested with executive power and removable by the President only for cause, violates the Constitution's separation of powers. This constitutional defect is no mere technicality: it means the CFPB never had the authority to investigate and then sue the Trusts, and therefore this enforcement action is void *ab initio*. And even if it were possible for the new Director to "ratify" the CFPB's unconstitutional acts (it is not), ***this*** action cannot be revived with a *post hoc* "ratification" because the statute of limitations has now expired on all the underlying claims.

Second, the CFPB's prosecution of this action also has exceeded its statutory boundaries. Its claims fall outside the enforcement authority given to the CFPB by Congress to pursue relief

---

[1] "Intervenors" refers to Ambac Assurance Corporation; Wilmington Trust Company; and Pennsylvania Higher Education Assistance Agency d/b/a American Education Services.

for the alleged Consumer Financial Protection Act ("CFPA") violations by "covered persons" engaged in an "unfair, deceptive, or abusive act or practice" ("UDAAP").  That authority does not extend to passive entities, like the Trusts, that are not engaged in offering or providing a consumer financial product or service.  Indeed, the sole allegedly violative acts upon which the CFPB rests its federal question claims (and hence the Court's subject matter jurisdiction) are those attributed to loan servicing companies engaged in "servicing loans" and "collecting debt." Yet, rather than simply seeking to hold those entities accountable consistent with its statutory authority, the CFPB inexplicably decided to also pursue the securitization Trusts where the loans at issue reside.  ***This is unprecedented.***  Intervenors are aware of no other instance where the CFPB has sued securitization vehicles, such as the Trusts, which exist solely to effectuate the pass through of cash flows from loans that other entities originate and service—and that other entities would have serviced regardless whether the loans were in the securitization.  The CFPB's attempt to expand its Congressionally limited mandate through this action, if allowed to proceed, would fundamentally alter the risk allocation paradigm for securitization participants. As the Structured Finance Association has already shown, the improper expansion of the CFPB's authority would have draconian effects on the securitization industry and the vital liquidity function it provides.  *See* D.I. 73–1.

Third, to evade the limits on its enforcement authority, the CFPB alleges that the servicers are the "agents" of the Trusts, and seeks to impute liability to the Trusts under a vicarious liability theory—as the purported "principals" controlling the servicers' actions.  Those conclusory allegations are inadequate to satisfy the traceability requirement of Article III standing, deficient as a matter of law, and refuted by the CFPB's own factual averments.  The complaint itself alleges that the Trusts cannot control anyone, or undertake any act themselves,

because they are static legal entities that "do not have employees."  Rather, as the CFPB

acknowledges, the Trusts contract with third parties to carry out "all actions" relating to

administration and operations, including loan servicing.  Further, the servicing entities alleged to

have engaged in purported malfeasance are not even in privity with the Trusts.  ███████████

███████████████████████████████████████████████████████████████

████████████████████████████████████. And those contracts

demonstrate that the Trusts have **_no_** control over the servicing practices that allegedly violated

the CFPA.

Finally, the CFPB discovered or should have discovered sufficient facts supporting most

of the alleged UDAAP violations by no later than ██████████—i.e., more than three years

before the CFPB filed the complaint.  Such claims fall outside the applicable statute of

limitations and should be dismissed.

Any one of these flaws is enough to independently doom the CFPB's complaint.  Taken

together, they illustrate why there is no point granting the CFPB leave to amend.  The complaint

should be dismissed with prejudice.

## STATEMENT OF FACTS[2]

The following facts, which are drawn from the CFPB's complaint and the agreements it

cites, belie the CFPB's allegations of subject matter jurisdiction and any viable claim against the

Trusts.

### A.     The Trusts, the Special Servicer, and the Subservicers

Defendants are fifteen Delaware statutory trusts created pursuant to the Delaware

Statutory Trust Act (12 Del. C. § 3801, *et seq.*) between 2001 and 2007 in order to facilitate the

---

[2] For purposes of this motion only, the allegations in the complaint are accepted as true.

securitization of more than 800,000 student loans originated by entities that are not parties to this action. *See* Compl. ¶¶ 10, 17. The Trusts are passive special purpose vehicles; as the complaint admits, the Trusts "do not have employees, and all actions relating to the administration of the Trusts, servicing of the student loans [in the Trusts], and collecting debt are carried out by" the Trusts' "Servicers." *Id.* ¶ 12. When a loan in the Trusts defaults, debt-collection activities are carried out by a Subservicer. *Id.* ¶¶ 18, 21–23. The authority of the Subservicer to perform these debt-collection activities flows from several servicing agreements.

The first relevant agreement, cited in the complaint, is a 2009 Special Servicing Agreement ("SSA") executed on behalf of the Trusts with the Trusts' then-Special Servicer. *Id.* ¶ 21; Haas Decl.[3] Ex. 1 at 1. ***The SSA expressly disclaims any oversight, affiliation, or agency relationship between the Trusts and the Special Servicer***:

> Independence of the Special Servicer. For all purposes of this Agreement, the Special Servicer ***shall be an independent contractor*** and ***shall not be subject to the supervision of the Trusts*** with respect to the manner in which it accomplishes the performance of its obligations hereunder. Unless expressly authorized by the Trusts, the Special Servicer shall have no authority to act or represent the Trusts, respectively, in any way other than as specified hereunder and ***shall not otherwise be deemed an agent*** of the Trusts.

SSA § 17 (emphases added). Further, the SSA states it should not be construed to create "any partnership, joint venture, association, syndicate, unincorporated business or other separate entity" between the Trusts and the Special Servicer. *Id.* § 18. Nor should the SSA be "construed to impose any liability as such on any of" the Trusts, or be "deemed to confer on any of them any express, implied or apparent authority to incur any obligation or liability on behalf of the others." *Id.*

---

[3] All references to "Haas Decl." refer to the Declaration of Erik Haas filed contemporaneously herewith.

Under the SSA, the Special Servicer—acting as an independent contractor not subject to the Trust's supervision—may "take such actions as it shall deem reasonably necessary or appropriate to administer and oversee . . . the enforcement and collection of Delinquent and Defaulted Loans." *Id.* §§ 2(B), 8(A). The SSA authorizes the Special Servicer to hire Subservicers to carry out its duties, including to act in a representative capacity in the name of the Trusts, "to commence any action or proceedings the Subservicers deem necessary or appropriate in connection with such enforcement or collection efforts." *Id.* § 4; *see also* Compl. ¶ 21. Only the Special Servicer—***not the Trusts***—is in privity with the Subservicers. SSA § 4. Only the Special Servicer—***not the Trusts***—retains the right to perform audits and oversee the Subservicers' performance at its "sole discretion." *Id.* § 2(B)(ii). And only the Special Servicer—***not the Trusts***—may replace a Subservicer who, in the Special Servicer's "***sole*** judgment," "is deemed to be deficient." *Id.* § 2(B)(iii) (emphasis added).

The second relevant servicing agreement, also cited in the complaint, is the 2009 Default Prevention and Collection Services Agreement ("DPCSA"), which the original Special Servicer entered into with NCO Financial Systems, Inc. ("NCO").[4] Haas Decl. Ex. 2; *see also* Compl. ¶ 21. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████

---

[4] The Court may consider the SSA and the DPCSA, which are integral to the CFPB's claims and incorporated by reference in the CFPB's complaint. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (courts may consider a document that is "integral to or explicitly relied upon in the complaint"); *Wise v. Biowish Techs., Inc*, Civ. No. 18-676-RGA, 2019 WL 4344273, at *6 (D. Del. Sept. 12, 2019) (same).

████████████████████████████████████████████████████████

████████████ In November 2014, TSI took over from NCO as the Subservicer responsible for servicing defaulted loans in the Trusts under the DPCSA.  Compl. ¶ 16.

**B.      The CFPB's Investigation and Enforcement Action Against the Trusts**

█████████████████████████████████

█████████████████████████████

███████████████████████ At that time, the CFPB was led by a Director who was only removable for cause, *see* 12 U.S.C. § 5491(c)(1), (3), a configuration that violated the Constitution, *see Seila Law LLC v. CFPB*, No. 19-7 (Slip Op.), at 10–11, 2020 WL 3492641, at *3 (June 29, 2020). ███████████████████████

████████████████████████████████

████████████████████████████████

███████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████.   Thereafter, McCarter and the CFPB negotiated a Proposed Consent Judgment ("PCJ") to resolve the CFPB's investigation of the Trusts.  *See* D.I. 226 at 16-18.

On September 18, 2017, the CFPB initiated this enforcement action against all fifteen Trusts to allow it to move the Court to approve the PCJ executed by the CFPB and McCarter. D.I. 1; D.I. 3.  On May 31, this Court held that McCarter was not authorized by the Trusts to execute the PCJ, and the CFPB was left with the complaint it never expected to litigate.  *See* D.I. 273.

The CFPB's complaint asserts five claims for alleged violations of the CFPA's prohibition against UDAAP, which arise from four categories of alleged misconduct by Subservicers[6] in connection with collections lawsuits they initiated between November 1, 2012 and April 25, 2016.  Compl. ¶¶ 24, 62–93.  Specifically, the complaint alleges that (1) employees of the Subservicers proffered sworn testimony in those lawsuits that was either false or misleading, *id.* ¶¶ 25–42; (2) employees of the Subservicers improperly executed or backdated

---

[5] ███████████████████████████████████████████████
████████████████

[6] The complaint fails to specifically identify the Subservicers, other than alleging that TSI has been a Subservicer since November 1, 2014.  Compl. ¶ 16.  As noted above, NCO assumed the role of Subservicer responsible for servicing defaulted loans in June 2012.  Statement of Facts, Section A, *supra*.

notarizations for certain affidavits,[7] *id.* ¶¶ 43–51; (3) law firms engaged by the Subservicers filed many of the lawsuits without the necessary documentation evidencing the Trusts' ownership of the underlying loans, *id.* ¶¶ 2–3, 52–57; and (4) law firms engaged by the Subservicers filed collections lawsuits outside the applicable statute of limitations, *id.* ¶¶ 2–3, 58.

The complaint contains a panoply of contradictory allegations regarding the role of the Trusts in loan servicing.  It concedes that third parties—not the Trusts—carry out "all actions" with respect to servicing loans in the Trusts and pursuing collections lawsuits against borrowers. *Id.* ¶¶ 18, 24–25.  Elsewhere, however, the complaint alleges that the Trusts themselves "engaged in servicing loans" and "the collection of debt," thereby allegedly rendering them "covered persons" under the CFPA.  *Id.* ¶¶ 8, 61.  In an apparent attempt to reconcile these inconsistencies, the complaint alleges—in conclusory fashion and contrary to the plain language of the agreements the complaint cites—that the Trusts' servicers acted "as an agent of the Trusts" in connection with the alleged misconduct.  *Id.* ¶ 15.

### C. The CFPB's Enforcement Proceeding and Settlement with the Subservicer Responsible for Servicing the Trusts' Defaulted Loans

The same day that the CFPB filed this action, it also filed an administrative consent order with TSI pertaining to allegations regarding certain debt collection and loan servicing practices for defaulted loans in the Trusts.  *See* Haas Decl. Ex. 6, *In the Matter of Transworld Systems, Inc.*, File No. 2017-CFPB-0018, Doc. 1 (hereinafter, "TSI Consent Order").[8]

---

[7] The complaint alleges that this purported misconduct took place between November 1, 2012 and August 3, 2014.  Compl. ¶ 43.

[8] The Court may take judicial notice of filings from enforcement proceedings like the TSI Consent Order.  *See In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 806 F.3d 125, 133 n.12 (3d Cir. 2015) (taking judicial notice of the defendant's settlement with state attorneys general); *Evans v. Johnson & Johnson Co.*, No. CV 14-1316-RGA, 2020 WL 616575, at *8

The TSI Consent Order squarely alleged that *TSI* committed the very UDAAP violations for which the CFPB now seeks to hold the Trusts liable.  And the CFPB exacted civil penalties from TSI to resolve those claims.  Specifically, the CFPB found that TSI employees executed and notarized allegedly false and misleading affidavits in connection with lawsuits initiated on behalf of the Trusts by law firms hired by TSI.[9]  *Id.* ¶¶ 10, 15–24.  In addition, the CFPB found that law firms engaged by TSI had brought collections lawsuits against borrowers in connection with loans held by the Trusts without proper documentation evidencing the Trusts' ownership of the loans.  *Id.* ¶¶ 11, 25–29.

The TSI Consent Order required TSI to pay a $2.5 million civil money penalty and compelled TSI to undertake certain changes to its practices as part of a Compliance Plan.  *Id.* ¶ 58.  The Compliance Plan, in turn, required TSI to confer with the Special Servicer regarding directions to law firms and debt-collection practices.  *Id.* ¶¶ 45(d)–(e).  TSI was also explicitly required to obtain "permission" from the Special Servicer to withdraw the allegedly improper affidavits.  *Id.* ¶ 49.  Consistent with the SSA and DPCSA, none of the requirements imposed on TSI entail any interaction with, or involvement of, the Trusts.

---

n.211 (D. Del. Feb. 10, 2020) (taking judicial notice of a plea agreement with the Department of Justice and a consumer protection settlement).

[9] Although the CFPB found that TSI "employees execute and notarize affidavits for Collections Lawsuits brought on behalf of the Trusts," TSI Consent Order ¶ 10, the CFPB seeks to hold only the Trusts liable for any alleged CFPA violation arising from "improperly notarized affidavits" in this action.  *Compare* TSI Consent Order, *with* Compl. ¶¶ 71–75.

## LEGAL STANDARDS

To successfully invoke federal question subject matter jurisdiction, a plaintiff must plead a colorable claim "arising under" federal law.  28 U.S.C. § 1331.  The party asserting subject matter jurisdiction has the burden of proving its existence.  *Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99, 105 (3d Cir. 2015).  Where, as here, the Court lacks subject matter jurisdiction, it must dismiss the suit.  *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 501 (2006).

The CFPB's complaint is also subject to dismissal because it fails to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Court is "not required to credit bald assertions or legal conclusions improperly alleged in the complaint."  *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.

## ARGUMENT

I.   **THE COURT SHOULD DISMISS THE COMPLAINT UNDER RULE 12(B)(6) BECAUSE THE CFPB LACKED THE AUTHORITY TO BRING THIS ACTION**

A.   **The CFPB's Structure Was Unconstitutional When This Action Commenced**

When the CFPB began its investigation and when it filed the complaint commencing this action, the CFPB's structure violated the Constitution's separation of powers.  *See Seila Law*, Slip Op. at 10–11, 2020 WL 3492641.  In *Seila Law*, the Supreme Court held that "an independent agency led by a single Director and vested with significant executive power" has "no basis in history and no place in our constitutional structure," *id*. at 18, and that the statutory restriction on the President's authority to remove the CFPB's Director compels the conclusion

that "the structure of the CFPB violates the separation of powers," *id.* at 3.[10]  The Court severed

the unconstitutional for-cause removal restriction but declined to decide the "appropriate

remedy" for the "here-and-now" injury of being subjected to an unconstitutionally filed

enforcement action.  *Id.* at 10.

Two Justices who joined the opinion of the Court wrote separately to explain that the

"continuance of the enforcement action" by the CFPB's current Director "presents a distinct

constitutional injury requiring immediate dismissal" of the underlying enforcement proceeding.

*Id.* at 19 (Thomas, J., concurring in part and dissenting in part), 31–32 n.12 (plurality opinion).

The plurality did not express any disagreement with the merits of that view, but because it had

not been fully briefed, the plurality left it to be "resolved by the lower courts in the first

instance."  *Id.* at 31–32 n.12.

The correct result here, as the *Seila Law* concurrence contemplates, is to bar the CFPB

from further pursuing its unconstitutionally maintained enforcement action against the Trusts.

*See id.* at 17–19 (concurrence); *accord Norton v. Shelby Cnty.*, 118 U.S. 425, 449 (1886) (an

officer claiming to act under the authority of an unconstitutional statute is "merely a usurper, to

whose acts no validity can be attached"); *SW Gen., Inc. v. NLRB*, 796 F.3d 67, 79 (D.C. Cir.

2015) ("Issues of separation of powers are structural errors that do not require a showing of

prejudice" for reversal of the agency action to be appropriate (alterations and internal quotation

---

[10] The Court recognized that "private parties aggrieved by an official's exercise of executive power [may] challenge the official's authority to wield that power while insulated from removal by the President."  *Seila Law*, Slip Op. at 10, 2020 WL 3492641 (citing *Bowsher v. Synar*, 478 U.S. 714, 721 (1986)).  And a party that has sustained an injury from an executive act that exceeds an official's authority may challenge governmental action as void in contravention of separation of powers.  *Id.*  Courts have further recognized that this defense is properly raised on a Rule 12(b)(6) motion.  *See, e.g.*, *Keeler v. Mayor of Cumberland*, 928 F. Supp. 591, 604–05 (D. Md. 1996).

marks omitted)), *aff'd*, 137 S. Ct. 929 (2017); *Synar v. United States,* 626 F. Supp. 1374, 1404 (D.D.C. 1986) (holding unconstitutional removal power over the Comptroller General rendered order issued in violation of separation of powers "without legal force and effect"), *aff'd sub nom. Bowsher v. Synar*, 478 U.S. 714, 736 (1986).

Indeed, in cases where the issue was fully briefed (unlike *Seila Law*), courts have dismissed enforcement actions that were maintained by an unconstitutionally structured agency.  *See Noel Canning v. NLRB*, 705 F.3d 490, 514 (D.C. Cir. 2013) (violation of the Appointments Clause and separation of powers voided NLRB order), *aff'd*, 573 U.S. 513 (2014); *Bandimere v. SEC*, 844 F.3d 1168, 1188 (10th Cir. 2016) (setting aside SEC's decision in enforcement action due to violation of separation of powers); *CFPB v. RD Legal Funding, LLC*, 332 F. Supp. 3d 729, 784 (S.D.N.Y. 2018) (appeal pending) (dismissing CFPB enforcement action because the CFPB "lack[ed] authority to bring" it, due to the separation of powers violation (citing *FEC v. NRA Political Victory Fund*, 6 F.3d 821, 822 (D.C. Cir. 1993))); *see also Benjamin v. V.I. Port Authority*, 684 F. App'x 207, 211–12 (3d Cir. 2017) (affirming dismissal of litigation committee's claims where its composition violated statutory requirements and it lacked authority to file original complaint).  Likewise here, the complaint is a product of actions taken by an agency while it was unconstitutionally composed, and so it must be dismissed.

### B.    The CFPB Cannot Evade Dismissal by "Ratifying" Its Own Invalid Acts

The CFPB may argue that it can cure its constitutionally defective complaint through "ratification" by its current Director.  Insofar as the CFPB attempts such a "ratification"—and it should not, given the sordid history of the CFPB's cooperation with certain of the Trusts' residual equity holders—that attempt would fail as a general proposition.  Moreover, it is doubly foreclosed here because ratification cannot revive claims that are no longer timely.

### 1.    *"Ratification" Cannot Erase the Constitutional Injury*

As an initial matter, the CFPB has not alleged in this case that its previous Acting Director or its current Director ratified this action, nor has it provided any evidence of ratification, despite repeated requests by the Intervenors.  But even if it had done so, ratification cannot cure the constitutional violation.  *FEC v. NRA Political Victory Fund*, 513 U.S. 88, 98 (1994) ("after-the-fact" authorization did not ratify unconstitutionally structured agency's filing); *Ringling v. City of Hempstead*, 193 F. 596, 601 (5th Cir. 1911) ("An unconstitutional law is null and void, and proceedings had under it afford no basis for subsequent ratification or retroactive validation."); *see also Seila Law*, No. 19-7 (Slip Op.), at 18, 2020 WL 3492641 (concurrence) ("[T]he alleged ratification does not cure the constitutional injury—enforcement of an investigative demand by an unconstitutionally insulated Director.").  As one court recently explained when dismissing a similar CFPB enforcement action, the CFPB cannot invoke ratification to cure its constitutional violation, which "concerns the structure and authority of the CFPB itself, not the authority of an agent to make decisions on the CFPB's behalf."  *RD Legal Funding, LLC*, 332 F. Supp. 3d at 785.

More importantly, the Supreme Court has consistently recognized that there must be a remedy for a successful, "timely challenge to the constitutional validity of" a government official's authority.  *E.g.*, *Ryder v. United States*, 515 U.S. 177, 182–83 (1995); *accord Lucia v. SEC*, 138 S. Ct. 2044, 2055 (2018).  With respect to the CFPB's structure, *Seila Law* confirms that the "violation indeed occurred."  *Ryder*, 515 U.S. at 177.  A rubber-stamp "ratification" of the CFPB's unconstitutional conduct would impermissibly leave the Trusts without recourse for the underlying violation.  *See FEC*, 6 F.3d at 828 (when a litigant raises a "constitutional challenge as a defense to an enforcement action," the court may not "declare the [agency]'s structure unconstitutional without providing relief" to the challenger).  The Trusts and

13

Intervenors have been enormously harmed by the years-long ordeal created by the CFPB's conduct in this action, first with an unauthorized proposed consent judgment and now with its unprecedented claims.  The appropriate remedy in this case, as in many others before it, is simply to set aside the act—here, the initiation of this lawsuit—taken by the unconstitutional government actor.  *See, e.g.*, *Lucia*, 138 S. Ct. at 2055; *Noel Canning*, 573 U.S. at 521; *Stern v. Marshall*, 564 U.S. 462, 469 (2011).

### 2.    Any "Ratification" Here Would Be Too Late

Even if one were to accept the dubious premise that ratification could cure a constitutionally defective agency action in some instances, this case is not one of them.  As the Supreme Court has explained, "the party ratifying should be able not merely to do the act ratified at the time the act was done, but also ***at the time the ratification was made***."  *FEC*, 513 U.S. at 98 (emphasis added).

The CFPB cannot meet this requirement.  Any attempt to ratify this action would be invalid because ***the CFPB can no longer "do the act ratified"***—i.e., commence a timely enforcement action against the Trusts for the violations alleged in the complaint.  *Id.*; *Advanced Disposal Servs. E., Inc. v. NLRB*, 820 F.3d 592, 603–04 (3d Cir. 2016) (no *FEC v. NRA* "timing issue" where there was "no statutory . . . limitation preventing" the agency officer's act "***at the time he ratified it***" (emphasis added)); *see also In re W.R. Grace & Co*, 366 B.R. 302, 306 (Bankr. D. Del. 2007) ("[R]atification is not effective when it takes place after a deadline."); Restatement (Second) of Agency § 90 cmt. c (ratification only effective if it "comes before a statute of limitations has run on the claim"); Restatement (Third) of Agency § 4.05 (same).[11]

---

[11] Insofar as the CFPB contends that it ratified this action prior to the Supreme Court's *Seila Law* decision, such ratification would have been issued by a Director who was unconstitutionally insulated from removal by the President.  *Seila Law*, No. 19-7 (Slip Op.), at 10–11, 2020 WL

Here, the timing defect is as simple as it is fatal:  an enforcement action arising from alleged violations of the CFPA must be brought no later than "3 years after the date of discovery of the violation to which [the] action relates."  12 U.S.C. § 5564(g)(1).  "[U]nder the discovery rule the statute of limitations begins to run when the plaintiff discovers, or with due diligence should have discovered, the injury that forms the basis for the claim."  *Stephens v. Clash*, 796 F.3d 281, 288 (3d Cir. 2015) (quotation marks omitted); *accord CFPB v. NDG Fin. Corp.*, No. 15-CV-5211, 2016 WL 7188792, at *19–20 (S.D.N.Y. Dec. 2, 2016).  Accordingly, if the CFPB were to seek to ratify its original complaint now, it would be unable to pursue claims for potential violations that it discovered or reasonably should have discovered *before July 2017*.

The CFPB cannot seriously dispute that it had discovered *all* of the potential UDAAP violations alleged here *no later than* ███████████████████████████████

████████████████████████████████████████████████.  ██████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████████

---

3492641.  Accordingly, the ratifying Director would have lacked authority "at the time the ratification was made," voiding the attempt.  *FEC*, 513 U.S. at 98.

[12] As discussed further below, the CFPB had actually discovered or had reason to discover—and indeed, had begun investigating—a substantial portion of the alleged misconduct years before ████████.  *See* Argument, Section IV, *infra*.

[13] This correspondence from the CFPB, which was generated and issued by the CFPB, is part of the existing record in this case and can be considered in connection with Intervenors' Rule 12(b)(6) motion.  *See McBride v. Warden of Allegheny Cnty. Jail*, 577 F. App'x 98, 99 (3d Cir. 2014) (In determining whether a claim is time-barred on a Rule 12(b)(6) motion, the court may consider "matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case."); *Aubrey v. City of Bethlehem, Fire Dep't*, 466 F. App'x 88, 91–92 (3d Cir. 2012) (district court "did not err in using limited discovery materials" to grant defendant's motion to dismiss on statute-of-limitations grounds); *see also Brass v. Am. Film Techs., Inc.*, 987

███████████████████████████████████████████████████████

█████████████████████████ The CFPB cannot credibly claim that any of the alleged

violations were discovered after ███████████████████████ with respect to the Trusts.

Indeed, the latest date of misconduct alleged in the complaint is April 25, 2016.  Compl. ¶ 24.

In short, an attempt to "ratify" and thereby re-initiate ***any*** of the claims asserted in the

complaint now would be barred as untimely.  12 U.S.C. § 5564(g)(1); *see FEC*, 513 U.S. at 98–

99 (holding Solicitor General's attempt to ratify FEC filing was invalid because the statutory 90-

day filing period had expired by the time of attempted ratification); *Benjamin*, 684 F. App'x at

211–12 (affirming holding that attempt to ratify litigation after expiration of statute of limitations

was untimely).  Because all the asserted claims would be untimely if brought in 2020, the CFPB

cannot "ratify" those claims now.  The complaint should be dismissed.

## II.     THE COURT SHOULD DISMISS THE COMPLAINT UNDER RULE 12(B)(1) FOR LACK OF SUBJECT MATTER JURISDICTION

The complaint should also be dismissed in its entirety because this Court lacks subject

matter jurisdiction.  *See Arbaugh*, 546 U.S. at 501.  The CFPA expressly provides that the CFPB

may commence district court actions for violations of federal consumer law and confers

jurisdiction upon federal courts to "require compliance with any Federal consumer financial

law."  *See* 12 U.S.C. § 5564(a), (f).  The only violation of consumer financial law alleged in the

complaint is that the Trusts violated the CFPA's prohibition against UDAAP as set forth in 12

U.S.C. §§ 5531, 5536, and 5564.  *See* Statement of Facts, Section B, *supra*.

These sections of Title 12, however, authorize the CFPB to bring such an action premised

on UDAAP violations in federal court against only "***covered persons***" and "***service providers***" in

---

F.2d 142, 150 (2d Cir. 1993) (courts may consider "documents either in plaintiffs' possession or
of which plaintiffs had knowledge and relied on in bringing suit.").

connection with a transaction with a consumer for a consumer financial product or service, or the

offering of a consumer financial product or service. 12 U.S.C. § 5531 (emphasis added). Here,

the CFPB does not, and cannot, allege that the Trusts meet the definition of a "service

provider."[14]   Accordingly, the court's subject matter jurisdiction here rests entirely upon the

CFPB's one-sentence allegation that the Trusts are "covered persons" by virtue of the servicing

and debt collection practices of others. This theory is unsupportable as a matter of law.

The CFPA defines a "covered person" as any person that "*engages* in offering or

providing a consumer financial product or service," as well as certain specifically identified

"related persons" of covered persons (none of which are applicable here).[15]  12 U.S.C.

§§ 5481(6)(A), 25(B) (emphasis added). The statute defines "financial product or service" as

any one of eleven types of products or services. *See* 12 U.S.C. § 5481(15)(A)(i)–(xi).

Here, the complaint alleges that the Trusts are "covered persons" because they

purportedly "engage" in two of these enumerated services: (i) "servicing loans" and (ii)

"collecting debt." Compl. ¶ 61; *see also* 12 U.S.C. § 5481(15)(A)(i), (x). But this allegation

fails based on the plain meaning of the cited statutory provisions. Specifically, the word

---

[14] "[S]ervice provider" is defined as a person "that provides a material service to a covered person in connection with the offering or provision by such covered person of a consumer financial product or service, including a person that (i) participates in designing, operating, or maintaining the consumer financial product or service; or (ii) processes transactions relating to the consumer financial product or service." 12 U.S.C. § 5481(26)(A). The Trusts do not provide (nor are alleged to provide) any services to the loan servicers.

[15] A "related person" includes any "controlling shareholder" or "agent" of a covered person, "any director, officer, or employee charged with managerial responsibility," and "any shareholder, consultant, joint venture partner, or other person" who "materially participates in the conduct of the affairs of [a] covered person." 12 U.S.C. § 5481(25)(C). The CFPB does not allege, nor could it, that the Trusts qualify as a "related person" under any of these definitions. The Act also defines "covered persons" to include any "affiliate" of a covered person if the affiliate "acts as a service provider" to them. But again, the CFPB does not and cannot allege that the Trusts are "service providers" within the meaning of the Act.

"engage" means "to occupy or involve oneself; take part; be active." *United States v. Graham*, 305 F.3d 1094, 1102 (10th Cir. 2002) (quoting Webster's New World College Dictionary at 450 (3rd ed. 1997)); *see also Freund v. Republic of France*, 592 F. Supp. 2d 540, 556 (S.D.N.Y. 2008), *aff'd sub nom Freund v. Societe Nationale Des Chemins De Fer Francais*, 391 F. App'x 939 (2d Cir. 2010) (the verb "engaged" requires an "affirmative decision by the entity" to perform the predicate act); *Zarra v. Sun Sentinel Co.*, No. 12-60542-CIV, 2012 WL 5306368, at *4 (S.D. Fla. Oct. 29, 2012) (an individual is "engaged" in a particular activity if she participates in that activity in a "substantial way").

Consistent with this definition, the CFPB has pursued enforcement actions against entities that are actively engaged in originating or servicing loans, or in collecting debt. *See, e.g.*, *In re Wells Fargo Bank*, File No. 2016-CFPB-0013 (Aug. 20, 2016) (Consent Order); *CFPB v. Navient Corp. et al.*, No. 17-cv-00101 (M.D. Pa. 2017); *In re Conduent Education Services, LLC*, No. 2019-BCFP-0005 (May 1, 2019) (Consent Order).  But the Trusts are not "actively engaged" in anything—indeed, they are special purpose vehicles used to pass through cash flows collected by the Subservicers to investors.  Intervenors are not aware of any other UDAAP claim brought by the CFPB against paper entities like the Trusts, which are not engaged or otherwise affirmatively involved in collecting debt, servicing loans, or otherwise offering or providing a consumer financial product or service.

The Trusts do not qualify as covered persons because they do not—and cannot—actively take part in servicing consumer loans or collecting consumer debt.[16]  As the CFPB concedes, the

---

[16] In an apparent reference to the Trust Agreements, the complaint alleges that "[t]he basic purpose of each Trust is to . . . provide for the administration of the Trusts and the servicing and collection of student loans."  Compl. ¶ 10; *e.g.*, Haas Decl. Ex. 7 ¶ 2.03(a)(i)–(ii). This does not render the Trusts covered persons, and the Trust Agreements refute any allegation to the

Trusts have no employees or management, and "***all actions*** relating to the administration of the Trusts, ***servicing of the student loans***, ***and collecting debt*** are carried out by [third parties]."[17] Compl. ¶ 12 (emphases added).  Stated differently, the Trusts themselves take ***no action*** related to the servicing of student loans or collecting debt—other than to contract with third party servicers that would engage in those activities regardless of whether the loans were securitized. The very reason the Servicers and Subservicers service Trust loans and collect related debt is that the Trusts cannot do so as they are not operating entities.

Nor can the CFPB manufacture jurisdiction over a non-covered person through a vicarious liability theory.  Even if the Trusts could somehow be held vicariously liable for the acts of their service providers (which, for the reasons set forth below, they cannot), the CFPB can still only bring UDAAP claims against "covered persons"—which the Trusts are not.  *See Pollice v. Nat'l Tax Funding, L.P.*, 225 F.3d 379, 405 (3d Cir. 2000) (individuals who do not qualify as debt collectors under the FDCPA cannot be held vicariously liable under that statute).

The CFPA's legislative history confirms that, for alleged UDAAP violations, Congress did not intend for the CFPB's enforcement authority to reach limited purpose entities, such as the Trusts, that do not "engage" in offering or providing consumer financial products or services— and instead are mere passive entities created to effectuate securitizations.  In connection with the

---

contrary.  The Trust Agreements ***do not*** provide that the Trusts' purpose is to take part in servicing student loans or collecting debt.  Rather, the Trust Agreements state that the Trusts' purpose in "provid[ing] for . . . the servicing and collection of loans" is limited to contracting for the loans to be serviced by others.  Haas Decl. Ex. 7 ¶ 2.03(a)(ii).  The Trusts did precisely this eleven years ago by executing agreements that provide for independent contractors to service the underlying loans.

[17] To the extent the CFPB seeks to argue that the Trusts themselves engaged in "servicing loans" or the "collection of debt" on the theory that the Trusts are the plaintiffs in the underlying collections lawsuits, Compl. ¶¶ 8, 52, 58, that argument is directly contradicted by the CFPB's concession that the Trusts' loan servicing is carried out by third parties.

19

Senate version of what became the CFPA, the Committee on Banking, Housing and Urban Affairs, which was tasked with drafting the Senate bill, issued the following explanation regarding the definition of a "financial product or service":  "[T]he term . . . is modeled on the activities that are permissible for a bank or a bank holding company . . .  However, ***it is more narrowly drawn in this Act in that the list does not include*** insurance or ***securities activities***." Haas Decl. Ex. 8, at 160 (emphasis added).[18]

The CFPB's efforts to sidestep the straightforward statutory language and the surrounding legislative history should be seen for what they are:  a bald attempt to defy Congress's express limitations on UDAAP claims brought pursuant to the CFPA.  These efforts should be rejected, and the complaint dismissed.

## III.  THE COURT SHOULD DISMISS THE COMPLAINT UNDER RULE 12(B)(1) OR RULE 12(B)(6) BECAUSE IT FAILS TO ALLEGE A VIABLE CLAIM

### A.  The Complaint Fails to Allege a Justiciable Case or Controversy Because the Alleged Violations Are Not Fairly Traceable to the Conduct of the Trusts

"Article III of the Constitution limits federal 'judicial Power' to the adjudication of 'Cases' or 'Controversies.'"  *Toll Bros. v. Twp. of Readington*, 555 F.3d 131, 137 (3d Cir. 2009) (quoting U.S. Const. art. III, § 2).  Courts enforce the case-or-controversy requirement through several justiciability doctrines, including the doctrine of standing.  *Id.*

---

[18] That the CFPB lacks authority to bring an enforcement action against the Trusts is further confirmed by the 2009 Treasury Department white paper that originally proposed the creation of the CFPB.  It stated that "the CFPA's jurisdiction should cover consumer financial services and products such as credit, savings and payment products and related services, as well as ***the institutions that issue, provide, or service these products and provide services to the entities that provide the financial products***."  Haas Decl. Ex. 9 at 57 (emphasis added).  The Trusts—which do ***not*** issue, provide, or service loans—are plainly distinct from these regulated institutions and entities.

"The 'irreducible constitutional minimum' of Article III standing" requires a showing, *inter alia*, that the alleged injury is "fairly traceable to the challenged action **of the defendant**, and not the result of the independent action of some third party not before the court."  *Id.* at 137–38 (quotation marks omitted and emphasis added); *see also id.* at 142 ("[T]he traceability prong focuses on *who* inflicted [the alleged] harm.").  In order to make that showing, the plaintiff must allege facts demonstrating that the defendant's conduct was the "but for" cause of the alleged injury-in-fact.  *Finkelman v. Nat'l Football League*, 877 F.3d 504, 510 (3d Cir. 2017).

Here, the CFPB's complaint fails to allege justiciable claims against the Trusts because, on its face, the complaint establishes that the alleged CFPA violations are not fairly traceable to any conduct **of the Trusts**.  The complaint readily concedes that third parties administer the Trusts and service the student loans they own.  Statement of Facts, Section B, *supra*.  The student loans would have been serviced regardless of whether they were securitized, and therefore, it cannot be said that the injury would not have occurred but for the securitization of the loans in the Trusts.  And as to the alleged unlawful collection practices giving rise to this enforcement action, the complaint acknowledges that the purported underlying conduct was engaged in by the Subservicers, rather than the Trusts.  Compl. ¶¶ 13, 24–58.

The CFPB's complaint also does not (and cannot) allege that the Trusts themselves supervised or otherwise controlled special servicing of the Trusts' defaulted loans.  The SSA, which provides for the servicing of these loans, stipulates that (i) the Special Servicer (not the Trusts) is responsible for overseeing the Subservicers' activities in connection with collections lawsuits, (ii) the Special Servicer is not subject to the Trusts' supervision, and (iii) the Special Servicer has no authority to impose obligations or liability on the Trusts.  Statement of Facts, Section A.2, *supra*.  In other words, the Trusts "didn't do (or fail to do) anything that

contributed" to the alleged UDAAP violations, so the CFPB's attempt to hold the Trusts liable

fails for want of Article III standing.  *Jacobson v. Fla. Sec'y of State*, 957 F.3d 1193, 1197–98,

1200, 1207 (11th Cir. 2020) (plaintiff failed to establish traceability in lawsuit alleging injury

that was the result of conduct by county government officials who were not subject to the control

of the defendant); *accord Binno v. Am. Bar Ass'n*, 826 F.3d 338, 341, 343, 345 (6th Cir. 2016)

(plaintiff failed to establish traceability and had "sued the wrong party" in disability

discrimination lawsuit alleging injury arising from LSAT because defendant did not "mandate"

that law schools use the LSAT or "prescribe its content").

### B. The Court Should Dismiss the Complaint Under Rule 12(b)(6) Because the CFPB Has Failed to Allege Facts that Support a Plausible Theory of Liability

As shown above, the complaint rests upon allegations of vicarious liability or *respondeat

superior*—i.e., that the Subservicers purportedly responsible for the alleged CFPA violations

committed them while "act[ing] as an agent of the Trusts."  Compl. ¶¶ 13, 15.  But even

presupposing the Trusts (which are not covered persons) could be held vicariously liable on an

agency theory for those alleged violations (which as discussed above, they cannot), the

complaint pleads only conclusory factual allegations to support that theory.  Moreover, the

agency theory is contrary to very nature of the securitizations and, consistently, the servicing

agreements directly refute it.  Put simply, the Trusts cannot be held vicariously liable here.

#### 1. The Complaint Is Devoid of Any Allegations to Support the Existence of an Agency Relationship Between the Trusts and Servicers

Under principles of *respondeat superior*, in a principal–agent relationship, a principal

may be held vicariously liable for the acts of an agent acting within the scope of its authority.

*Meyer v. Holley*, 537 U.S. 280, 285 (2003).  An agency relationship exists where two criteria are

satisfied.  First, there must be a manifestation of consent by the principal to the agent that the

agent shall act on the principal's behalf.  *Id.* at 285–86.  Second, the principal must exercise

control or have the right to direct the conduct or activities of the agent.  *Id.*  "[T]he principal's

right to control the agent . . . differentiates agency relationships from nonagency relationships."

Restatement (Third) of Agency § 1.01, cmt. E.[19]

Here, the complaint contains no factual allegations that would plausibly suggest the

Trusts had the right to exercise the kind of control over the Subservicers necessary for an agency

relationship.  The CFPB's sole support for its agency theory is the existence of the SSA—which,

as noted above, expressly disclaims an agency relationship—and its own conclusory allegation

that the Servicers acted as agents of the Trusts.  The Court need not credit the CFPB's "legal

conclusion couched as a factual allegation," *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir.

2007), which is insufficient to withstand a motion to dismiss, *see, e.g.*, *Garczynski v.

Countrywide Home Loan*s, 656 F. Supp. 2d 505, 512 (E.D. Pa. 2009) (conclusory allegation that

a broker "act[ed] as an agent" was "insufficient to support a conclusion that [broker] was an

agent" and that the defendant could be liable for their conduct).

Tellingly, the complaint contains no factual allegations (nor could it) that plausibly

suggest the Trusts had the right to control the Servicers' activities or that they in fact exercised

such control.  *Compare Clark v. Cavalry Portfolio Servs., LLC*, No. 17 CV 99 (VB), 2017 WL

---

[19] The Court need not engage in a choice of law inquiry as between federal common law (under which courts have generally analyzed vicarious liability for other federal consumer statutes, *see, e.g.*, *Gomez v. Campbell–Ewald Co*., 768 F.3d 871, 879 (9th Cir. 2014) (TCPA); *Klein v. Commerce Energy, Inc.*, 256 F. Supp. 3d 563, 584 (W.D. Pa. 2017) (FDCPA)); New York law (which governs the SSA, *see* SSA § 22(B)); and the laws of Delaware (where the Trusts are incorporated), as there is no conflict among them.  Each of these bodies of law recognizes that control is a *sine qua non* of an agency relationship.  *See Hollingsworth v. Perry,* 133 S. Ct. 2652, 2666 (2013) ("An essential element of agency is the principal's right to control the agent's actions.") (internal quotation marks and citations omitted); *Fisher v. Townsends, Inc.*, 695 A.2d 53, 59 (Del. 1997); *Kavanaugh v. Nussbaum*, 71 N.Y.2d 535, 546 (1988) ("[T]he imputation of liability to defendant for another person's fault, based on defendant's relationship with the wrongdoer—is the notion of control.").

6757224, at *3 (S.D.N.Y. Dec. 29, 2017) (allegations that defendant issued directives to "control" collection activities were sufficient to infer agency relationship).  Nor could the CFPB amend its complaint to plead the requisite factual basis for an agency relationship, because the existence of such a relationship is refuted by both the relevant contracts and the CFPB's concession that the Trusts have no employees and are administered by third parties.  The Trusts are passive, special purpose vehicles that do not, and literally cannot, exercise control over anything.  *See* Statement of Facts, Section B, *supra*.  As such, the CFPB's *respondeat superior* theory is simply inapplicable.

### 2.    *The Servicing Agreements Confirm that the Trusts Did Not Retain Control Over the Servicers Alleged to Have Violated the CFPA*

It is well settled that an allegation of agency may fail where it is belied by the relevant contract.  *See, e.g.*, *Brown*, 2004 WL 2579596, at *3 (dismissing agency claim where the agreement showed that the principal was "not in control of the process"); *Rhoades v. United States*, 950 F. Supp. 623, 629 (D. Del. 1996) (ruling on 12(b)(1) motion that party was an "independent contractor" whose negligence could not be imputed where the agreement gave the contractor "full responsibility" for the project).

Here, the SSA confirms that the Trusts do not control the Special Servicer (or the Subservicers retained by the Special Servicer) in connection with the servicing of loans in the Trusts.  The SSA explicitly provides that the Special Servicer, which has the authority to retain Subservicers to carry out its duties under the SSA, provides its services as an "independent contractor" and not as an agent of the Trusts.  SSA at 15–16; *see* Statement of Facts, Section B.3, *supra*.  That the SSA expressly states it is establishing an independent contractor relationship "provides strong support for a finding" that the Special Servicer was not an agent of the Trusts. *WaveDivision Holdings, LLC v. Highland Capital Mgmt. L.P.*, No. 08C-11-132-JOH, 2011 WL

5314507, at *16 (Del. Super. Ct. Nov. 2, 2011) (dismissing agency claim based on the lack of control exerted by the principal and "laissez-faire attitude" taken by the principal towards the contractors' conduct).

The parties' intent is further confirmed by other provisions in the SSA, which grant the Special Servicer the exclusive authority to hire Subservicers and commence proceedings as it deems "reasonably necessary or appropriate" without oversight from the Trusts.  *See* SSA § 2(B).[20]  As explained above, the Trusts are not in contractual privity with TSI, any other Subservicer, or the law firms hired by the Subservicers—i.e., the parties alleged to have actually engaged in the conduct giving rise to the CFPB's claims.  *See* Statement of Facts, Section C, *supra.*

Since the CFPB has not pled any facts "suggesting an agency relationship"—and its conclusory allegations are flatly refuted by the operative agreements—the complaint does not state a claim against the Trusts, and it should be dismissed.  *See Christiana Tr. v. Riddle*, 911 F.3d 799, 803–04 (5th Cir. 2018) (dismissing claim absent allegations to support the existence of an agency relationship between a bank and two loan servicers).

## IV.    THE COURT SHOULD DISMISS THE COMPLAINT UNDER RULE 12(B)(6) AS TIME-BARRED

All else aside, the complaint's claims that pertain to conduct that the CFPB discovered or should have discovered prior to September 18, 2014 (i.e., three years before the filing of the complaint) are untimely and should be dismissed.[21]  As noted earlier, the CFPB must initiate an

---

[20] A Successor Special Servicer is not permitted to perform collection activities itself.  Such activities must be conducted by a Subservicer, as has been done via the DPSCA.  *See* SSA § 8(A).

[21] It is well settled that a statute of limitations defense is properly raised in a Rule 12(b)(6) motion where the complaint, and other materials properly before the court, establish that the claim has not been timely brought.  *Robinson v. Johnson*, 313 F.3d 128, 135 (3d Cir. 2002).

enforcement action arising from alleged violations of the CFPA no later than three years after it discovered or should have discovered the underlying violations.  Argument, Section I.B.2, *supra*; *see also U.S. ex rel. Bauschwitz v. Holloman*, 671 F. Supp. 2d 674, 695 (E.D. Pa. 2009) (accrual under discovery rule "begins running when the facts underlying the [violation] should have been discovered," i.e., when the plaintiff "knows 'sufficient critical facts to put him on notice that a wrong has been committed and that he need[s to] investigate to determine whether he is entitled to redress.'").



These facts form the very backbone of the CFPB's complaint here.  *Compare* Compl. ¶¶ 62–93 (claims for "false and misleading affidavits and testimony," "improperly notarized affidavits," "filing lawsuits without the intent or ability to prove the claims, if contested," and "collection of time-barred debt"), *with*

---

[22] These ███████, which were generated and issued by the CFPB, are part of the existing record in this case and can be considered in connection with Intervenors' Rule 12(b)(6) motion. *See* n. 13, *supra*.

███████████████████████████████████. Accordingly, by ███████████████, the CFPB "possesse[d] sufficient information to prompt an investigation into [its] claims to determine if [it] can legally prevail"—thus commencing the limitations period for those claims. *Bauschwitz*, 671 F. Supp. 2d at 696. Nevertheless, the CFPB waited more than three years █████████████ ██████—until September 18, 2017—to file its complaint against the Trusts. Because the complaint includes claims for conduct that the CFPB had begun investigating, and knew or had reason to know of, more than three years before it filed its complaint, all such claims are untimely and must be dismissed.

## V.   THE COURT SHOULD DISMISS THE COMPLAINT WITH PREJUDICE

As established above, the Court does not have subject matter jurisdiction and the CFPB's claims are unauthorized, based on an untenable theory of vicarious liability, and time-barred. The CFPB cannot possibly amend the complaint to cure all of these deficiencies. Under these circumstances, dismissal with prejudice is warranted. *See In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1332 (3d Cir. 2002) (upholding the decision to dismiss the complaint with prejudice because "amendment of the Complaint would be futile"); *Jones v. Delaware Health*, 709 F. App'x 163, 164 (3d Cir. 2018) (upholding dismissal with prejudice because claim was jurisdictionally barred); *Katz v. Feldman*, No. 18-213 (MN), 2019 WL 266945, at *2 (D. Del. Jan. 18, 2019) (recognizing this Court's "broad discretion in deciding whether to dismiss an action with prejudice pursuant to its inherent authority to manage its docket").

## CONCLUSION

The CFPB began investigating the Trusts in ███.  In the years that followed, the CFPB demanded documents, threatened various claims, and even collaborated with an unauthorized law firm in an ill-conceived attempt to engineer a $20 million "settlement" of its allegations. Throughout this entire period, the CFPB lacked both a constitutional and statutory basis for each and every one of these actions.  For these reasons, and because the complaint fails to state a claim, the Intervenors respectfully request that the Court dismiss this action with prejudice.


DATED: July 10, 2020


OF COUNSEL:
Erik Haas
Peter W. Tomlinson
Joshua Kipnees
George A. LoBiondo
Jared S. Buszin
Devon Hercher
Peter Shakro
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036

/s/ Melissa N. Donimirski
Kurt M. Heyman (No. 3054)
Melissa N. Donimirski (No. 4701)
HEYMAN ENERIO GATTUSO & HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7300
kheyman@hegh.law
mdonimirski@hegh.law
*Attorneys for Ambac Assurance
Corporation*


OF COUNSEL:
Nicholas H. Pennington
STEVENS & LEE, P.C.
620 Freedom Business Center, Ste 200
King of Prussia, PA 19406
(610) 205-6352
nhp@stevenslee.com

/s/ Stacey A. Scrivani
Stacey A. Scrivani (No. 6129)
STEVENS & LEE, P.C.
919 Market Street, Suite 1300
Wilmington, DE 19801
(302) 425-3306
sasc@stevenslee.com

*Attorneys for Pennsylvania Higher
Education Assistance Agency d/b/a
American Education Services.*

Elizabeth A. Ware
STEVENS & LEE, P.C.
111 N. Sixth Street
Reading, PA 19603
(610) 478-2210
eaw@stevenslee.com

/s/ Stephen B. Brauerman
Stephen B. Brauerman (No. 4952)
Jason C. Jowers (No. 4721)
Elizabeth A. Powers (No. 5522)
BAYARD, P.A.
600 N. King Street, Suite 400
Wilmington, DE 19899
(302) 655-5000
sbrauerman@bayardlaw.com
epowers@bayardlaw.com
Attorneys for Wilmington Trust
Company

29