**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 17-1323-MN |
| THE NATIONAL COLLEGIATE MASTER STUDENT LOAN TRUST; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2003-1; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2004-1; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-1; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-1; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-3; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-4; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-1; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-3; and NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4, Delaware Statutory Trusts, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**BRIEF OF AMICUS CURIAE STRUCTURED FINANCE
ASSOCIATION, INC. (F/K/A STRUCTURED FINANCE INDUSTRY GROUP, INC.)[1]**

---

[1] The Court approved the filing of this brief as a standalone filing.  D.I. 81.   After moving for leave to file this brief as an *amicus curiae*, Structured Finance Industry Group, Inc. became the Structured Finance Association, Inc.   The brief is filed in its original form.

OF COUNSEL:

Jason M. Halper
Ellen V. Holloman
Cadwalader Wickersham & Taft LLP
200 Liberty Street
New York, NY 10281
(212) 504-6000
jason.halper@cwt.com
ellen.holloman@cwt.com


Cheryl D. Barnes
Cadwalader Wickersham & Taft LLP
700 6th Street N.W.
Washington, DC 20001
(202) 862-2200
cheryl.barnes@cwt.com


Scott A. Cammann
Cadwalader Wickersham & Taft LLP
227 West Trade Street
Charlotte, NC 28202
(704) 348-5100
scott.cammarn@cwt.com


Dated:  November 21, 2017

A. Thompson Bayliss (#4379)
Daniel J. McBride (#6305)
ABRAMS & BAYLISS LLP
20 Montchanin Road, Suite 200
Wilmington, Delaware  19807
(302) 778-1000
bayliss@abramsbayliss.com
mcbride@abramsbayliss.com

*Attorneys for Structured Finance Industry
Group, Inc.*

# <u>TABLE OF CONTENTS</u>

<u>**PAGE**</u>

STATEMENT OF INTEREST OF PROPOSED AMICUS CURIAE
STRUCTURED FINANCE INDUSTRY GROUP ........................................................................1

SUMMARY OF ARGUMENT ..................................................................................................2

ARGUMENT ..............................................................................................................................4

I.     THE TRUSTS ARE NOT "COVERED PERSONS" WITHIN THE
       MEANING OF THE CONSUMER FINANCIAL PROTECTION ACT
       AND TREATING THEM AS SUCH HAS SEVERE ADVERSE PUBLIC
       POLICY CONSEQUENCES...............................................................................4

II.    THE AFFAIRS OF SECURITIZATION TRUSTS ARE MANAGED  BY
       TRUSTEES AND CARRIED OUT BY SERVICERS. .......................................6

III.   CONGRESS CAREFULLY PROSCRIBED THE SUPERVISORY AND
       ENFORCEMENT AUTHORITY OF THE BUREAU TO COVERED
       PERSONS  WHO HAVE VIOLATED A FEDERAL CONSUMER
       FINANCIAL LAW................................................................................................7

IV.    THE BUREAU HAS MISTAKENLY TREATED THE TRUSTS  AS
       COVERED PERSONS AND DEBT COLLECTORS. .........................................9

V.     THE BUREAU'S TREATMENT OF THE TRUSTS IN THE
       PROPOSED CONSENT ORDER WOULD DESTABILIZE MARKET
       EXPECTATIONS................................................................................................14

CONCLUSION.........................................................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Henson v. Santander Consumer USA Inc.*,
  137 S. Ct. 1718 (June 2017)..................................................................................11, 12, 13

*Mondonedo v. Sallie Mae, Inc.*,
  No. 07-4059-JAR, 2009 WL 801784 (D. Kan. Mar. 25, 2009).............................................14

*Pollice v. National Tax Funding, L.P.*,
  225 F.3d 379 (3d Cir. 2000)..................................................................................12, 13, 14

*State Nat'l Bank of Big Spring v. Lew*,
  795 F.3d 48 (D.C. Cir. 2015)......................................................................................7

*Wadlington v. Credit Acceptance Corp.*,
  76 F. 3d 103 (6th Cir. 1996) ....................................................................................13

*Whitaker v. Ameritech Corp.*,
  129 F.3d 952 (7th Cir. 1977) ....................................................................................13

**Statutes**

12 U.S.C. § 5481(5) ......................................................................................................9

12 U.S.C. § 5481(6) ...............................................................................................8, 11

12 U.S.C. § 5481(12) ..............................................................................................8, 9

12 U.S.C. § 5481(14) ..................................................................................................8

12 U.S.C. § 5481 (15) ..............................................................................................8, 9

12 U.S.C. § 5481(26) ..............................................................................................2, 3

12 U.S.C. § 5491(a) ....................................................................................................7

12 U.S.C. §§ 5492(a) ..................................................................................................7

12 U.S.C. § 5511(a) ....................................................................................................7

12 U.S.C. § 5511(b) ................................................................................................7, 8

12 U.S.C. § 5511(c) ................................................................................................7, 8

12 U.S.C. §§ 5512(b) ..........................................................................................................8

12 U.S.C. §§ 5514–5516 ....................................................................................................8

12 U.S.C. §§, 5562–5564 ...................................................................................................8

12 U.S.C. § 5531 ........................................................................................................2, 9, 11

12 U.S.C. § 5564(a) ........................................................................................................3, 9

15 U.S.C. §§ 1601, *et seq.* ..............................................................................................3

15 U.S.C. 1692(a)(6) .........................................................................................................13

15 U.S.C. § 1692(e) ............................................................................................................3

**Other Authorities**

Consumer Fin. Prot. Bureau, Consumer Financial Protection Bureau
      Strategic Plan (2013) ...............................................................................................4

*www.sfindustry.org* ..........................................................................................................1

The Structured Finance Industry Group ("SFIG") is a member-based, trade industry advocacy group focused on improving and strengthening the broader structured finance and securitization market.  SFIG respectfully moves for leave to file this brief as an *amicus curiae*, in order to explain to the Court the harmful and destabilizing impact on the securitization industry that would result from the approval of the Proposed Consent Judgment between Plaintiff Consumer Financial Protection Bureau (the "Bureau") and Defendants National Collegiate Student Loan Trusts[2] (together, the "Trusts").  SFIG has serious concerns that the Bureau is exceeding its Congressional mandate and going beyond the limits of its statutorily granted jurisdiction in connection with the Proposed Consent Judgment.  This issue is critical to SFIG and its members, which already are subject to complex regulation by multiple federal and state agencies, and now confront the prospect of inconsistent and contradictory rule-making by a regulator seeking to impose its own imprint on an already well-functioning and highly regulated securitization market.

## STATEMENT OF INTEREST OF PROPOSED AMICUS CURIAE
## STRUCTURED FINANCE INDUSTRY GROUP

SFIG provides an inclusive network for securitization professionals to collaborate and, as industry leaders, drive necessary changes, advocate for securitization industry participants, share best practices and innovative ideas, and educate industry members through conferences and other programs.  Members of SFIG represent all sectors of the securitization market, including issuers, investors, financial intermediaries, law firms, accounting firms, technology firms, rating agencies, servicers, and trustees.  Further information can be found at *www.sfindustry.org*.

---

[2] The Trusts are The National Collegiate Master Student Loan Trust ("NCLST"), NCLST 2003-1, NCLST 2004-1, NCLST 2005-1, NCLST 2005-2, NCLST 2006-1, NCLST 2006-2, NCLST 2006-3, NCLST 2006-4, NCLST 2007-1, NCLST 2007-2, NCLST 2007-3, and NCLST 2007-4.

SFIG's core charge is supporting a robust and liquid securitization market as an essential source of efficient funding for the real economy.  SFIG is uniquely positioned to address the proper statutory scope of the Bureau's enforcement and litigation activities as they relate to the securitization industry.  While SFIG's members play diverse roles and have varying perspectives on securitization transactions, they share a common interest in ensuring that the expectations of market participants are not upended or frustrated by the Bureau's sudden, unwarranted and unlawful attempt to enlarge its authority, as it threatens to do *via* this action.

## SUMMARY OF ARGUMENT

Before the Court are a Complaint and a Proposed Consent Judgment in which the Bureau asserts that the conduct of the Trusts' servicers constituted unfair, deceptive or abusive acts or practices that violated the Consumer Financial Protection Act (the "CFPA" or the "Act") in connection with activities related to the collection of debt.  The Proposed Judgment would hold the Trusts responsible for its servicers' debt collection activities.  SFIG, as a proposed *amicus curiae*, takes no position on the conduct of the servicers.  Rather, SFIG, its members and constituents are concerned that the underlying arguments fail to account for whether the Bureau is empowered in the first place to exercise its authority against the Trusts with respect to the activities at issue, and what impact such a finding would have on the reasonable expectations of the market participants involved in securitizations.

*First*, under the Act, the statute that defines the Bureau's authority, the Bureau's authority extends to conduct engaged in by a "covered person," or a covered person's "service provider."[3]

---

[3] 12 U.S.C. § 5531(a). A "service provider" is defined as: "any person that provides a material service to a covered person in connection w*ith the offering or provision by such covered person of a consumer financial product or service*, including a person that (i) participates in designing, operating, or maintaining the consumer financial product or service; or (ii) processes transactions relating to the consumer financial product or service."  12 U.S.C. § 5481(26) (emphasis added).

The Trusts are not "covered persons" within the meaning of the CFPA because the Trusts—which the Bureau concedes are passive entities with no employees—are not engaged in the core conduct attributable to "covered persons," namely offering or providing a consumer financial product or service.

*Second*, even if the Trusts were "covered persons" within the meaning of the Act, the Bureau's enforcement authority extends only to "covered persons" that have violated a federal consumer protection law.[4]  Here, the Bureau implies that the Trusts vicariously violated the Fair Debt Collection Practices Act (the "FDCPA"),[5]  and therefore the Act itself, but provides no evidence of any actual violation by the Trusts.  Accordingly, SFIG submits that the Bureau lacks the statutory authority to file a complaint against or enter into a civil order with the Trusts. The Bureau has adequate remedies in bringing claims against the parties who allegedly actually conducted activities which violated the FDCPA and the Act.  There is no justification for expanding its authority to include passive entities that did not themselves engage in any such activities.

*Third*, SFIG's members, and all market participants, rely on the stability of law to anticipate their liabilities and risk, and enter into agreements that provide the building blocks for the economy.  The interests of SFIG's members, as well as the interests of other similarly situated market participants and, ultimately, the investors and borrowers themselves, will be

---

The definition expressly excludes "person[s] offering or providing to a covered person…a support service…or a similar ministerial service."  *Id*. The Trusts are plainly not "service provider[s]."

[4] 12 U.S.C. § 5564(a).

[5]  Congress enacted the FDCPA in order "to eliminate abusive debt collection practices *by debt collectors*, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e)(emphasis added); *see generally* 15 U.S.C. §§ 1601, *et seq.*

harmed if the Bureau is permitted to extend its litigation and enforcement powers beyond its legislative grant, thereby undermining this stability.  This extra-statutory enlargement will disrupt the secondary loan market for many types of consumer and business loans, including student loans, and also will create uncertainty and unwarranted potential liability for market participants that justifiably relied on previously well-established regulation by known regulators. The impact on the securitization market could result in increased interest rates and reduced availability of credit, all to the detriment of borrowers and the overall economy.

The Bureau has asserted that it "was designed to be agile and adjust its approach to supervising the financial industry in order to respond rapidly to changing consumer needs."[6] This is an overstatement of the Bureau's actual authority in light of its stated purpose and objectives set forth by Congress in the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act").  Congress intentionally placed clear limits on which entities were subject to the Bureau's jurisdiction.  In this action, the Bureau is not "adjusting its approach."  It is improperly attempting to expand its jurisdiction through use of the courts.  The statutes that grant enforcement power to the Bureau give it neither enforcement nor litigation authority over the Trusts.

## ARGUMENT

**I.    THE TRUSTS ARE NOT "COVERED PERSONS" WITHIN THE MEANING OF THE CONSUMER FINANCIAL PROTECTION ACT AND TREATING THEM AS SUCH HAS SEVERE ADVERSE PUBLIC POLICY CONSEQUENCES**

The Bureau has statutory authority to commence an enforcement action against only a "covered person," as that term is defined by the CFPA, and may commence litigation against a person only to the extent the person has violated a federal consumer protection law. Here, the

---

[6] CONSUMER FIN. PROT. BUREAU, CONSUMER FINANCIAL PROTECTION BUREAU STRATEGIC PLAN (2013) at 9.

Bureau relies on the conclusory allegation that the Trusts' servicers acted as agents on behalf of the Trusts to argue that the Trusts are "covered person[s]."[7] However, the Bureau has not pled facts sufficient to support  the claim that the Trusts are "covered persons," and in fact the governing agreements and market expectations establish just the opposite. In particular, under typical securitization transaction agreements, servicers are specifically identified as independent contractors rather than as agents of the Trusts.   Accordingly, at a minimum, the Proposed Consent Judgment should not be granted without further fact finding, and SFIG respectfully submits that the parties seeking to intervene in this action (the "Intervenors"[8]) should be allowed to do so in order to place before the Court factual information concerning the transactions at issue.

As set forth below, this conclusion is compelled by both law and policy.  As a matter of law, the Trusts are not "covered persons," did not take any of the actions challenged by the Bureau, and did not engage in conduct that could be construed to violate a federal consumer protection law.  As a matter of policy, the healthy functioning of the securitization markets, which is vital to the economy, would be disturbed if securitization trusts were to abruptly become liable for the acts of servicers over whom they have no control, after decades of practice to the contrary.

---

[7] Compl. ¶¶ 7-8. Proposed Consent J., D.I. 3 ¶ 4.

[8] The other parties to the underlying securitization who have sought to date to intervene in the underlying proceedings are: U.S. Bank National Association, N.A. ("U.S. Bank National"), the Objecting Noteholders (*see* D.I. 11 for a complete list of the objecting noteholder group), Transworld System, Inc. ("Transworld"), Ambac Assurance Corporation ("Ambac"), GSS Data Services, Inc. ("GSS"), Wilmington Trust Company ("WTC"), and Pennsylvania Higher Education Assistance Agency d/b/a American Educational Services ("PHEAA").

## II.    THE AFFAIRS OF SECURITIZATION TRUSTS ARE MANAGED BY TRUSTEES AND CARRIED OUT BY SERVICERS.

In broad terms, securitization is the pooling of assets entitled to receive regular cash flows—such as mortgages, lease payments, movie royalties, credit card receivables, or, as in this case, student loans—into one legal entity (*i.e.*, a trust). The trust then issues securities to investors, the interest and principal payments on which are funded by the cash flows accruing to the assets in the trust.  A robust and liquid securitization market provides many benefits to the economy, including facilitating efficient access to capital markets, minimizing issuer-specific limitations on the ability to raise capital, monetizing illiquid assets, diversifying funding sources, investor bases and transaction structures, and lowering interest rates for borrowers

After a securitization transaction closes, oversight and management of the trust and its assets are performed by the trustees and servicers, respectively. Based upon the structure of the transaction, generally, the trustee represents the investors' and trust's respective interests and/or performs certain administrative tasks in the interest of the trusts and/or the investors, as specifically enumerated in the applicable trust agreements. In contrast to trustees, servicers are responsible for interacting and communicating with borrowers, managing their accounts, collecting and processing loan payments, and remitting these payments for distribution to the investors.  Servicers are also responsible for handling delinquent and defaulted loans. Delinquencies and defaults are of particular concern because they reduce the funds ultimately available to investors, and servicers often engage legal counsel and other professionals to pursue collections against borrowers that fail to pay.  In most cases, the servicer or the sponsor retains the services of a special servicer, and/or a subservicer or subservicers, to interact and communicate with borrowers and address delinquent and defaulted loans.

Critically, the rights, obligations and roles of all the parties involved in both the origination and management of a securitization are governed by various written agreements between the transaction participants, including (and depending on the nature of the underlying securities) master loan purchase agreements, trust agreements, administration agreements, servicing agreements, and/or pooling and servicing agreements.  These contracts reflect the understandings and expectations of the participants, including the trustees and servicers, as well as their agreement on how responsibility and risk will be allocated.

## III. CONGRESS CAREFULLY PROSCRIBED THE SUPERVISORY AND ENFORCEMENT AUTHORITY OF THE BUREAU TO COVERED PERSONS WHO HAVE VIOLATED A FEDERAL CONSUMER FINANCIAL LAW.

Congress enacted the Dodd-Frank Act in the wake of the financial crisis that began in or around 2008.[9]  Title X of the Dodd-Frank Act—the CFPA—established the Bureau to "regulate the offering and provision of consumer financial products or services under the Federal consumer financial laws,"[10] and "to implement and … enforce Federal consumer financial law."[11]  According to the Dodd-Frank Act, the purpose of the Bureau is to:

> enforce Federal consumer financial law *consistently* for the purpose of ensuring that all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive.[12]

The Dodd-Frank Act also sets out five specific agency objectives to advance the interests of both consumers and responsible financial services providers by:

- providing consumers with timely and understandable information to assist them in making responsible decisions about financial transactions;

---

[9] *See, e.g.*, *State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 51 (D.C. Cir. 2015).

[10] 12 U.S.C. § 5491(a).

[11] 12 U.S.C. § 5511(a); *see also* 12 U.S.C. §§ 5492(a), 5511(b)–(c).

[12] 12 U.S.C. § 5511(a) (emphasis added).

- protecting consumers from unfair, deceptive, or abusive acts and practices and from discrimination;

- identifying and addressing outdated, unnecessary, or unduly burdensome regulations to reduce unwarranted regulatory burdens;

- enforcing federal consumer financial law *consistently*, without regard to the status of a person as a depository institution, to promote fair competition; and

- promoting the transparent and efficient operation of markets for consumer financial products and services to facilitate access and innovation.[13]

The Federal consumer financial law that the Bureau enforces includes the CFPA and eighteen other "enumerated consumer laws."[14]  The CFPA vests the Bureau with rulemaking, supervisory, investigatory, adjudicatory, and enforcement authority,[15] and one of the Bureau's "primary functions" is to "supervis[e] covered persons for compliance with [the CFPA and the eighteen other enumerated consumer laws], and tak[e] appropriate enforcement action to address violations of" such laws.[16]  As used in the CFPA, a "covered person" is defined as "any person that engages in offering or providing a consumer financial product or service."[17]  Accordingly, while the Bureau may bring an enforcement proceeding against a "covered person" with respect to a violation of either the CFPA or an enumerated consumer law, the Bureau's enforcement jurisdiction does not extend past this limited grant of authority by Congress.

---

[13] 12 U.S.C. § 5511(b) (emphasis added).

[14] 12 U.S.C. § 5481(12),(14).

[15] 12 U.S.C. §§ 5512(b), 5514–5516, 5562–5564.

[16] 12 U.S.C. § 5511(c)(4).

[17] 12 U.S.C. § 5481(6).  Under the Act, a "financial product or service" means "extending credit and servicing loans, including acquiring or purchasing . . . credit."  12 U.S.C. § 5481(15)(A)(i). Here, the Trusts are securitization vehicles which have acquired student loans.  There is only a single conclusory allegation that the Trusts are extending credit, servicing loans or acquiring credit, which is contradicted by other allegations that the Trusts have no employees.  Compl. at 4; Decl. of Rebecca L. Butcher in Support of GSS Data Services, Inc.'s Mot. to Intervene, D.I. 13, Ex. A. at 9.

The Bureau also has specifically defined litigation authority under the CFPA, and may bring a civil action against "any person [who] violates a Federal consumer financial law."[18]   A person cannot "violate" a Federal consumer financial law unless that person is subject to the restrictions of the Federal consumer financial laws in the first instance.

## IV.   THE BUREAU HAS MISTAKENLY TREATED THE TRUSTS AS COVERED PERSONS AND DEBT COLLECTORS.

The present action arises from the Bureau's enforcement of practices falling under the FDCPA, which is the primary federal statute governing debt collection for personal, family or household purposes, and is one of the eighteen enumerated consumer laws falling within the enforcement jurisdiction of the Bureau.[19]   Generally, the FDCPA places certain procedural obligations on debt collectors, prohibiting them from engaging in harassment or abuse, false or misleading representations and unfair practices.[20]

On September 18, 2017, the Bureau filed a Complaint and the Proposed Consent Judgment with this Court.  The Complaint alleges that the Trusts own hundreds of thousands of private student loans, acquired between 2001 and 2007, and securitized those loans by issuing notes that were marketed and sold to investors.  Subsequently, employees of the Trusts' subservicer, acting on behalf of the special servicer for the notes, completed, signed, and notarized sworn legal documents for various collections lawsuits brought on behalf of the

---

[18] 12 U.S.C. § 5564(a).

[19] 12 U.S.C. § 5481(12)(H).

[20] Subpart C of the CFPA prohibits any covered person from engaging in "unfair, deceptive, or abusive acts or practices" (commonly abbreviated as "UDAAP") in connection with consumer financial products or services.  12 U.S.C. § 5531; *see also id.* § 5536(a)(1)(B).  The Act gives the Bureau authority to prevent UDAAP applicable to consumer financial products or services, including consumer loans and debt collection activities.  12 U.S.C. § 5481(5), (15).

Trusts.[21]  Critically, the Complaint alleges that the Trusts have no employees and also concedes that the Trusts' subservicers—and not the Trusts—carry out "all actions relating to the administration of the Trusts, servicing of the student loans, and collecting debt."[22] This is invariably true, as the relevant agreements confirm and as is typical for securitization transactions. Nonetheless, the Complaint and the Proposed Consent Judgment allege that the *Trusts* violated the Act[23] by virtue of the subservicers' employees filing false affidavits in which the affiants claimed personal knowledge of the student loan debt that such affiants did not in fact have, for pursuing collections lawsuits without the necessary documentation required to sue, for filing suit after the applicable statutes of limitations had expired, and for submitting improperly notarized affidavits that were not sworn or signed in the presence of the notary because the subservicers acted as agents for the Trusts.[24] The Complaint characterizes the Trusts as "covered persons" and alleges that they engaged in "servicing loans, including acquiring, purchasing selling or brokering" and "in the collection of debt."[25]

The Proposed Consent Judgment appears to have been negotiated without the involvement of any of the other parties to the securitization transaction including the Trusts, the Noteholders, the Indenture Trustee, etc., all of whom would be materially adversely impacted by the entry of the Proposed Consent Judgment because their contractual rights and obligations would be upset thereby.[26]  Not surprisingly, since the Complaint and Proposed Consent Judgment were filed, U.S. Bank National Association, the Objecting Noteholders, Transworld,

---

[21] Compl. ¶ 19.

[22] Compl. ¶ 12.

[23] *Id.* ¶¶ 43-51.

[24] *Id.* ¶ 19; Proposed Consent J. ¶ 4.

[25] Compl. ¶ 8.

[26] D.I. 4, 9, 12.

Ambac, GSS, WTC, and PHEAA have all filed motions seeking to intervene in this action.[27] The Intervenors raise a variety of arguments, including that the Proposed Consent Judgment would impermissibly alter their contractual rights and obligations.

The Bureau has the mandate to supervise or use enforcement action against a "covered person."[28] There is no reason to believe it was the intent of Congress to extend the Bureau's authority under the CFPA to securitization vehicles and other debt *owners*, such as the Trusts, which have no supervisory authority over the allegedly unlawful actions of the servicers, which are independent of and not affiliated with the Trusts.  In keeping with the purpose of the CFPA, the term "covered person" should be limited to entities, whether or not owners of debt, that, by virtue of their business activities, are in a position to perpetrate unfair, deceptive or abusive practices—meaning persons that actually engage in offering or providing a consumer financial product or service or are materially involved in or have managerial responsibility for those actors.

The Bureau has the authority under the CFPA to take action to prevent conduct constituting unfair, deceptive or abusive acts or practices ("UDAAP").[29] Notably, the Bureau issued guidance in July 2013 regarding UDAAP with respect to debt collection, and stated that only "*[o]riginal creditors* and other covered persons involved in collecting debt related to any consumer financial product or service are subject to the prohibitions against UDAAP in the Dodd-Frank Act."[30]  This statement affirms that subsequent holders, like the Trusts, are not intended to be within the Bureau's debt collection UDAAP authority.  Additionally, in *Henson v.*

---

[27] D.I. 33, 11, 9, 4, 12, 31, 20.

[28] 12 U.S.C. § 5481(6).

[29] 12 U.S.C. § 5531.

[30] CFPB Bull. 2013-07 (July 10, 2013) (emphasis added).

*Santander Consumer USA Inc.*, the Supreme Court determined the reach of the FDCPA and clearly stated that it applies only to debt collectors, not debt holders, and that debt holders cannot be held vicariously liable for the actions of debt collectors.[31] The Bureau cannot now, using its UDAAP authority, assert that debt holders are nonetheless liable in direct contradiction of the Supreme Court. This litigation is nothing more than an attempt to circumvent the Supreme Court's interpretation.

The litigation authority of the Bureau extends only to those persons who have violated the CFPA or an enumerated consumer law. The only enumerated consumer law cited by the Bureau in the Complaint and the Proposed Consent Order is the Act itself, even though the underlying acts arise from activities related to debt collection.[32] This is a careful omission that obscures the fact that the Bureau is trying to extend the reach of the FDCPA by claiming that practices proscribed by the FDCPA are "unfair, deceptive or abusive," and then using its authority under the CFPA rather than the FDCPA to bring an enforcement action against persons not otherwise subject to the FDCPA. Even assuming the correctness of this position, for an act to constitute UDAAP under the CFPA on the grounds that it violates the FDCPA, an act must be committed that violates the FDCPA in the first place, and the Trusts have committed no such acts.

"Debt collectors"[33] are defined by the FDCPA as any person engaged in interstate commerce and in any business the principal purpose of which is the collection of debts, or that regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be

---

[31] *Henson v. Santander Consumer USA  Inc.*, 137 S. Ct. 1718, 1724 (June 2017).

[32] Compl. at 10.

[33] *See, e.g.*, *Pollice v. National Tax Funding, L.P.*, 225 F.3d 379, 403 (3d Cir. 2000) ("The FDCPA's provisions generally apply only to 'debt collectors.'").

owed or due another.[34]  Accordingly, the Trusts must be found to be debt collectors before they become liable under the statute, and that is impossible, because the Trusts are the owners of the debt (*i.e.*, the underlying student loans), not "debt collectors." It has been long held that persons who acquire debt not in default at the time of acquisition cannot be debt collectors,[35] and more recently it has been determined that even those persons acquiring defaulted debt are not "debt collectors" within the meaning of the FDCPA.  In *Henson v. Santander Consumer USA Inc.*,[36] the Supreme Court addressed the issue of whether purchasers of defaulted debt should be treated as debt collectors under the FDCPA.  The Court ruled that companies that buy and own debts in default cannot be debt collectors, as that definition requires them to collect debts owed to *another*. In *Henson*, the Court examined whether one who purchases a debt originated by another could be treated as a debt collector when seeking to collect on those debts for its own account. The Court examined the language of the statute, presumed that the "legislature says…what it means and means…what it says," and held that Congress plainly meant the term to "debt collector" to apply to those who seek to collect on a debt on behalf of another.[37] Thus, owners of debt – whether or not in default at the time of acquisition – cannot be debt collectors as defined by the FDCPA.

Even if the Trusts directed the subservicer's  debt collection activities – which plainly was not the case – the FDCPA provides that only an entity which itself meets the definition of

---

[34] 15 U.S.C. 1692(a)(6); *see also id*. § 1692(a)(6)(F) (excluding any person collecting or attempting to collect any debt owed if the debt was not in default at the time it was obtained by such person).

[35] *See Pollice*, 225 F. d at 404 (citing *Bailey v. Sec. Nat'l Servicing Corp.,* 154 F.3d 384, 387-88 (7th Cir. 1988)); *Whitaker v. Ameritech Corp.*, 129 F.3d 952, 958-59 (7th Cir. 1977); *Wadlington v. Credit Acceptance Corp*., 76 F. 3d 103, 106-07 (6th Cir. 1996).

[36] 137 S. Ct. 1718 (June 2017).

[37] *Id.* at 1725.

"debt collector" may be held *vicariously* liable for unlawful collection activities carried out by another on that person's behalf.[38]   The legislative history of the FDCPA also shows that Congress intended to target third-party or independent collectors of delinquent debts (such as the servicers), because unlike creditors, whose actions are often restrained by their desire to protect good will, independent contractors will generally have no future contact with the consumer and are therefore likely to place less importance on the consumer's opinion of the debt collection tactics.[39]

## V.   THE BUREAU'S TREATMENT OF THE TRUSTS IN THE PROPOSED CONSENT ORDER WOULD DESTABILIZE MARKET EXPECTATIONS.

Permitting the Bureau to treat the Trusts as covered persons, and exercise its litigation authority against them on that basis, will upend the reasonable and contractually documented expectations of market participants. An efficient and effectively functioning securitization market requires that the respective roles and responsibilities of each participant in a transaction are certain from the beginning.  In every securitization, the duties of each participant are defined in the various trust, administration and servicing agreements.  These documents are drafted with the expectation that each party to the agreement is aware of its own duties and responsibilities and can predict with a significant degree of certainty what other parties to the transaction will or might do. These documents also impose specific duties and obligations on trustees and as a general matter forbid the trustee from taking any actions that are contrary to law or the governing documents.  Further, the securitization industry has operated for years on the premise that the

---

[38] *See Pollice*, 225 F.3d at 404 (agreeing with sister Circuits that holding a company that is not a debt collector itself liable under the FDCPA for the unlawful collections activities carried out by another on its behalf would not accord with Congressional intent.)

[39] *Mondonedo v. Sallie Mae, Inc.*, No. 07-4059-JAR, 2009 WL 801784, (D. Kan. Mar. 25, 2009) (considering the Congressional rationale for placing limitations on the definition of "debt collector" and discussing the limited future contact with the consumer that independent contractors have when collecting a debt)

agreements governing the transactions provide that transaction parties are responsible for their own bad behavior and, barring special factual circumstances, will be not accountable for the malfeasance of other parties to the transaction.  The certainty of contract terms underlies the success of the structured finance industry, and disturbing that certainty by re-writing contracts without the consent of the parties will needlessly violate the expectations of market participants be and destructive to the market.

A critical public policy imperative, reflected in the Trust Indenture Act of 1939 (the "TIA"), is that the issuers must comply with the indentures under which they issue debt securities to the public.  Issuer adherence to the obligations imposed by indentures is of paramount importance to market participants.  If issuers were free to discard indenture provisions they find inconvenient the capital markets would freeze up and imperil the national economy.

There can be no doubt that the Trusts here propose to discard the most fundamental provisions of the relevant indentures.  The Granting Clause in the Trusts' indentures convey to the Indenture Trustee *all* of the Trusts' assets as collateral security for their debt obligations. The Trust may "not sell, transfer, exchange or otherwise dispose of any portion of the Indenture Trust Estate except as expressly permitted by this Indenture."[40] The Trust is forbidden, "directly or indirectly, [to] make payments to or distributions from the Collection Account except in accordance with this Indenture and the other Basic Documents."[41] The Trust may not permit the lien of the Indenture to be trumped, defeated or evaded.[42] On the contrary, the Issuer is under an obligation to take any:

---

[40] *E.g.*, NCSLT 2007-3 Indenture § 3.23(m).

[41] *Id.* § 3.17.

[42] *Id.* §§ 308(iii), § 3.23(o).

> action necessary or advisable to … (i) maintain or preserve the lien
> and security interest (and the priority thereof) of [the] Indenture …
> (ii) … protect the validity of any Grant … made by [the] Indenture;
> … [and] (iv) preserve and defend title to the Indenture Trust Estate
> and the rights of the Indenture Trustee, and the holders of the
> Notes and Ambac in such Indenture Trust Estate against the claims
> of all persons and parties.[43]

Except as provided in the Indenture, the Indenture Trustee may not "release property from the lien of [the] Indenture" without "an Issuer Order, an Opinion of Counsel [which would have to confirm that such release is permitted or authorized under the Indenture] and independent certificates in accordance with TIA Sections 314(c) and 314(d)(1) or an Opinion of Counsel in lieu of such independent certificates to the effect that the TIA does not require any such independent certificates."[44] Without direction from the relevant secured parties, the Trust may not dispose of any of its property in any manner not contemplated by the Indenture or the Basic Documents.[45]

The Proposed Consent Judgment violates all of these principles.  Paragraphs 17 and 18 divert all Trust revenue to a fund controlled by the Trusts' equity investors.  The proposal to use trust assets to pay fines is impermissible.  All of that money is pledged.  The indentures make clear that trust assets are not available to pay for the sins of servicers.

A ruling that the Trusts' present operators may enter into the Proposed Consent Judgment would signal to the investing public that indentures are no longer binding, notwithstanding the Trust Indenture Act.  In the short run, this would be contrary to the interest of SFIG's members, and before long it would be profoundly detrimental to the capital markets and would most likely deal a body blow to the national economy.

---

[43] *Id.* § 3.05.

[44] *Id.* § 3.14.

[45] *Id.* § 3.08(i).

Additionally, the Proposed Consent Judgment, if endorsed by the Court, would allow the Bureau to displace the contractual rights and obligations of the parties who negotiated the agreements governing the securitization transactions at issue, and substitute in their place new duties of the Bureau's choosing.  Specifically, the Proposed Consent Judgment would result in the imposition of obligations upon the Trusts not consented to by the parties either now or when they entered into this series of agreements.  The Trusts would be tasked with direct supervision of third party contractors, disturbing the obligations of other parties.[46]  For example, the Proposed Consent Judgment calls for the Trusts to set up an account to collect money from the servicer before sending funds to the Collection Account for distribution to noteholders.  There is no representation in the Proposed Consent Judgment that the Trusts are empowered to take this action, or that this action would not violate the transaction agreements, including the Indenture or the Trust Agreement.  As the Bureau concedes, the Trusts themselves are passive and have no employees.[47]  The Trusts thus are not in a position to rectify violations of, or promote compliance with, the consumer protection laws.  Instead, the Trusts are dependent on the terms of the relevant agreements, which include requirements for trustees and servicers—not the Trusts themselves—to perform the relevant services in compliance with law and the various transaction documents.[48]

Moreover, the endorsement of the Proposed Consent Judgment would allow a single investor—in this case, an alleged beneficial owner whose interests may not even be aligned with the interests of the trust as a whole—to override the authority and decision-making responsibilities of the trustees and direct the actions of the Trusts.  This would deprive all parties

---

[46] Mot. to Approve Consent J., D.I. 3.

[47] Compl. ¶ 12.

[48] D.I. 13, Ex. A at 10, 22; D.I. 13, Ex. B.

to the transaction of the protections the role of the trustee provides.[49]   Critically, there is no authority for the notion that a residual holder is permitted to direct and bind the Trusts.  It is a universal and contractually established market expectation, shared by SFIG's members as well as the industry at large, that trusts like the Trusts at issue here can only act through a trustee that is duty-bound to act according to the agreements governing the transaction.

The Proposed Consent Judgment further poses a risk to securitization investors.  These investors expect to take the risk of delinquencies and defaults in the performance of trust assets. Substantial steps are taken in the syndication and marketing process to assure investors of the quality of the assets, including extensive disclosure requirements, third party diligence reviews and, more recently, risk retention.  The risk of delinquency and default is analyzed in great detail.  Imposing on investors the additional and unquantifiable risk of substantial liability of the trusts, for actions which neither investors nor the trustee could promote or advocate, and which they could not in any way conduct, control or predict, would be highly destructive to the securitization market.  Allowing the Bureau to overextend its enforcement authority, as it is attempting to do in this case, by choosing its own definition of "covered person" would frustrate legislative intent and legitimate contractual rights.  Congress has already given the Bureau the powers it felt were necessary to carry out its legislative mandate.  The Bureau's attempts to expand its enforcement and supervisory jurisdiction should not go unchecked.

---

[49] As just one example, Ambac, the insurer of the notes, faces the risk of an unforeseeably large insurance payout due to the fallout from the Proposed Consent Judgment that it could not price in to the transaction at its inception.  D.I. 4 at 5.

## CONCLUSION

For the reasons set forth above, SFIG respectfully requests that this Court grant its Motion for Leave to File a Brief as an *Amicus Curiae.*

OF COUNSEL:

Jason M. Halper
Ellen V. Holloman
Cadwalader Wickersham & Taft LLP
200 Liberty Street
New York, NY 10281
(212) 504-6000
jason.halper@cwt.com
ellen.holloman@cwt.com

Cheryl D. Barnes
Cadwalader Wickersham & Taft LLP
700 6th Street N.W.
Washington, DC 20001
(202) 862-2200
cheryl.barnes@cwt.com

Scott A. Cammarn
Cadwalader Wickersham & Taft LLP
227 West Trade Street
Charlotte, NC 28202
(704) 348-5100
scott.cammarn@cwt.com

Dated:  November 21, 2017

/s/ *A. Thompson Bayliss*
A. Thompson Bayliss (#4379)
Daniel J. McBride (#6305)
ABRAMS & BAYLISS LLP
20 Montchanin Road, Suite 200
Wilmington, Delaware  19807
(302) 778-1000
bayliss@abramsbayliss.com
mcbride@abramsbayliss.com

*Attorneys for Structured Finance Industry Group, Inc.*