# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE NATIONAL COLLEGIATE )   **CONSOLIDATED**
STUDENT LOAN TRUSTS )   **C.A. No. 12111-VCS**
LITIGATION )

## OPINION

Date Submitted: June 5, 2020
Date Decided: August 27, 2020

Garrett B. Moritz, Esquire, Benjamin Z. Grossberg, Esquire and S. Reiko Rogozen, Esquire of Ross Aronstam & Moritz LLP, Wilmington, Delaware, Attorneys for NC Residuals Owners Trust and NC Owners LLC.

Kimberly A. Evans, Esquire and Rebecca A. Musarra, Esquire of Grant & Eisenhofer P.A., Wilmington, Delaware and Lance Gotthoffer, Esquire of Chaitman, LLP, New York, New York, Attorneys for The National Collegiate Master Student Loan Trust I, The National Collegiate Student Loan Trust 2003-1, The National Collegiate Student Loan Trust 2004-1, The National Collegiate Student Loan Trust 2004-2, The National Collegiate Student Loan Trust 2005-1, The National Collegiate Student Loan Trust 2005-2, The National Collegiate Student Loan Trust 2005-3, The National Collegiate Student Loan Trust 2006-1, The National Collegiate Student Loan Trust 2006-2, The National Collegiate Student Loan Trust 2006-3, The National Collegiate Student Loan Trust 2006-4, The National Collegiate Student Loan Trust 2007-1, The National Collegiate Student Loan Trust 2007-2, The National Collegiate Student Loan Trust 2007-3, The National Collegiate Student Loan Trust 2007-4.

Catherine A. Gaul, Esquire of Ashby & Geddes, P.A., Wilmington, Delaware and Michael Hanin, Esquire and Uri Itkin, Esquire of Kasowitz Benson Torres LLP, New York, New York, Attorneys for AG Mortgage Value Partners Master Fund, L.P., AG Opportunistic Whole Loan Select, L.P., AG Pisgah, L.P., AG Super RMBS LLC, AG TCDRS, L.P., AG Strategic ABS Fund Master, L.P., One William Street Capital Master Fund, Ltd., OWS Credit Opportunity I, LLC, OWS Global Fixed Income Fund (USD-Hedged), Ltd., LibreMax Master Fund, Ltd., LibreMax Value Master Fund, Ltd., LibreMax MSW Fund, Ltd.., Waterfall Delta Offshore Master Fund, LP, Waterfall Eden Master Fund, Ltd., and Waterfall Sandstone Fund LP.

John W. Shaw, Esquire and Jeffrey T. Castellano, Esquire of Shaw Keller LLP, Wilmington, Delaware and Matthew A. Martel, Esquire, Joseph B. Sconyers, Esquire, Keith M. Kollmeyer, Esquire and Anthony M. Masero, Esquire of Jones Day, Boston, Massachusetts, Attorneys for U.S. Bank National Association.

Kurt M. Heyman, Esquire and Melissa N. Donimirski, Esquire of Heyman Enerio Gattuso & Hirzel LLP, Wilmington, Delaware and Erik Haas, Esquire, Joshua Kipnees, Esquire, George A. LoBiondo, Esquire, Jared Buszin, Peter Shakro, Esquire, Devon Hercher, Esquire and Jonah Wacholder, Esquire of Patterson Belknap Webb & Tyler LLP, New York, New York, Attorneys for Ambac Assurance Corporation.

Jason C. Jowers, Esquire, Stephen B. Brauerman, Esquire, Brett M. McCartney, Esquire and Elizabeth A. Powers, Esquire of Bayard, P.A., Wilmington, Delaware, Attorneys for Wilmington Trust Company.

Rebecca L. Butcher, Esquire and Jennifer L. Cree, Esquire of Landis Rath & Cobb LLP, Wilmington, Delaware and John P. Doherty, Esquire and William Hao, Esquire of Alston & Bird LLP, New York, New York, Attorneys for GSS Data Services, Inc.

Stacey A. Scrivani, Esquire of Stevens & Lee, P.C., Wilmington, Delaware, Attorney for Pennsylvania Higher Education Assistance Agency d/b/a American Educational Services.

**SLIGHTS, Vice Chancellor**

The key constituents of several related Delaware statutory trusts cannot agree on how the trusts should be governed or how they should operate. Several of the constituents brought discreet operational controversies before the Court in separately filed lawsuits. When it became clear the disputes between the parties ran deeper than what was alleged in these lawsuits, all interested parties agreed to consolidate the actions so that multiple competing requests for declaratory relief could be joined for decision in cross-motions for judgment on the pleadings.[1]

The trusts at issue are offshoots of the National Collegiate Student Loan Master Trust I (collectively, the "Trusts"). Each are Delaware statutory trusts formed between 2003 and 2007 for the narrow purpose of acquiring and servicing a

---

[1] This procedural posture is the product of a planning session, for lack of a better description, between the Court and all interested parties. The Court scheduled the planning session after discerning that the fundamental disagreements related to the governance and operation of the trusts were disabling the trusts from functioning. Having now wrestled with more than 100 competing requests for declaratory relief, all I can say is that the plan to tee up core disputes related to the trusts sounded like a good idea at the time. *See* 10 *Del. C.* § 6503 (providing, under Delaware's Declaratory Judgments Act, that the court may "construe a [a contract] either before or after there has been a breach thereof"). I have done my best to forge through the labyrinth of the requested declarations and cross-declarations and thank the parties for gallant efforts to provide lit torches along the way. While I have addressed the discreet questions of law that have been submitted for decision, this Opinion will not resolve all of the parties' disputes. For example, in this procedural posture, the Court cannot decide questions of authority or propriety regarding specific acts that have been taken on behalf of the Trusts (*e.g.*, directions that purported to appoint counsel to represent the Trusts). As will become clear, the applicable contracts are extremely complex, and it would be improper to decide such questions without a well-developed factual record and the benefit of specific briefing. With that being said, I trust this Opinion is a valuable first step toward bringing clarity to the parties as they sort through broader aspects of their disagreements regarding the trusts' governance and operations.

sizable portfolio of student loans (the "Student Loans").[2]   According to the Trusts'

constitutive documents (the "Trust Agreement(s)"), the Trusts' purpose was to be

implemented in three basic steps.

*First*, the Trusts "acquire[d] a pool of Student Loans" with proceeds from the

issuance of debt instruments (the "Notes").[3]  *Second*, upon acquiring the Student

Loans, the Trusts entered into an Indenture (the "Indenture(s)").[4]  In the Indenture,

the Trusts granted all "right, title and interest in" the Student Loans to U.S. Bank

National Association as Indenture Trustee ("U.S. Bank" or the "Indenture

Trustee").[5]  The Indenture made clear that the Trusts transferred the Student Loans

to the Indenture Trustee "for the benefit of the holders of the Notes"

---

[2] Trust Agreement § 2.03(a) (JC0586) ("The purpose of the Trust is to engage in the following activities and only these activities."); Joint Compendium of Contracts (D.I. 404) ("Joint Compendium") (citing specific contracts as JC ____).  The Court follows the parties' convention of citing the applicable contracts by providing a reference to the page number of the relevant contract as organized in the Joint Compendium.

[3] Trust Agreement § 2.03(a)(i) (JC0586).

[4] Trust Agreement § 2.03(a)(i) (JC0586).

[5] Trust Agreement § 2.03(a)(i) (JC0586); Indenture (Granting Clause) (JC2760).

(the "Noteholders," further defined below).[6] *Third*, the Trusts promised to "provide for" the "administration" and the "servicing of the Student Loans."[7]

Each of the three steps has occurred as planned. Taken together, they form the heart of a securitization transaction whereby the Trusts acquired pools of Student Loans and then issued debt securities (backed by the Student Loans) to the Noteholders. Under this transaction structure, the Trusts serve as special purpose vehicles designed to separate the Student Loans from the balance sheets of the financial institutions that first extended credit to the borrowers.

Consistent with the limited "activities" in which the Trusts are to engage, the Trusts have no officers or employees, and only one entity, Wilmington Trust Company (the "Owner Trustee"), possesses the right to "act on behalf of the Trust[s]."[8] The Owner Trustee now finds itself in the middle of a tug of war between various parties with various economic interests in the Trusts.

---

[6] Trust Agreement § 2.03(a)(i) (JC0586); Indenture (Granting Clause) (JC2760).

[7] Trust Agreement § 2.03(a)(ii) (JC0586); Trust Agreement § 3.02(b) (JC0588); Def./Countercl. Pl. Wilm. Tr. Co.'s Verified Countercl. for Declaratory J. ("Owner Trustee Counterclaim") (D.I. 393) ¶ 31.

[8] Trust Agreement § 3.02(b)(i) (JC0586).

Broadly speaking, the Trusts' stakeholders have broken into two factions. On the one side, the holders of residual beneficial interests in the Trusts (the "Owners," further defined below) characterize the broader controversy as a "dispute between equity and debt."[9]  According to the Owners, they represent the Trusts' equity interests—in that they are the beneficiaries of proceeds from the Student Loans if (and only if) the Notes are paid off—while other deal constituents are mere creditors of the Trusts.  In short, they believe the measure of all other parties' rights is their respective bargained-for contractual rights, and *only* those rights.  With this in mind, the Owners maintain they can direct the Owner Trustee to do anything with respect to the Trusts as long as the directions fit within certain contractual boundaries.

Pulling the Owner Trustee in the other direction are the Indenture Trustee, the Noteholders and the reinsurer for certain of the Notes, Ambac Assurance Corporation ("AMBAC," together with the Indenture Trustee and the Noteholders, the "Indenture Parties"), all of whom have lined up to argue they are more than mere creditors.  Indeed, the Indenture Parties read the Indenture as creating an assignment

---

[9] *See* Pls.' Single Combined Reply Br. to Defs.' Joint Answering Br., U.S. Bank's Opp'n with Respect to Pls.' Proposed Decl. D, and GSS's Individual Answering Br. ("PRB") (D.I. 450) at 1.

of the Trusts' interests in the Student Loans for the benefit of the Indenture Parties. For this reason, they maintain the Owners lack any plenary authority to control the Trusts, and certainly have no right to cause the Trusts to enter into self-dealing transactions.

The parties' vastly different interpretations of the Trusts' governing documents, and of the resulting transactional structure they created, have left the Trusts in a state of near paralysis. Third parties interacting with the Trusts cannot determine who actually speaks for the Trusts and who has authority to bind the Trusts. The full extent of the Trusts' dysfunction was perhaps most vividly exposed when, on May 31, 2020, the United States District Court for the District of Delaware held that the Trusts' purported act of resolving claims brought against the Trusts by the Consumer Financial Protection Bureau (the "CFPB") for alleged unfair loan collection practices was ineffective. Specifically, the court determined that the proposed consent judgment effecting the settlement was executed on behalf of the Trusts by a party who lacked authority to bind the Trusts.[10]

As explained below, much of the divergence in the parties' views regarding the governance and operation of the Trusts arises from their disparate construction

---

[10] *See Consumer Fin. Prot. Bureau v. The Nat'l Collegiate Master Student Tr., et al.*, 2020 WL 2915759 (D. Del. May 31, 2020) (the "CFPB Decision").

of language in the Indenture known as the Granting Clause (or the "Grant"). In this clause, the Trusts granted the Indenture Trustee "all" of the Trusts' "right, title and interest" in the Student Loans.[11] The Grant is further characterized as a right to "pledge, bargain, sell, warrant, alienate . . . convey, assign [and] transfer" Trust collateral, and includes, among other rights, a transfer of the "immediate and continuing right" to "bring Proceedings in the name of the [Trusts]."[12]

According to the Owners, as a matter of law, the Granting Clause cannot create both an assignment of, and a security interest in, pledged collateral. Thus, in their view, the Granting Clause grants the Indenture Parties, at most, a security interest in collateral (i.e., the Student Loans). This construction, according to the Owners, supports their "debt versus equity" view of this securitization transaction and, relatedly, their contention that the Indenture Parties have no say in the governance of the Trusts. Alternatively, the Owners contend the Granting Clause is ambiguous and the Court must receive parol evidence before declaring its intended purpose.

---

[11] Indenture (Granting Clause) (JC2760).

[12] Indenture (Appendix A) (definition of "Grant") (JC2842). The Indenture defines "Proceedings" as "any suit in equity, action at law or other judicial or administrative proceeding" (a "Proceeding"). Indenture (Appendix A) (definition of "Proceeding") (JC2849).

The Indenture Parties counter that the Owners misstate the law. Specifically, they maintain there is no rule of law that would prohibit the Granting Clause from creating an absolute assignment of the collateral (and all rights in the collateral) while also granting a precautionary security interest in that same collateral. Given that they have received an absolute assignment from the Trusts through the Grant, the Indenture Parties argue the Owners (and the Owner Trustee) have retained only limited roles in the governance and operation of the Trusts.

Neither the parties nor the Court have identified New York precedent (which governs the Indentures) that addresses the construction and legal effect of the Granting Clause in as much detail as is required to resolve the parties' competing declarations. For reasons I explain below, based on persuasive authority and contrary to the Owners' construction, I am satisfied that a contract may unambiguously create both a precautionary security interest *and* an assignment without offending any rule of law. The Owners' effort to frame the only reasonable construction of the Grant as a binary choice between creating a security interest *or* an assignment, therefore, is misplaced. Given this lack of ambiguity, persuasive precedent directs that I "read the sweeping language of the Granting Clause" without

"limits that it lacks on its face."[13]  This leads to the inescapable conclusion, based on the plain language of the Indenture, that the Trusts currently have no beneficial interest in the Student Loans that serve as collateral for the Notes.

Another dispute that presents an issue of first impression, this time under Delaware law, is the extent to which the Owners, who through the Trusts retain an economic incentive to collect the Student Loans, owe fiduciary duties to the Indenture Parties, who are to reap the financial benefits deriving from these loans. Applying both the law related to so-called "assignments for collection," and an aspect of Delaware's common law of fiduciary duties as expressed by Chancellor Allen in *In re USACafes L.P. Litigation*,[14]  I am satisfied that the Owners' ultimate control over certain aspects of these owner-directed Trusts justifies the imposition of fiduciary duties upon them, running to the Indenture Parties, to the extent they exercise that control as the Trusts' fulfill their role as administrator (and collector) of the Student Loans.

---

[13] *BlackRock Allocation Target Shares: Series S. Portfolio v. Wells Fargo Bank, Nat'l Ass'n*, 247 F. Supp. 3d 377, 413 (S.D.N.Y. 2017).

[14] *In re USACafes L.P. Litig.*, 600 A.2d 43 (Del. Ch. 1991).

Apart from these two issues of first impression, the parties' remaining disputes are too numerous to recite here.[15]  Indeed, the parties are so disconnected in their views of the transactional structure created by the Trust Related Agreements (defined below) that they have brought 143 competing requests for declaratory relief relating to nearly all aspects of the Trusts' governance and operation.  Broadly speaking, the parties' other disputes center on the following topics: (i) which contracts constitute the Trusts' governing instruments, (ii) which parties have the right to direct the Trusts, (iii) what expenses are compensable as "Owner Trustee" expenses, (iv) which parties (beyond the Owners) owe fiduciary duties and to whom are those duties owed, (v) whether the Noteholders may enforce the Trusts' constitutive documents, (vi) whether all of the Owners must act together to direct the Trusts and (vii) various discreet issues related to the Trusts' governance.

As noted, the parties present their requests for declaratory relief on cross-motions for judgment on the pleadings.  In this posture, the Court may grant

---

[15] The sheer number of requests for declaratory relief has necessitated an Opinion of substantial length but of limited practical value to readers beyond the parties to this litigation and perhaps those involved in the structured finance community.  The weeds of this multi-faceted dispute have grown high and much of this Opinion dwells deep within them.  The Court's treatment of the assignment/security interest and the *USACafes* issues, however, may be useful beyond the limited context of this case and are highlighted in these early pages for those who may wish to focus on the discussion of these novel issues later in the Opinion.

judgment only if that relief is appropriate as a matter of undisputed fact or as a matter of law.  With this in mind, I have resolved several, indeed most, of the competing declarations, but others must await resolution on a more developed factual record. Attached to this Opinion is an Appendix with all of the requests for declaratory relief and a notation of whether the request has been granted or denied.

## I.  BACKGROUND

I have drawn the facts from the pleadings and from the applicable contracts, all of which have been incorporated by reference in the pleadings.[16]  I have confined my review of the contracts to those provided by the parties in the Joint Compendium of Contracts.[17]

---

[16] In addition to documents attached to the pleadings, the court may consider documents that are "incorporated by reference" or "integral" to the pleadings.  *See Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004); *H-M Wexford LLC v. Encrop, Inc.*, 832 A.2d 129, 139 (Del. Ch. 2003); *see also* Verified Am. Compl. ("Owners' Compl.") (D.I. 382); Def. U.S. Bank Nat'l Ass'n's Countercl. to the Verified Am. Compl. ("U.S. Bank Counterclaim") (D.I. 394); Owner Trustee Counterclaim.; GSS Data Servs., Inc.'s Joinder in Mot. for J. on the Pleadings (D.I. 420); Declaratory J. Countercls. on Common Contract Interpretation Issues  ("Ambac Counterclaim") (D.I. 391); The Noteholder Gp.'s Declaratory J. Countercls.  On Common Contract Interpretation Issues ("Noteholder Counterclaims") (D.I. 395) (collectively, the "Pleadings").

[17] *See* Joint Compendium.  While each of the 15 Trusts has a separate set of governing documents, the parties have represented that the various iterations of these agreements are "substantially similar."  See [Owner Trustee's] Opening Br. in Supp. of Mot. for J. on the Pleadings (D.I. 412) at 6 n.3.  For this reason, I adopt the parties' convention of citing to a single version of the underlying contracts except where versions are materially different.

## A. The Parties

The Trusts are fifteen Delaware statutory trusts formed under the Delaware Statutory Trust Act (the "DSTA") to hold Student Loans with a face amount of ~$15 billion.[18]   Each Trust is governed by a series of interlocking contracts, including a Trust Agreement, an Administration Agreement and an Indenture, each of which is further described below.[19]  Because the Trusts' purpose is strictly limited to (i) acquiring Student Loans by issuing certain Notes, (ii) executing the Indenture and (iii) fulfilling loan servicing obligations, the Trusts have no officers or employees.[20]

In lieu of officers and employees, the Trusts act through the Owner Trustee (Wilmington Trust), which is empowered to "act on behalf of the Trust[s]."[21]  As the trustee in a separate trust relationship, U.S. Bank National Association serves as

---

[18] Owners' Compl. ¶ 35; 12 *Del. C.* § 3801.

[19] Owner Trustee Counterclaim ¶ 32; Trust Agreement § 2.03(a)(i) (JC0586) (referencing the Indenture); Indenture (Appendix A) (JC2831) (referencing the Administration Agreement).

[20] Trust Agreement § 2.03 (JC0586); Indenture § 3.12 (JC2776) (captioned "No Other Business"); Owner Trustee Counterclaim ¶ 32.

[21] Trust Agreement § 1.01 (JC0582) (definition of Owner Trustee), § 2.01 ("The Trust continued hereby shall be known as . . . in which name the Owner Trustee may take any action as provided herein."), § 2.03(b)(i) (JC0586); Owners' Compl. ¶ 11.

"Indenture Trustee" for the "Indenture Trust Estate" and is the recipient of the Grant.[22]

To assist the Owner Trustee (and ultimately other Trust constituents), the parties engaged GSS Data Services, Inc. (the "Administrator") to act as one of the Trusts' Administrators.[23]   The Administrator's duties are memorialized in an Administration Agreement, where the Administrator agrees to "perform . . . the duties and obligations of the Owner Trustee" as well as the Trusts' obligations under the Indenture.[24]

The Administrator, in turn, entered into certain Servicing Agreements with entities such as the Pennsylvania Higher Education Assistance Agency

---

[22] Owners' Compl. ¶ 12; Indenture (Granting Clause) (JC27060) ("The [Trusts] hereby Grant[] to the Indenture Trustee . . . ."); Indenture (Appendix A) (JC2842) (defining "Indenture Trust Estate" as "all money, instruments, rights and other property that are subject or intended to be subject to the lien and security interest of the Indenture for the benefit of the Noteholders (including all property interests granted to the Indenture Trustee)").  I incorporate this definition of "Indenture Trust Estate" in the balance of this Opinion.

[23] Owners' Compl. ¶ 13.  GSS Data Servs., Inc. was not the only Trust Administrator. In the interests of brevity, however, I will refer to GSS as the exemplar Administrator for purposes of this Opinion.

[24] Administration Agreement § 1(a)(i) (JC3661), § 1(b)(i) (JC2662).

("PHEAA").[25]  In the applicable Servicing Agreement, PHEAA agreed to collect proceeds from certain Student Loans on behalf of the Trusts.[26]

The Noteholders[27] hold the Notes issued by the Trusts.[28]  NC Residuals Owners Trust and NC Owners LLC and Pathmark Associates, LLC (collectively, "Owners") hold certain "Trust Certificates" that evidence "the Beneficial Interest of an Owner" of the Trusts (the "Trust Certificates").[29]

For three of the fifteen Trusts, AMBAC acts as the "Note Insurer" with the obligation to cover shortfalls in amounts due to certain Noteholders and the right to

---

[25] *See* Servicing Agreement (JC4071).

[26] Servicing Agreement §§ 2.02, 4.01, 4.09 (JC4075–76, 80) (The "Servicer" agrees to provide the services listed in the "Program Manual," defined as "Borrower communications," "Procedures for delinquency and default" and "Disbursement procedures," among other things.).

[27] I use the term Noteholders as it is defined in the Noteholder Counterclaims to mean AG Mortgage Value Partners Master Fund, L.P., AG Opportunistic Whole Loan Select, L.P., AG Pisgah, L.P., AG Super RMBS LLC, AG TCDRS, L.P., AG Strategic ABS Fund Master, L.P., One William Street Capital Master Fund, LTC., OWS Credit Opportunity I, LLC, OWS Global Fixed Income Fund (USD-Hedged), Ltd., LibreMax Master Fund, Ltd., Libre Max Value Master Fund, Ltd., LibreMax MSW Fund, Ltd., Waterfall Delta Offshore Master Fund, LP, Waterfall Eden Master Fund, Ltd. and Waterfall Sandstone Fund, LP. *See* Noteholder Counterclaims at 1 n.1.

[28] Indenture (Granting Clause) (JC2760); Indenture (Appendix A) (JC2845) (definition of "Noteholders").

[29] Trust Agreement § 1.01 (JC0584) (definition of "Trust Certificate"); Owners' Compl. ¶ 40 (alleging the Owners hold certain "Beneficial Interest[s]"), ¶ 41 (alleging "[n]one of the Trusts' "third party beneficiaries . . . are a beneficial owner of the Trust").

13

reimbursement of amounts paid if there are sufficient recoveries from the Trusts.[30]

AMBAC has represented the interests of the "Note Insurers" in this litigation.

## B. The Trust Related Agreements

At their formation, each of the 15 Trusts and the Owner Trustee executed a

Trust Agreement governed by Delaware law.[31]  The Trust Agreement states, "it is

the intention of the parties hereto that . . . this Agreement constitute the governing

instrument of the Trust."[32]  But the Trust Agreement does not purport to be the only

contract that speaks to the Trusts' governance and operation.  To the contrary, each

Trust Agreement refers to the Indenture as well as the Administration Agreement,

defining them both as "Trust Related Agreements."[33]

---

[30] Owner Trustee Counterclaim ¶ 36; Owners' Compl. ¶ 14.

[31] Trust Agreement (cover page) (JC0573); Trust Agreement (recitals) (JC0578); Trust Agreement § 14.10 (JC0610) (captioned "Governing Law").

[32] Trust Agreement § 2.05 (JC0587).

[33] In its definitions, the Trust Agreement provides the "Trust Related Agreements" include "any instruments . . . signed by the Owner Trustee on behalf of the Trust" as well as the "Indenture," "Administration Agreement," "Loan Purchase Agreements," and the "Deposit and Security Agreement," (among other documents) (hereinafter, the "Trust Related Agreements").  Trust Agreement § 1.01 (definition of "Trust Related Agreements") (JC0584); *see also* Trust Agreement § 2.03(a)(i) (JC0586) ("The purpose of the Trust is to . . . execute the Indenture.").  As to the Trusts for which AMBAC provides reinsurance (the "Insured Trusts"), the securitization transaction is governed by slightly different versions of these agreements, (the "Insured Indenture," and the "Insured Trust Agreement").

14

One of the Trust Related Agreements, the Indenture, is an agreement, governed by New York law, between the applicable Trust and the Indenture Trustee (in its capacity as the Indenture Trustee).[34] The other key Trust Related Agreement is an Administration Agreement, executed by the Trust, the Indenture Trustee (in its capacity as such) and the Administrator.[35] Because of the interlocking nature of the Trust Related Agreements, the Trust Agreements, the Indentures and the Administration Agreements each play a pivotal role in the overall structure of the securitization transaction.

The overlapping nature of the Trust Related Agreements is well illustrated by the manner in which they address how the Owner Trustee will receive directions. As explained in more detail below, the Owners possess certain circumscribed authority to direct the Owner Trustee under the Trust Agreement.[36] Even though the Trust Agreement is the Trusts' "governing instrument," that agreement contains a broad prohibition that "no Owner shall direct the Owner Trustee to take or refrain

---

[34] Indenture (recitals) (JC27060); Indenture § 11.12 (JC2824) (captioned "Governing Law").

[35] Administration Agreement (recitals) (JC3660).  When the Administration Agreements were signed, non-party First Marblehead Data Services, Inc. was the acting Administrator. *Id.*

[36] *See* Trust Agreement § 4.01 (JC0590).

from taking any action contrary to . . . any Trust Related Agreement," and the Owner Trustee may decline to "follow any such direction, if given."[37]   As this sequence reveals, the Trust Agreement qualifies and subordinates its role in the Trusts' governance to the other Trust Related Agreements in several critical respects.

Further, to accommodate the overlapping role of the Trust Related Agreements, some provisions of the Trust Agreement lie dormant "for so long as any of the Notes is outstanding."[38]   For instance, Section 5.02 of the Trust Agreement directs that "income with respect to . . . Trust Property" (i.e., the Student Loans) "shall be remitted directly to the Indenture Trustee for application *in accordance with the Indenture*."[39]   Only *after* the Notes are repaid does the payment priority in Section 5.02 of the Trust Agreement (the "Trust Agreement Waterfall") spring to life.[40]

---

[37] Trust Agreement § 4.02(b) (JC0591).

[38] Trust Agreement § 5.02 (JC0593).

[39] Trust Agreement § 5.02 (JC0593) (emphasis supplied).   "Trust Property" is further defined below.

[40] Trust Agreement § 5.02 (JC0593).

## C. The Trust Res and the Granting Clause

Apart from issuing the Notes and acquiring and servicing the Student Loans, one of the Trusts' purposes is to "execute the Indenture."[41]  On the first page of the Indenture, in a section captioned "Granting Clause," the Trusts agreed to an "absolute" assignment of their sole asset, the Student Loans.[42]  As will become clear, the Granting Clause is center stage in the parties' dispute.  Given its importance, I reproduce the provision, in its entirety, below:

> The [Trust] hereby Grants to the Indenture Trustee at the Closing Date with respect to the Financed Student Loans, as trustee for the benefit of the holders of the Notes,[43] all the [Trust's] right, title and interest in and to the following:
>
> (a) the Financed Student Loans, and all obligations of the Obligors thereunder including all moneys paid thereunder on or after the Cutoff Date;
>
> (b) all Servicing Agreements and all Student Loan Purchase Agreements, including the right of the [Trust] to cause the Sellers to

---

[41] Trust Agreement § 2.03 (JC0586).

[42] Indenture (Granting Clause) (JC2760).

[43] As to the Trusts for which AMBAC provides reinsurance, the Insured Indenture states the Grant is made "for the benefit of the holders of the Notes and AMBAC."  *See* Insured Indenture (Granting Clause) (JC3461).

repurchase or the Servicers to purchase, Student Loans from the [Trust] under circumstances described therein;[44]

(c) each Guarantee Agreement,[45] including the right of the [Trust] to cause the Guarantee Agency to make Guarantee Payments in respect of the Student Loans, the TERI Deposit and Security Agreement and the [Trust's] rights to the TERI Pledge Fund as the same relate to the Student Loans and the proceeds thereof, and of the other Basic Documents;[46]

(d) all funds on deposit from time to time in the Trust Accounts related to the Notes (and sub-accounts thereof), including the Reserve Account Initial Deposit; and

(e) all present and future claims, demands, causes and choses in action in respect of any or all of the foregoing and all payments on or under and all proceeds of every kind and nature whatsoever in respect of any or all of the foregoing, including all proceeds of the conversion, voluntary or involuntary, into cash or other liquid property, all cash proceeds, accounts, accounts receivable, notes, acceptances, chattel paper, checks, deposit accounts, insurance proceeds, condemnation awards, rights to payment of any and every kind and other forms of obligations and receivables, instruments and other property which at

---

[44] In the Student Loan Purchase Agreements, certain parties first acquired the Student Loans and bundled them together so that they could be sold to the Trusts. *See* Indenture (Appendix A) (Definition of "Student Loan Purchase Agreements") (JC2853).

[45] In the Guaranty Agreements, certain parties agreed to guarantee payments on the financed Student Loans to the Noteholders. Indenture (Appendix A) (JC2842, 54).

[46] The Indenture defines the "Basic Documents" to include the "Trust Agreement, the Indenture, all Student Loan Purchase Agreements, the Deposit and Sale Agreement, the Servicing Agreements, the Administration Agreement, the Back-up Administration Agreement" and "the Guarantee Agreements" (among other documents) (the "Basic Documents"). Indenture (Appendix A) (JC2833).

any time constitute all or part of or are included in the proceeds of any of the foregoing (collectively, "Collateral").[47]

Stated succinctly, the Granting Clause creates a broad transfer of the Trusts' interest in a list of assets and related contractual rights, defined as the "Collateral," to the Indenture Trustee.[48]

The Indenture clarifies, "[t]he foregoing Grant is made in trust to secure the payment of principal of and/or interest on . . . the Notes" and "to secure compliance with the provisions of this Indenture."[49]  Relatedly, the Granting Clause makes clear that the Indenture Trustee, "on behalf of the holders of the Notes, acknowledges [the] Grant" and "accepts" the separate trust relationship established by the Indenture "to the end that the interest of the [Noteholders] may be adequately and effectively protected."[50]

Aside from the broad conveyance in the Granting Clause, the Indenture also provides an expansive definition of "Grant."

---

[47] Indenture (Granting Clause) (JC2760–61).  Sub-paragraph (e) is not included in the Master Trust Indenture.  (JC08666–67).

[48] Indenture (Granting Clause) (JC2760–61).

[49] Indenture (Granting Clause) (JC2761).

[50] Indenture (Granting Clause) (JC2761).

> "Grant" means mortgage, pledge, bargain, sell, warrant, alienate, remise, release, convey, assign, transfer, create, and grant a lien upon and a security interest in and right of set-off against, deposit, set over and confirm pursuant to the Indenture. A Grant of the Collateral or of any other agreement or instrument shall include all rights, powers and options (but none of the obligations) of the Granting party thereunder, including the immediate and continuing right to claim for, collect, receive and give receipt for principal and interest payments in respect of the Collateral and all other moneys payable thereunder, to give and receive notices and other communications, to make waivers or other agreements, to exercise all rights and options, to bring Proceedings in the name of the Granting party or otherwise and generally to do and receive anything that the Granting party is or may be entitled to do or receive thereunder or with respect thereto.[51]

Critically, the Indenture provides that a Grant includes "all rights, powers and options," but it does *not* include "obligations."[52] Thus, to the extent the Trusts are saddled with obligations under the Trust Related Agreements, those obligations are not swept into the Grant to the Indenture Trustee and, therefore, remain with the Trusts.

As an example of a Trust obligation, in Section 3.05, the Indenture provides the Trusts "will" take such other action necessary or advisable to (i) "maintain or preserve the lien and security interest . . . of [the] Indenture," (ii) "protect the validity

---

[51] Indenture (Appendix A) (definition of "Grant") (JC2842).

[52] Indenture (Appendix A) (definition of "Grant") (JC2842).

of" the "Grant," (iii) "enforce any of the Collateral" and (iv) "preserve and defend title to the Indenture Trust Estate and the rights of the Indenture Trustee."[53]

Multiple provisions in the Trust Agreement yield to the Indenture "for so long as any of the Notes are outstanding."[54]   Besides Section 5.02 (discussed above), Section 2.03(b) provides, in relevant part:

> *Until the Indenture is discharged*, the operations of the Trust shall be conducted in accordance with the following standards:
>
> (i) The Trust will act solely in its own name and the Owner Trustee or other agents selected in accordance with this Agreement will act on behalf of the Trust subject to direction by the Owners as provided herein, but such action shall not be in violation of the terms of this Agreement;
>
> (ii) The Trust's funds and assets shall at all times be maintained separately from those of the Owners and any of their respective Affiliates; . . .
>
> (iv) The Trust shall conduct its business at the office of the Trustee and will use stationery and other business forms of the Trust under its own name and not that of the Owners or any of their respective Affiliates, and will avoid the appearance (A) of conducting business on behalf of any Owner or any Affiliate of an Owner or (B) that the assets of the Trust are available to pay the creditors of the Owner Trustee or any Owner; . . .

---

[53] Indenture § 3.05 (JC2771–2).

[54] *See* Trust Agreement § 2.03(b)(vii–viii) (JC0587) ("[u]ntil the Indenture is discharged"); Trust Agreement § 4.01(a)–(b) (JC0590) ("for so long as any of the Notes are outstanding"); Trust Agreement § 5.02 (JC059) ("for so long as any of the Notes is outstanding").

(vii) For so long as any of the Notes are outstanding, the Trust shall not (A) merge or consolidate with or into any other entity, (B) convey or transfer all or substantially all of its assets to any other entity (other than to the Indenture Trustee pursuant to the Indenture), or (C) dissolve, liquidate or terminate in whole or in part; and

(viii) For so long as any of the Notes are outstanding, the Trust shall not own or acquire any financial asset that requires the Trust, the Owners or the Administrator to make any decisions regarding such asset other than the servicing of the asset.[55]

This structure allows the Trust Agreement to facilitate and protect the Trusts' "transfer of all or substantially all of its assets . . . pursuant to the Indenture" while also providing the Trusts with a residual governance structure that kicks in once the Indenture is "discharged."[56]  But, until such time, the Trusts are prohibited from "engaging in any business" other than the acquisition, collection and transfer of Student Loans, and "all [of] the [Trusts'] right, title and interest in" the Student Loans remains in the Indenture Trust Estate (as defined) subject to the control of the Indenture Trustee.[57]

---

[55] Trust Agreement § 2.03(b) (JC0586–87) (emphasis supplied).

[56] *See* Trust Agreement § 2.03(b)(viii) (JC0587); Indenture § 4.01 (JC2784) (providing for the Indenture's discharge when, among other things, "no Notes are outstanding").

[57] Indenture (Granting Clause) (JC2760); Indenture (Appendix A) (JC2842) (definition of "Indenture Trust Estate"); Indenture § 6.01 (JC2797) (recognizing the Indenture Trustee has certain "rights and powers vested in it by [the] Indenture"); Indenture § 6.02(c) (JC2798) (providing that the Indenture Trustee "may execute any of the trusts").

To support this structure, in a section entitled "Trust Accounts," the Indenture provides that the "Indenture Trustee, on behalf of the Noteholders, shall possess all right, title and interest in" the proceeds from the Student Loans, and further provides the trust accounts into which the proceeds are deposited "shall be under the sole dominion and control of the Indenture Trustee for the benefit of the Noteholders."[58] The upshot of these provisions is that the proceeds from the Student Loans will flow to the Indenture Trustee pursuant to the Trusts' "absolute" grant of "all" their "interest" in the Student Loans "for the benefit of the holders of the Notes."[59] As long as the Indenture is in effect, such proceeds must be distributed according to the payment scheme in Section 8.02 of the Indenture (the "Indenture Waterfall"), rather than according to the Trust Agreement Waterfall.[60]

### D. Directions to the Owner Trustee

The Trust Agreement provides the means by which the Trusts will operate. The Owner Trustee is appointed as "trustee" of the Trusts with "all the rights, powers and duties set forth . . . in the [DSTA]" to "hold the Trust Property in trust . . . for

---

[58] Indenture § 8.02(c) (JC2805).

[59] Indenture (Granting Clause) (JC2760); Indenture § 3.07(f) (JC2773), §§ 4.01–.02 (JC2783–84).

[60] Indenture § 8.02 (JC2804).

the use and benefit of the Owners."[61]  Even so, the Owner Trustee's obligations

under the Trust Agreement are "subject to" its obligations "under the Trust Related

Agreements."[62]

    In Section 4.01(a), the Trust Agreement directs the Owner Trustee to "take

such action or refrain from taking such action . . . with respect to nonministerial [sic]

matters, as it shall be directed by all the Owners for so long as any of the Notes are

outstanding."[63]  Section 4.01(b) continues:

> (b) Without limiting the generality of the foregoing, in connection with
> the following nonministerial matters, the Owner Trustee will take no
> action, and will not have authority to take any such action, unless it
> receives prior written approval from all the Owners for so long as any
> of the Notes are outstanding:[64]

Section 4.01(b) goes on to list certain "nonministerial" actions, such as (i) initiating

"any claim or lawsuit by the Trust" or compromising a claim brought against the

---

[61] Trust Agreement §§ 2.04–.05 (JC0587); Trust Agreement § 1.01 (JC0584) (defining
"Trust Property" as "all right, title and interest of the Trust or the Owner Trustee on behalf
of the Trust in and to any property contributed to the Trust by the Owners or otherwise
acquired by the Trust, including without limitation all distributions, payments or proceeds
thereon.") (hereinafter, the "Trust Property").

[62] Trust Agreement § 2.05 (JC0587).

[63] Trust Agreement § 4.01(a) (JC0590).  For the remainder of this Opinion, when quoting
from a contract, I use the term "nonministerial" as it appears in the parties' agreements, but
otherwise spell the term correctly.

[64] Trust Agreement § 4.01(b) (JC0590).

Trust (except those related to ordinary course debt collection) or (ii) amending the Trust Agreement or any Trust Related Agreement.[65]

Immediately following this language, in Section 4.02, entitled "Action Upon Instruction," the Trust Agreement enumerates certain circumstances in which the Owner Trustee need not follow Owner directions:

> (a) The Owner Trustee shall take such action or actions as may be specified in this Agreement or in any instructions delivered in accordance with this Article IV or Article VIII; provided, however, that the Owner Trustee shall not be required to take any such action if it shall have reasonably determined, or shall have been advised by counsel, that such action (i) is contrary to the terms hereof or of any document contemplated hereby to which the Trust or the Owner Trustee is a party or is otherwise contrary to law, (ii) is likely to result in personal liability on the part of the Owner Trustee, unless the Owners shall have provided to the Owner Trustee indemnification or security reasonably satisfactory to the Owner Trustee against all costs, expenses and liabilities arising from the Owner Trustee's taking of such action, or (iii) would adversely affect the status of the Trust as a partnership for Federal income tax purposes.

> (b) No Owner shall direct the Owner Trustee to take or refrain from taking any action contrary to this Agreement or any Trust Related Agreement, nor shall the Owner Trustee be obligated to follow any such direction, if given.[66]

As emphasized in both subsections (a) and (b), the Trust Agreement underscores the importance of the Trust Related Agreements in the Trusts' governance. Indeed,

---

[65] Trust Agreement § 4.01(b) (JC0590–91).

[66] Trust Agreement § 4.02(a)–(b) (JC0591–92).

under the Trust Agreement, Owner instructions are improper (and can be ignored by the Owner Trustee) if they contradict the overlapping Trust Related Agreements or undermine the Trusts' narrow purpose.[67]

Given the complex web of Trust Related Agreements, the parties to the Trust Agreement provided the Owner Trustee with a "Right to Receive and Rely Upon Instructions" while performing its duties.[68]  Section 8.06 states:

> In the event that the Owner Trustee is unable to decide between alternative courses of action, or is unsure as to the application of any provision of this Agreement or any Trust Related Agreement, or such provision is ambiguous as to its application, or is or appears to be in conflict with any other applicable provision, or in the event that this Agreement or any Trust Related Agreement permits any determination by the Owner Trustee or is silent or is incomplete as to the course of action which the Owner Trustee is required to take with respect to a particular set of facts, the Owner Trustee may give notice (in such form as shall be appropriate under the circumstances) to the Owners requesting instructions and, to the extent that the Owner Trustee shall have acted or refrained from acting in good faith in accordance with any instructions received from the Owners, the Owner Trustee shall not be liable to any Person on account of such action or inaction.  If the Owner Trustee shall not have received appropriate instructions within ten days of such notice (or within such shorter period of time as may be specified in such notice) the Owner Trustee may, but shall be under no duty to, take or refrain from taking such action, not inconsistent with this Agreement or the Trust Related Agreements, as the Owner Trustee

---

[67] Trust Agreement § 4.02(a)–(b) (JC0591–92); *see also* Trust Agreement § 8.09 (JC0601) ("Notwithstanding anything herein to the contrary, the Owner Trustee shall not take any action [] that is inconsistent with the purposes of the Trust.").

[68] Trust Agreement § 8.06 (JC0601).

> shall deem to be in the best interests of the Owners, and the Owner Trustee shall have no liability to any Person for such action or inaction.[69]

With this provision, the Owner Trustee has a discretionary safe harbor it may employ if the Owners issue questionable instructions.  When the Owner Trustee asks for clarifying directions from the Owners, and then follows those directions in "good faith," the Owner Trustee "shall not be liable to any Person."[70]

### E. The Indenture Trustee's Role in the Trusts' Governance

To summarize some of the foregoing provisions, the Trusts granted all of their "right, title and interest" in the Collateral to the Indenture Trustee.[71]  While the Trust Agreement contains provisions allowing the Owners to direct the Owner Trustee, the Owners are prohibited from directing the Owner Trustee to take "any action" that is contrary to the Indenture.[72]

---

[69] Trust Agreement § 8.06 (JC0601).

[70] Trust Agreement § 8.06 (JC0601).  The Trust Agreement for the Insured Trusts allows the Owner Trustee to request instructions from the Owners *as well as* AMBAC, and, "to the extent that the Owner Trustee shall have acted or refrained from acting in good faith in accordance with any instructions received from the Owners, which have been *approved* by [AMBAC,] or received from [AMBAC], the Owner Trustee shall not be liable."  Insured Trust Agreement § 8.06 (JC0029) (emphasis supplied).

[71] *See* Indenture (Granting Clause) (JC2760).

[72] Trust Agreement § 4.02(b) (JC0591).

In addition, even though the Indenture Trustee has received the Collateral from the Trusts by assignment, the Indenture contemplates that the Indenture Trustee has no baseline obligation "to administer, service or collect the loans in the Indenture Trust Estate."[73]  Indeed, the Indenture gives the Indenture Trustee a minimal role—at least as long as the Student Loans are generating enough proceeds to pay off the Notes.  The duty to service the Student Loans and collect proceeds belongs, instead, to the Trusts.[74]

This paradigm shifts dramatically, however, if proceeds from the Student Loans begin to flag, and the Trusts cannot make required payments on the Notes (an "Event of Default").[75]  If an Event of Default occurs, the Indenture Trustee must spring into action.  Specifically, the Indenture provides the Indenture Trustee "shall," subject to certain directions from the Noteholders, "exercise all rights, remedies, powers, privileges and claims of the [Trusts]" and, in such event, the Trusts' right to enforce key contractual right rights with respect to the Collateral "shall be

---

[73] Indenture § 3.20(b) (JC2779).

[74] Indenture § 3.20(d) (JC2779).

[75] Indenture § 5.01 (JC2784).

28

suspended."[76]  Following an Event of Default, the Indenture Trustee may "elect to maintain possession of the related Indenture Trust Estate."[77]

Similarly, in Section 5.04, the parties agreed that "if an Event of Default shall have occurred and be continuing, the Indenture Trustee may, or shall, at the written direction of the [] Noteholders . . . enforce any other proper remedy or legal or equitable right vested in the Indenture Trustee by this Indenture."[78]  To date, no party has represented to the Court that an Event of Default has occurred.

### F. The Owner Trustee's Obligations and Expenses

Like the Indenture Trustee, the Owner Trustee's obligations under the Basic Documents are narrowly defined.  Except as "expressly provided by the terms of [the Trust Agreement]," the parties agreed the Owner Trustee "shall not have any duty or obligation to . . . take or refrain from taking any action . . . in connection with" any of the Basic Documents.[79]  Given the limited nature of its duties, the Owner Trustee receives *de-minimus* annual compensation.[80]

---

[76] Indenture § 5.16(b) (JC2796).

[77] Trust Agreement § 5.05 (JC2793).

[78] Indenture § 5.04 (JC2789).

[79] Trust Agreement § 8.07 (JC0601).

[80] Owner Trustee Counterclaim ¶ 37.

The Trust Agreement states, "no implied duties or obligations shall be read into this Agreement against the Owner Trustee."[81]  Moreover, the Owner Trustee "shall not be personally liable with respect to any action taken or omitted . . . in good faith in accordance with the instructions of the Administrator or the Owners."[82]

To the extent the Owner Trustee does act on behalf of the Trusts, it "may act directly or, at the expense of the Trust, through agents or attorneys pursuant to agreements entered into with any of them."[83]  If the Owner Trustee chooses to act through agents, it "shall not be liable" for their misconduct as long as the agents were selected "with reasonable care."[84]

The Trust Related Agreements establish the means by which the Owner Trustee and its agents are compensated for their services.  Section 10.01 of the Trust Agreements provides:

> The Owner Trustee shall receive compensation from the Administrator and, to the extent not paid by the Administrator, from the Trust Property for its services hereunder. . . . The Owner Trustee shall be entitled to be reimbursed . . . for its reasonable expenses hereunder, including the reasonable compensation, expenses and disbursements of such agents,

---

[81] Trust Agreement § 8.07 (JC0601).

[82] Trust Agreement § 9.01(ii) (JC0602).

[83] Trust Agreement § 9.03(b) (JC0603).

[84] Trust Agreement § 9.03(b) (JC0603).

representatives, experts and counsel as the Owner Trustee may employ in connection with the exercise and performance of its rights and duties under this Agreement and the Trust Related Agreements.[85]

The Indenture places "Owner Trustee fees and expenses" at the top of the Indenture Waterfall.[86]

### G. Administration and Servicing Agreements

While the Trust Agreement and the Indenture govern many of the high-level aspects of the Trusts' operation, these agreements do not explain the nitty-gritty of how proceeds from the Student Loans are collected from the underlying borrowers. For these details, one must look to, among other documents, the applicable Administration Agreement and Servicing Agreement.

At approximately the same time as the applicable Trust Agreement and the Indenture were executed, the Trusts, the Owner Trustee and the Indenture Trustee entered into an Administration Agreement with the Administrator.[87]  Dovetailing with the Trusts' retention of certain "obligations" under the Indenture, the Administration Agreements make clear the Administrator will "perform" the "duties

---

[85] Trust Agreement § 10.01 (JC0603).

[86] Indenture § 8.02(d)(1) (JC2807).

[87] *See* Administration Agreement (recitals) (JC3643).

31

of the [Trusts]" as well as "the duties and obligations of the Owner Trustee on behalf of the [Trusts] under the Indenture and the Trust Agreement"[88]  This structure aligns with the Owner Trustee's limited role because, to the extent the Administrator assumes the Owner Trustee's obligations, the Trust Agreement provides that "the Owner Trustee shall be *deemed to have discharged* its duties."[89]

If the Administrator believes the Trusts are facing a non-ministerial decision, the Administration Agreement provides that the Administrator:

> . . . shall not be under any obligation to take any action, and in any event shall not take any action, unless the Administrator shall have received instructions from the Indenture Trustee, in accordance with the indenture, or from the Owner Trustee or the Owners, in accordance with the Trust Agreement.[90]

The Administration Agreement also specifies that the "initiation of any claim or lawsuit by [a Trust]" outside the "ordinary course of business" is a "nonministerial" matter that would require directions from the Indenture Trustee or

---

[88] Administration Agreement § 1(a)(i) (JC3661), § 1(b)(i) (JC3662).

[89] Trust Agreement § 8.03 (JC0600) (emphasis supplied).

[90] Administration Agreement § 1(c)(i) (JC3663).  Presumably, in such instances, the Administrator would seek direction from those authorized to give it.  As to the Trusts for which AMBAC provides insurance, the Insured Administration Agreement states the Administrator may receive non-ministerial instructions from "the Indenture Trustee or AMBAC."  Insured Administration Agreement § 1(c)(i) (JC3890).

the Owner Trustee.[91]   On the other hand, the Administrator need not await instructions before pursuing ordinary course lawsuits initiated "by the [Trust] or its agents . . . for the collection of the Student Loans owned by the [Trust]."[92] In connection with the assumption of these duties, the Trusts executed a power of attorney in favor of the Administrator "for the purpose of executing on behalf of the [Trusts]" certain "documents, reports, filing, instruments, certificates and opinions."[93]

As noted above, the Administrator does not shoulder all the Trusts' logistical duties.  To shed some of this burden, for each Trust, the Administrator contracted with a Servicer (or a similar entity) in a Servicing Agreement.[94]  In that agreement, the Servicer promised to "provide and perform" certain services such as "[b]orrower communications," "[p]rocedures for delinquency and default," and "[d]isbursement."[95]

---

[91] Administration Agreement § 1(c)(i)(B) (JC3663).

[92] Administration Agreement § 1(c)(i)(B) (JC3663).

[93] Administration Agreement § 1(b)(i) (JC3662).

[94] *See, e.g.*, Servicing Agreement (JC4071) (stating that the Administrator "desires to oversee the servicing of" certain "education loans" and the Administrator "desires to utilize the expertise of the Servicer to service such education loans").

[95] Servicing Agreement §§ 4.01, 4.09 (JC4076, JC4080).

## H. Securitization Transactions

It is undisputed that the contractual structure described above is intended to facilitate a form of a "securitization transaction."[96] Such transactions "involve[] the pooling and repackaging of loans into securities that are then sold to investors."[97] The securitization label connotes "the fact that very often, the form of instrument that the parties use to obtain funds from the ultimate investor [(in this case, the Notes)] is a security."[98] One of the objects of these transactions is to isolate financial assets from certain types of credit risk.[99] Thus, with regard to the Trusts, the ultimate investor (the Noteholder) is exposed only to the risk that the underlying borrower (the student) cannot repay, but is shielded from the risk that another entity (e.g., the financial institution that first extended credit to the student) will default on its obligations.[100]

---

[96] *See* Oral Arg. on R.12(c) Cross Mots. for J. on the Pleadings via Video Conference (D.I. 482–83) ("Tr.") at 114, 147, 276, 279 (parties characterizing the transactions as "major securitizations" and recognizing the treatise, JASON H.P. KRAVITT, ET AL, SECURITIZATION OF FINANCIAL ASSETS (3d ed. 2020) ("Kravitt"), as authoritative in this area of law).

[97] Kravitt § 1.01.

[98] Kravitt § 1.02.

[99] Kravitt §§ 1.01, 3.06, 4.04.

[100] Kravitt §§ 1.01, 3.06, 4.04.

While securitization transactions can take many forms, the Trusts, through the documents discussed above, implemented the securitization in a two-tiered structure.[101]   First, an entity, known as the "sponsor," acquired financial assets (in this case, the pooled Student Loans) from the originators.[102]   The sponsor then transferred the loans to an entity known as the "Depositor."[103]   The Depositor then sold the loans to the "Issuer" (i.e., the Trusts).[104]

In the second "tier," the Issuer issues notes under an Indenture.[105]   The Issuer then collateralizes the notes by transferring its rights to the proceeds of the pooled loans to an Indenture Trustee, who holds the pooled loans on behalf of the Noteholders.[106]

---

[101] Kravitt § 4.04.

[102] *See Fixed Income Shares v. Citibank N.A.*, 130 F. Supp. 3d 842, 846 (S.D.N.Y. 2015) (discussing a two-tiered structure).

[103] *Id.* at 846.

[104] Kravitt §§ 1.01, 3.06, 4.04; *see also BlackRock*, 247 F. Supp. 3d at 385–85 (explaining "Indenture Trusts" and their role in securitization transactions).  In the remainder of this Opinion, I use the term "Issuer" as a generic term that refers to the party that issues securities in a securitization transaction (the "Issuer").

[105] Kravitt §§ 1.01, 3.06, 4.04; *see also BlackRock*, 247 F. Supp. 3d at 385–85.

[106] Kravitt §§ 1.01, 3.06, 4.04; *see also BlackRock*, 247 F. Supp. 3d at 385–85.

One of the critical advantages of a securitization transaction is that it allows parties to structure the transaction as a sale or assignment of financial assets from the Issuer to the Indenture Trustee (rather than a secured loan), while also allowing the Issuer to retain administrative responsibility for servicing the financial assets.[107] The "premise" underlying this compromise "is that the purchaser, as the owner of the financial assets, prefers for the seller to exercise day-to-day control in order to maximize the value of the transaction for the purchaser, but, consistent with ownership, possesses the right to displace the seller from that role."[108] "While such an approach is [well understood], logical and grounded in common sense, it has not been examined rigorously in judicial decisions."[109]

## I. Procedural Posture

The Trusts first appeared before this Court in case number 12111-VCS, filed in 2016, when the Owners caused the Trusts to petition the Court for an emergency

---

[107] *See* Kravitt § 5.03(D)(3) ("In what is probably the vast majority of purchases of financial assets by parties . . . for business and practical reasons . . . the seller and purchaser both desire the seller to retain administrative responsibility.").

[108] Kravitt § 5.03(D)(3).

[109] Kravitt § 5.03(D)(3).

audit under the Servicing Agreement.[110]  In hindsight, many claims asserted in this opening salvo appear as glimmers of the more fundamental disputes that were brewing over the Trusts' *de jure* governance.  Over the next three years, three more cases were filed in this Court—each related in some way to the parties' contradictory interpretations of the Trust Related Agreements (the "Related Chancery Actions").[111]

As these actions progressed, it became clear that, absent a definitive construction of the Trust Related Agreements, the various parties interested in the Trusts' governance would continue to pull the Owner Trustee in opposite directions, and the Trusts would fall into a deepening state of paralysis.[112]  To help break the gridlock, the Court appointed a special master to determine whether certain "Disputed Instructions" were "proper under the terms of the Trust [Related]

---

[110] *See* D.I. 1 (filed in 12111-VCS).

[111] *See Nat'l Collegiate Master Student Loan Tr. I. v. U.S. Bank Nat'l Ass'n*, C.A. No. 2018-0167-JRS (filed Mar. 9, 2018); *AG Mortg. Value P'rs Master Fund, et al. v. VCG Owners Tr., et al.*, C.A. No. 2018-0825-JRS (filed Nov. 13, 2018); *NC Residuals Owners Tr., et al. v. Wilm. Tr. Co., et al.*, C.A. No. 2019-088-JRS (filed Nov. 1, 2019).

[112] *See, e.g.*, D.I. 362 (filed in 12111-VCS) (rulings of the Court involving a dispute over certain directions to the Owner Trustee).

Agreements."[113]  Yet, as noted, the claims pending before the Court did not ask the Court to interpret the Trust Related Agreements more broadly (at least not in a way that would be binding upon all the Trusts' constituents).[114]

Once the full breadth of the parties' disagreements came into focus, the Related Chancery Actions were consolidated into this Action, and the Court asked the parties to create a list of "Common Contract Interpretation Issues" that, if decided, would clarify the governance disputes that plague the Trusts.[115] In response, the parties filed pleadings that sought 143 separate declarations from the Court related to the governance and operation of the Trusts (the "Declarations").[116]    These Declarations are reproduced in the Appendix

---

[113] *See* Order Regarding [the Owner Trustee's] Mot. to Appoint a Successor Owner Tr. (D.I. 308) at 4.

[114] *See, e.g.*, D.I. 362 (filed in 12111-VCS) (stating that to obtain a judgment deciding "what [] disputed provisions of the trust documents definitively mean . . . one must seek a declaratory judgment under our Declaratory Judgment Act," which had not yet happened).

[115] *See* Order Consolidating Cases (D.I. 377); Letter to the Hon. Joseph R. Slights, III from Jeff Castellano re: list of contract interpretation issues (D.I. 373).

[116] *See* Pleadings; Excel Chart Organizing Requested Decls. ("Chart") (D.I. 481).  The parties have not submitted some of the Declarations for Judgment on the Pleadings.  As a result, this Opinion does not address those Declarations.  *See* Chart (The unsubmitted Declarations include: (i) Owner Trustee's Declarations E, F, G, X and (ii) U.S. Bank's Declarations H–O and Z–OO).

accompanying this Opinion.  The parties then filed competing Motions for Judgment on the Pleadings under Court of Chancery Rule 12(c) (the "Motions").[117]

As noted, while this Court wrestled with the multiple claims for declaratory judgment, my learned colleague down the street wrestled with some of these same issues in an action before the United States District Court for the District of Delaware seeking to enforce a proposed consent judgment against the Trusts on behalf of the CFPB (the "CFPB Action").[118]  In the CFPB Action, the CFPB seeks damages and penalties for the Trusts' alleged violations of federal lending laws related to the Trusts' collection of private student loan debt.[119]  On September 18, 2017, following an investigation, the CFPB filed a motion for approval of a Proposed Consent Judgment ("PCJ") that had been signed by the CFPB and attorneys who purported to have authority to act on behalf of the Trusts at the direction of the Owners.[120]  On May 31, 2020, the court in the CFPB Action construed the Trust Related Agreements

---

[117] Ct. Ch. R. 12(c); D.I. 409 (Noteholders' Motion); D.I. 410 (AMBAC's Motion); D.I. 411 (Owner Trustee's Motion); D.I. 413 (Owners' Motion); D.I. 418 (U.S. Bank's Motion).

[118] *See CFPB v. Nat'l Collegiate Master Student Loan Tr., et al.*, C.A. No. 17-1323-MN (D. Del.); *CFPB Decision*, 2020 WL 2915759.

[119] *CFPB Decision*, 2020 WL 2915759, at *2.

[120] *Id.*

and ultimately held the parties representing the Trusts lacked the authority to execute the PCJ because (i) the Owner Trustee is "the only entity through which the Trusts may be bound" and (ii) the Owner Trustee "never delegated" its power to execute the PCJ to any other party or attorney(s).[121]

The federal court issued the CFPB Decision shortly after this Court heard oral argument on the cross-Rule 12(c) Motions.[122]   The Motions were submitted for decision on June 5, 2020.[123]

## II.   ANALYSIS

After the pleadings are closed, Court of Chancery Rule 12(c) allows a party to move for judgment on the pleadings.[124]   In reviewing a motion under Rule 12(c), this court "is required to view the facts pleaded and the inferences to be drawn from such facts in a light most favorable to the non-moving party."[125]   With deference to the non-movant in mind, "judgment on the pleadings is a proper framework for

---

[121] *Id.*, at *3.

[122] *Compare id.*, at *1, *with* D.I. 476 (oral argument held on May 20, 2020).

[123] *See* Chart.

[124] Ct. Ch. R. 12(c).

[125] *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1205 (Del. 1993).

enforcing unambiguous contracts because there is no need to resolve material disputes of fact . . . .  If the contract's meaning is unambiguous, [and that meaning supports the movant's claim or defense], the court must grant judgment on the pleadings in favor of the moving party."[126]

When construing a contract, the court must be mindful that "[a]mbiguity does not exist simply because the parties disagree about what the contract means."[127] Instead, contracts are ambiguous only when the provisions at issue are "reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[128]

---

[126] *Lillis v. AT&T Corp.*, 904 A.2d 325, 329–30 (Del. Ch. 2006) (quotations omitted). As noted above, the Indentures are governed by New York Law, but no party has identified, and the Court is unaware of, a substantive difference between New York and Delaware law regarding the rules of contract construction.  *See House of Europe Funding I Ltd. v. Wells Fargo Bank, N.A.*, 2015 WL 1472301, at *3 (S.D.N.Y. Mar. 30, 2015) ("*House of Europe II*") (applying New York law and stating, "[i]f a court concludes that the contractual terms are complete, clear and unambiguous[,] it must proceed to interpret those terms according to their plain meaning") (internal quotations omitted); *Cty. of Suffolk v. Long Island Power Auth.*, 100 A.D.3d 944, 947 (N.Y. Sup. Ct. App. Div. 2012) ("[A]greements are construed in accord with the parties' intent" as evidenced by "their own writing," and an agreement that is "clear and unambiguous on its face must be enforced according to the plain meaning of its terms."); *Galantino v. Baffone*, 46 A.3d 1076, 1081 (Del. 2012) ("Where the language of a contract is plain and unambiguous, its meaning should be determined without reference to extrinsic facts or aids, and it must be enforced as written.").

[127] *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007).

[128] *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992); *see also GMG Capital Invs., Inc. v. Athenian Venture P'rs I, L.P.*, 36 A.3d

In determining whether a contract has only one reasonable interpretation, the court must read the agreement "in full and situated in the commercial context between the parties."[129]  In this regard, when assessing "commercial context," the court may consider guidance from "experienced commentators" when seeking to understand "the basic business relationship between parties" in order to "give sensible life" to a contract.[130]  If contracts overlap with other agreements in a single transaction, courts strive to "give a consistent reading" to the interrelated documents.[131]

---

776, 783 (Del. 2012) (same); *House of Europe II*, 2015 WL 1472301, at *3 ("If a court concludes that the contractual terms are complete, clear, and unambiguous[,] it must proceed to interpret those terms according to their plain meaning.") (internal quotations omitted).

[129] *Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 926–27 (Del. 2017).

[130] *Id.* at 927.

[131] *CA, Inc. v. Ingres Corp.*, 2009 WL 4575009, at *47 (Del. Ch. Dec. 7, 2009), *aff'd*, 8 A.3d 1143 (Del. 2010); *see also MPEG LA, LLC v. Samsung Elecs. Co.*, 166 A.D.3d 13, 17 (N.Y. App. Div. 2018) (holding that interrelated agreements "must be read together."); *Cortlandt St. Recovery Corp. v. Bonderman*, 96 N.E.3d 191, 198 (N.Y. Ct. App. 2018) ("When reviewing a contract, particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties manifested thereby.") (internal quotations omitted); PRB at 28 (same).

## A. The Big Picture

Much like the way the Indenture Parties and the Owners have pulled the Owner Trustee in different directions, in their arguments before the Court, the parties have presented discordant views of how the instant securitization transaction is supposed to work. But if one allows the Trust Related Agreements to work as written, with each agreement playing the tune it was designed to play, a certain harmony emerges. Explaining why this is so will, at times, require the Court to cut a path through the tangled weeds of interrelated contractual language. So, while I repeat much of the discussion in this section elsewhere in this Opinion, in the interest of clarity, I begin my analysis with a plain statement of how this securitization works. This summary will also serve as a roadmap for the balance of this Opinion.

As discussed in subsection II.B, while the Trust Agreements are the Trusts' constitutive documents, they reflect just a small part of the larger structure the parties used to create the securitization transaction. Indeed, in subsection II.C, I explain why the most important aspect of the parties' arrangement is the Granting Clause. There, the Trusts transferred their beneficial interest in the Student Loans to the Indenture Trustee. In effect, the Granting Clause creates a two-trust structure wherein the Trusts are designed to hold legal title to the Student Loans to collect payments from the underlying student-borrowers, while the Indenture Trustee holds

43

all beneficial interest in the Student Loans for the benefit of the Noteholders and AMBAC until the Indenture is discharged. Ultimately, the goal of the securitization transaction is to funnel the stream of payments flowing from the Collateral to the Collateral's beneficial owners (the Noteholders). The chart (below) provides a visual depiction of this two-trust structure for reference.



One central pillar of this two-trust structure is the Owner Trustee—the *only* entity authorized to act on behalf of the Trusts (absent delegation). *Ab initio*, the

parties contemplated the Owner Trustee would make two key delegations of its authority.  *First*, the Trust Agreement provides that the Granting Clause automatically transfers to the Indenture Trustee the Owner Trustee's rights to act on behalf of the Trusts as to the Collateral.  *Second*, the parties agreed the day-to-day management function with respect to the Student Loans would be centralized in the Administrator.  To fulfill this role, the Owner Trustee granted the Administrator a power of attorney to act on behalf of the Trusts.

As discussed in Section II.D, when the skies were clear, the parties did not intend that either of the two trustees (the Owner Trustee or the Indenture Trustee) would take an active role in managing the Student Loans.  Instead, the Trusts retained servicing obligations (e.g., to "enforce" the Collateral), which the Administrator agreed to perform.

The parties anticipated that certain non-ministerial matters might arise which would require the Administrator to seek additional guidance.[132]  For example, the Administrator might be asked to settle a non-ordinary course lawsuit brought against the Trusts.  In such an event, the Administrator would not be authorized to act absent

---

[132] *See, e.g.*, Administration Agreement § 1(c) (JC3663) (declaring, as an example, the "compromise of any action, claim or lawsuit brought against the [Trusts]" outside of claims initiated "in the ordinary course of business").

direction.  These non-ordinary course claims would trigger the sometimes-confusing

reality that *both* the Indenture Trustee and the Owners may direct the Administrator

and the Trusts—setting up the potential for conflicting instructions.[133]

On the one hand, the Indenture Trustee would have two options when the

Administrator is confronted with non-ministerial claims.  *First*, if the claims asserted

against the Trusts relate to the Collateral, the Indenture Trustee may settle the legal

action directly on behalf of the Trusts.[134]  This right allows the Indenture Trustee to

---

[133] *See, e.g.*, Administration Agreement § 1(c) (JC3663) (Administrator can receive non-ministerial direction from either "the Indenture Trustee, in accordance with the Indenture, or from the Owner Trustee or the Owners, in accordance with the Trust Agreement"); Trust Agreement § 4.1(b) (JC0590) (Owner Trustee not permitted to "compromise any claim or lawsuit brought by or against the Trust" without "prior written approval from all the Owners."); Indenture (Appendix A) (JC2842) (defining "Grant" to include the Trusts' "immediate and continuing right to . . . make waivers or other agreements . . . with respect" to the Collateral).

[134] *See* Indenture (Appendix A) (definition of "Grant") (the Indenture Trustee possesses an "immediate and continuing right . . . to make waivers or other agreements . . . in the name of the [Trusts] or otherwise and generally to do and receive anything that the [Trusts are] entitled to do or receive . . . with respect" to the Collateral.).  To be clear, nothing in this Opinion holds that the Trusts would lack standing to enforce the Indenture or that the Indenture Trustee could act on behalf of the Trusts in a way that violated that agreement.  In Section II.C.3, I hold that it is uncertain, at this stage of the proceedings, whether the Grant includes the Trusts' rights under the Basic Documents (defined below to include the Indenture).  While I find the language facially ambiguous, it is likely that the Owners will be able to show with the benefit of parol evidence that the Trusts retained the right to enforce the Indenture.  Otherwise, the Owners' residual beneficial interest in the Trusts would appear to be meaningless as the Indenture Trustee could use the Collateral however it wanted without recourse.  Indeed, it seems likely that while the Indenture Trustee possesses plenary authority over the Collateral, the Indenture Trustee agreed to certain contractual limitations concerning its use of the Collateral.  *See, e.g.*, Indenture § 3.14

protect the Noteholders' and AMBAC's beneficial interest.  *Alternatively* (and consistent with its passive role), the Indenture Trustee could direct the Administrator to negotiate and settle the lawsuit at the expense of the Trusts.  If the Administrator received this direction from the Indenture Trustee, it would be authorized to act accordingly.

On the other hand, the Owners' economic interest in the Student Loans hinges on the Noteholders being repaid and the Trusts fulfilling their obligations under the Indentures.  Once the Notes are no longer outstanding and the Indenture is discharged, the residual Student Loan payment stream reverts to the Trusts—flowing through the Trust Agreement Waterfall (ultimately to the Owners).  Of course, if the Trusts breach their obligations, the Indenture Trustee possesses remedies under the Indenture that could wipe out the Owners' reversionary interest in the Collateral.  To protect their interest, the Owners have a right to direct the Owner Trustee as to non-ministerial matters to ensure the Trusts fulfill their obligations.

---

(JC2776) (stating that the "Financed Student Loans may *only be sold, transferred, exchanged or otherwise disposed of by the Indenture Trustee*" if certain conditions are met) (emphasis supplied).  And as just stated, if the Indenture Trustee were to breach the Indenture, nothing in this Opinion holds as a matter of law that the Trusts would lack standing to sue the Indenture Trustee for that breach.

Returning to the example of non-ordinary course litigation asserted against the Trusts, the Trust Agreement gives the Owners the right to direct the Owner Trustee—which (if properly directed) could settle litigation brought against the Trusts.[135]  But, unlike the Indenture Trustee, the Owners' indirect authority to direct the Trusts is circumscribed because it derives from their control over the Trusts. Because the Trusts hold mere legal title to the Collateral, the Trusts' authority to control the Collateral is strictly limited to the control required to fulfill their contractual obligations.[136]  And the Owners' rights to direct the Owner Trustee cannot exceed the Trusts' rights in the Collateral.

This reality has a key consequence.  Because of the Trusts' limited interest, the Owners lack authority to direct the Owner Trustee to act on behalf of the Trusts *unless* the Owner direction arises out of a Trust obligation.  The Owners, therefore,

---

[135] Here, I'll note that, depending on the terms of any settlement, other Trust Related Agreements might provide an independent bar to the Owners directing the Owner Trustee to settle litigation on behalf of the Trusts.  For example, the Trusts may not amend the Indenture (including the Indenture Waterfall) without consent from the Indenture Trustee. *See* Indenture § 3.07(f) (JC2773).

[136] For example, the Trusts agreed to "diligently enforce, and take all steps, actions and proceedings reasonably necessary to protect [their] rights with respect to each Financed Student Loans."   Indenture § 3.20(f) (JC2779); *see also* Indenture § 3.07 (JC2772) (The Trusts promised to "use [their] best efforts not to permit any action to be taken by others that would . . . result in the amendment, hypothecation, subordination, termination or discharge of . . ." any documents within the Indenture Trust Estate.).

could not direct the Owner Trustee to settle non-ordinary course litigation unless the Trusts had a contractual obligation to do so.

For example, a third party might threaten to file a lien against the Collateral—which would trigger the Trusts' obligation to prevent "any lien . . . to be created on or extend to . . . the Indenture Trust Estate."[137]  The Owner Trustee, or by extension the Administrator, subject to direction by the Owners, could settle such a lawsuit to ensure the Trusts fulfill their obligations.[138]  But, under all circumstances, until the Indenture is discharged, the Trusts cannot take any action that derogates from the Granting Clause or otherwise violates a Basic Document.[139]

The Basic Documents' provision for administrative fees and expenses reinforces the Owners' and the Owner Trustee's minimal role.  For example, as explained in Section II.E, if the Owner Trustee incurs expenses while performing its limited, ministerial duties, it may submit *its* expenses for reimbursement at the top

---

[137] Indenture § 3.8(iii) (JC2774).

[138] As I highlight above, depending on the terms of any settlement, the Indenture Trustee's consent may be required.  *See* Indenture § 3.07(f) (JC2773) (Indenture Trustee consent required to amend a Basic Document).

[139] *See, e.g.*, *In re Nat'l Collegiate Student Loan Tr.*, 2020 WL 4813889 (3d Cir. Aug. 19, 2020) (discussed further below) (holding that the Trusts cannot appoint an additional Servicer on terms that gave the Trusts enhanced rights (e.g., the right to remove the Servicer) that originally belonged exclusively to the Indenture Trustee under the Granting Clause).

of the Indenture Waterfall.  But, in harmony with its ministerial role, the parties did not saddle the Owner Trustee with a plenary duty to defend the Trusts in lawsuits or negotiate on behalf of the Trusts.  For this reason, any fees generated from these activities could not constitute Owner Trustee expenses.  In other words, the Owner Trustee has no right to seek reimbursement for *Trust* expenses.

On the other hand, the Administrator also has a right to reimbursement of its expenses.  But, as the entity charged with fulfilling the Trusts' obligations, the Administrator *does* have a right to incur expenses on behalf of the Trusts.  Again, this arrangement reflects the reality that the Administrator (not the Owner Trustee or the Owners) is the central actor in the Trusts' day-to-day management and operations.

Section II.F addresses contractual and fiduciary duties.  As I have explained, the Owner Trustee delegated its authority to act on behalf of the Trusts (as was its right) to both the Administrator and the Indenture Trustee (as to the Collateral).  Accordingly, the Owner Trustee has neither a common law fiduciary obligation nor a contractual duty to monitor the Student Loans or the Trusts.

In what appears to be an issue of first impression under Delaware law, in Section II.F.4, I explain why the securitization transaction created an assignment of the Collateral for the benefit of the Noteholders and AMBAC.  While the Owners

50

did not agree affirmatively to manage the Student Loans, to the extent they use their rights to direct the Owner Trustee (and, in turn, the Trusts), as a matter of fiduciary duty, the Owners cannot use the Trusts' legal title to the Student Loans to self-deal at the expense of the Student Loans' beneficial owners.[140]

Simply put, the Owners must regulate their conduct to recognize that while the Notes are outstanding, they do not possess *any* direct or indirect beneficial interest in the Collateral.  This principle leads to the inescapable conclusion that the Owners owe fiduciary duties to the Noteholders and AMBAC (the *owners* of the Collateral) to the extent the Owners cause the Trusts to exercise control over the Collateral in relation to the Trusts' fulfillment of their obligations.  Stemming from the principles Chancellor Allen first articulated in *In re USACafes*, this fiduciary duty arises—not from the Noteholders and AMBAC's interests in the *Trusts*—but from their interest in the *Collateral*.[141]

To provide a reader's digest version of the Trusts' governance (and, perhaps, a roadmap for resolving future disputes), the validity of any purported attempt to act

---

[140] For example, the Owners could not direct the Owner Trustee (and indirectly the Administrator) to engage a Servicer affiliated with the Owners on terms that were not arms-length.

[141] *See In re USACafes*, 600 A.2d 43.

on behalf of the Trusts must involve at least three levels of analysis. *First*, one must ascertain whether the Trust Related Agreements specifically address the purported exercise of authority to act on behalf of the Trusts.[142] *Second*, the Trusts cannot take any action that compromises the Indenture Trustee's rights under the Granting Clause.[143] *Third*, to the extent the Owners purport to direct the Trusts and thereby control the Collateral in connection with the Trusts' fulfillment of their obligations, the Owners owe fiduciary duties to the Collateral's beneficial owners.

Without the benefit of a more specific case or controversy, and perhaps more developed factual records, it is impossible to give the parties more precise guidance than the framework I have just provided.[144] The Trusts' interests in fulfilling their

---

[142] *See, e.g.*, Indenture § 3.07(c) (JC2773) (Trusts cannot amend a Basic Document without consent of Indenture Trustee); Indenture § 3.14 (JC2776) (Indenture Trustee can "only" sell or dispose of the Student Loans if certain conditions are met); Trust Agreement § 4.02(b) (JC0591) (Owners cannot direct the Owner Trustee to contravene a Trust Related Agreement).

[143] *See, e.g.*, Indenture (Granting Clause) (JC2760) (stating the Trusts assigned to the Indenture Trustee their rights under "all Servicing Agreements"); *see generally In re Nat'l Collegiate*, 2020 WL 4813889, at *8–11 (discussion of "shared" rights under the Granting Clause and holding that "The Odyssey Agreement Violates the Granting Clause by Reserving for the Trusts Rights Belonging to the Indenture Trustee for the Benefit of the Noteholders").

[144] I note here that the Third Circuit Court of Appeals recently provided more precise guidance when it reviewed whether the Trusts validly appointed an additional "Special Servicer" for the Trusts. The Owners believed that the original "Special Servicer"—which was engaged to collect delinquent Student Loan payments—was failing in its duties. Without the consent of the Indenture Trustee, the Owners purported to direct the Owner

obligations may overlap with the Indenture Trustee's rights to act on behalf of the Trusts in matters that relate to the Collateral. While it is possible to harmonize these competing interests, to do so will require a careful review of all three of the steps I have just outlined.[145]

---

Trustee to appoint an additional "Special Servicer." The agreement that governed the Trusts' relationship with the additional "Special Servicer" gave the Trusts (and, therefore the Owners) a right to veto the subsequent removal of the "Special Servicer," whereas the original Service Agreement did not. The Third Circuit invalidated the "Special Servicer's" appointment on two grounds. *First*, the court held the appointment violated the Granting Clause. The court noted the Grant includes the Trusts' rights in all "Servicing Agreements." On the other hand, the Trusts retain an obligation to "provide for . . . the servicing of the Student Loans." Trust Agreement § 3.02(a)(ii) & (iii) (JC0586). Based on this obligation, the court held the Trusts *could* appoint an additional Servicer to fulfill this obligation. But the problem with the Owners' directions was that the new "Servicing Agreement" granted the Trusts enhanced rights when compared with the original "Servicing Agreements" (*i.e.*, the right to remove the Servicer). The new "Servicing Agreement" was thus invalid—not because the Trusts appointed an additional Servicer, but because the new agreement derogated from the Grant. *Second*, the court held the additional "Servicing Agreement" amended a "Basic Document" without the requisite consent. *See In re Nat'l Collegiate*, 2020 WL 4813889, at *11–15.

[145] One question this Opinion does not resolve is what should happen if: (i) the Owners issue a valid direction to the Owner Trustee, directing the Trusts to take an action in relation to the Collateral that is directly related to the Trusts' fulfillment of their obligations under the Indenture, and (ii) the Indenture Trustee purports to take a contractually valid, but contradictory, action on behalf of the Trusts (pursuant to its right to act on behalf of the Trusts as to the Collateral). I am not convinced the parties have joined issue on this narrow question, and it is not clear to me that this factual scenario has arisen in the past or will arise in the future. In any event, I do not reach the question as it is not before the Court.

53

Against the backdrop of this high-level summary, I invite the reader (if so inclined) to don a scuba tank and take a deep dive into the minutia of the parties' competing Declarations and the Trust Related Agreements.

## B. The Governing Instruments of the Trusts

At the threshold, the Owners seek a Declaration that the Trust Agreements "are the governing instruments of the Trusts under the DST Act."[146]  The Owner Trustee seeks a similar Declaration.[147]  This Declaration, it seems, would place the contracts related to the Trusts in a hierarchy, and that, in turn, would suggest that the Trust Agreements trump all others.  Given that this Declaration affects all of the other, more specific Declarations at issue here, I tackle this one first.

The DSTA provides that a statutory trust's "governing instrument" is "any written instrument . . . which creates a statutory trust or provides for the governance of the affairs of the statutory trust and the conduct of its business."[148]  In Section 2.05, captioned "Declaration of Trust," the Trust Agreement states, "[i]t is the intention of the parties hereto that the Trust constitute a statutory trust

---

[146] Owners' Compl. ¶ 149(d).

[147] Owner Trustee Counterclaim ¶ 74(a).

[148] 12 *Del. C.* § 3801(e) (definition of "Governing instrument").

under the [DSTA] and that *this Agreement constitute the governing instrument of the Trust*."[149]   Based on the plain meaning of this provision, I am satisfied that each Trust Agreement is the governing instrument for the applicable Trust.[150]

But that does not end the analysis or create the documentary hierarchy the Owners seek.  The Indenture Parties contend it would "obscure the fundamental structure of the securitizations, each of which is governed by several interlocking agreements that must be read together to give full effect to their meanings," if the Court were to issue a declaration that Trust Agreements are the Trust's "governing documents"—hard stop.[151]   Such a declaration, they say, would "sever symbiotic agreements that recognize their interlocking roles in governing the Trusts' operations."[152]   For reasons explained below, I am satisfied the Indenture and other

---

[149] Trust Agreement § 2.05 (JC0587) (emphasis supplied).

[150] *See Martin Marietta Mat'ls, Inc. v. Vulcan Mat'ls Co.*, 56 A.3d 1072, 1120 (Del. Ch. May 4, 2012), *aff'd*, 45 A.3d 148 (Del. 2012), and *aff'd*, 68 A.3d 1208 (Del. 2012), *as corrected* (July 12, 2012) (holding that the definite article "the" made clear that a contract referred to "only one transaction"); *ION Geophysical Corp. v. Fletcher Int'l Ltd.*, 2010 WL 4378400, at *8 (Del. Ch. Nov. 5, 2010) (applying New York law) ("[P]lacing the article 'the' in front of a word connotes the singularity of the word . . . .").

[151] *See* Joint Answering Br. in Opp'n to NC Residual Owners Trs.' and NC Owners LLC's Mot. for J. on the Pleadings ("JAB") (D.I. 437) at 36.

[152] JAB at 36.

Trust Related Agreements are not inoperative or subordinated simply because those agreements are not the Trusts' "governing instrument."

"It is, of course, axiomatic that a contract may incorporate by reference provisions contained in some other instrument."[153]  As long as a contract "refers to another instrument" and "makes the conditions of such other instrument a part of it, the two will be interpreted together as the agreement of the parties."[154]  Here, the Trust Agreements make frequent reference to other Trust Related Agreements and, in particular, the Indenture.[155]

While a "mere reference in one agreement to another agreement, without more, does not incorporate the latter agreement," the first page of the Trust Agreements states that one of the central purposes of the Trusts is to "execute the Indenture."[156]  In this spirit, the Trust Agreement prohibits the Owners from

---

[153] *State ex rel. Hirst v. Black*, 83 A.2d 678, 299 (Del. Super. Ct. 1951).

[154] *Brastor Mercantile, Ltd. v. Central Citrus S/A*, 1989 WL 70971, at *4 (Del. Super. Ct. June 6, 1989) (citing *Hirst*, 83 A.2d at 681)); *see also* 17A C.J.S. *Contracts* § 419 (2020) ("Matters incorporated by reference or annexed to a contract will be construed as part of the contract, for the purpose and to the extent indicated.").

[155] *See, e.g.*, Trust Agreement § 2.03(a)(i) (JC0586) (stating the Trusts' purpose is to "execute the Indenture"), § 4.02(b) (JC0591) (stating the Owners may not "direct the Owner Trustee" to act in a manner contrary to the Trust Related Agreements).

[156] Trust Agreement § 2.03 (JC0586) (referencing the Trust Related Agreements and the Indenture), § 4.02 (JC0591) (referencing the Trust Related Agreements); *Town of Cheswold v. Central Del. Bus. Park*, 188 A.3d 810, 818–19 (Del. 2018); *see also* 17A

directing the Owner Trustee to contravene any Trust Related Agreement, which, of course, includes the Indenture.[157]   These are more than mere references; they are explicit manifestations of intent that the Trust Related Agreements play a central role in the Trusts' governance and day-to-day operations.[158]   As a result, "matters incorporated into [the Trust Agreement] by reference are as much part of [the Trust Agreement] as if they had been set out in the contract verbatim."[159]   Subject to this clarification, the Court will grant the Owners' and the Owner Trustee's Motions as to their respective Declarations (D) and (A).[160]

## C. The Granting Clause

The second category of competing Declarations relates to the scope of the Granting Clause.[161]   These disputes include (i) whether any Trust Property could be

---

C.J.S. *Contracts* § 419 (2020) (stating the elements of the incorporation by reference doctrine).

[157] Trust Agreement § 1.01 (JC0584) (definition of "Trust Related Agreement"), § 4.02(a) (JC0591).

[158] *See Town of Cheswold*, 188 A.3d at 819 (stating that to be incorporated by reference, an agreement must make more than a "mere reference" to another agreement and must make an "explicit manifestation of intent" to incorporate the other document).

[159] 17A C.J.S. *Contracts* § 419 (2020).

[160] *See* Owners' Compl. ¶ 149(d); Owner Trustee Counterclaim ¶ 74(a).

[161] *Compare* Owners' Compl. ¶ 149(a)–(b), *with* U.S. Bank Counterclaim ¶ 3(a)–(o).

distributed according to the Trust Agreement Waterfall while the Notes are outstanding, (ii) whether the Granting Clause creates an assignment or a mere security interest in the Collateral (iii) whether the Collateral includes all the Trusts' rights under all Basic Documents, (iv) whether the Trusts' extra-contractual tort claims are included within the Collateral and (v) whether the Indenture establishes contractual prerequisites that must be satisfied before the Indenture Trustee exercises its rights in the Collateral.

When ruling on each of these disputes, New York law (which governs the Indenture) requires that the Granting Clause be read to "mean what it says" as long as the contract is "clear and unambiguous."[162]   In the words of the United States District Court for the Southern District of New York, the Court may not "read the sweeping language of the Granting Clause to have limits that it lacks on its face."[163]

## 1. While the Notes Are Outstanding, No Trust Property Can Be Distributed According to the Trust Agreement Waterfall

One of the parties' fundamental disagreements concerns whether any Trust Property could be distributed according to the Trust Agreement Waterfall (rather than the Indenture Waterfall) while the Notes are outstanding.  According to the

---

[162] *BlackRock*, 247 F. Supp. 3d at 413 (internal quotation and citation omitted).

[163] *Id.*

Owners, in the Indenture, the Trusts have granted "only the assets expressly enumerated in the Granting Clause."[164]  They point to the Granting Clause's detailed list of assets and contractual rights and argue that the list would be surplusage if the Grant had simply intended to transfer *all* the Trusts' assets.[165]  Implicit in this line of argument is the notion that property remains outside the Grant that could be distributed according to the Trust Agreement Waterfall.  On the other hand, U.S. Bank (as Indenture Trustee) interprets the Trust Related Agreements to create an absolute assignment of the Trusts' assets and contractual rights for the benefit of the Noteholders.[166]

I begin my analysis of these divergent interpretations, as I must, with the plain language of the Indenture.  On the first page of the Indenture, the Trusts "Grant[ed]" all their "right title and interest" in the Student Loans and certain contracts, as well as "all present and future . . . choses in action in respect of" the Student Loans and

---

[164] Owners' Compl. ¶ 149(a).

[165] Pls.' Opening Br. in Supp. of their Mot. for J. on the Pleadings ("POB") (D.I. 413) at 18.

[166] *See* U.S. Bank Counterclaim ¶ 3(a).

the applicable contracts.[167]  The Indenture defines the assets and contractual rights included within the Grant as the "Collateral."[168]

The plain meaning of the Granting Clause is that the Trusts granted only contractual rights and assets that meet the definition of "Collateral."[169]  But, when read in context with the Trust Related Agreements, it becomes clear that the definition of Collateral includes "all" the Trusts' "right, title and interest in" the "Student Loans" which, under the Trust Agreement, are the *only* assets the Trusts can hold or acquire.[170]  It is, therefore, immaterial that some aspects of the Grant are only "in respect of" the Collateral because the Trust Agreement prohibits the Trusts from acquiring any assets other than those listed.[171]

---

[167] Indenture (Granting Clause) (JC2760–61).  One of the Indentures contains different language.  *See* Indenture (Granting Clause) (JC0866–67) ("The [Trusts] . . . hereby bargain, assign, pledge and grant a security interest . . . in Any and all other real or personal property of every name and nature.").  Given that this clause also includes the terms "bargain" and "assign," the Owners have not shown that this Indenture should be interpreted differently from the other Indentures when read in context with the other Trust Related Agreements.

[168] Indenture (Granting Clause) (JC2761).

[169] Indenture (Granting Clause) (JC2760).

[170] Indenture (Granting Clause) (JC2760); Trust Agreement § 2.03 (JC0586); POB at 18.

[171] *Compare* Trust Agreement § 2.03(a) (JC0586) ("The purpose of the Trust is to engage in the following activities and *only* those activities: (i) To acquire a pool of Student Loans, to execute the Indenture and to issue the Notes."), *with* Indenture (Granting Clause) (JC2760) ("The Issuer hereby Grants . . . the Financed Student Loans."); *see also* Trust Agreement § 2.03(b)(iv) (JC0587) (requiring the Trusts to "avoid the appearance (A) of

To be clear, even if the Owners could identify Trust Property or contractual rights that fall outside the definition of "Collateral," therefore falling outside the Indenture Trust Estate, while the Notes are outstanding, the Trusts cannot distribute *any* property to the Owners unless the property has flowed through the Indenture Waterfall.[172]  While the Notes are outstanding, the Trust Agreement directs "Income with respect to and proceeds of the Trust Property [(defined as 'all right, title and interest of the Trust . . . *in and to any property* contributed to the Trust by the Owners *or otherwise acquired* by the Trust)']" to be "remitted directly to the Indenture Trustee for application in accordance with the Indenture."[173]  For this provision to work, notwithstanding that the Granting Clause includes only the "Collateral," no "Trust Property" can be distributed according to the Trust Agreement Waterfall while the Notes are outstanding.

---

conducting business on behalf of any Owner or any Affiliate of an Owner or (B) that the Assets of the Trust are available to pay the creditors of the Owner Trustee or any Owner"); Indenture § 3.12 (JC2776) ("The [Trusts] shall not engage in any business other than financing, purchasing, owning, selling and servicing the Financed Student Loans.").

[172] *See* Indenture (Appendix A) (JC2842) (definition of "Indenture Trust Estate"); *cf.* PRB at 30 (arguing the Trusts retain certain extracontractual internal affairs claims that are not among the assets identified in the granting clause).

[173] Trust Agreement § 5.02 (JC0590) (emphasis supplied).

### 2.  The Granting Clause Creates an Assignment of the Collateral, and the Trusts Lack Plenary Authority to Control the Collateral

The parties' very different understanding of how the Trusts are to be governed may best be explained by their disparate views regarding whether the Granting Clause intends an assignment, a security interest, or both.  The Indenture Parties contend the Granting Clause creates both a present assignment *and* a precautionary security interest in the Collateral.[174]  For their part, the Owners view the Grant as creating *only* a security interest in the Collateral.[175]  While the difference between an assignment and a security interest can have many legal implications, the distinction is important here because it dictates which party (the Trusts and/or the Indenture Trustee) may exercise proprietary rights with respect to the Collateral.[176]

As explained below, the only reasonable interpretation of the Trust Related Agreements is that the Granting Clause creates an assignment of the Collateral while

---

[174] Def. U.S. Bank Nat'l Ass'n's Reply Br. in Supp. of its Mot. for J. on the Pleadings ("U.S. Bank RB") (D.I. 446) at 9.

[175] Pls.' Single Combined Answering Br. in Resp. to Rule 12(c) Opening Brs. (D.I. 433) ("PAB").

[176] *See generally* 21 C.J.S. *Creditor and Debtor* § 3 (2020) (discussing the difference between a security interest and an assignment and stating that an assignment "does not create a lien in favor of creditors on property, which is still regarded as the assignor's, but it passes both legal and equitable title to the property absolutely beyond the control of the assignor").

also preserving bare legal title to the Collateral in the name of the Trusts so that the Trusts may fulfill their servicing obligations. This assignment divests the Trusts of standing to enforce rights with respect to the Collateral except to the extent necessary to fulfill their obligations.

As a general matter, under New York common law, "[a]n unequivocal and complete assignment extinguishes the assignor's rights against the obligor and leaves the assignor without standing to sue the obligor."[177]  A transfer creates an assignment if it conveys a party's rights "in toto" so that nothing is "held back" from the grant.[178]

On its face, the Granting Clause certainly appears to be a broad grant of the Collateral with nothing held back.  It states the Trusts "hereby Grant[] to the Indenture Trustee . . . all the [Trusts'] right, title and interest in" the Collateral.[179] The definition of "Grant" includes "sell," "convey," and "assign," as well as the

---

[177] *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A.*, 731 F.2d 112, 125 (2d Cir. 1984).

[178] *Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 2016 WL 796850, at *8–9 (S.D.N.Y Feb. 25, 2016) ("*NCUAB I*"), *aff'd*, 898 F.3d 243 (2d Cir. 2018) ("*NCUAB II*"). *House of Europe Funding I, LTD v. Wells Fargo Bank*, 2014 WL 1383703, at *15–16 (S.D.N.Y. Mar. 31, 2014) ("*House of Europe I*") ("A party that has assigned away its rights under a contract lacks standing to sue for breach of that contract.").

[179] Indenture (Granting Clause) (JC2760).

"immediate and continuing right" to bring "any suit" "in the name of the Trusts . . . with respect" to the Collateral.[180]  And, to reiterate, the Trust Related Agreements define the Collateral so that it is coextensive with the type of property the Trusts can acquire.[181]

Given the importance of consistency and predictability in the securitization industry, as already noted, New York law is clear that when interpreting indentures, courts must be careful not to read "sweeping language of [a] Granting Clause to have limits that it lacks on its face."[182]  Notwithstanding this clear direction, and in an effort to find such a limitation, the Owners highlight what they perceive as a conflict between the Indenture Parties' construction of the Granting Clause and the Trust Related Agreements.  Specifically, the Owners underscore that the Trusts still have legal title to the Student Loans.[183]  Because the Granting Clause purports to convey

---

[180] Indenture (Granting Clause) (JC2760); Indenture (Appendix A) (definitions of "Grant" and "Proceedings") (JC2842, 2849).

[181] *Compare* Indenture (Granting Clause) (JC2760) (the Trusts assigned all their "right, title and interest" in the "Financed Student Loans."), *with* Trust Agreement § 2.03(i) (JC0586) ("The purpose of the Trust is to . . . acquire a pool of Student Loans.").

[182] *BlackRock*, 247 F. Supp. 3d at 413.

[183] PAB at 48; U.S. Bank RB at 18 ("[T]rue ownership . . . of the Student Loans still lies with the Trusts."); Trust Agreement § 14.02 (JC0609) ("Legal title to all Trust Property shall be vested at all times in the Trust.").

the Trusts' "title" to the Indenture Trustee, the Owners believe this inconsistency shows that other aspects of the Granting Clause (such as the "immediate and continuing right" to bring claims in the name of the Trusts with respect to the Collateral) should not be taken at face value.[184]

In response, the Indenture Parties observe that the "Trusts' *rights* in the Student Loans" (which are subject to the Granting Clause) are legally distinct from "the Student Loans themselves" (which the Trusts "did not sell and transfer").[185] Indeed, the Indenture Parties readily concede that legal title to the Student Loans "still lies with the Trusts."[186]  This was no accident, say the Indenture Parties, since it was necessary for the Trusts to maintain legal title in the Collateral (the loans) so they could fulfill their role in the collection of the loans as needed to satisfy the purpose of the Trusts.[187]

Indeed, the Indenture obligates the Trusts to "enforce all of [their] rights under . . . the Basic Documents" and to enforce "all terms . . . of all Financed Student

---

[184] *See* PAB at 48.

[185] *See* U.S. Bank RB at 17 (emphasis supplied).

[186] U.S. Bank RB at 18; Trust Agreement § 14.02 (JC0609).

[187] *See* U.S. Bank RB at 18.

Loans."[188]   And the Administration Agreement states that "lawsuits . . . for the collection of the Student Loans owned by the [Trusts]" will be "initiated in the ordinary course of business by the [Trusts] or [their] agents."[189]   These narrow limitations, by the Indenture Parties' reckoning, are in place solely to facilitate the Trusts' servicing obligations and cannot be expanded to undermine the Granting Clause's clear assignment of rights in the Collateral to the Indenture Trustee.[190]

In this regard, I note that many cases the Indenture Parties cite to support their reading of the Indenture appear, at first glance, to prove too much.  The cases hold that a broad grant of all "rights, title and interest" in collateral will divest the Issuer of *standing* to bring claims that are related to the collateral.[191]   Indeed, these cases treat lack of an assignor's standing to bring collateral-related claims as part of the

---

[188] Indenture § 3.07(c) (JC2772), § 3.20(d) (JC2779); *see also* Trust Agreement § 2.03(ii) (JC0586) (the Trusts are to "provide for the . . . servicing of the Student Loans"); Trust Agreement § 4.01(a), (b)(i) (JC0590).

[189] Administration Agreement 1(c)(i)(B) (JC3663).

[190] U.S. Bank RB at 17–18.

[191] *See House of Europe I*, 2014 WL 1383703, at 16 ("HOE I assigned its rights to Wells Fargo . . . [and] lacks standing to sue . . . for any breaches"); *NCUAB I*, 2016 WL 796850, at *9 ("[O]nce the NGN Trust made its own assignment to the Indenture Trustee, it could no longer pursue any claims directly."); *NCUAB II*, 898 F.3d 243, at *254 ("We presume that the express grant of the right to institute proceedings to the Noteholders entails the denial of such a right to others.").

very definition of an assignment.[192]  Given that the Indenture Parties argue the Trusts *are intended* to have standing to "enforce the Collateral," it is not clear that this authority actually advances their construction of the Granting Clause.[193]

For example, in *House of Europe Funding I v. Wells Fargo*, the court held that, after the Issuer agreed to the grant, it "lack[ed] standing to sue [] for breaches" of a collateral administration agreement because it was "no longer the real party in interest with respect to an action upon the instrument."[194]  The indenture in *House of Europe* also contained a license that the indenture trustee granted *back* to the Issuer to "exercise all of the Issuer's rights pursuant to" the collateral administration

---

[192] *See, e.g.*, *House of Europe I*, 2014 WL 1383703, at 16 (holding that because an issuer assigned its rights in collateral, it "lacks standing").

[193] Indenture § 3.05(iii) (JC2771); None of the cases the Indenture Trustee cites discuss whether the Issuer/plaintiff had servicing obligations; each involve the Issuer's attempt to sue another deal party—rather than underlying borrowers.  *See Triaxx Prime CDO 2006-1, LTD v. The Bank of N.Y. Mellon*, 2018 WL 1417850, at *1 (S.D.N.Y. Mar. 8, 2018), *aff'd*, 741 F. App'x 875 (2d Cir. 2018) ("*Triaxx II*") (holding Issuer lacked standing to sue indenture trustee for breach of contract, negligence and breach of fiduciary duty); *BlackRock*, 247 F. Supp. 3d at 410–413 (holding Issuer lacked standing to sue trustee for certain failures to identify problems with mortgage backed securities in a resecuritization transaction because the issuer "assigned the Trust Estate as collateral to the Indenture Trustee").

[194] *House of Europe I*, 2014 WL 1383703, at *15, *16 (interpreting the following grant language: "the Co-Issuers hereby Grant to the Indenture Trustee . . . all of their right, title, and interest in, to, and under the Asset Management Agreement and the Collateral Administration Agreement").

agreement.[195]  The court found this distinction was critical and held that the Issuer had standing to bring suit related to the collateral administration agreement because of the *license* (but not because it retained any rights after executing the indenture).[196]

 *House of Europe* could be read to create a rule that if parties wish for an Issuer to fulfil servicing duties, the Issuer should be granted a license to exercise rights with respect to the collateral for that purpose.  A fairer reading of the case, however, is that after executing the indenture, the Issuer lacks the plenary "*right* to sue" in relation to the collateral, but as other New York courts have recognized, an Issuer may still have "standing based upon the contractual *duties* [(rather than retained *rights*)] . . . under the Indenture."[197]

 After careful consideration, I am satisfied that when read in context with the Trust Related Agreements, the Granting Clause creates an assignment of the

---

[195] *Id.*, at *15–16.

[196] *Id.*, at *16.

[197] *Id.*, at *15; *Hildene Capital Mgmt., LLC v. The Bank of N.Y. Mellon*, 105 A.D.3d 436, 438 (N.Y. Sup. Ct. App. Div. 2013) ("Most significantly, PreTSL XX has standing based upon the contractual duties it assumed under the Indenture."); *In re Nat'l Collegiate*, 2020 WL 4813889, at *9 (interpreting the Trust Related Agreements at issue in this Action and noting that "more instructive here is the outcome in" *Hildene* because the Trusts "assumed certain contractual obligations under the Basic Documents that were not annulled by the Granting Clause," and, for this reason, the Trusts retain the power that is concomitant with their obligations—otherwise, the Trusts' obligations in the Trust Related Agreements would be rendered meaningless).

Collateral to the Indenture Trustee—including an immediate and continuing right to bring legal proceedings in the Trusts' name.[198]  The only limitation to the sweeping language in the Granting Clause that can be drawn from the plain language of the Trust Related Agreements is the Trusts' retention of legal title to the Collateral so that the Trusts may fulfill their servicing obligations.[199]

While some of the cases the parties have cited could be read to support the opposite conclusion, the weight of authority holds that a securitization trust's retention of bare legal title and servicing responsibilities does not, *ipso facto* or *ipso jure*, mean that the trust has conveyed a mere security interest.[200]  Courts in

---

[198] *See* Indenture (Appendix A) (definition of "Grant") (JC2842).

[199] *BlackRock*, 247 F. Supp. 3d at 413 (stating courts should not "read the sweeping language of the Granting Clause to have limits that it lacks on its face.").

[200] *See House of Europe I*, 2014 WL 1383703, at *11, *15 ("A CDO issuer like HOE I owns the underlying assets and is therefore injured [(i.e., has standing)] by actions that adversely affect the underlying assets," but, at the same time, "HOE I [] lacks standing" to bring its own claims "under [] contracts" in which it has conveyed all "right, title, and interest."); *Triaxx Prime CDO 2006-1, LTD v. OCWEN Loan Serv.*, 762 F. App'x 601, 607–08 (11th Cir. 2019) ("*Triaxx III*") (involving a special purpose entity obligated "to file financing statements," "take action as necessary to secure the rights and remedies of the Secured Party" and to "enforce any of the Pledged Securities" even though it had transferred its rights in a "complete assignment") (internal quotation omitted); *Triaxx Prime CDO 2006-1, LTD v. Bank of N.Y. Mellon*, 2017 WL 1103033, at *3–4 (S.D.N.Y. Mar. 21, 2017) ("*Triaxx I*") (noting that a servicer might have an obligation to exercise "rights or remedies with respect to [] Collateral" "*on behalf of the Issuer*" even though the issuer had assigned "all of its right, title and interest" in the collateral and had been "divest[ed]" of "any rights" to "commence litigation on their own behalf") (emphasis supplied); *NCUAB I*, 2016 WL 796850, at *3–4 (noting the Issuer trust transferred its

multiple jurisdictions have found transactions to be sales or assignments (rather than mere security interests) despite the grantor's retention of bare legal title so that the grantor can continue to service the assigned assets.[201]   And, as an aside, I note the Bankruptcy Code specifically contemplates that an Issuer may sell its "interest" in a financial asset while retaining "legal title to service or supervise the servicing of such" financial asset.[202]

To be sure, the Trusts may have a right to distributions if the Notes are repaid.[203]   Notwithstanding this dynamic, in *TraxxPrime v. Ocwen Loan Servicing*, the court held that a similar transaction structure made the applicable trust the

---

"right, title and interest" while, at the same time, the parties agreed that "legal title to the Trust Estate shall be vested at all times in the [issuer] as a separate legal entity"); *Hildene*, 105 A.D.3d at 436 (holding that an entity which had "granted its right, title and interest" in certain collateral still "has standing based upon the contractual duties it assumed under the Indenture") (internal quotations omitted).

[201] *See In re Mortg. Funding, Inc.*, 48 B.R. 152, 154 (Bankr. D. Nev. 1985) (involving a non-recourse sale of financial assets with the seller receiving a fee for servicing and retaining "bare legal title"); *In re S. Indus. Banking*, 45 B.R. 97, 100 (Bankr. Tenn. 1984) (grantor "merely held legal title" such that proceeds from property were not "property of" the transferor); *Matter of Federated Dept. Stores, Inc.*, 1990 WL 120751, at *1–2 (Bankr. S.D. Ohio 1990) (transferor did not "retain any ownership rights" where transferee bore "the risk that the Receivables will prove uncollectable" even though the transferor continued to service the receivables).

[202] 11 *U.S.C.* § 541(d).

[203] *See* Trust Agreement § 5.02 (JC5093).

"resulting beneficiary of the Indenture Trust," but rejected the argument that the Trusts' "status as a potential beneficiary renders the transfer . . . 'incomplete.'"[204]

It is not surprising that sophisticated parties would seek to structure transactions so that an Issuer/assignor trust can "exercise day-to-day control in order to maximize the value" of the transaction, but also, "consistent with ownership," allow the assignee to "possess the right to displace" the Issuer from that role.[205]  The Trust Related Agreements reflect this transactional structure.  For example:

- The Granting Clause transfers to the Indenture Trustee the "*immediate and continuing*" right to bring Proceedings in the name of the Trusts, while also omitting in that transfer the Trusts' servicing "obligations" from the definition of "Grant."[206]

- Even though the Indenture Trustee has received the "immediate and continuing" right to file suit in the name of the Trusts, the Indenture provides that the "Indenture Trustee" has "no obligation to administer, service or collect the loans in the Indenture Trust Estate." [207]

- The Trust Agreement prohibits the Trusts from acquiring "any financial asset that requires the Trust, the Owners or the Administrator to *make any decisions regarding such asset other than the servicing of the asset*."[208]

---

[204] *Triaxx III*, 762 F. App'x at 606.

[205] Kravitt § 5.03(D)(3).

[206] Indenture (Appendix A) (definition of "Grant") (JC2842) (emphasis supplied).

[207] Indenture §§ 3.20(b),(d) (JC2779) (emphasis supplied).

[208] Trust Agreement § 2.03(b)(viii) (JC0587) (emphasis supplied).

- Rather than relying on the Indenture Trustee, the Indenture states the Trusts "*shall* cause to be diligently enforced and taken all reasonable . . . proceedings necessary for the enforcement of all terms . . . of all Financed Student Loans made and agreements in connection therewith."[209]

- Section 5.16 of the Indenture, entitled "Performance and Enforcement of Certain Obligations," provides that the Trusts "shall" enforce certain Basic Documents "as the Indenture Trustee *may request*."[210]

- To the extent the Trusts continue to make payments on the Notes, the Indenture Trustee has the right to direct the Trusts to "exercise any and all rights . . . lawfully available to the [Trusts] under . . . the Basic Documents."[211]

- But if the Student Loan proceeds are insufficient to repay the Notes, the Indenture requires the Indenture Trustee to take over, stating the Indenture Trustee "shall . . . exercise all rights, remedies, powers, privileges and claims of the [Trusts]."[212]

- The Trusts agreed that, "[w]ithout derogating from the absolute nature of the assignment granted to the Indenture Trustee," the Trusts would not modify the terms of any Collateral or the Basic Documents absent consent from the Indenture Trustee (among others).[213]

---

[209] Indenture §§ 3.20(b),(d) (JC2779) (emphasis supplied).

[210] Indenture § 5.16 (JC2796) (emphasis supplied); *see also* Indenture § 5.03(f) (JC2788) (stating the Indenture Trustee possesses an independent right to bring "[a]ll rights of action and of asserting claims under this Indenture . . . in its own name as trustee of an express trust"); Indenture § 3.14 (JC2776) (stating the Indenture Trustee has an independent right to dispose of the Financed Student Loans under certain circumstances).

[211] Indenture § 5.16(a) (JC2796).

[212] Indenture § 5.16(b) (JC2796).

[213] Indenture § 3.07(f) (JC2773).

Taken together, these provisions reflect the Indenture Trustee's present ownership of rights in the Collateral.  They also establish the Trusts as an administrative vassal with duties to enforce (but no present beneficial interest or plenary rights in) the Collateral.

Having failed to identify a disabling conflict between rights in and title to the Collateral, the Owners seek to avoid judgment on U.S. Bank's requested Declaration regarding the Granting Clause by arguing that several aspects of the Indenture are ambiguous and cannot be construed without yet-to-be-developed extrinsic evidence.[214]  For example, the Owners see ambiguity in the Indenture's definition of "Grant," which states that the "Grant" includes both a "pledge of" and "a lien upon and a security interest in" the Collateral.[215]  This, according to the Owners, cannot be reconciled with an absolute assignment.

The Indenture does use these terms; it even speaks of perfecting a security interest in the Collateral.[216]  But the Indenture's use of the term "Security Interest" in the definition of "Grant" is consistent with an absolute assignment because the

---

[214] *See* PAB at 23–48.

[215] Indenture (Appendix A) (definition of "Grant") (JC2842); *see also* POB at 25.

[216] Indenture (Granting Clause) (JC2760); Indenture § 3.06 (JC2772).

Uniform Commercial Code ("UCC") defines a "Security Interest" as *both* an interest which "secures payment" *and* "any interest of . . . a buyer of accounts . . . [or] payment intangible[s]."[217]  Moreover, New York's statutory law (which has adopted the UCC) prohibits courts from considering whether a financing statement was filed when determining the substantive nature of a transaction.[218]  Indeed, the UCC states the filing of a financing statement "is not of itself a factor in determining whether the collateral secures an obligation."[219]  The statute's official comments elaborate that although sophisticated parties may choose to file a "precautionary" financing statement, that filing cannot be used to answer "the substantive question of" whether an assignment was a true assignment.[220]  Commenters likewise have recognized "precautionary" financing statements protect sophisticated parties' option to structure a true assignment so that it *also* creates a security interest as a failsafe in

---

[217] 6 *Del. C.* § 1-201(35); N.Y. U.C.C. Law § 1–201(35) (McKinney) (same); Indenture § 3.22(b) (JC2780) ("The Financed Student Loans constitute 'accounts' or 'payment intangibles' within the meaning of the applicable UCC.").

[218] N.Y. U.C.C. Law § 9–505 (McKinney) ("The filing" of a financing statement "is not itself a factor in determining whether the collateral secures an obligation.").

[219] N.Y. U.C.C. Law § 9–505 (McKinney).

[220] N.Y. U.C.C. Law § 9–505 cmt. 2 (McKinney).

the event a court (erroneously) characterizes an assignment as a security interest (which must be perfected to be enforceable against third-party creditors).[221]

More fundamentally, under the Indenture, the Indenture Trustee's rights are "cumulative."[222]   There is, therefore, no inconsistency in a grant that assigns all "right, title and interest" while also containing language sufficient to create a security interest as a backstop.[223]  In such circumstances, an indenture's reference to "preservation of a security interest in the collateral [] does not circumscribe the [] indentures' grant of 'all right, title and interest.'"[224]

---

[221] Kravitt § 3.04 (stating, "a prudent purchaser will always perfect its purchased interest, even if absolutely certain that a transfer in fact constitutes a true sale").

[222] Indenture § 5.09 (JC2794); *see also* Indenture § 3.23 (JC2782) (stating the Indenture creates "ownership and/or security interests in the [Trusts'] assets").

[223] Indenture (Granting Clause) (JC2760); Kravitt § 3.04.  Multiple provisions in the Indenture evidence a dual intent to create an assignment, as well as language that would be sufficient to create a security interest.  *See, e.g.*, Indenture § 3.05 (JC2771) (obligating the Trusts to "preserve the lien" *and* "protect the validity of any Grant").

[224] *Triaxx II*, 2018 WL 1417850, at *4 (rejecting an argument much like the one the Owners make here); *see also ProGrowth Bank, Inc. v. Wells Fargo Bank, N.A.*, 558 F.3d 809, 814 (8th Cir. 2009) (rejecting an argument that "[d]efendants must not have intended the financing statements to cover all of Hanson's assets because doing so would render the subsequent descriptions of the annuity contracts superfluous" and holding "nothing in the UCC prevents a creditor from filing redundant or precautionary financing statements"); *In re QDS Components, Inc.*, 292 B.R. 313, 345 (Bankr. S.D. Ohio 2002) (addressing analogous law governing the distinction between a "true lease" and a security interest and stating, "the filing of a financing statement by a cautious lessor does not destroy true lease status, [and] it stands to reason that the ultra-cautious lessor, who takes the additional step of obtaining subordination agreements from the lessee's senior secured lender, has not

Likewise, the Indentures' reference to the "Trust's rights" and requirement that the Trust "enforce . . . *its* rights with respect to each Financed Student Loans" do not alter this conclusion.[225]   Courts have interpreted similar references to *an Issuer's* rights to be:

> irrelevant both because it creates a duty rather than a right (the Issuer '*shall* enforce,' not the Issuer 'retains the right to enforce'), and because there is no inconsistency between a provision that confers a right to [the Issuer] and a provision that assigns all such rights to [the Indenture Trustee].[226]

Put differently, one can reconcile an assignor's promise to "enforce any of the Pledged Securities" with the conclusion that the assignor granted more than a security interest because the assignor retains an *obligation* to "defend challenges to

---

thereby admitted that it has entered into a disguised financing agreement."); *Rollins Commc'ns, Inc. v. Ga. Inst. of Real Estate, Inc.*, 231 S.E.2d 397, 399 (Ga. Ct. App. 1976) ("It is our view that the lessor, faced with such uncertainty, should be permitted to make provisions for a precautionary filing without risk that such provisions would, in and of themselves, as urged in the instant appeal, convert the lease into a secured transaction."). New York Courts agree. *Accord BlackRock*, 247 F. Supp. 3d at 413 (finding an assignment notwithstanding language in an Indenture that the assignment of collateral was made "as security for the benefit of the Noteholders").

[225] *See* Indenture § 3.20(f) (JC2779) (emphasis supplied).

[226] *House of Europe I*, 2014 WL 1383703, at *16 (involving a grant of all "right, title, and interest in, to, and under" certain agreements and the grantor's obligation to "enforce all of *its* material rights" under those agreements) (emphasis supplied); *Triaxx III*, 762 F. App'x 601, 608 (involving a special purpose entity obligated "to file financing statements," "take action as necessary to secure the rights and remedies of the Secured Party" and to "enforce any of the Pledged Securities") (internal quotation omitted).

the preference and priority of" the assignee, rather than a right that the Trust could wield for its own benefit.[227]

In yet another attack on the plain language of the Indenture, the Owners urge the Court to find that the "execution of an absolute form of assignment is not controlling evidence" of an intent to assign the Trusts' interest in the Collateral.[228] In support of this argument, the Owners cite authority from bankruptcy courts recognizing the power of a bankruptcy trustee to claw back assigned property into the debtor's bankruptcy estate.[229]  It is black letter law that a bankruptcy trustee's "strong-arm powers" "serve essentially to marshal all of the debtor's assets, including *some that the debtor itself could not recover*, in order to enhance the

---

[227] *Triaxx III*, 762 F. App'x at 608.

[228] *See* PAB at 15 (quoting *In re Ridgewood Realty of L.I. Inc.*, 2015 WL 7755431, at *1 (Bankr. S.D.N.Y. Dec. 1, 2015)).

[229] *See, e.g.*, *In re the Matter of Joseph Kanner Hat Co., Inc. v. City Trust Co.*, 482 F.2d 937 (2d Cir. 1973) (involving a claim by a bankruptcy trustee that his interest in property was entitled to priority); *In re Candy Lane Corp.*, 38 B.R. 571 (Bankr. S.D.N.Y. 1984) (involving an action by a "[t]rustee in bankruptcy"); *In re Grant Assocs*, 1991 WL 21228 (S.D.N.Y. Feb. 5, 1991) (determining whether certain financial assets were "property of the bankruptcy estate").

resources available to the pool of creditors."[230]   In bankruptcy cases, courts can (and do) ignore the titles contracting parties use to describe their transaction.[231]

Of course, in this case, there is no bankruptcy trustee and no third-party rights are involved.[232]   Instead, the Owners are trying to walk back the Trusts' promise to the Indenture Trustee to convey "*all*" their "right, title and interest" in the Collateral.[233]   As other courts have reasoned, in the financial asset securitization context, "all must mean all," and I must give effect to the "breadth and completeness of the Granting Clause."[234]

But even assuming, *arguendo*, the Court could look past the plain language of the Grant (it cannot),[235] the Trust Related Agreements contemplate a transaction that

---

[230] *Matter of Quality Holstein Leasing*, 752 F.2d 1009, 1014 (5th Cir. 1985) (emphasis supplied).

[231] *See, e.g.*, *In re Candy Lane*, 38 B.R. at 571, 575 (looking past "broad language" to determine the "true nature of a security transaction").

[232] This Court does not decide whether the Collateral would constitute a part of the Trusts' estate if the Trusts were forced into bankruptcy proceedings because this question is not before the Court.

[233] Indenture (Granting Clause) (JC2760).

[234] *BlackRock*, 247 F. Supp. 3d at 413; *Triaxx III*, 762 F. App'x at 605 ("To determine whether the assignment in the Indenture Agreement is complete and unequivocal, we look to the terms of the agreement.").

[235] *See BlackRock*, 247 F. Supp. 3d at 412; PAB at 13–14.

possesses the most important characteristic of an assignment; the Noteholders have no recourse against the Trusts even if the Notes are not repaid.[236]  For this reason, the allocation of risks provided for in the Trust Related Agreements reflects an unmistakable intent that the Grant create more than a mere security interest.[237]

At the end of the day, "the words parties use to bind themselves together in a contractual relationship matter."[238]  While this court has held that other securitization indentures create security interests (rather than assignments), those indentures stated "the [Trust] hereby Grants to the Trustee . . . <u>a continuing security interest in</u>, and lien on, all of its right, title and interest in, to and under" certain financial assets.[239]  Here, in contrast, the Trusts granted "*all*" their "*right, title and interest* in and to"

---

[236] Indenture § 3.01 (JC2769) ("The Notes will be non-recourse obligations of the [Trusts]").

[237] *See Triaxx III*, 762 F. App'x at 603 (finding that if notes are "limited-recourse obligations," it weighs in favor of finding an assignment rather than a secured loan); *Major's Furniture Mart, Inc. v. Castle Credit Corp., Inc.*, 602 F.2d 538, 545 (3d Cir. 1979) (discussing the "extremely relevant factor of recourse and the risks allocated" in assessing the proper characterization of a transaction) (internal quotation omitted).

[238] *Zohar II 2005–1, Ltd. v. FSAR Hldgs., Inc.*, 2017 WL 5956877, at *1 (Del. Ch. Nov. 30, 2017).

[239] *Id.*, at *9 (emphasis supplied); *see also* Kravitt § 4.04 (noting that the "second sale" in a two-tiered securitization structure "need not be a true sale for bankruptcy purposes").

the Collateral.[240]   This difference matters, and U.S. Bank has offered the only reasonable interpretation of the Trust Related Agreements that accounts for the specific language the parties chose to characterize the assignments.  Given the true assignment, the Trusts lack plenary authority to control the Collateral during the life of the Indenture, and thus cannot bring claims related to the Collateral unless strictly tied to one of their contractual obligations.[241]

### 3.  The Indenture Trustee Has Not Demonstrated the Trusts Granted All Their Rights Unambiguously Under the Basic Documents

The parties have also joined issue regarding whether the "Basic Documents" are included within the Collateral.[242]   This question is important because the Indentures define "Basic Documents" to include, among other agreements, the Indenture, the Trust Agreements, the Administration Agreements and the Servicing Agreements (i.e., a much longer list of contracts than those specifically mentioned in the Granting Clause).[243]   And, as outlined above, to the extent the Trusts' rights

---

[240] Indenture (Granting Clause) (JC2760) (emphasis supplied).

[241] *See Hildene*, 105 A.D.3d at 438 (holding that an entity that had "granted its right, title and interest" in certain collateral still "has standing based upon the contractual duties it assumed under the Indenture") (internal quotations omitted).

[242] *See* U.S. Bank Counterclaim ¶ 3(d).

[243] Indenture (Appendix A) (JC2833) (definition of "Basic Documents"); Indenture (Granting Clause) (JC2760); PAB at 61.

in a specific agreement are swept over to the Indenture Trustee in the Grant, the Indenture Trustee has immediate and continuing authority to use those rights for the benefit of the Noteholders and AMBAC.

If a contract right is included in the Indenture Trust Estate, it does not necessarily mean the right cannot be "shared" between the Trusts and the Indenture Trustee.[244]  To the contrary, the Student Loans are within the Indenture Trust Estate, yet the Trusts must exercise certain rights related to the Student Loans if they are to make good on their promise to "enforce" the Collateral.[245]  It does follow, however, that a contract right residing in the Indenture Trust Estate cannot be directly or indirectly clawed-back to the Trusts—nor can the Trusts exercise a Collateral-right for any purpose other than fulfilling their obligations.[246]

To repeat, the Granting Clause assigns all the Trusts' "right, title and interest" in certain contracts that govern the inner workings of the securitization transaction,

---

[244] *See In re Nat'l Collegiate*, 2020 WL 4813889, at *8–10 (interpreting the Trust Related Agreements and holding that, although the right to appoint servicers is included within the Granting Clause, the Trusts may "share" the right to appoint servicers in connection with the obligations they assumed under the Indenture).

[245] Indenture § 3.05(iii) (JC2771).

[246] *In re Nat'l Collegiate*, 2020 WL 4813889, at *10–11 (holding that the Trusts' efforts to appoint an additional Servicer violated the Granting Clause "by Reserving for the Trusts Rights Belonging to the Indenture Trustee for the Benefit of the Noteholders").

including, in subsection (b), the "Servicing Agreements" and the "Student Loan Purchase Agreements."[247]  In subsection (c), the Granting Clause also conveys the Trusts' rights under "each Guarantee Agreement."[248]  This much is undisputed, but the parties' interpretations of the Indenture diverge with respect to the remainder of subsection (c).[249]

In its briefs, U.S. Bank argues the Granting Clause's reference to "each of the other Basic Documents" should be read as an independent object in which the Trusts granted all their "right, title and interest."[250]  The Owners agree that, in isolation, the Granting Clause could be interpreted as U.S. Bank reads it.[251]  Even so, the Owners

---

[247] Indenture (Granting Clause) (JC2760); Indenture (Appendix A) (JC2852–53) (defining "Servicing Agreement" and "Student Loan Purchase Agreements," respectively as the agreements "under which [the] servicer agrees to service Financed Student Loans included in the Indenture Trust Estate" and the agreements "providing for the sale of Student Loans from the Sellers to the Depositor for deposit into the Indenture Trust Estate").

[248] Indenture (Granting Clause) (JC2760); Indenture (Appendix A) (JC2842, 54) (defining "Guarantee Agreements" as certain contracts through which payments of principal and interest owing on certain Student Loans were guaranteed).

[249] Indenture (Granting Clause) (JC2760); *compare* PAB at 58 ("If the drafters of the Indenture had intended to include all of the Basic Documents, . . . they would not have placed it at the end of a paragraph otherwise relating solely to guarantees."), *with* U.S. Bank RB at 22 ("The Granting Clauses expressly include 'each of the other Basic Documents.'").

[250] U.S. Bank RB at 22 (citing Indenture (Granting Clause) (JC2760)).

[251] *See* PAB at 57 (listing U.S. Bank's interpretation among the ways the Granting Clause "could be parsed.").

contend U.S. Bank's reading is not the only reasonable construction because the other contracts listed in subsection (b) and (c) are among the Basic Documents.[252] According to the Owners, the Indentures' drafters could have simply granted the Trusts rights in "the Basic Documents," rather than identifying a few agreements and then referencing "all other Basic Documents."[253]

Ultimately, given lawyers' well-recognized "impulse towards over inclusiveness," the Indenture is fairly susceptible to the interpretation U.S. Bank advances.[254] At this stage, it is reasonable to read the Granting Clause as identifying some contracts by name while also sweeping in others by its reference to other Basic

---

[252] *See* Indenture (Appendix A) (JC2833) (definition of "Basic Documents"); PAB at 58–59.

[253] *See* Indenture (Appendix A) (JC2833) (definition of "Basic Documents"); PAB at 58–59.

[254] *Rag Am. Coal Co. v. AEI Res., Inc.*, 1999 WL 1261376, at *2–5 (Del. Ch. Dec. 7, 1999) (recognizing the lawyers' "impulse towards over inclusiveness").

Documents.[255]  This interpretation gives independent meaning to each item in the list and is in harmony with the broader Trust Related Agreements.[256]

On the other hand, the Owners advance a different interpretation.  They read subsection (c) as a grant of (i) the Guarantee Agreement, (ii) the TERI Deposit and Security Agreement and (iii) the TERI Pledge fund as all three relate to (a) the Student Loans and the proceeds thereof, and (b) each of the other Basic Documents.[257]  The Owners contend the reference to "other Basic Documents" was intended to sweep into the Grant the Trusts' rights related to the Guarantee Agreement and the TERI Deposit and Security Agreement to the extent such rights were discussed in other Basic Documents—without sweeping in *all* the Trusts' rights under *any* Basic Document.[258]

---

[255] *See* U.S. Bank RB at 24; *Johnson City Cent. Sch. Dist. v. Fidelity and Deposit Co. of Md.*, 226 A.D.2d 990, 992–93 (N.Y. Sup. Ct. App. Div. 1996) (stating an interpretation is reasonable if language is "fairly susceptible" to that reading).

[256] *See In re Viking Pump, Inc.*, 52 N.E.3d 1144, 1151 (N.Y. Ct. App. 2016) (holding that contracts must be interpreted to give "fair meaning to all of the language employed by the parties in the contract and leaves no provision without force and effect").

[257] *See* PAB at 55; Tr. at 39.

[258] PAB at 56–57; Tr. at 39.

I am satisfied the Owners' proffered construction is also reasonable.[259] Because both parties have offered reasonable interpretations of the Indenture, "parol evidence is necessary to interpret the contract" with respect to this issue, and neither party is entitled to judgment on the pleadings.[260]  And, again, to come full circle, the question of whether (or not) the Granting Clause includes the Trusts' rights under all of the Basic Documents is important because it answers whether the Indenture Trustee has an immediate and continuing right to enforce *the Trusts'* (as opposed to its own) rights under, for example, the Indenture.

---

[259] One of the Trust Agreements, which the parties have called the "Master Trust Agreement," also supports the Owners' reading because, unlike the other Indentures, it does not mention "Basic Documents" in its granting clause.  *See* Master Trust Indenture (JC0866) (Clause III) (omitting "Basic Documents" from a similar granting clause); *See Cty. of Suffolk*, 100 A.D.3d at 947 ("Separate contracts relating to the same subject matter and executed simultaneously by the same parties may be construed as one agreement.").

[260] *See Foot Locker, Inc. v. Omni Funding Corp. of Am.*, 78 A.D.3d 513, 515 (N.Y. Sup. Ct. App. Div. 2010) (stating that where a contract is ambiguous, "parol evidence is necessary to interpret the contract.").  This ruling is not intended to detract from or contradict my prior rulings that nothing in the Trust Related Agreements supports the notion that the Trusts could monetize any rights they may possess and then distribute any property according to the Trust Agreement's Waterfall.  For reasons stated above, Section 5.02 of the Trust Agreement forecloses that option.  (JC0593).

### 4. The Granting Clause Assigned All Tort Claims in Respect of the Collateral

While related to the discussion above, the parties separately dispute the narrow issue of whether the Granting Clause effectively assigned the Trusts' extra-contractual tort claims under New York law.[261]  The Owners contend the Trusts' tort claims fall outside the Grant while the Indenture Trustee argues the Trusts have assigned their rights to bring such claims under the Indenture.[262]  This question is critical because it appears the Trusts have tort claims that could be asserted against various service providers, and the Owners and the Indenture Trustee dispute whom, as between them, has the plenary right to control such claims.[263]

In *Commonwealth v. Morgan Stanley*, the New York Court of Appeals held that "where an assignment of fraud or other tort claims is intended in conjunction

---

[261] POB at 19–20.

[262] *Compare* Owners' Compl. ¶ 149(a), *with* U.S. Bank Counterclaim ¶ 3(c).

[263] *See, e.g.*, *In re Nat'l Collegiate Student Loan Trs. Litig.*, 2020 WL 3960334 (Del. Ch. July 13, 2020) (involving a tort claim asserted by the Trusts against a service provider). At this juncture, I will reiterate that nothing in this Opinion holds that a right swept into the Granting Clause cannot, *ipso jure*, be "shared" between the Trusts and the Indenture Trustee.  *See In re Nat'l Collegiate*, 2020 WL 4813889, at *8–10 (the Third Circuit grappling with "shared" rights).  Rather, it is likely that the Trusts must have standing to use the Collateral to fulfill their obligations—otherwise, the Trusts' obligations would be "rendered meaningless."  *Id.* at *10.  With that said, I do not decide whether the Trusts have any obligation that is germane to the Trusts' tort claims.  That question has not been presented in the competing requests for declaratory relief.

with the conveyance of a contract or note, there must be some language—although no specific words are required—that evinces that intent and effectuates the transfer of such rights."[264]  When read in context with the other Trust Related Agreements, the Granting Clause "evinces" an intent to transfer to the Indenture Trustee a right to assert tort claims on behalf of the Trusts relating to the Collateral.

The Granting Clause's language is, once again, ground zero for this dispute. In the Indenture, the Trusts conveyed "the immediate and continuing right" to "bring Proceedings in the name of the Granting party or otherwise and generally to do and receive anything that the [Trusts are] or may be entitled to do or receive . . . with respect" to the Collateral.[265]

When interpreting a similar agreement, the Second Circuit implicitly confirmed that an assignment of all "right, title and interest in and to the . . . Trust Estate," including "all present and future claims . . . in respect of" the transferred collateral, is sufficient to transfer tort claims (e.g., breach of fiduciary duty

---

[264] *See Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co., Inc.*, 35 N.E.3d 481, 486 (N.Y. Ct. App. 2015); *Triaxx I*, 2017 WL 1103033, at *5.

[265] Indenture (Granting Clause) (JC2760); Indenture (Appendix A) (JC2842, JC2849) (definitions of "Grant" and "Proceeding").

claims).[266]   In reaching this conclusion, the court affirmed the district court's reasoning that "the contract must be read to mean what it says" when "nothing was held back" after giving effect to a similar granting clause.[267]  The same result follows here.

Moreover, the notion that the Granting Clause excluded the Trusts' tort claims conflicts with the structure of the Trust Related Agreements.[268]   The Trust Agreement Waterfall directs that proceeds from all "Trust Property" be remitted to the Indenture Trustee.[269]  As noted, "Trust Property" includes "all right, title and interest of the Trust . . . in and to *any* property contributed to . . . or otherwise acquired by the Trust."[270]  Any proceeds from a tort claim belonging to the Trusts, therefore, would be "Trust Property," remitted directly to the Indenture Trustee (that is, such proceeds would be treated the same as proceeds from the Collateral).  This

---

[266] *NCUAB II*, 898 F.3d at 247–48; *see also NCUAB I*, 2016 WL 796850, at *6, *8–11 (clarifying that the underlying assignment in *Nat'l Credit* included tort claims); *but see Triaxx I*, 2017 WL 1103033, at *5 (interpreting a securitization indenture and holding that "tort claims do not transfer with a broad assignment of rights," but noting this holding was rendered "without the benefit of specific briefing").

[267] *NCUAB I*, 2016 WL 796850, at *9–10.

[268] *See Salamone v. Gorman*, 106 A.3d 354, 374 (Del. 2014) (stating that a court should interpret an agreement "in the context of the overall structure of the contract").

[269] Trust Agreement § 5.02 (JC0593).

[270] Trust Agreement § 1.01 (JC0584) (definition of "Trust Property") (emphasis supplied).

dynamic belies the notion that the parties intended to exclude any of the Trusts' extra-contractual tort claims from the Granting Clause. The only reasonable interpretation of the Granting Clause is that a right to assert these claims was transferred from the Trusts to the Indenture Trustee.

### 5. The Indenture Does Not Require the Satisfaction of Contractual Prerequisites Before the Indenture Trustee May Exercise Control over the Collateral

Having determined that the Trusts conveyed their rights in the Collateral (including the immediate and continuing right to bring Proceedings in the name of the Trusts with respect to the Collateral), I turn next to the question of whether the Indenture establishes a contractual limitation on the Indenture Trustee's rights. As explained below, it does not.

In Section 5.16(b), the Indenture contemplates the Indenture Trustee's role will change if an "Event of Default" occurs because of the Trusts' failure to repay the Notes.[271] In such an event, the Indenture states the Indenture Trustee "*shall* . . . exercise all rights, remedies, powers, privileges and claims of the [Trusts] . . . in connection with the Basic Documents."[272]

---

[271] Indenture § 5.16(b) (JC2796).

[272] Indenture § 5.16(b) (JC2796) (emphasis supplied).

89

Sections 5.03(c) and 5.04 contain similar language outlining how the Indenture Trustee's role ratchets up after an Event of Default:

| Section 5.03(c) | Section 5.04 |
|---|---|
| "If an Event of Default occurs and is continuing, the Indenture Trustee *may*, or *shall* at the written direction of [certain Noteholders], proceed to protect and enforce its rights, the rights of the holders of the Notes, by such appropriate Proceedings as the Indenture Trustee shall deem most effective to protect and enforce any such rights, whether for the specific enforcement of any covenant or agreement in this Indenture or in aid of the exercise of any power granted herein, or to enforce any other proper remedy or legal or equitable right vested in the Indenture Trustee by this Indenture or by law."[273] | "If an Event of Default shall have occurred and be continuing, the Indenture Trustee *may*, or *shall*, subject to [certain limited rights of the Noteholders to direct the Indenture Trustee] . . . institute Proceedings in its own name and as a trustee of an express trust for the collection of all amounts then payable on the notes or this Indenture."[274] |

Both Sections 5.03(c) and 5.04 implicate Section 5.11 of the Indenture, which gives the Noteholders certain limited rights to direct the Indenture Trustee regarding the Collateral:

> the Interested Noteholders, representing not less than a majority of the Outstanding Amount of the applicable [] Notes . . . shall have the right to direct the time, method and place of conducting any Proceeding for

---

[273] Indenture § 5.03(c) (JC2787) (emphasis supplied).

[274] Indenture § 5.04 (JC2789) (emphasis supplied).

any remedy available to the Indenture Trustee with respect to the Notes or exercising any trust or power conferred on the Indenture Trustee.[275]

Against this backdrop, the Owners ask the Court to declare "[t]he Indenture Trustee may not bring suit absent an Event of Default including expiration of any applicable cure period."[276] U.S. Bank, on the other hand, seeks Declarations that it (as Indenture Trustee) may prosecute, defend, or settle lawsuits concerning claims in respect of the Collateral without the occurrence of (i) an Event of Default or (ii) any other contractual predicate or condition precedent.[277] Further, U.S. Bank contends that it may bring claims in relation to the Collateral at any time "directly in its capacity as Indenture Trustee and/or directly on behalf of and in the name of the Trusts."[278]

In this regard, the Owners' main argument is that even if there is nothing in the Indenture stating that the Indenture Trustee "shall *not*" bring claims before an Event of Default (or "EOD"), the Indenture Trustee's Declarations "read"

---

[275] Indenture § 5.11 (JC2795–95).

[276] Owners' Compl. ¶ 149(b).

[277] U.S. Bank Counterclaim ¶ 3(d).

[278] U.S. Bank Counterclaim ¶ 3(e).

Sections 5.03(c), 5.04 and 5.16(b) (the "EOD Provisions") "out of the Indenture."[279]

To the extent the Owners are arguing that U.S. Bank's reading fails to give independent meaning to the EOD Provisions, that view of U.S. Bank's construction is not supported by the Indenture's plain language.

Each EOD Provision can be interpreted as a trigger for certain *mandatory* duties of the Indenture Trustee ("the Indenture Trustee *shall* …"), as well as a means by which the Noteholders may exercise a limited right to direct the Indenture Trustee.[280]  It is consistent for the Indenture Trustee, on one hand, to possess an "immediate and continuing right" to "bring Proceedings in the name of the [Trusts]" while, on the other, to have no obligation to monitor the Student Loans or otherwise "enforce" the Collateral unless an Event of Default triggers its *mandatory* duties.[281]

It is also consistent for the Indenture Trustee to possess a present right to control the

---

[279] PAB at 65.

[280] *See* Indenture § 5.03(c) (JC2787) ("The Indenture Trustee *may*, or *shall* at the written direction of the Interested Noteholders") (emphasis supplied), § 5.04 (JC2789) (same), § 5.16(b) (JC2796) ("The Indenture Trustee *shall* . . . at the direction . . . of the Interested Noteholders . . . exercise all rights, remedies, powers privileges and claims of the [Trusts].") (emphasis supplied).

[281] *See* Indenture § 3.20(b) (JC2779) ("the Indenture Trustee shall have no obligation to administer, service or collect the loans in the Indenture Trust Estate"); Indenture (Appendix A) (definition of "Grant") (JC2842).

Collateral while also possessing an independent right to "request" that the Trusts act "at the Administrator's expense," as Section 5.16(a) provides.[282]

In support of their argument that the phrase "the Indenture Trustee *may*" should be read as an implicit limitation on the Granting Clause, the Owners cite to cases interpreting contracts that lack a broad Granting Clause like the one at issue here.[283]  This distinction is critical because, as explained at length above, the plain language of the Granting Clause includes all the Trusts' "right[s]" in the Collateral as well as the "immediate and continuing" right to bring Proceedings in the name of the Trusts.[284]

---

[282] Indenture § 5.16(a) (JC2796).

[283]  Indenture (Appendix A) (JC2842) (definition of "Grant"), § 5.03 (JC2787) ("the Indenture Trustee may"), § 5.04 (JC2789) (same); *See* PAB at 65–69 (citing *U.S. Bank Nat'l Ass'n v. U.S. Timberlands Klamath Falls, L.L.C.*, 2004 WL 1699057 (Del. Ch. July 29, 2004) and *Harris Tr. & Sav. Bank v. E-II Hldgs., Inc.*, 722 F. Supp. 429, 441 (N.D. Ill. 1989)).  The Owners' citation to *Cortlandt Street*, 96 N.E.3d at 199 (addressing an argument that an indenture trustee's right to bring claims for payment "on the Notes" should be read to "mean solely a claim for payment due under the terms and conditions of the Notes" rather than, for example, a fraudulent transfer claim) (internal quotations omitted) also misses the mark.  There, the court addressed the specific types of claims an indenture trustee may bring after an event of default (*e.g.*, fraudulent transfer claims versus a simple breach of contract claim to collect payments under notes), but did not hold that permissive language should be read as a prohibition of *all* claims.  *Id.*

[284] Indenture (Granting Clause) (JC2760); Indenture (Appendix A) (JC2842) (definition of "Grant").

Since the Indenture Trustee has the "immediate and continuing" right to bring Proceedings in the name of the Trusts, as well as all the Trusts' "rights" to the Collateral, the Indenture must "be read to mean what it says."[285]   Once again, the Court will not "read the sweeping language of the Granting Clause to have limits that it lacks on its face."[286]   For these reasons, U.S. Bank has offered the only reasonable interpretation of the Trust Related Agreements on this issue.   The Indenture Trustee may bring suit as to the Collateral before an Event of Default; there are no contractual conditions precedent to the exercise of this right.

*****

Based on the analysis above, and subject to the clarifications I have provided: (i) U.S. Bank's Motion as to its Declarations A, C, D, E, F, G, Q and R (ii) AMBAC's Motion as to its Declaration O and P; (iii) the Noteholders' Motion as to their Declarations N and O are GRANTED; and (iv) the Owners' Motion is DENIED as to its Declarations A and B.   U.S. Bank's motion is DENIED as to its

---

[285] *BlackRock*, 247 F. Supp. 3d at 413 (internal quotation omitted); Indenture (Granting Clause) (JC2760); Indenture (Appendix A) (JC2842) (definition of "Grant"); *see also Kass v. Kass*, 235 A.D.2d 150, 159 (N.Y. Supp. Ct. App. Div. 1997), *aff'd*, 696 N.E.2d 174 (N.Y. Ct. App. 1998) ("If the language is in any way ambiguous, the law does not favor a construction which creates a condition precedent.").

[286] *BlackRock*, 247 F. Supp. 3d at 413.

Declaration B because its reading of the Indenture in support of that Declaration is not the only reasonable construction of the Indenture.

### D. The Trusts' Governance and Direction Rights

As I turn to the next major area of dispute regarding the Trusts' governance, I begin by highlighting a rare example of agreement between the parties.  Each faction agrees that the Owners do not have a "freestanding right to act on behalf of the Trusts."[287]  Beyond this simple statement, however, the parties read the Trust Related Agreements very differently as to whom may direct the Trusts and when.

In response to the specific questions posed by the parties' Declarations, I find as follows: (i) the Owner Trustee is the Trusts' trustee, and the Owners cannot remove the Owner Trustee from this role; (ii) the Owners have circumscribed rights to direct the Owner Trustee; (iii) certain Indenture Parties can act in the name of the Trusts as to the Collateral; (iv) AMBAC has a right to consent to certain Owner directions before they are followed; and (v) certain negative covenants in the Indenture restrict the Trusts' power to sell Collateral or amend Basic Documents. I address each Declaration *seriatim.*

---

[287] *See* PAB at 85.

### 1. Absent Delegation, the Owner Trustee Has the Sole Authority to Act for the Trusts, and the Owners Cannot Supplant the Owner Trustee From this Role

Section 3806(a) of the DSTA provides, "[e]xcept to the extent otherwise provided in the governing instrument of a statutory trust, the business and affairs of a statutory trust shall be managed by or under the direction of its trustees."[288] Apparently with this direction in mind, Section 2.03(b) of the Trust Agreement states:

> until the Indenture is discharged, . . . the Trust will act solely in its own name and the Owner Trustee or other agents selected in accordance with this Agreement will act on behalf of the Trust . . . but such action shall not be in violation of the terms of this Agreement.[289]

Based on this unambiguous language, the Trust Agreement does not alter the default rule of Section 3806(a), and the Owner Trustee is the *only* entity authorized to act directly on behalf of the Trusts.[290]

Moving beyond this baseline premise, the DSTA also provides that:

> [e]xcept to the extent otherwise provided in the governing instrument of a statutory trust, a trustee of a statutory trust has the power and authority to delegate to 1 or more other persons the trustee's rights,

---

[288] 12 *Del. C.* § 3806(a).

[289] Trust Agreement § 2.03(b) (JC0586) (emphasis supplied).

[290] 12 *Del. C.* § 3806(a).

powers or duties to manage and control the business and affairs of the statutory trust.[291]

Again, the Trust Agreement does not "otherwise provide" with respect to delegation.[292] The Trust Agreement expressly allows that the Owner Trustee may "act directly or . . . through agents or attorneys pursuant to agreements entered into with any of them."[293]

Indeed, the Trust Related Agreements contemplate the Owner Trustee *will* make two critical delegations of its authority to act on behalf of the Trusts. First, in Section 14.03, entitled "Pledge of Collateral by Owner Trustee is Binding," the Trust Agreement provides:

> [t]he pledge of any Trust Property to any Person by the Owner Trustee made under any Trust Related Agreement [(i.e., the Indenture)] . . . shall bind the Owners and shall be effective to transfer or convey the rights of the Owner Trustee and the Owners in and to such Trust Property.[294]

By this provision, Section 14.03 ties a transfer of the *Trusts* "right, title and interest . . . in and to *any property*" to an automatic transfer of "the rights of the

---

[291] 12 *Del. C.* § 3806(i).

[292] 12 *Del. C.* § 3806(i).

[293] Trust Agreement § 9.03(b) (JC0603).

[294] Trust Agreement § 14.03 (JC0609).

Owner Trustee and the Owners in and to such Trust Property."[295]  Thus, if the Trusts transfer Trust Property, the Owner Trustee and the Owners' rights associated with the transferred property will automatically flow along with the transferred property.[296]

To reiterate, in the Indenture, the Trusts transferred all of their "right, title and interest" in the Collateral—including the "immediate and continuing" right to bring Proceedings in the name of the Trusts with respect to the Collateral.[297]  The Indenture is a Trust Related Agreement incorporated by reference into the Trust Agreement.[298] And, in the Indenture, the Owner Trustee, the Owners and the Trusts granted their

---

[295] Trust Agreement § 1.01 (definition of "Trust Property") (JC0584) (emphasis supplied), § 14.03 (JC0609).

[296] Here again, this is not to say that the Owner Trustee and Owners may not "share" some or all of these rights with the Indenture Trustee.

[297] Indenture (Granting Clause) (JC2760); Indenture (Appendix A) (definition of "Grant") (JC2842).

[298] Trust Agreement § 1.01 (JC0584) (definition of "Trust Related Agreements").

respective rights in the Collateral to the Indenture Trustee.[299]  The Indenture Trustee, thus, can act in the name of the Trusts "with respect" to the Collateral.[300]

As for the second key delegation, per the Administration Agreement, the Owner Trustee and the Trusts delegated their respective duties to the Administrator.[301]  The Administrator, in turn, agreed to "take all appropriate action that is the duty of the [Trusts] to take pursuant to the Trust Related Agreements," and to that end, the Trusts and the Owner Trustee appointed the Administrator as the Trusts' attorney-in-fact.[302]  Accordingly, the Administrator also can act on behalf of the Trusts in matters specified in the Administration Agreement.[303]

---

[299] In this regard, under the Grant, the Indenture Trustee received the respective rights of the Owners and the Owner Trustee to direct the Trusts with regards to the Collateral under Section 4.01(b) and Section 2.03(b) of the Trust Agreement.  *See* Trust Agreement § 14.03 (JC0609).

[300] Indenture (Granting Clause) (JC2760); Indenture (Appendix A) (definition of "Grant") (JC2842).

[301] Administration Agreement § 1(a)(i) (JC3661).

[302] Administration Agreement § 1(a)(i) (JC3661), § 1(b)(i) (JC3662); 2A C.J.S. *Agency* § 11 (2020) ("An attorney-in-fact is one given authority under a power of attorney to act as agent with respect to matters set forth therein.").

[303] Administration Agreement § 1(b)(i) (JC3662) (stating the Administrator may "execute[] on behalf of the [Trusts] all such documents, reports, filings, instruments, certificates and opinions" related to certain duties of the Trusts).

With these two examples in mind, while the *Owner Trustee* may be able to authorize agents to act on behalf of the Trust under Section 9.03(b), nothing in the Trust Agreement empowers the *Owners* unilaterally to supplant the Owner Trustee's role in managing the Trusts.[304]  To re-emphasize, 12 *Del. C.* § 3806(a) of the DSTA provides that "Except to the extent otherwise provided [in the Trust Agreement,] the business and affairs of a statutory trust *shall be managed by or under the direction of its trustees*."[305]  The Trust Agreement confirms that the Owner Trustee—not the Owners—is the Trusts' sole trustee empowered to manage the Trusts.[306]

The Owners do have a right to direct the Owner Trustee as to non-ministerial matters, but nothing in Section 4.01 supports the notion that this non-ministerial direction right includes the power to force the Owner Trustee to delegate its role as Owner Trustee to another party.[307]  This means that any order from the Owners that would direct the Owner Trustee to authorize a third party to act on behalf of the Trusts, subject only to the Owners' directions, would contravene 12 *Del. C.*

---

[304] Trust Agreement § 9.03(b) (JC0603).

[305] 12 *Del. C.* § 3806(a) (emphasis supplied).

[306] Trust Agreement § 4.01(a) (JC0590).

[307] Trust Agreement § 4.01(a) (JC0590).

§ 3806(a) and Section 4.01(a) of the Trust Agreement.[308]  These provisions empower the Owner Trustee (and *only* the Owner Trustee) to manage the business and affairs of the Trusts—subject to *direction* from the Owners.[309]

Simply put, only the Owner Trustee can fulfil the role of the Owner Trustee. If the *Owner Trustee* decides to delegate its authority, it may.[310]  But any non-ministerial Owner direction under Section 4.01(a) *must* flow through the Owner Trustee so that the Owner Trustee can exercise its right to decline to follow Owner instructions that contravene the Trust Related Agreements (as discussed below).[311] Any other reading of the Trust Agreement would allow the Owners to direct the Owner Trustee to delegate all of its authority to the Owners, who would then be free to manage the Trusts as to non-ministerial matters without review by the Owner Trustee.  This construction is unreasonable because it would render the Owner Trustee's role in Section 4.02 "meaningless," "illusory," and "mere surplusage."[312]

---

[308] 12 *Del. C.* § 3806(a); Trust Agreement § 4.01(a) (JC0590).

[309] 12 *Del. C.* § 3806(a); Trust Agreement § 4.01(a) (JC0590).

[310] Trust Agreement § 9.03(b) (JC0603).

[311] Trust Agreement § 4.02(a) (JC0591).

[312] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010).

Even when following Owner directions, the Owner Trustee remains the party through whom the Trusts must act (unless it has elected properly to delegate that authority).  Under Section 9.03(b) of the Trust Agreement, once the Owners issue a valid instruction, "the Owner Trustee" may determine how to execute the instruction, either (i) "directly" or (ii) "at the expense of the Trust, through agents."[313]  Nothing in Section 9.03(b) can be read as giving the Owners the right to direct the Owner Trustee when making this choice.[314]  To be sure, if the Owner Trustee decides to act through agents, the Owners still possess the right to direct the Owner Trustee as to non-ministerial matters, but the Owners cannot cut the Owner Trustee out of the loop.

This principle is important because the court in the CFPB Action struck down an attempt by the Owners to do just that.[315]  Specifically, the Owners purported to direct the Owner Trustee to authorize attorneys to represent and act on behalf of the Trusts—subject only to directions from the Owners.[316]  These attorneys then

---

[313] Trust Agreement § 9.03(b) (JC0603).

[314] *See CFPB Decision*, 2020 WL 2915759, at *3.

[315] *CFPB Decision*, 2020 WL 2915759, at *5.

[316] *Id.*

102

purported to execute the PCJ on behalf of the Trusts during negotiations with the CFPB.  The court rejected this attempt and held that "the Owner Trustee remains the party through whom [the PCJ] must be" executed.[317]   Stated differently, if the Owners direct the Owner Trustee to hire counsel for the Trusts, those professionals would be contractors *of the Trust*—not "delegates" of the Owner Trustee.[318]  If the Owners then wish to direct the Trusts' counsel on non-ministerial matters, any such direction must flow through the Owner Trustee.

*****

Based on the foregoing analysis, and subject to the clarifications I have provided, the Owners' Motion as to their Declarations W, X and Y is DENIED, and the Noteholders' Motion as to their Declarations C and D is GRANTED.

### 2.  The Owners Have Circumscribed Rights to Direct the Owner Trustee

While the Owners cannot supplant the Owner Trustee from its role as the Trusts' trustee, under Section 4.01 of the Trust Agreement, the Owner Trustee must "take such action or refrain from taking such action . . . with respect to nonministerial matters, as it shall be directed by *all* the Owners."[319]   The Trust Agreement

---

[317] *Id.*

[318] *Cf.* PAB at 85.

[319] Trust Agreement § 4.01(a) (JC0590) (emphasis supplied).

contemplates that, as a matter of default, the Owners may act on a matter if a super majority of the Owners consent to the action.  Section 4.03, captioned "Super-majority Control," states:

> *Except as otherwise expressly provided* in this Agreement, any action which may be taken or consent or instructions which may be given by the Owners under this Agreement may be taken by the Owners holding in the aggregate at least 85%" interest in the Trusts.[320]

The Trust Agreement *does* "otherwise expressly provide" in Section 4.01 when it states, "the Owner Trustee will take such action or refrain from taking such action . . . as it shall be directed by *all* the Owners for so long as any of the Notes are outstanding."[321]  When read together, the plain meaning of Sections 4.01 and 4.03 is that the Owner Trustee is to follow instructions issued by "*all*" of the Owners on non-ministerial matters—subject to limitations provided in Section 4.02 (discussed below).  As non-exclusive examples of "nonministerial" matters, the Trust Agreement lists, (i) initiating any "claim" by the Trusts or compromising any lawsuit "brought by or against the Trust" except for claims initiated in the ordinary

---

[320] Trust Agreement § 4.03 (JC0592) (emphasis supplied).

[321] Trust Agreement § 4.01(a) (JC0590) (emphasis supplied).

course of business to collect proceeds from the Student Loans and (ii) amending or modifying any Trust Related Agreement.[322]

Section 4.01 is expressly limited by Section 4.02, which constrains the Owners' ability to direct the Owner Trustee.[323]  Specifically, the Owner Trustee need not follow Owner directions that would violate the Trust Related Agreements or expose the Owner Trustee to the risk of personal liability for which the Owners have not provided indemnity satisfactory to the Owner Trustee.[324]  Moreover, beyond simply empowering the Owner Trustee to ignore improper directions, the Trust Agreement expressly *forbids the Owners* from directing the Owner Trustee to act or refrain from acting in a manner "contrary to" the Trust Agreement or the Trust Related Agreements.[325]

Given the uncertainty that can accompany contract interpretation, the Owner Trustee need not be certain that an Owner instruction violates the Trust Related

---

[322] Trust Agreement § 4.01(b) (JC0590–91).

[323] Trust Agreement § 4.02 (JC0591).

[324] Trust Agreement § 4.02(a) (JC0591).  Among the reasons the Owner Trustee might refuse an Owners' direction are instances where implementing the direction will (i) violate the Trust Related Agreements, (ii) create negative tax consequences, (iii) cause certain negative regulatory consequences or (iv) subject the Owner Trustee to certain types of personal jurisdiction outside Delaware.  Trust Agreement § 4.02 (JC0591–92).

[325] Trust Agreement § 4.02(b) (JC0591).

Agreements before refusing to comply.  All that is required for a valid Owner Trustee refusal is that the Owner Trustee "reasonably determine[s]" *or* is "advised by counsel" that: (i) an Owner instruction is contrary to "any document contemplated" by the Trust Agreement or is "otherwise contrary to law," (ii) the instruction "is likely to result in personal liability on the part of the owner Trustee,"[326] or (iii) the order would adversely affect the tax status of the Trusts.[327]  In connection with this provision of the Trust Agreement, the Owners ask the Court for two related Declarations:

- Declaration E: "The Owners may direct the Owner Trustee to take any action with respect to the Trusts, subject solely to the limitations set forth in Section 4.02(b)" (i.e., that the Owners cannot direct the Owner Trustee to take an action contrary to the Trust Related Agreements).[328]

- Declaration G: "The only grounds for the Owner Trustee to refuse an Owner direction are the specific exceptions set out in Sections 4.02 of the Trust Agreements."[329]

---

[326] This ground for refusal is unambiguously eliminated if the Owners provide the Owner Trustee "indemnification or security reasonably satisfactory to the Owner Trustee against all costs, expenses and liabilities arising from the owner Trustee's taking of such action." Trust Agreement § 4.02(a) (JC0591).

[327] Trust Agreement § 4.02(a) (JC0591).

[328] Owners' Compl. ¶ 149(e).

[329] Owners' Compl. ¶ 149(g).

The Owners correctly concede that these Declarations, as written, would still prohibit the Owners from directing the Owner Trustee to take an action inconsistent with the "purposes" of the Trusts because such an order would contradict the terms of the Trust Agreement.[330]  The Owners also correctly acknowledge that these Declarations would not allow a binding Owner instruction that would violate the implied covenant of good faith and fair dealing that inheres in every contract.[331]

As these concessions make clear, the Owners are not arguing that the language found in Section 4.02, alone, answers whether the Owner Trustee is obliged (or not) "to follow Owner instructions."[332]  Rather, these Declarations reference (and incorporate) all Trust Related Agreements as potential sources for reasons why the Owners would be prohibited from issuing an instruction or the Owner Trustee would be entitled to decline to act.

---

[330] *See* PRB at 49 (citing Trust Agreement § 8.09 (JC0601) (prohibiting the Owner Trustee from taking an action that would be "inconsistent with the purposes of the Trust")).  These purposes include the execution of the Indenture in which the Trusts agreed to Grant the Collateral to the Indenture Trustee "for the benefit of the holders of the Notes."  Indenture (Granting Clause) (JC2760); Trust Agreement § 2.03 (JC0586).

[331] PRB at 54; *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009) ("The implied covenant of good faith and fair dealing inheres in every contract and requires that a party in a contractual relationship refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain.") (internal quotations omitted).

[332] *See* JAB at 57.

107

Setting aside any fiduciary duties the Owners owe to AMBAC and the Noteholders, an analysis of the propriety of the Owners' instructions and the Owner Trustee's response thereto is limited to the language of the Trust Related Agreements and the implied covenant of good faith and fair dealing.[333]  If any interested party wishes to bring a contract-based challenge to an Owner instruction, it must support the claim(s) with these tools in hand, and these tools alone.[334]

If a dispute arises between the parties over the propriety of an Owner direction, as long as other jurisdictional requirements are met, then the affected parties could seek declaratory relief under 10 *Del. C.* § 6502, which allows courts of this state to construe "a contract either before or after there has been a breach thereof."[335]  Indeed, the purpose of the Declaratory Judgment Act is to "afford relief from uncertainty and insecurity with respect to rights, status and other legal

---

[333] I address the scope of the Owners' fiduciary duties elsewhere in this Opinion.

[334] *See, e.g.*, *In re Nat'l Collegiate*, 2020 WL 4813889, at *10, *12 (holding that a specific Owner direction was invalid both because it violated the Granting Clause and because it amended a Basic Document without the Indenture Trustee's consent).

[335] 10 *Del. C.* §§ 6502, 6503; *Horizon Personal Commc'ns, Inc. v. Sprint Corp.*, 2006 WL 2337592, at *20 n.169 (Del. Ch. Aug. 4, 2006) (stating that, as long as other jurisdictional requirements are met, a party could bring a claim under the Declaratory Judgment Act "to determine a controversy between the parties as to the interpretation of" an agreement) (internal citation and quotation omitted).

relations," which would fairly encompass a judicial resolution of whether (or not) a particular Owner direction is "contrary" to the Trust Related Agreements.[336]  As I state elsewhere in this Opinion, if a court rendered final judgment in such an action, the doctrines of *res judicata* and collateral estoppel would govern the judgment's preclusive effect.

*****

Based on the foregoing analysis and subject to the clarifications I have provided, the Court addresses the parties' specific requests for declaratory relief as follows: (i) the Owners' Motion as to their Declarations C, E, G, H, I, J, N and FF (ii) the Noteholders' Motion as to their Declaration B (iii) the Owner Trustee's Motion as to its Declaration C are all GRANTED; and (iv) the Owners' Motion as to their Declaration M is DENIED.

### 3. The Basic Documents Make Clear The Indenture Trustee May Act Directly on Behalf of the Trusts as to the Collateral; The Basic Documents Are Not Clear Regarding the Extent to Which AMBAC and the Indenture Trustee May *Direct* the *Trusts* to Act

The parties dispute the extent to which the Basic Documents authorize the Indenture Trustee to act directly with respect to the Collateral and the extent to which the Basic Documents authorize AMBAC and the Noteholders (either directly or

---

[336] 10 *Del. C.* § 6512.

through the Indenture Trustee) to issue directions to the Trusts.  As explained below, the answer to the first is clear; the answer to the second not so much.

> Section 3806(a) of the DSTA provides, in relevant part:

> To the extent provided in the governing instrument of a statutory trust, any person (including a beneficial owner) shall be entitled to direct the trustees or other persons in the management of the statutory trust.[337]

As already discussed, Section 4.01 of the Trust Agreement gives the Owners a circumscribed right to direct the Owner Trustee which, in turn, is authorized to act on behalf of the Trusts.[338]  The Owners' Declaration F asks the Court to declare that the "Indenture Trustee, the Administrator, and [AMBAC] are not 'persons' authorized by the Trust Agreements to direct the Owner Trustee concerning nonministerial matters."[339]  This Declaration, as worded, is overbroad and cannot be granted.

In support of their proffered Declaration, I gather one of the Owners' main arguments is that, to the extent the Indenture Parties find rights to direct the Trusts in contracts other than the Trust Agreements, such rights would be invalid under

---

[337] 12 *Del. C.* § 3806(a).

[338] Trust Agreement § 4.01 (JC0590).

[339] Owners' Compl. ¶ 149(f).

Section 3806(a) of the DSTA because the Trust Agreement is the lone governing instrument.[340]  But, as I have explained, the Trust Related Agreements (including the Indenture and the Administration Agreement) are incorporated by reference into the Trust Agreement.[341]  The fact that direction rights are traced to other Trust Related Agreements, therefore, cannot be invoked as a basis to invalidate the direction.

The Owners also argue that a naked right to direct the *Trusts* to do something (without more) cannot be effective because only the Owner Trustee may act for the Trusts.[342]  To be sure, Section 2.03(b)(i) of the Trust Agreement does provide that *only* the Owner Trustee may act on behalf of the Trusts (unless proper delegation by the Owner Trustee has occurred).[343]  According to the Owners, because the Trust Agreement is clear on this point, to be valid, a direction right must trace back to the

---

[340] *See* PRB at 45.

[341] *See* Section II.B.  Again, given this dynamic, the Trust Related Agreements should be "interpreted together" and "regarded as a part of" the Trust Agreement.  *Hirst*, 83 A.2d at 681; *Town of Cheswold*, 188 A.3d at 819.

[342] PRB at 45–47.

[343] *See* Trust Agreement § 2.03(b)(i) (JC0586).

111

root of Section 2.03(b)(i), either as (i) a right to direct the Owner Trustee or (ii) a right to direct another party to which the Owner Trustee has delegated authority.[344]

To be clear, even if the Owners' reading of the Trust Agreement is correct, as I have explained more than once above, the Grant conveys to the Indenture Trustee the right to act directly in the *name* of the Trusts *as to the Collateral*.[345] The Granting Clause traces to Section 2.03(b)(i) because the Trust Agreement states that any "pledge" (i.e., the Grant) "*shall be effective to transfer* or convey *the rights of the Owner Trustee . . . in and to such Trust Property*."[346] In matters related to the Collateral, therefore, the Indenture Trustee has the option of acting in the Trusts' name or, alternatively, directing the Administrator to act on behalf of the Trusts with respect to non-ministerial matters.[347]

---

[344] PRB at 45–47; *See Brinckerhoff v. Enbridge Energy Co., Inc.*, 159 A.3d 242, 254 (Del. 2017) (stating it is a "settled" rule of contract interpretation that a court must "prefer specific provisions over more general ones").

[345] *See* Indenture (Granting Clause) (JC2760) (emphasis supplied); Indenture (Appendix A) (definition of "Grant") (JC2842). This aspect of the Granting Clause is discussed elsewhere in this Opinion. For the Insured Indenture, AMBAC has the right to "direct the time, method and place of conducting any Proceeding for any remedy available to the Indenture Trustee . . . or exercising any trust or power conferred on the Indenture Trustee" as long as certain prerequisites are met. Insured Indenture § 5.11 (JC3495).

[346] Trust Agreement § 14.03 (JC0609) (emphasis supplied).

[347] Administration Agreement § 1(c)(i) (JC3663).

Likewise, as explained above, the Administrator has a power of attorney to act in the name of the Trusts.[348]  This right also traces to Section 2.03(b)(i) because the Owner Trustee executed the Administration Agreement, which authorizes the Administrator to execute certain "documents, reports, filings, instruments, certificates and opinions" "on behalf of the [Trusts.]"[349]  The Administration Agreement affirms the Administrator's responsibility to use this power of attorney to perform "the duties of the [Trusts]," as well to discharge its obligations to follow directions given by the Indenture Trustee or AMBAC.[350]

The upshot is that the Indenture Trustee may act in the name of the Trusts as to the Collateral.  Because the definition of "Collateral" is so broad, any further debate over the Indenture Trustee's direction rights is largely academic since it is difficult to imagine a circumstance where the Indenture Trustee's concerns (and

---

[348] *See* Administration Agreement 1(b)(i) (JC3662); *see also* Indenture (Appendix A) (JC2831) (defining an "Authorized Officer" of the Trusts to include "the Administrator who is authorized to act for the Owner Trustee and/or the Administrator in matters relating to the [Trusts]").

[349] *See* Administration Agreement (recitals) (JC3660); Administration Agreement § 1(b)(i) (JC3662).

[350] Administration Agreement § 1(a)(i) (JC3661), § 1(c)(i) (JC3663); Insured Administration Agreement § 1(c)(i) (JC3890).

resulting actions) would relate to some matter other than the Collateral.[351] Nevertheless, for the sake of completeness, I address the instances where the Trust Related Agreements appear to provide the Indenture Trustee and AMBAC with specific rights to direct "the Trusts" – Sections 5.16, 3.19 and 3.08(i) of the Indenture and Section 8.1 of the Trust Agreement.[352]   Because the parties dispute the proper construction of each of these provisions, I address them briefly below.

Sections 5.16 and 3.19 of the Indenture, on their face, permit the Indenture Trustee (and AMBAC where applicable) to direct the *Trusts*.[353]   Specifically, in Section 5.16(a), the Indenture Trustee has the right to direct the *Trusts* to "exercise any and all rights, remedies, powers and privileges lawfully available to the [Trusts] under or in connection with the Basic Documents."[354]   Section 3.19 is similar in that

---

[351] Thus, by of example, if a third party asserted claims against the Trusts relating to or arising out of the Collateral, then the Indenture Trustee could defend or settle that litigation directly on behalf of the Trusts if it chose to do so. *See* Indenture (Granting Clause, Subsection (e)) (JC2761); Indenture (Appendix A) (definition of "Grant") (JC2842); Trust Agreement § 14.03 (JC0690).  As I have stated elsewhere, however, nothing in this Opinion holds that the Indenture Trustee could use its rights to act on behalf of the Trust to breach the Indenture or that it would be protected from suit if it did so. *See, e.g.*, Indenture § 3.14 (JC2776) (stating that the Student Loans "may only be sold . . . by the Indenture Trustee" if certain conditions are met).

[352] *See* JAB at 53–54.

[353] Indenture § 3.19 (JC2778) ("the [Trust] will"), § 5.16 (JC2796) ("the [Trust] shall").

[354] Indenture § 5.16(a) (JC2796).  For the Insured Trusts, the Indentures and Administration Agreements also provide AMBAC with similar rights.  *See* Insured Indenture § 5.16

it gives the Indenture Trustee a right to request that the *Trusts* "do such further acts as may be reasonably necessary or proper to carry out more effectively the purpose of this Indenture." [355]

At first glance, both provisions appear clear enough. In certain circumstances, the Indenture Trustee may direct the Trusts. But the clarity is fleeting. Without more context, it is unclear how a right to direct "the Trusts" flows through the Trust Related Agreements or what legal or practical significance the parties intended for these rights to carry. On the one hand (as the Indenture Parties seem to argue), it is reasonable to interpret a right to direct the Trusts as a right to direct the Owner Trustee because, beyond the Indenture Trustee's right to act directly with respect to the Collateral, only the Owner Trustee (or its designees) may cause the Trusts to act.[356] On the other hand, as the Owners correctly point out, the drafters of the Trust

---

(JC3497). The Insured Indenture contains materially similar language and should be interpreted the same as to AMBAC provided that it meets the other criterion in Section 5.16. *See* Insured Indenture § 5.16 (JC3497).

[355] *See* Indenture § 3.19 (JC2778); JAB at 53. AMBAC has a similar direction right under Section 3.19 of the Insured Indenture. *See* Insured Indenture § 3.19 (JC3480). For purposes of this Opinion, the language of Section 3.19 is materially similar in both agreements and should be interpreted in the same way as to the Indenture Trustee and AMBAC.

[356] *See* Trust Agreement § 2.03 (JC0586) ("The Trust will act solely in its own name and the Owner Trustee . . . will act on behalf of the Trust."); JAB at 23; Reply Br. in Supp. of AMBAC Assurance Corp.'s Mot. for J. on the Pleadings ("AMBAC RB") (D.I. 447) at 23.

Related Agreements knew how to create a right to direct the Owner Trustee when they intended to grant that right by doing so in express, declarative language.[357]

On this record, I am unable to provide a definitive declaration of what these "Trust" direction rights actually mean. The Indenture must be read to give "independent meaning" to each provision, and this court is disinclined to infer that unexplained differences in contract language are the result of "sloppy drafting."[358] Without further clarity on how (or if) a direction from the Indenture Trustee to the Trusts would work, I cannot declare that the right exists.[359]

---

[357] Trust Agreement § 2.03 (JC0586); PRB at 45–46.

[358] *Majkowski v. Am. Imaging Mgmt. Servs., LLC*, 913 A.2d 572, 588 (Del. Ch. 2006) ("Courts attempt to interpret each word or phrase in a contract to have an independent meaning."); *Norton v. K-Sea Transp. P'rs, L.P.*, 67 A.3d 354, 364 (Del. 2013) (declining to infer that language was the result of "sloppy drafting" where drafters "new how to impose an affirmative obligation when they so intended").

[359] I note that the Indenture Parties' argument that the right to direct the Trusts dovetails with the Indenture Trustee's right to direct the Administrator (and Ambac's similar right with respect to the Insured Trusts), as provided for in the Administration Agreement, also falls short because, here again, the argument fails to trace how a direction to the Trusts would flow. Would it be directed to the Owner Trustee (none of the provisions say that), or to the Administrator (same), or would it be directed to an inanimate Trust in hopes that some constituent with authority to act for the Trust might pick it up and execute it? *See* AMBAC RB at 23 ("The Indenture Trustee (and AMBAC and the Noteholders) are empowered by [] Section 5.16 to secure the Administrator's performance of its duties on behalf of the Trusts."); JAB at 53 (arguing Sections 5.16 and 3.19 are "direction rights").

116

Turning to the other disputed direction rights, AMBAC and U.S. Bank assert that the Indenture Trustee (and AMBAC as to the Insured Trusts) has the right to direct the Trusts "with respect to the disposition of the assets and property of those Trusts" under Section 3.08(i) of the Indenture.[360]   That provision states, in relevant part, "the [Trust] shall not . . . sell . . . the properties or assets of the [Trusts] . . . unless directed to do so by the Indenture Trustee pursuant to the terms hereof."[361]   While Section 3.08(i) prohibits a sale of the Student Loans absent direction from the Indenture Trustee, nothing in Section 3.08(i) explains when or how the Indenture Trustee could issue such an order or to whom specifically it would be directed.

The only guidance provided by Section 3.08(i) is that any direction from the Indenture Trustee regarding the sale of Trust assets must be "*pursuant to the terms hereof.*"[362]   It appears the relevant "terms hereof" refer to Section 3.14 of the Indenture, which states the "Financed Student Loans may only be sold . . . by the

---

[360] AMBAC RB at 36–37; Indenture § 3.08(i) (JC2774); Insured Indenture § 3.08(i) (JC3475).

[361] Indenture § 3.08(i) (JC2774); Insured Indenture § 3.08(i) (JC3475) (same except for "unless directed to do so by the Indenture Trustee or AMBAC").

[362] Indenture § 3.08(i) (JC2774).

Indenture Trustee . . . if the Indenture Trustee" receives certain directions from the Administrator.[363]   This, of course, says nothing about a right belonging to the Indenture Trustee or AMBAC unilaterally to direct the Trusts to dispose of assets.

Finally, AMBAC and U.S. Bank's attempt to invoke Section 8.01 of the Trust Agreement as authority for the Administrator to direct the Owner Trustee fails under the weight of the provision's clear terms.[364]   In relevant part, Section 8.01 states, "the Owner Trustee is authorized to . . . take such action as the Administrator directs with respect to the Trust Related Agreements."[365]   On its face, this language only *authorizes* the Owner Trustee to follow Administrator directions; it does not explain how or when the Administrator, itself, has the right to direct the Owner Trustee. Without more, Section 8.01 does not establish the Administrator's right to direct the Owner Trustee.

*****

Based on the foregoing analysis and subject to the clarifications I have provided, (i) AMBAC's Motion as to its Declarations K, L and N, (ii) the Owners'

---

[363] Indenture § 3.14 (JC2777).

[364] *See* JAB at 54; Trust Agreement § 8.01 (JC0599).

[365] Trust Agreement § 8.01 (JC0599).

Motion as to their Declaration F and (iii) the Noteholders' Motion as to their Declaration M are all DENIED.

### 4. AMBAC Does Not Have the Right to Direct the Owner Trustee, But Any Owner Directions to the Owner Trustee Regarding Non-Ministerial Matters Related to the Insured Trusts Require AMBAC's Consent Before Execution

In AMBAC's Declaration M, it asks the Court to declare that, as to certain trusts for which AMBAC provides reinsurance, "AMBAC has the right to direct the Owner Trustee."[366]  In support of this Declaration, AMBAC cites Section 8.06 of the Trust Agreement for the Insured Trust,[367] which provides:

> In the event that the Owner Trustee is unable to decide between alternative courses of action, or is unsure as to the application of any provision of this Agreement or any Trust Related Agreement . . . the Owner Trustee may give notice . . . to the Owners and [AMBAC] requesting instructions and, to the extent that the Owner Trustee shall have acted or refrained from acting in good faith in accordance with any instructions . . . received from [AMBAC], the Owner Trustee shall not be liable.[368]

On its face, this language does not amount to a right to direct the Owner Trustee.  The effect of this provision is limited to protecting the Owner Trustee from liability, rather than granting AMBAC a direction right.  Like the other Trust

---

[366] AMBAC Counterclaim ¶ M.

[367] JAB at 55.

[368] Master Trust Agreement § 8.06 (JC0029).

119

Agreements, the affirmative right to direct the Owner Trustee of the Insured Trust is set forth in Section 4.01(a), which states, "The Owner Trustee will take such action or refrain from taking such action . . . as it shall be directed by all the Owners with the consent of [AMBAC]."[369]

Any instructions AMBAC provides under Section 8.06 are not binding on the Owner Trustee and, if followed, are limited in their effect to insulating the Owner Trustee from monetary liability. On the other hand, to the extent the Owners direct the Owner Trustee to take a non-ministerial action without obtaining AMBAC's consent, the Insured Trust Agreement would have been breached, and AMBAC would have a right to pursue a remedy.[370] At this stage, however, it would be premature to declare the exact nature of the remedy to which AMBAC would be entitled.[371]

---

[369] Master Trust Agreement § 4.01(a) (JC0018).

[370] Master Trust Agreement § 4.01(a) (JC0018).

[371] *See, e.g.*, *Zimmerman v. Crothall*, 62 A.3d 676, 698 (Del. Ch. 2013) (noting that an operating agreement "required an amendment approved by the Common unitholders" but only awarding $1 in damages after trial).

***** 

Based on the foregoing and subject to the clarifications I have provided, AMBAC's Motion as to its Declaration C is GRANTED.  AMBAC's Motion as to its Declaration M is DENIED.

**5. The Indenture Limits the Owners' Ability to Amend the Basic Documents While the Scope of Other Negative Covenants is Unclear at this Stage**

AMBAC (joined by the Noteholders) asks the Court to declare that neither the Owners nor the Owner Trustee acting at the direction of the Owners can (i) cause the Trusts to amend any terms of the Collateral or the Basic Documents or (ii) transfer or otherwise dispose of any Trust Property without consent from the Indenture Trustee, the Noteholders and AMBAC (with respect to the Insured Trusts).[372]  In support of this Declaration, AMBAC cites Sections 3.07(f) and 3.08(i) of the Indenture (the "Amendment and Sale Provisions"), which provide, respectively:

> 3.07(f): The [Trust] agrees that it will not, without the prior written consent of the Indenture Trustee [and either (i) a majority of the Noteholders or (ii) AMBAC as to the Insured Indenture] amend, modify, waive, supplement, terminate or surrender, or agree to any amendment, modification, supplement, termination, waiver or

---

[372] AMBAC Counterclaim ¶¶ A, B, F; Noteholder OB at 29.

surrender of, the terms of any Collateral or the Basic Documents, except to the extent otherwise provided therein.[373]

And

3.08(i): So long as any Notes are Outstanding, the [Trusts] shall not: [] except as expressly permitted by this Indenture or any other Basic Document, sell, transfer, exchange or otherwise dispose of any of the properties or assets of the [Trust] . . . unless directed to do so by the Indenture Trustee [or AMBAC as to the Insured Trusts] pursuant to the terms hereof.[374]

While the plain meaning of the Amendment and Sale Provisions requires consent from either the Indenture Trustee, AMBAC or the Noteholders before Basic Documents may be amended or Trust Property can be transferred, both sections are qualified by the phrase "except to the extent otherwise provided" and "except as expressly permitted."[375]   AMBAC explains away this language by declaring, with no analysis, "there is no such provision in the Indentures applicable to" these Declarations.[376]   For their part, the Owners seize on the qualifying language in the

---

[373] Indenture § 3.07(f) (JC2773); Insured Indenture §3.07(f) (JC3474); Indenture § 3.07(c) (JC2773) (similar).

[374] Indenture § 3.08(i) (JC2774); Insured Indenture § 3.08(i) (JC3475).

[375] Indenture § 3.07(f) (JC2773), § 3.08(i) (JC2774).

[376] Opening Br. in Supp. of AMBAC Assurance Corp.'s Mot. for J. on the Pleadings (D.I. 410) at 23, 25.

Amendment and Sale Provisions and argue AMBAC's unqualified Declarations are overbroad because they would read out the "otherwise provided" qualification from the Indenture.[377]

As for Section 3.07(f) (regarding amendments to Basic Documents without consent), the Owners do not identify any contract language that would permit the Owners to direct the Owner Trustee to amend a Basic Document without the requisite consent.[378]  In other words, their only objection to AMBAC's interpretation of Section 3.07(f) is that AMBAC has failed to prove a negative (i.e., that nothing in the Basic Documents "otherwise provides").  Given that AMBAC threw down the gauntlet in its Opening Brief, I am satisfied that the Owners' failure to identify relevant contract language means it does not exist, and the Owners cannot amend a Basic Documents or the terms of any Collateral without consent from the requisite Indenture Parties.

On the other hand, the Owners *do* flag certain language in the Trust Related Agreements that they read as allowing the Trusts to transfer or sell the Collateral, which could coincide with the "except as expressly permitted by this Indenture"

---

[377] PAB at 107, 109.

[378] PAB at 107 (failing to identify any contractual provision that would allow the Owners unilaterally to amend a Basic Document).

language from Section 3.08(i)—as well as the Owners' right to direct the Owner Trustee in non-ministerial matters.[379]

> *First*, the Owners cite Section 3.14 of the Indenture, which states:
>
> 3.14: Financed Student Loans *may* only be sold, transferred, exchanged or otherwise disposed of by the Indenture Trustee . . . if the Indenture Trustee is provided with the following: (a) an Issuer Order stating the sale price and directing that Financed Student Loans be sold, transferred or otherwise disposed of . . . and (b) a certificate signed by an Authorized Officer of the [Trust] to the effect that the disposition price is equal to or in excess of the amount required by the applicable Guarantee Agreement. . .[380]

Nothing in Section 3.14 suggests the *Owners* unilaterally could direct the Owner Trustee to dispose of Trust Property because, on its face, Section 3.14 only states the circumstances when the *Indenture Trustee* "*may*" (not must) dispose of Trust Property.[381]

---

[379] Indenture § 3.08(i) (JC2774); PAB at 108 (citing Indenture § 3.14).

[380] Indenture § 3.14 (JC2776–77) (emphasis supplied); *see also* Indenture (Appendix A) (JC2844) (defining "Issuer Order" to mean a "written order or request signed in the name of the [Trusts] by any one of its Authorized Officers"); Indenture (Appendix A) (JC2831) (defining an "Authorized Officer" of the Trusts as "the Administrator"); Administration Agreement § 1(a)(i)(d) (JC3661) (obligating the Administrator to "take all appropriate action that it is the duty of the [Trusts] to take pursuant to the Trust Related Agreements" including "[t]he preparation of an Issuer Order and Officer's Certificate . . . for the release of property of the Trust Estate").

[381] Indenture § 3.14 (JC2776–77).

*Second*, the Owners cite language from the Deposit and Sale Agreements.[382] In these contracts, the Trusts first acquired the Student Loans before assigning them as Collateral to the Indenture Trustee.[383]  Under the Deposit and Sale Agreements, the "seller" of the Student Loans made certain representations and warranties.[384] If these representations and warranties were breached, the seller promised the Trusts it would "cure or repurchase" the applicable Student Loan.[385]

While not spelled out in their Answering Brief, I gather the Owners' unstated theory is that, in the event of a breached seller representation, the Owners could direct the Owner Trustee to cause the Administrator to exercise the Trusts' rights under the Deposit and Sale Agreement.[386]  Neither party traces the means by which such an order would flow through the Trust Related Agreements.  Given this lack of clarity, at this juncture, I cannot fully endorse any party's interpretation of Section 3.08(i).

---

[382] PAB at 108.

[383] *See* PAB Ex. E (the Deposit and Sale Agreement by and between the National Collegiate Funding LLC, in its capacity as seller, and the National Collegiate Student Loan Trust 2006-4, as purchaser).

[384] PAB Ex. E § 4.02.

[385] PAB Ex. E § 5.

[386] *See* Trust Agreement § 4.01(a) (JC0590).

*****

Based on the foregoing and subject to the clarifications I have provided, (i) AMBAC's Motion as to its Declarations A and F and (ii) the Noteholders' Motion as to their Declarations A and G are GRANTED; and (iii) AMBAC's Motion as to its Declaration B is DENIED.

### E. Owner Trustee and Administrator Expenses

In exchange for their role as the Trusts' trustee and administrator, the parties to the Trust Related Agreements agreed upon a mechanism by which the Owner Trustee and the Administrator, respectively, could be reimbursed for their expenses. In Section 10.01 of the Trust Agreement and Section 3 of the Administration Agreement, respectively, the parties agreed:

> The Owner Trustee shall be entitled to be reimbursed by the Administrator and, to the extent not paid by the Administrator, from the Trust Property for its reasonable expenses hereunder, including the reasonable compensation, expenses and disbursements of such agents, representatives, experts and counsel as the Owner Trustee may employ in connection with the exercise and performance of its rights and duties under this Agreement and the Trust Related Agreements.[387]

And

> As reimbursement for its expenses related [to its role as Administrator,] the Administrator shall be entitled to: . . . reimbursement for the

---

[387] Trust Agreement § 10.01 (JC0603).

following expenses: . . . (i) annual audits . . . [and] (iii) any other expenses of the [Trusts].[388]

These rights of the Owner Trustee and the Administrator for expense reimbursement ripple through the other Trust Related Agreements. For example, the Administration Agreement states the Administrator "will" pay "the Owner Trustee fees and expenses" set forth in Section 10.01 of the Trust Agreement.[389] Likewise, Section 8.02(d) of the Indenture (the Indenture Waterfall) states that at regular intervals:

> the Administrator *shall instruct* the Indenture Trustee in writing . . . to make the following deposits and distributions to the Persons . . . specified below . . . in the following order of priority . . . and the Indenture Trustee *shall comply* with such instruction. (1) FIRST: pro rata (i) Indenture Trustee fees and expenses . . . , Owner Trustee fees and expenses. . . and Administration Fees and expenses.[390]

The Indenture defines the Administrator's written instruction to the Indenture Trustee under Section 8.02(d) as an "Issuer Order," (i.e., any "written order or request signed in the name of the [Trusts] by any one of [the Trusts'] Authorized

---

[388] Administration Agreement § 3 (JC3664).

[389] Administration Agreement § 1(a)(ii)(C) (JC3662).

[390] Indenture § 8.02(d) (JC2807) (emphasis supplied); *see also* Indenture (Appendix A) (JC2831) (defining "Administration Fee" to mean "the meaning specified in Section 3 of the Administration Agreement").

127

Officers and delivered to the Indenture Trustee").[391]  The Administrator is an "Authorized Officer" of the Trusts.[392]

Taken together, the unambiguous language of the Trust Related Agreements allow for *reimbursement* of Owner Trustee and Administrator expenses *after* such expenses have been incurred.[393]  Nothing in the Trust Related Agreements permits advancement of Owner Trustee or Administrator expenses.  Under the plain meaning of the word "reimburse," the Owner Trustee or the Administrator must first incur an expense and *then* seek "reimbursement" for the expense.[394]

To constitute an Owner Trustee expense, the Owner Trustee (or one of the agents the Owner Trustee employs under Section 9.03(b)) must spend funds "in connection with the exercise and performance of [the Owner Trustee's] rights

---

[391] Indenture (Appendix A) (JC2844) (defining "Issuer Order").

[392] Indenture (Appendix A) (JC2831) (definition of "Authorized Officer").

[393] *See* Trust Agreement § 10.01 (JC0603) ("The Owner Trustee shall be entitled to *reimbursement.*") (emphasis supplied); Administration Agreement § 3 (JC3664) ("as *reimbursement* for its expenses") (emphasis supplied).

[394] *Reimbursement*, BLACKS LAW DICTIONARY (11th ed. 2019) (defining "Reimbursement" as "Repayment"); *Reimburse*, MERRIAM-WEBSTER (Last visited July 25, 2020) https://www.merriam-webster.com/dictionary /reimburse (defining Reimburse to mean "to pay back" or "make restoration or payment of an equivalent to"); *see also U.S v. Serafini*, 233 F.3d 758, 767 n.11 (3d Cir. 2000) ("As it is used in its common parlance, reimbursement means the delivery of money to a person to pay back that person for money the person expended for some matter.") (internal citation and quotation omitted).

128

and duties under this Agreement and the Trust Related Agreements."[395]  Because the Owner Trustee's duties are limited, and the Owner Trustee has no "duty or obligation to manage . . . or otherwise deal with the Trust Property, or to otherwise take or refrain from taking any action . . . except as expressly provided," an expense must directly link to one of the Owner Trustee's ministerial roles under the Trust Related Agreements to be a valid Owner Trustee expense.[396]

To the extent expenses are incurred by the Owner Trustee in the performance of a role not contemplated by the Trust Related Agreements, the Owner Trustee cannot seek reimbursement for such expenses.[397]  The Owners cannot expand the Owner Trustee's role by ordering the Owner Trustee, for example, to undertake an obligation the Owner Trustee has delegated to the Administrator and, as noted, the Administrator has agreed to perform *all* of the Owner Trustee's "duties and obligations."[398]  This leaves the Owner Trustee with only the most basic ministerial

---

[395] Trust Agreement § 9.03(b) (JC0603), § 10.01 (JC0603).  In this regard, nothing in the Trust Related Agreements requires that Owner Trustee Expenses be incurred for the "benefit" of the Trusts.  *Cf.* AMBAC Declarations G and H.  Rather, such expenses must be incurred in connection with the Owner Trustee's rights and duties.

[396] Trust Agreement § 8.07 (JC0601).

[397] *See* Trust Agreement § 8.07 (JC0601) (stating the Owner Trustee has no "duty or obligation to manage . . . the Trust Property").

[398] Administration Agreement § 1(b)(i) (JC3662); Trust Agreement § 8.03 (JC0600).

function, and Owner Trustee expenses must be incurred in connection with this limited role.

To be clear, nothing in Section 10.01 provides for reimbursement of the *Trusts*' fees and expenses.  Rather, on its face, Section 10.01 only addresses reimbursement of the Owner Trustee for "*its* reasonable expenses."[399]  "Its," in this case, modifies "expenses" and refers to the Owner Trustee—limiting reimbursable expenses to those incurred by the Owner Trustee, not by the Trusts or the Owners. As a result, Owner Trustee expenses must be: (i) submitted at the discretion of the Owner Trustee (ii) a "reimbursement," (iii) "reasonable," (iv) incurred at the direction of the Owner Trustee and (v) incurred "in connection with the exercise and performance of [the Owner Trustee's] rights and duties under the [Trust Agreement] and the Trust Related Agreements."[400]

If, for example, the Owners direct the Owner Trustee to hire counsel to represent the Trusts, and the Owner Trustee determines it will need an attorney to help it review the Owners' instruction for compliance with the Trust Related Agreements, those attorneys' fees will be Owner Trustee expenses if the Owner

---

[399] Trust Agreement § 10.01 (JC0603).

[400] Trust Agreement § 10.01 (JC0603).

Trustee chooses to submit them to the Administrator.  The fees of any attorneys hired to represent the *Trusts* (rather than the Owner Trustee), however, would constitute *Trust* expenses that do not fit within Section 10.01.

On the other hand, while Section 3 of the Administration Agreement has materially similar language ("As reimbursement for *its* expenses related [to] the Administrator's obligations"), the Administration Agreement contemplates the Administrator must "perform . . . the duties of the [Trusts.]"[401]  Mirroring this obligation, Section 3 of the Administration Agreement provides for reimbursement of certain Administrator expenses, including "expenses of the [Trusts]."[402] Thus, under certain circumstances, the Administrator—but not the Owner Trustee— may have a limited right to seek reimbursement for Trust expenses.

Once the Owner Trustee submits its expenses to the Administrator and the Administrator instructs the Indenture Trustee to make distributions under the Indenture Waterfall, the Indenture is clear that the Indenture Trustee *shall* make the

---

[401] Administration Agreement § 1(a)(i) (JC3661).

[402] Administration Agreement § 3(b)(iii) (JC3664) (defining "Administration Fee" as, among other things, "Reimbursement for . . . [a]ny other expenses of the [Trusts]"); Indenture § 8.02(d)(1) (JC2807) (allowing for reimbursement of "Administration fees" at the top of the Indenture Waterfall); Indenture (Appendix A) (JC2831) (defining "Administration Fee" as "the meaning specified in Section 3 of the Administration Agreement").

distribution as directed by the Administrator.[403]   Nothing in any Trust Related Agreement suggests the Administrator or the Indenture Trustee has any subjective discretion to define what is (or is not) an Owner Trustee expense.[404]

To the contrary, the Indenture contemplates that the work-a-day reality for the Indenture Trustee will be that it will rely on the accuracy of Issuer Orders since the Administrator is given the primary responsibility to calculate amounts owed under the Indenture Waterfall.[405]   In accordance with the Indenture Trustee's limited administrative role, "[e]xcept during the continuance of an Event of Default, . . . in the absence of bad faith on its part, the Indenture Trustee may conclusively rely, as to the truth of the statements . . . upon certificates or opinions furnished to . . . the

---

[403] Indenture § 8.02(d) (JC2807).

[404] Relatedly, nothing in the language of the Trust Agreement or the Indenture *requires* the Owner Trustee to provide any "certification" of its expenses.  *Cf.* Def. GSS Data Servs., Inc.'s Individual Answering Br. in Opp'n to NC Residual Owners Tr.'s and NC Owners LLC's Mot. for J. on the Pleadings (D.I. 436) at 3 (arguing the parties informally agreed the Owner Trustee would certify its expenses and that it is "reasonable for the Administrator to request information from the parties confirming the character of their submitted expenses").  While there may be good reasons to provide a certification, "when a written contract is meant to embody the whole agreement completely, such proof of a collateral agreement [(*e.g.*, the informal agreement that the Owner Trustee would certify its expenses)] is not admissible."  *Pine River Master Fund Ltd. v. Amur Fin. Co., Inc.*, 2017 WL 4548143, at *17 (Del. Ch. Oct. 12, 2017), *aff'd*, 190 A.3d 996 (Del. 2018).

[405] Administration Agreement § 1(a)(i) (JC3661).

Indenture Trustee" as long as the Indenture Trustee "examine[s] the certificates" to determine "whether or not they conform to the requirements of this Indenture."[406]

Having said this, the Indenture Trustee need not obey an Issuer Order if it would "require the Indenture Trustee to risk its own funds or otherwise incur financial liability in the performance of its duties."[407]   Therefore, if the Owner Trustee were to request reimbursement for an expense that did not meet the contractual definition of an Owner Trustee expense, then, as a practical matter, the Indenture Trustee could refuse to obey an Issuer Order.[408]   Similarly, the Administrator could refuse to submit an Issuer Order to the Indenture Trustee if the Owner Trustee requests reimbursement to which it is not entitled.[409]   If the Owner Trustee disagreed with the Administrator or Indenture Trustee's position, the Owner Trustee could file a breach of contract action, and a court would be called upon to

---

[406] Indenture § 6.01(b)(ii) (JC2797).

[407] Indenture § 6.01(g) (JC2798).

[408] Indenture § 8.02(d) (JC2807).

[409] The Owners ask the Court to declare that the Owner Trustee "is not prohibited from certifying prospectively that expenses for specified categories of legal services are proper Owner Trustee expenses." Owners' Compl. ¶ 149(S), (R) (similar); POB at 37; PRB at 77. Given that the Owners, themselves, recognize that there are "no contract provisions supporting" a nebulous "certification" procedure, it is unclear what legal effect any such certification would have. *See* PRB at 75. Given this disconnect from the language in the parties' agreement, the Court will not issue the Owners' Declarations S and R.

decide whether the particular expense did (or did not) meet the applicable contractual definition.

At the conclusion of such litigation, a court might render a judgment holding that a particular expense was (or was not) an Owner Trustee or Administrator expense. Then, the doctrines of issue preclusion and *res judicata* would govern whether any "similar" expenses in the future were also Owner Trustee or Administrator expenses.[410] Beyond these general principles, it is impossible to say whether any future, "similar" expense would merit the same treatment as any past expense.

\*\*\*\*\*

Based on the foregoing and subject to the clarifications I have provided, (i) the Indenture Trustee's Motion as to its Declarations P, S, T, U, W, X and Y,[411] (ii) the

---

[410] *See Cal. State Teachers' Ret. Sys.*, 179 A.3d at 842–43 (setting forth the elements of issue preclusion); *LaPoint*, 970 A.2d at 192 (setting forth the elements of res judicata).

[411] I acknowledge the Owners' argument that many of the Indenture Trustee's declarations–(p)–(s)–are not justiciable for lack of a case or controversy. *See* PAB at 98–99. There remains a live dispute as to whether "certain expenses should be paid at the top of the Trusts' waterfall." Owners' Compl. ¶ 148. In challenging Special Master Order Number 2, the Owners argued that the expenses of a professional retained at their direction were payable "at the top of the waterfall." D.I. 347 at 3–4. A justiciable controversy remains where an issue "h[angs] like a sword poised to drop," even if a party has shifting positions. *Hill v. LW Buyer, LLC*, 2019 WL 3492165, at \*12 (Del. Ch. July 31, 2019).

Owners' Motion as to their Declarations P, Q and T and (iii) the Owner Trustee's

Motion as to its Declarations H, I, J, K and L are all GRANTED.  But (i) the Owners'

Motion as to their Declarations O, R and S, (ii) AMBAC's Motion as to its

Declarations G and H, (iii) the Noteholders' Motion as to their Declarations H and I

and (iv) the Indenture Trustee's Motion as to its Declaration V[412] are all DENIED.

### F. Owner Trustee and Owner Duties

The parties seek various Declarations regarding the contractual and extra-

contractual contours of the Owners' and the Owner Trustee's duties to act in the

interests of various parties to the Trust Related Agreements.  Section 3809 of the

DSTA provides, "[e]xcept to the extent otherwise provided in the governing

instrument of a statutory trust . . . , the laws of this State pertaining to trusts are

hereby made applicable to statutory trusts."[413]   "Thus, unless the Trust Agreement

---

[412] In this regard, the Indenture Trustee's Motion as to its Declaration V is denied only to the extent it implies the Administrator could not seek reimbursement for Trust expenses. As explained above, the Administration Agreement allows the Administrator to seek reimbursement for "expenses of the [Trusts]."   Administration Agreement § 3(b)(iii) (JC3664).

[413] 12 *Del. C.* § 3809.

or the Act 'otherwise provides,' existing trust law applies, including default fiduciary duties provided by statute or common law."[414]

At common law, the "duties of a trustee to trust beneficiaries" include "loyalty, good faith, and due care."[415]  Section 3806(c) of the DSTA, however, permits the elimination of fiduciary duties that otherwise exist under common law.[416] While parties may agree to waive default fiduciary duties, the DSTA forbids parties from eliminating the "implied *contractual* covenant of good faith and fair dealing."[417]  In the alternative entity context, which corresponds well here, this Court has consistently held that drafters "must make their intent to eliminate fiduciary duties plain and unambiguous."[418]

For reasons explained below, I find: (i) the Owner Trustee owes limited contractual fiduciary duties, but those duties have been satisfied through the Administration Agreement; (ii) the Owner Trustee's remaining contractual

---

[414] *Cargill, Inc. v. JWH Special Circumstance LLC*, 959 A.2d 1096, 1111 (Del. Ch. 2008).

[415] *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1148 (Del. Ch. 1994), *aff'd*, 663 A.2d 1156 (Del. 1995).

[416] *See* 12 *Del. C.* § 3806(c).

[417] 12 *Del. C.* § 3806(c) (emphasis supplied).

[418] *Ross Hldg. & Mgmt. Co. v. Advance Realty Gp.*, 2014 WL 4374261, at *13 (Del. Ch. Sept. 4, 2014) (internal quotation and citation omitted).

obligations are narrow; (iii) the Owners are the Trusts' beneficial owners and yet, given their right to control certain aspects of the Trusts' operations, they owe fiduciary duties to the *Trusts*; (iv) only holders of Trust Certificates have standing to bring derivative claims on behalf of the Trusts; (v) the Owners owe direct but limited fiduciary duties to the Noteholders and AMBAC; and (vi) the implied covenant does not support broad declarations regarding duties owed by the Owners or the Owner Trustee to the Indenture Parties.

### 1.  The Owner Trustee Does Not Owe Extra-contractual Duties

Whether (or not) the Owner Trustee owes fiduciary duties and to whom those duties are owed is hotly debated between the parties.  The Owner Trustee's position is that it owes fiduciary duties to no one; the Owners maintain the Owner Trustee owes them fiduciary duties, and the Noteholders and AMBAC argue the Owner Trustee owes them fiduciary duties.[419]  As I will explain below, the Owner Trustee's position is the only reasonable reading of the Trust Agreement.

---

[419] *Compare* Owners' Compl. ¶ 149 (ii), (jj), *with* Noteholder Gp.'s and AMBAC's Joint Answering Br. in Partial Opp'n to [the Owner Trustee's] Mot. for J. on the Pleadings (D.I. 431) ("Partial Opp'n") at 27, *and* Owner Trustee Counterclaim ¶ 74(r).

As a default matter, the "business and affairs of a statutory trust shall be managed under the direction of its trustees."[420]   For this reason, under normal circumstances, the trustee of a statutory trust (i.e., the Owner Trustee) would be expected to manage the trust for the benefit of other parties and would, in that capacity, owe fiduciary duties.[421]  But this default rule can be modified if "otherwise provided in the [trust's] governing instrument."[422]  Here, the Trust Agreement *does* "otherwise provide."

Section 8.03 of the Trust Agreement states, "[i]t shall be the duty of the Owner Trustee . . . to administer the Trust in the interest of the Owners."[423]  Commensurate with Owner Trustee's *de minimis* compensation, however, the Trust Agreement qualifies this general duty in Section 8.07:

> The Owner Trustee shall not have a duty or obligation to manage . . . or otherwise deal with the Trust Property, or to otherwise take or refrain

---

[420] 12 *Del. C.* § 3806(a).

[421] *Cinerama*, 663 A.2d at 1148 ("In general, the duties of a trustee to trust beneficiaries" are "loyalty, good faith, and due care" which are "broadly similar to those of a corporate director to his corporation.")

[422] 12 *Del. C.* § 3806(a).

[423] Trust Agreement § 8.03 (JC0600); *see also* Trust Agreement § 2.05 (JC0587) ("The Owner Trustee hereby declares that it will hold the Trust Property in trust upon and subject to the conditions set forth herein for the use and benefit of the Owners.").

> from taking any action . . . except as *expressly* provided by the terms of *this* Agreement.[424]

The only reasonable interpretation of this language is that the Owner Trustee has no affirmative duty to manage the Trusts unless a specific provision in the Trust Agreement triggers an Owner Trustee duty to act.[425]

Section 8.07 thus creates a contractual duty that replaces common law fiduciary duties.[426] That contractual duty is incongruous with common law fiduciary duties because, at common law, a Delaware fiduciary has an unremitting duty to act in the best interests of the beneficiary, and the scope of that duty could never be reduced to a few express provisions in a contract.[427] But the Owner Trustee's duties

---

[424] Trust Agreement § 8.07 (JC0601) (emphasis supplied).

[425] *See, e.g.*, Trust Agreement § 8.07 (JC0601) (obligating the Owner Trustee to "promptly take all action as may be necessary to discharge any liens on any part of the Trust Property which result from claims against the Owner Trustee").

[426] *See, e.g.*, *Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 101 (Del. 2013) (finding that the operative contract "creates a contractual duty that replaces the common law fiduciary duties"); *Norton*, 67 A.3d at 361 (finding language requiring a general partner to take actions that it reasonably believed to be in "the best interest of the Partnership" to be a "contractual fiduciary duty").

[427] Trust Agreement § 8.07 (JC0601) (emphasis supplied); *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 778 (Del. Ch. 2005) (stating that a "faithful fiduciary" has an "affirmative duty to act" in "the best interests of the Company" after "taking into account" all reasonably available information as well as "potential alternatives" to her action).

139

have been reduced to contract, as permitted by our law, and it is that contract (the Trust Agreement) that defines the scope of those duties.[428]

While the Owner Trustee has a general contractual duty to administer the Trusts for the benefit of the Owners, the Trust Agreement whittles down that general duty to a fine point.[429] *First*, the Owner Trustee cannot take an action that is "inconsistent with the purposes of the Trust[s]"—even if that action would otherwise be in the Owners' interests.[430] *Second*, the Owner Trustee has no unilateral authority to act on "nonministerial matters."[431] Given that fiduciary duties arise only to the extent that one exercises "control over the property of another," the scope of the Owner Trustee's contractual fiduciary duties could not extend to matters over which it has no authority, discretion or control (i.e., "nonministerial matters").[432] *Finally*,

---

[428] Trust Agreement § 8.07 (JC0601).

[429] Trust Agreement § 8.03 (JC0600) ("It shall be the duty of the Owner Trustee to discharge (or cause to be discharged) all of its responsibilities pursuant to this Agreement and to administer the Trust in the interest of the Owners.").

[430] *See* Trust Agreement § 8.09 (JC0601). The Owners are similarly prohibited from ordering the Owner Trustee to act or refrain from acting in a way that would violate the Trust Related Agreements—which encompasses an order that would contravene the Trusts' purposes. Trust Agreement § 4.02(b) (JC0591).

[431] Trust Agreement § 4.01 (JC0590).

[432] *Stewart v. Wilm. Tr. SP Servs., Inc.*, 112 A.3d 271, 297 (Del. Ch. 2015); *In re USACafes*, 600 A.2d at 48 ("I understand the principles of fiduciary duty, stated most generally, to be that one who controls property of another may not, without implied or express agreement,

in the same breath the Trust Agreement obligates the Owner Trustee to "administer the Trusts[s] in the interest of the Owners," the Trust Agreement also states, "the Owner Trustee *shall be deemed to have discharged its duties and responsibilities* . . . to the extent the Administrator has agreed . . . to . . . discharge such duties, . . . and the Owner Trustee shall not be held liable for the default or failure of the Administrator to carry out its obligations under the Administration Agreement."[433] As contemplated and permitted by this provision, the Administrator, in fact, has agreed to perform *all* of the Owner Trustee's "duties and obligations" in the Administration Agreement.[434]

The only reasonable interpretation of this sequence is that the Owner Trustee is now conclusively "deemed to have discharged its duties"—which were already limited.[435]   As a result, even if the Owner Trustee possesses some baseline

---

intentionally use that property in a way that benefits the holder of the control to the detriment of the property or its beneficial owner."); *Sokol Hldgs., Inc. v. Dorsey & Whitney, LLP*, 2009 WL 2501542, at *3 (Del. Ch. Aug. 5, 2009) ("The hallmark of a fiduciary relationship is that one person has the power to exercise control over the property of another as if it were her own.").

[433] Trust Agreement § 8.03 (JC0600) (emphasis supplied).

[434] Trust Agreement § 4.01(b) (JC0590); Administration Agreement § 1(b)(i) (JC3662) ("The Administrator shall perform . . . the duties and obligations of the Owner Trustee.").

[435] *Compare* Trust Agreement § 8.03 (JC0600) ("The Owner Trustee shall be deemed to have discharged its duties and responsibilities . . . to the extent the Administrator has agreed . . . to perform such acts or to discharge such duties of the Owner Trustee."), *with*

contractual duty to act in the interests of the Owners regarding *ministerial* matters, that duty has been discharged via the Administration Agreement.

Turning to duties the Owner Trustee purportedly owes to other Indenture Parties, the plain language of the Trust Agreement forecloses any notion that the Owner Trustee owes any extra-contractual duties (fiduciary or otherwise) to the Noteholders or AMBAC.[436]  The Owner Trustee's duty is to "administer the Trust in the interest of the Owners."[437]  If the drafters of the Trust Agreement (or the Trust Related Agreements) had intended the Owner Trustee to administer the Trusts in the interests of another deal party, the Trust Agreements would have said so.[438]  To settle all doubt, Section 8.07 states, "no implied duties or obligations shall be read into this Agreement against the Owner Trustee."[439]

---

Administration Agreement § 1(b)(i) (JC3662) ("The Administrator shall perform . . . the duties and obligations of the Owner Trustee.").

[436] *See* Trust Agreement § 8.07 (JC0601).

[437] Trust Agreement § 8.03 (JC0600).

[438] *Fortis Advisors LLC v. Shire US Hldgs., Inc.*, 2017 WL 3420751, at *8 (Del. Ch. Aug. 9, 2017) (reasoning that courts generally will not "blue-pencil" contracts by inserting language into agreements that does not exist).

[439] Trust Agreement § 8.07 (JC0601).

***** 

Based on the foregoing and subject to the clarifications I have provided, (i) the Owners' Motion as to their Declarations KK and II and (ii) the Owner Trustee's Motion as to its Declaration U are GRANTED; but (iii) the Owners' Motion as to their Declaration JJ is DENIED.

## 2. The Owner Trustee's Contractual Duties are Narrow and Few

Having determined the Owner Trustee does not owe fiduciary duties, I turn next to the scope of the Owner Trustee's *contractual* obligations under the Trust Related Agreements. The Indenture Parties maintain that the Owner Trustee has a "duty to administer the Trusts in accordance with the Trust Agreements."[440] This overstates the Owner Trustee's role. Nothing in the Trust Related Agreements saddles the Owner Trustee with a contractual obligation to administer, supervise or review *any* aspect of the Trusts' operations beyond an overarching obligation to act in good faith.

While the Owner Trustee *may* decline to follow Owner directions that are "contrary to" the Trust Related Agreements, nothing requires the Owners to *study*

---

[440] Partial Opp'n at 19.

each Owner direction to determine whether (or not) it is proper.[441]  Section 4.02(b)

simply states that if the Owners issue an improper instruction, the Owner Trustee is

not "*obligated to* follow" that direction.[442]  And even if the Owners Trustee were to

follow an improper Owner or Administrator instruction, as long as the Owner

Trustee follows the relevant instruction "in good faith," the Owner Trustee "shall

not be personally liable."[443]

While the Owner Trustee does not have to use them, as noted, the Trust

Agreement provides the Owner Trustee with two safe harbors when confronted with

unclear or questionable Owner instructions.  In such instances, the Owner Trustee

"*may*" (but need not):

> give notice . . . to the Owners requesting instructions, and to the extent
> that the Owner Trustee shall have acted or refrained from acting *in good
> faith* in accordance with any instructions received from the Owners,[444]

---

[441] Trust Agreement § 4.02(b) (JC0591) ("No Owner shall direct the Owner Trustee to take
or refrain from taking any action contrary to this Agreement or any Trust Related
Agreement, nor shall the Owner Trustee *be obligated to follow any such direction*,
if given.") (emphasis supplied).

[442] Trust Agreement § 4.02(b) (JC0591) (emphasis supplied).

[443] Trust Agreement § 9.01(ii) (JC0602).  Whether the Owner Trustee acted in "good
faith / bad faith raises [] a question of fact which generally cannot be resolved on the
pleadings."  *Desert Equities*, 624 A.2d at 1208–09.

[444] Under the Insured Trust Agreement, any instructions must be "received from the
Owners" and "approved by" AMBAC for the Owner Trustee to avail itself of the safe
harbor.  Insured Trust Agreement § 8.07 (JC0029).

the Owner Trustee *shall not be liable to any Person* on account of such action or inaction.[445]

Additionally, and at the expense of the Trusts, the Owner Trustee may "consult with counsel, accountants and other skilled persons" selected with "reasonable care."[446] If the Owner Trustee exercises this voluntary right, "the Owner Trustee shall not be liable" for any action taken in good faith reliance on advice from its advisors.[447] While important, neither of these two safe harbors impose an affirmative obligation on the Owner Trustee to monitor Owner instructions.[448]

On the other hand, if the Owner Trustee acts as to a ministerial matter without Owner instructions,[449] it may not act "in violation of" the Trust Agreement or in a

---

[445] Trust Agreement § 8.07 (JC0601) (emphasis supplied).

[446] Trust Agreement § 9.03(b) (JC0603).

[447] Trust Agreement § 9.03(b) (JC0603).

[448] To the contrary, the Owner Trustee is permitted to "rely on a certificate" for "all purposes" that is signed by an authorized representative of the Owners, and such certificate "shall constitute full protection to the Owner Trustee for any action taken or omitted to be taken by it in good faith in reliance thereon." Trust Agreement § 9.03(a) (JC0603). Given that "the law presumes that parties never accept the risk that their counterparties will exercise their contractual discretion in bad faith," nothing in the Trust Agreements suggests that the Owner Trustee has a background duty to suspect the Owners would act in direct contravention of the Trust Related Agreements. *Amirsaleh v. Bd. of Trade of City of N.Y., Inc.*, 2008 WL 4182998, at *1 (Del. Ch. Sept. 11, 2008).

[449] *See, e.g.*, Trust Agreement § 4.01(a) (JC0590).

manner "inconsistent with the purposes of the Trust."[450]   But, even when acting

without Owner instructions, as long as the Owner Trustee avoids "willful

misconduct or gross negligence," the Owner Trustee "shall not be personally

liable."[451]

*****

Based on the foregoing and subject to the clarifications I have provided, (i) the

Owner Trustee's Motion as to its Declarations D, R, and S and (ii) the Owners'

Motion as to their Declaration LL are GRANTED.

### 3. The Owners Are the Trusts' Beneficial Owners; The Owners Owe Fiduciary Duties to the Trusts Because of Their Direction Rights; and Only Beneficial Owners of the Trusts Have Standing to Bring Derivative Claims on Behalf of the Trusts

As noted above, the common law of trusts applies to statutory trusts unless

otherwise provided in a trust's governing instrument, and a governing instrument

may waive default fiduciary duties with clear and unambiguous language.[452]   The

DSTA, at 12 *Del. C.* § 3805(a), provides that "except to the extent otherwise

provided in the governing instrument of the statutory trust, a beneficial owner [of a

---

[450] Trust Agreement § 2.03(b)(i) (JC0586), § 8.09 (JC0601).

[451] Trust Agreement § 9.01 (JC0602).

[452] 12 *Del. C.* § 3809, § 3806(c), (e).

statutory trust] shall have an undivided beneficial interest in the property of the statutory trust."[453]  In turn, the DSTA defines "beneficial owner" as "any owner of a beneficial interest in a statutory trust, the fact of ownership to be determined and evidenced . . . in conformity to the applicable provisions of the governing instrument of the statutory trust."[454]

The Trust Agreements define the "Owners" as "any . . . Person who becomes an owner of a Beneficial Interest," and defines "Beneficial Interest" as "all or any part of the interest of that Owner in the Trust."[455]  The Trust Agreements then provide for "Trust Certificates" that "evidenc[e] the Beneficial Interest[s]" of the Owners.[456]  Finally, the Trust Agreements state that the Owner Trustee "may treat the Person in whose name any Trust Certificate is registered as the sole owner of the Beneficial Interest."[457]

Based on the foregoing language, and following the DSTA's direction that I determine the "fact of ownership . . . in conformity to" the Trust Agreement, any

---

[453] 12 *Del. C.* § 3805(a).

[454] 12 *Del. C.* § 3801(a).

[455] Trust Agreement § 1.01 (JC0582) (JC0579).

[456] Trust Agreement § 1.01 (JC0484) (definition of "Trust Certificate").

[457] Trust Agreement § 3.02(b) (JC0588).

party that does not hold a Trust Certificate is not a "beneficial owner" of the Trusts.[458]  Conversely, any party that *does* hold a Trust Certificate *is* a "beneficial owner."[459]  It follows that, if the Owners hold Trust Certificates, then they are beneficial owners of the Trusts to which those certificates relate.

As discussed above, Section 3806(a) of the DSTA and Section 4.01(b) of the Trust Agreement permit the Owners (*qua* beneficial owners) to "direct the trustees or other person in the management of" the Trusts.[460]  Under the principles established by this court in *Cargill v. JWH Special Circumstance LLC*, the Owners owe fiduciary duties *to the Trusts* when the Owners "(1) . . . exercise[] control over the Trust[s] or [their] assets" and (2) exercise "that control to benefit themselves at the expense of the Trust."[461]  As Vice Chancellor Parsons noted in *Cargill*, this conclusion flows from the Owners' direction rights and the concomitant authority to control the "property of another."[462]

---

[458] 12 *Del. C.* § 3801(a).

[459] 12 *Del. C.* § 3801(a).

[460] 12 *Del. C.* § 3806(a); Trust Agreement § 4.01(b) (JC0590).

[461] *Cargill*, 959 A.2d at 1121.

[462] *Id.* (citing *In re USACafes*, 600 A.2d 43).

148

Consistent with the DSTA's policy of giving maximum "effect to the principle of freedom of contract," the Trust Agreement could have waived or modified the Owners' fiduciary duties to the Trusts with clear and unambiguous language.[463] While such a waiver is possible, the Owners have identified no language in the Trust Agreement that purports to modify the default fiduciary duties they owe to the Trusts.

This holding has limited practical consequences because 12 *Del. C.* § 3816(b) states that "[i]n a derivative action, the plaintiff *must be a beneficial owner*."[464] Here, the "General Assembly used the mandatory and exclusive 'must,' rather than the permissive may."[465]   Accordingly, even if the Indenture purports to Grant the right to bring derivative breach of fiduciary duty claims on behalf of the Trusts to constituents other than the beneficial owners, those contractual transfers cannot "contravene any mandatory provisions of the Act."[466]   For this reason, only a holder of a Trust Certificate has standing to bring a derivative claim on behalf of the Trusts.

---

[463] 12 *Del. C.* § 3806(c), § 3825(b).

[464] 12 *Del. C.* § 3816(b) (emphasis supplied).

[465] *CML V, LLC v. Bax*, 28 A.3d 1037, 1042 (Del. 2011).

[466] *Elf Atochem N. Am., Inc. v. Jaffari*, 727 A.2d 286, 290 (Del. 1999).

No party has standing to pursue a derivative claim on behalf of the Trusts unless that party holds a Trust Certificate, even if the party is a Trust creditor (like the Noteholders and AMBAC), even if the party is an assignee and even if the Trusts were insolvent when the creditor/assignee filed suit. Creditor fiduciary claims cannot exist in the DST context because the mandatory language in the DSTA limiting derivative standing to beneficial owners still controls. "[C]ourts cannot interpret the common law to override the express provision the General Assembly adopted."[467]

On this point, *Bax* is instructive.[468] There, the Supreme Court considered whether *Gheewalla* (which holds that creditors of insolvent corporations may have standing to bring derivative claims) applied to creditor suits in the context of an insolvent LLC.[469] The Supreme Court construed materially similar statutory language to that in Section 3816(b).[470] After a careful analysis, our highest Court

---

[467] *Bax*, 28 A.3d at 1045.

[468] *Id.* at 1037.

[469] *Id.* at 1041–42, 1044–45 (citing *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 99 (Del. 2007)).

[470] *Compare* 12 *Del. C.* § 18–1002 ("In a derivative action, the plaintiff must be a member or an assignee of a limited liability company interest at the time of bringing the action."), *with* 12 *Del. C.* § 3816(b) ("In a derivative action, the plaintiff must be a beneficial owner at the time of bringing the action.").

held the statutory language was unambiguous and applied the statute's plain meaning, holding that only members or assignees of an LLC interest "have derivative standing to sue on behalf of an LLC—creditors do not."[471]

Given the clear and unambiguous language of 12 *Del. C.* § 3816(b), the same result follows here.[472] In hopes of resisting this inevitable outcome, the Noteholders and AMBAC make much of Section 3809 of the DSTA, which provides that "the laws of this State pertaining to trusts are hereby made applicable to statutory trusts."[473] This general principle does not change the mandate of Section 3816(b), as revealed by the fact that Section 3809 also contains the modifying clause: "*[e]xcept to the extent provided . . . in this subchapter.*"[474] The General Assembly *did* "otherwise provide" as relates to derivative standing, and I must give effect to the plain meaning of their words.[475]

---

[471] *Bax*, 28 A.3d at 1024.

[472] Of course, this does not mean the Indenture Parties could not assert direct claims, as discussed below.

[473] 12 *Del. C.* § 3809.

[474] 12 *Del. C.* § 3809 (emphasis supplied)

[475] The Indenture Parties cite *NCUAB I*, 2016 WL 796850, at *9 as holding "that direct and derivative claims of [of a Delaware Statutory Trust may be] granted to the indenture trustee pursuant to [a] grant." JAB at 104. *NCUAB* is far more complicated than Defendant's parenthetical explanation lets on. The case involved the re-securitization of certain residential mortgage backed securities *certificates*. In that case, the court noted that the

151

\*\*\*\*\*

Based on the foregoing and subject to the clarifications I have provided, (i) the Owners' Motion as to their Declarations DD, EE, HH, NN and PP, (ii) AMBAC's Motion as to its Declaration I and (iii) the Noteholders' Motion as to their Declaration J are all GRANTED.

### 4. The Owners Owe Direct Fiduciary Duties to the Noteholders and AMBAC to the Extent the Owners Exercise Control over the Collateral

AMBAC and the Noteholders seek a Declaration that the Owners owe them direct fiduciary duties.[476]   It appears this Declaration raises an issue of first impression under Delaware law, as neither party has cited a controlling decision that addresses whether a securitization Issuer's controllers owe fiduciary duties to the Issuer's assignees.

---

assets transferred to the Indenture Trustee were "Owner Trust Certificates which shall evidence the beneficial ownership interest in the trust estate." *NCUAB I*, 2016 WL 796850, at *3.  Accordingly, the Indenture Trustee, by virtue of the securitization transaction, was held to have standing to bring derivative claims because it had been assigned all "right, title and interest" in the "Re-securitized Certificates."  *Id.*, at *7.  Here, in contrast, the Indenture Trustee does *not* hold the Trust Certificates or a beneficial interest in the Trust Certificates.  Section 14.03 of the Trust Agreement does not change this outcome because it serves to transfer the Owners' "rights . . . in and to [the] Trust Property," but *not* "in and to" the Trust Certificates.  (JC0690).

[476] JAB at 21; AMBAC Counterclaim ¶¶ I, J; Noteholder Counterclaims ¶¶ J, K; JAB at 21.

By the Noteholders' and AMBAC's lights, they are "entitled to the same rights as a common law trust beneficiary."[477]  The Noteholders and AMBAC draw this conclusion, not from their status as "beneficial owners" of the Trusts, but from the structure of the Trust Related Agreements as a whole, which they interpret as establishing the Noteholders and AMBAC as the "beneficiaries with priority interests in the Trust Property."[478]

In support of this argument, the Indenture Parties cling to 12 *Del. C.* § 3801(i).[479]  There, the DSTA provides that property of a statutory trust is to be administered "for the benefit of . . . beneficial owners *or as otherwise provided in the governing instrument*."[480]  The Noteholders and AMBAC then reason that the Trust Related Agreements evidence an intent to make the Noteholders (and AMBAC as to the Insured Trusts) the "beneficiaries of the Trusts' assets."[481]  Specifically, the Indenture Parties cite: (i) the purposes of the Trusts (i.e., to enter into a securitization transaction and to "conserve" the Trust Property), (ii) the Granting Clause, (iii) the

---

[477] JAB at 21.

[478] JAB at 23.

[479] JAB at 19 (citing 12 *Del. C.* § 3801(i)).

[480] 12 *Del. C.* § 3801(i) (emphasis supplied).

[481] JAB at 19.

Noteholders' and AMBAC's status as third-party beneficiaries of the Trust Agreement and the Indenture and (iv) the Indenture Waterfall.[482]

No matter how emphatically the Noteholders and AMBAC proclaim otherwise, the Trust Agreement unambiguously states the Trusts are to be administered "in the interest of the Owners."[483]  Given that I must give priority to the "specific provisions" in the Trust Related Agreements "over more general ones," the Noteholders and AMBAC's reading of the Trust Agreement on this point is unreasonable.[484]  Nothing in the Trust Related Agreements suggests the Noteholders or AMBAC have a beneficial interest in the Trust or a general right to compel the Owners as fiduciaries to administer the Trusts in their interests.

To the contrary, the Noteholders are the assignees of Trust Property and the holders of debt instruments issued by the Trusts.[485]  "Delaware courts have

---

[482] JAB at 19–21.

[483] Trust Agreement § 8.03 (JC0600); *see also* Trust Agreement § 8.06 (JC0601) (granting safe harbor to the Owner Trustee when it acts as it "shall deem to be *in the best interests of the Owners*") (emphasis supplied); Trust Agreement § 2.05 (JC0587) (The Owner Trustee is to "hold the Trust Property in trust upon and subject to the conditions set forth herein for the use and benefit of the Owners subject to the obligations of the Owner Trustee under the Trust Related Agreements.").

[484] *See Brinckerhoff*, 159 A.3d at 254 (A court must "prefer specific provisions over more general ones.").

[485] Indenture (Granting Clause) (JC2760); Indenture § 2.01 (JC2761).

traditionally been reluctant to expand existing fiduciary duties, [and] [] the general rule is that [a business entity's fiduciaries] do not owe creditors [or assignees] duties beyond the relevant contractual terms."[486] For these reasons, neither the Noteholders nor AMBAC have demonstrated that their relationship to the Trusts makes them beneficiaries of fiduciary duties.

But this finding does not conclude the analysis. While the Noteholders and AMBAC are not beneficial owners *of the Trusts* (*qua* creditors and assignees), they are the beneficial owners *of the Collateral* (*qua* owners). In the Indenture, the Trusts granted all their interest in the Collateral "to the Indenture Trustee, as trustee for the benefit of the holders of the Notes [and AMBAC under the Insured Indenture]."[487] Yet, as outlined above, the Trusts retained legal title to the Collateral so that they could collect Student Loans for distribution according to the Indenture Waterfall.[488] While the parties have not identified a Delaware case directly on point, at common law, when parties agree to split legal and equitable title to property in an assignment

---

[486] *Gheewalla*, 930 A.2d at 99 (internal quotations omitted).

[487] Indenture (Granting Clause) (JC2760) (the Trusts Grant "to the Indenture Trustee . . . as trustee for the benefit of the holders of the Notes."); Insured Indenture (Granting Clause) (JC3461).

[488] *See* Trust Agreement § 5.02 (JC0593).

for purposes of collection, "the resultant split in ownership gives rise to a fiduciary relationship between the assignor and assignee."[489]

This legal conclusion melds with the key "underlying premise for the imposition of fiduciary duties," i.e., the "separation of legal control from beneficial ownership."[490]  If parties agree to divide property in this way, "[e]quitable principles act in those circumstances to protect the beneficiaries who are not in a position to protect themselves."[491]  For this reason, the Trusts owe fiduciary duties to the Noteholders and AMBAC (the beneficial owners of the Collateral) to the extent the Trusts exercise control over the Collateral.

---

[489] *Schoonmaker v. Lawrence Brunoli, Inc.*, 828 A.2d 64, 80 (Conn. 2003); *Cal. Ins. Guarantee Ass'n v. Workers' Comp. Appeals Bd.*, 203 Cal. App. 4th 1328, 1335 (Cal. Ct. App. 2012) ("An assignment for collection vests legal title in the assignee which is sufficient to enable him to maintain an action in his own name, but the assignor retains the equitable interest in the thing assigned" and "a fiduciary relationship exists" between assignor and assignee.); *Harrison v. Adams*, 128 P.2d 9, 12–13 (Cal. 1942) (same); *In re Liquidation of Home Ins. Co.*, 953 A.2d 443, 499 (N.H. 2008) (An assignment for collection "gives rise to a fiduciary relationship between assignor and assignee."); 6 AM. JUR. 2D ASSIGNMENTS § 115 (2020) ("An assignment of a claim for the purposes of collection gives rise to a fiduciary relationship between the assignor and the assignee."); 6A C.J.S. ASSIGNMENTS § 98 (2020) ("The resultant split in ownership" arising from an assignment for collection "gives rise to a fiduciary relationship between the assignor and assignee.").

[490] *Malone v. Brincat*, 722 A.2d 5, 9 (Del. 1998).

[491] *Id.* at 9.

To be clear, this fiduciary duty arises because of the Noteholders and AMBAC's relationship to the *Collateral*, rather than their relationship to the *Trusts*. As long as the Notes are outstanding, the Indenture Trustee holds the Collateral "for the benefit of the holders of the Notes and AMBAC."[492]  To the extent the Trusts exercise control over this property (which now belongs to the Noteholders and AMBAC), such as when they act to collect the Student Loans, the Trusts must "regulate their conduct" and act in the best interests of the Collateral's beneficial owners.[493]

This conclusion recognizes the substantive reality of the securitization transaction.  In effect, the Indenture created an inverse "assignment for collection."[494]  "An assignment for collection only leaves the beneficial or equitable ownership of the claim in the assignor, while vesting legal title in the assignee; the

---

[492] Insured Indenture (Granting Clause) (JC3461).

[493] *Malone*, 722 A.2d at 9.  For example, if the Trusts were to engage additional service providers, those contractors would be compensated out of proceeds from the Collateral. For this reason, the Trusts would be exercising control over property that was within the Indenture Trust Estate—which would implicate the Trusts' fiduciary duties to the Noteholders and AMBAC.

[494] *Compare* Indenture (Granting Clause) (JC2760), *with* Indenture § 3.05 (JC2771) (obligating the Trusts to "Enforce [] the Collateral"); 6 AM. JUR. 2D ASSIGNMENTS § 111 (2020) (defining an "assignment for collection only").

assignee is empowered to collect the claim."[495]   While, in this case, the assignor conveyed beneficial ownership of the Collateral and retained legal title (rather than the inverse), the substance and structure of the instant securitization transaction leads to the same conclusion.[496]   To wit, to the extent the holder of mere legal title to the Collateral (i.e., the Trusts) controls the Collateral to fulfill its obligations under the Indenture, it does so for the benefit of the Collateral's beneficial owners (i.e., the Noteholders and AMBAC).[497]

In turn, this fiduciary duty of the Trusts extends to the Owners under the principles established in *In re USACafes, L.P.* and applied to Delaware Statutory Trusts in *Cargill v. JWH Special Circumstance LLC*; "fiduciary duties [may be] owed by those that control a fiduciary."[498]   And "one who controls property of

---

[495] 6 AM. JUR. 2D ASSIGNMENTS § 115 (2020); *see also* 6A. C.J.S. ASSIGNMENTS § 98 (2020) ("[A]n assignment merely for collection does not transfer the beneficial ownership to the assignee, such an assignment, when it is absolute and the thing assigned is capable of assignment, vests legal title to the thing assigned in the assignee, so that he or she may collect from the debtor.").

[496] *See Feeley v. NHAOCG, LLC*, 62 A.3d 649, 668 (Del. Ch. Nov. 28, 2012) ("Breach of fiduciary duty is an equitable claim, and it is a maxim of equity that 'equity regards substance rather than form.'") (quoting *Monroe Park v. Metro. Life Ins. Co.*, 457 A.2d 734, 737 (Del. 1983)).

[497] *See Malone*, 722 A.2d at 9 (The "underlying premise for the imposition of fiduciary duties is a separation of legal control from beneficial ownership.").

[498] *Cargill*, 959 A.2d at 1110; *In re USACafes*, 600 A.2d at 47–50; *see also Fannin v. UMTH Land Dev., L.P.*, 2020 WL 4384230, at *18 (Del. Ch. July 31, 2020) (recognizing

another may not, without implied or express agreement, intentionally use that property in a way that benefits the holder of the control to the detriment of the property or its beneficial owner."[499]  Because the Owners have the right to direct the Trusts, the Owners also owe fiduciary duties to the Noteholders and AMBAC to the extent they direct the Trusts in their control the Collateral for the purposes of collecting the Student Loans (or otherwise purport to exercise control over the assigned Collateral).  And again, while the Trust Agreements could have waived this fiduciary duty with clear and unambiguous language, nothing in the Trust Agreements purports to alter the Owners' common law fiduciary duties.[500]

At this stage, I do not "attempt to delineate the full scope" of this duty.[501] What is clear is that the Owners' duty "surely entails" an obligation not "to use control over [the Collateral] to advantage the [Owners] at the expense" of the Noteholders an AMBAC.[502]

---

that *USACafes* is "stare decisis" and that this court has "followed *USACafes* consistently") (internal quotation omitted).

[499] *In re USACafes*, 600 A.2d at 47–50; *Cargill*, 959 A.2d at 1120–21 (applying *USACafes* to Delaware Statutory Trusts).

[500] 12 *Del. C* § 3806(c).

[501] *In re USACafes, L.P. Litig.*, 600 A.2d at 49.

[502] *Id*.

***** 

Based on the foregoing and subject to the clarifications I have provided, (i) the Noteholders' Motion as to their Declaration L and (ii) the Owners' Motion as to their Declarations MM, OO and QQ are GRANTED, but (iii) the Owners' Motion as to their Declarations GG, RR and SS is DENIED.

### 5. The Implied Covenant Is Not a Basis to Support Sweeping Contractual Duties without Specific Factual Allegations and Contract Language

The Noteholders and AMBAC seek Declarations that the implied covenant of good faith and fair dealing saddles both the Owners and the Owner Trustee with broad and nebulous duties to act in their interests.[503]  While it is true the implied covenant "attaches to every contract by operation of law," and cannot be waived under the DSTA, the implied covenant is a limited "gap-filling tool" used "to infer contractual terms to which the parties would have agreed had they anticipated a situation they failed to address."[504]  As it assesses whether the implied covenant

---

[503] Noteholder Counterclaims ¶ 4(K); AMBAC Counterclaim ¶ J; JAB at 66–67 (arguing against the Owners' Declaration KK that Wilmington Trust owes an "extracontractual" duty because of the implied covenant).

[504] 12 *Del. C.* § 3806(c), (e); *Dawson v. Pittco Capital P'rs*, 2012 WL 1564805, at *24 (Del. Ch. Apr. 30, 2012) ("The implied covenant attaches to every contract."); *In re Encore Energy P'rs L.P. Unitholder Litig.*, 2012 WL 3792997, at *12 (Del. Ch. Aug. 31, 2012) ("The implied covenant is a limited gap-filling tool to infer contractual terms.").

applies or has been breached, the court must understand that "existing contract terms control" and the "implied good faith cannot be used to circumvent the parties' bargain, or to create a 'free-floating duty . . . unattached to the underlying legal document.'"[505]  When the court relies on the implied covenant, it essentially reads an implied term into a contract.[506]  This "quasi-reformation" process is "rare" and requires a "fact-intensive exercise governed solely by issues of compelling fairness."[507]

At this stage of proceedings, it would be inappropriate to issue sweeping declarations concerning abstract duties that either the Owners or the Owner Trustee may owe to another deal party based on the implied covenant.  To be sure, the implied covenant inures in the Trust Related Agreements, and nothing in this Opinion should be read to prevent the Noteholders or AMBAC from pleading and proving a breach of the implied covenant based on a specific factual predicate. But the implied covenant is not a basis with which to saddle the Owners or the Owner Trustee with generalized duties as a matter of law.

---

[505] *Dunlap v. State Farm Fire and Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (quoting *Glenfed Fin. Corp. Commercial Fin. Div. v. Penick Corp.*, 647 A.2d 852, 858 (N.J. Sup. Ct. App. Div. 1994)).

[506] *Id.*

[507] *Id.* (internal quotations omitted).

*****

Based on the foregoing and subject to the clarifications I have provided, (i) the Noteholders' Motion as to their Declaration K and (ii) AMBAC's Motion as to its Declaration J are DENIED.

## G. The Noteholders Are Third-Party Beneficiaries of the Trust Agreements

The Noteholders have asked the Court to declare that they are "[e]xpress third-party beneficiaries of the Trust Agreement" and that they "may sue to enforce the Trust Agreement."[508]  The Owners do not dispute that the Noteholders are "among the Trust Agreements' [contractually designated] third-party beneficiaries,"[509] and for good reason.  Section 14.04 of the Trust Agreement unambiguously states, "for so long as any of the Notes are outstanding . . . the Noteholders are third party beneficiaries hereof."[510]

Notwithstanding Section 14.04, the Owners maintain that the Noteholders' "rights to sue to enforce the Trust Agreements are circumscribed by the Indentures'

---

[508] Noteholder Counterclaims ¶ P.

[509] PAB at 158.

[510] Trust Agreement § 14.04 (JC0690); *see also Ark. Teacher Ret. Sys. v. Alon USA Energy, Inc.*, 2019 WL 2714331, at *2 (Del. Ch. June 28, 2019) (Under Delaware law, a third party to a contract may sue to enforce its terms.").

no action and no-recourse clauses."[511]   These clauses are found in Sections 5.06 (the "no action clause") and 11.15 (the "no recourse clause") of the Indenture.

The no action clause states, "no holder of the Notes shall have any right to institute any Proceeding, judicial or otherwise, with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy hereunder, unless" certain conditions are satisfied, including that the "holder of the notes has previously given written notice to the Indenture Trustee of a continuing Event of Default."[512] This language makes clear that the Noteholders must satisfy the conditions in the no action clause before bringing any Proceeding "with respect to" the Indenture.[513]

But, at this stage, the Court will not venture into hypothetical questions about what future claims would (or would not) constitute a claim "with respect to" the Indenture.  No party has sought such a fact specific Declaration, and the Owners raise the issue only to "reserve[] their rights."[514]  Nothing in this Opinion prevents the Owners from raising Section 5.06 as a defense in the future.  The Noteholders'

---

[511] PAB at 158.

[512] Indenture § 5.06 (JC2793).

[513] Indenture § 5.06 (JC2793).

[514] PAB at 158.

Declaration is limited on its face to their status as third-party beneficiaries—not any defenses other parties may raise to any future claim.

The same result follows for the no recourse clause. To prevail on a claim against the Owners, the Noteholders would need either to explain why the no recourse clause does not apply or satisfy its conditions. [515]

Based on the foregoing, the Noteholders' Motion as to their Declaration P is GRANTED.

### H. No Person May Own All of the Trust Certificates

The Trust Agreements limit the transfer of the Owners' Beneficial Interests in the Trusts. Section 3.04(c) of the Trust Agreement states:

> No Transfer [of Trust Certificates] shall be valid if, as a result of such Transfer, (i) any Person would have a Percentage Interest or a Sharing Ratio of 100%, considering for such purpose all interests owned by any Affiliate of such Person as owned by such Person.[516]

The Trust Agreement further defines "Affiliate" with respect to any specified Person as "any other Person controlling or controlled by or under common control with such

---

[515] Indenture § 11.15 (JC2824–25).

[516] Trust Agreement § 3.04(b) (JC0589); *see also* Trust Agreement § 1.01 (JC0583) (defining "Transfer" as "the sale, transfer or other assignment of all of an Owner's right, title and interest in all or a portion of such Owner's Beneficial Interest").

specified Person."[517]  In turn, the agreement defines "control" as "the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise."[518]  Based on this language, the Noteholders' Declaration E asks the Court to declare that "a transfer of Certificates is invalid if it would cause a specific Person to own or control, directly or indirectly, or with an Affiliate, 100% of the Certificates."[519]

The Owners resist this Declaration by arguing it amounts to an effort by the Noteholders to "relitigate" an issue this Court has already decided.[520]  It is true this is not the first occasion the Court has been asked to interpret Section 3.04(c) of the Trust Agreements.  In November, 2017, certain parties objected to instructions the Owners were providing to the Owner Trustee in connection with a case the Trusts brought against PHEAA.[521]  After a brief period of discovery, the Court ruled that, while 99.9999% of the Trust Certificates were under the common control of one

---

[517] Trust Agreement § 1.01 (JC0578) (definition of "Affiliate").

[518] Trust Agreement § 1.01 (JC0578) (definition of "Affiliate").

[519] Noteholder Counterclaims ¶ E.

[520] *See* PAB at 135.

[521] *See* Rulings of the Court on Ownership Issue, *Nat'l Collegiate Student Loan Master Tr., et al. v. Pa. Higher Educ. Assistance Agency*, C.A. No. 12111-VCS (Del. Ch. Nov. 7, 2017) (C.A. No. 12111-VCS) (D.I. 235) ("Ownership Issue Tr.").

person, "the only evidence in the record is uncontradicted sworn testimony" that .0001% of the Trust Certificates were controlled by an unaffiliated party.[522]

Nothing on the face of the Noteholders' Declaration E contradicts this then-extant finding of fact. As I have already stated, if a party brings a claim or raises a question of law or fact that has already been decided by this Court, then the doctrines of *res judicata* and issue preclusion would come into play and those doctrines may or may not bar the claim. For today's purposes, however, it is enough that the Noteholders' Declaration E is supported by the unambiguous language of the Trust Agreement.

## I. Declarations That Involve Disputed Question of Material Fact

In various ways, the parties have sought to draw the Court into factual disputes over (i) whether specific delegations of Owner Trustee authority are appropriate,[523] (ii) whether certain expenses are "Owner Trustee" expenses,[524] (iii) whether parties

---

[522] Ownership Issue Tr. at 17–18.

[523] *See, e.g.*, Owners' Compl. ¶ 149 (AA) ("The Owner Trustee had the power to enter into the terms set forth in the BPA Engagement Letter"), ¶ 149(Z) (stating the Owner Trustee "had the power to enter into" a specific agreement).

[524] *See, e.g.*, Owners' Compl. ¶ (BB) (stating certain expenses "must be paid by the Administrator and the Indenture Trustee").

"consented" to certain actions,[525] (iv) whether parties acted in "good faith"[526] and whether certain orders conflicted with the purposes of the Trusts[527] (among other factual determinations). At this stage, it would constitute reversible error to decide a "factual question when deciding a motion for judgment on the pleadings."[528] The parties agreed the purpose of these cross-motions for judgment on the pleadings would be to seek "declaratory relief regarding . . . Common Contract Interpretation Issues" that do not require the Court to decide disputed questions of fact.[529] That is all I do today.

*****

Based on the foregoing and subject to the clarifications I have provided, (i) the Owners' Motion as to their Declarations U, V, Z, AA, BB and CC, (ii) the Owner

---

[525] *See, e.g.*, AMBAC Counterclaim ¶ D (stating the "Owners lacked authority to direct the Owner Trustee to execute the 2015 Chaitman Letter").

[526] *See, e.g.*, Owner Trustee Counterclaim ¶ 74(v) (stating the Owner Trustee has no liability for "following the directions of the Owners").

[527] *See, e.g.*, Owners' Compl. ¶ 149 (U) (stating a specific direction letter is not "contrary to the terms of the Trust Agreement").

[528] *Desert Equities*, 624 A.2d at 1206–07 (holding that Rule 12(c) motions are not appropriate procedural vehicles in which to address disputed issues of fact).

[529] *See* Stip. and Order Regarding Pleadings and Br. Sched. (D.I. 388) at 1.

Trustee's Motion as to its Declarations N, O, P, Q, V, W and (iii) AMBAC's Motion as to its Declaration D are all DENIED.

### III.   CONCLUSION

For the foregoing reasons, the parties, cross-Motions are **GRANTED** in part and **DENIED** in part, as delineated below.

The Owners' Motion as to their Declarations C, D, E, G, H, I, J, N, P, Q, T, DD, EE, FF, HH, II, KK, LL, MM, NN, OO, PP and QQ is **GRANTED.** The Owners' Motion as to their Declarations A, B, F, M, O, R, S, U, V, W, X, Y, Z, AA, BB, CC, GG, JJ, RR and SS is **DENIED.**

The Owner Trustee's Motion as to its Declarations A, C, D, H, I, J, K, L, R, S and U is **GRANTED.** The Owner Trustee's Motion as to its Declarations N, O, P, Q, V and W is **DENIED.**

The Indenture Trustee's Motion as to its Declarations A, C, D, E, F, G, P, Q, R, S, T, U, W, X and Y is **GRANTED.** The Indenture Trustee's Motion as to its Declarations B and V is **DENIED.**

AMBAC's Motion as to its Declarations A, C, F, I, O and P is **GRANTED**. AMBAC's Motion as to its Declarations B, D, G, H, J, K, L, M and N is **DENIED.**

The Noteholders' Motion as to their Declarations A, B, C, D, E, G, J, L, N, O and P is **GRANTED.**  The Noteholders' Motion as to their Declarations H, I, K and M is **DENIED.**

**IT IS SO ORDERED.**

# APPENDIX:

**Owner Declarations:**[530]

A. The Granting Clause of the Indenture did not assign or pledge the power to assert all claims on behalf of the Trusts, but rather assigned or pledged as collateral the Trusts' right, title, and interest in and to only the assets expressly enumerated in the Granting Clause.  **DENIED**

B. The Indenture Trustee may not bring suit absent an Event of Default including expiration of any applicable cure period.  **DENIED**

C. The Trusts are Owner-directed.  **GRANTED**

D. The Trust Agreements are the governing instruments of the Trusts under 12 *Del. C.* § 3801, *et seq.* (the "DSTA").  **GRANTED**

E. The Owners may direct the Owner Trustee to take any action with respect to the Trusts, subject solely to the limitations set forth in Section 4.02(b). **GRANTED**

F. The Indenture Trustee, the Administrator, and the Note Insurer are not "persons" authorized by the Trust Agreements to direct the Owner Trustee concerning non-ministerial matters.  **DENIED**

G. The only grounds for the Owner Trustee to refuse an Owner direction are the specific exceptions set out in Sections 4.02 of the Trust Agreements. **GRANTED**

H. Whether an Owner direction's purpose is to benefit the Owners does not provide a valid reason for the Owner Trustee to refuse to follow an Owner direction.  **GRANTED**

I. The Owners may challenge the Owner Trustee's refusal to follow an Owner direction if the Owner Trustee asserts that one of the exceptions set forth in Section 4.02 of the Trust Agreement applies. **GRANTED**

---

[530] *See* Owners' Compl. (D.I. 382) ¶ 149.

J.  If the Owners and the Owner Trustee disagree over the construction of the Trust Agreement or any Trust Related Agreement, or if the Owner Trustee is uncertain as to such construction, either may seek a declaratory judgment to resolve the issue.  **GRANTED**

K.  The Court may resolve disputes over whether a given instruction is contrary to the Trust Agreement or any Trust Related Agreement.  **UNOPPOSED (GRANTED)**

L.  Retroactively, in determining whether a past Owner Trustee refusal to follow an Owner direction constituted a breach of the Trust Agreement, the Court of Chancery reviews determinations by the Owner Trustee that one of the exceptions set forth in Section 4.02(a) or (b) of the Trust Agreement applies for reasonableness, not correctness.  **UNOPPOSED (GRANTED)**

M. Prospectively, if the Court of Chancery has ruled that a given Owner direction is valid, the Owner Trustee cannot continue to refuse to comply with the direction or similar future directions.  **DENIED**

N.  Prospectively, if the Court of Chancery has issued a declaration resolving a dispute over contract interpretation of the Trust Agreement or any Trust Related Agreement, the Owner Trustee cannot refuse to comply with an instruction based on a contrary contract interpretation (whether asserted by the Owner Trustee or by some other party).  **GRANTED**

O.  The invoices of the Trusts' professional advisors retained pursuant to the Owners' directions are payable as Owner Trustee expenses and as Administrator expenses.  **DENIED**

P.  The Administrator and the Indenture Trustee do not have discretion as to whether to pay Owner Trustee expenses submitted by the Owner Trustee.  **GRANTED**

Q.  The Administrator and the Indenture Trustee may not condition payment of expenses sent by the Owner Trustee on the Owner Trustee providing a certification of the expenses.  **GRANTED**

R.  Nevertheless, the Owners may direct the Owner Trustee to certify the invoices of the Trusts' professional advisors retained pursuant to the Owners' directions as Owner Trustee expenses. If the Owners provide such a direction, the Owner Trustee has no discretion to refuse to do so unless one of the exceptions in Section 4.02 of the Trust Agreement applies.  **DENIED**

S.  The Owner Trustee is not prohibited from certifying prospectively that expenses for specified categories of legal services are proper Owner Trustee expenses payable under Section 8.02(d)(1)(i) of the Indenture and not expenses of the Trusts payable under Section 5.02 of the Trust Agreement. **DENIED**

T.  The Court's resolution of disputes over what constitutes an Owner Trustee expense is binding on all parties to the proceeding and parties in privity with them.  **GRANTED**

U.  The Legal Invoice Direction Letter and accompanying draft Issuer Order are not contrary to the terms of the Trust Agreement or of any document contemplated by the Trust Agreement to which the Trusts or the Owner Trustee are a party nor are they otherwise contrary to law nor are they likely to result in personal liability on the part of the Owner Trustee.  **DENIED**

V.  The BPA Judgment Direction Letter and accompanying draft Issuer Order are not contrary to the terms of the Trust Agreement or of any document contemplated by the Trust Agreement to which the Trust or the Owner Trustee is a party nor were they otherwise contrary to law nor are they likely to result in personal liability on the part of the Owner Trustee.  **DENIED**

W. If properly directed, the Owner Trustee has the power to engage agents and attorneys to exercise and perform any of the Owner Trustee's rights and duties, including to act on behalf of the Trust subject to direction by the Owners.  **DENIED**

X.  If properly directed, the Owner Trustee has the power to delegate any of its authority, including the power to delegate authority to agents.  **DENIED**

Y.  If properly directed, the Owner Trustee has the power to delegate to agents and attorneys its right to engage and agents and attorneys to act on behalf of the Trust subject to direction by the Owners.  **DENIED**

3

Z.  The Owner Trustee had the power to enter into the terms set forth in the 2015 Chaitman Engagement Letter.  **DENIED**

AA. The Owner Trustee had the power to enter into the terms set forth in the BPA Engagement Letter.  **DENIED**

BB.  Issuer Orders and engagement letters that have been signed by the Owner Trustee (including the 2015 Chaitman Engagement Letter and the BPA Engagement Letter) are Trust Related Agreements, and therefore payment under those Issuer Orders and engagement letters must be paid by the Administrator and Indenture Trustee without requiring involvement of the Owner Trustee, subject only to the Indenture expense caps.  **DENIED**

CC. The 2019 Chaitman Direction Letter and accompanying 2019 Chaitman Engagement Letter are not contrary to the terms of the Trust Agreement or of any document contemplated by the Trust Agreement to which the Trust or the Owner Trustee is a party nor were they otherwise contrary to law nor are they likely to result in personal liability on the part of the Owner Trustee.  **DENIED**

DD. The Owners are the Trusts' "beneficial owners" as that term is used in the DSTA.  **GRANTED**

EE. No other parties are "beneficial owners" of the Trusts as that term is used in the DSTA.  **GRANTED**

FF.  The Owners have no generalized contractual duties not to act in their own interest to the detriment of the interests of the Noteholders, the Indenture Trustee, Ambac or the Administrator.  **GRANTED**

GG. The Owners have no extracontractual duties to the Noteholders, the Indenture Trustee, Ambac or the Administrator.  **DENIED**

HH. Even assuming that an Owner with a controlling interest in a Trust may owe fiduciary duties to the Trust, only another Owner has standing to assert any such fiduciary claims.  **GRANTED**

II.  Wilmington Trust holds the Trust Property for the use and benefit of the Owners.  **GRANTED**

4

JJ. Wilmington Trust has a duty to administer the Trusts in the interest of the Owners.  **DENIED**

KK. Wilmington Trust does not owe any extracontractual duties to the Noteholders, the Indenture Trustee, Ambac or the Administrator. **GRANTED**

LL. If the Owner Trustee acts in good faith in accordance with Owner instructions as set forth in the safe harbor provisions of Section 8.06 or 9.01(ii) of the Trust Agreement, the Owner Trustee cannot be held liable for breach of the Trust Agreement, the Indenture, or any other Trust Related Agreement nor can it be held liable for a breach of any purported extracontractual duties. **GRANTED**

MM. The Noteholders are creditors of the Trusts.  **GRANTED**

NN. The Noteholders are not "beneficial owners" of the Trusts as that term is used in the DSTA.  **GRANTED**

OO. The Noteholders do not have legal status equivalent to that of the beneficiaries of a Delaware common law trust. **GRANTED**

PP.  Ambac is not a "beneficial owner" of the Trusts as that term is used in the DSTA.  **GRANTED**

QQ.  Ambac does not have legal status equivalent to that of the beneficiaries of a Delaware common law trust.  **GRANTED.**

RR. The Owners do not owe the Noteholders extracontractual duties.  **DENIED**

SS.  The Owners do not owe Ambac extracontractual duties.  **DENIED**

**Owner Trustee Declarations**[531]

    A. The Trust Agreements are the sole governing instruments of the Trusts under 12 *Del. C.* § 3801, *et seq*. **GRANTED**

    B. The Owners may direct the Owner Trustee in accordance with the terms of the Trust Agreements, including Sections 2.03, 4.01, 4.02 and 8.06, subject to applicable limitations in the Trust Agreements, including those in Section 4.02. **UNOPPOSED (GRANTED)**

    C. The Owners have a duty to direct the Owner Trustee in a manner not contrary to the terms of the Trust Agreements and the Trust Related Agreements, and their failure to do so constitutes a violation of the Trust Agreements. **GRANTED**

    D. The Owner Trustee has the right (but not the obligation) to (a) review any direction to determine whether it is contrary to the (i) Trusts' interests, (ii) Trust Related Agreements, or (iii) the law, and (b) decline to follow any such direction. **GRANTED**

    E. If the Court of Chancery determines that a given direction is not contrary to the Trusts' interests, the Trust Agreement, the Trust Related Agreements, or the law, the Owner Trustee must comply with the direction (subject to Owner Trustee's rights and protections under the Trust Agreements) and in such case, the Owner Trustee would have no liability to any Person for following such direction. **NOT SUBMITTED**

    F. The Court of Chancery or any court of competent jurisdiction may resolve issues over the construction of the Trust Agreement or any Trust Related Agreement, or the validity of an instruction. **NOT SUBMITTED**

    G. The Court of Chancery may resolve disputes over whether a given instruction is contrary to the Trust Agreement or any Trust Related Agreement. **NOT SUBMITTED**

---

[531] *See* Owner Trustee Counterclaim (D.I. 393) ¶ 74.

6

H. The Owner Trustee may, but is under no duty, contractual or otherwise, to retroactively or prospectively certify its fees or expenses as "Owner Trustee fees and expenses" as such term is used in the Waterfall provisions. (Indenture § 8.02(e)(1)). **GRANTED**

I. The Owner Trustee has the sole authority to determine what expenses qualify as Owner Trustee fees and expenses, including without limitation the fees and expenses of the Owner Trustee's personal counsel advising it in connection with its service as Owner Trustee. **GRANTED**

J. The Administrator and the Indenture Trustee do not have discretion as to whether to pay Owner Trustee fees and expenses submitted by the Owner Trustee. **GRANTED**

K. The Administrator and the Indenture Trustee may not condition payment of fees and expenses submitted by the Owner Trustee on the Owner Trustee providing a certification of the fees and expenses. **GRANTED**

L. If a dispute arises concerning the Owner Trustee's determination of what constitutes Owner Trustee fees and expenses, the Court of Chancery's resolution of this dispute is binding on all parties to the proceeding and parties in privity with them. **GRANTED**

M. The Owners do not have the power to directly retain any professionals or advisors to act on behalf of the Trusts under the Trust Agreement – all such Trust professionals must be appointed by the Owner Trustee. **UNOPPOSED (GRANTED)**

N. BPA's fees and expenses do not constitute Owner Trustee fees and expenses under the Indentures. **DENIED**

O. Chaitman's fees and expenses do not constitute Owner Trustee fees and expenses under the Indentures. **DENIED**

P. McCarter's fees and expenses do not constitute Owner Trustee fees and expenses under the Indentures. **DENIED**

Q. DiCello Levitt & Casey LLC's fees and expenses do not constitute Owner Trustee fees and expenses under the Indentures. **DENIED**

R. The Owner Trustee's duties are limited to the contractual ministerial duties expressly set forth in the Trust Agreements, such as maintaining the ownership register, and distributing funds to Owners of record if such event should ever occur, and the Owner Trustee has no implied duties, nor any duty to generally administer the Trusts. **GRANTED**

S. If the Owner Trustee acts in good faith in accordance with Owner instructions, as set forth in the Safe Harbor provisions of Sections 8.06 or 9.01(ii) of the Trust Agreement, the Owner Trustee cannot be held liable for breach of the Trust Agreement, the Indenture, or any other Trust Related Agreement nor can it be held liable for a breach of any purported extracontractual duties. **GRANTED**

T. The Owner Trustee has the power and authority to engage agents and attorneys selected with reasonable care to exercise and perform any of the Owner Trustee's rights and duties. **UNOPPOSED (GRANTED)**

U. To the maximum extent set forth in Section 3806(b) of the DST Act, the Trust Agreements eliminated all common law or other extra contractual duties (including fiduciary duties) of the Owner Trustee, and Owner Trustee does not owe any such extracontractual duties to any party and to the maximum extent set forth in to Section 3806(e) of the DST Act, the Trust Agreements exculpate the Owner Trustee from liability for the performance of its duties under the Trust Agreement in the absence of a bad faith violation of the implied contractual covenant of good faith and fair dealing. **GRANTED**

V. The Owner Trustee has no liability to any party for following the directions of the Owners to execute the 2015 Chaitman Engagement Letter on behalf of the Trusts and/or for executing any other documents related to such engagement pursuant to Owner directions, including any Issuer Orders purporting to certify invoices of Chaitman or any other counsel retained by Chaitman. **DENIED**

W. The Owner Trustee has no liability to any party for following the directions of the Owners to execute the BPA Engagement Letter on behalf of the Trusts and/or for executing any other documents related to such engagement pursuant to Owner directions, including any Issuer Orders purporting to certify invoices of BPA. **DENIED**

8

X. The 2019 Chaitman Engagement Letter violates the terms of the Trust Agreements and/or Trust Related Agreements. **NOT SUBMITTING**

Y. When, following instructions in good faith under the Trust Agreement, the Owner Trustee signs a document in any form (including correspondence, contracts or issuer orders) reciting that it executed the document solely in its capacity as Owner Trustee and not in its individual capacity, the statements and obligations therein are not attributable to, or binding on the Owner Trustee personally. **UNOPPOSED (GRANTED)**

## U.S. Bank Declarations[532]

A. Under the Granting Clauses of the Indentures, the Trusts Granted to the Indenture Trustee all of the Trusts' right, title, and interest (but none of their obligations) in and to all of the assets and contracts set forth under the Granting Clauses for the benefit of the Noteholders and Note Insurer, as applicable. **GRANTED**

B. The Granting Clauses include a Grant of each of the Basic Documents. **DENIED**

C. The Granting Clauses Grant to the Indenture Trustee all present and future claims, demands, causes, and choses in action in respect of the assets and contracts set forth the Granting Clauses. **GRANTED**

D. While the Indentures and Notes remain outstanding, the Indenture Trustee is permitted to prosecute, defend, or settle lawsuits or other actions concerning claims in respect of any of the assets and contracts Granted under the Granting Clauses without the occurrence of (i) an Event of Default or other default or (ii) any other contractual predicate or condition precedent. **GRANTED**

---

[532] *See* U.S. Bank Counterclaim (D.I. 394) ¶ 3.

9

E.  While the Indentures and Notes remain outstanding, if the Indenture Trustee prosecutes, defends, or settles a lawsuit or other action concerning claims in respect of the assets and contracts Granted under the Granting Clauses, it may do so directly in its capacity as Indenture Trustee and/or directly on behalf of and in the name of the Trusts.  **GRANTED**

F.  While the Indentures and Notes remain outstanding, if there is no express duty or obligation imposed on the Trusts concerning the assets and contracts Granted under the Granting Clauses, the Trusts are divested of any control over such assets and contracts and lack authority to bring any lawsuit or other action concerning the same.  **GRANTED**

G.  While the Indentures and Notes remain outstanding, if a duty or obligation is imposed on the Trusts concerning the assets and contracts Granted under the Granting Clauses, the Trusts are permitted to exercise control over such assets and contracts only to the extent required to discharge the applicable duty or obligation and have authority to bring a lawsuit or other action concerning such items only as required under the same duty or obligation.  **GRANTED**

H.  Only authorized parties, including the Owner Trustee and the Administrator, may act on behalf of and in the name of the Trusts subject to directions from the Owners or other authorized parties, in conformity with the requirements of the Trust Agreements and other Basic Documents.  **NOT SUBMITTED**

I.  The Owners are bound by the terms of the Trust Agreements.  **NOT SUBMITTED**

J.  The Owner Trustee is not required to follow any direction from the Owners that does not comply with the requirements of Section 4.02 or Article IX of the Trust Agreements or any other applicable provision of the Trust Agreements concerning directions.  **NOT SUBMITTED**

K.  Section 4.02 of the Trust Agreements provides, among other things, that the Owner Trustee is not required to follow directions that are (i) contrary to the terms of the Trust Agreements or of any document contemplated thereby to which the Trusts or the Owner Trustee is a party or (ii) otherwise contrary to law.  **NOT SUBMITTED**

10

L.  Under the Administration Agreements, the Administrator has the authority to act on behalf of and in the name of the Trusts, and to advise the Owner Trustee when action is necessary to comply with the Trusts' duties under the Trust Related Agreements.  **NOT SUBMITTED**

M. Under Sections 1(c) or 1(d) of the Administration Agreements, as applicable, the Indenture Trustee and the Note Insurer, as applicable, are permitted to direct the Administrator to take non-ministerial actions on behalf of and in the name of the Trusts.  **NOT SUBMITTED**

N.  Under Section 8.06 of the Trust Agreement for The National Collegiate Master Student Loan Trust I, the Note Insurer has the authority to direct the Owner Trustee to take actions on behalf of and in the name of that Trust.  **NOT SUBMITTED**

O.  Under the Trust Agreements, the following include valid grounds for the Owner Trustee to decline to follow a direction from the Owners:

   a.  The Owner Trustee reasonably determines, or is advised by counsel, that a direction would require the Trusts to undertake conduct that has no connection with, and does not relate to, the Trusts' obligations as Issuers of Notes under the Indenture or any other obligations under the Basic Documents (while the Indentures and Notes remain outstanding); or

   b.  The Owner Trustee reasonably determines, or is advised by counsel, that a direction would require the Trusts to undertake conduct that is intended to benefit the Owners to the detriment of (x) the Trusts' ability to discharge its obligations as Issuers under the Indentures or other obligations under the Basic Documents or Trust Related Agreements, or (y) the interests of the Noteholders and Note Insurer (for both (x) and (y), while the Indentures and Notes remain outstanding).  **NOT SUBMITTED**

P.  Income and proceeds from the Trusts must be distributed in accordance with the Indentures so long as the Notes and Indentures are outstanding.  **GRANTED**

11

Q. Distribution provisions in Article V of the Trust Agreements become operative only if the Notes are paid in full and the Indentures are discharged and satisfied (including satisfaction of all other related payment obligations). **GRANTED**

R. If operative, the distribution provisions in Article V of the Trust Agreements provide for, among other things, (i) payment of expenses of the Trusts, and (ii) payment of the Owners in accordance with other provisions in the Trust Agreements. **GRANTED**

S. While the Indentures and Notes remain outstanding, Article VIII of the Indentures provide that the Administrator and Owner Trustee are entitled to reimbursement of their respective fees and expenses subject to certain enumerated limitations. **GRANTED**

T. The Owner Trustee is the party with the authority to determine what constitutes fees and expenses of the Owner Trustee, including without limitation fees and expenses of retained agents, experts or professionals. **GRANTED**

U. The Administrator is the party with the authority to determine what constitutes fees and expenses of the Administrator, including without limitation fees and expenses of retained agents, experts or professionals. **GRANTED**

V. The Indentures do not provide for reimbursement of expenses of the Owners or the Trusts. **DENIED**

W. Under Article VIII of the Indentures, the Administrator is required to provide written instructions to the Indenture Trustee in the form of an Issuer Order to distribute funds as specified therein, and the Indenture Trustee is obligated to distribute funds to reimburse fees and expenses of the Owner Trustee and Administrator only to the extent that the Administrator provides a valid Issuer Order instructing the Indenture Trustee to make such distributions. **GRANTED**

X. The Indenture Trustee may conclusively rely upon Issuer Orders from the Administrator instructing the Indenture Trustee to distribute funds to reimburse fees and expenses of the Owner Trustee and Administrator, and shall not be liable for distributing funds in accordance with any such Issuer Orders. **GRANTED**

Y. The Indenture Trustee is not obligated to follow an Issuer Order or any other written instruction from the Administrator concerning the distribution of funds to the extent such Issuer Order or written instruction (i) does not comport with Article VIII of the Indentures; (ii) fails to clearly identify the manner in which funds should be distributed, or (iii) qualifies or questions the propriety of the Issuer Order, written instruction, or the specified distribution of funds thereunder. **GRANTED**

Z. Under the Trust Agreements, the Owner Trustee is permitted to act through, or consult with, agents, experts, or other professionals to discharge its duties and obligations and may delegate or assign its authority to act for the Trusts to such representatives as necessary, subject to the following conditions and limitations:

    a. such representatives must be subject to the ongoing direction and control of the Owner Trustee, and to the extent the Owners seek to direct or control such representatives, they may do so only through the Owner Trustee;

    b. such representatives cannot bind the Trusts without knowledge of and approval from the Owner Trustee and must observe all applicable duties, obligations, and covenants of the Trusts and the Owner Trustee; and

    c. in the event any such representative retains agents, experts, or professionals to represent, or work on behalf of or for, the Trusts or the Owner Trustee, any such agents, experts or professionals are subject to the limitations set forth in paragraphs (z)(i) and (ii) above. **NOT SUBMITTED**

AA. The Trust Agreements do not otherwise permit the Owner Trustee to assign or delegate its authority to act for the Trusts, or any of its rights or obligations, to the Owners. **NOT SUBMITTED**

BB. The 2015 Chaitman Engagement Letter and 2019 Chaitman Engagement Letter are invalid. **NOT SUBMITTED**

CC. Any engagement letters or contracts that Chaitman LLP purported to execute on behalf of the Trusts are likewise invalid. **NOT SUBMITTED**

DD. Under the Trust Agreements, the Owners are expressly prohibited from directing the Owner Trustee to take or refrain from taking any action contrary to the Trust Agreements or any Trust Related Agreements. **NOT SUBMITTED**

EE. The contractual prohibition described in the immediately preceding declaration restricts the Owners from providing directions that would require the Trusts to undertake conduct:

   a. that has no connection with, and does not relate to, the Trusts' obligations as Issuers of Notes under the Indentures or any other obligations under the Basic Documents (while the Indentures and Notes remain outstanding); or

   b. intended to benefit the Owners to the detriment of (x) the Trusts' ability to discharge its obligations as Issuers under the Indentures or other obligations under the Basic Documents, or (y) the interests of the Noteholders and Note Insurer (for both (x) and (y), while the Indentures and Notes remain outstanding). **NOT SUBMITTED**

FF. The Owners owe common law fiduciary duties to the Trusts and the direct and intended economic beneficiaries of the Trusts, including the Noteholders and Note Insurer. **NOT SUBMITTED**

GG. The Owners' common law fiduciary duties include a duty to act with due care and loyalty and a duty to avoid conflicts of interest. **NOT SUBMITTED**

HH. The Owners owe an implied duty of good faith dealing under the Trusts Agreements to the Trusts and the direct and intended economic beneficiaries of the Trusts, including the Noteholders and Note Insurer. **NOT SUBMITTED**

II. Under 12 Del. C. §3806(c),the Owners' implied duty of good faith and dealing cannot be eliminated by contract. **NOT SUBMITTED**

JJ. The Noteholders, the Note Insurer, and Indenture Trustee are among the parties that have standing to assert claims against the Owners for breach of contract and breach of extracontractual duties, including without limitation claims for breach of fiduciary duty and breach of the implied duty of good faith and fair dealing. **NOT SUBMITTED**

KK. The Owner Trustee holds the property of the Trusts subject to the obligations of the Owner Trustee under the Basic Documents, including without limitation the obligations of the Trusts as Issuers under the Indentures executed by the Owner Trustee on behalf of and in the name of the Trusts. **NOT SUBMITTED**

LL. The Owner Trustee is bound by the Trusts' Grant of the assets and contracts under the Granting Clauses, including without limitation, the first priority lien and security interest in favor of the Indenture Trustee and the applicable terms of the Uniform Commercial Code. **NOT SUBMITTED**

MM. The Owner Trustee is prohibited from taking any actions that are inconsistent with the purposes of the Trusts (which purposes include entering into the Indentures and issuing the Notes), and is authorized to take all actions required or permitted to be taken by the Owner Trustee pursuant to the Trust Agreements, the Trust Related Agreements, and the Basic Documents. **NOT SUBMITTED**

NN. The law firm of McCarter & English lacked the authority to execute the Proposed Consent Judgment on behalf of the Trusts under the Trust Related Agreements and applicable law. **NOT SUBMITTED**

OO. Regardless of whether McCarter & English had authority to execute the Proposed Consent Judgment, it was improper (or in violation of the Trust Related Agreements) for McCarter & English to enter into the Proposed Consent Judgment.  **NOT SUBMITTED**

## AMBAC Declarations[533]

A. For as long as the Notes are outstanding, neither the Owners, nor the Owner Trustee acting at the direction of the Owners, can cause the Trusts to amend, modify, supplement, terminate, waive or surrender the terms of any Collateral or the Basic Documents, or take any action that would have the effect of amending, modifying, supplementing, terminating, waiving, or surrendering the terms of any Collateral or Basic Document, without first securing the requisite written consent of the Indenture Trustee, and the Noteholders or Ambac, as applicable.  **GRANTED**

B. For as long as the Notes are outstanding, neither the Owners, nor the Owner Trustee acting at the direction of the Owners, can cause the Trusts to transfer or otherwise dispose of any of the properties or assets of the Trust, unless directed to do so by the Indenture Trustee or Ambac (with respect the Insured Trusts).  **DENIED**

C. Neither the Owners, nor the Owner Trustee acting at the direction of the Owners, can cause the Master Trust to take any non-ministerial action without Ambac's consent.  **GRANTED**

D. The Owners lacked authority to direct the Owner Trustee to execute the 2015 Chaitman Letter on behalf of the Master Trust.  **DENIED**

---

[533] *See* AMBAC Counterclaim (D.I. 391).

E.  The Owner Trustee has the right to decline to follow a direction if it reasonably finds or is advised by counsel that the direction is (i) contrary to the Trust Related Agreements, (ii) contrary to the law, or (iii) likely to result in personal liability on the part of the Owner Trustee for which no indemnification is satisfactory.  **UNOPPOSED (GRANTED)**

F.  A direction that would benefit the Owners but amend, modify, waive, or surrender the Grant of the Indenture, or the manner and priority of payments provided for in the waterfall in Section 8.02 of the Indenture, is a direction that is contrary to the (i) Trust Related Agreements and/or (ii) the law. **GRANTED**

G.  Owner Trustee expenses must be incurred on behalf of the Owner Trustee for the benefit of the Trusts.  **DENIED**

H.  The Owner Trustee has the right to determine that expenses do not qualify as Owner Trustee expenses, if not incurred on behalf of the Owner Trustee for the benefit of the Trusts.  **DENIED**

I.  The Owners owe fiduciary duties to the Trusts.  **GRANTED**

J.  The Owners have a duty not to cause the Trusts to act, or to themselves act on behalf of the Trusts, in their own interest to the detriment of the interests of the Trusts, the Noteholders or the Note Insurer (with respect to the Insured Trusts) before the Notes are discharged.  **DENIED**

K.  Ambac has the right to direct the NCSLT 2007-3 and NCSLT 2007-4 Trusts with respect to the disposition of the assets and property of those Trusts. **DENIED**

L.  For the NCSLT 2007-3 and NCSLT 2007-4 Trusts, Ambac has the right to direct the Indenture Trustee to instruct the Issuer to undertake any act reasonably necessary or proper to carry out more effectively the purpose of the Indentures, and to direct the Administrator with respect to non-ministerial matters.  **DENIED**

M. For the Master Trust, Ambac has the right to direct the Owner Trustee. **DENIED**

N. The Indenture Trustee, acting at the direction of Ambac or the Noteholders, as applicable, has the right to direct the Issuer on matters relating to the Indenture. **DENIED**

O. While the Notes are outstanding, the Indenture Trustee, acting at the direction of Ambac or the Noteholders, as applicable, has the right to direct the Issuer to bring claims and compromise claims brought against the Trusts. **GRANTED**

P. Until the Notes are discharged, the Indenture Trustee has the right to bring all of the Trusts' claims relating to the Collateral, and the right to control the litigation of such claims, for the benefit of Ambac (in the Insured Trusts) and the Noteholders. **GRANTED**

## Noteholder Declarations[534]

A. For as long as the Notes are outstanding, neither the Owners, nor the Owner Trustee acting at the direction of the Owners, can cause the Trusts to amend, modify, supplement, terminate, waive or surrender the terms of any Collateral or the Basic Documents, or take any action that would have the effect of amending, modifying, supplementing, terminating, waiving, or surrendering the terms of any Collateral or Basic Document, without first securing the requisite written consent of the Indenture Trustee, and the Noteholders or Ambac, as applicable. **GRANTED**

B. For a direction by the Owners to be effective while the Notes are outstanding, all of the Owners must provide the direction, in writing, to the Owner Trustee. **GRANTED**

C. Absent a power of attorney from the Owner Trustee, the Owners cannot act on behalf of the Trusts. **GRANTED**

---

[534] *See* Noteholder Counterclaims (D.I. 395) ¶ 4.

D. Only the Owner Trustee, or its authorized agents acting within the scope of their agency, can act on behalf of the Trusts. **GRANTED**

E. A transfer of Certificates is invalid if it would cause a specific Person to own or control, directly or indirectly, or with an Affiliate, 100% of the Certificates. **GRANTED**

F. The Owner Trustee has the right to decline to follow a direction if it reasonably finds or is advised by counsel that the direction is (i) contrary to the Trust Related Agreements, (ii) contrary to the law, or (iii) likely to result in personal liability on the part of the Owner Trustee for which no indemnification is satisfactory. **UNOPPOSED (GRANTED)**

G. A direction that would benefit the Owners but amend, modify, waive, or impair the Grant of the Indenture, or the manner and priority of payments provided for in the waterfall in Section 8.02 of the Indenture, is a direction that is contrary to the (i) Trust Related Agreements and/or (ii) the law. **GRANTED**

H. Owner Trustee expenses must be incurred on behalf of the Owner Trustee for the benefit of the Trusts. **DENIED**

I. The Owner Trustee has the right to determine that expenses do not qualify as Owner Trustee expenses, if not incurred on behalf of the Owner Trustee for the benefit of the Trusts. **DENIED**

J. The Owners owe fiduciary duties to the Trusts. **GRANTED**

K. The Owners have a duty not to cause the Trusts to act, or to themselves act on behalf of the Trusts, in their own interest to the detriment of the interests of the Trusts, the Noteholders or the Note Insurer (with respect to the Insured Trusts) before the Notes are discharged. **DENIED**

L. To the extent the Owners exercise control over the Collateral, they owe duties to the beneficiaries of the Collateral. **GRANTED**

M. The Indenture Trustee, acting at the direction of Ambac or the Noteholders, as applicable, has the right to direct the Issuer on matters relating to the Indenture. **DENIED**

N. While the Notes are outstanding, the Indenture Trustee, acting at the direction of Ambac or the Noteholders, as applicable, has the right to bring claims and to compromise claims on behalf of the Trusts.  **GRANTED**

O. Until the Notes are discharged, the Indenture Trustee has the right to bring all of the Trusts' claims relating to the Collateral, and the right to control the litigation of such claims, for the benefit of Ambac (in the Insured Trusts) and the Noteholders.  **GRANTED**

P. Express third-party beneficiaries of the Trust Agreement, including any holder of the Notes, may sue to enforce the Trust Agreement.  **GRANTED**