# EXHIBIT 1

EFiled: Feb 03 2021 09:49PM EST
Transaction ID 66307409
Case No. 12111-VCS

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | ) | |
|---|---|---|
| IN RE NATIONAL COLLEGIATE | ) | CONSOLIDATED |
| STUDENT LOAN TRUSTS LITIGATION | ) | C.A. No. 12111-VCS |
| | ) | |

**GSS DATA SERVICES, LLC'S MOTION TO EFFECTUATE CERTAIN PROVISIONS OF THE COURT'S AUGUST 27, 2020 OPINION**

GSS Data Services, LLC ("GSS" or the "Administrator"), solely in its capacity as Administrator for the Trusts (defined below), by and through its undersigned counsel, hereby files this Motion to Effectuate Certain Provisions of the Court's August 27, 2020 Opinion ("Motion").

**PRELIMINARY STATEMENT**

1. This Court observed in its August 27, 2020 Opinion (the "Opinion"), that the Trusts have, for years, been left "in a state of near paralysis" as a result of the Trust Parties' varying interpretations of the Trusts' governing documents (*see* Op. at 5) and, among other things, the question of whether the Trusts could retain and pay litigation counsel contributed to this paralysis. In the Opinion, this Court issued a helpful, wide-ranging set of rulings that provided a roadmap for the Trusts to move forward on several fronts. Relevant here, the Court recognized that the Administrator was authorized: (i) to accept a direction to act in a non-ministerial manner, such as to retain counsel to represent the Trusts; and (ii) to incur expenses on behalf of the Trusts in certain instances. This Motion is intended to effectuate

{1110.004-W0064043.}

these provisions of the Opinion.

2.     Following the Opinion, commencing in late November 2020, the Administrator received, for the first time, written instructions to retain counsel on behalf of the Trusts in connection with three proceedings.  To date, because of the potential adverse consequences to the Trusts in the case of inaction, the Administrator has complied with two of these instructions and retained counsel to represent the Trusts, even though it is concerned about how to fund such legal expenses.  Namely, there is no money presently available under the Administrator expense caps to pay such counsel with respect to six of the fifteen Trusts, which constitutes 40% of the Trusts.

3.     The Administration Agreements provide an annual expense cap to reimburse the Administrator "for all its expenses in performing its obligations" under the Administration Agreement, which may include certain Administrator expenses incurred on behalf of the Trusts, if appropriately incurred and agreed to by the Administrator.  *See* Admin. Agreement § 3(b) (defined below).  These "caps" range from $100,000 (six Trusts created in 2003, 2004, and 2005 (the "2003-2005 Trusts")), to $200,000 (one 2006 Trust), to $300,000 (two 2006 Trusts), to $400,000 (one 2006 and the four 2007 Trusts), to having no cap at all (the Master Trust).

4.     From time to time, the Trusts may be named as defendants in a legal proceeding and may be best served by having counsel appear on their behalf.  Absent

a real-world ability to pay such counsel, certain Trusts will be unable to secure legal counsel, which can lead to a litany of bad outcomes: default, adverse judgment, writs of garnishment, and the like.  It is beyond dispute that, if named as a defendant in a litigation, it is *not* in the Trusts' best interest to be unrepresented, to default, and/or to have an adverse judgment or legal sanction entered.

5. Certain earlier Trusts have only a quarter of the available funds for expense reimbursement under the particular Administration cap when compared to other later Trusts.  This discrepancy means that six of the fifteen Trusts currently do not have the ability to pay litigation costs.  At present, the Administrator expense caps for the 2003-2005 Trusts—the six $100,000 expense cap Trusts—have been exhausted at least until July 2022, due to thousands of dollars in expense reimbursement accrued and unpaid.  Accordingly, by this Motion, the Administrator seeks Court authorization to permit the nine Trusts that currently do not have $400,000 expense caps (the "At-Issue Trusts") to raise their caps to $400,000.

6. In this regard, it is important to note that the At-Issue Trusts—if the caps are increased—will not pay any more in legal fees or other expenses in total over the lifetime of these Trusts.  Rather, these Trusts will merely be able to pay their counsel on a current basis, as opposed to (at best) deferring payment for years, or (worst) not having counsel.

7. In addition, increasing the caps does not increase the Administrator's

compensation; it solely increases the amount presently available for expense reimbursement and, if a Trust's expense caps are not used in a given year, the remaining balance does not roll over to future years and does not get paid out to anyone.

8.  The Administrator further notes that this Motion is unrelated to and agnostic towards any disputes certain Trust parties may have over direction and control of the Trusts' affairs. It is intended solely to create a mechanism for the payment of expenses of counsel.

9.  This Motion is modeled both procedurally and substantively on the application made to this Court to appoint a Special Master and to enlarge the Owner Trustee/Indenture Trustee expense cap by 50% to pay the Special Master—which the Court granted.

10. Like the Special Master motion, the Court will be requested to approve a form of notice to be provided by the Indenture Trustee to certificateholders of the Trusts, which describes the Motion and provides a mechanism and deadline for comment and objection.[1]  Here, the Administrator proposes following the same notice protocol for all interested parties. The proposed form of notice is attached to this Motion as Exhibit 1.

---

[1] *See* Owner Trustee Letter, Trans. ID 62144220 (June 15, 2018); Court of Chancery Letter, Trans. ID 62200014 (July 3, 2018).

11. The substantive relief sought in this Motion mirrors the relief granted in the Court's Order appointing the Special Master and, in particular, the 50% increase in the Owner Trustee cap to compensate the Special Master – as a means to create more functional Trusts.[2]

12. Last, the Administrator has worked closely with the Indenture Trustee, Ambac, the Noteholders and the Owner Trustee since the Fall 2020 on the relief sought in this Motion. The Administrator understands that the Owner Trustee and Ambac are supportive of the Motion; as of the date of filing, the Administrator was still in discussions with the Indenture Trustee and the Noteholders and will update the Court promptly on their positions.

## FACTUAL BACKGROUND

13. As noted in the Opinion, GSS is the Administrator of fifteen Delaware statutory trusts created pursuant to the Delaware Statutory Trust Act, 12 *Del. C.* §§ 3801, *et seq.*, between 2001 and 2007 (the "Trusts").[3] *See* Op. at 32. The Trusts are governed by certain agreements, including the Trust Agreements, the Indentures, and the Administration Agreements (collectively, the "Trust Related Agreements"),[4] which

---

[2] *See* Order, Trans ID. 62668197 (Nov. 14, 2018).

[3] The individual Trusts are: National Collegiate Master Student Loan Trust (the "Master Trust"), NCSLT 2003-1, 2004-1, 2004-2, 2005-1, 2005-2, 2005-3, 2006-1, 2006-2, 2006-3, 2006-4, 2007-1, 2007-2, 2007-3, and 2007-4.

[4] The Trust Related Agreements cited in this Motion are in the joint compendium of contracts submitted to the Court in relation to the Parties' Rule 12(c) motions on

are governed by New York law. *See* Declaration of Andrea Lenox ("Lenox Decl."), ¶¶ 3-4.

14. Relevant here, the Administrator does not believe that the Administration Agreement imposes a plenary obligation to act in a non-ministerial capacity, but that, if it elects, the Administrator can act in a non-ministerial capacity in response to a proper direction, including to engage counsel on behalf of the Trusts in non-ordinary course litigation. The Administrator has the right to be reimbursed for Administrator expenses incurred on behalf of the Trusts, which the Court referred to as Trust expenses in the Opinion. *See* Op. at 50 ("[T]he Administrator does have a right to incur expenses on behalf of the Trusts."), 131 ("[T]he Administrator—but not the Owner Trustee—may have a limited right to seek reimbursement for Trust expenses.").

15. Each Administration Agreement for the Trusts[5] provides that the Administrator may be reimbursed for its expenses up to a set amount per year (the "Expense Caps"). *See* Admin. Agreement § 3; Indenture § 8.02. The Expense Caps vary per Trust, ranging from $100,000 to $400,000 per year, and reset each year on July 1st. *See* Lenox Decl., ¶¶ 5-7.

16. If expenses chargeable to Expense Caps exceed the cap amount in a

---

March 6, 2020. Trans. ID. 64801188 (Mar. 6, 2020).

[5] With the exception of the Master Trust, which does not have a cap on Administrator expenses.

fiscal year, they cannot be reimbursed in that fiscal year, but must await reimbursement in subsequent fiscal years. *Id.* at ¶ 8. So, to use an example, for a Trust with a $100,000 cap, if that Trust incurred $300,000 in reimbursable expenses, the Trust will pay $100,000 in year one, $100,000 in year two and $100,000 in year three. In comparison, if that Trust's expense caps were raised to $400,000, and that if that same Trust incurred $300,000 in reimbursable expenses, the Trust will pay $300,000 in year one (and the remaining $100,000 will have been unused when the fee caps reset). As such, the only difference in these two illustrations is *when* the Trusts make payment, not the *amount* of payment. Currently, for the six trusts with Expense Caps of $100,000, the payment of any new reimbursable expenses cannot occur until at least July 2022. *Id.* at ¶ 9.

17. As this Court noted in the Opinion, the Indenture sets forth certain obligations of the Trusts, including to "maintain or preserve the lien and security interest . . . of [the] Indenture," "enforce any of the Collateral," and "preserve and defend title to the Indenture Trust Estate and the rights of the Indenture Trustee." Op. at 20-21 (citing Indenture § 3.05).

18. Since late November 2020, the Administrator has received three separate directions to retain counsel to represent the Trusts in non-ordinary course lawsuits as set forth below.

19. In *McCarter & English, LLP v. The National Collegiate Master Student*

*Loan Trust I, et al.*, No. 654144-2018 (N.Y. Sup. Ct.), the McCarter law firm sued the Trusts over unpaid attorneys' fees. On October 23, 2020 the McCarter court set a November 23, 2020 deadline for counsel to appear for the Trusts. Subsequently, the Indenture Trustee and Owner Trustee directed the Administrator to retain counsel for the Trusts. *See* Lenox Decl., Ex. C (Nov. 21, 2020, Direction Letter from Indenture Trustee), Ex. D (Nov. 23, 2020, Direction Letter from Owner Trustee).

20. In response, the Administrator retained counsel as directed to avoid a default – with the understanding there would need to be a plan to pay counsel. Lenox Decl., ¶¶ 10-11, Ex. A.

21. In *DiCello Levitt Gutzler LLC v. The National Collegiate Master Student Loan Trust I, et al.*, No. 01-19-0004-0792 (American Arbitration Association), the DiCello firm initiated an arbitration against the Trusts for unpaid legal fees. In December 2020, the Indenture Trustee directed the Administrator to retain counsel to represent the Trusts (other than the Master Trust). Lenox Decl., Ex. E. The Administrator has accepted the direction and engaged counsel for the Trusts – with the caveat about a plan to pay counsel. *Id.* at ¶¶ 12-13, Ex. B, Ex. E (Dec. 18, 2020, Direction Letter from Indenture Trustee).

22. The Administrator was directed to retain counsel for the Trusts in response to the CFPB's pending Request for Default against the Trusts in *Consumer*

*Financial Protection Bureau v. National Collegiate Master Student Loan Trust, et al.*, No. 1:17-CV-1323 (D. Del.). Lenox Decl., Ex. F (Jan. 22, 2021, Direction Letter from Indenture Trustee). The Administrator has not yet followed the direction and an update on the status of retention of counsel for the Trusts in that action will be provided to the District Court this week.

## ARGUMENT

23.  The Court should authorize the proposed increase of the Expense Caps to give effect to the Court's Opinion, effectuate the parties' intent as described by the Court and avoid potential harm to the Trusts should they not be able to retain counsel in the event the Expense Caps are not increased.

**A.  Legal Authority**

24.  Courts may imply terms into contracts to avoid "arbitrary[y] or unreasonabl[e]" results "thereby frustrating the fruits of the bargain that the asserting party reasonably expected." *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2009). The implied covenant of good faith and fair dealing "protects the spirit of the agreement rather than the form." *NAMA Holdings., LLC v. Related WMC LLC*, 2014 Del. Ch. LEXIS 232, at *47 (Del. Ch. Nov. 17, 2014). Through the implied covenant of good faith and fair dealing, "Delaware law cautiously supplies terms to fill gaps in the express provisions of a specific agreement." *Id.* at *47, 52 (quotation omitted).

25.  The Delaware Supreme Court explains that "[t]he covenant is 'best

understood as a way of implying terms in the agreement,' whether employed to analyze unanticipated developments or to fill gaps in the contract's provisions." *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005) (quotation omitted). Thus, courts may imply terms into contracts where parties have encountered unanticipated developments not contemplated in the language of the contract. *See Lonergan v. EPE Holdings, LLC*, 5 A.3d 1008, 1018 (Del. Ch. 2010) (acknowledging a contract may "fail to address a future state of the world . . . because contracting is costly and human knowledge imperfect"); *Amirsaleh v. Bd. of Trade of City of New York, Inc.*, 2008 Del. Ch. LEXIS 131, at *1 (Del. Ch. Sept. 11, 2008).

26. When a court implies contract terms, the court "assess[es] the parties' reasonable expectations at the time of contracting." *Nemec,* 991 A.2d 1120, 1126. The court looks to notions of "good faith" and "fair dealing" to determine "what the parties would have agreed to themselves had they considered the issue in their original bargaining positions at the time of contracting." *Gerber v. Enter. Prods. Holdings, LLC*, 67 A.3d 400, 418 (Del. 2013), *overruled in part on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808 (Del. 2013). The court may imply additional terms "consistent with the terms of the agreement as a whole." *Alliance Data Sys. Corp. v. Blackstone Capital Partners VL.P.*, 963 A.2d 746, 770 (Del. Ch. 2009), *aff'd*, 976 A.2d 170 (Del. 2009).

27. Courts also have inherent authority to enforce their orders and give

effect to their decisions. *See Forsythe v. CIBC Empl. Private Equity Fund*, 2006 Del. Ch. LEXIS 60, at *5 (Del. Ch. 2006) ("This court, moreover, retains inherent authority to enforce its decisions, even in the absence of specific authorization by rule.").

28.     While the Court held in the Opinion that the Trust Agreements contemplated the Administrator being allowed to take non-ministerial direction from other parties, the parties did not anticipate the costs associated with such direction when setting the Expense Caps fifteen plus years ago or the costs of all the non-ordinary course litigation that has embroiled the Trusts in recent years, which has taxed the Expense Caps.  The relief described below fills the gap between the parties' intent as described by the Court and the means to effectuate that intent and the Court's Opinion.

**B.     The Trusts' Need for Counsel**

29.     At times, for differing reasons, the Trusts are named in legal proceedings and, given the nature of the claims, there may be a need to retain counsel on behalf of the Trusts.  Take, as an example, where an entity is suing the Trusts for money damages.  Clearly, there is a benefit, at a minimum, for counsel to appear and avoid entry of a default judgment, to respond to a pleading or discovery requests (and thus avoid sanctions).  There cannot be serious dispute that it is not in the Trusts' best interest to be unrepresented in litigation, to default, or to have an adverse judgment entered.

30. To date, the Administrator has executed engagement letters with two law firms on behalf of the Trusts. However, there is not a plan in place to pay these counsel on the six capped out Trusts, thus facilitating this Motion. The Administrator agreed to engage these counsel on very short notice with the explicit negotiated understanding that the parties would work towards an Expense Cap increase.

31. The Administrator believes it has discretion whether to comply with a direction letter to retain counsel on behalf of the Trusts. That discretion includes a reasonable analysis as to whether such counsel can be paid in a timely manner for its work (to avoid, among other things, a potential lawsuit against the Trusts for nonpayment). The Administrator likewise has the right—as confirmed in the direction letters—to terminate counsel. Going forward, if there is not a meaningful ability for the Trusts to pay Trust counsel, the Administrator will have no choice but to terminate any counsel engaged and to decline any future directions to engage counsel for such Trusts. *See generally* Op. at 45-46; Admin. Agreement § 1(c).

32. This Motion is intended to assist in creating a mechanism to pay counsel retained by the Administrator on behalf of the Trusts. This Motion is not intended to dictate the Trusts' legal position in any litigation. It is not intended to influence any of the Trust governance issues between the Owner, Indenture Trustee and Ambac discussed in the Opinion. It is not intended to decide who can direct

Trust counsel. It is therefore agnostic to the parties' disputes—but creates a solution to one of the many issues still facing the Trusts.

33. While it is unclear if the Expense Cap increases sought through this Motion will be too little, too much, or just right, the proposed increase will allow the Trusts to move ahead with representation and carry out current instructions. The Administrator has discussed with several parties the potential need to revisit the $400,000 Expense Caps if, in reality, they prove insufficient. In the event the Court grants the Motion, and the Expense Caps prove to be insufficient, the Administrator reserves its right to seek further relief from this Court.

For these reasons, the Administrator respectfully requests that the Court authorize an increase in the Expense Caps for the NCSLT 2003-1, 2004-1, 2004-2, 2005-1, 2005-2, 2005-3, 2006-1, 2006-2, and 2006-3 to $400,000 per year.

| | |
|---|---|
| Dated: February 3, 2021 | LANDIS RATH & COBB LLP |
| | */s/ Jennifer L. Cree*<br>Rebecca L. Butcher (No. 3816)<br>Jennifer L. Cree (No. 5919)<br>919 Market Street, Suite 1800<br>Wilmington, DE 19801<br>302-467-4400 (main)<br>302-467-4450 (fax)<br>butcher@lrclaw.com<br>cree@lrclaw.com<br>and |

ALSTON & BIRD LLP
John P. Doherty, Esquire
William Hao, Esquire
90 Park Avenue
New York, NY  10016-1387
(212) 210-9400 (main)
(212) 210-9444 (fax)
john.doherty@alston.com
william.hao@alston.com

*Attorneys for Defendant*
*GSS Data Services, LLC*

WORDS: 2,996