## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU<br><br>      Plaintiff,<br><br>      v.<br><br>THE NATIONAL COLLEGIATE MASTER STUDENT LOAN TRUST; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2003-1; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2004-1; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2004-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-1; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-3; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-1; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-3; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-4; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-1; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-3; and NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4, Delaware Statutory Trusts,<br><br>      Defendants. | Case No. 17-1323 (MN)<br><br>**FIRST AMENDED COMPLAINT FOR PERMANENT INJUNCTION AND OTHER RELIEF** |

## INTRODUCTION

1.     Plaintiff, the Consumer Financial Protection Bureau ("Bureau"), brings

this action against the fifteen (15) National Collegiate Student Loan Trusts ("Defendants," or "NCSLTs", or "the Trusts") under sections 1031(a), 1036(a), 1054(a), and 1055 of the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. §§ 5531, 5536(a), 5564(a), 5565, to obtain permanent injunctive relief, restitution, refunds, disgorgement, damages, civil money penalties, and other appropriate relief for Defendants' violations of Federal consumer financial law in connection with Defendants' servicing and collection of private student loan debt.

2. The Bureau has reviewed the debt-collection and litigation practices of the fifteen Delaware statutory trusts that are Defendants in this action and the practices of Defendants' agents.

3. To collect on defaulted private student loans, Defendants' agents filed collections lawsuits on behalf of Defendants in state courts across the country. In support of these lawsuits, Defendants' agents executed and filed affidavits that falsely claimed personal knowledge of the account records and the consumer's debt and, in many cases, personal knowledge of the chain of assignments establishing ownership of the loans. In addition, Defendants' agents filed at least 2,000 collections lawsuits on Defendants' behalf either without the documentation necessary to prove Trust ownership of the loans or on debt that was time-barred. Finally, notaries for Defendants' agents notarized more than 25,000 affidavits even though they did not witness the affiants' signatures.

## JURISDICTION AND VENUE

4. The Court has subject-matter jurisdiction over this action because it is brought under Federal consumer financial law, 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C.

§ 1345.

5.      Venue is proper in this District because Defendants are located and do business in this District. 12 U.S.C. § 5564(f).

## PLAINTIFF

6.      The Bureau is an independent agency of the United States charged with regulating the offering and provision of consumer financial products or services under Federal consumer financial laws. 12 U.S.C. § 5491(a). The Bureau has independent litigating authority to enforce Federal consumer financial laws, including the CFPA. 12 U.S.C. §§ 5531(a), 5564(a)–(b).

## DEFENDANTS

7.      Defendants are any and all of the fifteen Delaware statutory trusts referred to as the National Collegiate Student Loan Trusts ("NCSLTs" or "the Trusts," which are the National Collegiate Master Student Loan Trust, NCSLT 2003-1, NCSLT 2004-1, NCSLT 2004-2, NCSLT 2005-1, NCSLT 2005-2, NCSLT 2005-3, NCSLT 2006-1, NCSLT 2006-2, NCSLT 2006-3, NCSLT 2006-4, NCSLT 2007-1, NCSLT 2007-2, NCSLT 2007-3, and NCSLT 2007-4) and their successors and assigns.

8.      Defendants are "covered person[s]" under the CFPA, 12 U.S.C. § 5481(6).The CFPA defines "covered person" as "any person that engages in offering or providing a consumer financial product or service" and "any affiliate of [such a person] if such affiliate acts as a service provider to such person." 12 U.S.C. § 5481(6). Defendants are "person[s]" as defined by the CFPA because they are "trust[s]" and, under Delaware law, unincorporated associations. 12 U.S.C. § 5481(19). Defendants offer or provide a "consumer financial product or service" because they engage in "servicing loans, including acquiring, [and] purchasing" loans, which are themselves

3

extensions of credit that are offered or provided for use by consumers primarily for personal, family, or household purposes, and also engage in the collection of debt related to these extensions of credit. 12 U.S.C. § 5481(5), (15)(A)(i), (x).

### PROCEEDINGS TO DATE

9.      This action was initially filed by the Bureau on September 18, 2017, along with a proposed consent judgment seeking to settle the Bureau's claims and a joint motion by the Bureau and Defendants to approve the settlement. The filing of the complaint and settlement was authorized by then Bureau Director Richard Cordray. At the time of filing, the CFPA provided that the Director of the Bureau could be removed from that position by the President of the United States for "inefficiency, neglect of duty, or malfeasance in office." 12 U.S.C. § 5491(c)(3).

10.     From September 20 to October 10, 2017, seven parties who professed interest in Defendants or the settlement filed motions to intervene in this action. Briefing on the motions to intervene was completed by November 20, 2017.

11.     In November 2017, Director Cordray resigned. From November 28, 2017, until December 17, 2018, the Bureau was headed by an Acting Director appointed to fill the vacancy. The Acting Director, Mick Mulvaney, was removable by the President at will. During the Acting Director's tenure, the Bureau continued to prosecute this action.

12.     On July 10, 2018, counsel for Defendants moved to withdraw for non-payment. The Court granted this request on July 16, 2018, and ordered Defendants to retain new counsel within 30 days.

13.     On September 20, 2018, this case was reassigned from Judge Gregory M. Sleet to Judge Maryellen Noreika.

14.     As of the date of reassignment, the initial complaint and motion to

4

approve the proposed consent judgment had been pending for just over a year, the motions to intervene had been pending for almost a year, Defendants had been without counsel for over two months, and Defendants were more than a month delinquent in complying with the Court's order to retain new counsel.

15.     On October 19, 2018, the Court granted the motions to intervene. On November 1, 2018, the Court ordered the parties to propose a schedule for briefing the motion to approve the consent judgment and for any related discovery.

16.     On November 16, 2018, in the parties' joint submission to the Court, the Bureau argued that the Court should schedule briefing on disputed threshold legal issues without permitting the parties to engage in discovery. On November 29, 2018, the Court issued a scheduling order rejecting the Bureau's argument and permitting discovery on the disputed threshold legal issues. The scheduling order called for discovery to close on February 22, 2019. In fact, discovery on the threshold issues would extend until February 12, 2020.

17.     On December 17, 2018, Kathleen Kraninger, who had been confirmed by the Senate, became the Bureau's Director, replacing Acting Director Mick Mulvaney.

18.     On December 21, 2018, less than thirty days after entry of the scheduling order, the Bureau served requests for documents on certain Intervenors and served subpoenas for documents on certain third parties regarding the threshold legal issues. From that date until the close of discovery, the Bureau prosecuted this action vigorously, including by litigating numerous discovery disputes.

19.     Briefing on the threshold legal issues related to the proposed consent judgment that had been filed with the Bureau's original complaint was completed on April 30, 2020. On May 31, 2020, the Court denied the motion to approve the proposed

consent judgment on the ground that the counsel who had executed the settlement on Defendants' behalf did not have authority to do so.

20.     On June 11, 2020, the Bureau served a summons and the complaint on Defendants via process server. Service was necessary after the Court denied entry of the settlement, which had included a waiver of service.

21.     On June 29, 2020, the Supreme Court issued its ruling in *Seila Law, LLC, v. Consumer Financial Protection Bureau*, 140 S. Ct. 2183 (2020), holding that the "for cause" removal provision contained in the CFPA was unconstitutional but severable from the rest of the statute.

22.     On July 2, 2020, the Bureau filed an application for entry of default against Defendants for failure to timely answer or respond to the complaint.

23.     On July 10, 2020, certain Intervenors moved to dismiss this action under Rules 12(b)(1) and (6), arguing for the first time that because of the CFPA's for-cause removal provision, the Bureau lacked authority to file its complaint in September 2017.

24.     On July 17, 2020, the Bureau filed a declaration executed by Director Kraninger ratifying the 2017 filing of this action.

25.     On February 5 and 10, 2021, counsel for Defendants appeared for the first time in the action since July 10, 2018.

### DEFENDANTS' BUSINESS STRUCTURE AND OPERATIONS

26.     The fifteen Defendants were organized between 2001 and 2007 under the Delaware Statutory Trusts Act. Del. Code Ann. tit. 12, § 3801 *et seq.*

27.     The basic purpose of each Defendant is to acquire a pool of private student loans, to issue notes secured by that pool of student loans, and to service and collect on those student loans.

28.     The activities and operations Defendants engage in to execute their basic purposes are delineated in a number of agreements, collectively referred to as the Trust-Related Agreements. These agreements include, but are not limited to, for each Trust, a Trust Agreement, an Indenture, an Administration Agreement, and servicing agreements defining how Defendants' loan servicing and debt collection activities are to be carried out.

29.     Defendants act in their own name. However, they do not act through employees or officers. Instead, Defendants act through entities that are empowered according to relevant Trust-Related Agreements to act in the Trusts' name. The Trusts also contracted with entities that acted as the Trusts' agents.

30.     The Trusts explicitly represent and covenant in their Trust Agreements and Indentures that they will act only in their own name.

31.     The Trusts explicitly represent and covenant in their Trust Agreements and Indentures that they will engage in the business of acquiring, owning, and servicing student loans.

32.     The Trusts explicitly represent and covenant in their Indentures that they are responsible for compliance with all Federal laws and regulations applicable to the acquired student loans.

33.     The Trusts explicitly represent in their Indentures that the actions of entities acting within the prescribed authority of relevant Trust-Related Agreements are, legally, the actions of the Trusts themselves.

34.     The Trusts acquired more than 800,000 private student loans from originating lenders.

7

35.     The Trusts engage in regular servicing of these student loans through certain designated entities including Intervenor Pennsylvania Higher Education Assistance Agency. In the Indentures, the Trusts explicitly represent that the actions of these entities, acting within the prescribed authority of relevant servicing agreements, are, legally, the actions of the Trusts themselves.

36.     The Trusts also engage in delinquent or default servicing and debt collection activities through certain designated entities, and contract with subservicers to assist in these activities.

37.     Debt collection activities include the filing of debt collection lawsuits filed against allegedly defaulted borrowers. Thousands of debt collection lawsuits have been filed against borrowers whose loans are held or allegedly held by the Trusts since 2012. In these lawsuits the relevant Trust is the named plaintiff in the action. Relevant Trusts are also named as defendants in countersuits or other actions related to the allegedly held debt by borrowers. The relevant Trusts have defended such actions in their own name.

38.     In 2009, the Trusts entered into the Special Servicing Agreement ("SSA"). The SSA appointed a "Special Servicer" to ensure the servicing, collection, and litigation of delinquent and defaulted student loans.

39.     When acting pursuant to the SSA the Special Servicer acts for and represents the Trusts, and the Special Servicer's actions are deemed to be the actions of the Trusts.

40.     The SSA required that the Trusts, acting through the Special Servicer, hire subservicers to enforce and collect on delinquent and defaulted student loans.

41.     The SSA empowered the Trusts, acting through the Special Servicer, to oversee, supervise, and direct the subservicers.

42.     In 2012, upon the resignation of the Special Servicer and pursuant to the terms of the SSA, the Back-Up Special Servicer, Intervenor US Bank, assumed the role of Special Servicer.

43.     Upon assumption of the role of Special Servicer, the Back-Up Special Servicer became subject to all of the terms and conditions of the SSA.

44.     The SSA required that the Trusts, acting through the Special Servicer, enter into and adhere to the Default Prevention and Collection Services Agreement ("DPCSA") to engage a "Subservicer" to enforce and collect on delinquent and defaulted student loans.

45.     Under the DPCSA the Trusts, acting through the Special Servicer, had the right to exercise control over the Subservicer by, among other things:

a.   replacing the Subservicer;

b.   directing the means and manner by which the Subservicer engaged in the services it provided under the DPCSA;

c.   exercising control over who the Subservicer employed or contracted with to engage in the services it provided under the DPCSA;

d.   retaining the right to audit the Subservicer's books and records;

e.   overseeing the Subservicer's provision of services under the DPCSA;

f.   requiring the Subservicer to provide monthly reports on its provision of services under the DPCSA; and

g.  maintaining authority over the terms of the operating guidelines that dictated how the Subservicer could engage in collections litigation under the DPCSA.

46.  The DPCSA provides that the Subservicer is engaged for the benefit of the Trusts, including by providing that:

a.  the Subservicer agrees to take no action that would damage the reputation of the Trusts;

b.  the Subservicer agrees to disclose that it is acting in a representative capacity on behalf of the Trusts when hiring counsel to engage in debt collections litigation, and when preparing any document in support of debt collections litigation filed for the Trusts' benefit;

c.  the Subservicer is appointed to maintain records on the Trusts' behalf;

d.  the Subservicer is compensated for its services under the DPCSA by the Trusts; and

e.  the Subservicer deposits money collected as a result of its services under the DPCSA into accounts maintained for the Trusts' benefit.

47.  As of March 1, 2009, the Subservicer appointed by the DCPSA was NCO Financial Systems, Inc.

48.  Since November 1, 2014, the Subservicer appointed by the DPCSA, as amended, has been Intervenor Transworld Systems, Inc.

49.  Pursuant to its obligations to the Trusts under the DPCSA, the Subservicers executed and notarized deceptive affidavits and caused them to be filed in debt collection actions brought on behalf of the Trusts.

50.     Pursuant to its obligations to the Trusts under the DPCSA, the Subservicers filed or caused to be filed collections lawsuits lacking documentation needed to prove ownership of the loans.

### FALSE AND MISLEADING AFFIDAVITS AND TESTIMONY

51.     In connection with collecting or attempting to collect debt from consumers, between November 1, 2012, and April 25, 2016, the Subservicers, acting on behalf of Defendants, initiated 94,046 collections lawsuits in courts across the country.

52.     In each of these collections lawsuits, the relevant Defendant that purported to own the subject student loan was listed as the named plaintiff.

53.     In support of the collections lawsuits, the Subservicers acting on behalf of Defendants submitted affidavits and documents in support of Defendants' claims that consumers owed debts to Defendants.

54.     The Subservicers' affiants executed and notarized affidavits on behalf of Defendants, and caused those affidavits to be filed—often attaching exhibits—in Defendants' collections lawsuits.

55.     In these affidavits, the affiants swore that they had personal knowledge of the student loan records evidencing the debt.

56.     In fact, in numerous instances, affiants lacked personal knowledge of the student loan records evidencing the debt when they executed the affidavits.

57.     The affiants also swore in the affidavits that they were authorized and competent to testify about the consumers' debts through review of and "personal knowledge" of the business records, including electronic data, in their possession.

58.     In fact, in numerous instances, affiants lacked personal knowledge of the business records, including the electronic data, showing that consumers owed debts to Defendants.

59.     Affiants were instructed to review data on a computer screen to verify information in the affidavits about the debts. Affiants, however, did not know the source of the data on that screen, how the data was obtained or maintained, whether it was accurate, or whether those data meant that the debt was in fact owed to Defendants.

60.     Each affiant also swore that he or she had "personal knowledge of the record management practices and procedures of Plaintiff [the Trust] and the practices and procedures Plaintiff requires of its loan servicers and other agents."

61.     In fact, affiants lacked personal knowledge of the record management practices and procedures of Defendants or the practices and procedures of the entities through which Defendants acted.

62.     In many affidavits, the affiants also swore, "I have reviewed the chain of title records as business records" regarding the relevant account.

63.     In fact, in numerous instances, affiants did not review the chain of assignment records prior to executing the affidavits. In some cases, affiants reviewed only "chain of title" records that had been found online. In fact, the Subservicers instructed affiants that they did not need to review the chain of assignment records before executing affidavits that represented that the affiant had reviewed those records.

64.     In fact, affiants did not have access to deposit and sale agreements—the last link in the chain of assignment transferring loans into the Trust—until May 30, 2014.

65.     In many affidavits, the affiants asserted that they had personal knowledge that the loans were transferred, sold, and assigned to the Trusts on dates certain.

66.     In fact, affiants lacked personal knowledge of the chain of assignment records necessary to prove that the relevant Trust owned the subject loan.

67.     In some instances, when affiants complained to management that they did not have personal knowledge of certain representations made in the affidavits, the Subservicers instructed the affiants to continue signing the affidavits. In some instances, affiants felt "bullied" by management and followed the instructions for fear of losing their jobs.

68.     On numerous occasions, to address a backlog of affidavits, employees of the Subservicers such as interns and mailroom clerks were instructed to execute affidavits.

69.     On numerous occasions, between November 1, 2012, and September 1, 2013, the Subservicer filed stale affidavits that had earlier been executed by a previous entity. Contrary to the statements in the affidavits, the affiants in question were no longer "authorized to testify" in the matter and no longer had access to or knowledge of the consumer's account records or debt.

70.     Affiants also later provided live testimony in court, purportedly based on personal knowledge, similar to the statements made in the affidavits as described in Paragraphs 55–66.

## IMPROPERLY NOTARIZED AFFIDAVITS

71.     Between November 1, 2012, and August 3, 2014, in connection with collecting or attempting to collect debt from consumers, Defendants' Subservicers acting on behalf of Defendants filed at least 11,412 affidavits in collections lawsuits.

72.     Between November 1, 2012, and August 3, 2014, Defendants' Subservicer acting on behalf of Defendants improperly notarized virtually every affidavit executed and filed.

73.     Affiants executed the affidavits outside the presence of the notary.

74.     Affiants placed executed affidavits in a specified location.

75.     Defendants' Subservicers' notaries later notarized stacks of previously signed affidavits all at once at their desks.

76.     Contrary to the representations in the affidavits, affiants did not personally appear before notaries.

77.     Contrary to the representations in the affidavits, notaries did not place the affiants under oath or witness their signatures.

78.     On numerous occasions, notaries notarized affidavits executed by affiants on a prior date. At least one of Defendants' Subservicers instructed notaries to ensure that the notarization date matched the date of execution, even if that meant backdating the notarization date.

79.     In many cases, the notaries did in fact back date their notarization of the affidavits.

## FILING LAWSUITS WITHOUT THE INTENT OR ABILITY TO PROVE THE CLAIMS, IF CONTESTED

80.     Defendants filed at least 1,214 collections lawsuits against consumers even though the documentation needed to prove they owned the loans was missing. Through

these lawsuits, Defendants obtained approximately $21,768,807 in judgments against consumers.

81.     In these lawsuits, documentation of a complete chain of assignment evidencing that the subject loan was transferred to Defendants was missing.

82.     In addition, Defendants filed at least 812 collections lawsuits where the documentation did not support the Trusts' ownership of the loans. The chain of assignment documentation shows that these loans were allegedly transferred to Defendants before they were in fact disbursed to consumers.

83.     In at least 208 other collections lawsuits, the promissory note to prove that a debt was owed did not exist or could not be located.

84.     For each collections lawsuit described in Paragraphs 80-83, Defendants could not prove that a debt was owed to Defendants, if contested.

85.     Defendants knew, or their processes should have uncovered, that these chain of assignment documents were missing or flawed, yet Defendants continued to file collections lawsuits.

## COLLECTION OF TIME-BARRED DEBT

86.     In at least 486 collections lawsuits, in connection with collecting or attempting to collect debt from consumers, Defendants filed a collections lawsuit outside the applicable statute of limitations.

87.     In numerous instances, in connection with collecting or attempting to collect debt, Defendants represented to consumers, directly or indirectly, expressly or by implication, including by the filing of collections lawsuits itself, that the Trusts had a legal right to obtain judgment through their collections lawsuits.

## THE CONSUMER FINANCIAL PROTECTION ACT

88.     The CFPA provides that it is unlawful for any covered person "to offer or provide to a consumer any financial product or service not in conformity with Federal consumer financial law, or otherwise commit any act or omission in violation of a Federal consumer financial law." 12 U.S.C. § 5536(a)(1)(A). The CFPA grants the Bureau authority to commence a civil action against any person who violates a Federal consumer financial law, such as the CFPA. 12 U.S.C. § 5564(a).

## VIOLATIONS OF THE CFPA

89.     The CFPA prohibits a covered person from committing or engaging in any "unfair, deceptive, or abusive act or practice" in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service. 12 U.S.C. §§ 5531, 5536(a)(1)(B).

90.     Servicing loans and collecting debt are "consumer financial products or services" under the CFPA. 12 U.S.C. § 5481(15)(A)(i), (x).

## DECEPTIVE ACTS OR PRACTICES

### COUNT I

### False and Misleading Affidavits and Testimony

91.     The Bureau incorporates the allegations in Paragraphs 1–70 by reference.

92.     In numerous instances, in connection with collecting or attempting to collect debt, Defendants represented to consumers, directly or indirectly, expressly or by implication, that affiants or witnesses in court had personal knowledge of the student loan records evidencing the debt.

93.     In fact, in numerous instances those representations were false because affiants and witnesses lacked personal knowledge of the student loan records evidencing

the debt when they executed the affidavits.

94.     In numerous instances, Defendants represented to consumers, directly or indirectly, expressly or by implication, that affiants and witnesses had personal knowledge of the record management practices and procedures of the Trusts and the practices and procedures of the entities through which the Trusts acted.

95.     In fact, in numerous instances those representations were false because affiants and witnesses lacked personal knowledge of the record management practices and procedures of the Trusts and the practices and procedures of the entities through which the Trusts acted.

96.     In numerous instances, Defendants represented to consumers, directly or indirectly, expressly or by implication, that affiants and witnesses had reviewed the chain of title records and asserted that they had personal knowledge that the loans were transferred, sold, and assigned to the Trusts on dates certain.

97.     In fact, in numerous instances those representations were false because, affiants and witnesses had not reviewed the chain of title records and lacked personal knowledge that the loans were transferred, sold and assigned to the Trusts.

98.     Defendants' false representations set forth in Paragraphs 92–97 are material and likely to mislead consumers acting reasonably under the circumstances.

99.     Defendants' false representations set forth in Paragraphs 92-97 constitute deceptive acts or practices in violation of the CFPA. 12 U.S.C. §§ 5531, 5536 (a)(1)(B).

## COUNT II

## Improperly Notarized Affidavits

100.    The Bureau incorporates the allegations in Paragraphs 1–50 and 71—79 by

reference.

101.    In numerous instances, in connection with collecting or attempting to collect debt, Defendants represented to consumers, directly or indirectly, expressly or by implication, that the affidavits submitted in support of their collections lawsuits were properly sworn and executed before a notary.

102.    In fact, in numerous instances those representations were false because the affidavits were unsworn and executed outside the presence of a notary.

103.    Defendants' false representations set forth in Paragraphs 101–102 are material and likely to mislead consumers acting reasonably under the circumstances.

104.    Defendants' false representations set forth in Paragraph 101–102 constitute deceptive acts or practices in violation of the CFPA. 12 U.S.C. §§ 5531, 5536(a)(1)(B).

## COUNT III

### Filing Lawsuits without the Intent or Ability to Prove the Claims, if Contested

105.    The Bureau incorporates the allegations in Paragraphs 1–50 and 80-85 by reference.

106.    In numerous instances, in connection with collecting or attempting to collect debt, Defendants represented to consumers, directly or indirectly, expressly or by implication, that collections lawsuits were supported by valid and reliable legal documentation needed to obtain judgment.

107.    In fact, in connection with numerous lawsuits, those representations were false because documentation of a complete chain of assignment evidencing that the subject loan was transferred to Defendants was missing.

108.    In fact, in connection with numerous lawsuits, those representations were false because a promissory note proving the existence of the debt was missing.

109.    In fact, in connection with numerous lawsuits, those representations were false because the Trusts could not prove their claims, if contested.

110.    Defendants' false representations set forth in Paragraphs 106–109 are material and likely to mislead consumers acting reasonably under the circumstances.

111.    Defendants' false representations set forth in Paragraph 106–109 constitute deceptive acts or practices in violation of the CFPA. 12 U.S.C. §§ 5531, 5536(a)(1)(B).

## COUNT IV

## Collection of Time-Barred Debt

112.    The Bureau incorporates the allegations in Paragraphs 1–50 and 86-87 by reference.

113.    In numerous instances, in connection with collecting or attempting to collect debt, Defendants represented to consumers, directly or indirectly, expressly or by implication, that the Trusts had a legal right to obtain judgment through their collections lawsuits.

114.    In fact, in numerous instances those representations were false because the statute of limitations on these loans had expired.

115.    Defendants' false representations set forth in Paragraphs 113–114 are material and likely to mislead consumers acting reasonably under the circumstances.

116.    Defendants' false representations set forth in Paragraph 113–114 constitute deceptive acts or practices in violation of the CFPA. 12 U.S.C. §§ 5531, 5536(a)(1)(B).

## UNFAIR ACTS OR PRACTICES

### COUNT V

### Filing Lawsuits without the Intent or Ability to Prove the Claims, if Contested

117.    The Bureau incorporates the allegations in Paragraphs 1–50 and 80-85 by reference.

118.    Under section 1031 of the CFPA, an act or practice is unfair if it causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers, and such substantial injury is not outweighed by countervailing benefits to consumers or to competition. 12 U.S.C. §§ 5531(c), 5536(a)(1)(B).

119.    In numerous instances, in connection with collecting or attempting to collect debt through collections lawsuits, Defendants filed collections lawsuits without the intent or ability to prove the claims, if contested.

120.    Defendants' acts or practices have caused or were likely to cause substantial injury to consumers, estimated to be at least $3.5 million in payments made in connection with these lawsuits.

121.    Consumers could not reasonably avoid the harm, and the harm was not outweighed by countervailing benefits to consumers or competition.

122.    Defendants' acts or practices set forth in Paragraph 119–121 constitute unfair acts or practices in violation of the CFPA. 12 U.S.C. §§ 5531(c), 5536(a)(1)(B).

## CONSUMER INJURY

123.    Consumers have suffered or were likely to suffer substantial injury as a result of Defendants' violations of the CFPA. In addition, Defendants have been unjustly

enriched as a result of their unlawful acts or practices.

## THIS COURT'S POWER TO GRANT RELIEF

124.    The CFPA empowers this Court to grant any appropriate legal or equitable relief including, without limitation, a permanent or temporary injunction, rescission or reformation of contracts, the refund of moneys paid, restitution, disgorgement or compensation for unjust enrichment, payments of damages or other monetary relief, limits on the activities or functions of Defendants, and civil money penalties. 12 U.S.C. § 5565(a). In addition, the CFPB may recover its costs in connection with the action, if it is the prevailing party. 12 U.S.C. § 5565(b).

## DEMAND FOR RELIEF

125.    Wherefore, the Bureau requests that the Court:

   a.   Permanently enjoin Defendants from committing future violations of the CFPA;

   b.   Grant additional injunctive relief as the Court may deem to be just and proper;

   c.   Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the CFPA, including, but not limited to, rescission or reformation of contracts, the refund of moneys paid, restitution, disgorgement or compensation for unjust enrichment, and payment of damages or other monetary relief;

   d.   Award the Bureau civil money penalties; and

   e.   Award the Bureau the costs of bringing this action, as well as such other

and additional relief as the Court may determine to be just and proper.


Dated: April 30, 2021


Respectfully submitted,

Cara M. Petersen
*Acting Enforcement Director*

Deborah Morris
*Deputy Enforcement Director*

/s/ Gabriel Hopkins
Gabriel Hopkins
(E-mail: Gabriel.Hopkins@cfpb.gov)
(Phone: 202-435-7842
Stephen Jacques
(E-mail: Stephen.Jacques@cfpb.gov)
(Phone: 202-435-7368)
Tiffany Hardy
(E-mail: Tiffany.Hardy@cfpb.gov)
(Phone: 202-435-9375)
*Enforcement Attorneys*
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552
Telephone: (202) 435-9198
Facsimile: (202) 435-7722

For the Consumer Financial Protection Bureau