IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>Plaintiff,<br><br>v.<br><br>THE NATIONAL COLLEGIATE MASTER STUDENT LOAN TRUST et al.,<br><br>Defendants. | : | C.A. No. 17-1323 (MN) |

**DEFENDANTS' AND INTERVENORS' COMBINED OPENING BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS THE AMENDED COMPLAINT**

Michael A. Weidinger (No. 3330)
Megan Ix Brison (No. 6721)
PINCKNEY, WEIDINGER, URBAN & JOYCE
2 Mill Road, Suite 204
Wilmington, DE 19806
(302) 504-1497
mweidinger@pwujlaw.com
mixbrison@pwujlaw.com

OF COUNSEL:
Joshua Kipnees
George A. LoBiondo
Devon Hercher
Peter Shakro
Jonah Wacholder
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
jkipnees@pbwt.com
globiondo@pbwt.com
dhercher@pbwt.com
pshakro@pbwt.com
jwacholder@pbwt.com

Kurt M. Heyman (No. 3054)
Melissa N. Donimirski (No. 4701)
HEYMAN ENERIO GATTUSO & HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7300
kheyman@hegh.law
mdonimirski@hegh.law

Stacey A. Scrivani (No. 6129)
STEVENS & LEE, P.C.
919 Market Street, Suite 1300
Wilmington, DE 19801
(302) 425-3306
sasc@stevenslee.com

Daniel A. O'Brien (No. 4897)
Allyson B. Baker (*pro hac vice*)
Meredith L. Boylan (*pro hac vice*)
VENABLE LLP
1201 N. Market Street, Suite 1400
Wilmington, DE 19801
(302) 298-3535
DAObrien@venable.com
ABBaker@venable.com
MLBoylan@venable.com

Stephen B. Brauerman (No. 4952)
Elizabeth A. Powers (No. 5522)
BAYARD, P.A.
600 N. King Street, Suite 400
Wilmington, DE 19899
(302) 655-5000
sbrauerman@bayardlaw.com
epowers@bayardlaw.com

Dated: May 21, 2021

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .......... ii

PRELIMINARY STATEMENT .......... 1

STATEMENT OF FACTS .......... 3

A. The Trusts, the Special Servicer, and the Subservicers .......... 3

B. The CFPB's Investigation and Enforcement Action Against the Trusts .......... 4

LEGAL STANDARD .......... 6

ARGUMENT .......... 7

I. THIS ACTION CANNOT BE RATIFIED .......... 7

A. The July 2020 Ratification Attempt Was Untimely and Ineffective .......... 7

B. The Doctrine of Equitable Tolling Does Not Apply Here .......... 8

II. THE TRUSTS CANNOT BE HELD LIABLE FOR UDAAP UNDER THE CFPA .......... 11

A. The Trusts Are Not Covered Persons .......... 11

B. The Trusts Cannot Be Held Vicariously Liable for the Actions of Subservicers .......... 13

1. Vicarious Liability Cannot Be Imposed on Non-Covered Persons .......... 14

2. The CFPB Has Not Pled the Acts of Subservicers Can Be Vicariously Imputed to the Trusts .......... 16

3. The CFPB Does Not Otherwise Plead a Viable Agency Relationship .......... 18

III. THE CFPB'S CLAIMS ARE TIME-BARRED .......... 19

CONCLUSION .......... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Disposal Servs. East v. NLRB*,
820 F.3d 592 (3d Cir. 2016)....7, 8

*Ashcroft v. Iqbal*,
556 U.S. 663 (2009)....6

*Baldwin Cnty. Welcome Ctr. v. Brown*,
466 U.S. 147 (1984)....10

*Benjamin v. V.I. Port Auth.*,
684 F. App'x 207 (3d Cir. 2017)....7

*Bishop v. Bishop*,
257 F.2d 495 (3d Cir. 1958)....9

*In re Burlington Coat Factory Secs. Litig.*,
114 F.3d 1410 (3d Cir. 1997)....3

*Carr v. United States*,
560 U.S. 438 (2010)....13

*CFPB v. ITT Educ. Servs., Inc.*,
219 F. Supp. 3d 878 (S.D. Ind. 2015)....12

*CFPB v. Navient Corp.*,
2021 WL 772238 (M.D. Penn. Feb. 26, 2021)....8

*Christiana Tr. v. Riddle*,
911 F.3d 799 (5th Cir. 2018)....15

*DeSimone v. U.S. Claims Servs., Inc.*,
2020 WL 2556949 (E.D. Pa. May 20, 2020), *aff'd*,
2021 WL 1662779 (3d Cir. Apr. 28, 2021)....19

*FEC v. NRA Political Victory Fund*,
513 U.S. 88 (1994)....8

*Gabelli v. SEC*,
568 U.S. 442 (2013)....8

*Hawk v. Carrington Mortg. Servs. LLC*,
2016 WL 4433665 (M.D. Pa. Aug. 17, 2016)....15, 16

*Hollingsworth v. Perry*,
570 U.S. 693 (2013)....................................................................................................18

*Liu v. SEC*,
140 S. Ct. 1936 (2020)..................................................................................................8

*Lucia v. SEC*,
138 S. Ct. 2044 (2018)..................................................................................................8

*Meyer v. Holley*,
537 U.S. 280 (2003)....................................................................................................18

*Oran v. Stafford*,
226 F.3d 275 (3d Cir. 2000)........................................................................................13

*Oshiver v. Levin, Fishbein, Sedran & Berman*,
38 F.3d 1380 (3d Cir. 1994)........................................................................................19

*Otto Candies, LLC v. KPMG, LLP*,
2020 WL 4917596 (Del. Ch. Aug. 21, 2020) ..............................................................19

*Pension Tr. Fund for Operating Eng'rs v. Mortg. Asset Securitization Transactions, Inc.*,
730 F.3d 263 (3d Cir. 2013)....................................................................................6, 19

*Pollice v. Nat'l Tax Funding, L.P.*,
225 F.3d 379 (3d Cir. 2000)........................................................................................15

*Ray v. Kertes*,
285 F.3d 287 (3d Cir. 2002)........................................................................................14

*Rhoades v. United States*,
950 F. Supp. 623 (D. Del. 1996)..................................................................................16

*Simmons v. Simpson House, Inc.*,
224 F. Supp. 3d 406 (E.D. Pa. 2016) ..........................................................................16

*Sprague v. Neil*,
2007 WL 3085604 (M.D. Pa. Oct. 9, 2007) ................................................................15

*In re Stone & Webster, Inc.*,
558 F.3d 234 (3d Cir. 2009)........................................................................................18

*Talley v. Christiana Care Health Sys.*,
2018 WL 4938566 (D. Del. Oct. 11, 2018) ...................................................................7

*United States v. Atiyeh*,
402 F.3d 354 (3d Cir. 2005)....................................................................................8, 10

*United States v. Graham*,
305 F.3d 1094 (10th Cir. 2002) ....................12

*United States v. Kensington Hosp.*,
1993 WL 21446 (E.D. Pa. Jan. 14, 1993) ....................20

*United States v. Nagarwala*,
438 F. Supp. 3d 821 (E.D. Mich. 2020) ....................12

*Warren Gen. Hosp. v. Amgen Inc.*,
643 F.3d 77 (3d Cir. 2011) ....................7, 17

*Weis-buy Servs., Inc. v. Paglia*,
411 F.3d 415 (3d Cir. 2005) ....................9

*Wise v. Biowish Techs., Inc.*,
2019 WL 4344273 (D. Del. Sept. 12, 2019) ....................3

*Zeleznik v. United States*,
770 F.2d 20 (3d Cir. 1985) ....................19

**Statutes**

5 U.S.C. § 1692 ....................15

12 U.S.C. § 5481 ....................11, 13, 14, 15

12 U.S.C. § 5531 ....................11, 13

12 U.S.C. § 5562 ....................19

12 U.S.C. § 5564 ....................7, 19

15 U.S.C. § 45 ....................15

**Other Authorities**

Fed. R. Civ. P. 12(b)(6) ....................1, 6, 19

Restatement (Third) of Agency ....................18

Defendants (the "Trusts") and Intervenors[1] (collectively, "Movants") submit this combined opening brief in support of their motion to dismiss the Consumer Financial Protection Bureau's ("CFPB") amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

The amended complaint should be dismissed for the same reason this Court dismissed the CFPB's original complaint: this action was initiated when the CFPB was unconstitutionally structured, and the CFPB did not timely act to cure the constitutional defect. Just as this Court predicted, the CFPB has proven unable to allege any facts that would alter this Court's conclusions that (a) the purported ratification by a constitutionally appointed director came after the statute of limitations expired on the underlying claims, and (b) the CFPB did not take "a single act . . . to preserve its rights in this case," despite the "regular and reoccurring" constitutional challenges to its enforcement authority. D.I. 359 ("Opinion") at 11–13. The amended complaint shows that the CFPB cannot fix the constitutional problem here.

The amended complaint also fails to cure the other flaws in the CFPB's original pleading: (1) the Trusts are not subject to the CFPB's enforcement authority for alleged unfair, deceptive or abusive acts or practices ("UDAAP"), and (2) the CFPB's claims are time-barred. First, there is no viable theory of UDAAP liability asserted against the Trusts. The Trusts are passive special purpose vehicles formed solely to effectuate the pass-through of cash flows from loans that third parties originate and service. They do not, and cannot, engage in offering or providing consumer financial products or services. They therefore do not qualify as "covered persons" that may be held liable for alleged UDAAP violations under the Consumer Financial Protection Act ("CFPA").

[1] "Intervenors" refers to Ambac Assurance Corp., Pennsylvania Higher Education Assistance Agency, Transworld Systems, Inc., and Wilmington Trust Company. Transworld takes no position with respect to Argument § I discussed herein.

Unable to escape the fact that the Trusts themselves do not service loans, the CFPB attempts to repackage its facially deficient theory of vicarious liability—i.e., that alleged wrongdoing by third-party loan subservicers can be imputed to the Trusts. However, as a matter of law, vicarious liability cannot be used to transform a non-covered person into a covered person, and thereby expand the CFPB's statutory mandate beyond the limits imposed by Congress. And, even if vicarious liability were available (it is not), the CFPB fails to allege facts that would support its application here. Although the amended complaint includes new allegations purportedly addressing the contractual relationships between the Trusts, the Special Servicer, and the Subservicers, the CFPB still does not, and cannot, plausibly allege the essential element of an agency relationship: that the Trusts had the right or ability to control the servicers' conduct. Indeed, the very contracts on which the amended complaint's new allegations are based expressly disclaim any agency relationship between the Trusts and servicing entities, and exclude the Trusts from any oversight or control over servicing practices.

Second, the amended complaint's claims are time-barred because the CFPB discovered the alleged UDAAP violations that form the core of its case no later than September 4, 2014, more than three years before it filed suit. Third Circuit precedent expressly permits resolution of this issue at the pleading stage where, as here, indisputably authentic materials already in the record—specifically, the September 4, 2014 Civil Investigative Demands ("CIDs") the CFPB issued to the Trusts identifying the alleged UDAAP violations—demonstrate the untimeliness of the claims as a matter of law.

For each of these reasons, the action should be dismissed with prejudice.

## STATEMENT OF FACTS

### A. The Trusts, the Special Servicer, and the Subservicers

Defendants are fifteen trusts created pursuant to the Delaware Statutory Trust Act (12 Del. C. § 3801, *et seq.*) between 2001 and 2007 to facilitate the securitization of more than 800,000 student loans originated by entities that are not parties to this action. *See* Amended Complaint ("AC") ¶¶ 1, 34. Each Trust acquired these loans through transactions with a Depositor, another special purpose vehicle, over a decade ago.

As the CFPB concedes, the Trusts are passive special purpose vehicles that do not act through employees or officers. AC ¶ 29. Their governance is set forth in a number of agreements, including a Trust Agreement and an Indenture. *Id.* ¶ 28. As alleged here, the servicing of delinquent loans held by the Trusts is carried out by a servicer and subservicers pursuant to two agreements: the Special Servicing Agreement ("SSA") and the Default Prevention and Collection Services Agreement ("DPCSA").[2] *Id.* ¶¶ 29, 35, 37, 44.

Neither agreement establishes a role for the Trusts in overseeing or participating in servicing and collection activities. To the contrary, the servicing agreements expressly disclaim (a) any role for the Trusts in such activities under these agreements and (b) any agency relationship between the Trusts and the servicer and subservicers. Under the SSA, the Special Servicer—and not the Trusts—has authority to hire, oversee, and replace the Subservicers, the entities responsible for collecting on delinquent loans. D.I. 310-1 ("SSA") §§ 2(B)(i)–(iii), § 17; AC ¶¶ 37–38; *id.* ¶¶ 44, 47–48 (defining "Subservicers"). For example, the SSA vests the Special Servicer with

[2] On this motion, the Court may consider the SSA and the DPCSA, which are integral to the CFPB's claims and are explicitly relied upon in the amended complaint. *See, e.g.*, *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997); *Wise v. Biowish Techs., Inc.*, 2019 WL 4344273, at *6 (D. Del. Sept. 12, 2019).

discretion to take any actions "as it shall deem reasonably necessary or appropriate" to (a) administer and oversee enforcement and collection of past-due loans, (b) audit the Subservicers, and (c) replace any Subservicer that, "in [its] sole judgment," is deemed to be deficient.[3] SSA § 2(B)(i)-(iii). And the SSA explicitly provides that the Special Servicer "***shall be an independent contractor and shall not be subject to the supervision of the Trusts***" and is not granted "any express, implied or apparent authority to incur any obligation or liability on behalf" of the Trusts. *Id.* § 18 (emphasis added).

In fact, the Trusts are not a party to the DPCSA, which governs the relationship between the Special Servicer and the Subservicers that actually service and collect on delinquent loans. AC ¶ 44; D.I. 302-2 ("DPCSA"). The Trusts are thus not in privity with any of the entities that allegedly engaged in the challenged servicing practices, *see* AC ¶¶ 47-79, and the Trusts do not possess any right of control over them.

### B. The CFPB's Investigation and Enforcement Action Against the Trusts

On September 4, 2014, the CFPB issued a CID to each of the Trusts for information concerning collections lawsuits brought against borrowers with respect to defaulted student loans in the Trusts. Opinion at 2. Each CID stated that the investigation's purpose was to determine whether any entities "have engaged or are engaging in unlawful acts and practices relating to the servicing and collecting" of the loans held in the Trusts—the exact UDAAP violations alleged in the amended complaint. D.I. 302-3 at WTC_CFPB00000105; AC ¶¶ 51–87.

On September 18, 2017, the CFPB initiated this enforcement action and asked the Court to approve the Proposed Consent Judgment ("PCJ") executed by the CFPB and McCarter & English

[3] The amended complaint refers to the Special Servicer's role rather than the Successor Special Servicer's narrower responsibilities. Because the differences are not germane to whether the Trusts are covered persons, they are not discussed here.

("McCarter"), the law firm then purporting to represent the Trusts.[4] Opinion at 3. By September 2017, the CFPB had already faced constitutional challenges to its enforcement authority in several cases, and as early as 2018, the CFPB began procuring ratifications of at least four other cases from then-Acting Director Mulvaney—who, by virtue of his "acting" status, was arguably subject to removal without cause prior to *Seila Law*. Opinion at 11–12 n.7; D.I. 348 at 1 n.1. However, it is undisputed that the CFPB did not even attempt to procure a ratification from Acting Director Mulvaney in this case. D.I. 348-1 at 40:7–10; 37:20–23; 38:21–23. The Court later granted Intervenors' motions to intervene in this action, and "place[d] no limitation on the intervenors' participation in this litigation." D.I. 95 at 1.

Pursuant to the Court's scheduling order, D.I. 99, the action proceeded to an initial "threshold issues" phase involving discovery and motion practice that was limited to the propriety of the PCJ. After that phase, this Court ruled that McCarter was not authorized to execute the PCJ and denied the CFPB's motion to approve it. D.I. 272. The case then proceeded to the pleadings stage, and certain Intervenors moved to dismiss the complaint. D.I. 333.

On March 26, 2021, the Court dismissed the complaint on the grounds that the CFPB's attempt to ratify this action after the Supreme Court's *Seila Law* decision was untimely and ineffective. Opinion at 8–14. The Court noted the CFPB's admission that the attempted ratification came more than three years after the date the CFPB discovered the alleged violations. *Id.* at 10. The Court also rejected the CFPB's appeal to equitable tolling, since the CFPB was

[4] The same day that the CFPB filed this action, it also filed an administrative consent order with a Subservicer, alleging UDAAP violations for which the CFPB now seeks to hold the Trusts liable. *See* D.I. 303-2, Consent Order, *In the Matter of Transworld Systems, Inc.*, File No. 2017-CFPB-0018 (Sept. 18, 2017); D.I. 1. That consent order included a compliance plan for loan servicing and collections and imposed a $2.5 million civil money penalty. In its Motion to Intervene (D.I. 9), which the Court granted (D.I. 95), Transworld argued, *inter alia*, that the PCJ was inconsistent with its consent order. D.I. 9 at 9.

"acutely aware that there was doubt over the constitutionality of its enforcement authority," yet "could not identify a single act that it took to preserve its rights in this case in anticipation of the constitutional challenges that could have reasonably ended with an unfavorable ruling from the Supreme Court." *Id.* at 12–13. Although the Court dismissed the complaint without prejudice, the Court's Order noted that it was "hardly clear" how the CFPB could cure these deficiencies. *Id.* at 11–14; D.I. 360. And while the Court did not reach the merits of the "covered persons" issue because the CFPB's untimely ratification was dispositive, the Court expressed "some doubt that the Trusts are 'covered persons' under the plain language" of the CFPA. Opinion at 6.

On April 30, 2021, the CFPB filed the amended complaint. It does not allege that any CFPB director attempted ratification of the decision to bring this case prior to July 2020—or, indeed, that the CFPB took any act that would demonstrate "that the Bureau was not only aware of the admitted risk to its rights, but also that it had the desire to preserve them." Opinion at 13. And the amended complaint still asserts the same five servicing-related claims against the Trusts for the same alleged UDAAP violations, which date to 2012. AC ¶¶ 91–122.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion, a complaint must "state a claim to relief that is plausible on its face" by pleading "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 663, 678 (2009). The Court may consider contracts cited in the complaint, matters of public record, and any other documents appearing in the record of the case. *Pension Tr. Fund for Operating Eng'rs v. Mortg. Asset Securitization Transactions, Inc.*, 730 F.3d 263, 271 (3d Cir. 2013). And the Court need not credit (a) allegations that are contradicted by other allegations in the amended complaint, *see Talley v. Christiana Care Health Sys.*, 2018 WL 4938566, at *5 (D. Del. Oct. 11, 2018); or (b)

allegations belied by the contracts on which the complaint relies*, see Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 88 (3d Cir. 2011).

## ARGUMENT

## I. THIS ACTION CANNOT BE RATIFIED

### A. The July 2020 Ratification Attempt Was Untimely and Ineffective

Nothing in the amended complaint undermines this Court's holding that Director Kraninger's attempted ratification in July 2020 was untimely and ineffective.[5] It is undisputed that the CFPB "initiated this action against the Trusts at a time when its structure violated the Constitution's separation of powers." Opinion at 9. Moreover, as this Court noted, Director Kraninger's declaration purporting to ratify this action on July 9, 2020 was filed more than three years after the CFPB discovered the alleged violations. Opinion at 10 (quoting D.I. 356 at 35:8–10); *see also* 12 U.S.C. § 5564(g)(1) (enforcement action under the CFPA must be filed within three years "after the date of discovery of the violation to which an action relates"). Because "it is essential that the party ratifying should be able not merely to do the act ratified at the time the act was done, ***but also at the time the ratification was made***," Director Kraninger's ratification attempt remains "too late to be effective." Opinion at 9 (quoting *Advanced Disposal Servs. East v. NLRB*, 820 F.3d 592, 603 (3d Cir. 2016); *Benjamin v. V.I. Port Auth.*, 684 F. App'x 207, 212 (3d Cir. 2017)). The CFPB did not (and cannot) add any factual allegations to cure this "timing problem." This is fatal to the amended complaint, just as it was to the original complaint.

[5] By addressing the flaws in the CFPB's attempted ratification, Movants do not concede that ratification can cure a separation-of-powers violation, and expressly preserve and incorporate by reference their previous arguments on this point. *See* D.I. 309 at 12–14, D.I. 325 at 4–6.

**B. The Doctrine of Equitable Tolling Does Not Apply Here**

Equitable tolling still cannot save this action. As an initial matter, there is "no supporting precedent" for the proposition that equitable tolling is "available in the first instance" to cure a constitutional defect and permit ratification of an untimely enforcement action. *CFPB v. Navient Corp.*, 2021 WL 772238, at *5 (M.D. Penn. Feb. 26, 2021); *accord Liu v. SEC*, 140 S. Ct. 1936, 1941 (2020) ("[E]quity never lends its aid to enforce a forfeiture or penalty."); *Gabelli v. SEC*, 568 U.S. 442, 452 (2013) (rejecting government's invocation of the discovery rule because it "would be utterly repugnant to the genius of our laws if actions for penalties could be brought at any distance of time"). Indeed, allowing the CFPB to spare itself the consequences of untimely ratification would violate established precedent holding that an untimely ratification is ineffective, and that litigants who successfully raise constitutional defenses must be afforded meaningful relief. *See FEC v. NRA Political Victory Fund*, 513 U.S. 88, 98 (1994) (adopting Restatement rule that "[t]he bringing of an action … by a purported agent can not be ratified after the cause of action or right to appeal has been terminated by lapse of time"); *Advanced Disposal*, 820 F.3d at 604 (same); *Lucia v. SEC*, 138 S. Ct. 2044, 2055 & n.5 (2018) (meaningful remedies must be available for constitutional challenges to "create incentives to raise" them).

In any event, this Court has already concluded that the CFPB is not entitled to equitable tolling, and the amended complaint offers nothing to change that result. Equitable tolling is to be used "only sparingly," *United States v. Atiyeh*, 402 F.3d 354, 367 (3d Cir. 2005), and then only if the party (1) "pursu[ed] his rights diligently," and (2) "some extraordinary circumstance stood in his way and prevented timely filing." Opinion at 11. The CFPB cannot satisfy either prong.

First, this Court previously considered and rejected the CFPB's argument that it acted diligently by filing the original complaint and litigating the propriety of the PCJ. *See id.* at 1 n.1,

13–14. As this Court recognized, the Bureau's failing was that it chose not to take "a single act … to preserve its rights in this case in anticipation of" known constitutional challenges that culminated in *Seila Law*. *Id.* at 13. Although the CFPB procured ratifications from Acting Director Mulvaney in at least four other cases, it did not even attempt to do so here. *Supra* at 5. The amended complaint does not contain a single allegation that could enable the Court "to interpret the Bureau's passivity in the face of the inevitable constitutional challenge as diligence." *Id.* at 13; *Weis-buy Servs., Inc. v. Paglia*, 411 F.3d 415, 424 (3d Cir. 2005) (no tolling where parties "sat on their hands" and failed to protect their interests).

The amended complaint's "new" allegations on this point simply double down on what this Court already knows: instead of securing a ratification from Acting Director Mulvaney, or taking any other measures to mitigate the "admitted risk to its rights," Opinion at 13, the CFPB chose instead to focus exclusively on securing approval of the PCJ, *see* AC ¶¶ 9–19. But these allegations cut *against* the CFPB, which cannot invoke equitable tolling without first showing that it has itself acted equitably. *Bishop v. Bishop*, 257 F.2d 495, 500 (3d Cir. 1958). It cannot make this showing here. To the contrary, the CFPB knew that its PCJ violated the Trusts' governing agreements, and consequently, the rights of numerous third parties. *See* D.I. 238 at 22–23. The CFPB also knew that its proposed order had been concealed from Ambac—whose consent, the CFPB also knew, was a contractual requirement that had never been fulfilled. *See* D.I. 272 at 11–12. And the CFPB knew that the Owner Trustee, the party with the contractual authority to execute the consent order on the Trusts' behalf, had refused to do so. D.I. 238 at 23 n.26; D.I. 228 Ex. 4 at -0001467. Nevertheless, the CFPB pursued the PCJ despite its knowledge of the foregoing fatal flaws, and without disclosing them to this Court—and persisted in doing so for years, until the Court rejected the PCJ on May 31, 2020. D.I. 272; *see also* AC ¶¶ 9–19. Thus, far from supporting the CFPB's

invocation of equitable tolling, the amended complaint underscores why equitable tolling is unavailable here, and the Court's previous ruling on the first prong of the equitable tolling inquiry applies with equal force now.

The CFPB also fails the second prong—it cannot show that the circumstances of its limitations problem were beyond its control. In fact, the opposite is true, as the problem was largely one of the CFPB's own making: it openly conceded and even sought the declaration of its own unconstitutionality. *See* Opinion at 12 ("[T]he Bureau has itself taken the position that the removal clause was unconstitutional because of the for-cause removal provision."); CFPB's Resp. Br., *Seila Law*, 2019 WL 4528136, at *16, *20 (Sept. 17, 2019) ("[T]he Court should hold that the removal restriction in 12 U.S.C. § 5491(c)(3) impermissibly infringes the separation of powers fundamental to our constitutional structure."). Notably, the CFPB did so two years ***after*** filing this action, and nine years after the CFPA was enacted. Having received the ruling it requested, the CFPB cannot now complain that the consequences or timing of *Seila Law* were unfair or beyond its control. *See Atiyeh*, 402 F.3d at 367 ("no convincing rationale" to apply equitable tolling where the defendant "did not 'induce' the Government's current situation").

All else aside, the CFPB cannot possibly demonstrate an absence of prejudice to the Movants here. *See* Opinion at 11 ("If the first two prongs are satisfied, then the 'absence of prejudice is a factor to be considered in determining whether the doctrine of equitable tolling should apply.'" (quoting *Baldwin Cnty. Welcome Ctr. v. Brown*, 466 U.S. 147, 152 (1984))). This factor alone compels ruling against the CFPB on the tolling issue: Movants have already spent several years and significant resources undoing the improper PCJ. Allowing the CFPB to proceed on its time-barred amended complaint now would cause enormous prejudice to the Movants—and

would be a gross inversion of ratification's timeliness requirement, which is intended to ensure that the "intervening rights of third persons" are not thwarted. Opinion at 10.

## II. THE TRUSTS CANNOT BE HELD LIABLE FOR UDAAP UNDER THE CFPA

The amended complaint should be dismissed for the independent reason that the CFPB has not plausibly alleged that the Trusts can be held liable for UDAAP under the CFPA. Congress expressly limited the CFPB's enforcement authority for UDAAP violations to a "covered person" that "engag[es]" in a UDAAP "in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service." 12 U.S.C. § 5531(a).[6] The Trusts do not engage in any of this activity, and are therefore not covered persons under the plain statutory language, as explained below.

To avoid this straightforward result, the amended complaint asks the Court to hold the Trusts vicariously liable for the alleged misconduct of ***other*** entities that it asserts are covered persons under the CFPA. But as a matter of law, ***only entities that are themselves covered persons*** can be held liable for UDAAP violations under the CFPA. And even if vicarious liability allegations could transform the Trusts into covered persons (and they cannot), the amended complaint still fails to state a claim because its theory of agency liability is refuted by the very agreements on which the CFPB relies.

### A. The Trusts Are Not Covered Persons

The CFPA defines a "covered person" subject to its purview as one that "engages in offering or providing a consumer financial product or service." 12 U.S.C. § 5481(6)(A). The statute identifies eleven types of qualifying financial products or services. *See* 12 U.S.C.

[6] The CFPA also applies to certain "service providers" and "related persons" of covered persons, 12 U.S.C. §§ 5481(25)–(26), but the CFPB does not allege that the Trusts are either (and they are not).

§ 5481(15)(A)(i)–(xi). To state a claim, then, the amended complaint must allege that the Trusts engaged in offering or providing one of these delineated consumer financial products or services.

The amended complaint attempts to meet this requirement by alleging that the Trusts "engage" in "'servicing loans, including acquiring, [and] purchasing' loans" and "the collection of debt." AC ¶ 8 (quoting 12 U.S.C. § 5481(15)(A)(i), (x)). But this is flatly contradicted by other allegations in the amended complaint, which concede that the Trusts are passive securitization vehicles that do not act through employees or officers and take no action related to the servicing of student loans or collecting debt. AC ¶ 29. Indeed, it is precisely because the Trusts cannot themselves engage in servicing or collections that they long ago entered into contracts with third-party servicers that actually can and do engage in those activities. *Id.* ¶¶ 29, 35–36. The amended complaint thus fails to establish that the *Trusts* "engage"—i.e., actively participate—in "servicing loans." *See CFPB v. ITT Educ. Servs., Inc.*, 219 F. Supp. 3d 878, 907–08 (S.D. Ind. 2015) (quoting *United States v. Graham*, 305 F.3d 1094, 1102 (10th Cir. 2002)) ("engage" in CFPA's "covered person" definition means "to occupy or involve oneself; take part; be active"); *United States v. Nagarwala*, 438 F. Supp. 3d 821, 826 (E.D. Mich. 2020) (collecting dictionary definitions for "engage" and concluding that "if one is engaged in an activity, one is *actively* involved in it, i.e., *doing* the activity").[7]

[7] In an attempt to show the Trusts "engage" in servicing, the amended complaint alleges that each trust's "basic purpose" is to "acquire a pool of private student loans, to issue notes secured by that pool of student loans, and to service and collect on those student loans." AC ¶ 27. This apparent reference to the Trust Agreement distorts the key language. That agreement does not provide that the ***Trusts*** service or collect on loans; it states that one purpose of the Trusts is to "enter into the Trust Related Agreements and to provide for the administration of the trust and servicing of the Student Loans." D.I. 303-3, Trust Agreement § 2.03(a)(ii). "Provid[ing] for" servicing by contracting with third parties—because the Trusts are incapable of servicing loans themselves—plainly does not signify the Trusts are "active" in, or "doing," any servicing or collections. *ITT Educ. Servs.,* 219 F. Supp. 3d at 908; *Nagarwala*, 438 F. Supp. 3d at 826.

The only activity that the Trusts are alleged to have engaged in themselves is the purchase of pools of loans over a decade ago. *See* AC ¶ 34. But each pool was purchased from a special-purpose entity Depositor ***solely*** to facilitate the securitization;[8] these were not transactions with a consumer (or even a lender), and involved no consumer interaction whatsoever.[9] And even if these loan-pool acquisitions could somehow qualify the Trusts as covered persons, the CFPB would still not have statutory authority to bring the claims asserted here. The CFPA limits the CFPB's enforcement authority to UDAAP committed "***in connection with*** any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service." 12 U.S.C. § 5531(a). Here, the UDAAP violations alleged in the amended complaint have no connection to the Trusts' loan purchases.[10]

**B. The Trusts Cannot Be Held Vicariously Liable for the Actions of Subservicers**

Unable to demonstrate that the Trusts themselves qualify as covered persons, the CFPB posits that the Trusts can be held vicariously liable based on alleged violations by covered-person Subservicers. Referencing certain agreements governing the Trusts, the amended complaint

---

[8] *See* D.I. 303-3, Trust Agreement § 2.03(a)(i); NCSLT 2006-3 Deposit and Sale Agreement, *available at* https://www.sec.gov/Archives/edgar/data/1223029/000088237706003526/p06-1554ex99_6.htm. The Court can take judicial notice of this public disclosure to the SEC. *Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000).

[9] Furthermore, acquiring loans in and of itself does not make the acquirer a "covered person." Rather, the CFPA defines the relevant consumer financial service or product as "extending credit and servicing loans, *including acquiring*, purchasing, selling, brokering, or other extensions of credit . . ." 12 U.S.C. § 5481(15)(A)(i) (emphasis added). Read in context, the words "acquiring" and "purchasing" describe aspects of "servicing loans." Given that each Trust acquired loans not through servicing, but rather in a transaction with another special purpose entity years before the applicable limitations period, that provision has no application here.

[10] Additionally, the allegation of a long-ago acquisition of a loan pool cannot show that each Trust "engages" in a consumer transaction. 12 U.S.C. § 5481(6)(A). Congress's use of the present tense "engages" demonstrates that this provision does not apply to actions completed before the CFPA was enacted. *Carr v. United States*, 560 U.S. 438, 447–49 (2010) (Congress's "choice of verb tense" informs "a statute's temporal reach"; the "present tense generally does not include the past").

alleges that the Trusts vicariously engage in servicing "*through* certain designated entities" that act as the Trusts' "agents." AC ¶¶ 29, 35–36 (emphasis added). These theories are unavailing as a matter of law and are directly contradicted by those same agreements.

#### 1. *Vicarious Liability Cannot Be Imposed on Non-Covered Persons*

First, under the CFPA, non-covered persons like the Trusts cannot be held liable as "principals" for the acts of a covered person. The statute specifically enumerates the "related parties" that can be subject to the CFPB's enforcement authority by virtue of their relationship to a "covered person," thereby rendering them "covered persons" as well. 12 U.S.C. § 5481(25)(C)(i). Notably, the CFPA explicitly permits enforcement against "directors," "officers," and "agents" of "covered persons"—but does not list "principals" among qualifying "related parties." *Id.*; *see Ray v. Kertes*, 285 F.3d 287, 296 (3d Cir. 2002) ("[W]hen a statute specifically enumerates some categories, it impliedly excludes others.").[11] In other words, Congress decided to limit the CFPA's reach only to specifically delineated covered persons, service providers, and related persons—none of which describe the Trusts. The CFPB cannot circumvent Congress's judgment and expand its own mandate through artful pleading.

[11] Notably, an early draft of the CFPA created covered person liability for any party that "engages ***directly or indirectly***" in providing a consumer financial product or service. Consumer Financial Protection Agency Act of 2009, H.R. 3126, 111th Cong. § 101(9) (1st Sess. July 8, 2009), *available at* https://www.govinfo.gov/content/pkg/BILLS-111hr3126ih/pdf/BILLS-111hr3126ih.pdf. Following criticism of its overbreadth, that clause was excised from the final version that was passed into law—thus eliminating the possibility of liability for persons that "indirectly" engage in covered activity. *See, e.g.*, Joint Trade Letter on H.R. 3126 (Sept. 17, 2009), *available at* https://www.uschamber.com/letter/joint-trade-letter-hr-3126-consumer-financial-protection-agency-cfpa-act. Yet that is exactly the theory that the CFPB seeks to resurrect here against the Trusts.

Longstanding precedent concerning other federal consumer financial protection statutes related to loan collections and servicing support this reading of the CFPA's scope.[12] For instance, the Fair Debt Collection Practices Act ("FDCPA") applies to statutorily defined "debt collectors"—analogously to "covered persons." 5 U.S.C. § 1692. The Third Circuit has held that entities cannot be held liable or even vicariously liable under the FDCPA unless they *themselves* qualify as debt collectors. *Pollice v. Nat'l Tax Funding, L.P.*, 225 F.3d 379, 404 (3d Cir. 2000) (only "an entity which itself meets the definition of 'debt collector' may be held vicariously liable for unlawful collection activities carried out by another on its behalf"); *Sprague v. Neil*, 2007 WL 3085604, at *4 (M.D. Pa. Oct. 9, 2007) ("Because of the [FDCPA's] clear legislative purpose and its general application limited to debt collectors, common law principles of agency are inapplicable"). Courts have imposed a similar limitation on the scope of liability in the context of the Real Estate Settlement Procedures Act ("RESPA"). *See, e.g.*, *Hawk v. Carrington Mortg. Servs. LLC*, 2016 WL 4433665, at *2 (M.D. Pa. Aug. 17, 2016) (joining courts that "have rejected efforts to expand RESPA liability . . . beyond the limits expressly set by statute, which only governs loan servicers, and impose vicarious liability upon loan holders as well"); *Christiana Tr. v. Riddle*, 911 F.3d 799, 803–04 (5th Cir. 2018) (same).

The same reasoning applies with equal force to the CFPA. The CFPA defines the categories of "related persons" that can be held liable based on that person's relationship to a "covered person," and specifically omits principals of covered persons. 12 U.S.C. § 5481(25).

[12] To the extent that the CFPB suggests that the Trusts are covered persons through application of agency doctrine as it has been advanced in certain cases involving the FTC Act, that suggestion should be rejected. The FTC Act broadly empowers the FTC to prevent all "persons, partnerships, or corporations" from engaging in unfair or deceptive acts or practices affecting commerce, except for certain exclusions not relevant here. 15 U.S.C. § 45(a)(2). By contrast, the CFPA confers UDAAP authority only over the very narrow list of "covered persons" specifically delineated in the statute, as described herein.

The CFPB therefore has no basis for superimposing a principal-liability theory that would vitiate "the limits expressly set by statute." *Hawk*, 2016 WL 4433665, at *2.

**2. *The CFPB Has Not Pled the Acts of Subservicers Can Be Vicariously Imputed to the Trusts***

Even assuming that vicarious liability could theoretically provide a basis for imputing covered person status, the CFPB's allegations still fail as a matter of law.

As an initial matter, the CFPB alleges that the Trusts are covered persons because the acts of certain servicers are "deemed to be the actions of the Trusts." AC ¶ 39; *see also id.* ¶¶ 29, 40–41, 45, 94 (repeatedly alleging that Trusts act "through" servicers). Although the CFPB frames these allegations as support for a direct liability claim against the Trusts for "engag[ing]" in servicing, *see id.* ¶¶ 35–36, in truth, it is just a disguised theory of vicarious liability. *See Simmons v. Simpson House, Inc.*, 224 F. Supp. 3d 406, 413 (E.D. Pa. 2016) (vicarious liability simply means "hold[ing] one party liable for the actions of another due to a preexisting relationship between the two parties"). In any event, this interpretation is squarely refuted by the SSA, which expressly disclaims any oversight by the Trusts:

> <u>Independence of the Special Servicer</u>. For all purposes of this Agreement, the Special Servicer ***shall be an independent contractor and shall not be subject to the supervision of the Trusts*** with respect to the manner in which it accomplishes the performance of its obligations hereunder.

SSA § 17 (emphasis added); *see, e.g.*, *Rhoades v. United States*, 950 F. Supp. 623, 629 (D. Del. 1996) (holding, on 12(b) motion, that party was an "independent contractor" and not agent because agreement gave the contractor "full responsibility" for the project). Other provisions of the SSA confirm that the Trusts have no control or oversight over servicing or collection activities thereunder. SSA §§ 2(B)(i)–(iii), 17. And while the amended complaint alleges that the Trusts, "acting through the Special Servicer," entered into the DPCSA with the Subservicers and had a

"right to exercise control over the Subservicers" thereunder, this is belied by the DPCSA itself: the Trusts are not parties to that agreement, and neither the SSA nor the DPCSA permits the Trusts to control the activities of the Subservicers performing collection activities. *See* AC ¶ 45; SSA § 2(B); DPCSA §§ 2.4, 11.4; *Warren Gen. Hosp.*, 643 F.3d at 88 (affirming dismissal where contracts referenced in pleadings refuted allegations).

Alternatively, the CFPB purports to rely on the Trusts' Indentures for the principle that the actions of the Special Servicer are imputed to the Trusts. *See* AC ¶¶ 35–36, 39–40. What the CFPB appears to rely on here is not a contract with any servicer or borrower, but an agreement between the Indenture Trustee and the Trusts in connection with the initial securitization, which states:

> Although the [Trusts] will contract with other Persons to assist it in performing its duties under this Indenture, any performance of such duties by a Person identified to the Indenture Trustee in an Officers' Certificate of the Issuer shall be deemed to be action taken by the Issuer. Initially, the Issuer has contracted with the Servicers and the Administrator to assist the Issuer in performing its duties under this Indenture.

D.I. 239-3, Indenture § 3.07(b). This covenant does not mean what the CFPB wishes it meant. It states that, for purposes of satisfying the Trusts' obligations *to its specific contractual counterparties* under the Indenture, the performance by another party would be sufficient to meet those obligations. *Id.* That limited representation to specific contractual counterparties is a far cry from the CFPB's present contention that the actions of servicers "are, legally, the actions of the Trusts themselves"—which, again, is irreconcilable with the SSA, the agreement that actually governs the Trusts' relationship to special servicing. The CFPB's attempt to contort this arrangement between contractual parties into a representation to borrowers and the world at large

is unavailing.[13] *See, e.g.*, *In re Stone & Webster, Inc.*, 558 F.3d 234, 241 (3d Cir. 2009) ("a stranger to a contract acquires no rights thereunder").

### 3. *The CFPB Does Not Otherwise Plead a Viable Agency Relationship*

Elsewhere, the amended complaint embraces a more traditional vicarious-liability theory based on a purported agency relationship between the Trusts and Subservicers. AC ¶¶ 2–3, 29. But it does not (and cannot) plead the facts needed to support that theory.

An agency relationship exists only if the principal exercises *control*, or has the *right to direct or control*, the conduct or activities of the agent. *Meyer v. Holley*, 537 U.S. 280, 285–86 (2003). It is the "principal's right to control" that distinguishes agency relationships from nonagency relationships. Restatement (Third) of Agency § 1.01, cmt. e. Here, the amended complaint alleges that the Special Servicer exercised control over the Subservicers, *see* AC ¶¶ 44–45—but even if that were true, there is nothing suggesting that the ***Trusts*** exercised control over the Special Servicer or the Subservicers. Nor could the amended complaint plausibly make such an allegation, since as explained above, the SSA expressly disclaims any such control by the Trusts. *See supra* at 3–4. Similarly, the mere fact that the Subservicers were authorized to file collections lawsuits in the name of the Trusts, *see* AC ¶¶ 37, 50–53, does not suffice to plausibly allege an agency relationship. *Hollingsworth v. Perry*, 570 U.S. 693, 713 (2013) ("Agency requires more than mere authorization to assert a particular interest.").

Because the amended complaint does not allege the requisite facts suggesting "an agency relationship," it does not state a claim for agency-based vicarious liability against the Trusts, and

[13] The amended complaint's other references to the SSA are equally unmoored from the contractual language. For instance, the CFPB alleges that the SSA "required the Trusts, acting through the Special Servicer," to hire subservicers and "empowered the Trusts, acting through the Special Servicer, to oversee, superimpose, and direct the subservicers." AC ¶¶ 40–41. This is exactly backwards. The SSA assigned these servicing functions to the Special Servicer, not the Trusts, and specifically excluded the Trusts from involvement. SSA § 2(B)(i)–(iii); *supra* at 4.

should be dismissed. *See DeSimone v. U.S. Claims Servs., Inc.*, 2020 WL 2556949, at *3 (E.D. Pa. May 20, 2020) (agency relationship was not adequately pled absent allegations the alleged principal was "in control of the undertaking") *aff'd*, 2021 WL 1662779 (3d Cir. Apr. 28, 2021); *Otto Candies, LLC v. KPMG, LLP*, 2020 WL 4917596, at *16 (Del. Ch. Aug. 21, 2020) (dismissing agency claim where plaintiff failed to adequately plead control by alleged principal).

## III. THE CFPB'S CLAIMS ARE TIME-BARRED

The amended complaint's claims relating to conduct that the CFPB discovered before September 18, 2014 (i.e., three years before commencing this action) should be dismissed as untimely. The Third Circuit authorizes Rule 12(b)(6) dismissal on statute of limitations grounds where, as here, untimeliness is established by the complaint's allegations and materials already in the record. *See, e.g.*, *Pension Tr. Fund*, 730 F.3d at 271 (affirming dismissal where "matters of public record and items appearing in the record of the case reveal[ed] that the claims in the [complaint] were untimely"); *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384–85 nn.1–2 (3d Cir. 1994) (on a motion to dismiss, including on statute of limitations grounds, the court may consider "matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case").

A timely enforcement action must be filed within three years "after the date of discovery of the violation to which an action relates." 12 U.S.C. § 5564(g)(1). Here, the CIDs in the record demonstrate that by September 4, 2014, the CFPB believed it possessed sufficient facts that, if proven, would constitute the violations ultimately alleged in the amended complaint—and thus, it had "discovered" those alleged violations.[14] *Zeleznik v. United States*, 770 F.2d 20, 23 (3d Cir.

[14] Indeed, the CFPB could not have issued those CIDs and initiated an investigation without having already identified a potential violation. *See* 12 U.S.C. § 5562(c) (CFPB may only issue CIDs to persons believed to have information "relevant to a violation," and "shall state the nature of the

1985) (date of "discovery" is when a claimant "possesses sufficient critical facts to put him on notice that a wrong has been committed and that he need investigate to determine whether he is entitled to redress"); *United States v. Kensington Hosp.*, 1993 WL 21446, at *6 (E.D. Pa. Jan. 14, 1993) (holding the "same [discovery] rule under the federal statutes of limitations should apply to the Government").

In particular, the requests in the CIDs demonstrated that the CFPB already knew that (i) collection lawsuits were being filed against borrowers with respect to defaulted loans owned by the Trusts; (ii) there were questions as to whether in prosecuting those lawsuits the existence, ownership, and amount of the underlying debt could be proven; and (iii) sworn testimony had been proffered in certain collection lawsuits regarding the Trusts' ownership of the underlying debt. D.I. 302-3 at WTC_CFPB_00000113–17. These alleged "acts" mirror the UDAAP violations alleged in the amended complaint. *See* AC ¶¶ 91–116 (allegations of "false and misleading affidavits and testimony," "filing lawsuits without the intent or ability to prove the claims," and "collection of time-barred debt").

The CFPB simply waited too long to file its complaint against the Trusts on September 18, 2017—more than three years after it discovered the alleged violations and issued the CIDs to investigate them further. Accordingly, its claims are time-barred and should be dismissed.

## <u>**CONCLUSION**</u>

For the foregoing reasons, the Court should dismiss the CFPB's amended complaint with prejudice.

---

conduct constituting the alleged violation which is under investigation"); *Life Cycle of an Enforcement Action*, CFPB, https://www.consumerfinance.gov/enforcement/life-cycle-of-enforcement-action/ (investigation cannot be authorized unless the Enforcement Director first determines that "[t]here is a plausible set of facts that, if proven, would amount to a violation of one or more federal consumer financial laws").

*/s/ Michael A. Weidinger*
Michael A. Weidinger (No. 3330)
Megan Ix Brison (No. 6721)
PINCKNEY, WEIDINGER, URBAN & JOYCE
2 Mill Road, Suite 204
Wilmington, DE 19806
(302) 504-1497
mweidinger@pwujlaw.com
mixbrison@pwujlaw.com

*Attorneys for Defendants*

*/s/ Melissa N. Donimirski*
Kurt M. Heyman (No. 3054)
Melissa N. Donimirski (No. 4701)
HEYMAN ENERIO GATTUSO & HIRZEL LLP
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7300
kheyman@hegh.law
mdonimirski@hegh.law

*Attorneys for Ambac Assurance Corporation*

OF COUNSEL:
Joshua Kipnees
George A. LoBiondo
Devon Hercher
Peter Shakro
Jonah Wacholder
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
jkipnees@pbwt.com
globiondo@pbwt.com
dhercher@pbwt.com
pshakro@pbwt.com
jwacholder@pbwt.com

*/s/ Stacey A. Scrivani*
Stacey A. Scrivani (No. 6129)
STEVENS & LEE, P.C.
919 Market Street, Suite 1300
Wilmington, DE 19801
(302) 425-3306
sasc@stevenslee.com

*Attorneys for Pennsylvania Higher Education Assistance Agency d/b/a American Education Services.*

*/s/ Daniel A. O'Brien*
Daniel A. O'Brien (No. 4897)
Allyson B. Baker (*pro hac vice*)
Meredith L. Boylan (*pro hac vice*)
VENABLE LLP
1201 N. Market Street, Suite 1400
Wilmington, DE 19801
(302) 298-3535
DAObrien@venable.com
ABBaker@venable.com
MLBoylan@venable.com

*Attorneys for Transworld Systems, Inc.*

*/s/ Stephen B. Brauerman*
Stephen B. Brauerman (No. 4952)
Elizabeth A. Powers (No. 5522)
BAYARD, P.A.
600 N. King Street, Suite 400
Wilmington, DE 19899
(302) 655-5000
sbrauerman@bayardlaw.com
epowers@bayardlaw.com

*Attorneys for Wilmington Trust Company*

Dated: May 21, 2021