IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CONSUMER FINANCIAL
PROTECTION BUREAU,

    *Plaintiff*,

v.

ACCESS FUNDING, LLC, *et al.*,

    *Defendants*.

Civil Action No. ELH-16-3759

**MEMORANDUM OPINION**

This protracted litigation arises under the Consumer Financial Protection Act of 2010

("CFPA" or the "Act"), 12 U.S.C. §§ 5481 *et seq*., and concerns the purchase of structured

settlements in tort suits. Plaintiff Consumer Financial Protection Bureau (the "Bureau" or "CFPB")

has filed suit against a host of defendants:  Access Funding, LLC ("Access Funding"); Access

Holding, LLC ("Access Holding"); Reliance Funding, LLC ("Reliance Funding");[1] Lee

Jundanian, former Chief Executive Officer ("CEO") of Access Funding; Raffi Boghosian, Chief

Operating Officer ("COO") of Access Funding; Michael Borkowski, CEO of Access Funding; and

Charles Smith, Esquire, an advisor for Access Funding consumers. *See* ECF 1 ("Complaint").[2]  I

---

[1] Reliance Funding has been dismissed as a defendant. ECF 149.

[2] The case was originally assigned to Judge J. Frederick Motz. On December 7, 2017, following Judge Motz's retirement, the case was reassigned to me.  The case was stayed during the pendency of the litigation, awaiting the decision of the Supreme Court in *Seila Law LLC v. CFPB*, __ U.S.__, 140 S. Ct. 2183 (2020).  *See* ECF 124.

shall refer to Access Funding, Access Holding, Jundanian, and Boghosian collectively as the "Access Funding Defendants."[3]

The Amended Complaint (ECF 44), filed in December 2017, is the operative pleading. CFPB alleges that defendants violated the Act by participating in a scheme to pursue structured settlement holders in order to purchase their settlements on unfair terms. CFPB seeks a permanent injunction, damages, disgorgement, payment of redress to consumers, civil penalties, and costs based on defendants' alleged violation of various provisions of the CFPA.

In particular, the Amended Complaint alleges three violations of the CFPA by Smith and two by the Access Funding Defendants and Borkowski. The claims against Smith and one claim against the Access Funding Defendants and Borkowski arise out of Smith's conduct as an independent professional advisor ("IPA"). According to the CFPB, Smith engaged in unfair (Count I), deceptive (Count II), and abusive (Count III) acts and practices, in violation of 12 U.S.C. §§ 5531(a), (b), and (d), and the Access Funding Defendants and Borkowski "provided substantial assistance" with respect to Smith's unfair, deceptive, and abusive acts (Count IV), in violation of 12 U.S.C. § 5536(a)(3). *See* ECF 44, ¶¶ 62-92. In Count V, which concerns advances by the Access Funding Defendants and Borkowski, CFPB claims that the Access Funding Defendants and Borkowski engaged in abusive acts and practices, in violation of 12 U.S.C. §§ 5531(d)(2)(a) and 5536(a)(1)(B). *Id.* ¶¶ 93-99.

The Access Funding Defendants have filed a motion to dismiss under Fed. R. Civ. P. 12(b)(1). ECF 138. The motion is supported by a memorandum (ECF 139) (collectively, "Access Funding Motion to Dismiss") and one exhibit. ECF 139-1. In the Access Funding Moiton to

---

[3] Borkowski, who is self-represented, is included as an "Access Funding Defendant" by the Bureau. *See* ECF 132-1 at 6. But, Borkowski has filed his own dispositive motion, discussed *infra*.

Dismiss, the defendants urge the Court to dismiss the Amended Complaint on the ground that the Bureau lacks authority to pursue this enforcement action. ECF 139 at 3. CFPB opposes the Access Funding Motion to Dismiss (ECF 148) with two exhibits. ECF 148-1; ECF 148-2. And, the Access Funding Defendants have replied. ECF 154.

CFPB has moved for partial summary judgment (ECF 132), supported by a memorandum (ECF 132-1) (collectively, the "CFPB Motion") and 89 exhibits. CFPB seeks summary judgment as to liability under the five counts in the Amended Complaint.

Smith has filed a combined cross-motion for summary judgment, or in the alternative, motion for judgment on the pleadings under Fed. R. Civ. P. 12(c), and opposition to the CFPB Motion. ECF 137 ("Smith Motion"). The Smith Motion is supported by six exhibits. ECF 137-1 to ECF 137-7.

The Access Funding Defendants have also filed a combined cross-motion for summary judgment as to Counts IV and V of the Amended Complaint and an opposition to the CFPB Motion. ECF 140. The motion is supported by a memorandum (ECF 141) (collectively, "Access Funding S.J. Motion") and 27 exhibits. ECF 141-1 to ECF 141-27.

Borkowski has filed a combined cross-motion for summary judgment and opposition to the CFPB Motion (ECF 146, "Borkowski Motion"), supported by six exhibits. ECF 146-1 to ECF 146-6. Borkowski argues that the CFPB has not established that he was personally engaged in the alleged abusive practices under Count V or provided substantial assistance to Smith's unfair, deceptive, and abusive acts, as alleged under Count IV.

CFPB has submitted a combined opposition to the Smith Motion (ECF 137), the Access Funding S.J. Motion (ECF 140), and the Borkowski Motion (ECF 146), as well as a reply in support of its own motion (ECF 152), with 15 additional exhibits. ECF 152-1 to ECF 152-15. The

Access Funding Defendants have replied (ECF 157) and submitted ten additional exhibits. ECF 157-1 to ECF 157-10.

The defendants have also filed a joint motion to strike the deposition testimony of Stephen Thomas, one of Access Funding's consumers, docketed at ECF 132-45. ECF 142. The motion is supported by a memorandum (ECF 143) (collectively, the "Motion to Strike") and one exhibit. ECF 143-1. The Bureau opposes the Motion to Strike (ECF 151), supported by two exhibits. ECF 151-1 to ECF 151-2. And, defendants have replied. ECF 153.

CFPB filed a notice of supplemental authority docketed at ECF 158. The Access Funding Defendants and Smith filed a "Motion for Leave to File a Response to the Bureau's Notice of Recent Authority" (ECF 159), along with the proposed response. ECF 159-1. The Access Funding Defendants, together with Smith, also filed an additional notice of supplemental authority. ECF 161.  In addition, CFPB filed supplemental authorities.  *See* ECF 160; ECF 162; ECF 163.

The motions are fully briefed and no hearing is necessary to resolve them.  *See* Local Rule 105.6.  Because CFPB has not opposed ECF 159, I shall grant that motion.  I shall also grant the Motion to Strike (ECF 142). But, for the reasons that follow, I will deny all other motions.

## I.  Procedural Background[4]

---

[4] The Court cites to the electronic pagination, which does not always correspond to the page number imprinted on the particular submission. In general, when citing to an exhibit, I have identified the exhibit at least once, but not repeatedly.

CFPB "is an agency of the United States charged with regulating the offering and providing of consumer-financial products and services" under certain federal statutes, including the CFPA. ECF 44, ¶ 5. It "has independent litigating authority, including the authority to enforce the CFPA." *Id*. (citing 12 U.S.C. § 5564(a)-(b)).

Maryland has enacted a Structured Settlement Protection Act ("SSPA"). *Id*. ¶ 21. *See* Md. Code (2013 Repl. Vol., 2018 Supp.), §§ 5-1101 *et seq.* of the Courts and Judicial Proceedings Article ("C.J."). It is one of 49 states in the country that has enacted a statute governing structured settlements. ECF 44, ¶ 21. Maryland's SSPA requires structured-settlement-factoring companies to obtain court approval before purchasing a payment stream. *Id.* ¶ 22; C.J. § 5-1102. It also requires "the court to find that the consumer has consulted with an [IPA] before it can approve a structured-settlement transfer." ECF 44, ¶ 29.

After suit was filed, defendants moved for abstention under *Burford v. Sun Oil, Co.*, 319 U.S. 315 (1943), and for a stay or, in the alternative, to dismiss. ECF 13; ECF 16. By Memorandum (ECF 27) and Order (ECF 28) of September 13, 2017, Judge Motz denied these motions. But, he granted the motions to dismiss as to Counts I-IV of the Complaint, which were based upon the conduct of Smith, and denied the motion as to Count V, lodged against the Access Funding Defendants and Borkowski, alleging substantial assistance to Smith's unfair and deceptive acts.

Judge Motz determined that Smith was engaged in the practice of law when he provided advice to consumers, and therefore his conduct fell under the "practice of law" exclusion to the CFPA, pursuant to 12 U.S.C. § 5571(e). ECF 27 at 26. Further, he found inapplicable the first exception to the practice-of-law exclusion—for conduct that, although undertaken by an attorney practicing law, takes place "outside the scope of the attorney-client relationship." *Id.* Judge Motz

5

reasoned that if the allegations in the Complaint were true, "both Smith and the consumers manifested the intent necessary to form an attorney-client relationship." *Id.*

CFPB subsequently moved for leave to file an Amended Complaint as to Counts I-IV, seeking to add allegations that consumers never formed an attorney-client relationship with Smith. ECF 37.  The Access Funding Defendants and Smith opposed that motion.  ECF 39; ECF 40.  I granted the Bureau's motion (ECF 42; ECF 43), and the Amended Complaint followed.  ECF 44.

Thereafter, on December 27, 2017, Smith moved to dismiss the Amended Complaint or, in the alternative, for summary judgment.  ECF 46.  Borkowski also moved to dismiss.  ECF 48. By Order of June 5, 2018 (ECF 66), I denied both motions.

Then, on April 6, 2018, before discovery was completed, the defendants filed a joint motion for partial summary judgment with regard to the Bureau's claims for monetary damages on behalf of consumers. ECF 58; ECF 59. The basis for defendants' motion was a settlement agreement in connection with a class action suit filed in the Circuit Court for Baltimore City, *Crystal Linton, et al. v. Access Holding, LLC, et al.*, Case No. 24-C-16-003894-OT. ECF 59 at 1-2. In light of the settlement agreement, defendants argued that the Bureau's effort to enforce the CFPA "is barred by the doctrine of *res judicata* and the bar against obtaining a double recovery." *Id.* at 2.

I concluded that the settlement agreement in the State case was not a final judgment on the merits. ECF 87 at 23. Thus, defendants' res judicata claim failed. By Memorandum Opinion (ECF 87) and Order (ECF 88) of January 18, 2019, I denied defendants' motion for partial summary judgment.

Thereafter, the parties continued to engage in discovery. *See* Docket. Then, on October 24, 2019, defendants filed a joint motion to stay, pending the outcome of two cases: *Seila Law LLC v. Consumer Financial Protection Bureau*, __ U.S.__, 140 S.Ct. 2183, 2197 (2020), which was then

pending before the Supreme Court and is discussed, *infra*, and *Linton v. Consumer Protection Division*, 467 Md. 502, 225 A.3d 456 (2020), which was then pending before the Maryland Court of Appeals.[5] By Memorandum Opinion (ECF 123) and Order (ECF 124) of December 23, 2019, I granted defendants' motion to stay proceedings, pending the outcome of *Seila Law*. But, I found that a stay was not appropriate based on *Linton*.

On June 29, 2020, the Supreme Court issued its decision in *Seila Law*. Thereafter, I granted the parties' proposed scheduling order (ECF 129). *See* ECF 131. The pending motions followed.

## II.     Factual Background

### A.  Access Funding

"Structured settlements are often used to ensure the financial well-being of victims who have suffered long-term physical or cognitive harm." ECF 44, ¶ 19. They "are established by legal judgments or settlements of tort claims to provide recipients with an arrangement for periodic payment of damages for personal injuries." *Id.* "Access Funding's principal business was to acquire future structured-settlement-payment streams and transfer those payment streams to third-party investors." *Id.* ¶ 18.

Jundanian, Boghosian, and Borkowski formed Access Funding in December 2012. ECF 132-3 (Access Funding Sales Manual) at 6-7; ECF 132-6 (Access Funding Responses to Interrogatories). Access Funding is a limited liability company that "operated in all 50 states." ECF 44, ¶ 6. It "conducted business under two alter-ego names: Assoc LLC and En Cor LLC. *Id.*

---

[5] In *Linton*, the Maryland Court of Appeals concluded that the circuit court erred in certifying a settlement agreement because it contained unenforceable limitations on the Maryland Consumer Protection Division's ability to pursue disgorgement or restitution.

Access Holding is a "non-operating entity that owns" Access Funding and its other subsidiaries. ECF 132-6 at 2. It is "the sole and managing member of Access Funding." ECF 44, ¶ 8. On October 17, 2015, Access Funding, through its affiliate Access Holding, sold its assets to Reliance Funding. ECF 132-7 ("Agreement for the Purchase and Sale of Assets"). Thus, Reliance Funding is the "successor in interest to Access Funding." ECF 44, ¶¶ 6, 7, 9. Reliance Funding was terminated as a defendant on October 23, 2020. ECF 149 (Stipulation of Dismissal); ECF 150 (Order approving stipulation).

Jundanian, Boghosian, and Borkowski all have "an ownership interest in Access Funding and [each] helped develop Access Funding's business model and manage its business." ECF 44, ¶¶ 10-12. They have all held leadership roles in Access Funding since its inception. In particular, from inception to May 2014, Borkowski served as the Chief Financial Officer ("CFO") and Chief Operating Officer ("COO"). ECF 132-50 (Supplemental Response to Interrogatories) at 3; ECF 132-6 at 3. After May 2014, Borkowski continued serving as the CFO and took over as the Chief Executive Officer ("CEO") of the company. *Id.* From inception to May 2014, Boghosian was Access Funding's "Chief Marketing and Sales Officer." Thereafter, he served as the company's COO. ECF 132-50 at 4; ECF 132-6 at 3; ECF 141-3 (Boghosian Declaration), ¶ 2. Jundanian was the CEO until May 2014. He also serves as "Managing Member" of Access Holding. ECF 132-50 at 2; ECF 132-6 at 3.

Access Funding "purchased payment streams from structured-settlement holders," a practice known as "structured-settlement factoring." ECF 44, ¶ 6. Structured-settlement factoring involves offering "recipients of structured settlements the opportunity to transfer a portion of their future payment streams in exchange for a discounted immediate lump sum." *Id.* ¶ 20; *see also* ECF 132-3 at 5.

In particular, Access Funding acquired future structured-settlement-payment rights and transferred them to third-party buyers, through "court-approved transactions." ECF 141-3, ¶ 3; *see* ECF 141-1 (Boghosian Dep., 3/5/2019) at 3, Tr. 16:10-13; ECF 132-6 at 2; ECF 132-3 at 5. The recipient of a structured settlement received an "immediate lump sum" in exchange for a portion of the "annuity stream." ECF 132-6 at 2; *see* ECF 132-3 at 5. Access Funding conducted "a little over 300 transactions…nationwide," of which "163 were in Maryland." ECF 141-1 at 3, Tr. 16:17-20. The remaining transactions "were scattered throughout the rest of the United States." *Id.*

Many of the Maryland consumers with whom Access Funding worked were victims of lead paint poisoning. *See id.* at 4, Tr. 17:4-8 (noting that Access Funding "did business with 70 lead paint victims"); *see also* ECF 132-8 (email from Jundanian to Boghosian, 12/4/2013, stating: "I would love to figure out how we can truly 'own' the lead paint market in Baltimore…."); ECF 132-9 at 3 (email from Boghosian to Access Funding colleagues, 6/22/2013, describing Access Funding as "the 'Kleenex,' of lead paint cases where people automatically think of us to turn their payments into cash"); ECF 132-10 at 3 (email from Mark Gutierrez, Manager of Sales, to Jundanian, 7/12/2013, stating: "All of the lead poisoning annuitants we have signed are under the age of 22…."). Some of Access Funding's consumers had cognitive impairments. *See* ECF 132-4 (email from Boghosian to Gutierrez, 7/15/2013, stating: "We need to be more cognizant of the fact [that] people have Thea [sic] payments from being poisoned. In fact, many people with lead paint issues have mental capacity issues as a result.").

Access Funding used a variety of methods to identify potential consumers. They sent mailers and advertised on the internet through "Google AdWords." ECF 132-13 at 2 (Borkowski email to non-Access Funding contacts, 1/23/2014); ECF 132-20 (Gutierrez Dep., 3/30/2016) at 4, Tr. 28. Access Funding also had a website, a mobile site, a Facebook page, and twitter account.

ECF 132-13 at 3. In addition, the company identified potential consumers by using a court database that listed consumers who had already completed structured settlements with other companies. ECF 132-89 (Borkowski Dep, 2/11/2016) at 5-10, Tr. 38-43. Once Access Funding made initial contact with a consumer, the Access Funding sales associate would communicate with the consumer primarily by phone, but might also use text messages and emails to communicate. *See* ECF 132-12 (Dep. of Joseph Kim, Access Funding salesperson, 3/28/2019) at 5-6, Tr. 33-34.

After Access Funding secured a consumer's verbal agreement to enter into a deal, the company would typically send a notary to meet with the consumer and witness the consumer's signature on various documents. *See* ECF 132-12 at 6-7, Tr. 34-35. The documents included, *inter alia*, a "Purchase and Sale Agreement", ECF 132-19 at 3; a "Disclosure Statement," *id.* at 16; an "Affidavit in Support of Transfer of Structured Settlement Payment Rights," *id.* at 18; a form with "Personal Information," *id.* at 21; a form titled "Independent Professional Advice Received," *id.* at 22; an "Authorization," *id.* at 24; and "Directions for Funding." *Id.* at 25. The Purchase and Sale Agreement stated that a consumer was free to cancel his or her transaction with Access Funding within a specified time period. *See* ECF 132-19, § 7.2 (the "three-day rescission period"); *id.* § 7.3 ("cancellation after three days").

**B. Advances**

Many of Access Funding's clients received "advances," which are payments made to consumers "*before* court-approval of the structured settlement transfer." ECF 141-3, ¶ 4 (emphasis in original); *see* ECF 141-10 (Jundanian Dep., 3/8/2019) at 9, Tr. 57:12-15.[6] Of the more than 160

---

[6] "A payment to a consumer *after* court approval, but before the consumer receives the final lump sum payment, is called a 'pre-funding' payment." ECF 141-3, ¶ 4.

transactions completed by Access Funding with Maryland consumers, only "seventeen transactions included no advance at all." ECF 141-3, ¶ 6.

According to the Boghosian, "it is customary for structured settlement factoring companies to provide advances at a consumer's request and before a court approved the transfer of that consumer's structured settlement payment rights." ECF 141-3, ¶ 5; ECF 141-10 at 9, Tr. 57 (Jundanian stated: "What I'm aware [of] is that hundreds upon hundreds of thousands of advances are made in this industry, are demanded by customers, and that we did make advances, yes."). And, Access Funding determined that it had to provide consumers with advances in order to remain competitive with competitors. *See, e.g.*, ECF 141-1 at 15-16, Tr. 93:25-94:1 (Boghosian noted that many "customers are highly demanding of advances, in our proximity"). Thus, they would provide advances when the consumer was "in a bind" and would need some money "up front…just to tie them over until the transaction completes." ECF 132-12 at 8, Tr. 58:12-18. But, Jundanian and Boghosian testified that Access Funding did not like giving advances because they would often lose money if the transaction was not consummated. ECF 141-10 at 9-10, Tr. 57-58; *see also* ECF 141-11 (Boghosian Dep., 8/9/2019) at 7, Tr. 134:2-8 ("We didn't like giving advances. We weren't trying to give advances.").

Access Funding had a "document that set guidelines for customer advances" developed by the legal and funding departments of the company. ECF 141-11 at 3, Tr. 125; ECF 141-12 (Gutierrez Dep., 7/26/2018) at 5, Tr. 96:13-15. The legal department would also review a transaction to determine whether to approve a requested advance. ECF 141-11 at 6, Tr. 133:1-3. Such decisions were made on a case-by-case basis by the Access Funding attorneys. ECF 141-11 at 7, Tr. 134:9-11. According to Gutierrez, the salesperson managing the deal would initially

11

discuss the request with him and then apply for approval for the advance from the legal department. ECF 141-12 at 3, Tr. 33:14-22; *see id.* at 6, Tr. 98:9-18.

An advance was typically a "couple thousand" dollars that would be provided after the consumer signed the paperwork and after Access Funding's legal department gave approval for the advance. ECF 132-12 at 8-9, Tr. 58-59; *see* ECF 141-13 (Boghosian and Jundanian, Rule 30(b)(6) Dep., 8/10/2018) at 3, Tr. 201:7-10) (noting that Access Funding never provided an advance to a consumer before the consumer had signed a contract with Access Funding); ECF 132-49 (Boghosian Dep., 2/10/2016) at 6, Tr. 62:11-15 (noting that Access Funding provided an advance only if a consumer signed with Access Funding, the consumer requested it, and Access Funding approved it). And, on at least some occasions, a consumer was required to speak with an independent professional advisor before the consumer could receive an advance. ECF 141-6 (Dep. of Paul Scott Stutts, Access Funding salesperson, 7/27/2018) at 6, Tr. 242-243; *id.* at 10-11, Tr. 236-237 (noting that on several occasions Stutts told consumers that they had to speak with Smith before they could receive an advance).

"At times, Access Funding asked consumers to sign an advance agreement in connection with the payment of an advance." ECF 141-3, ¶ 8; *see* ECF 132-25. The advance agreements were sometimes provided in the initial package of documents that customers received and were signed before a notary. *See, e.g.*, ECF 132-19. And, in at least two instances, consumers signed an advance agreement before receiving advice from an independent professional advisor. *See* ECF 152-3; ECF 152-4.

The advance agreement provided, in relevant part, ECF 132-25, ¶ 5(a): "Consumer will use the utmost good faith in completing the transaction with the Company as described in the PSA [*i.e.*, the Purchase and Sale Agreement], including but not limited to cooperating fully with the

12

Company in keeping the court order…until such time as all remaining closing contingencies…have been fully met to complete satisfaction of the Company, in Company's sole and absolute discretion."

Another version of the advance agreement stated, in relevant part, ECF 152-2, ¶ 6 (emphasis in original):

> **Customer agrees and understands that this advance is contingent on the completion of the transaction contemplated by the PSA. In the event that the transaction is cancelled, breached, or fails to be completed, Company is entitled to refund of the full amount advanced as stated by this Agreement. Customer will remain personally liable to Company for this amount and any other amounts paid contingent on the completion of the structured settlement transaction. Customer agrees that upon cancellation, breach, or termination, Customer will return the previously advanced payment. . . . Should the Customer fail to return the payment in its full amount, Company will take immediate action to recover it, including reporting Customer to collection agencies and taking legal action against Customer.**

Access Funding "used [the advance] agreement more often during the early part of its operations." ECF 141-3, ¶ 8. Later in its operations, Access Funding primarily "relied upon the statements in the Purchase and Sale Agreement each consumer signed concerning the advances." *Id.*

Boghosian avers that Access Funding "informed all consumers that any advance would be deducted from their lump sum payment once the transaction was approved." ECF 141-3, ¶ 3. The Purchase and Sale Agreement provided, in relevant part, ECF 132-19 § 1.3: "The Seller acknowledges and agrees that the Purchase Price may be adjusted, if necessary, by subtracting an amount equal to the sum of (i) all Assigned Payments received by Seller after the date of this Agreement until Closing; plus (ii) **any payments and advances made to Seller** or made on behalf of Seller to a third-party at or prior to Closing. Any advances and payments to third-parties by Purchaser shall be made, if at all, in Purchaser's sole and absolute discretion." (Emphasis added).

The Access Funding executives averred that, even if a customer received an advance, they never compelled a customer to complete a transaction. Boghosian testified, ECF 141 at 23, Tr. 105:12-14: "As a practice as a company we did not go after anybody in those situations." *See also, e.g.,* ECF 141-3, ¶ 11 (Boghosian stating: "I am not aware of any instance where a consumer expressed a desire to cancel a transaction but was told by an Access Funding employee that the consumer must complete the transaction because he or she received an advance or because he or she had signed an advance agreement."); ECF 141-6 at 4-5, Tr. 200-201 (Stutts explaining that if the client wanted to cancel then he had "to respect the client's wishes even if they took advances…"). And, Boghosian claimed that Access Funding "never recovered any funds it advanced to a consumer who later canceled or did not complete his or her transaction." ECF 141-3, ¶ 13.

According to Boghosian, Access Funding lost a significant amount of money from consumers who canceled transactions after receiving advances. Notably, he stated that Access Funding had "521 transactions where customers signed up and received an advance and did not continue with the transaction" and those "521 transactions represent nearly half a million dollars in lost advances and expenses associated with" those deals. ECF 141-1 at 23, Tr. 105:2-8. Boghosian explained: "I think, when I looked at the accounting, [we lost] $55,000 on notaries, $178,000 on attorney's fees, another approximately $180,000 on lost advances." *Id.*, Tr. 105:9-12. However, as discussed, *infra*, the consumers did not always understand that they were allowed to cancel their transactions once they had received an advance.

### C.  Independent Professional Advice

Smith has been licensed to practice law in Maryland since June 2005. ECF 137-1 (Smith Aff.), ¶ 2. From 2013 through 2015, Smith "provided independent professional advice to

consumers in connection with potential transfers of structured settlements…relating to customers of Access Funding." *Id.* ¶ 3.

As noted, Maryland's Structured Settlement Protection Act governed the sale of structured settlement payment rights during the relevant period. *See* C.J. §§ 5-1101 *et seq.*  The SSPA requires structured-settlement-factoring companies, such as Access Holding, to obtain court approval before purchasing a payment stream. C.J. § 5-1102. In order to authorize the transaction, the court must find, *id.* § 5-1102(b) (emphasis added):

> (1) The transfer is necessary, reasonable, and appropriate and in the best interest of the payee…
>
> (2) The financial terms of the transfer agreement are fair to all parties….
>
> (3) **The payee received independent professional advice concerning the proposed transfer**…

Pursuant to this requirement, the Access Funding salespeople would inform consumers that they had to obtain independent professional advice concerning the implications of their transactions with Access Funding before a transaction could be completed. *See* ECF 141-4 (Kim Dep., 3/28/2019) at 7-8, Tr. 128-129 (noting that he told "100 percent" of his Maryland consumers that they should "find an attorney or certified financial planner"; ECF 141-2 (Gutierrez Dep., 3/5/2019) at 5, Tr. 67 ("[W]e basically would tell [consumers] that Maryland law requires that you speak with either an attorney or an accountant to make sure that you understand the terms of the deal."); ECF 141-6 (Stutts Dep.) at 8, Tr. 222 ("Every time I signed a client I told them what was a requirement of getting it to the next stage, and at that point I would give them a list [of IPAs], I would explain what the IPA entailed" and "I said this is a state requirement.").

Some of the consumers already had an attorney to advise them but, in most cases, the Access Funding salesperson provided the consumer with "a couple people" from whom they could

choose. ECF 141-4 at 4, Tr. 101; *see also* ECF 141-6 at 8, Tr. 222. According to Gutierrez, the sales people did not tell the consumers anything about the "'independent' prong" of the IPA role. ECF 141-2 at 5, Tr. 67.

One of the documents accompanying the Purchase and Sale Agreement was titled "Independent Professional Advice Received." ECF 132-19 at 22. This document stated, *id.*: "I have been advised by Access Funding, LLC, in writing, to seek independent professional advice, and have received such independent professional advice regarding my proposed transfer from the below listed person"; *see also* ECF 141-5 (same). The document contained blanks to insert the IPA's name, address, and phone number.

Smith also signed a letter "To Whom It May Concern" regarding the advice he provided. *See, e.g.*, ECF 132-27 at 3. The letter stated, *id.*: "Please be advised that I spoke with [consumer's name] on [relevant date]. I reviewed on her behalf the proposed transaction between [consumer's name] and Assoc, LLC. I explained to her the financial, legal, and tax implications of this transaction. [Consumer's name] indicated that she understood every aspect of the transaction and the implications of said transaction." Further, he noted, *id.*: "I am not affiliated nor compensated by the transferee of this transfer and my compensation is not affected by whether a transfer occurs."

Based on the date provided on the document titled "Independent Professional Advice Received" and the date noted on Smith's letter, it appears that consumers sometimes signed the document before they had received any IPA services. *See* ECF 132-27 (consumer signature on May 31, 2014; independent professional advice provided on June 3, 2014); ECF 132-28 (consumer signature on November 21, 2013; independent professional advice provided on November 29, 2013); ECF 132-29 (consumer signature on April 29, 2014; independent professional advice provided on May 1, 2014).

Smith was a friend of Boghosian. ECF 141-1 at 11, Tr. 56:16-17. When Access Funding first began operations, Smith spoke with Boghosian about being added to Access Funding's list of potential IPAs for consumers. *Id.*, Tr. 56:15-17; *id.* at 10, Tr. 55:2-7. Around February 2013, Access Funding's lawyer, Earl Nesbitt, told Boghosian that it would not be a problem for Access Funding to use Smith as an IPA. *Id.*, Tr. 56:18; *see* ECF 141-10 at 6, Tr. 46:10-18 (Jundanian noting that "third-party independent counsel reviewed the structure and reviewed having Mr. Smith as an IPA [in February 2013], and we received their blessing"). Thereafter, Boghosian told the Access Funding salespeople to suggest Smith as an IPA for consumers in Maryland. ECF 141-4 at 5, Tr. 102:1-7 (Kim explaining that "one day…we got an e-mail or Raffi told us, hey, moving forward, you know, if you have a Maryland transaction" that needs an IPA "Chuck Smith is available if they need it and they want to use him").

Therefore, beginning in February 2013, the Access Funding salespeople began to include Smith in the list of IPA options for consumers. *Id.* at 4, Tr. 101. Around the same time, Boghosian sent several emails to Smith, advising him about what to write in his IPA letter on behalf of consumers. *See* ECF 132-35 at 2; *see, e.g.*, ECF 132-37 at 2. And, according to Boghosian, "somewhere along the line…it became default to refer to Charles Smith, if the customer asked for the name of an attorney or they couldn't find one on their own." ECF 141-1 at 17-18, Tr. 95:20-96:1. Thus, Smith performed a significant amount of IPA work for Access Funding in Maryland. ECF 132-30 (Jundanian Dep., 3/8/2019) at 6, Tr. 42:22-24; ECF 141-1 at 12, Tr. 57:16-22 (Boghosian stating: "Charles Smith did do, I believe, not all, almost all…of Access Funding's Maryland deals. It wasn't a mandate to the staff that he be used…but he was regularly used."); *see also* ECF 132-31 at 2 (Email from Boghosian to Borkowski, 7/26/2014, referring to Smith as "an extension of our internal team").

After a consumer signed all the paperwork pertaining to the Purchase and Sale Agreement, an Access Funding sales associate would email the paperwork to Smith. ECF 132-36 (Smith Dep., 1/14/2016) at 4-5, Tr. 20:23-21:14; *see, e.g.*, ECF 132-34 at 2. According to Smith, those emails "would say, This person is going to call you. They are interested in having an IPA; or, Can you call this person? They are interested in having an IPA." ECF 132-36 at 4-5, Tr. 20:23-21:14. Additionally, Smith would sometimes receive a call directly from a consumer who was conducting a transaction with Access Funding. ECF 141-8 (Smith Dep., 3/11/2019) at 6, Tr. 107:1-6.

Generally, the only information Smith had about his Access Funding clients was from the paperwork he received from the Access Funding sales associate. ECF 132-36 at 6, Tr. 25:12-16. According to Smith, this paperwork usually included "an application" with the consumer's date of birth and social security number and "the disclosure statement." *Id.* at 6-7, Tr. 25-26. The disclosure statement contained the portion of the settlement that consumers were selling, so Smith would have the "aggregate amount of what they were selling" and the "amount that they would receive in exchange for selling." *Id.* at 9, Tr. 28:1-11. But, Smith usually did not have information about the clients' income or financial obligations, among other things. *Id.* at 6-7, Tr. 25-26. And, he did not ask for additional information from the consumers. *Id.* at 8, Tr. 27:6-8. In fact, Smith said that he would not necessarily know if his client had a disability or a cognitive impairment. *Id.* at 9, Tr. 28:12-19.

Smith avers that he usually performed IPA consultations with consumers by telephone. ECF 137-1, ¶ 4. He explained, *id.* ¶ 5: "My practice during those consultations, at the outset of the call, was to introduce myself and indicate that I was a licensed attorney in the State of Maryland. I would then advise the client that the reason we were speaking was because the client was contemplating selling his/her structured settlement payments, and prior to doing so, Maryland law

required that the consumer obtain independent professional advice from an attorney, accountant, actuary, or other professional. I would then obtain the client's agreement to continue with the consultation. I would then explain the legal, financial, and tax implications of the prospective transfer to each client." *See also* ECF 141-9 (Smith Dep., 10/31/2017) at 3-4, Tr. 225:9-226:2 ("I would introduce myself, and I would say I'm a licensed attorney in the State of Maryland….I would also say the reason that we are speaking today is because you are contemplating selling structured settlement payments, and prior to doing so pursuant to statute you have to have what's called an independent professional advice consultation with an attorney, CPA or actuary or other professional.").

Smith also testified as to the point of engagement. He said, ECF 141-8 (Smith Dep., 3/11/2019) at 6, Tr. 107:12-108:2: "I told them I was a Maryland attorney…. Before they did a deal, they required independent professional advice from an attorney, CPA, or other professional in the State of Maryland, licensed. And I would ask them: Do you want me to provide this service to you? And when they said yes, I want you to provide this service, that to me is when I was engaged to do it." *See id.* at 7, Tr. 108:7-10 ("[T]hese people call me. I asked them if they wanted me to help them. And they assented to my representation for the purpose of doing the IPA."); ECF 141-9 at 4, Tr. 226:3-5 (noting that he would seek the consumer's consent to continue after introducing himself). However, when Smith provided IPA services, the customer did not sign any documentation confirming the "attorney-client relationship" with Smith. ECF 132-36 at 6, Tr. 25:6-11.

To make sure that the clients "understood" the implications of the transaction, Smith said he "would go over the disclosure statement with them…point by point tell them what they were doing, make sure that they understood once they sold the payment stream that that payment stream

was not going to be there anymore and then get some sort of audible response from them that they did understand." ECF 132-36 at 10, Tr. 29:10-19. Further, Smith said, *id.*, Tr. 29:4-9: "I would advise them as to the financial, tax and legal implications of what they were going to do, just explain it to them, make sure they understood what they were doing." According to Smith, "the majority of people" with whom he spoke "had already sold payments...so they were familiar with the process." *Id.*, Tr. 29:19-21. Additionally, Smith stated: "I wouldn't analyze their [*i.e.*, the client's] situation in particular. I would analyze the deal and make sure that they understood what they were doing and what they were giving up in return...for those payments." *Id.* at 12, Tr. 33:9-16.

Smith testified that he did not "venture to determine if" a structured settlement transfer would be in the "best interest" of his client because he did not "believe that was [his] duty" under the statute. *Id.* at 10-11, Tr. 29:22-30:4. In fact, Smith testified that he would not assess "the legal capability of clients" with whom he was consulting. Rather, he "would just focus on going over what was required of [him] in the statute." *Id.* at 9-10, Tr. 28:23-29:3. Smith recalled that he usually spent five or ten minutes speaking to the client on the phone. *Id.* at 15, Tr. 39:15-22.

Smith charged a $250 "flat rate" for each consultation. *Id.* at 16, Tr. 41. According to Smith, "generally speaking," at the end of the consultations, he would tell the consumers that he was going to send them an invoice for $250. ECF 141-8 at 4, Tr. 68:2-17. And, the consumers would be responsible for paying the fee even if "the deal didn't go through." *Id.* at 5, Tr. 70:9-15. If the deal was finalized, then the $250 payment for Smith would be paid from the customer's lump sum payment from Access Funding. ECF 141-1 at 22, Tr. 102:19-21.

### D.  Consumer Testimony

Four Access Funding consumers were deposed during discovery: Adina Henson (ECF 132-16); Antonio Durham (ECF 132-44); Stephen Thomas (ECF 132-45); and Rodney Fair (ECF 132-46).[7] The Bureau also submitted the affidavit of Deon Hayes (ECF 132-47), another Access Funding consumer. Smith signed separate letters for each of these consumers, stating that he contacted them and provided them with independent professional advice. *See* ECF 152-8.

Henson testified that she recalled "someone coming" to her home for her "to sign quite a few papers" in connection with Access Funding. ECF 132-16 at 7, Tr. 45:1-4. She explained that she had questions about the documents, but the person "who was there to [witness her] sign could not answer any of the questions" that she had for Access Funding because he "was just the notary." *Id.*, Tr. 45:4-11. Further, while the notary was at her residence, she tried to call Scott, the Access Funding salesperson with whom she was working, to ask questions about the documents.  *Id.* at 9, Tr. 47:3-8. But, Scott did not answer and the notary said that "he could not stay." *Id.* As a result, Henson signed the documents before obtaining answers to her questions. *Id.*, Tr. 47.

With respect to Smith, Henson stated, *id.* at 10-11, Tr. 51:17-52:3: "I don't recollect having a conversation [with Smith]. I remember his name being stated, but I don't recollect speaking with him. I believe Scott was the middle person that spoke with him….I don't believe I have had conversations with him. And if it was, Scott had to have been on the phone because every dealing that I had was via him." Additionally, Henson averred that she did not believe that she paid for Smith's services, but "that's not to say it wasn't taken out of…the funds." *Id.* at 11-12, Tr. 52:22-53:2; *see also id.* at 12-13, Tr. 53:25-54:5 (noting that she never received an invoice for Smith's

---

[7] The defendants move to strike the deposition testimony of Stephen Thomas. ECF 143. As discussed, *infra*, I shall grant the Motion to Strike. Therefore, I shall not include the deposition testimony of Thomas in the factual background or in my analysis.

services). Further, she stated that Scott did not tell her that she had to pay for Smith's services. *Id.* at 12, Tr. 53:3-6.

Fair testified that he "never heard of a Charles E. Smith"; did not remember talking to anyone with the name Charles Smith; did not know Smith was acting as his lawyer; did not intend for Smith to be his lawyer; and did not know that $250 was taken out of his lump sum to pay Smith. ECF 132-46 at 7-10, Tr. 35, 94.

Similarly, Durham testified that he never spoke to anyone named Charles Smith; he was never told to get a lawyer; and he "never had a lawyer" represent him in connection with Access Funding. ECF 132-44 at 6, Tr. 20; *id.* at 8, Tr. 45:11-23. Further, Durham testified that he was not advised to seek independent professional advice in connection with the transfer and never received independent professional advice. *Id.* at 8, Tr. 45:5-23. With respect to the advance, Durham stated that "Bill" at Access Funding told him that he would have to pay back all the cash advances if he did not complete the transaction after he obtained an advance. *Id.* at 11, Tr. 160:16-25.

In his Affidavit, Hayes stated that he received a structured settlement because he sustained "permanent cognitive injuries due to childhood exposure to lead paint." ECF 132-47, ¶ 2. Hayes explained that an Access Funding salesperson named Trevor contacted him several times about making a deal with Access Funding. *Id.* ¶¶ 5-6. Hayes said, *id.* ¶ 7: "I do not recall actually agreeing to give my payments to Access Funding. At some point in the middle of 2013, though, a notary came to my house and told me to sign papers from Access Funding, and I signed the papers. I did not try to read them."

The Access Funding salesperson told Hayes that he had to speak with a lawyer before he could get his "lump sum" and that "someone [*i.e.*, a lawyer] would call" him. *Id.* ¶ 8. After signing

22

the papers before a notary, a "lawyer named Scott Blumenfeld called [Hayes] and said he would help [him]." *Id.*

Before Hayes received any money from Access Funding, he got an offer from Novation, Access Funding's competitor. Hayes told Blumenfeld about the competitive offer from Novation. According to Hayes, Blumenfeld responded that Hayes "should stay with Access funding because they had given [him] some money already." *Id.* ¶ 11. Additionally, Boghosian told Hayes that Hayes would "have to pay back the money" if he did not complete his transaction with Access Funding. *Id.* ¶ 12.

With respect to Smith, Hayes averred that he never heard the term "independent professional advice"; he did not recall talking with someone named Smith in connection with Access Funding; and he "did now know that someone named Charles Smith was involved" in his deal with Access Funding. *Id.* ¶ 15.

Additional facts are included, *infra.*

### III.     Legal Standard

#### A.  Rule 12(b)(6)

The Access Funding Defendants initially filed the Motion to Dismiss under 12(b)(1). ECF 139. But, the Bureau suggests that the Court should assess this Motion under Rule 12(b)(6), because the defendants' argument presents an Article III issue. ECF 148 at 2. In their reply, the Access Funding Defendants "agree that the statute of limitations issue at the core of this Motion should be evaluated under Rule 12(b)(6)." ECF 154 at 4 n.3. Accordingly, the Court shall construe the Motion to Dismiss as one brought under Rule 12(b)(6).

Moreover, in addition to moving for summary judgment, Smith has moved for a judgment on the pleadings, pursuant to Fed. R. Civ. P. 12(c). ECF 137. Rule 12(c) provides: "After the

pleadings are closed—but early enough not to delay trial—a party may move for judgment on the

pleadings." A motion under Rule 12(c) is "assessed under the same standard that applies to a Rule

12(b)(6) motion." *Walker v. Kelly*, 589 F.3d 127, 139 (4th Cir. 2009) (citing *Edwards v. City of

Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)); *see also McBurney v. Cuccinelli*, 616 F.3d 393,

408 (4th Cir. 2010).

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss

under Rule 12(b)(6). *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty.

Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th

Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of

Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by

a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of

law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading

requirements of Fed. R. Civ. P. 8(a)(2). It provides that a complaint must contain a "short and

plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule

is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to

relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state

a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556

U.S. 662, 684 (2009) (citation omitted) ("Our decision in *Twombly* expounded the pleading

standard for 'all civil actions' . . . ."); *see also Fauconier v. Clarke*, 996 F.3d 265, 276 (4th Cir.

2020); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir.

2019); *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). To be sure, a plaintiff need not include

"detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 10 (2014) (per curiam). But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief. *Iqbal*, 556 U.S. at 678. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co.*, 637 F.3d at 440 (citations omitted); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011). But, a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Glassman v. Arlington Cty.*, 628 F.3d 140, 146 (4th Cir. 2010). "A court decides whether [the pleading] standard is met by

separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses'" through a Rule 12(b)(6) motion. *Edwards*, 178 F.3d at 243 (quoting *Republican Party v. Martin,* 980 F.2d 943, 952 (4th Cir. 1992)). However, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan,* 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.*'" *Goodman,* 494 F.3d at 464 (quoting *Forst,* 4 F.3d at 250) (emphasis added in *Goodman*).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448). Ordinarily, the court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein . . . ." *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013); *see Bosiger v. U.S. Airways, Inc.*, 510 F.3d 442, 450 (4th Cir. 2007).

26

But, under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015). In particular, a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits." *Goines*, 822 F.3d at 166 (internal citation omitted); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

A court may also "consider a document submitted by the movant that [is] not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines*, 822 F.3d at 166 (citations omitted); *see also Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied*, __ U.S. __, 138 S. Ct. 558 (2017); *Oberg*, 745 F.3d at 136; *Kensington Volunteer Fire Dep't. v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012). To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis in original). *See also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

The Access Funding Defendants have submitted with the Motion to Dismiss the "Declaration of Kathleen L. Kraninger, Director of Plaintiff Consumer Financial Protection

Bureau, Regarding Ratification." ECF 139-1 ("Ratification"). The Bureau attached the same exhibit to its opposition to the Motion to Dismiss. *See* ECF 148-2. The Ratification, dated July 8, 2020, states, in part: "On behalf of the Bureau, I hereby ratify the decisions to file the original complaint and the amended complaint . . . against Defendants."

The Ratification is integral to the Amended Complaint and there is no dispute about the content. Accordingly, I may consider the Ratification, without converting the Motion to Dismiss to one for summary judgment.

### B.  Rule 56

As noted, CFPB (ECF 132), the Access Funding Defendants (ECF 140), Smith (ECF 137), and Borkowski (ECF 146) have all submitted motions for summary judgment.

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020); *Variety Stores, Inc. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018); *Iraq Middle Mkt. Dev. Found v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017). To avoid summary judgment, the nonmoving party must demonstrate that there is a genuine dispute of material fact so as to preclude the award of summary judgment as a matter of law. *Ricci v. DeStefano*, 557 U.S. 557, 585-86 (2009); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Gordon v. CIGNA Corp.*, 890 F.3d 463, 470 (4th Cir. 2018).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion. "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion

for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248.

There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658 (4th Cir. 2020); *Variety Stores, Inc.*, 888 F.3d at 659; *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. But, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see Celotex*, 477 U.S. at 322-24. And, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *Ricci*, 557 U.S. at 585-86; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *accord Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019); *Variety Stores, Inc.*, 888 F.3d at 659; *Gordon*, 890 F.3d at 470; *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249;

*accord Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Wilson v. Prince George's Cty.*, 893 F.3d 213, 218-19 (4th Cir. 2018); *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002). That said, "a party's 'self-serving opinion ... cannot, absent objective corroboration, defeat summary judgment.'" *CTB, Inc*., 954 F.3d at 658-59 (quoting *Williams v. Giant Food Inc.,* 370 F.3d 423, 433 (4th Cir. 2004)). In other words, "[u]nsupported speculation is not sufficient to defeat a summary judgment motion." *Felty v. Graves-Humphreys Co*., 818 F.2d 1126, 1128 (4th Cir. 1987); *Harris v. Home Sales Co*., 499 F. App'x 285, 294 (4th Cir. 2012).

When, as here, the parties have filed cross-motions for summary judgment, the court "'consider[s] each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law.'" *Def. of Wildlife v. N.C. Dep't of Transp*., 762 F.3d 374, 392 (4th Cir. 2014) (citation omitted); *see Belmora LLC v. Bayer Consumer Care*, 987 F.3d 284, 291 (4th Cir. 2021). In doing so, the court "'resolve[s] all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion.'" *Def. of Wildlife*, 762 F.3d at 393 (quoting *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003), *cert. denied*, 540 U.S. 822 (2003)); *see Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003).

In sum, simply because multiple parties have filed for summary judgment does not mean that summary judgment to one party or another is necessarily appropriate.  Indeed, "[b]oth motions must be denied if the court finds that there is a genuine issue of material fact."  10A C. WRIGHT, A. MILLER, & M. KANE, FEDERAL PRACTICE & PROCEDURE § 2720 (4th ed. Suppl. 2020) (WRIGHT & MILLER).

## IV.    Discussion

### A.  Motion to Dismiss

As an initial matter, the Access Funding Defendants move to dismiss the Amended Complaint, arguing that the CFPB's enforcement action is barred as a result of  the Supreme Court's recent ruling in *Seila Law LLC v. Consumer Financial Protection Bureau*, __ U.S.__, 140 S.Ct. 2183, 2197 (2020), as well as the statute of limitations under the CFPA, 12 U.S.C. § 5564(g)(1). ECF 139. In particular, they contend that the CFPB Director's Ratification of the action in July 2020, attempting to cure any separation-of-powers problem that existed at the initiation of the enforcement action, "came too late because the statute of limitations" as to the CFPA claims had already expired. ECF 154 at 2. In addition, Smith contends that he is entitled to judgment on the pleadings for the same reason. ECF 137 at 14.

Section 5491(c)(3) of 12 U.S.C. states that the "President may remove the Director for inefficiency, neglect of duty, or malfeasance in office." In *Seila Law*, 140 S.Ct. 2183, the Supreme Court held that the Bureau's structure—*i.e.*, leadership by a Director who could be removed by the President only for inefficiency, neglect, or malfeasance, and not at will—"violates the separation of powers." *Id.* at 2197. But, the Court explained that "[t]he only constitutional defect we have identified in the CFPB's structure is the Director's insulation from removal" and therefore "[i]f the Director were removable at will by the President, the constitutional violation would

31

disappear." *Id.* at 2209. And, the Court determined that "the CFPB Director's removal protection is severable from the other statutory provisions bearing on the CFPB's authority." *Id.* at 2192. The Court concluded, *id.*: "The agency may therefore continue to operate, but its Director, in light of our decision, must be removable by the President at will." In so holding, the Supreme Court severed "Establishment of the Bureau of Consumer Financial Protection," 12 U.S.C. § 5491(c)(3), from the remainder of the provisions in 12 U.S.C. § 5491. *See also Collins v. Yellen*, __ U.S.__, 141 S. Ct. 1761 (2021) (finding that, for the same reasons as in *Seila Law*, the single-head structure of the Federal Housing Finance Authority is unconstitutional, and remanding to lower court to determine the remedy).

Notably, the Supreme Court remanded the case to the Ninth Circuit "to consider whether the civil investigative demand [at the root of this case] was validly ratified." *Id.* at 2211. Shortly thereafter, the CFPB's Director, Kathleen Kraninger, ratified both the civil investigative demand and the petition to enforce the demand against Seila Law. *CFPB v. Seila Law LLC*, 984 F.3d 715, 717–18 (9th Cir. 2020), *reh'g denied*, 997 F.3d 837 (9th Cir. 2021).

On remand, the Ninth Circuit held that the CFPB's post-severance ratification cured any defect in the agency's prior actions. *Id.* at 719. The court reasoned that the constitutional defect was confined "to the Director alone," so the "legality of the agency itself" was undisturbed. *Id.* That meant that the Director could retroactively ratify decisions made when the agency was operating under its previous, unconstitutional structure, thereby permitting the investigation of Seila Law to continue. *Id.*

In light of *Seila Law*, there is no question that the Bureau initiated this action at a time when its structure violated the Constitution's separation of powers. Thus, the question before this Court is whether that defect has been cured by ratification or whether dismissal is required.

The Access Funding Defendants and Smith concede that a "proper ratification…could cure the Director's lack of authority [when bringing that action]," but they maintain that ratification was not proper in this case because it "cannot circumvent the applicable statute of limitations." ECF 154 at 3. And, they posit that it is "undisputed that the three-year limitations period for the Bureau's claims expired, at the latest, in November 2019." *Id.* at 4. Thus, they contend that when the Director ratified the action here in July 2020, limitations had already expired with regard to the Bureau's claims. *Id.*

Under the CFPA, "[e]xcept as otherwise permitted by law or equity, no action may be brought ... more than 3 years after the date of discovery of the violation to which an action relates." 12 U.S.C. § 5564(g)(1). As defendants note, it is undisputed that the Bureau discovered the conduct at issue in this case no later than November 2016, when it filed the Complaint in this suit. Thus, the Director's Ratification on July 8, 2020, clearly occurred after limitations had expired.

The Bureau maintains that, for two reasons, the statute of limitations provides no basis to "dismiss this timely-filed action." ECF 148 at 11. First, it asserts that there is nothing in the limitations provision that requires an action to "be approved by a Director removable at will within" the allotted time frame. *Id.* at 6. And, defendants' interpretation of the limitations provision would lead to absurd results. *Id.* at 7. Second, it argues that, "[e]ven if the statute of limitations would somehow otherwise bar the Bureau from pursuing its claims here, equity would surely permit it." *Id.* at 8.

The defense relies principally on the Supreme Court's decision in *Federal Election Commission v. NRA Political Victory Fund*, 513 U.S. 88, 98 (1994) ("*FEC*"). There, the Court held that the FEC could not independently file a petition for certiorari in the Supreme Court. Rather, only the Solicitor General had the authority to file such a petition. And, the Solicitor

General's "'after-the-fact' authorization" of the FEC petition after the deadline for filing had passed "came too late in the day to be effective." *Id.* at 98.

In so holding, the Court explained that the "question is at least presumptively governed by principles of agency law, and in particular the doctrine of ratification." *Id.* The Court stated, *id.*:

> [I]f an act to be effective in creating a right against another or to deprive him of a right must be performed before a specific time, an affirmance is not effective against the other unless made before such time." Restatement (Second) of Agency § 90 (1958); *see also id.*, Comment a ("The bringing of an action, or of an appeal, by a purported agent can not be ratified after the cause of action or right to appeal has been terminated by lapse of time"). Though in a different context, we have recognized the rationale behind this rule: "The intervening rights of third persons cannot be defeated by the ratification. In other words, it is essential that the party ratifying should be able not merely to do the act ratified at the time the act was done, *but also at the time the ratification was made*." *Cook v. Tullis*, 85 U.S. (18 Wall.) 332, 338, 21 L.Ed. 933 (1874) (emphasis added).

Further, the Court explained that if a principal were allowed to ratify an unauthorized agency action after expiration of the statute of limitations, "he would have the unilateral power to extend the ... statutory period for filing [a complaint] by days, weeks, or, as in this case, even longer. Such a practice would result in the blurring of the jurisdictional deadline." *Id.* at 99. Thus, the Court concluded that "the Solicitor General's 'after-the-fact' authorization does not relate back to the FEC's unauthorized filing so as to make it timely." *Id.*; *see also Advanced Disposal Serv. E., Inc. v. Nat'l Labor Relations Bd.*, 820 F.3d 592, 602 (3d Cir. 2016) (noting three general requirements for "[r]atification of previously unauthorized agency action": (1) "the ratifier must, at the time of ratification, still have the authority to take the action to be ratified"; (2) "the ratifier must have full knowledge of the decision to be ratified"; and (3) "the ratifier must make a detached and considered affirmation of the earlier decision").

Pursuant to the principle of ratification set out in *FEC*, the Bureau must have the authority "to do the act," *i.e.*, file suit, when "the ratification was made." *FEC*, 513 U.S. at 98. In this case,

that authority had to exist in July 2020. Director Kraninger's Ratification was made after limitations expired for CFPB's claim against these defendants. *See Consumer Fin. Protection Bureau v. Nat'l Collegiate Master Student Loan Trust*, No. 17-1323 (MN), 2021 WL 1169029, at *6 (D. Del. Mar. 26, 2021) (finding that "the Court cannot disregard the timeliness requirement for ratification" set forth in *FEC*, and noting that "the Court cannot find that the statute of limitations was 'satisfied' for the purposes of ratification because the Bureau brought the original suit within the applicable limitations period"); *Consumer Fin. Protection Bureau v. Navient Corp*., __ F. Supp.3d __, 2021 WL 134618, at *10 (M.D. Pa. Jan. 13, 2021) (finding that the "Court is bound by the application of a basic principle of ratification, despite its potentially draconian result: Director Kraninger's ratification came outside of the statute of limitations for the CFPB's claims and she was thus without the ability to act in this action at the time the ratification was made in July of 2020").

Accordingly, in the absence of an equitable remedy, the Ratification was ineffective and the CFPB's claims in this case would be barred by the statute of limitations. However, given CFPB's diligent pursuit of its rights, and the existence of an extraordinary circumstance that was out of its control, as discussed, *infra*, the next question is whether doctrine of equitable tolling operates to toll limitations and save the case from dismissal.

Defendants do not dispute that equitable tolling *could be* available to a litigant under the CFPA. But, defendants maintain that they did not engage "in the type of deceit necessary to warrant equitable tolling." ECF 154 at 8. However, equitable tolling is not limited to situations in which defendants wrongfully deceived or misled the plaintiff.

"[E]quitable tolling pauses the running of, or 'tolls,'" the beginning of the statute of limitations period which, in practical effect, provides litigants more time to file suit. *Lozano v.*

35

*Montoya Alvarez*, 572 U.S. 1, 10 (2014); *see United States v. Wong*, 575 U.S. 402, 408 (2015) (holding that the limitations under the Federal Tort Claims Act is subject to equitable tolling). A litigant is entitled to equitable tolling if: (1) he "'pursu[ed] his rights diligently,'" and (2) "'some extraordinary circumstance stood in his way and prevented timely filing.'" *Menominee Indian Tribe of Wis. v. United States*, 577 U.S. 250, 256 (2016) (quoting *Holland v. Florida*, 560 U.S. 631, 649 (2010)) (alteration by this Court); *see Edmonson v. Eagle National Bank*, 922 F.3d 535, 548 (4th Cir. 2019); *Battle v. Ledford*, 912 F.3d 708, 718 (4th Cir. 2019); *Cruz v. Maypa*, 773 F.3d 138, 146-47 (4th Cir. 2014). "[T]he diligence prong ... covers those affairs within the litigant's control; the extraordinary-circumstances prong, by contrast, is meant to cover matters outside its control." *Menominee*, 577 U.S. at 257. If the first two prongs are satisfied, then the "absence of prejudice is a factor to be considered in determining whether the doctrine of equitable tolling should apply." *Baldwin Cnty. Welcome Ctr. v. Brown*, 466 U.S. 147, 152 (1984).

The Supreme Court has "allowed equitable tolling in situations where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period ... [but it has] generally been much less forgiving in receiving late filings where the claimant failed to exercise due diligence in preserving his legal rights." *Irwin v. Dep't of Veteran's Affairs*, 498 U.S. 89, 96 (1990). Moreover, it has said that the doctrine is to be applied "sparingly." *Id.*

Similarly, the Fourth Circuit has said that equitable tolling is available only in "'those rare instances where—due to circumstances external to the party's own conduct—it would be unconscionable to enforce the limitation period against the party and gross injustice would result.'" *Rouse v. Lee*, 339 F.3d 238, 246 (4th Cir. 2003) (quoting Harris v. *Hutchinson*, 209 F.3d 325, 330 (4th Cir. 2000)). Courts in this Circuit generally engage in "'a case-by-case examination to determine if an equitable tolling of the filing period is appropriate.'" *Nguyen v. Inova Alexandria*

36

*Hosp.*, 187 F.3d 630 (Table), 1999 WL 556446, at *3 (4th Cir. July 30, 1999) (quoting *Harvey v. City of New Bern Police Dep't*, 813 F.2d 652, 654 (4th Cir. 1987)).

I am aware of only two other courts to consider the question of equitable tolling in light of *Seila Law*: *Nat'l Collegiate Master Student Loan Trust*, 2021 WL 1169029, and *Navient Corp.*, 2021 WL 134618. Both courts concluded that Director Kraninger's ratification came outside of the statute of limitations for the CFPB's claims. But, the courts reached different results as to the equitable tolling analysis.

In *Navient Corp.*, 2021 WL 134618, a judge in the Middle District of Pennsylvania reasoned, *id.* at *14: "The present action was timely filed under existing law, at a time where there was no finding that a provision of the Dodd-Frank Act was unconstitutional. The case has been continuously and vigorously litigated for approximately four years and the Supreme Court's severance in *Seila* of the offending provision in the Dodd-Frank Act constituted an extraordinary circumstance outside of the CFPB's control. Further, the Director of the CFPB immediately ratified this action following the *Seila* decision, further demonstrating diligent pursuit of this action." Thus, the court concluded, *id.* at *11: "[A]ssuming that the statute of limitations may otherwise bar this lawsuit, due to CFPB's diligent pursuit of its rights, and the existence of an extraordinary circumstance which stood in its way, the doctrine of equitable tolling operates to toll the statute of limitations in this action and save the CFPB's case from dismissal."

In *Student Loan Trust*, 2021 WL 1169029, a judge in the District of Delaware recognized that the statute of limitations *could be* equitably tolled in this context. But, based on the facts of the case, the court declined to apply equitable tolling. It concluded that the Bureau had not acted diligently in pursuing its claims. In particular, the court noted that the complaint was filed more than three years after the Bureau issued the civil investigative demand in the case. *Id.* at *7. And,

the court stated, *id.*: "Despite its admitted 'questioning' of [the constitutionality of its] own structure and the other red flags . . . the Bureau could not identify a single act that it took to preserve its rights in this case in anticipation of the constitutional challenges that could have reasonably ended with an unfavorable ruling from the Supreme Court (*i.e.*, what actually happened)." Thus, the court concluded that there was an "absence of favorable facts" as to the Bureau's diligent pursuit of its claims.

Neither ruling is binding on this court. But, I find the facts of *Navient Corp.* similar to those of this case.  And, the *Navient* Court's analysis is persuasive. Unlike in *Student Loan Trust*, there are numerous facts here that reflect the Bureau's diligent pursuit of its claims.

The CFPB filed suit against the defendants in November 2016. Since the inception of this case, CFPB has vigorously pursued its claims against defendants and sought to timely advance this action. The parties have engaged in extensive discovery, motion practice, and the submission of cross-motions for summary judgment. While the case has been pending for a considerable period, some of the delays were the result of the Court's response time as well as the issuance of the stay, pending the Supreme Court's decision in *Seila Law*.  ECF 123.  That case was decided on June 29, 2020.  The Ratification followed in July 2020. ECF 139-1.

*Seila Law* severed an offending statutory provision; it did not result in the determination that the entire Act is unconstitutional. Moreover, "[n]o amount of diligence, research, investigation, or action, by the CFPB prior to the Supreme Court's decision could have avoided (or rectified) the statute of limitations issue now before this Court." *Navient Corp.*, 2021 WL 134618, at *13.  And, after *Seila Law* was decided, the Director of the CFPB promptly ratified this action, further demonstrating diligent pursuit.

38

The second prong of the equitable tolling analysis "is met only where the circumstances that caused a litigant's delay are both extraordinary *and* beyond its control." *Menominee*, 136 S.Ct. at 756 (emphasis in original). In my view, the issue concerning the constitutionality of the CFPB's structure and the Supreme Court's decision in *Seila Law* were undoubtedly not "within the litigant's control." *Menominee*, 577 U.S. at 257. Although the Bureau had been subject to numerous constitutional challenges, many of the lower courts that addressed such challenges found the CFPB's structure to be constitutional. *See, e.g., Consumer Fin. Protection Bureau v. Think Finance, LLC*, No. CV-17-127-GF-BMM, 2018 WL 3707911, at *1 (D. Mont. Aug. 3, 2018) (not unconstitutional); *Consumer Fin. Protection Bureau v. All Am. Check Cashing, Inc.*, C.A. No. 3:16-cv-356-WHB-JCG, 2018 WL 9812125, at *2 (S.D. Miss. Mar. 21, 2018) (not unconstitutional), *aff'd*, 952 F.3d 591, 593 (5th Cir. 2020); *Consumer Fin. Protection Bureau v. Navient Corp.*, Civ. No. 3:17-CV-101, 2017 WL 3380530, at *18 (M.D. Pa. Aug. 4, 2017) (not unconstitutional); *Consumer Fin. Protection Bureau v. Future Income Payments, LLC*, 252 F. Supp. 3d 961, 975 (C.D. Cal. 2017) (not unconstitutional); *Consumer Fin. Protection Bureau v. D & D Mktg., Inc.*, CV 15-9692 PSG (Ex), 2017 WL 5974248, at *1 (C.D. Cal. Mar. 21, 2017) (not unconstitutional); *Consumer Fin. Protection Bureau v. ITT Educ. Serv., Inc.*, 219 F. Supp. 3d 878, 899 (S.D. Ind. 2015) (not unconstitutional); *Consumer Fin. Protection Bureau v. Morgan Drexen, Inc.*, 60 F. Supp. 3d 1082, 1086 (C.D. Cal. 2014) (not unconstitutional).

In my view, the Supreme Court's conclusion that the Bureau's structure was unconstitutional constitutes an "extraordinary" circumstance.  Any defect in the CFPB's timely pursuit of this action was caused by an obstacle "beyond its control." *Navient Corp.*, 2021 WL 134618, at *11. Even if the CFPB had questioned the constitutionality of its structure, it was unable to rectify any defects.

Additionally, defendants do not argue that they would be prejudiced if the claims are allowed to proceed. Nor could they. Defendants have been on notice of this action and the Bureau's legal claims since the filing of the Complaint in November 2016. ECF 1.  They have engaged in extensive discovery and have challenged virtually every aspect of the case at every turn. The case is now at an advanced stage of litigation. The Director's Ratification does not alter the posture of the suit or the Bureau's claims against defendants; it "only serves to establish that this action continues with the approval of a Director removable at will by the President of the United States." *Navient Corp.*, 2021 WL 134618, at *14.

Moreover, as plaintiff notes, if dismissal is required because the Ratification was made outside the statute of limitations, then many actions that the CFPB has brought and continues to pursue in other courts would also be subject to dismissal. This would seem to run counter to the Supreme Court's concern in *Seila Law* with limiting the damage caused by its holding in order to preserve the agency's work. *Seila Law*, 140 S.Ct. at 2209 ("'Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem, severing any problematic portions while leaving the remainder intact.'") (quoting *Free Enterprise Fund v. Public Company Accounting Oversight Bd.*, 561 U.S. 477, 508 (2010)); *Seila Law*, 140 S.Ct. at 2210 (agreeing with Solicitor General and House of Representatives that the shift caused by the elimination of the CFPB "would trigger a major regulatory disruption and would leave appreciable damage to Congress's work in the consumer-finance arena" and explaining that no other agency "has the authority to administer the Dodd-Frank Act's new prohibition on unfair and deceptive practices in the consumer-finance sector"); *see Navient Corp.*, 2021 WL 134618, at *14 (noting that a "finding that this action must be dismissed, where no other agency had in 2017, or has now, the power to enforce key provisions of the Dodd-Frank Act (which are at issue in this case),

effectively allows Navient and others to avoid defending their actions, alleged by the CFPB to be unlawful….”). And, nothing in *Seila Law* indicates that the Supreme Court intended that its holding should result in invalidating lawsuits such as this one.

Accordingly, I am satisfied that the CFPB may pursue the enforcement action that it initially brought in 2016.  Therefore, I shall deny the Access Defendant's Motion to Dismiss and Smith's motion for judgment on the pleadings.

### B.  Motion to Strike

During discovery, CFPB deposed Stephen Thomas, an Access Funding consumer. Defendants have jointly moved to strike the excerpt of Thomas's deposition testimony (ECF 143-1), which CFPB submitted as an exhibit to its Motion. ECF 132-45.  According to defendants, Smith was "deprived of all but a cursory cross-examination of this witness and the Access Funding Defendants and Mr. Borkowski were completely deprived of that opportunity." ECF 143 at 5. Thus, they argue that the testimony should be stricken because (1) there was no permissible basis to terminate Thomas's deposition, pursuant to Fed. R. Civ. P. 30(d)(3); and (2) defendants were not allowed to cross examine Thomas, in violation of Fed. R. Civ. P. 30(c).

CFPB subpoenaed Thomas and deposed him on March 18, 2019, beginning at about 1:00 p.m. ECF 143-1 (Thomas Dep. excerpt) at 2. Thomas originally agreed to proceed without the presence of counsel. *Id.* at 4-5, Tr. 6-7. Counsel for CFPB questioned Thomas for approximately two hours. Then, Smith's attorney began to question him. *Id.* at 15, Tr. 65. Soon after, Thomas asked to continue the deposition, stating that he wanted legal representation and that he had an appointment at 4:00 p.m. *Id.* at 21-22, Tr. 72-73. After some debate, the parties agreed to postpone the remainder of the deposition. *Id.* at 34, Tr. 98. But, at that time, defense counsel stated that defendants expected the Bureau to subpoena Thomas so as to compel his return to complete his

41

deposition. *Id.* at 31-32, Tr. 91-92. Defendants also advised the Bureau that they believed that they had been denied a fair opportunity to cross-examine the witness. Therefore, if Thomas did not return to complete his deposition, they would move to strike his testimony. *Id.* at 30, Tr. 90.

The parties scheduled the continuation of Thomas's deposition for April 8, 2019. Pursuant to the Scheduling Order of February 22, 2018 (ECF 56), as amended on March 29, 2019 (ECF 98), the discovery deadline was set for March 29, 2019. On that date, the parties jointly asked to extend the discovery deadline to April 9, 2019, in order to complete this remaining deposition. ECF 97. I granted that request by Order of the same date. *See* ECF 98.

On several occasions during the week prior to the follow-up deposition, CFPB attempted to serve Thomas with a subpoena, without success. ECF 153-1 (Emails between counsel) at 2. But, the parties did not seek another extension of discovery. Rather, in a jointly filed status report on May 6, 2020, the parties confirmed that discovery closed on April 9, 2019. ECF 100. Further, defendants noted that they intended to file a motion to strike Thomas's deposition testimony because they were unable to cross-examine the witness. *Id.* at 1. Plaintiff, on the other hand, stated, *id.* at 2: "When the Bureau was unable to contact Mr. Thomas a second time, despite repeated attempts by the Bureau's process server, Bureau staff informed Defendants' counsel that the Bureau took no position on a further extension of discovery. Further, the Bureau staff would make themselves available for his deposition. The Bureau is unaware of Defendants attempting to subpoena or otherwise contact Thomas."

In the Motion to Strike, defendants argue that Thomas's deposition should be stricken as an exhibit to the CFPB Motion because defendants did not have the opportunity to cross-examine him.  ECF 143 at 8 (citing *Alford v. United States*, 282 U.S. 687 (1931); *see also Du Beau v.*

*Smither & Mayton, Inc.* 203 F.2d 395 (D.C. Cir. 1953)).[8]  Indeed, "[c]ross-examination of a witness is a matter of right." *Alford*, 282 U.S. at 691, 694; *see Du Beau*, 203 F.2d at 396 (noting that "measuring the credibility of a witness in a civil trial is equally as important as in a criminal trial"). And, courts often strike testimony where a witness refuses to submit to cross-examination. *See Cisco Sys., Inc. v. Sheikh*, No. 4:18-cv-07602, 2020 WL 5877573, at \*4 (N.D. Cal. Oct. 2, 2020) ("Having asserted the Fifth Amendment rather than provide complete evidence, the ADSI affiliated defendants are not entitled to a second bite at the apple that would allow it to present selectively evidence it believes is favorable."); *In re Inofin Inc.*, 219 F.Supp.3d 265, 270–71 (D. Mass. 2016) (striking a third party's testimony where the party sat for 5 hours of direct examination but later invoked the Fifth Amendment and refused to answer questions from defense counsel); *see also In re: Edmond*, 934 F. 2d 1304, 1308-1309 (4th Cir. 1991) (concluding that trial court properly refused to consider declaration offered by defendant in support of summary judgment motion after defendant invoked the Fifth Amendment). Therefore, "[s]triking all of the testimony of a witness may be the only appropriate remedy when refusal to answer the questions of the cross-examiner frustrates the purpose of [cross-examination]." *United States v. One Parcel of Real Property Commonly Known as 901 N.E. Lakewood Drive, Newport, Or.*, 780 F. Supp. 715, 722 (D. Or. 1991).

In response, CFPB attempts to defend its action by suggesting that it had a duty, under Fed. R. Civ. P. 45(d), "to protect Thomas during the deposition." ECF 151 at 3. However, Rule 45(d) requires parties to "take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Thus, for example, it protects a nonparty witness "from being inconvenienced by being compelled to travel inordinate distances to have depositions taken." *In re*

---

[8] Defendants did not ask to bar Thomas as a witness at trial.

*Guthrie*, 733 F.2d 634, 638 (4th Cir. 1984). But, nothing in the rule suggests that the party issuing a witness subpoena has a duty to protect the witness during the deposition. Thus, the rule is inapplicable here.

And, to some extent, the Bureau created the time constraints that it subsequently used as an excuse to continue the deposition. On the day that Thomas's deposition was set to begin at 1:00 p.m., CFPB scheduled another deposition to begin at 3:00 p.m. ECF 143-1 at 15, Tr. 65. But, the Bureau's counsel questioned Thomas for approximately two hours, until the 3:00 p.m. start time for the next deposition. *Id.* That left defendants' counsel with no time for cross-examination, even if the witness had remained.

The CFPB cannot be faulted for the courtesy of granting Thomas's request to continue the deposition. But, defendants should not be deprived of their right to cross-examine him. Because the CFPB failed to subpoena Thomas to complete his deposition, as it agreed to do, ECF 143-1 at 17, Tr. 67, it should not be allowed to make use of his incomplete testimony. Accordingly, I shall grant the Motion to Strike.

### C.  Counts I through IV

In Counts I through III, CFPB alleges that Smith engaged in unfair, deceptive, and abusive acts or practices, in violation of §§ 5531 and 5536 of the CFPA. And, in Count IV, CFPB claims that the Access Funding Defendants and Borkowski substantially assisted in Smith's unfair, deceptive, and abusive acts, in violation of § 5536(a)(3).

In general, the CFPA prevents "a covered person or service provider from committing or engaging in any unfair, deceptive, or abusive act or practice under Federal law in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service." 12 U.S.C. § 5531(a). A "covered person" is defined in part as "any person that [sic] engages in offering or providing a consumer financial product or

service." 12 U.S.C. § 5481(6)(A). Further, the CFPA defines a "financial product or service" in part as "providing financial advisory services. . . to consumers on individual financial matters. . ." 12 U.S.C. § 5481(15)(viii).

Under the CFPA, an act or practice is "unfair" if it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers" and "such substantial injury is not outweighed by countervailing benefits to consumers or to competition." 12 U.S.C. § 5531(c)(1). An act or practice is "deceptive" if it involves a representation, omission, or practice that is both material and likely to mislead reasonable consumers. *Consumer Fin. Protection Bureau v. Gordon*, 819 F.3d 1179, 1192–93 (9th Cir. 2016) (adopting the definition of "deceptive act or practice" from the Federal Trade Commission Act, 15 U.S.C. § 45(a)). And, an act or practice is "abusive" if it "takes unreasonable advantage of" either "a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service" or "the reasonable reliance by the consumer on a covered person to act in the interests of the consumer." 12 U.S.C. § 5531(d)(2).

Further, it is unlawful for "any person to knowingly or recklessly provide substantial assistance to *a covered person or service provider* in violation of the provisions of section 5531 of this title." *Id.* § 5536(a)(3) (emphasis added). And, "the provider of such substantial assistance shall be deemed to be in violation of that section to the same extent as the person to whom such assistance is provided." *Id.*

Thus, for Counts I through IV to survive, Smith must be a "covered person or service provider" under the CFPA and must not be excluded from an enforcement action. In his Memorandum Opinion (ECF 27), Judge Motz reasoned that by "advising consumers about whether to sell their structured settlements for an immediate lump sum payment, Smith undeniably

provided those consumers with 'financial advisory services' regarding 'individual financial matters.'" *Id.* at 22. Therefore, he concluded that Smith is a "covered person" within the meaning of the CFPA. *Id.*

Notably, the parties do not dispute that Smith is a "covered person" under the Act. But, they vigorously disagree about whether Smith is subject to the CFPB's enforcement action. In particular, defendants argue that the CFPA's "practice-of-law" exclusion, pursuant to 12 U.S.C. § 5517(e), precludes the Bureau's claims under Counts I through IV.

Under the practice-of-law exclusion, "[e]xcept as provided under paragraph (2), the Bureau may not exercise any supervisory or enforcement authority with respect to an activity engaged in by an attorney as part of the practice of law under the laws of the state in which the attorney is licensed to practice law." 12 U.S.C. § 5517(e)(1); *see Consumer Fin. Protection Bureau v. Frederick J. Hanna & Assoc., P.C.*, 114 F. Supp. 3d 1342, 1351 (N.D. Ga. 2015) (noting that the practice of law exclusion is a "broad limitation on the Bureau's authority"). Paragraph (2) of § 5517(e) sets forth two exceptions to the exclusion. The first exception is for conduct "that is not offered or provided as part of, or incidental to, the practice of law, occurring exclusively within the scope of the attorney-client relationship." *Id.* § 5517(e)(2)(A). The second exception is for conduct "that is otherwise offered or provided by the attorney in question with respect to any consumer who is not receiving legal advice or services from the attorney in connection with such financial product or service." *Id.* § 5517(e)(2)(B).

CFPB acknowledges that the CFPA "provides certain limits on the Bureau's authority over attorneys under" this exclusion. ECF 132-1 at 21. Further, the Bureau does not dispute that Smith is an attorney licensed to practice law in Maryland and that he was engaged in conduct that constitutes the practice of law when working with Access Funding customers. However, plaintiff

argues that Smith's conduct falls within the first exception to the exclusion because it did not take place within the scope of the attorney-client relationship. And, even if Smith did have attorney-client relationships with the relevant consumers, CFPB contends that "the financial-advisory services the consumers received were not 'exclusive' between themselves and Smith." *Id.* at 25.

As a threshold matter, the parties disagree over who bears the burden of proving Smith's entitlement to the practice-of-law exclusion. Plaintiff argues that "the burden of proving entitlement to a 'special exception to the prohibitions of a statute generally rests on one who claims its benefits.'" ECF 152 at 11 (quoting *FTC v. Morton Salt Co.*, 334 U.S. 37, 44–45 (1948)). According to the Bureau, the only court to consider the same question found that attorney-defendants "'have the burden of proving that they qualify for the attorney exemption'" under the CFPA. ECF 152 at 12 (quoting *Consumer Fin. Protection Bureau v. Mortg. Law Grp.*, 157 F. Supp. 3d 813, 828 (W.D. Wisc. 2016)).

The Access Funding Defendants do not dispute that, in general, they have the burden to prove the applicability of the practice-of-law exception.  However, they argue that because it is undisputed that Smith was engaged in the practice of law, "the burden shifts to the Bureau to prove that the *exception* to the *exclusion* applies." ECF 155 at 15 (emphasis in original). In other words, according to defendants, the "Bureau must offer competent evidence to establish that Smith's provision of financial advisory services to the consumers occurred outside of an attorney-client relationship with the consumers, and therefore, the exception" to the exclusion applies. *Id.*

Under *Morton Salt*, 334 U.S. 37, on which both sides rely, the Court explained that the "general rule of statutory construction" is that "the burden of proving justification or exemption under a special exception to the prohibitions of a statute generally rests on one who claims its benefits…." *Id.* at 44-45; *see also Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84, 91 (2008)

(making note of the "familiar principle that '[w]hen a proviso ... carves an exception out of the body of a statute or contract those who set up such exception must prove it'") (quoting *Javierre v. Central Altagracia*, 217 U.S. 502, 508 (1910)). The logical conclusion from this principle is that Smith bears the burden to prove that the practice-of-law exclusion applies to him, but the Bureau bears the burden of demonstrating that the exception to the exclusion also applies, because it is the Bureau that claims to benefit from it.[9]

The question here is whether the Bureau has satisfied its burden to establish that Smith was not in attorney-client relationships with Access Funding consumers. And, if Smith had such relationships, the question is then whether he was acting "exclusively" within the scope of those relationships when he gave IPA advice.

For the purpose of identifying an attorney-client relationship, Maryland has adopted the Restatement (Third) of the Law Governing Lawyers ("Restatement"). *Att'y Grievance Comm'n v. Stillwell*, 434 Md. 248, 276-77, 74 A.3d 728, 745 (2013) (Adkins, J., concurring, and citing *Att'y Grievance Comm'n of Maryland v. Shoup*, 410 Md. 462, 490, 979 A.2d 120, 136 (2009)). Section 14 of the Restatement provides:

> A relationship of client and lawyer arises when:
>
> (1) a person manifests to a lawyer the person's intent that the lawyer provide legal services for the person; and either
>
> > (a) the lawyer manifests to the person consent to do so; or
> >
> > (b) the lawyer fails to manifest lack of consent to do so, and the lawyer knows or reasonably should know that the person reasonably relies on the lawyer to provide the services; or

---

[9] In *Mortg. Law Grp.*, 157 F. Supp. 3d 813, cited by CFPB, the court determined that the defendant law firm had the burden to prove it was "engaged in the practice of law while providing the allegedly unfair or deceptive mortgage assistance relief services." *Id.* at 827. But, the court did not reach the issue of which party had the burden of proving an exception to the practice of law exclusion.

(2) a tribunal with power to do so appoints the lawyer to provide the services.

No tribunal appointed Smith to provide legal services. Therefore, the existence of an attorney-client relationship is governed by paragraph one, which requires mutual intent to form an attorney-client relationship on the part of both the attorney and the client.

"What constitutes an attorney-client relationship is a rather elusive concept." *Folly Farms I, Inc. v. Trustees of Clients' Sec. Trust Fund of Bar of Maryland*, 282 Md. 659, 670, 387 A.2d 248, 254 (1978). Beyond the requirement of mutual intent, there are no set criteria for determining the existence of an attorney-client relationship. *See, e.g., Stillwell*, 434 Md. at 260, 74 A.3d at 735 (stating that the existence of an attorney-client relationship does not depend on "payment for the services rendered"); *Att'y Grievance Comm'n of Maryland v. Brooke*, 374 Md. 155, 175, 821 A.2d 414, 425 (2003) ("The [attorney-client] relationship may arise by implication from a client's reasonable expectation of legal representation and the attorney's failure to dispel those expectations.") (Court's alterations); *Att'y Grievance Comm'n v. Shaw*, 354 Md. 636, 650-51, 732 A.2d 876, 883 (1999) (stating that "an attorney-client relationship may be found to exist even when the services performed by the attorney are not strictly legal in character" and "does not depend on there being a formal fee arrangement"); *Att'y Grievance Comm'n v. Parker*, 306 Md. 36, 43, 506 A.2d 1183, 1187 (1986) (recognizing that an attorney-client relationship may exist even where "neither attorney nor client thought so and there was no formal retainer or agreement as to fee").

Notably, a formal or explicit contract is not required to create an attorney-client relationship. *Shoup*, 410 Md. at 489, 979 A.2d at 136. Indeed, "the facts and circumstances of each particular case are critical in determining whether an attorney-client relationship exists." *Id.*, 979 A.3d at 135 (citing *Shaw*, 354 Md. at 650-51, 732 A.2d at 883). Thus, "[w]hether an attorney-

client relationship had been formed and when, is a question of fact…and not a question of law." *Stillwell*, 434 Md. at 265, 74 A.3d at 738 (internal citations omitted).

Here, at least 100 consumers engaged in transactions with Access Funding in Maryland. Of those consumers, the CFPB has provided statements from five consumers concerning their transactions with Access Funding and their communications, or lack thereof, with Smith. In other words, the view of at least 95% of the consumers is unknown. And, this is not necessarily a one-size fits all situation.

Smith argues that, with regard to all but those five consumers, it is undisputed that there was "clearly an intent to enter into an attorney-client relationship." ECF 137 at 11. According to Smith, he "expressly communicated [to each consumer] that he was a Maryland attorney" and it "was only after the consumer consented that Smith provided the IPA" services. *Id.* To support his argument, Smith offers his own testimony of his "practice" of introducing himself to consumers over the phone as a Maryland lawyer, telling them that Maryland law required them to obtain independent professional advice, and then obtaining "the client's agreement to continue with the consultation." ECF 137-1, ¶ 5; *see* ECF 137-2 (Smith Dep., 3/11/2019) at 18-19, Tr. 107:12-108:10.

In contrast, the Bureau argues: "Defendants have presented no evidence from *any purported client* manifesting that person's subjective intent to engage Smith as their attorney." ECF 152 at 13 (emphasis in original). And, according to plaintiff, "Smith's own testimony…can't establish any single consumer's subjective intent" and should not be used by the Court to "impose attorney-client relationships on 100 or more unnamed consumers" because his claimed representation of those consumers is not objectively reasonable. *Id.* at 13, 17-18. Further, the Bureau posits that the "only evidence of specific consumers' intent [from the five consumers that

50

were deposed]...shows a *lack* of manifest intent to engage Smith..." *Id.* at 14 (emphasis in original).

As indicated, Smith attests that he intended to function as a lawyer and to enter into an attorney-client relationship with the Access Funding consumers. The test, however, also turns on the client's belief that there was an attorney-client relationship. *See First NBC Bank v. Murex, LLC*, 259 F. Supp. 3d 38, 64 (S.D.N.Y. 2017) ("The operative test, however, does not turn on the lawyer's state of mind or good faith intentions. It is focused on the reasonableness of the *client*'s belief that there was an attorney-client relationship, including based on the services performed.") (emphasis in original). And, Maryland courts have "decline[d] to find the existence of an attorney-client relationship where the purported client was unable to testify to the relationship's existence." *Catler v. Arent Fox, LLP*, 212 Md.App. 685, 704, 71 A.3d 155, 166–67 (2013); *see also Greenberg v. State*, 421 Md. 396, 406, 26 A.3d 955, 962 (2011) ("[P]rivilege may be invoked only where a 'finding that the [proponent's] subjective belief' [that] an attorney-client relationship existed would be minimally reasonable.") (quoting *In re Grand Jury Subpoena: Under Seal*, 415 F.3d 333 (4th Cir. 2005)).

For most of the Access Funding consumers, there is no evidence as to their belief or intent. The evidence indicates only that four consumers who were allegedly advised by Smith do not recall speaking with him. *See* ECF 132-16 (Henson Dep.); ECF 132-44 (Durham Dep.); ECF 132-46 (Fair Dep.); ECF 132-47 (Hayes Dep.). Specifically, Henson and Hayes said that they did not recall speaking with Smith, and Fair and Durham testified that they had never heard of Smith or talked to him. But, Smith points to his own testimony, to the effect that "each client expressly assented to the representation." ECF 156 at 14; *see* ECF 137 at 12-13.

51

As noted, in considering a summary judgment motion, the court may not make credibility determinations. *Wilson v. Prince George's Cty.*, 893 F.3d 213, 218-19 (4th Cir. 2018) ("We do not weigh the evidence or make credibility determinations"). Thus, in the face of conflicting evidence, such as competing deposition testimony and affidavits, summary judgment is not appropriate. *See Gray v. Spillman*, 925 F.2d 90, 95 (4th Cir. 1991) ("It is not our job to weigh the evidence ... or to disregard stories that seem hard to believe. Those tasks are for the jury.") (citation omitted).

Further, Smith argues that if "the trier of fact accepts the testimony from" the consumers "as true," then he "did not provide the IPA consultations" to those consumers and is entitled to summary judgment because "there would be no evidence upon which the trier of fact could conclude that Smith was a person covered under the CFPA that engaged in abusive acts or practices with those individuals." ECF 156 at 15-16.  Yet, Smith does not discuss that he signed letters stating that he advised all five of these consumers. *See* ECF 152-8 (letter of 1/15/15 from Smith "To Whom it May Concern", stating that he spoke with Durham; letter of 4/15/15 from Smith stating that he spoke with Fair; letter of 6/10/13 from Smith stating that he spoke with Hayes; letter of 11/17/14 from Smith stating that he spoke with Henson; and letter of 8/12/14 from Smith stating that he spoke with Thomas).

Thus, there is a genuine issue of material fact as to whether Smith even interacted with these consumers, let alone whether he formed an attorney-client relationship with them. And, it is for the jury to resolve this dispute.

Accordingly, the Court cannot determine whether Smith's conduct falls within the exception to the practice-of-law exclusion. And, because of the prevailing issues of material fact as to the applicability of the practice-of-law exclusion, the Court cannot determine whether Smith may be held accountable for his allegedly illegal conduct.  Moreover, given the nature of the claims

against Access Funding Defendants and Borkowski, if Smith is not liable, there is no violation of the law by them. *Cf. Consumer Fin. Protection Bureau v. Universal Debt & Payment Solutions, LLC*, 1:15-CV-0859-RWS, 2019 WL 1295004, at *15 (N.D. Ga. Mar. 21, 2019) (noting that because there are issues of fact as to whether company violated the CFPA, the court cannot determine whether individual defendant is liable for a violation).

### D.  Count V

### 1.

In Count V, CFPB alleges that Access Funding and its principals engaged in abusive acts or practices relating to the advances they gave consumers, in violation of 12 U.S.C. §§ 5531(d)(2)(A) and 5536(a)(1)(B). ECF 44, ¶¶ 93-99.  As noted, under the CFPA, an act or practice is "abusive" if it "takes unreasonable advantage of" either "a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service" or "the reasonable reliance by the consumer on a covered person to act in the interests of the consumer."  12 U.S.C. § 5531(d)(2).

The Bureau asserts that the Access Funding Defendants and Borkowski "represented to the consumers who received advance[s], including in the advance agreement Access Funding used, that consumers would be bound to complete the transactions and liable to repay the advance amounts if they did not complete the transaction." ECF 44, ¶ 96. The Bureau also claims that defendants' conduct took unreasonable advantage of consumers' lack of understanding of the material risks, costs, or conditions of the advances. *Id.* ¶¶ 94, 98, 99.

In the CFPB Motion, the Bureau moves for summary judgment only as to one of those allegedly abusive practices: "those involving consumers who signed advance agreements before receiving independent professional advice, thus committing to the transaction before being advised

about it." ECF 152 at 7.  The Bureau posits that consumers "who entered into advance agreements before receiving independent professional advice risked agreeing to a condition that rendered meaningless independent professional advice that followed." *Id.* at 9. Thus, the CFPB contends that Access Funding took "unreasonable advantage of consumers' lack of understanding of the 'material risks, costs, or conditions' of a financial product." *Id.*

The Access Funding Defendants and Borkowski urge the Court to reject the Bureau's "attempt to recast its claim in Count V." ECF 141 at 31; ECF 146 at 10. In particular, the Access Funding Defendants posit that the theory of liability alleged in CFPB's Motion is not the same theory alleged in the Amended Complaint. *Id.* Therefore, they maintain that the Bureau may not rely on it at this stage of the case.

This contention lacks merit. As the Bureau points out, in Count V it seeks partial summary judgment as to a "narrower subset of advance-related acts and practices for which the facts are undisputed." ECF 152 at 7.  Rather than pursuing a new theory of liability, the Bureau claims that it merely seeks to establish liability based on one specific practice in which Borkowski and the Access Funding Defendants engaged.

In any event, the Access Funding Defendants and Borkowski argue, the Bureau fails to prove its new theory of liability. First, they assert, the Bureau fails to "identify deceptive, unfair, or otherwise abusive language in the advance agreement." ECF 155 at 11; *see* ECF 146 at 11. Second, they claim that the Bureau "lacks any evidence that Access Funding took advantage of a consumer's lack of understanding of the nature of an advance or the fact that the consumer would have to repay the advance if she canceled the deal or if a court rejected it." *Id.*; *see* ECF 141 at 32. Third, they contend that "the Bureau offers no facts or evidence to substantiate its claim that the

advance agreement rendered illusory the subsequent independent professional advice provided to a consumer." ECF 155 at 12.

Defendants are correct to some extent. The record contains only two examples of advance agreements signed by consumers before they met with an IPA. *See* ECF 152-3; ECF 152-4. And, the other evidence surrounding those two transactions does not indicate that the consumers believed they were required to complete the transaction with Access Funding or that they misunderstood the terms of the advance *because* they had signed an advance agreement prior to meeting with an IPA.

For instance, on December 15, 2013, Jay Saunders signed an advance agreement with Access Funding. ECF 152-3. According to a letter from Smith, Saunders received independent professional advice from Smith the day after signing the agreement. *Id.* at 5. However, court records from the Circuit Court for Howard County (ECF 155-1) indicate that in September 2014 Saunders actually completed a structured settlement transaction with J.G. Wentworth, Access Funding's competitor.  ECF 155 at 12; ECF 155-1 at 5. And, Saunders did not sign a Purchase and Sale Agreement with Access Funding until February 14, 2015. ECF 155-2 at 7. Thus, Saunders completed a deal with Access Funding's competitor after receiving an advance from Access Funding. And, he did not complete his deal with Access Funding for more than a year after receiving an advance. This suggests that Saunders did not feel trapped by the advance agreement, nor did he fail to understand the terms of the agreement.

Moreover, the Access Funding leaders testified that they lost a significant amount of money because consumers would often cancel their transactions after receiving advances. *See, e.g.*, ECF 141-10 (Jundanian Dep., 3/8/2019) at 9-10, Tr. 57-58 (noting that Access Funding "lost a lot of money on advances"); ECF 152-12 (Jundanian Dep., 2/19/2016) at 6, Tr. 44:18-23 ("I was told by

Mr. Borkowski that we never enforced any defaulted advances, which led to us losing a significant amount of money on the advances that we made to consumers."). This suggests that at least some consumers understood that they were free to cancel their transactions even if they had received an advance. *See* ECF 132-89 (Borkowski Dep., 2/11/2016) at 13, Tr. 92 (noting that Access Funding "did not make it a practice to go after" the advances that went to consumers who chose to contract with a competitor "despite the fact that [they] had a legal right to").

On the other hand, it is undisputed that Access Funding gave advances to most of its consumers. *See* ECF 141-3, ¶ 6. And, the evidence indicates that at least some consumers signed an advance agreement with the initial document package and prior to meeting with an independent professional advisor. *See, e.g.,* ECF 152-2; ECF 152-3; *see* ECF 132-49 (Boghosian Dep., 2/10/2016) at 9, Tr. 107:21-23 (noting that the advance agreement is part of the "document package"). Moreover, consumers testified to the fact that they did not understand the documents in the initial document package that they signed before a notary. *See, e.g.*, ECF 132-16 (Henson Dep.) at 7-8, Tr. 45-46; ECF 132-46 (Fair Dep.) at 6, Tr. 30:4-7. Thus, it is certainly plausible that at the time consumers signed their advance agreements, at least some did not appreciate the "risks, costs, and conditions of the advances." ECF 152 at 7. And, it is possible that this misunderstanding was exacerbated by the fact that these consumers did not meet with an IPA before signing the agreement.

In sum, based on the record, there remain disputes of material fact as to whether consumers misunderstood the implications of their advances and, if so, whether any misunderstanding resulted from signing an advance agreement before meeting with an IPA. Further, given the conflicting evidence, whether the Access Funding Defendants and Borkowski took advantage of the consumers' lack of understanding is a matter upon which reasonable minds may differ.

**2.**

The Bureau also alleges that, as "related persons," Jundanian, Borkowski, and Boghosian are individually liable for the abusive use of cash advances. ECF 132-1 at 19.  The CFPA treats as a "covered person" anyone who meets the definition of a "related person." 12 U.S.C. § 5481(25)(B). A "related person," in turn, includes any "director," "officer," "controlling shareholder," or "agent" of a covered person, as well as "any shareholder, consultant, joint venture partner, or other person" who "materially participates in the conduct of the affairs of [a] covered person." *Id.* § 5481(25)(C)(i)-(ii).

Defendants do not dispute that Jundanian, Borkowski, and Boghosian are "related persons" as a result of their leadership roles within Access Funding. ECF 141 at 40-41; ECF 155 at 23-24. But, they dispute that they are liable for abusive acts or practices under Count V. ECF 141 at 40; ECF 146 at 9-12; ECF 155 at 23;

An individual is liable for corporate abusive acts or practices if "(1) he or she 'participated directly in the wrongful acts or practices' or had the authority to control the corporate defendant who did, and (2) 'had some knowledge of the acts or practices.'" *Consumer Fin. Protection Bureau v. NDG Financial Corp.*, No. 15-cv-5211 (CM), 2016 WL 7188792, *17 (S.D.N.Y. Dec. 2, 2016) (quoting *F.T.C. v. Tax Club, Inc.*, 994 F. Supp. 2d 461, 471 (S.D.N.Y. 2014) (citations omitted)); *see Gordon*, 819 F.3d at 1192–93; *cf. F.T.C. v. Ross*, 743 F.3d 886, 892 (4th Cir. 2014) ("We hold that one may be found individually liable under the Federal Trade Commission Act if she (1) participated directly in the deceptive practices or had authority to control those practices, and (2) had or should have had knowledge of the deceptive practices."). "The second prong of the analysis may be established by showing that the individual had actual knowledge of the deceptive conduct,

was recklessly indifferent to its deceptiveness, or had an awareness of a high probability of deceptiveness and intentionally avoided learning the truth." *Ross*, 743 F.3d at 892.

The Bureau argues that "Jundanian, Boghosian, and Borkowski established, controlled, and monitored Access Funding's policies and practices, including the practice of providing advances to consumers"; they were each "aware of and involved in providing advances to consumers"; and they were each "involved in discussions about how advances could be used to draw consumers to Access Funding." ECF 132-1 at 19-20. Thus, according to CFPB, they "engaged in" the abusive acts or practices, in violation of the CFPA. *Id.* at 20.

The Access Funding Defendants and Borkowski argue that the Bureau fails to offer facts establishing that the leaders "had any role in providing advances to any of Access Funding's customers" or that they were "aware that Access Funding's sales executives allegedly told consumers that they could not cancel their transactions with Access Funding because the consumers had received advances." ECF 141 at 40-41; *see* ECF 146 at 9-11.

The Access Funding executives were actively involved in the affairs of Access Funding during the period in question and had authority to control the company. In particular, Jundanian was the "Managing Member" of Access Holding, meaning that he had "full power, discretion and authority to make all decisions affecting the business, affairs and properties" of the company. ECF 132-50 at 2. Jundanian was CEO of Access Funding until May 2014, and he "manage[d] the day-to-day operations" of the company. *Id.* Borkowski became CEO in May 2014 and had the same responsibilities. *Id.* at 3. And, prior to May 2014, Borkowski served as the CFO and COO of Access Funding.  In that role, he "manage[d] the financial matters of the" company, among other things. *Id.* Last, Boghosian served as Access Funding's "Chief Marketing and Sales Officer," meaning he was responsible "for sales and processing activities." *Id.* at 4.

58

Moreover, all three testified that they were aware of the policies regarding advances. *See, e.g.*, ECF 132-89 at 12, Tr. 91 ("The sales guys would ask if they could provide an advance, and we had established policies that said no advances unless you can prove that the payments existed."); ECF 141-10 at 10-11, Tr. 58-59  ("I think [the idea to provide advances] just percolated as a discussion, but….I don't think it was any particular person's idea. It's just something that came up, I would imagine, in the context of what's happening in the industry….") (Court's alterations). And, correspondence from the three leaders indicates that they were sometimes directly involved in providing advances to consumers. *See, e.g.*, ECF 312-24 at 2 (email from Borkowski saying that he will wire a $1,000 advance to a client after she signs the advance agreement); *see also* ECF 132-47 (Hayes Aff.), ¶ 12 (consumer stating that Boghosian told him he could not cancel his transaction because he had already received an advance from Access Funding).

Therefore, to the extent that Access Funding was engaged in abusive acts or practices regarding advances, a factfinder could reasonably infer that Boghosian, Borkowski, and Jundanian were aware of the practices and could have exerted their authority and control over them. *See Ross*, 743 F.3d at 894 (finding that the district court did not err in concluding that a high-level business official had authority to control the deceptive acts). But, there remains a dispute of material fact as to whether the company was engaged in abusive conduct with respect to the advances. Therefore, a determination as to individual liability would be premature.

## V.     Conclusion

For the aforementioned reasons, I shall grant the Surreply Motion (ECF 159) and the Motion to Strike.  ECF 142.  The remaining motions are denied.

A separate Order follows.


Date: July 12, 2021                                      _____/s/_____

                                                         Ellen L. Hollander
                                                         United States District Judge