## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>              Plaintiff,<br><br>v.<br><br>NATIONAL COLLEGIATE MASTER STUDENT LOAN TRUST *et al.*,<br><br>              Defendants. | Case No.: 1:17-cv-1323-SBS |

## PACIFIC INVESTMENT MANAGEMENT COMPANY LLC'S OBJECTION TO THE <u>PROPOSED CONSENT JUDGMENT AND MOTION TO STAY</u>

Mark W. Eckard (No. 4542)
**RAINES FELDMAN LITTRELL LLP**
824 North Market Street, Suite 805
Wilmington, DE 19801
(302) 647-1018
meckard@raineslaw.com

Rachel Rodman (*pro hac vice* pending)
**WHITE & CASE LLP**
701 Thirteenth Street, NW
Washington, DC 20005
(202) 637-6281
rachel.rodman@whitecase.com

*Counsel for Pacific Investment Management Company LLC*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................1

STATEMENT OF FACTS .......................................................................................2

    A.  Formation and Structure of the Trusts ..................................................3

    B.  The Noteholders...................................................................................6

PROCEDURAL HISTORY ......................................................................................6

    A. CFPB I…..........................................................................................6

    B. CFPB II ............................................................................................8

ARGUMENT .........................................................................................................9

    I. The CFPB and Trusts seek approval of the Proposed Consent Judgment based on the same flawed arguments that PIMCO is challenging in the Appeal..........................................9

    II. The Court should stay this action during the pendency of the Appeal............................16

CONCLUSION.....................................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*,
    No. CV 15-1168-LPS, 2021 WL 616992 (D. Del. Feb. 17, 2021) ...................................17, 18

*Bone v. XTO Energy, Inc.*,
    No. CV 21-1460-GBW, 2022 WL 4355258 (D. Del. Sept. 20, 2022) .............................17, 18

*Burlington N. R. Co. v. Hyundai Merchant Marine Co., Ltd.*,
    63 F.3d 1227 (3d Cir. 1995)...................................................................................................15

*Consumer Fin. Protection Bureau v. Nat'l Collegiate Student Loan Master Trust, et al.*,
    No. 17-1323 (MN), 2020 WL 2915759 (D. Del. May 31, 2020) ................................... passim

*Consumer Fin. Protection Bureau v. Nat'l Collegiate Student Loan Master Trust, et al.*,
    96 F.4th 599 (3d Cir. 2024) ......................................................................................................2

*Consumer Fin. Protection Bureau v. Pa. Higher Educ. Assistance Auth.*,
    No. 1:24-cv-00756, 2024 WL 4367926 (M.D. Pa. Oct. 1, 2024)............................2, 9, 13, 14

*Duncan v. XTO Energy*,
    No. CV 22-0091-GBW, 2022 WL 4289779 (D. Del. Sept. 16, 2022) ...................................16

*Enhanced Sec. Rsch., LLC v. Cisco Sys., Inc.*,
    No. C.A.09-571-JJF, 2010 WL 2573925 (D. Del. June 25, 2010) .........................................17

*Franklin v. Navient Corp.*,
    No. 17-1640-RGA, 2019 WL 4222681 (D. Del. Nov. 13, 2017) ...........................................17

*In re Nat'l Collegiate Student Loan Trusts 2003-1, 2004-1, 2004-2, 2005-1, 2005-2, 2005-3*,
    971 F.3d 433 (3d Cir. 2020).....................................................................................................4

*In re Nat'l Collegiate Student Loan Trusts Litig.*,
    251 A.3d 116 (Del. Ch. 2020)......................................................................................... passim

*In re Twitter, Inc. S'holder Derivative Litig.*,
    No. CV 18-62-VAC-MPT, 2018 WL 3536085 (D. Del. July 23, 2018) ................................18

*Landis v. North American Company*,
    299 U.S. 248 (1936).................................................................................................................16

*Local No. 93 v. City of Cleveland*,
    478 U.S. 501 (1986).................................................................................................................11

*Messina v. Hackett*,
　　No. CV 05-344-JJF, 2005 WL 8177590 (D. Del. Oct. 25, 2005) ............................................16

*Random Ventures, Inc. v. Advanced Armament Corp., LLC*,
　　No. 12 CIV. 6792 (KBF), 2014 WL 113745 (S.D.N.Y. Jan. 13, 2014) ...........................13, 14

*Spinelli v. Nat'l Football League*,
　　903 F.3d 185 (2d Cir. 2018) ....................................................................................................13

*Texas v. New Mexico*,
　　602 U.S. 943 (2024) ....................................................................................................11, 15, 17

*U.S. v. City of Hialeah*,
　　140 F.3d 968 (11th Cir. 1998) ..................................................................................................11

*UCB, Inc. v. Hetero USA Inc.*,
　　277 F. Supp. 3d 687 (D. Del. 2017) ...............................................................................16, 17, 18

## STATUTES AND RULES

Del. Code Ann. Title 12 § 3801 .......................................................................................................3

Del. Code Ann. Title 12 § 3806(a) ..............................................................................................3, 10

Fed. R. Civ. P. 24 .............................................................................................................................9

Fed. R. Civ. P. 62 .............................................................................................................................9

## PRELIMINARY STATEMENT

The Consumer Financial Protection Bureau ("Bureau") asks this Court to enter a consent decree ("Proposed Consent Judgment") against defendants the National Collegiate Student Loan Trusts (the "Trusts"). The Trusts are special purpose vehicles that acquired billions of dollars of student loans and issued notes ("Notes") to investors ("Noteholders") backed exclusively by those loans. The Trusts, through their counsel, have joined the motion to approve the Proposed Consent Judgment. Pacific Investment Management Company LLC ("PIMCO") is an investment manager or adviser for certain investment vehicles (the "PIMCO-Managed Funds") that hold Notes issued by the Trusts.

The Trusts were formed for the narrow purpose of owning student loans, issuing the Notes, and providing for the administration of the Trusts and servicing of the student loans. They have no employees. Instead, the Trusts entered into agreements (the "Trust Related Agreements") with third-party service providers to facilitate administering the Trusts and servicing the student loans. Those agreements strictly limit what the Trusts do, who is permitted to instruct them, and how they use their assets. Noteholders, in turn, relied on the promises made in the Trust Related Agreements when they purchased the Notes.

The Proposed Consent Judgment upends the Trust Related Agreements without addressing any of the collateral consequences, especially insofar as they impair the contractual rights of non-party Noteholders. Indeed, the Court rejected the parties' first request, in 2017, to approve a consent judgment because it did not comply with the strictures of the Trust Related Agreements. The Proposed Consent Judgment repeats these mistakes:  it is not demonstrably authorized by the necessary parties under the Trust Related Agreements, and it imposes obligations, such as the payment of a multi-million-dollar civil money penalty, that violate Noteholders' contractual rights under the Trust Related Agreements.

The legal questions presented by the Proposed Consent Judgment are not new. In May 2024, the Bureau filed a collateral enforcement action against the Trusts and their primary servicer in the U.S. District Court for the Middle District of Pennsylvania (hereinafter *CFPB II*).[1] As in this case, the parties in *CFPB II* sought court approval of a consent judgment ("*CFPB II* Consent Judgment") that did not comply with the Trust Related Agreements. PIMCO objected. And while the district court in *CFPB II* denied PIMCO's objections, PIMCO has appealed to U.S. Court of Appeals for the Third Circuit (the "Appeal"). The Appeal asks the Third Circuit to revoke the *CFPB II* Consent Judgment based on the same structural flaws that plague the Proposed Consent Judgment here. The Appeal will therefore directly inform the permissibility of the Proposed Consent Judgment in this case. As a result, PIMCO believes a stay of this action is in the best interests of all parties and respectfully moves for a stay pending the Appeal in *CFPB II*.

## STATEMENT OF FACTS

Disputes have dogged the Trusts for many years. In addition to this action,[2] lawsuits relating the Trusts' governance, purpose and structure have been filed in the U.S. Court of Appeals for the Third Circuit, the U.S. District Court for the Middle District of Pennsylvania, and the Delaware Court of Chancery.[3] The Statement of Facts draws from opinions issued in these cases.[4]

---

[1] *Consumer Fin. Protection Bureau v. Pa. Higher Educ. Assistance Auth.*, No. 1:24-cv-00756 (M.D. Pa. 2024).

[2] This action (hereinafter *CFPB I*) includes the Trusts' unsuccessful interlocutory appeal to the Third Circuit challenging the Court's order denying the Trusts' motion to dismiss the Amended Complaint. *See Consumer Fin. Prot. Bureau v. Nat'l Collegiate Master Student Loan Tr.,* 96 F.4th 599 (3d Cir. 2024) (hereinafter *CFPB I Appeal*).

[3] *In re Nat'l Collegiate Student Loan Trusts*, Nos. 18-3326, 18-3328 (3d Cir. 2018) (hereinafter *NCSLT Servicer Dispute*); *CFPB II*; *In re Nat'l Collegiate Student Loan Trusts Litig.*, Consolidated C.A. Nos. 12111-VCS (Del. Ch. 2016) (hereinafter *NCSLT Governance Dispute*).

[4] *See generally CFPB I Appeal*, 96 F.4th 599 (3d Cir. 2024); *NCSLT Servicer Dispute*, 971 F.3d 433 (3d Cir. 2020); *CFPB I*, No. 17-1323 (MN), 2020 WL 2915759 (D. Del. May 31, 2020); *CFPB*

### A.        Formation and Structure of the Trusts

The Trusts are fifteen Delaware statutory trusts formed between 2003 and 2007 under the Delaware Statutory Trust Act. *NCSLT Governance Dispute*, 251 A.3d at 126; Del. Code Ann. tit. 12 § 3801. The Trusts are governed by a series of interlocking agreements called the Trust Related Agreements. Three of those agreements are relevant here: the Trust Agreement, the Indenture, and the Administration Agreement.[5] The ultimate goal of these agreements is to pass through the stream of payments flowing from the student loans held by the Trusts to the beneficial owners of those payments: the Noteholders. *See generally NCSLT Governance Dispute*, 251 A.3d at 145–46.

#### 1.        Trust Agreement

The Trust Agreement establishes the Trusts and defines their purpose. Trust Agreement §§ 2.01, 2.03. The Trusts are "to engage in the following activities and only these activities": (i) acquiring a pool of student loans, issuing Notes and executing the Indenture (ii) entering into the Trust Related Agreements that provide for the administration of the Trusts and servicing of the student loans, (iii) engaging in activities and entering agreements that are "necessary, suitable or convenient" to accomplish these purposes, and (iv) engaging in activities required to conserve the Trusts' property and distributions to the Owners. *Id.* § 2.03(a). The Trusts cannot engage in any other business or activity until the Indenture is discharged. *Id*. § 2.03(a)(iv).

The Trusts "have no officers or employees." *NCSLT Governance Dispute*, 251 A.3d at 131. Instead, they "are 'managed by or under the direction of' their trustee(s)." *CFPB I*, 2020 WL 2915759, at *3 (quoting Del. Code Ann. tit. 12 § 3806(a)). The Trust Agreement appoints the

---

*II*, No. 1:24-cv-00756, 2024 WL 4367926 (M.D. Pa. Oct. 1, 2024); *NCSLT Governance Dispute*, 251 A.3d 116 (Del. Ch. 2020).

[5] The agreements are attached as Rodman Decl. Ex. 1 (Trust Agreement), Rodman Decl. Ex. 2 (Indenture), Rodman Decl. Ex. 3 (Administration Agreement).

"Owner Trustee" as "the entity through which the Trusts act." *Id*. The Owner Trustee is the "trustee of the Trust" and has "all the rights, powers and duties set forth . . . in the [Delaware] Statutory Trust [Act]." Trust Agreement §§ 2.04, 2.03(b)(i). The Trust Agreement authorizes the Owner Trustee to "act directly" or "through agents or attorneys pursuant to agreements entered into with any of them." *Id*. § 9.03(b). At the same time, the Trust Agreement limits the Owner Trustee's authority to act unilaterally. As relevant here, the Owner Trustee cannot "compromise any claim or lawsuit brought by or against the Trust" "unless it receives prior written approval from all the Owners for so long as any of the Notes are outstanding." *Id*. § 4.01(b).

### 2.    Indenture

To fund the acquisition of student loans, the Trusts issued Notes to Noteholders. The payment of principal and interest on the Notes is exclusively backed by the payments received on the student loans owned by the Trusts. This arrangement is governed by a contract between the Trusts and the Indenture Trustee called the Indenture. The Indenture does three things relevant here.

First, under a "Granting Clause," the Trusts pledge all of their right, title and interest in the "Collateral" to the Indenture Trustee for the benefit of the Noteholders. *See* Indenture, Granting Clause. The Collateral includes "the student loans held by the Trusts, the related agreements, funds and accounts, and all related present and future claims related thereto." *NCSLT Servicer Dispute*, 971 F.3d at 439. The Granting Clause further makes clear that this "Grant" is "made in trust to secure the payment of principal and/or interest on . . . the Notes" and that the Indenture Trustee "accepts the trusts under this Indenture" "on behalf of the [Noteholders]" so that "the interests of the [Noteholders] may be adequately and effectively protected." Indenture, Granting Clause. The Trusts' grant is "absolute." *Id*. § 3.07(f).

4

Second, the Indenture specifies how the Trusts' funds are held and distributed. In broad strokes, so long as the Trusts are not in default, money collected by the Trusts (such as payments collected from borrowers) is deposited into a "Collection Account." *Id.* § 8.01(b), (c). The Collection Account is "under the sole dominion and control of the Indenture Trustee for the benefit of the Noteholders." *Id.* § 8.02(c). On the designated distribution date, the Indenture Trustee distributes the funds available in the Collection Account according to a waterfall structure—first to pay the fees and expenses of the Trusts' trustees and service providers (some of which are subject to annual caps), and then to the Noteholders according to their class. *Id.* § 8.01(d). The Indenture does not permit distributions from the Collection Account outside of the waterfall structure. And there is no step in the waterfall that authorizes the Trusts to make distributions to themselves to pay costs and fines to settle an enforcement action.

Third, the Trusts promise to maintain the value and integrity of the Collateral. For instance, the Trusts pledge not to waive or surrender the terms of the Collateral, *id.* § 3.07(f), or permit any "encumbrance" to be created on or otherwise "burden" the money, rights or property that are "subject to the lien and security interest of the Indenture for the benefit of Noteholders," *id.* § 3.08(iii)(B); *id.*, App'x A (definition of "Indenture Trust Estate").

### 3.     *Administration Agreement*

The Trusts, Owner Trustee and Indenture Trustee also entered into an Administration Agreement, under which an "Administrator" agreed to perform the duties of the Trusts and the Owner Trustee under the Trust Related Agreements. Administration Agreement § 1(a)(i), (c)(i). The Administrator is an independent contractor; it has "no authority to act for or represent the [Trusts] or Owner Trustee" unless "expressly authorized." *Id.* § 5. With respect to non-ministerial matters, including the settlement of claims involving the Trusts, the Administrator "shall not take

any action unless" it has "received instructions from the Indenture Trustee, in accordance with the Indenture, from the Owner Trustee or Owners, in accordance with the Trust Agreement." *Id.* § 1(d)(i).

### B.  The Noteholders

The PIMCO-Managed Funds are Noteholders. They own Class A Notes with an original balance of approximately $212,227,000 issued by five of the Trusts.[6] Until the Indenture is discharged, the Noteholders have the priority economic interest in the Trusts. *See* Indenture, Granting Clause. The Noteholders are also express third-party beneficiaries of the Trust Agreement, Indenture, and Administration Agreement. Trust Agreement § 14.04; Indenture §§ 11.10, 11.18; Administration Agreement § 18. The Trusts, in contrast, hold "bare legal title" to the Collateral and "have no beneficial interest in the Student Loans" until the Indenture is discharged. *NCSLT Governance Dispute*, 251 A.3d at 154, 129.

## PROCEDURAL HISTORY

### A.  *CFPB I*

The Bureau filed this action in 2017 alleging that the Trusts violated federal consumer financial law in connection with the servicing of student loans held by the Trusts. *See* ECF 1. On the same day the Bureau filed the Complaint, the parties moved for approval of a proposed consent judgment. *See* ECF 3. Multiple stakeholders objected, including a group of Noteholders. *See* ECF 11. They argued, among other things, that the law firm signatory to the proposed consent decree was not authorized to bind the Trusts under the Trust Related Agreements. *See id.*, ECF 226. After

---

[6] The PIMCO-Managed Funds hold Notes in The National Collegiate Student Loan Trust 2005-2; The National Collegiate Student Loan Trust 2005-3; The National Collegiate Student Loan Trust 2006-1; The National Collegiate Student Loan Trust 2006-3; and The National Collegiate Student Loan Trust 2006-4.

approximately sixteen months of discovery and briefing, this Court agreed. The Court held that "the Owner Trustee is the entity through which the Trusts act and the only entity through which the Trusts may be bound to the [proposed consent judgment]." *See CFPB I*, 2020 WL 2915759, at *3. Because the Owner Trustee did not "execute[] or authorize[] the execution" of the proposed consent decree, the Court refused to approve it. *Id.* at *6.

Since that ruling, the Bureau filed an Amended Complaint against the Trusts; the Trusts filed and lost their appeal of an interlocutory order denying their motion to dismiss the Amended Complaint; and the Bureau and Trusts engaged in discovery and confidential settlement discussions. *See generally* ECF 362-457. The parties now present a second Proposed Consent Judgment for approval by the Court. *See* ECF 458-1. The Proposed Consent Judgment would:

- <u>Impose costs on the Trusts</u>. The Trusts must pay a $2,250,000 civil money penalty. ECF 458-1 ¶ 11. The Trusts are also enjoined from taking any action to collect debt from defaulted student loans specified on a "Master List" or reselling that debt. *Id.* ¶¶ 6–8. The value of the debt subject to this prohibition is unknown.

- <u>Restrict the Trusts' discretion in servicing the loans its holds</u>. The Trusts are prohibited from hiring a new special sub-servicer to service past due and defaulted loans, unless the agreement with the servicer includes certain compliance provisions. *Id.* ¶¶ 9–10.

- <u>Impose various administrative obligations</u>. For example, the Trusts must notify the Bureau of any development that affects its obligations under the Proposed Consent Judgment, *id.* ¶ 20; distribute the Proposed Consent Judgment to its trustees, the Administrator, and certain servicers and obtain acknowledgments of receipt, *id.* ¶¶ 28–30; respond within 14 days to "compliance monitoring" requests from the Bureau, *id.* ¶ 32; and obtain the written agreement of any transferee or assignee of the Trusts' "operations" to comply with the Proposed Consent Order, *id.* ¶ 36.

## B.    *CFPB II*

While this action was pending, the Bureau filed *CFPB II* against the Trusts and their primary servicer, Pennsylvania Higher Education Assistance Agency ("PHEAA") in the U.S. District Court for the Middle District of Pennsylvania. Like *CFPB I*, *CFPB II* is an enforcement action against the Trusts, but it alleges different violations of federal consumer financial law and names PHEAA as a defendant. On the same day that the Bureau commenced *CFPB II*, the parties moved the court to approve two consent judgments: one against the Trusts (*i.e.,* the *CFPB II* Consent Judgment) and one against PHEAA ("PHEAA Consent Judgment").

The *CFPB II* Consent Judgment has many of the same features as the Proposed Consent Judgment. For example, it:

- Imposes costs on the Trusts. The Trusts must pay a $400,000 civil money penalty. *CFPB II* Docket ECF 3-1 ¶ 44. Together with PHEAA, the Trusts also must reserve not less than $2.88M for consumer restitution. *Id.* ¶ 16. Finally, the Trusts agreed to share the costs of administering a redress plan for consumers. *Id.* ¶ 21(h).

- Restricts the Trusts' discretion in servicing the loans its holds. The Trusts are required to implement new, amended "Servicing Guidelines." *Id.* ¶¶ 7(b)–(c), 8, 10. The Trusts cannot make changes to amended Servicing Guidelines without obtaining the Bureau's non-objection. *Id.* ¶ 9.

- Imposes various administrative obligations. The Trusts agreed to notify the Bureau of any development that affects its obligations under the Proposed Consent Judgment, *id.* ¶ 54; distribute the Proposed Consent Judgment to its trustees, the Administrator, and certain servicers and obtain acknowledgments of receipt, *id.* ¶¶ 57–61; respond within 14 days to "compliance monitoring" requests from the Bureau, *id.* ¶ 68; and obtain the written agreement of any transferee or assignee of the Trusts' "operations" to comply with the Proposed Consent Order, *id.* ¶ 72. The Trusts also committed to administering a consumer redress plan that includes a retrospective, loan-level review as far back as January 1, 2015. *See id.* ¶¶ 17–43.

PIMCO, in its capacity as investment manager or advisor for the PIMCO-Managed Funds, moved to intervene and objected to the *CFPB II* Consent Judgment. The court granted PIMCO's motion to intervene, holding that PIMCO "ha[s] a sufficient interest in the outcome of this litigation, namely the proposed judgment," to support intervention as-of-right under Rule 24(a). *CFPB II* Docket ECF 46 at 14. The court then overruled PIMCO's objections and approved the *CFPB II* Consent Judgment. *See CFPB II*, 2024 WL 4367926, at *1 (M.D. Pa. Oct. 1, 2024).

PIMCO timely appealed the court's order denying its objection. *See* Appeal No. 24-3061 (3d Cir. Nov. 7, 2024). Soon after, PHEAA moved the district court, under Rule 62, to stay the monetary provisions of the PHEAA Consent Judgment pending the Appeal. The Trusts, in turn, requested a contemporaneous stay of the *CFPB II* Consent Judgment. *CFPB II* Docket ECFs 54, 57. The district court granted both motions. *Id.* ECF 60. In analyzing the "likelihood of success" factor under Rule 62(d), the court held:

> [T]here is a possibility that the appellant PIMCO will succeed on appeal. This case involves a complex set of issues, authorized a large monetary payment, and detailed an intricate compliance scheme. The Third Circuit may certainly disagree with this court in some way that will affect the judgment.

*Id.* at 7.

The Appeal is scheduled for mediation on March 20, 2025 with a Circuit Mediator. *See Consumer Financial Protection Bureau v. PHEAA et al.*, Case No. 24-3061, ECF 22-1. No briefing schedule is currently in place.

## ARGUMENT

### I.    The CFPB and Trusts seek approval of the Proposed Consent Judgment based on the same flawed arguments that PIMCO is challenging in the Appeal.

In broad strokes, the Trusts seek the Court's approval to bind themselves to a Proposed Consent Judgment that will be enforced under the continuing jurisdiction of this Court; to cease

collection activity for certain student loan debt; to pay a substantial civil money penalty; to limit their discretion in servicing their loan holdings; and to administer various reporting, compliance, and operational obligations. The Trusts' request is facially defective for at least two reasons.

1. <u>There is no evidence the Trusts are authorized to enter into the Proposed Consent Judgment</u>.

According to their filings, the Trusts agreed to the entry of the Proposed Consent Judgment directly through their outside counsel. *See* ECF 458 at 2 (signature block). But that cannot be. Under Delaware law, except as otherwise provided in the Trust Agreement, "the business and affairs of a statutory trust *shall be managed by or under the direction of its trustees*." *NCSLT Governance Dispute*, 251 A.3d at 170 (quoting Del. Code Ann. tit. 12 § 3806(a)) (emphasis added). Consistent with Delaware law, this Court has held that "the Owner Trustee is the entity through which the Trusts act and the only entity through which the Trusts may be bound to the [Proposed Consent Judgment]." *CFPB I*, 2020 WL 2915759, at *3, *5. Yet, there is no indication that the Owner Trustee is acting on behalf of the Trusts here. The Owner Trustee is not a party to this action. It did not move the Court to approve the Proposed Consent Judgment. And it has not provided this Court any assurance that it directed the Trusts to execute the Proposed Consent Judgment.

There is another problem. Even if the Owner Trustee properly authorized the Proposed Consent Judgment on behalf of the Trusts, its authority to do so is circumscribed by the Trust Related Agreements. *See, e.g.*, Trust Agreement § 8.01. One such limitation is found in Section 4.01(b) of the Trust Agreement, which prohibits the Owner Trustee from attempting to "compromise any claim or lawsuit brought by or against the Trust[s]" without first receiving

written approval from all of the Owners.[7] *Id.* § 4.01(b)(i); *see also CFPB I*, 2020 WL 2915759, at *3 ("Under the Trust Related Agreements, the Owners' consent is required to settle claims against the Trusts[.]"). Yet, the Trusts also have made no showing that the Owner Trustee obtained the Owners' written approval to enter into the Proposed Consent Judgment.

    2.   <u>The Proposed Consent Judgment violates Noteholders' contractual rights</u>.

      Even if the Trusts were authorized to enter into the Proposed Consent Judgment, the Court should decline to approve it because the Proposed Consent Judgment impairs the contractual rights of the PIMCO-Managed Funds as Noteholders. In doing so, the Proposed Consent Judgment runs afoul of cardinal principles governing the use of court-approved settlements. *See Texas v. New Mexico*, 602 U.S. 943, 961–92 (2024) (rejecting proposed consent judgment because it disposed of the federal government's claims without its consent); *Local No. 93 v. City of Cleveland*, 478 U.S. 501, 529 (1986) ("Of course, parties who choose to resolve litigation through settlement may not dispose of the claims of a third party, and *a fortiori* may not impose duties or obligations on a third party, without that party's agreement."); *see also U.S. v. City of Hialeah*, 140 F.3d 968, 975 (11th Cir. 1998) ("[T]he objection of a party whose rights or claims would be adversely affected does bar a proposed consent decree.").

      As noted above, the Trust Related Agreements narrowly circumscribe the Trusts' purpose and activities. *See* Trust Agreement § 2.03(a); Indenture § 3.23(a). These limitations are a critical feature of the securitization transaction. At the most basic level, the Trusts are "special purpose vehicles designed to separate the Student Loans from the balance sheets of the financial institutions

---

[7] There is an exception for "lawsuits initiated in the ordinary course of business by the Trust[s] or [their]agents or nominees for collection on the Student Loans," *id.* § 4.01(b)(i), but that exception is plainly inapplicable here.

that first extended credit to the borrowers." *NCSLT Governance Dispute*, 251 A.3d at 128. That separation, in turn, ensures that "the ultimate investor (the Noteholder) is exposed only to the risk that the underlying borrower (the student) cannot repay." *Id.* at 141.

But the Proposed Consent Judgment changes that. For example, the Proposed Consent Judgment imposes costs on the Trusts in the form of civil penalties and by enjoining the collection of an unspecified amount of student loan debt. *See* ECF 458-1 ¶¶ 7, 8, 11, 20–36. But the Trusts have already granted *all* "right, title and interest" in their assets to the Indenture Trustee, as trustee for the benefit of the Noteholders. Indenture, Granting Clause; *see also id.* § 4.02. As a result, the Trusts are not authorized to "sell, transfer, exchange or otherwise dispose of" their "properties or assets," except as permitted by the Trust Related Agreements. *Id.* § 3.08(i).

The costs imposed on the Trusts under the Proposed Consent Judgment are not contemplated under the Trust Related Agreements. Indeed, it is entirely unclear how the Trusts propose to pay them at all. They are certainly not authorized, let alone prioritized, under the payment distributions negotiated in the Indenture's "waterfall" provision. *Id.* §§ 8.01–02. And to the extent the Trusts intend to pay these costs outside of the Indenture's waterfall structure, the Trusts would violate the Indenture and repurpose assets that have been pledged to Noteholders.

The Proposed Consent Judgment further imposes, without Noteholder consent, significant non-monetary obligations on the Trusts that are not contemplated or permitted by the Trust Related Agreements. For instance, the Proposed Consent Judgment limits the Trusts' freedom to contract with servicers, *see* ECF 458-1 ¶¶ 9–10, and to sell or assign its assets, *see id.* ¶ 36. It also requires the Trusts to submit to the continuing jurisdiction of this Court and exposes the Trusts to claims of contempt and additional payments and interest in the event that they breach their obligations under the Proposed Consent Judgment. *See id.* ¶¶ 17–19, 38.

These obligations extend far beyond the limited activities authorized by the Trust Related Agreements. *See* Trust Agreement § 2.03 (delineating the "only" activities the Trusts may engage in); Indenture § 3.12 (prohibiting Trusts from engaging "in any business other than" what is expressly authorized). In some cases, they are expressly prohibited by the Indenture. *See* Indenture § 3.15 (prohibiting the Trusts from paying money outside the waterfall); *id* § 3.20(d) (requiring Trusts to "diligently enforce[]" all terms of the loans and to "defend[], enforce[], preserve[], and protect[] the rights of privileges" of the Trusts in the loans). But New York law (which governs the Indenture) protects the bargained-for expectations of Noteholders like the PIMCO-Managed Funds. *See Spinelli v. Nat'l Football League*, 903 F.3d 185, 205 (2d Cir. 2018) (holding that defendants deprived plaintiffs of the "fruits of their [] agreements" because these agreements "if not expressly, at least implicitly prohibit [defendants] from [performing] in a way that benefits [defendants], but yields little to no value for [p]laintiffs"); *Random Ventures, Inc. v. Advanced Armament Corp., LLC*, No. 12 CIV. 6792 (KBF), 2014 WL 113745, at *38 (S.D.N.Y. Jan. 13, 2014) (strictly construing contract's termination rights to ensure parties received "benefit of their bargain"). By imposing these obligations on the Trusts, the Proposed Consent Judgment subverts their limited role and requires them to act outside of—and contrary to—their contractual obligations.

3.  The Proposed Consent Judgment mirrors the structural flaws of the *CFPB II* Consent Judgment.

The *CFPB II* Consent Judgment was similarly defective, and PIMCO objected to it on the same grounds discussed above. *See CFPB II* Docket ECF 33 (PIMCO's Objection to *CFPB II* Consent Order). Nevertheless, the court approved the *CFPB II* Consent Judgment over PIMCO's objection. *See CFPB II*, 2024 WL 4367926, at *1 (M.D. Pa. Oct. 1, 2024). The court concluded that, while the Owner Trustee is the only entity that may authorize the Trusts to settle non-

ministerial claims, the Owner Trustee may also delegate that authority under the Administration Agreement, which allows either the Indenture Trustee or the Owner Trustee to direct the Administrator to enter into settlements on behalf of the Trusts. *CFPB II*, 2024 WL 4367926, at *9.

The court also rejected PIMCO's argument that the *CFPB II* Consent Judgment impairs the rights of non-party Noteholders by imposing obligations not contemplated or permitted under the Trust Related Agreements. *Id.* at *10-11. With respect to costs, the court adopted the Trusts' view that the redress and fines imposed by the *CFPB II* Consent Judgment could be paid as an "Administrator" or "Servicer" expense under the Indenture's waterfall provision, *see* Indenture § 8.01(d), which would take priority over distributions to the Noteholders. *Id.* at *13. With respect to the non-monetary obligations, the court held that all the obligations of the Proposed Consent Judgment are "connected to servicing the student loans, which is expressly contemplated by the trust Agreement and the Indenture." *Id.*

The district court's decision has multiple flaws. For one, the court rejected PIMCO's claim that the Owner Trustee cannot delegate more power than it has under the Trust Agreement, which requires the prior written consent of all Owners before the Owner Trustee may compromise a non-ministerial claim. *Id.* at *9. The court also relied on out-of-context dicta from the Delaware Chancery Court instead of performing its own contractual analysis of the Trust Related Agreements' "unclear" provisions regarding the settlement of non-ministerial claims. *Id.* at *8–9. And the court failed to conduct any contractual analysis of the Indenture's waterfall provisions, holding instead that the Trusts and the Bureau had sufficiently "explained why the monetary requirements of the proposed judgment would be considered Administrator or Servicer expenses under the payment priority provisions." *Id.* at *13.

There is more. The court also failed to apply the Supreme Court's recent ruling in *Texas v. New Mexico*, in which the Court expanded on "the rules that apply when parties wish to settle via consent decree over the objection of a nonconsenting intervenor." 602 U.S. at 953. In *Texas*, the Supreme Court rejected a proposed consent judgment between the states to the Rio Grande Compact because it disposed of the federal government's claims that New Mexican groundwater pumping was violating the Compact without the federal government's consent. *Id.* at 1765. The Court noted that the proposed consent judgment "would have the effect of cutting [the United States] off from a remedy to which it alleges it is entitled." *Id.* at 1770. Significantly, it did not matter that the federal government's position "may not ultimately prevail at trial." *Id.* The states could not enter into the proposed consent judgment "without the actual consent of the Government when the Government ***seeks an item of relief to which evidence adduced at trial may show that it is entitled***." *Id.* (internal quotations omitted) (emphasis added). That is not the standard the *CFPB II* court applied in disposing of PIMCO's objections. The court also permitted one round of briefing and no discovery, despite PIMCO's express request to develop the record. *See CFPB II* Docket ECF 41 at 11–13.

Notwithstanding the district court's errors in *CFPB II*, PIMCO acknowledges that the objections it raised in *CFPB II* mirror its objections in this case. As a result, the doctrine of collateral estoppel likely would compel this Court to deny PIMCO's Objection to the Proposed Consent Judgment. *See Burlington N. R. Co. v. Hyundai Merchant Marine Co., Ltd.*, 63 F.3d 1227, 1231-32 (3d Cir. 1995) (listing elements). At the same time, the identity of parties and issues in *CFPB I* and *CFPB II* means that the resolution of the Appeal will directly inform the permissibility of the Proposed Consent Judgment currently before this Court. PIMCO therefore does not seek a

ruling on its Objection at this time. PIMCO instead requests that the Court stay this action pending resolution of the Appeal. All factors for a stay are satisfied, as discussed below.

## II.    The Court should stay this action during the pendency of the Appeal.

"A court has discretionary authority to grant a motion to stay." *Duncan v. XTO Energy*, Inc., No. CV 22-0091-GBW, 2022 WL 4289779, at *1 (D. Del. Sept. 16, 2022). In determining whether a stay is warranted pending an outcome in another action, courts weigh three factors, derived from the Supreme Court's decision in *Landis v. North American Company*, 299 U.S. 248, 254-55 (1936): (1) "whether a stay will simplify the issues for trial"; (2) "whether discovery is complete and a trial date has been set"; and (3) "whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party." *UCB, Inc. v. Hetero USA Inc.*, 277 F. Supp. 3d 687, 690 (D. Del. 2017) (citing *Landis*, 299 U.S. at 254-55). Here, all three factors favor weigh in favor of a stay.

The first *Landis* factor considers whether a stay will simplify the issues before the Court. It undoubtedly would. As noted above, the Proposed Consent Judgment and the *CFPB II* Consent Judgment contain the same structural flaws—namely, they were not properly authorized under the Trust Related Agreements, and they violate Noteholders' contractual rights under the Trust Related Agreements.

Both issues are at the heart of the Appeal. If the Appeal is successful—and PIMCO believes it will be—the permissibility of the Proposed Consent Judgment will be completely upended. *See UCB*, 277 F. Supp. 3d at 690 (stay appropriate where appellate court was reviewing the validity of a patent, thereby potentially affecting the scope of the claims in a parallel district court action); *Messina v. Hackett*, No. CV 05-344-JJF, 2005 WL 8177590, at *2 (D. Del. Oct. 25, 2005) (granting a stay where outcome of proceedings ongoing in separate forum could "dispose of the [present]

litigation"); *Franklin v. Navient Corp.*, No. 17-1640-RGA (D. Del. Nov. 13, 2017), ECF 64 (Apr. 10, 2020 Memorandum Order), at 2 (staying proceedings while Supreme Court decided legality of an issue that "may have an impact on future rulings in this case").

Conversely, if the Third Circuit affirms the entry of the *CFPB II* Consent Judgment, these issues will be settled law. Moreover, the Appeal may clarify the proper standard to be applied when assessing a non-party's objection to a proposed consent judgment. *See Texas*, 144 S. Ct. at 177. Staying this action until the Appeal is resolved would therefore simplify the issues raised by the Proposed Consent Judgment. *See, e.g.*, *Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*, No. CV 15-1168-LPS, 2021 WL 616992, at *2 (D. Del. Feb. 17, 2021) ("The simplification factor includes the reality that judicial economy favors avoiding the complexity and expenditure of resources that would result from this case proceeding simultaneously in both a trial court and [appellate court].").

The second *Landis* factor considers whether discovery is complete and a trial date has been set. *See UCB*, 277 F. Supp. 3d at (citing *Landis*, 299 U.S. at 254-55). To the extent this factor is applicable, it favors a stay. No trial date has been set and, if an objection to the Proposed Consent Judgment is not sustained, one never will be. A stay pending the Appeal will therefore not delay any impending trial or other deadlines in this matter. *See Enhanced Sec. Rsch., LLC v. Cisco Sys., Inc.*, No. C.A.09-571-JJF, 2010 WL 2573925, at *3 (D. Del. June 25, 2010) (holding that this factor favored a stay "where no trial date ha[d] been set, and discovery [was] not yet complete"). Likewise, if an objection to the Proposed Consent Judgment is sustained—or if the Appeal is successful—additional discovery will be required, irrespective of whether a temporary stay is issued now. Accordingly, this factor favors a stay. *See, e.g.*, *Bone v. XTO Energy, Inc.*, No. CV 21-1460-GBW, 2022 WL 4355258, at *2 (D. Del. Sept. 20, 2022) (granting a stay where limited

fact discovery had been conducted and no trial date was set); *Neapco Holdings*, 2021 WL 616992, at *2 (granting a stay, despite the completion of discovery, where no trial date had been set and the potential for further appellate review rendered setting a trial date "imprudent").

Finally, the third *Landis* factor considers whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party. *See UCB*, 277 F. Supp. 3d at 690. It would not. Indeed, the absence of a stay would be far more prejudicial, particularly if the *CFPB II* Consent Judgment is invalidated on appeal. Were that to happen without a stay in this action, PIMCO would have to expend additional time and resources seeking to re-open this action and modify or terminate the Proposed Consent Judgment to comport with binding Third Circuit precedent. The Bureau would also be forced to claw back consumer redress. That would be inefficient, a waste of judicial resources, and unfair to the non-parties impacted by the Proposed Consent Judgment. *See Duncan*, 2022 WL 4289779, at *2 (no undue prejudice where "both parties would benefit from a stay of the present matter in order to gain pertinent insight that the Supreme Court could offer" on one of the key issues in the case).

In any case, the proposed stay would be of limited duration, lasting only while the Appeal is pending. And while a stay would temporarily delay adjudication of the Proposed Consent Judgment, delay "alone does not warrant a finding that plaintiffs will be unduly prejudiced." *See In re Twitter, Inc. S'holder Derivative Litig.*, No. CV 18-62-VAC-MPT, 2018 WL 3536085, at *3 (D. Del. July 23, 2018), *report and recommendation adopted*, No. CV 18-062 (MN), 2018 WL 4326986 (D. Del. Sept. 10, 2018) (cleaned up); *accord Bone*, 2022 WL 4355258, at *2 (no prejudice to non-moving party where "insight [from parallel litigation] may narrow the issues presented and streamline discovery"). A stay here also aligns with the court's decision in *CFPB II*

18

to stay the monetary aspects of the *CFPB II* Consent Judgment pending resolution of the Appeal. *See CFPB II* Docket ECF 60.

In sum, all three *Landis* factors are easily satisfied under these circumstances. Accordingly, the Court should stay this action pending resolution of the Appeal by the Third Circuit.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should stay this action until at least 30 days following the adjudication and resolution of PIMCO's Appeal of the *CFPB II* Consent Judgment, which is currently pending before the United States Court of Appeals for the Third Circuit.

Dated: February 18, 2025

Respectfully Submitted,

*/s/      Mark W. Eckard*
Mark W. Eckard (No.  4542)
**RAINES FELDMAN LITTRELL LLP**
824 North Market Street, Suite 805
Wilmington, DE 19801
(302) 647-1018
meckard@raineslaw.com

and

Rachel Rodman (*pro hac vice* pending)
**WHITE & CASE LLP**
701 Thirteenth Street, NW
Washington, DC 20005
(202) 637-6281
rachel.rodman@whitecase.com

*Counsel for Pacific Investment Management Company LLC*

19